UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ :
                                  :
U.S. SECURITIES AND EXCHANGE      :
COMMISSION,                       :
                                  :
                   *Plaintiff*,   :
                                  :   No. 11 Civ. 9645 (RJS)
       -v-                        :
                                  :
ELEK STRAUB,                      :   **ORAL ARGUMENT:**
ANDRAS BALOGH, and                :   **January 17, 2013**
TAMÁS MORVAI,                     :
                                  :   ECF Case
                   *Defendants*.  :   Electronically Filed
_____ :


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' JOINT MOTION TO DISMISS THE COMPLAINT**


SKADDEN, ARPS, SLATE,                    PILLSBURY WINTHROP SHAW
MEAGHER & FLOM LLP                       PITTMAN LLP

Saul M. Pilchen                          William M. Sullivan Jr.
Amanda R. Grier                          2300 N Street, NW
1440 New York, Ave., NW                  Washington, DC 20037-1122
Washington, D.C. 20005                   (202) 663-8027
(202) 371-7000                           william.sullivan@pillsburylaw.com

                                         *Counsel for Andras Balogh*
HOGAN LOVELLS US LLP

Carl S. Rauh                             HINCKLEY, ALLEN & SNYDER LLP
Columbia Square
555 Thirteenth Street, NW                Michael L. Koenig
Washington, DC 20004                     Victoria P. Lane
(202) 637-5600                           30 South Pearl Street, Suite 901
                                         Albany, NY  12207
*Counsel for Elek Straub*                (518) 396-3100
                                         mkoenig@haslaw.com
                                         vlane@haslaw.com

                                         *Counsel for Tamás Morvai*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 2

FACTS AND CONCLUSIONS ALLEGED IN THE COMPLAINT ............................ 4

ARGUMENT ................................................................................................... 6

I.  THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE DEFENDANTS ...................... 6

    A.  The Defendants Lack Minimum Contacts With This Forum. ................. 6

    B.  The SEC's Theory Of Personal Jurisdiction. ........................................ 8

    C.  Potential Foreseeable Adverse Impact On Investors Is Insufficient To Demonstrate Personal Jurisdiction, And Is Not Alleged In The Complaint ......... 10

II.  THE SEC'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ........... 17

    A.  The SEC's Claims Are Subject To A Five-Year Statute Of Limitations. ............. 17

    B.  The Five Year Statute Of Limitations Applies To All Of The SEC's Claims. ................................................................................................ 18

    C.  The Defendants' Foreign-National Status Does Not Eliminate the Statute of Limitations. ........................................................................... 18

III.  THE COMPLAINT FAILS TO ADEQUATELY ALLEGE BRIBERY AND THE RELATED CLAIMS. ...................................................................................... 20

    A.  The Applicable Legal Standard. ......................................................... 21

    B.  The Complaint Fails To Allege Facts Supporting The Legal Element That The Defendants Corruptly Made Use of United States Interstate Commerce To Further The Alleged Bribe Payment. ............................................. 22

        1.  Email Traffic Sent To And From Foreign Countries, Which Allegedly Passed For Technological Reasons Through The United States Unbeknownst To The Defendants, Is Insufficient To Support The Legal Element Of "Corrupt Use" Under The FCPA. ............. 23

i

2.      Email Traffic Allegedly In Furtherance Of A Broad Bribe "Scheme," As Opposed To The Particular Bribe "Payment," Is Insufficient To Support The Legal Element Of "In Furtherance" Under The FCPA. ...................................................................24

C.      The Complaint Fails To Allege Facts Supporting The Legal Element That The Intended Bribe Recipients Were "Foreign Officials" Under The FCPA. ...................................................................................................26

1.      Who Is A "Foreign Official" For FCPA Purposes Is A Fact-Intensive Inquiry. .............................................................26

2.      The Basic Facts Regarding The Intended Recipient(s) Of A Bribe In Macedonia Are Not Alleged. ....................................27

D.      The Complaint Fails To Adequately Allege False Statements To Auditors. .........28

1.      The Heightened Pleading Standard For Fraud Applies. ...........................29

2.      The Complaint Fails To Individualize The Necessary Factual Allegations. ...............................................................29

3.      The Complaint Fails To Plead Facts Supporting The Legal Element Of Materiality. ..........................................................30

CONCLUSION ............................................................................................................32

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*3M Co. v. Browner*,
   17 F.3d 1453 (D.C. Cir. 1994) ........................................................................19

*Adams v. Woods*,
   6 U.S. 336 (1805) ...........................................................................................20

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) .............................................................................28

*Asahi Metal Industry Co. v. Superior Court of California*,
   480 U.S. 102 (1987) ........................................................................................15

*Ashcroft v. Iqbal*,
   555 U.S. 662 (2009) ........................................................................................21

*In re Baan Co. Securities Litigation*,
   No. 98-2465, 2002 WL 1284295 (D.D.C. June 10, 2002) ...............................13

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ........................................................................................30

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................21

*In re Boston Technology, Inc. Securities Litigation*,
   8 F. Supp. 2d 43 (D.Mass. 1998) ...................................................................30

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ..................................................................................6, 7, 15

*Burnett v. New York Central Railroad*,
   380 U.S. 424 (1965) ........................................................................................20

*Calder v. Jones*,
   465 U.S. 783 (1984) ....................................................................................6, 15

*Cedeno v. Castillo*,
   457 F. App'x 35 (2d Cir. 2012) .......................................................................15

*Chang v. Virgin Mobile USA, LLC,*
 No. 3:07-CV-1767, 2009 WL 111570 (N.D. Tex. Jan. 16, 2009) ..................................... 9

*Chase Securities Corp. v. Donaldson,*
 325 U.S. 304 (1945) ................................................................................................... 20

*Commercial Property Investments Inc. v. Quality Inns International, Inc.,*
 61 F.3d 639 (8th Cir. 1995) ........................................................................................ 29

*Consolidated Gold Fields, PLC v. Anglo American Corp. of South Africa Ltd.,*
 698 F. Supp. 487 (S.D.N.Y. 1988) .............................................................................. 14

*Copeland v. Fortis,*
 685 F. Supp. 2d 498 (S.D.N.Y. 2010) .......................................................................... 13

*FCStone LLC v. Buckley,*
 No. 4:11-cv-00551, 2012 WL 1889727 (S.D. Iowa May 24, 2012) ................................. 9

*Figueroa v. Ponce De Leon Federal Bank,*
 No. 11 Civ. 7633, 2012 WL 3262784 (S.D.N.Y. July 2, 2012) ..................................... 17

*Guaranty Trust Co. v. United States,*
 304 U.S. 126 (1938) ................................................................................................... 20

*IMO Industries, Inc. v. Kiekert AG,*
 155 F.3d 254 (3d Cir. 1998) .......................................................................................... 9

*International Shoe Co. v. State of Washington, Office of Unemployment Compensation & Placement,*
 326 U.S. 310 (1945) ..................................................................................................... 7

*Johnson v. SEC,*
 87 F.3d 484 (D.C. Cir. 1996) ...................................................................................... 20

*Jones v. Bock,*
 549 U.S. 199 (2007) ................................................................................................... 17

*Kaufman v. HSBC USA, Inc.,*
 No. 4:09-CV-318, 2010 WL 1410997 (N.D. Okla. Mar. 31, 2010) .................................. 9

*Keeton v. Hustler Magazine, Inc.,*
 465 U.S. 770 (1984) ......................................................................................... 6, 7, 10, 11

*Kramer v. Time Warner Inc.,*
 937 F.2d 767 (2d Cir. 1991) ........................................................................................ 12

iv

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
    26 F. Supp. 2d 593 (S.D.N.Y. 1998)..............................................................6, 7, 14

*In re Magnetic Audiotape Antitrust Litigation*,
    171 F. Supp. 2d 179(S.D.N.Y. 2001)........................................................................13

*Mainstream Media, EC v. Riven*,
    No. C 08-3623, 2009 WL 2157641 (N.D. Cal. July 17, 2009)........................................9

*Manchester Manufacturing Acquisitions, Inc. v. Sears, Roebuck & Co.*,
    802 F. Supp. 595 (D.N.H. 1992)............................................................................30

*McGee v. International Life Insurance Co.*,
    355 U.S. 220 (1957)..............................................................................................6

*Morrison v. National Australia Bank Ltd.*,
    130 S. Ct. 2869 (2010)...............................................................................*passim*

*Norex Petroleum Ltd. v. Access Industrial, Inc.*,
    631 F.3d 29 (2d Cir. 2010)......................................................................................15

*In re NYSE Specialists Sec. Litigation*,
    503 F.3d 89 (2d Cir. 2007).................................................................................13, 21

*Parnes v. Gateway 2000*,
    122 F.3d 539 (8th Cir. 1997) ...............................................................................29

*Pieczenik v. Cambridge Antibody Technology Group*,
    No. 03 Civ. 6336, 2004 WL 527045 (S.D.N.Y. Mar. 16, 2004) .....................................14

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
    507 F.3d 117 (2d Cir. 2007)...................................................................................21

*Ray v. Experian*,
    No. 3:07-CV-1114, 2007 WL 4245459 (N.D. Tex. Nov. 30, 2007)...................................9

*Reynolds Corp. v. National Operator Services, Inc.*,
    73 F. Supp. 2d 299 (W.D.N.Y. 1999).......................................................................6

*Robinson v. Overseas Military Sales Corp.*,
    21 F.3d 502 (2d Cir. 1994).....................................................................................6

*In re SCOR Holding (Switzerland) AG Litigation.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008).....................................................................13

*SEC v. Alexander*,
    160 F. Supp. 2d 642 (S.D.N.Y. 2001)..................................................................16

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012)...........................................................................24

*SEC v. Bartek*,
    No. 11-10594, 2012 WL 3205446 (5th Cir. Aug. 7, 2012) ..............................19

*SEC v. Brown*,
    740 F. Supp. 2d 148 (D.D.C. 2010) .................................................................18

*SEC v. Carrillo*,
    115 F.3d 1540 (11th Cir. 1997) ......................................................................11

*SEC v. Euro Security Fund, Coim SA*,
    No. 98 CIV. 7347, 1999 WL 76801 (S.D.N.Y. Feb. 17, 1999).........................16

*SEC v. Jones*,
    476 F. Supp. 2d 374 (S.D.N.Y. 2007)...........................................................17, 18

*SEC v. Nacchio*,
    438 F. Supp. 2d 1266 (D. Colo. 2006).....................................................29, 30, 31

*SEC v. Patel*,
    No. 07-cv-39, 2008 WL 781914 (D.N.H. 2008)................................................29

*SEC v. Unifund SAL*,
    910 F.2d 1028 (2d Cir. 1990).......................................................................11, 16

*SEC v. Wyly*,
    788 F. Supp. 2d 92 (S.D.N.Y. 2011).............................................................17, 18

*Shaffer v. Heitner*,
    433 U.S. 186 (1977).................................................................................7, 10, 13

*Shields v. Amoskeag Bank Shares, Inc.*,
    766 F. Supp. 32 (D.N.H. 1991)........................................................................30

*In re Societe Generale Securities Litigation*,
    No. 08 Civ. 2495, 2010 WL 3910286 (S.D.N.Y Sept. 29, 2010) .....................13

*Stichting ter Behartiging van de Belangen van Oudaandeelhouders in het Kapitaal van Saybolt International B.V. v. Schreiber*,
    327 F.3d 173 (2d Cir. 2003)............................................................................25

*Stimpson v. Pond*,
    23 F. Cas. 101 (C.C.D. Mass. 1855) (No. 13,455) ........................................................19

*In re StockerYale SEC Litigation*,
    453 F. Supp. 2d 345 (D.N.H. 2006).............................................................................30

*TSC Industrial, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)......................................................................................................31

*United States v. Aguilar*,
    783 F. Supp. 2d 1108 (C.D. Cal. 2011) .......................................................................27

*United States v. Bullock*,
    243 F. App'x 107 (6th Cir. 2007).................................................................................24

*United States v. Carson*,
    No. SACR 09–00077, 2011 WL 5101701 (C.D. Cal. May 18, 2011))...........................27

*United States v. Kay*,
    513 F.3d 432 (5th Cir. 2007) ..........................................................................8, 25, 26

*United States v. Kozeny*,
    582 F. Supp. 2d 535 (S.D.N.Y. 2008)..........................................................................23

*United States v. Kubrick*,
    444 U.S. 111 (1979)................................................................................................19, 20

*United States v. Maillard*,
    26 F. Cas. 1140 (S.D.N.Y. 1871) (No. 15,709) ...........................................................19

*United States v. Marion*,
    404 U.S. 307 (1971).......................................................................................................20

*United States v. Montreal Trust Co.*,
    358 F.2d 239 (2d Cir. 1966)............................................................................................6

*United States v. O'Shea*,
    No. 09-CR-629 (S.D. Tex. Jan. 16, 2012) .......................................................................9

*Whitaker v. Fresno Telsat, Inc.*,
    87 F. Supp. 2d 227 (S.D.N.Y. 1999)................................................................................6

*Whiteman v. Federal Republic of Austria*,
    No. 00 Civ. 8006, 2002 WL 31368236 (S.D.N.Y. Oct. 21, 2002) ..................................13

*Wiwa v. Royal Dutch Petroleum Co.*,

226 F.3d 88 (2d Cir. 2000)................................................................................13

*World-Wide Volkswagen Corp. v. Woodson,*
444 U.S. 286 (1980)..................................................................................7, 11, 15

**Statutes and Rules**

15 U.S.C. § 78dd-1 ........................................................................... *passim*

18 U.S.C. § 1341 .........................................................................................24

18 U.S.C. § 1343 .........................................................................................24

28 U.S.C. § 2462 .............................................................................. *passim*

Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1 ...........................................8

Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2 ......................... *passim*

Fed. R. Civ. P. 9(b) .....................................................................................29

Fed. R. Civ. P. 12 .............................................................................. *passim*

N.Y.C.P.L.R. §§ 301, 302 .............................................................................6

**Legislative History**

H.R. Rep. No. 95-831(1977)........................................................................ 25

S. Rep. No. 95-114 (1977)............................................................................24

**Other Authorities**

Appellate Brief of The United States, *United States v. Kay*, 513 F.3d 432 (5th Cir. 2007)..........25

*Magyar Telekom and Deutsche Telekom Resolve Foreign Corrupt Practices Act Investigation and Agree to Pay Nearly $64 Million in Combined Criminal Penalties*, DoJ Press Release, Dec. 29, 2011, http://www.justice.gov/opa/pr/2011/December/11-crm-1714.html .......................................................................................................4

Magyar Telekom Co., Report of Foreign Private Issuer (Form 6-K) (Feb. 13, 2006) .................31

Magyar Telekom Co., Report of Foreign Private Issuer (Form 6-K) (Apr. 13, 2006) ...................3

Magyar Telekom Co., Report of Foreign Private Issuer (Form 6-K) (Nov. 4, 2010)....................3

Magyar Telekom Co., Annual Report of Foreign Private Issuer (Form 20-F) (Feb. 22, 2007) ................................................................................................................21, 31

Max Stendahl, *DOJ Flip-Flop on "Foreign Official" Baffles FCPA Attorneys*, Law 360, (Oct. 4, 2012), http://www.law360.com/articles/384323/doj-flip-flop-on-foreign-official-baffles-fcpa-attys....................................................................................................26

*SEC Charges Magyar Telekom and Former Executives with Bribing Officials in Macedonian and Montenegro: Firm and Its Parent Agree to Pay $95 Million to Settle Civil and Criminal Charges*, SEC Litigation Release No. 22213, Dec. 29, 2011, http://sec.gov/litigation/litreleases/2011/lr22213.htm. ...................................................4

Trial Transcript, *United States v. O'Shea*, No. 09-CR-629 (S.D. Tex. Jan. 16, 2012) ...................9

## INTRODUCTION

Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), defendants Elek Straub, Andras Balogh, and Tamás Morvai respectfully submit this memorandum in support of their joint motion to dismiss the complaint filed by the plaintiff United States Securities and Exchange Commission ("the plaintiff" or "the SEC"), alleging violations of the Foreign Corrupt Practices Act ("FCPA") and related offenses.

The defendants are Hungarian nationals who have resided and worked outside the United States during the entire time period alleged in the complaint, 2005-2006, and continue to do so. During the complaint's period, the defendants served as senior executives of Magyar Telekom Nyrt. ("Magyar Telekom" or "the Company"), the leading telecommunications company in Hungary, but each left the Company by early December  2006.   The SEC filed the complaint on December 29, 2011, more than five years later.

There are several bases for dismissing the complaint.  First, this Court lacks personal jurisdiction over the defendants.  The complaint alleges conduct by foreign national defendants that occurred wholly outside, and with no nexus to, the United States.  Nowhere does the complaint allege that defendants purposefully directed their conduct at the United States. Following constitutional due process principles, the defendants lack the requisite minimum contacts with the forum, and it would be inconsistent with traditional notions of fair play and substantial justice to require them to defend this action in the United States.  Indeed, the SEC has acknowledged that its jurisdictional position lacks precedent "on all fours factually" and "may be breaking new ground[.]"[1]

---

[1]   Oct. 12, 2012 Tr. at 8-10 (court conference).

Second, the SEC's claims are time-barred by 28 U.S.C § 2462. This provision asserts that an action or suit by the government seeking enforcement of civil fines, penalties or forfeiture shall not be maintained unless the action is "commenced within five years" provided "proper service may be made" upon the defendant. 28 U.S.C. § 2462. There is no doubt that the complaint was filed outside the five-year period. Specifically, the complaint was filed on December 29, 2011, more than five years after all three defendants had left Magyar Telekom, and more than five years after the alleged conduct occurred. Consequently, the five-year period has expired.

Third, with regard to the remaining claims, the complaint fails to adequately state the claims alleged. More specifically, the complaint: (i) fails to adequately plead that the defendants corruptly made use of interstate commerce, as is required to state a claim for bribery and the claims stemming from the alleged bribery under the FCPA (books and records and internal controls violations, falsifying books and records, and lying to auditors); (ii) fails to adequately plead that the intended payment recipients were "foreign official[s]" under the FCPA; (iii) fails to allege sufficient facts supporting the aiding and abetting claims; and (iv) fails to meet the heightened pleading requirements under Rule 9, including allegations of individualized culpable conduct by each defendant. The complaint also merely parrots the statutory language and fails to allege that the defendants profited personally from any of the alleged conduct. For all these reasons, the complaint should be dismissed with prejudice.

## BACKGROUND

The defendants are Hungarian citizens residing outside the United States. (Compl. ¶ 11-13). Mr. Straub served as the CEO and Chairman of the Board of Directors of Magyar Telekom for approximately ten years until he retired in early December 2006. (*Id.* ¶ 11). Mr. Balogh served as the Company's Director of Strategic Organization between April 2002 and August

2006, when he left the Company.  (*Id.* ¶ 12).  Mr. Morvai was the Director of Business Development and Acquisitions within the Company's Strategy Group between July 2004 and July 2006, when he left the Company.  (*Id.* ¶ 13).

In early 2006, in connection with review of the Company's 2005 financials, Magyar Telekom's external auditor identified contracts, "the nature and business purposes of which were not readily apparent to them."  *See* Magyar Telekom Co., Report of Foreign Private Issuer (Form 6-K) (Nov. 4, 2010), at 39.  In response, the auditor withheld its approval, the Company's yearly filing was not made, and the Company's audit committee retained a United States international law firm to conduct an internal investigation.  Magyar Telekom Co., Report of Foreign Private Issuer (Form 6-K) (Feb. 13, 2006).  Not long after the investigation began, Magyar Telekom disclosed the inquiry to the United States Department of Justice ("DoJ") and SEC.  Magyar Telekom Co., Report of Foreign Private Issuer (Form 6-K) (Apr. 26, 2006).  Magyar Telekom also subsequently submitted regular reports on the status of the investigation both to the DoJ and SEC, and in its public filings.  In December 2009, a final report of the investigation was submitted by the audit committee's outside counsel.  Magyar Telekom Co., Report of Foreign Private Issuer (Form 6-K) (Nov. 4, 2010), at 39.[2]

On December 29, 2011, over a year after the internal investigation was completed, Magyar Telekom and its parent company, Deutsche Telekom AG, executed settlement

---

[2]   The outside law firm claimed it could not verify the legitimacy of the contracts under review, but no evidence of bribery was identified.  *See, e.g.,* Magyar Telekom Co., Report of Foreign Private Issuer (Form 6-K) (Nov. 4, 2010), at 39-42 ("the Investigation did not uncover evidence showing receipt of payments by any Macedonian government officials or political party officials").

agreements with the DoJ and SEC.[3]   On the same day, over five years after the defendants had

left the Company, the SEC filed the complaint.

**FACTS AND CONCLUSIONS ALLEGED IN THE COMPLAINT**

The complaint alleges that the defendants engaged in two separate schemes, one each in

Macedonia and Montenegro, to: (i) bribe foreign government officials (Compl. ¶¶ 71-73), (ii) aid

and abet Magyar Telekom's bribery of foreign government officials (*id*. ¶¶ 74-76), (iii) aid and

abet Magyar Telekom's failures to adequately maintain its books and records and internal

controls (*id*. ¶¶ 77-81), (iv) falsify Magyar Telekom's books and records (*id*. ¶¶ 82-84), and (v)

make false or misleading statements to an accountant or auditor (*id.* ¶¶ 85-87).   The SEC has

clarified that the first and second claims for relief only pertain to the alleged conduct in

Macedonia.[4]

The complaint alleges that, in 2005 and 2006, the defendants sought to block the entry of

a competitor to the Company's subsidiary in Macedonia by authorizing payments of €4.875

million to "an intermediary" in Greece using "bogus 'consulting' and 'marketing' contracts" with

the "knowledge, the firm belief, or under circumstances that made it substantially certain, that all

or a portion of the money would be forwarded to Macedonian government officials."  (*Id*. ¶¶ 2,

18-40).  No facts are alleged regarding the intended recipient(s) of any corrupt payments.  It is

also alleged that the defendants offered a "Macedonian minority political party within the

---

[3]   *Magyar Telekom and Deutsche Telekom Resolve Foreign Corrupt Practices Act Investigation and Agree to Pay Nearly $64 Million in Combined Criminal Penalties*, DoJ Press Release, Dec. 29, 2011, http://www.justice.gov/ opa/pr/2011/December/11-crm-1714.html; *SEC Charges Magyar Telekom and Former Executives with Bribing Officials in Macedonian and Montenegro: Firm and Its Parent Agree to Pay $95 Million to Settle Civil and Criminal Charges*, SEC Litigation Release No. 22213, Dec. 29, 2011, http://sec.gov/litigation/litreleases/2011/lr22213.htm.

[4]   *See* Oct. 12, 2012 Tr. at 8-10 (court conference).

coalition government the opportunity to designate the beneficiary of a business venture in exchange for the minority party's support of Magyar Telekom's desired benefits[,]" even though the venture "was not developed." (*Id.* ¶¶ 19, 29).[5]

With regard to the third, fourth, and fifth claims for relief, the complaint alleges that the defendants "caused" all payments via the phony contracts at issue to be falsely "recorded as fees for legitimate consulting and marketing services, when no such bona fide services were provided, or intended, under the contracts." (*Id.* ¶ 6). Further, the complaint alleges that the Company "lacked sufficient internal accounting controls to provide reasonable assurances that the transactions were legitimate and recorded appropriately." (*Id.* ¶¶ 40, 60). Finally, it is alleged that the defendants "made false or misleading statements or omissions" to the Company's auditors, in connection with preparation of the 2005 financial statements, when they signed management representation and sub-representation letters omitting disclosure of the aforementioned bribe schemes. (*Id.* ¶¶ 62-63). The complaint does not refer to any witness or document that states bribes occurred.

---

[5]     "[I]n a separate corrupt scheme" designed to secure control over the state-owned telecommunications company in Montenegro, the complaint alleges that the defendants authorized payments of €7.35 million to Montenegrin officials, in 2005, through "third-party consultants under four sham contracts." (*Id.* ¶¶ 3-4, 41-61). Again, it is alleged that these payments were allegedly made "with the knowledge, the firm belief, or under circumstances that made it substantially certain, that all or a portion of the money would be forwarded to Montenegrin government officials[.]" (*Id.*). As noted, this alleged conduct does not form the basis for the first and second claims for relief. *See* note 4, above, and accompanying text.

ARGUMENT

I.   **THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE DEFENDANTS.**

A.   **The Defendants Lack Minimum Contacts With This Forum.**

"Upon motion, the Court is obligated to dismiss actions against defendants over whom it has no *in personam* jurisdiction." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 26 F. Supp. 2d 593, 597 (S.D.N.Y. 1998). Where, as here, personal jurisdiction has been challenged, the plaintiff bears the burden of proving that personal jurisdiction exists. *Whitaker v. Fresno Telsat, Inc.*, 87 F. Supp. 2d 227, 229-30 (S.D.N.Y. 1999) (citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994)). That burden must be satisfied with respect to each defendant individually. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984); *Calder v. Jones*, 465 U.S. 783, 790 (1984) (same); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) ("Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State.") (emphasis in original) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

The exercise of personal jurisdiction must comport with constitutional due process.[6] *Robinson*, 21 F.3d at 510. The "constitutional touchstone" of due process requires a finding that the defendant had "minimum contacts with [the forum] such that the maintenance of the suit does

---

[6]   When deciding whether personal jurisdiction exists over a defendant, federal courts may look to the law of the state in which the court sits, so long as the exercise of jurisdiction comports with constitutional due process. *Laborers Local 17*, 26 F. Supp. 2d at 598 ("a federal court can assert jurisdiction over a non-resident defendant under the long-arm statute of the state in which it sits, provided that doing so comports with due process.") (citing *United States v. Montreal Trust Co.*, 358 F.2d 239, 240 (2d Cir. 1966)). Specifically, N.Y.C.P.L.R. § 301 and § 302 govern the state law determination of whether personal jurisdiction exists. *Reynolds Corp. v. Nat'l Operator Servs., Inc.,* 73 F. Supp. 2d 299, 302-03 (W.D.N.Y. 1999). The complaint alleges no facts supporting personal jurisdiction over the defendants under either section.

not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted). These minimum contacts must be "purposefully established" by the defendant. *Id.* To demonstrate such minimum contacts, the plaintiff must establish that: (i) its claims arise out of the defendant's contacts with the forum; (ii) the defendant individually and purposefully availed himself of the privilege of doing business in the forum; and (iii) the defendant could foresee being haled into the forum for litigation purposes. *See Burger King Corp.*, 471 U.S. at 474 (citing cases); *Laborers Local 17*, 26 F. Supp. 2d at 598. At its core, "in judging minimum contacts, the court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Keeton*, 465 U.S. at 775 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp.*, 471 U.S. at 476 (quoting *Int'l Shoe Co.*, 326 U.S. at 320)); *see World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 295 (1980) (plaintiff must show that it is "fair" and "reasonable" to subject the defendants to litigation in the forum). This determination depends on balancing (i) the burden on the defendant to litigate in that forum; (ii) the state's interest in adjudicating the dispute; (iii) the plaintiff's interest in obtaining convenient and effective relief; (iv) judicial economy; and (v) the shared interests of the states in furthering their respective social policies. *World-Wide Volkswagen Corp.*, 444 U.S. at 292.

"[J]urisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent." *Burger King Corp.*, 471 U.S. at 478 (citation omitted).

7

Allegations supporting a balance in favor of the exercise of personal jurisdiction are absent from the complaint, because (i) there are no minimum contacts; (ii) maintaining a vigorous defense in New York by the individual defendants - who live, maintain families, and work outside the United States - would be enormously burdensome, expensive, and disruptive as compared to plaintiff which is resident in New York and Washington, D.C.; and (iii) the complaint makes no allegation of substantial foreseeable harm in the forum which would be insufficient even if it was alleged and, as described in the next section, seems to be the gravamen of the SEC's jurisdictional theory.

**B.      The SEC's Theory Of Personal Jurisdiction.**

While not alleged in the complaint, the SEC set forth its theory of personal jurisdiction in the parties' October 3, 2012 joint letter to the Court as follows:

> The SEC contends that the Court has personal jurisdiction over the defendants because, as senior executives of a public company that sold its registered securities in American markets, the defendants' illegal conduct directly and foreseeably harmed investors in the United States.  The defendants are alleged to have authorized bribe payments and falsified Magyar Telekom's books and records.  Magyar Telekom filed its financial statements, which were rendered inaccurate by the defendants' conduct, with the SEC.  And those financial statements were relied upon by investors.

At the parties' initial appearance before the Court, plaintiff's counsel basically repeated this alleged basis for personal jurisdiction, while acknowledging that there was no precedent "on all fours factually" to support it and that the theory "may be breaking new ground[.]"[7]

The SEC did not assert in the joint letter or at the initial appearance that emails originating in a foreign country and sent to another foreign country, that might

---

[7]      Oct. 12, 2012, Tr. at 8-10 (court conference).

incidentally and fortuitously have been "routed through and/or stored" on servers located in the United States unbeknownst to the user(s), affords a basis for personal jurisdiction. (*But see* Compl. ¶ 39).  This is understandable, as such an assertion of personal jurisdiction has been rejected repeatedly by the courts.  *See, e.g., FC Stone LLC v. Buckley*, No. 4:11-cv-00551, 2012 WL 1889727, at *6 (S.D. Iowa May 24, 2012) ("the simple passage of three emails that allegedly contained trade secrets from some unidentified location through the company server in Iowa does not generate the requisite reasonable inference" necessary to establish personal jurisdiction); *Kaufman v. HSBC USA, Inc.*, No. 4:09-CV-318  2010 WL 1410997, at *4-8 (N.D. Okla. Mar. 31, 2010) (numerous phone calls and email communications in forum state insufficient); *Mainstream Media, EC v. Riven*, No. C 08-3623, 2009 WL 2157641, at *7-8 (N.D. Cal. Jul. 17, 2009) (dismissing complaint because "the fact that [defendant] has an e-mail account with yahoo.com . . . is not sufficient to show purposeful availment"); *Chang v. Virgin Mobile USA, LLC*, No. 3:07-CV-1767-D, 2009 WL 111570, at *3-4 (N.D. Tex. Jan. 16, 2009) (plaintiff may not rely "on the fortuitous location of . . . servers to establish personal jurisdiction," and even if there was contact by foreign company with a server in the forum "such contact would be insufficient to establish minimum contacts"); *Ray v. Experian*, No. 3:07-CV-1114, 2007 WL 4245459, at *3 (N.D. Tex. Nov. 30, 2007) ("accessing or sending data . . . to or from a database which happens to be headquartered in Texas is not a purposeful availment by [defendant] of the benefits and protections of Texas' laws"); *accord  IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 260 n.3 (3d Cir. 1998) ("minimal communication" in forum does not support personal jurisdiction under

minimum contacts analysis because no showing that defendant "purposefully directed its

activities toward the forum or has purposefully availed itself" of the forum).

## C.   Potential Foreseeable Adverse Impact On Investors Is Insufficient To Demonstrate Personal Jurisdiction, And Is Not Alleged In The Complaint.

The SEC's theory of personal jurisdiction seeks application of a broad "effects" test that is

unprecedented in FCPA cases and has been rejected by courts in other contexts, including by the

United States Supreme Court.  *See generally Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct.

2869, 2878-81 (2010).  Apart from the fact that the SEC's theory fails to establish the

constitutionally-required minimum contacts between the defendants and this forum, which is

dispositive, nothing in the text of the FCPA indicates congressional intent to cover *any* wholly

foreign conduct that might have some incidental effect on a domestic exchange.  *See, e.g.*,

*Shaffer*, 433 U.S. at 218 (Stevens, J., concurring) (due process means that defendant must have

"fair warning" that his conduct may subject him to the jurisdiction of a foreign sovereign");

*Keeton*, 465 U.S. at 774 (fair warning is satisfied when defendant has "purposefully directed" his

conduct at residents of the forum).  In any event, such an effect - however incidental and

speculative - is not alleged in the complaint.[8]

Application of the theory advanced by the SEC here would provide personal jurisdiction

over *any* individual director, officer, or employee of an issuer in *any* FCPA case - even if there is

no nexus to the United States for that individual.  Such automatic personal jurisdiction for

---

[8]   While separate from the question of personal jurisdiction, the text of the FCPA does reveal that Congress required a specific contact with the United States in order to support a finding of liability; that is, there must be a particular and "corrupt" use, by a particular defendant, of the mails or a means or instrumentality of United States interstate commerce that furthers a particular bribe payment to a foreign official.  *See* 15 U.S.C. § 78dd-1(a).  This element of the offense is addressed in Section III, below, and is not satisfied by the complaint's factual allegations.

individuals affiliated with corporate issuers is not consistent with the text of the FCPA, or the standards for establishing personal jurisdiction consistent with constitutional due process.

To comport with the principals of constitutional due process, the complaint must allege particular facts that establish personal jurisdiction for each individual defendant. *See, e.g., SEC v. Unifund SAL*, 910 F.2d 1028, 1032 (2d Cir. 1990) ("[T]he Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment"). Accordingly, the Court "must determine whether each of the defendants had sufficient minimum contacts with the United States and, if so, whether exercising personal jurisdiction would offend traditional principles of fair play and substantial justice." *SEC v. Carrillo*, 115 F.3d 1540, 1544 (11th Cir. 1997).  Essentially, the inquiry is whether jurisdiction can be exercised over an individual whose "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp.*, 444 U.S. at 297.  Here, the SEC has not alleged facts that meet this constitutional standard.

The complaint alleges generally that, during the relevant time period, the securities of Magyar Telekom and Deutsche Telekom were "publicly traded through American Depository Receipts listed on the New York Stock Exchange and registered with the Commission," and that they filed the requisite reports.  (*See* Compl. ¶¶ 10, 14-15).  The books and records of Magyar Telekom were consolidated with those of Deutsche Telekom.  (Compl. ¶ 6).  The defendants signed management representation or sub-representation letters which were allegedly false as they did not disclose the alleged unlawful bribery schemes.  (Compl. ¶¶ 63-70).  There is no allegation, however, that the defendants "purposefully directed" their conduct at the United States, *Keeton*, 465 U.S. at 774, much less that they knew or reasonably could have expected that their actions, all of which occurred overseas, would have harmed American investors.  Nor is

11

there an allegation that any investor - whether in the United States or abroad - suffered such harm.

Not only does the complaint fail to allege that investors were harmed, but the Company's public filings show that it simply is not possible that investors could have relied to their detriment on any omissions in the representation and sub-representation letters - with regard, as alleged, to the 2005 financials. Specifically, those financials were not released to the public until February 2007, and were not based on management representations and sub-representations signed by the defendants. Magyar Telekom Co., Annual Report of Foreign Private Issuer (Form 20-F) (Feb. 22, 2007), at iv. ("The investigation and consequent delay in completing the audit of our 2005 financial statements has led to a delay in filing this annual report.").[9] Moreover, the 20-F filing was not signed by Mr. Straub, who had left Magyar Telekom nearly three months earlier in early December 2006, or the other defendants. *Id.* at Exh. 12.1. The Sarbanes-Oxley certification of the Chief Executive Officer, supporting that filing, also was not signed by Mr. Straub. *Id.* at Exh. 13.1. Because the Company's 2005 financial statements, filed in 2007, were not false, investors in the United States could not have been harmed. Therefore, personal jurisdiction over each defendant cannot be established even under the SEC's unprecedented theory.

---

[9]  Although courts are generally required to limit their analysis to the four corners of the complaint when considering a motion dismiss, judicial notice of relevant public sources is permitted. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("a district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' This of course includes related documents that bear on the adequacy of the disclosure as well as documents actually alleged to contain inadequate or misleading statements. We stress that our holding relates to public disclosure documents required by law to be filed, and actually filed, with the SEC, and not to other forms of disclosure such as press releases or announcements at shareholder meetings.") (citation omitted).

Personal jurisdiction over a corporation does not extend to the corporation's officers or directors if those individuals personally lack the requisite basic minimum contacts with the forum.  *See Shaffer*, 433 U.S. at 215-16 (personal jurisdiction must be based on the defendant's own contacts with the forum, and the existence of personal jurisdiction over a corporation does not convey jurisdiction over the corporation's officers or employees); *accord In re Baan Co. Sec. Litig.*, No. 98-2465, 2002 WL 1284295, at *5 (D.D.C. June 10, 2002) ("[p]ersonal jurisdiction over officers of a corporation in their individual capacities must be based on their personal contacts with the forum, not their acts and contacts carried out solely in a corporate capacity").

Furthermore, foreign corporate issuers of ADRs are not subject to personal jurisdiction in the United States on the basis of domestic trading alone.  *See In re Magnetic Audiotape Antitrust Litig.*, 171 F. Supp. 2d 179, 186 (S.D.N.Y. 2001) (reversed on other grounds by *Texas Int'l Magnetics, Inc. v. BASF Aktiengesell Schaft*, 31 Fed. Appx. 738 (2d Cir. 2002)) (dismissing complaint for failure to demonstrate that exercise of personal jurisdiction comported with constitutional due process because "the listing of shares on NYSE and related activities, such as SEC filings, 'are insufficient to confer jurisdiction.'") (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 97 (2d Cir. 2000)); *accord Whiteman v. Fed. Republic of Austria*, No. 00 Civ. 8006, 2002 WL 31368236, at *6 (S.D.N.Y. Oct. 21, 2002) (selling ADRs to United States investors did not constitute "doing business" in New York and did not establish general personal jurisdiction).  ADR trades are considered "predominantly foreign securities transactions." *Copeland v. Fortis,* 685 F. Supp. 2d 498, 506 (S.D.N.Y. 2010) (quoting *In re SCOR Holding (Switzerland) AG Litigs.,* 537 F. Supp. 2d 556, 561 (S.D.N.Y. 2008)); *see also* Morrison, 130 S. Ct. at 2885 (same); *In re Societe Generale Sec. Litig.*, No. 08 Civ. 2495, 2010 WL 3910286, at

*4 (S.D.N.Y Sept. 29, 2010) (same).[10]  In short, the trading by Magyar Telekom cannot support the exercise of personal jurisdiction over the defendants.

This result is not different due to the SEC's recent contention, which is *not* alleged in the complaint, that "the defendants' illegal conduct directly and foreseeably harmed investors in the United States."  (Joint Letter Proposing Case Mgmt. Plan at 3 (Oct. 3, 2012)).  The application of such a *post-hoc* "effects" test has  no support under the FCPA as a basis for personal jurisdiction.  *See Morrison*, 130 S. Ct. at 2881 (declining to "divin[e] what Congress would have wanted if it had thought of the situation before the court" and affirming "the wisdom of the presumption against extraterritoriality").

In the FCPA context, there is simply no authority for the proposition that individuals (i) engaged in wholly foreign conduct; (ii) purportedly for the benefit of the foreign corporation rather than personal enrichment stemming from domestic securities trades;[11] (iii) in a case where the *corpus* of the violation is the corruption of a foreign government official; and (iv) who, by the FCPA's express terms, must commit an act in furtherance of that conduct corruptly through a means of United States interstate commerce in order to be liable, *see* 15 U.S.C. § 78dd-1(a); can be said to have reasonably foreseen that their wholly foreign conduct would cause them to be haled into a federal courtroom in the United States.  *See Laborers Local 17*, 26 F. Supp. 2d at

---

[10]    *Accord Pieczenik v. Cambridge Antibody Tech. Grp.*, No. 03 Civ. 6336, 2004 WL 527045, at *6 (S.D.N.Y. Mar. 16, 2004) ("[Defendant's] designation of the Bank of New York as a depository for its ADRs cannot support a finding of general jurisdiction under New York law."); *Consolidated Gold Fields, PLC v. Anglo Am. Corp. of S. Africa Ltd.*, 698 F. Supp. 487, 494 (S.D.N.Y. 1988), rev'd in part on other grounds, 871 F.2d 252 (1989) (general personal jurisdiction did not exist over a Luxembourg corporation that had unsponsored ADRs traded in the United States, but specific personal jurisdiction did exist, due to the defendant corporation's specific "courtship" of a United States company).

[11]    *See* Compl. ¶ 37 (the Company allegedly estimated how it would profit from benefits sought in Macedonia).

598; *see also Morrison*, 130 S. Ct. at 2883 (even "when a statute provides for some

extraterritorial application, the presumption against extraterritoriality operates to limit that

provision to its terms"); *accord Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S.102,

114 (1987) (courts must give significant weight to "unique burdens" associated with defending a

matter in a foreign legal system).  In addition, mere "foreseeability of causing *injury* in another

State . . . is not a 'sufficient benchmark' for exercising personal jurisdiction."  *Burger King Corp.*,

471 U.S. at 474 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 295)); *cf. Calder*, 465 U.S.

at 789-90 (1984) (where the tort was committed outside of forum but caused harm within the

forum, jurisdiction in the forum affirmed under state law because the tort was intentional, forum

was the focal point of harm, and the tort was "expressly aimed" at the forum).[12]  Instead, the

harmful effect of a defendant's actions within the forum suffices to establish personal jurisdiction

only where the defendant "expressly aimed" his conduct at the forum such that the harm suffered

there was foreseeable.  *Calder*, 465 U.S. at 789-90.

Moreover, even outside the FCPA context, the effects test as it applies to conduct wholly

outside the United States either has been banished on statutory grounds, *see Morrison,* 130 S. Ct.

2869,  involving §10(b) of the Securities Exchange Act, or finds no support unless the harm

caused by the foreign conduct directly involves domestic trading, *and* when the wholly foreign

---

[12]   Neither the FCPA books and records and controls provision nor the prohibition on lying to
auditors contains a separate jurisdictional element than that set forth in the text with regard to
the use *by the individual defendant* of a means of United States interstate commerce.
Following the analysis in *Morrison*, 130 S. Ct. 2869, which has been applied to statutes apart
from § 10(b) of the Securities Exchange Act, *see, e.g., Cedeno v. Castillo*, 457 F. App'x. 35
(2d Cir. 2012) (RICO does not apply extraterritorially under *Morrison*, and dismissing
complaint for failure to allege a domestic RICO violation); *Norex Petroleum Ltd. V, Access
Indus., Inc.*, 631 F.3d 29 (2d Cir. 2010) (same), there is nothing textually in those statutes
and rules suggesting an intent to apply them extraterritorially to conduct wholly outside the
United States.

conduct causes particular, foreseeable, and *significant* impact on those trades. *See, e.g., Unifund SAL*, 910 F.2d at 1033. "[N]ot every causal connection between action abroad and ultimate injury to American investors" is sufficient to establish personal jurisdiction. *Id.* Rather, the impact on the trades must be "alleged to have had a rather direct and an unmistakably foreseeable effect within the United States." *Id.* In *Unifund*, personal jurisdiction was upheld only because the allegation - involving millions of dollars in trades - "created the near certainty that United States shareholders . . . would be adversely affected." *Id.* Similarly, in *SEC v. Euro Security Fund, Coim SA*, No. 98 CIV. 7347, 1999 WL 76801 (S.D.N.Y. Feb. 17, 1999), another insider trading case, the size of the trades was in the millions of dollars - which was alleged to comprise "a significant portion of the daily volume of trading" in that company's stock. *Id.* at *3; *see also, e.g., SEC v. Alexander*, 160 F. Supp. 2d 642, 655-57 (S.D.N.Y. 2001) (finding lack of personal jurisdiction for wholly foreign conduct over foreign investor alleged to have committed insider trading). There is no claim here that the defendants intended to affect a market in the United States, or that their actions had a "direct" or "significant" impact here, much less that any such impact would have been "unmistakeably foreseeable."

In this case, where there is no securities fraud or insider trading resulting in personal enrichment alleged, the SEC's theory of personal jurisdiction under the FCPA - depending on some foreseeable yet unarticulated, speculative adverse effect on unknown investors that is not even alleged in the complaint - must fail. Accordingly, the complaint should be dismissed with prejudice.[13]

---

[13]   The SEC has informed the Court that it does not intend to amend the complaint with regard to personal jurisdiction or otherwise. *See* Oct. 12, 2012, Tr. at 8.

## II.   THE SEC'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

### A.   The SEC's Claims Are Subject To A Five-Year Statute Of Limitations.

In addition to a lack of personal jurisdiction over the defendants, the SEC is not entitled to relief because its claims are barred by the applicable five-year statute of limitations.  28 U.S.C. § 2462; *SEC v. Jones*, 476 F. Supp. 2d 374, 380 (S.D.N.Y. 2007); *SEC v. Wyly*, 788 F. Supp. 2d 92, 102 (S.D.N.Y. 2011) (§ 2462 "governs punitive relief sought by the SEC" under the Exchange Act).

While the statute of limitations is normally an affirmative defense, "[a] complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief.  If the allegations, for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim . . . ."  *Jones v. Bock*, 549 U.S. 199, 215 (2007); *see also Figueroa v. Ponce De Leon Fed. Bank*, No. 11 Civ. 7633, 2012 WL 3262784, at *2 (S.D.N.Y. July 2, 2012) (applying *Jones* and dismissing the complaint under Rule 12(b)(6) because the facts pleaded in the complaint demonstrated that it was filed after the statute of limitations had expired).

The complaint in this case was filed on December 29, 2011 - well over five years following the alleged conduct and, indeed, over five years after all the defendants had left Magyar Telekom.  (*See* Compl. ¶¶ 11-13).  Accordingly, there can be no contention that the defendants' alleged conduct fell within the five-year period.  Even the complaint does not allege a particular act by any of the defendants within five years of the filing of the complaint; the last alleged corrupt payment described in the complaint, for example, was allegedly received by a foreign official on December 28, 2005, and the complaint was filed six years later - on December 29, 2011.  (*See* Compl. ¶ 60).

17

**B.**      **The Five Year Statute Of Limitations Applies To All Of The SEC's Claims.**

"Civil penalties" within the meaning of § 2462 include the civil money penalties the SEC seeks here.  (*See* Compl. ¶ E (requesting a judgment that the defendants pay civil penalties)).  *See* 28 U.S.C. § 2642 (barring claims for "civil fine[s]" filed five years after the claim first accrued); *Jones*, 476 F. Supp. 2d 374 at 381 (holding that "[t]he SEC's claim for civil monetary penalties against Defendants is unquestionably a penalty and, as such, is subject to the five-year limitations period of § 2462"); *Wyly*, 788 F. Supp. 2d at 102 n.67 (citing several cases and noting that the SEC does not dispute application of § 2462 to its claims for civil monetary penalties); *SEC v. Brown*, 740 F. Supp. 2d 148, 157-58 (D.D.C. 2010) (noting no dispute by the parties regarding the application of § 2462 to civil money penalties).

Not only are civil money penalties subject to § 2462, but courts have also held that "civil penalties" under § 2462 can include claims for equitable relief, such as permanent injunctions, disgorgement, and pre-judgment interest.  *See, e.g., Jones*, 476 F. Supp. 2d at, 380  (holding that § 2462 applied to the SEC's claims for civil money penalties and a permanent injunction prohibiting future violations because they were "penalties").  Thus, the injunctive and other equitable relief sought by the SEC in this case is also time-barred.

**C.**      **The Defendants' Foreign-National Status Does Not Eliminate the Statute of Limitations.**

The conclusion that the statute of limitations has run, due to the SEC's lack of diligence following Magyar Telekom's voluntary disclosures and regulatory filings, does not change because the defendants are foreign nationals.  To the extent the SEC would argue that there is, in fact, *no* statute of limitations because the defendants are foreign nationals, its argument has no support.  Section 2462 states that claims must be brought within five years, "if, within the same period, the offender or the property is found within the United States in order that proper service

18

may be made thereon."  This clause is not an indefinite waiver of the statute of limitation that

leaves foreign nationals exposed to indefinite liability while cutting off liability for those within

the United States after five years.  Rather, the clause relates only to the ability to serve the

defendant with process, something that was easily accomplished by the SEC in this case through

the Hague Convention.[14]

Congress, in enacting statutes of limitation, has made it clear that those statutes serve

important public purposes.  *See, e.g.*, *United States v. Kubrick*, 444 U.S. 111, 117 (1979)

("Statutes of limitations, 'which are found and approved in all systems of enlightened

jurisprudence,' represent a pervasive legislative judgment that it is unjust to fail to put the

adversary on notice to defend within a specified period of time and that 'the right to be free of

stale claims in time comes to prevail over the right to prosecute them.'") (citations omitted).  As

recognized by the Supreme Court, "[w]e should regard the plea of limitations as a 'meritorious

---

[14]   The "if" clause of § 2462 has ancient roots.  The first precursor to § 2462 was passed in
1790.  *See Stimpson v. Pond*, 23 F. Cas. 101, 101-02 (C.C.D. Mass. 1855) (No. 13,455). *But
see 3M Co. v. Browner*, 17 F.3d 1453, 1458 n.7 (D.C. Cir. 1994) (finding it "unclear"
whether the true predecessor was the 1790 Act or a 1799 statute).  But whether the statute's
ancestry goes all the way back to 1790, or only to 1799, the point remains - portions of §
2462 addressing service of process completely predate modern service practice under both
the Federal Rules and, more importantly, with respect to service of process on foreign
nationals.  The "if" clause only tolls the statute of limitations when the plaintiff is unable to
effect "proper service" on the defendants, which was not an issue here for the SEC under the
Hague Convention.  Courts have recognized, albeit in *dicta*, that the effect of the "if" clause
is simply to allow for service, not to extend the statute of limitations indefinitely.  *See United
States v. Maillard*, 26 F. Cas. 1140, 1141 (.S.D.N.Y. 1871) (No. 15,709) (statute of
limitations extended only "so as to serve process"); *SEC v. Bartek*, No. 11-10594, 2012 WL
3205446, at * 3 (5th Cir. Aug. 7, 2012) (unpublished opinion) (limitation extended only if
defendant is "outside of the United States, *precluding service of process*") (emphasis
added).  In this case the defendants are not fugitives or otherwise unknown to the SEC.  They
were served quickly once the plaintiff decided to file suit.  Although located outside the
United States, there was nothing about the defendants that precluded service of process.  It
would, therefore, be an abuse of the "if" clause to reward the SEC for its dalliance by
granting it any extension of the statute of limitations.

defense, in itself serving a public interest.'"  *Id.*  (citing *Guar. Trust Co. v. United States*, 304 U.S. 126, 136 (1938)).  Statutes of limitation serve to "protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *Kubrick*, 444 U.S. at 117 (*citing United States v. Marion*, 404 U.S. 307, 322 n.14 (1971)); *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 428 (1965); *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945); *Mo., Kan. & Tex. Ry. Co. v. Harriman Bros.*, 227 U.S. 657, 672 (1913)).  As noted by Chief Justice Marshall, "[i]n a country where not even treason can be prosecuted after a lapse of three years, it could scarcely be supposed that an individual would remain forever liable to a pecuniary forfeiture." *Adams v. Woods*, 6 U.S. 336, 342 (1805), *quoted with approval,  Johnson v. SEC*, 87 F.3d 484, 492 (D.C.Cir. 1996).  The extraordinary, indeed unprecedented, claim that there is no statute of limitations on the SEC's claims against foreign nationals would require a far more definitive statement from Congress than what § 2462 provides.

    For these reasons, the complaint should be dismissed with prejudice.

## III.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE BRIBERY AND THE RELATED CLAIMS.

    Pursuant to Rule 12(b)(6), this Court should dismiss the SEC's first and second claims for relief alleging that the defendants violated the anti-bribery provisions of the FCPA and aided and abetted Magyar Telekom's violations of those provisions, as well as the remaining claims which hinge on a successful allegation of bribery.  (*See* Compl. ¶¶ 71-76).  The complaint fails to plead sufficient facts supporting these allegations and instead relies at critical junctures on vague and conclusory restatements of the FCPA's statutory language, which is not sufficient.  Specifically, with regard to the bribery offenses, the complaint fails to allege facts that support its conclusions

that: (i) defendants corruptly made use of United States interstate commerce and that any such use furthered an unlawful bribery payment involving Macedonia,[15] and (ii) an intended recipient of the bribe was in fact a "foreign official" under the FCPA.  Indeed, the complaint fails to provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Therefore, the complaint should be dismissed with prejudice.

## A.    The Applicable Legal Standard.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  Although there is no "probability requirement at the pleading stage," the Supreme Court teaches that "something beyond . . . mere possibility . . . must be alleged."  *Id.* at 556–58.  The Court need not accept the plaintiff's legal conclusions or inferences that are unsupported by facts alleged in the complaint.  *Id.* at 556-58 (holding that "a legal conclusion couched as a factual allegation" need not be accepted as true) (internal quotation marks and citation omitted); *see also Ashcroft v. Iqbal*, 555 U.S. 662, 677-78 (2009); *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.,* 507 F.3d 117, 121 (2d Cir. 2007); *In re NYSE Specialists Securities Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) ("[l]egal conclusions, deductions or opinions couched as factual allegations [do not warrant] a presumption of truthfulness") (internal quotation marks and citation omitted).  The facts alleged "must be enough to raise a right to relief above the speculative level" or must be sufficient "to state a claim for relief that is plausible on its face."  *Twombly*, 550 U.S. at 555, 570; *see also Iqbal*, 555 U.S. at 678 ("A claim

---

[15]   *See* note 4, above, and accompanying text (plaintiff's counsel clarified to the Court that the first and second claims for relief only pertain to alleged conduct in Macedonia).

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  The complaint fails these tests.

**B.     The Complaint Fails To Allege Facts Supporting The Legal Element That The Defendants Corruptly Made Use of United States Interstate Commerce To Further The Alleged Bribe Payment.**

With regard to the alleged bribery in Macedonia, the complaint fails to allege facts to support satisfaction of the FCPA element that the defendants made "use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money . . . or . . . anything of value" to "any foreign official[.]"  15 U.S.C. § 78dd-1(a).  The SEC's only attempt to satisfy this element is the following allegation in the complaint:

> Electronic mail messages in furtherance of the bribe scheme, including those attaching drafts of the Protocol of Cooperation, the Letter of Intent, and copies of consulting contracts with a third-party intermediary, were transmitted through the means or instrumentalities of United States interstate commerce.  The electronic mail messages were sent from locations outside the United States, but were routed through and/or stored on network servers located within the United States.  Some of these electronic mail messages were sent or received by defendant Balogh.

(Compl. ¶ 39).  It is not alleged that an intended recipient of these emails, "sent from locations outside the United States," was present in the United States.  Nor is there any allegation that any defendant had any reason to know that the wholly foreign email communications might be "routed through and/or stored" on servers within the United States, apparently (if true) for technological reasons having to do with the handling of electronic traffic.  Such allegations do not state a claim under the FCPA's bribery provision.

1.    *Email Traffic Sent To And From Foreign Countries, Which Allegedly Passed For Technological Reasons Through The United States Unbeknownst To The Defendants, Is Insufficient To Support The Legal Element Of "Corrupt Use" Under The FCPA.*

This case represents the first time, to our knowledge, that the SEC has pursued the theory that the happenstance of a data manager's routing through or storing emails on a server allegedly located in the United States - unbeknownst to the defendant - constitutes a "corrupt" use by the defendant of United States interstate commerce under the FCPA's anti-bribery provision, when those emails allegedly were sent only to and from foreign countries and foreign nationals. Modern communication through computerized means almost invariably involves data transmissions over the internet. Certainly when the electronic traffic is intended to and does begin and conclude in foreign countries, individuals making use of such modern communications tools have no way to know or even suspect which of the computer servers throughout the world may carry their data and, therefore, whether they may have stumbled unknowingly into the cyberspace of the United States due to the unrelated actions of one or more unknown and unseen data managers. Given the operation of different laws in different countries, if the interstate commerce element is satisfied on these facts, then foreign nationals operating wholly abroad would have no way to know what countries' standards apply to guide and regulate their conduct. *Cf. Morrison*, 130 S. Ct. at 2885 (noting that "[t]he probability of incompatibility [of United States law] with the applicable laws of other countries is so obvious"). The unforeseen and unforeseeable transit of purely foreign email traffic through a United States server, guided by a data manager for technological reasons separate and apart from anything the defendants could know, let alone intend, is insufficient to meet the United States interstate commerce element of the FCPA bribery provision, which requires the defendant himself to "make use of" those instrumentalities "corruptly," that is, with corrupt intent. *See, e.g.*, *United States v. Kozeny*, 582

23

F. Supp. 2d 535, 541 (S.D.N.Y. 2008) (corrupt means "having an improper motive or purpose");

*see also* S. Rep. No. 95-114, at 10 (1977) (defining "corruptly" as intentional conduct).[16]

> 2.     *Email Traffic Allegedly In Furtherance Of A Broad Bribe "Scheme," As*
> *Opposed To The Particular Bribe "Payment," Is Insufficient To Support*
> *The Legal Element Of "In Furtherance" Under The FCPA.*

Quite apart from the above, the email-related allegation is insufficient to satisfy the

United States interstate commerce element of the FCPA.  The FCPA's anti-bribery provision

requires an unlawful "offer, payment, promise to pay, or authorization of the payment of any

money, or offer, gift, promise to give, or authorization of the giving of anything of value to . . .

any foreign official."  15 U.S.C. § 78dd-1.  Unlike, for example, the mail and wire fraud statutes,

18 U.S.C. §§ 1341, 1343, the FCPA does not speak in terms of any broader and more amorphous

"scheme or artifice."  Instead, it speaks specifically of a "payment."  Yet the complaint alleges

only that the defendants, "executed a *scheme* to bribe government officials in the Republic of

Macedonia . . ." and that emails "in furtherance of the bribe *scheme*" somehow touched the

United States.  (Compl. ¶¶ 2, 21-22, 39) (emphasis added).  This is insufficient to state a valid

claim of bribery under the FCPA because the complaint fails to allege facts in support of the

---

[16]    For similar reasons, and not to the exclusion of  the argument as to all claims in the
complaint because they hinge on the bribery allegations, the argument in the text applies with
additional force to the second and third claims for relief in the complaint.  The second claim
for relief alleges that the defendants aided and abetted the Company's (principal's) violation
of the FCPA's anti-bribery provision, and the third claim alleges the related books and
records violation.  The complaint does not allege factually the use of United States interstate
commerce by the Company, so there is no adequately alleged principal violation.  *See, e.g.*,
*SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (securities law violation by primary party is
required).  Even if there was a primary violation, there remains no allegation that the
defendants - as alleged aiders and abettors - knew or could have known about such corrupt
use of United States interstate commerce via alleged routing of emails.  *Cf. United States v.*
*Bullock*, 243 Fed. App'x 107, 112 (6th Cir. 2007) (in aider and abettor case charging mail
fraud, "[t]he government must show that Bullock had the knowledge, or a reasonable person
would have foreseen, that the mails would be used in order to obtain a loan using fraudulent
documents").

statutory requirement that the corrupt use of United States interstate commerce be specifically "in furtherance of an offer or payment of anything of value." *See Stichting ter Behartiging van de Belangen van Oudaandeelhouders in het Kapitaal van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 179-80 (2d Cir. 2003). In order to properly allege a claim of bribery under the FCPA, therefore, the complaint must plead sufficient facts to show a plausible nexus between a particular and corrupt use of United States interstate commerce and how, in fact, that corrupt use furthered an *offer or payment* of the unlawful bribe *itself. See id.* The complaint fails to do so.[17]

In *United States v. Kay*, 513 F.3d 432 (5th Cir. 2007), the court examined the scope of the interstate commerce element of the FCPA and rejected the view that "every use of an instrumentality during business activities facilitated by a bribe are in furtherance of the bribe." Indeed, the DoJ has conceded that use of United States interstate commerce is properly in furtherance of a bribe under the FCPA "*only* when . . . it promotes or advances the *payment of the bribe*." Appellate Brief of The United States, *United States v. Kay*, 513 F.3d 432 (5th Cir. 2007), at *52 (emphasis added). The *Kay* court agreed with the DoJ and held that allegedly false documents sent in United States interstate commerce, used to "calculate the bribes" eventually paid, were sufficiently "'in furtherance' of the bribes" to state the offense under the FCPA. *Kay*, 513 F.3d at 454.[18]

---

[17] Put another way, because the FCPA's language is expressly narrower than that set forth in the mail or wire fraud statutes - permitting the use of United States interstate commerce to further "a scheme or artifice to defraud" - the complaint's allegation of email traffic in furtherance of a "scheme" misses the statutory mark of the FCPA and is, accordingly, not enough to state the FCPA bribe claim involving Macedonia.

[18] The *Kay* court declined to consider the FCPA's legislative history on this point, because it believed that the plain language of the FCPA was sufficiently clear to support the interpretation identified in the text. *See Kay*, 513 F.3d at 454. But the legislative history supports *Kay*'s holding. *See* H.R. Rep. No. 95-831 at 12 (1977) ("adoption of the Senate 'in

*(cont'd)*

**C.   The Complaint Fails To Allege Facts Supporting The Legal Element That The Intended Bribe Recipients Were "Foreign Officials" Under The FCPA.**

      *1.   Who Is A "Foreign Official" For FCPA Purposes Is A Fact-Intensive Inquiry.*

Pursuant to § 78dd-1 of the FCPA, the recipient of the unlawful bribe must be a "foreign official," which the statute defines as "any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization."  15 U.S.C. § 78dd-1(f)(1)(A).  The definition of a "foreign official" under the FCPA has not been much tested in the courts, or even settled upon by the DoJ,[19] but the limited case law makes clear that the complaint in this case is deficient in sufficiently alleging that any recipients of the charged bribes in Macedonia were, in fact, "foreign officials" under the FCPA.

---

*(cont'd from previous page)*

furtherance of' language makes clear that the use of interstate commerce need only be in furtherance of *making the corrupt payment*.") (emphasis added).

The holding in *Kay*, and related argument advanced here, makes sense.  This is because the FCPA, unlike other statutes, by its very nature might reach a broad swath of conduct abroad.  In order to give the international reach of the statute some discernible limitation in the sensitive area of international relations, Congress was quite specific about the culpable nexus to the United States that was required.  *See Morrison*, 130 S. Ct. at 2878-81 (looking to text of statute in discerning congressional intent with regard to question of extraterritorial application).

[19]   Most recently, the DoJ has taken contradictory positions on what facts support a conclusion that an individual is a "foreign official" under the FCPA.  *See* Max Stendahl, *DoJ Flip-Flop on "Foreign Official" Baffles FCPA Attorneys*, Law 360, (Oct. 4, 2012), http://www.law360.com/articles/384323/doj-flip-flop-on-foreign-official-baffles-fcpa-attys (discussing recent DoJ opinion contradicting existing guidance regarding who is a "foreign official" under the FCPA).  This confusion underscores the need for facts in the instant complaint instead of labels that mirror the statutory terms.

The question of who is a "foreign official" for FCPA purposes is a fact-specific determination that goes well beyond the mere label offered in the statute.  *See, e.g., United States v. Carson*, No. SACR-09-00077, 2011 WL 5101701, at *3-4 (C.D. Cal. May 18, 2011).  Courts have considered several factors in the analysis, including (i) the foreign country's characterization of the entity and its employees, (ii) the foreign state's degree of control over the entity, (iii) the purpose of the entity's activities, (iv) the entity's obligations and privileges under the foreign state's law, (iv) the circumstances surrounding the entity's creation; (v) the extent of the foreign state's ownership of the entity and level of state financial support, such as subsidies, special tax treatment, and loans, (vi) whether the entity provides a service to the citizens of the foreign jurisdiction, (vii) whether key officers and directors are, or are appointed by, government officials, (viii) and whether the entity is perceived and understood to be performing official government functions.  *Id.* at *11-12; *United States v. Aguilar*, 783 F. Supp. 2d 1108, 1115 (C.D. Cal. 2011) (applying the totality of circumstances test to facts in order to determine "foreign official" status under the FCPA).

> 2.    *The Basic Facts Regarding The Intended Recipient(s) Of A Bribe In Macedonia Are Not Alleged.*

Here, the complaint fails to plead facts supporting its conclusion that the defendants "offered and/or paid bribes to Macedonian government and political party officials."  (*See* Compl. ¶18).  The complaint refers to the alleged recipients merely as "officials," "government officials," "government officials from both political parties in Macedonia's coalition government," "a senior Macedonian government official," and "government officials from the respective political parties[.]"  (*See, e.g.,* Compl. ¶¶ 18, 19, 21, 30, 31).  There are no allegations with regard to whether any particular "government official" was intended by defendants as a recipient of a bribe. Rather, the complaint's vague references represent mere legal conclusions that the recipients

were "foreign officials" under the FCPA.  A legal conclusion couched as a "factual allegation," *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), is insufficient to establish the essential element that the intended recipient be a foreign official.  Repeated reference to "government officials" without underlying facts presents nothing "more than labels and conclusions" that constitute "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.  The allegation is therefore insufficient and the bribe claims must be dismissed.[20]

For all these reasons, the first and second claims for relief, involving allegations of bribery in Macedonia, as well as the remaining claims which hinge fully on a proper allegation of unlawful bribery under the FCPA, should be dismissed with prejudice.

**D.    The Complaint Fails To Adequately Allege False Statements To Auditors.**

Also pursuant to Rule 12(b)(6), the fifth claim for relief the complaint separately fails to state a claim and should be dismissed.  The SEC alleges that the defendants "made or caused to be made materially false or misleading statements or omissions to an accountant or auditor in connection with audits of Magyar Telekom's financial statements" in violation of Exchange Act Rule 13b-2, 17 C.F.R. § 240.13b2-2.  The basis of the allegation is the management and sub-

---

[20]   Indeed, a close reading of the Macedonian allegations reveals that the complaint does not even attempt to assert that any particular government official in Macedonia was offered or received a bribe.  But identification of a particular government official is an essential element of the claim for relief.  In one recent case, the district court dismissed the action because the DoJ failed to "connect the payment to a particular official, that the funds [were] made under his authority [as] a foreign official, who could be identified in some reasonable way." Trial Tr. 248:18-24, *United States v. O'Shea*, No. 09-CR-629 (S.D. Tex. Jan. 16, 2012).  There, the district court took issue with the DoJ's argument that the statute does not require that a particular foreign official be identified. *Id*., Trial Tr. 227:19-23 ("You can't convict a man promising to pay unless you have a particular promise to a particular person for a particular benefit.").  Accord *Twombly*, 550 U.S. at 556-58 ("something beyond . . . mere possibility . . . must be alleged").

management letters allegedly signed by the defendants in connection with the audit of Magyar

Telekom's 2005 financials, which allegedly were false because they did not disclose the alleged

bribe schemes in Montenegro and Macedonia.  (Compl. ¶¶ 62-64).  These allegations fail to

adequately state a claim for relief.

1.     *The Heightened Pleading Standard For Fraud Applies.*

To establish a violation of Rule 13b2-2, the plaintiff must prove the following: (i) the

individual is a director or an officer of an issuer; (ii) who made or caused to be made a materially

false or misleading statement or omission to an auditor; (iii) in connection with any SEC filing or

an audit.  Exchange Act Rule 13b-2, 17 C.F.R. § 240.13b2-2.  The heightened pleading standard

of Rule 9(b) applies here, providing that "[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and

other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  *See SEC v.*

*Patel*, No. 07-cv-39, 2008 WL 781914, at *3 (D.N.H. Mar. 24, 2008); *SEC v. Nacchio*, 438 F.

Supp. 2d 1266 (D. Colo. 2006).  "Circumstances constituting fraud" include "the time, place and

contents of false representations, as well as the identity of the person making the

misrepresentation and what was obtained or given up thereby . . . .  [C]onclusory allegations that

a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule."  *Parnes*

*v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997) (quoting *Commercial Prop. Invs. Inc. v.*

*Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995)).

2.     *The Complaint Fails To Individualize The Necessary Factual Allegations.*

Here, the alleged fraud arises from an alleged omission of material facts.  (*See* Compl. ¶¶

62-70).  Therefore, the complaint must allege (i) the information that should have been disclosed,

(ii) the reason the information should have been disclosed, (iii) that the defendant is a person

who should have disclosed it, and (iv) the approximate time or circumstances in which the

29

information should have been disclosed.  *SEC v. Nacchio*, 438 F. Supp. 2d at 1277-78.  This information is lacking in the complaint.

In cases such as this, "where . . . 'multiple defendants are involved, each defendant's role in the fraud must be particularized.'"  *Manchester Mfg. Acquisitions, Inc. v. Sears, Roebuck & Co.*, 802 F. Supp. 595, 600 (D.N.H. 1992) (quoting *Shields v. Amoskeag Bank Shares, Inc.*, 766 F. Supp. 32, 40 (D.N.H. 1991)).  Allegations of fraud must also be organized "into discrete units that are, standing alone, each capable of evaluation."  *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 350 (D.N.H. 2006) (quoting *In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 55-56 (D.Mass. 1998)).  The complaint in this case fails to meet these standards.  Instead, it relies upon impermissible group pleading and merely lumps the defendants together in a generalized allegation that they should have disclosed what they must have known about the alleged bribery schemes in Macedonia and Montenegro.  (*See, e.g.,* Compl. ¶¶ 65-67 ("Straub, Balogh, and Morvai knew . . ."); *id.* ¶ 66, 67; *id.* ¶ 68, 69 ("Straub, Balogh, and Morvai failed to disclose . . .")).  This is insufficient to state the claim.

     3.    *The Complaint Fails To Plead Facts Supporting The Legal Element Of Materiality.*

To be liable, the director or officer must have either made or caused someone else to make an untrue statement to an auditor or failed to disclose a fact necessary to make statements to the auditor not misleading.  The untrue or undisclosed statement must be material. Exchange Act Rule 13b-2, 17 C.F.R. § 240.13b2-2(a).  The traditional definition of materiality in securities law turns on the significance that a reasonable investor would assign to the withheld or misrepresented information.  *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).[21]

---

[21] Materiality requires "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of

*(cont'd)*

Here, the alleged non-disclosure came in the context of the representation and sub-representations in connection with the review by the auditor of the Company's 2005 financial statements.  (Compl. ¶¶ 62-64).  As discussed in Section I above, issuance of the 2005 financial statements and the accompanying annual 20-F report were delayed due to the Company's "investigation and consequent delay in completing the audit[.]"  Magyar Telekom Co., Annual Report of Foreign Private Issuer (Form 20-F) (Feb. 22, 2007), at iv.  The financials issued, which did not allegedly involve a restatement, were not based in any way on representations or certifications by the defendants.  Because there is no allegation that anyone relied to their detriment on management representation or sub-representation letters allegedly offered by the defendants, the alleged non-disclosures referenced in the complaint are insufficient to support the legal element of materiality.

Accordingly, for this independent reason, the fifth claim for relief should be dismissed with prejudice.

_____
*(cont'd from previous page)*
information made available."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).
District courts have adopted this standard for Rule 13b2-2 claims.  *See, e.g., Nacchio*, 438 F.
Supp. 2d at 1280, 1283-85 (D. Colo. 2006) (refusing to dismiss 13b2-2 claims alleging false
statements relating to disclosures alleged to be material to investors).

**CONCLUSION**

Wherefore, the defendants respectfully submit that (i) there is no personal jurisdiction

over the defendants in this case; (ii) the SEC's claims are barred by the statute of limitations; and

(iii) the complaint fails to state a claim upon which relief can be granted.  For the foregoing

reasons, defendants respectfully request that the entire complaint be dismissed with prejudice.

Dated: October 29, 2012

Respectfully submitted,

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP

s/  Saul M. Pilchen
Saul M. Pilchen
Amanda R. Grier
**Skadden, Arps, Slate, Meagher & Flom**
1440 New York Avenue, NW
(202) 371-7000
Washington, DC 20005-2111
saul.pilchen@skadden.com
amanda.grier@skadden.com


Carl S. Rauh
**Hogan Lovells US LLP**
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
carl.rauh@hoganlovells.com


*Counsel for Elek Straub*

32

William M. Sullivan Jr.
**Pillsbury Winthrop Shaw Pitman LLP**
2300 N Street, NW
Washington, DC 20037-1122
(202) 663-8027
william.sullivan@pillsburylaw.com

*Counsel for Andras Balogh*

Michael L. Koenig
Victoria P. Lane
**Hinckley, Allen & Snyder LLP**
30 South Pearl Street, Suite 901
Albany, NY 12207
(518) 396-3100
mkoenig@haslaw.com
vlane@haslaw.com

*Counsel for Tamás Morvai*

To:   Kara N. Brockmeyer
      Robert I. Dodge
      Jeffrey T. Infelise
      **Securities and Exchange Commission**
      100 F. Street, N.E.
      Washington, DC 20549
      (202) 551-4421 (Dodge)
      DodgeR@sec.gov

*Attorneys for Plaintiff*