# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

—————————————

No. 11 Civ. 9645 (RJS)

—————————————

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

VERSUS

ELEK STRAUB, *et al.*,

Defendants.

—————————————

MEMORANDUM AND ORDER
February 8, 2013

—————————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff Securities and Exchange Commission (the "SEC") brings this action against Defendants Elek Straub, Andras Balogh, and Tamas Morvai (collectively, "Defendants") – executives of the Hungarian telecommunications company Magyar Telekom, Plc. ("Magyar") – arising out of alleged violations of the Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, *et seq.* (the "FCPA"). Before the Court is Defendants' joint motion to dismiss the Complaint in this action on the grounds that: (1) the Court lacks personal jurisdiction over Defendants; (2) the SEC's claims are time barred; and (3) the Complaint fails to state claims for certain of its causes of action. For the reasons that follow, the Court denies Defendants' motion in its entirety.

## I. BACKGROUND

The SEC alleges that Defendants engaged in two related schemes involving the bribery of public officials in Macedonia and Montenegro. However, the SEC has advised the Court that the Complaint's anti-bribery claims "are based solely on the allegations involving Macedonia." (Opp'n 3 n.2.) Accordingly, for the purpose of resolving the instant motion, the facts below relate almost entirely to Defendants' alleged Macedonian scheme.

### A. Facts[1]

In early 2005, the Macedonian Parliament enacted a new Electronic Communications Law, which "liberalized the telecommunications market [in Macedonia] in a manner that would have been unfavorable to Magyar." (Compl. ¶ 20.) Specifically, the legislation increased frequency fees, imposed regulatory burdens, and authorized the licensing of a third mobile telephone operator in direct competition with Makedonski Telekommunikacii A.D. Skopje ("MakTel") – the former telecommunications services provider jointly owned by Magyar and the Macedonian government. (Id.) To mitigate the effects of the new law, Defendants allegedly began executing a scheme in March 2005 to bribe public officials from both political parties in Macedonia's coalition government, memorializing the elements of that scheme in a "secret document" maintained on Magyar's computers. (Id. ¶ 21.)

In furtherance of the alleged scheme, Magyar's Macedonian subsidiaries retained a Greek intermediary to facilitate negotiations with Macedonian government officials on Magyar's behalf. (Id. ¶ 22.) The negotiations resulted in a "secret agreement" with those officials entitled the "Protocol of Cooperation" (the "Protocol"), which set a framework whereby the Macedonian officials would mitigate certain adverse effects of the new law in return for the Macedonian government receiving a €95 million dividend payment from MakTel and Macedonian officials receiving undisclosed bribe payments from Magyar. (Id.) On or about May 25, 2005, Straub approved the Protocol on behalf of Magyar, and approximately two days later, Balogh and a senior Macedonian government official signed and countersigned the document. (Id. ¶ 23.)

On or about August 31, 2005, Straub allegedly entered into a second, nearly-identical version of the Protocol with a senior Macedonian government official belonging to the minority political party in the governing coalition. (Id. ¶ 30.) Prior to the execution of this version of the Protocol, Defendants internally confirmed in writing that officials within the minority party would "torpedo [or wreck] the agreement within [two] months if we don't pay bribes to those officials." (Id. ¶ 27 (internal quotation marks omitted).) To induce members of the minority political party to sign the Protocol, Defendants allegedly offered "to have [Magyar's] Macedonian subsidiary construct a mobile telecommunications infrastructure in a neighboring country and allow a designee of the minority political party to operate [it] using the company's network backbone." (Id. ¶ 29.) On or about August 30, 2005 – one day prior to signing the second Protocol with a senior official within the minority political party – Straub executed a Letter of Intent, which identified the prospective business party only as "a company to be named by the [minority political p]arty." (Id.)

According to the Complaint, neither Magyar nor Deutsche Telekom – a company that had a controlling interest in Magyar – kept signed copies of the two Protocols, and the senior Macedonian government officials who signed the documents failed to record them as official government documents, as

---

[1] The following facts are taken from the Complaint ("Compl."). In connection with the instant motion, the Court also considers Defendants' opening brief ("Mem."), the SEC's opposition brief ("Opp'n"), Defendants' reply brief ("Reply"), and, where appropriate, the exhibits attached to those documents. The Court also considers the transcript of oral argument proceedings before the Court on January 17, 2013 ("Tr.").

required under Macedonian law. (*Id.* ¶¶ 24–25, 30.) Only the Greek intermediary allegedly kept the original signed Protocols. (*Id.* ¶ 30; *see* Reply Ex. 1 (unsigned copy of the Protocol).)

To obtain the government official's consent to the Protocols, Defendants allegedly offered up to €10 million in bribes, in three installments. (Compl. ¶ 26.) Defendants authorized MakTel and other Magyar subsidiaries to make the first installment (totaling €4.875 million) to government officials via the Greek intermediary under purported "sham 'success[-]fee[-]based' contracts for 'consulting' or 'marketing services.'" (*Id.*) According to the SEC, the contracts "served no legitimate business purpose, and no bona fide services were rendered under them. Instead, the contracts were used to channel corrupt payments indirectly to government officials in a manner that would not be detected." (*Id.* ¶ 32.) Moreover, they were allegedly "supported by false performance certificates or fabricated evidence of performance[,] were in many cases backdated[,] and were in many cases purportedly success-based[] but entered into after the relevant contingencies had already been satisfied." (*Id.* ¶ 35.)

Defendants allegedly referred to the routing of payments through such contracts using the code "logistics," and in an untitled document prepared by Balogh on or about June 1, 2005, Balogh proposed to structure the payments as "success[-]fee [-]based" contracts and volunteered to "be present when signing the contracts or meet[] with the representatives of both sides and inform[] them about the source of the money." (*Id.* ¶¶ 31–33.) On June 16, 2005, Balogh also asked representatives of the Greek intermediary to provide "feedback, after the transaction, from high[-]level representatives of both sides acknowledging

that they received what we promised." (*Id.* ¶ 34.) Additionally, Defendants allegedly discussed various options for structuring bribe payments to the minority political party. (*Id.* ¶ 28.) As a result of the allegedly corrupt payments, the Macedonian government purportedly delayed the introduction of a third mobile telephone competitor until 2007 – when a new administration came to power – and reduced the frequency-fee tariffs imposed on MakTel. (*Id.* ¶ 38.)

During and before the time of the alleged conduct, both Magyar's and Deutsche Telekom's securities were publicly traded through American Depository Receipts ("ADRs") listed on the New York Stock Exchange ("NYSE") and were registered with the SEC pursuant to Section 12(b) of the Exchange Act. (Compl. ¶¶ 14–15.) As executives of a publicly filed company, Defendants were required to make certifications to Magyar's auditors regarding the accuracy of the company's financial statements and the adequacy of its internal controls. However, the Complaint alleges that, to cover up the alleged bribery scheme, Defendants falsified their certifications in connection with the company's 2005 financial statements. (*Id.* ¶¶ 62–64.) Specifically, between July 2005 and January 2006, Straub signed management representation letters to Magyar's auditors, allegedly misrepresenting that: (1) "we have made available to you all financial records and related data"; (2) "we are not aware of any accounts, transactions or material agreement not fairly described and properly recorded in the financial and accounting records and underlying the financial statements"; and (3) "we are not aware of any violations or possible violations of laws or regulations." (*Id.* ¶ 63.)

For their part, Balogh and Morvai signed management sub-representation letters[2] for quarterly and annual reporting periods in 2005, again falsely certifying that "all material information related to my area was disclosed accurately and in full (actual and accruals) and in agreement with the subject matter of the management representation letter." (*Id.* ¶ 64.) To avoid detection, Defendants allegedly "consistently set" the payments to Macedonian government officials "just below internal control thresholds that would have required Board approval," and, in some cases, "re-executed" the contracts and performance certificates "to name different contracting parties." (*Id.* ¶ 36.) Additionally, the first installment payment to Macedonian government officials under the alleged sham contracts was purportedly booked falsely as legitimate operating expenses such as "consulting or marketing services." (*Id.* ¶ 6.)

For all of these reasons, the Complaint alleges that the payments made under the sham marketing and consulting contracts were recorded on Magyar's books and records "in a manner that did not reflect the true purpose of the contracts." (*Id.* ¶ 40.) The alleged false records were then subsequently consolidated into Deutsche Telekom's financial statements. (*Id.*) According to the Complaint, had Magyar auditors known these facts, "they would not have accepted the management representation letters and other representations provided by Straub[, n]or would the auditors have provided an unqualified audit opinion to accompany Magyar['s] annual report [to the SEC] on Form 20-F." (*Id.* ¶ 70.)

During the pendency of the alleged Macedonian bribery scheme, Magyar filed seven quarterly reports on Form 6-K with the SEC, one of which Straub signed on August 10, 2006.[3] (Opp'n Ex. 1.) On July 3, 2006, Magyar announced that its 2005 annual report would be delayed by an internal investigation of the conduct forming the basis of this lawsuit, and Straub signed the Form 12b-25 SEC filing notifying the SEC of the delay. (*Id.* Ex. 1 at 17.) Magyar did not file its Form 20-F annual report until February 22, 2007. (*Id.* Ex. 1 at 23.)

### B. Procedural History

The SEC initiated this action on December 29, 2011 by filing its Complaint. On July 11, 2012, the action was transferred to the Honorable Ronnie Abrams, United States District Judge; however, Judge Abrams recused herself and subsequently transferred the case back to the undersigned's docket. On November 5, 2012, Defendants filed the instant joint-motion, arguing that the Complaint should be dismissed because: (1) the Court lacks personal jurisdiction over them; (2) the SEC's claims are time barred; and (3) the Complaint fails to state a claim as to the SEC's first, second, and fifth causes of action. The motion was fully submitted as of December 19, 2012, and, on January 17, 2013, the Court heard oral argument on the motion.

## II. DISCUSSION

### A. Personal Jurisdiction

On a motion to dismiss for lack of personal jurisdiction, the "plaintiff bears the

---

[2] At oral argument, the SEC referred to these letters alternatively as "Sarbanes-Oxley certifications." (*See, e.g.*, Tr. 40:2–3, 41:24–42:9.)

[3] The Court may take judicial notice of relevant SEC filings during the period in question (2005 to 2006) even though the filings in question may not be referenced in the Complaint. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

burden of establishing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). However, "[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith . . . legally sufficient allegations of jurisdiction, i.e., by making a *prima facie* showing of jurisdiction." *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998) (citations and internal quotation marks omitted); *see PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997). "In deciding [a] pretrial motion to dismiss for lack of personal jurisdiction, the court has considerable discretion." *Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98, 100 (S.D.N.Y. 1989).

Under this standard, the plaintiff "must plead facts which, if true, are sufficient in themselves to establish jurisdiction" as to each defendant. *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc.*, 975 F. Supp. 562, 564 (S.D.N.Y. 1997). "[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781, n.13 (1984). Where the issue of personal jurisdiction "is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) (citations omitted). Eventually, however, "personal jurisdiction must be established by a preponderance of the evidence, either at an evidentiary hearing or at trial." *Id.* at 79.

In securities cases like this one involving securities listed on domestic exchanges, Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa (the "Exchange Act"),

establishes the exclusive basis for personal jurisdiction. *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir. 1972), *abrogated on other grounds by*, *Morrison v. Nat'l Aust. Bank Ltd.*, 130 S. Ct. 2869 (2010); *accord Bensinger v. Denbury Resources Inc.*, No. 10 Civ. 1917 (JG), 2011 WL 3648277, at *7 (E.D.N.Y. 2011); *see also* 15 U.S.C. §§ 77v (providing for worldwide service of process), 78aa ("The district courts of the United States . . . shall have exclusive jurisdiction of violations of [the Exchange Act] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder."). Because Section 27 "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment," "the personal jurisdiction challenge raised by [Defendants] must be tested against due process standards." *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (citations omitted).[4]

"The due process test for personal jurisdiction has two related components: the 'minimum contacts inquiry' and the 'reasonableness' inquiry. The [C]ourt must first determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Metro Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567

---

[4] Although Defendants argue that the applicable long-arm statute is the N.Y. C.P.L.R. – specifically, sections 301 and 302 – the Court need not discuss the statute's applicability because "Congress meant [Section] 27 to extend personal jurisdiction to the full reach permitted by the due process clause," and the N.Y. C.P.L.R. "could reach no further." *Leasco*, 468 F.2d at 1339; *cf. Unifund*, 910 F.2d at 1033 ("Since the . . . Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment, the personal jurisdiction challenge raised by [the defendant] must be tested against due process standards." (citations omitted)).

(2d Cir. 1996) (citations omitted). "If such contacts are found, the [C]ourt may assert personal jurisdiction so long as 'it is reasonable [to do so] under the circumstances of the particular case.'" *SEC v. Softpoint, Inc.*, No. 95 Civ. 2951 (GEL), 2001 WL 43611, at *2 (S.D.N.Y. Jan 18, 2001) (quoting *Metro Life Ins. Co.*, 84 F.3d at 567); *see Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (holding that due process requires that each defendant must have "minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice" (citation and internal quotation marks omitted)).

1.   Minimum Contacts

In judging minimum contacts under the standard set forth in *International Shoe* and its progeny, courts focus on "'the relationship among the defendant, the forum, and the litigation.'" *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). "The leading Supreme Court cases defining the constitutional limits of the initial minimum contacts inquiry arose in state courts or in federal diversity cases." *Softpoint*, 2001 WL 43611, at *3 (collecting cases); *see, e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–76 (1985); *World-Wide Volkswagen Co. v. Woodson*, 444 U.S. 286, 293–94 (1980). "In those circumstances, there is no question that the pertinent referent is the Fourteenth Amendment and that the minimum contacts in question are those with the forum state." *SEC v. Morton*, No. 10 Civ. 1720 (LAK) (MHD), 2011 WL 1344259, at *12 (S.D.N.Y. Mar. 31, 2011), *adopted*, No. 10 Civ. 1720 (LAK) (MHD), Doc. No. 102, (S.D.N.Y. Nov. 3, 2011). "When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nation-wide service of process, however, the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." *Id.* (collecting cases); *accord Softpoint*, 2001 WL 43611, at *5; *see, e.g.*, *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998); *Unifund*, 910 F.2d at 1033; *Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 314 (2d Cir. 1981), *overruled on other grounds*, *Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 398–401 (2d Cir. 2009); *Mariash v. Morrill*, 496 F.2d 1138, 1143–44 (2d Cir. 1974); *see also In re Oil Spill by Amoco Cadiz off Coast of France Mar. 16, 1978*, 954 F.2d 1279, 1294 (7th Cir. 1992) ("When the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation. [T]he due process clause requires only that the defendant possess sufficient contacts with the United States." (internal quotation marks omitted)).

Even though a defendant's contacts with the entire United States in such cases are determinative of the "minimum contacts" inquiry, because the language of the Fifth Amendment's due process clause is identical to that of the Fourteenth Amendment's due process clause, the same general principles guide the minimum contacts analysis. Thus, a court may exercise "specific jurisdiction" over a defendant where the suit "aris[es] out of or relate[s] to the defendant's contacts with the forum." *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).[5]   In such cases, a plaintiff can demonstrate minimum contacts where it can

--------

[5] The SEC concedes that its case is premised on an assertion of specific, rather than general, jurisdiction. (Opp'n 14.)

establish that the defendant "purposefully availed himself of the privilege of doing business in the forum state and that the defendant could foresee being haled into court there." *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 242–43 (2d Cir. 1999) (alterations and internal quotation marks omitted); *accord Burger King*, 471 U.S. at 474 (explaining that the "constitutional touchstone" of the due process analysis is "whether the defendant purposefully established 'minimum contacts' in the forum"). Although a defendant may "not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, . . . [j]urisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum." *Burger King*, 471 U.S. at 475.[6]  Moreover, a

---

[6]   At oral argument, Defendants repeatedly misrepresented this standard, indicating that a defendant's contact must "proximately cause[]" a "substantial injury" in the forum.  (*See, e.g.*, Tr. 6:24–7:9.)  As an initial matter, the Supreme Court in *Burger King* stated that a defendant's personal actions need to proximately *cause* a defendant's contacts, not that a defendant's personal actions need to have proximately *caused the injury* in the forum. *Burger King*, 471 U.S. at 475.  Indeed, in the aftermath of *Burger King* and its progeny, the Second Circuit expressly declined to adopt such a standard. *Chew*, 143 F.3d at 29; *see also Del Ponte v. Universal City Dev. Partners, Ltd.*, No. 07 Civ. 2360 (KMK) (LMS), 2008 WL 169358, at *10 (S.D.N.Y. 2008) ("[Under *Chew*,] if a defendant has scant contacts with the forum, a court may demand a proximate relation between the defendant's contacts and the plaintiff's injury.  If, on the other hand, the defendant has substantial contacts with the forum (even if not sufficient to establish general jurisdiction), the court may accept a more attenuated relation between the defendant's contacts with the forum and the plaintiff's cause of action.").  For this reason, courts have declined to read Defendants' preferred standard into the due process analysis. *See, e.g.*, *Imagine Solutions, LLC v. Med. Software Sys., Inc.*, No. 06 Civ. 3793 (ARR) (JMA), 2007 WL 1888309, at *7 n.3 (E.D.N.Y. June 28, 2007).  Moreover, Defendant cites no binding authority – and the Court is aware of none – which stands for the

defendant's physical absence from a forum is insufficient to defeat personal jurisdiction. *Id.*

Notably, the Supreme Court has recently emphasized that "it is the defendant's actions, not his expectations, that empower a [forum's] courts to subject him to judgment." *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011) ("The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct.").  Thus, although "[i]t long has been recognized that effects in the United States attributable to conduct abroad may be sufficient predicate for the exercise of personal jurisdiction over the actor," *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 456 (S.D.N.Y. 2005), "'foreseeability' *alone* has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause," *World-Wide Volkswagen*, 444 U.S. at 295 (emphasis added).  Accordingly, to square these principles and for a court to exercise jurisdiction over a foreign defendant based upon effects in the United States, a foreign actor's activity in relation to the United States must be "sufficiently extensive and regular to make [the] possibility [of litigation in the United States] a foreseeable risk of the business." *Leasco*, 468 F.2d at 1341 n.11; *accord In re Parmalat Sec. Litig.*, 376 F. Supp. 2d at 455 (explaining that the questions for determining minimum contacts of an individual foreign defendant with the United States are whether that defendant's "actions

---

proposition that an injury in the forum must be "substantial."  Indeed, in *Burger King*, the Court held that the connection to the forum, rather than the injury therein, had to be substantial. *Burger King*, 471 U.S. at 475.

caused effects in the United States, whether those effects were direct and foreseeable results of those actions, and whether []he knew or had good reason to know that [his] conduct would have effects here").[7]

"[I]n some cases, as with an intentional tort, the defendant might well fall within the [forum's] authority by reason of his attempt to obstruct its laws." *J. McIntyre Machinery*, 131 S. Ct. at 2787; *accord SEC v. Compania Internacional Financiera*, No. 11 Civ. 4904 (DLC), 2011 WL 3251813, at *5 (S.D.N.Y. July 29, 2011).  For example, as Judge Lynch held in *SEC v. Stanard*:

> Where an executive of a foreign securities issuer, wherever located, participates in a fraud directed to deceiving United States shareholders in violation of federal regulations requiring disclosure of accurate information to holders of securities traded in the United States, such direct consequences have occurred. SEC regulations would be meaningless as applied to foreign

issuers of U.S.-traded securities if the United States courts lacked jurisdiction over executives abroad who violate those regulations.  The complaint here alleges that [the defendant executive] conceived and implemented a strategy for entering a sham transaction and specifically intended that his work would result in false statements by [his company] in its publicly-filed financial statements in the United States.  At least to the extent that this allegation states a claim for violation of the United States securities laws, this Court has jurisdiction over the persons alleged to have committed that violation.

*SEC v. Stanard*, No. 06 Civ. 7736 (GEL) (S.D.N.Y. May 16, 2007) (unpublished transcript of ruling, Opp'n Ex. 2, Tr. 3:2–18.)

Here, based on the standards discussed above, the Court finds that the SEC has met its burden of proving a prima facie case of jurisdiction sufficient to withstand a jurisdictional challenge at this early stage of the litigation.  Like the defendants in *Stanard*, the Defendants here allegedly engaged in conduct that was designed to violate United States securities regulations and was thus necessarily directed toward the United States, even if not principally directed there.  As noted above, during and before the time of the alleged violations, both Magyar's and Deutsche Telekom's securities were publicly traded through ADRs listed on the NYSE and were registered with the SEC pursuant to Section 12(b) of the Exchange Act. (Compl. ¶¶ 14–15.)  Because these companies made regular quarterly and annual consolidated filings during that time (*id.* ¶ 6), Defendants knew or had reason to know that any false or misleading financial reports would be given

---

[7] Defendants argue that courts apply a "heightened causation standard when evaluating the constitutionality of asserting jurisdiction under an 'effects' theory like the one advocated by the SEC." (Reply 5.)  Specifically, Defendants cite *Calder v. Jones*, 465 U.S. 783 (1984), for the proposition that "[t]he Supreme Court has sanctioned jurisdiction based on the effects test only where defendants 'expressly aimed' their 'intentional' actions at the forum and consequently 'knew that the brunt of [the] injury would be felt' in that forum."  (Reply 5 (quoting *Calder*, 465 U.S. at 789–90); *see* Tr. 8:20–24.)  Although it is true that the so-called effects test "must be applied with caution, particularly in an international context," *Leasco*, 468 F.2d at 1341, the Supreme Court has never suggested – whether in *Calder* or otherwise – that the conditions cited by Defendants are *necessary* for a Court to exercise jurisdiction.  *See Calder*, 465 U.S. at 789–90.  Rather, the conditions are merely *sufficient* to bestow jurisdiction.  *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d at 455 n.34 (citing *Calder*, 465 U.S. at 789–90).  Therefore, the Court rejects Defendants' argument.

to prospective American purchasers of those securities. *Cf. Leasco*, 468 F.2d at 1341 n.11; *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d at 456.

Indeed, during the period of the alleged violations, Straub allegedly signed false management representation letters to Magyar's auditors, and Balogh and Morvai signed allegedly false management sub-representation letters for quarterly and annual reporting periods in 2005. (Compl. ¶¶ 63–64.)  Therefore, it is not only that Magyar traded securities through ADRs listed on the NYSE that satisfies the minimum contacts standard but also that Defendants allegedly engaged in a cover-up through their statements to Magyar's auditors knowing that the company traded ADRs on an American exchange, and that prospective purchasers would likely be influenced by any false financial statements and filings. (*Cf.* Mem. 13 (arguing that "foreign corporate issuers of ADRs are not subject to personal jurisdiction in the United States on the basis of domestic trading alone").)  The Court thus has little trouble inferring from the SEC's detailed allegations that, even if Defendants' alleged primary intent was not to cause a tangible injury in the United States, it was nonetheless their intent, which is sufficient to confer jurisdiction.

Holding that Defendants have sufficient minimum contacts would not only be consistent with Judge Lynch's opinion in *Stanard* but also with a host of other cases within this Circuit that Defendants unconvincingly attempt to distinguish. (*See* Reply 9 n.7.)  For example, in *In re Parmalat Securities Litigation*, the court upheld jurisdiction over an Italian auditor in connection with Parmalat's misleading financial statements filed with the SEC where the complaint alleged that Parmalat "traded actively in the United States, that

Parmalat made note offerings [there], and that company documents including [s]tatutory [b]oard reports were posted on company web sites in English." 376 F. Supp. 2d at 456. Similarly, in *In re CINAR Corp. Sec. Litig.*, the court upheld jurisdiction over a Canadian general counsel defendant who signed an allegedly fraudulent registration statement because she "must have known that the [s]tatement was made to comply with the laws governing securities offerings in American markets and, as such, it would be used and relied upon by American investors." 186 F. Supp. 2d 279, 304–06 (E.D.N.Y. 2002).  In other words, "[she] could have reasonably foreseen that, were there to be litigation concerning the [s]tatement, she would be haled into court in the United States." *Id.*; *see also Itoba, Ltd. v. LEP Grp. PLC*, 930 F. Supp. 36, 40–41 (D. Conn. 1996) (upholding jurisdiction over British board chairman who approved filing of fraudulent SEC Form 20-F, even though he did not attend board meetings where the documents were approved); *Landry*, 715 F. Supp. at 100–02 (upholding jurisdiction over Canadian board member who allegedly orchestrated fraudulent corporate acquisition, resulting in filing of misleading financial statements with SEC); *Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1260–61 (S.D.N.Y. 1984) (upholding jurisdiction over Australian auditor of fraudulent registration statement when plaintiff alleged that registration statement misled public and distorted market).  Thus, despite Defendants' arguments to the contrary, the Court is not by any means "breaking new ground" with this finding.[8]

---

[8] At the initial status and pre-motion conference, the SEC indicated that its jurisdictional theory "may be breaking new ground." (Tr. of Oct. 12, 2012 Pre-Motion and Initial Status Conference at 10.)  In their motion papers, Defendants attempt to use that statement as a proverbial albatross to hang around the

Nevertheless, in an attempt to avoid jurisdiction, Defendants argue that the Complaint fails to allege that investors relied to their detriment on the allegedly fraudulent SEC filings. (Mem. 12; Reply 7.) Specifically, Defendants point to the fact that Magyar's 2005 financial statements "were not certified by the auditors or the subject of any filing in the United States until 2007 . . . [,] long after [D]efendants had left Magyar . . . and well after the Company's postponement of the 2005 filing." (Reply 7.)

However, Defendants' argument is beside the point for several reasons. First, the SEC does not bear the burden of alleging that investors relied to their detriment on the concealment of Defendant's bribery scheme. *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006) ("The SEC, unlike a private plaintiff, is not required to prove reliance when it brings enforcement actions under the securities laws."). Indeed, whether reliance is alleged or not, the SEC has the authority under the FCPA to enforce not only the FCPA's provisions regarding alleged bribery but also the books and records, internal controls, and lying to auditors requirements set forth in §§ 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act. 15 U.S.C. §§ 78m(b)(2)(A), (b)(2)(B), (b)(5). Second, and more important, it is sufficient for purposes of the jurisdictional inquiry at this stage that Defendants knew or should have known when they allegedly falsified Magyar's books and records that the company's resulting fraudulent financial statements would be filed with the SEC and

made available to prospective American investors. (*See* Opp'n 20.)

Third, the SEC need not, as Defendants contend, demonstrate that the trading harm caused by Defendants' conduct was demonstrable, let alone "significant." (*See* Mem. 15–16.) Indeed, the series of insider trading cases that Defendants cite for their position are inapposite because the SEC here premises Defendants' liability on allegedly fraudulent filings rather than on harm to investors. Furthermore, even if these cases were on point, they would not support Defendants' argument. Indeed, in only one case – *SEC v. Alexander* – did the court find personal jurisdiction to be lacking, and it did so only where the Italian defendant in question placed a single order with her Italian broker to sell shares in an Italian company without knowing "that the sale of stock would be accomplished by sale of [the company's] ADRs listed on the [NYSE]." 160 F. Supp. 2d 642, 655–57 (S.D.N.Y. 2001). Plainly, *Alexander* is readily distinguishable: Defendants here, unlike the Italian woman in *Alexander*, were sophisticated actors who knew that Magyar listed ADRs on the NYSE and that the allegedly fraudulent financial reports would be filed with the SEC.

Defendants also argue that, should the Court exercise jurisdiction over them, it would automatically imply that "any individual director, officer, or employee of an issuer in any FCPA case" would also be subject to personal jurisdiction. (Mem. 10.) However, Defendants' concerns are overblown. In holding that Defendants have met their burden of demonstrating a prima facie case for jurisdiction at this early stage, the Court does not create a *per se* rule regarding employees of an issuer but rather bases its decision on a fact-based inquiry – namely, an analysis of the SEC's specific allegations regarding the Defendants'

---

SEC's neck. Given the precedent cited above, however, the Court finds that it is *not* breaking new ground by exercising personal jurisdiction over the Defendants. Thus, the Court declines to dismiss the Complaint for lack of jurisdiction merely because of an errant, isolated statement made prior to full briefing on the instant motion.

bribery scheme, Defendants' falsification of Magyar's books and records, and Defendants' personal involvement in making representations and sub-representations with respect to and in anticipation of Magyar's SEC filings. Although Defendants' alleged bribes may have taken place outside of the United States (as is typically true in cases brought under the FCPA), their concealment of those bribes, in conjunction with Magyar's SEC filings, was allegedly directed toward the United States.

Lastly, Defendants also cite *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), for the proposition that the "effects test as it applies to conduct wholly outside of the United States . . . has been banished on statutory grounds." (Mem. 15.) However, *Morrison* is inapposite because the case addressed the permissible extraterritorial reach of § 10(b) of the Exchange Act and did not address personal jurisdiction at all. *See Morrison*, 130 S. Ct. at 2877 ("[T]o ask what conduct § 10(b) reaches . . . is a merits question."). Perhaps tellingly, this point was raised by the SEC in their opposition brief, but Defendants did not offer a response in their reply brief.[9]

Accordingly, the Court finds that the SEC has established a prima facie case that Defendants had the requisite minimum contacts with the United States to support personal jurisdiction.

### 2. Reasonableness

"Once it has been decided that a defendant purposefully established minimum contacts within the forum . . . , these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice,'" *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320) – "that is, whether it is reasonable under the circumstances of the particular case," *Metro. Life Ins.*, 84 F.3d at 568; *see World-Wide Volkswagen*, 444 U.S. at 292, 295 (explaining that the "fair play and substantial justice" standard is often described in terms of whether it would be "fair" or "reasonable" to subject the defendant to litigation in the forum). In determining the reasonableness of exercising jurisdiction in connection with a particular defendant, courts must evaluate:

(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Metro Life Ins.*, 84 F.3d at 568 (citing *Asahi Metal Indus. Co., Ltd. v. Super. Ct.*, 480 U.S. 102, 113–14 (1987)).

"While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case that the presence of some

---

[9] The SEC does not rely on Balogh's emails as a basis for the Court's jurisdiction over him; rather, it relies on those messages to satisfy the "interstate commerce" element of the SEC's bribery charges under 15 U.S.C. § 78dd-1. (*See* Opp'n 18.) Therefore, while the Court addresses those emails *infra* Part II.C.2., it does not address them here.

other considerations would render jurisdiction unreasonable.'" *Id.* (citing *Burger King*, 471 U.S. at 477); *see also Burger King*, 471 U.S. at 478 (explaining that the defendant must demonstrate that the assertion of personal jurisdiction in the forum will "make litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent" (internal quotation marks omitted)); *Asahi*, 480 U.S. at 116 (Brennan, J., concurring) (finding that only in "rare cases" will inconvenience defeat the reasonableness of jurisdiction). "The reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process because of the strong federal interests involved." *SEC v. Syndicated Food Servs. Int'l, Inc.*, No. 04 Civ. 1303 (NGG) (ALC), 2010 WL 3528406, at *3 (E.D.N.Y. Sept. 3, 2010) (internal quotation marks omitted); *accord Softpoint*, 2001 WL 43611, at *5. "To date, while most courts continue to apply the test as a constitutional floor to protect litigants from truly undue burdens, few (and none in this Circuit) have ever declined jurisdiction, on fairness grounds, in such cases." *Syndicated Food Servs. Int'l*, 2010 WL 3528406, at *3 (internal quotation marks omitted).

Like each and every court in this Circuit to have applied the reasonableness standard after determining that a given defendant has the requisite minimum contacts, this Court finds that this is not the rare case where the reasonableness analysis defeats the exercise of personal jurisdiction. Although it might not be convenient for Defendants to defend this action in the United States, Defendants have not made a particular showing that the burden on them would be "severe" or "gravely difficult." Indeed, as the SEC rightly notes, unlike in a private diversity action, here there is no alternative forum available for the government. (Opp'n 22.) Thus, if the SEC could not enforce the FCPA against Defendants in federal courts in the United States, Defendants could potentially evade liability altogether. Additionally, because this case was brought under federal law, the judicial system has a strong federal interest in resolving this issue here. The Court therefore finds that the exercise of personal jurisdiction over Defendants is not unreasonable.

*        *        *

Accordingly, because the SEC has established that Defendants have minimum contacts with the United States and that the exercise of personal jurisdiction over Defendants would not be unreasonable, the Court finds that the SEC has met its burden at this stage of establishing a prima facie case of personal jurisdiction over Defendants.

## B.  Time Bar

A statute of limitations is normally an affirmative defense; however, if the allegations "show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim." *Jones v. Bock*, 549 U.S. 199, 215 (2007). Here, it is undisputed that, to the extent that the SEC's claims are subject to a statute of limitations, the catch-all limitations period set forth in 28 U.S.C. § 2462 applies. (*See* Opp'n 23–24; Reply 10.) That statute provides:

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, *within the*

*same period, the offender or the property is found within the United States in order that proper service may be made thereon.*

28 U.S.C. § 2462 (emphasis added).

It is undisputed that more than five years have elapsed since the SEC's claims first accrued. (*See* Opp'n 23–24; Reply 10.) The parties nevertheless disagree as to the plain meaning of § 2462 and, given that Defendants were not physically located within the United States during the limitations period, whether the statute of limitations has run on the SEC's claims. The SEC argues that the statute of limitations has not run because the statute applies only "'if, within the same period, the offender . . . is found within the United States.'" (Opp'n 23–24 (quoting 28 U.S.C. § 2462).) Thus, according to the SEC, because Defendants were not "found" in this country at any point during the limitations period in question, the Court's inquiry should end. (*Id.* at 24.) The Court agrees.

Statutory interpretation begins with the text and, where the meaning of a statutory provision is unambiguous, a court should proceed no further. *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 131 S. Ct. 1101, 1107 (2011); *accord United States v. Colasuonno*, 697 F.3d 164, 173 (2d Cir. 2012). Here, Defendants argue that the phrase "in order that proper service may be made thereon" relates "only to the ability to serve [a] defendant with process" and thus must control the Court's reading of the phrase "is found within the United States." (Mem. 19.) However, Defendants' proffered reading is at odds with § 2462's plain meaning.

First, Defendants conflate § 2462's *operative* language – "if, within the same period, the offender . . . is found within the

United States" – with the provision's *statement of purpose* – "in order that proper service may be made thereon." *See* 28 U.S.C. § 2462; *see also Dist. of Columbia v. Heller*, 554 U.S. 570, 577–78 (2008) (noting the difference between the Second Amendment's "prefatory" and "operative" clauses and noting that a prefatory clause "does not limit the [operative clause] grammatically, but rather announces a purpose"). Although a statement of purpose might "resolve an ambiguity in the operative clause," it "does not limit or expand the scope of the operative clause." *Heller*, 554 U.S. at 577–78.[10]

Here, the operative language in § 2462 requires, by its plain terms, that an offender must be physically present in the United States for the statute of limitations to run. In arguing otherwise, Defendants essentially seek to amend the statute to run against a defendant if he is *either* "found within the United States" *or* subject to service of process elsewhere by some alternative means. Such a reading would be a dramatic restatement of the statutory language and would render the clause "if . . . found within the United States" mere surplusage. *Colasuonno*, 697 F.3d at 173 ("An alternative construction would 'violate[ ] the established principle that a court should give

---

[10]  Defendants unconvincingly try to distinguish *Heller* by arguing that it was a "constitutional case" and that its analysis "applied only to 'legal documents of the founding era[.]'" (Reply 11 n.10 (quoting *Heller*, 554 U.S. at 577).) However, the mere fact that the Supreme Court in *Heller* was interpreting a constitutional, as opposed to statutory, provision is of limited significance and does not provide a compelling reason in the statutory context to ignore the Supreme Court's interpretive rubric. Likewise, the mere fact that the Supreme Court in *Heller* noted that prefatory clauses were common in "legal documents of the founding era" was not dispositive to its ultimate conclusion regarding the connection between prefatory and operative clauses, wherever they exist.

effect, if possible, to every clause and word of a statute.'" (quoting *Moskal v. United States*, 498 U.S. 103, 109–110 (1990)).

Additionally, reading the statute to require a defendant's physical presence in the United States is not inconsistent with § 2462's statement of purpose, as was originally understood. *See Heller*, 554 U.S. at 578 (noting that a court should begin "textual analysis with the operative clause [and] return to the prefatory clause to ensure that [its] reading of the operative clause is consistent with the announced purpose"). When the precursor to § 2462 was first passed in the 1790s, legislators could only authorize proper service of process within the borders of the United States. *See 3M Co. v. Browner*, 17 F.3d 1453, 1458 n.7 (D.C. Cir. 1994); *Stimpson v. Pond*, 23 F. Cas. 101, 101–02 (C.C.D. Mass. 1855). When Congress added the language "if found within the United States" in 1839, courts at the time understood that the statute of limitations would not begin to run while defendants were outside of the United States and, therefore, not amenable to service. *See United States v. Brown*, 24 F. Cas. 1263, 1264 (D. Mass. 1873) (construing the tolling provision of the 1839 precursor statute as meaning "that in suits for pecuniary penalties there must have been, within the five years, an opportunity for personal service on the defendant"). Each subsequent re-codification of the statute maintained the operative "found within the United States" language. (Opp'n Ex. 3 (28 U.S.C. § 791 (1940 ed.); 28 U.S.C. § 2462 (1948 ed.)).) That it now might be possible, through the Hague Service Convention or otherwise, to serve defendants who are not found in the United States does not change the fact that Congress has maintained the statutory carve-out for defendants not found within the

United States.[11]   Indeed, although the purpose underlying that carve-out may no longer be as compelling as it might have once been in light of the possibilities opened by worldwide service of process, it is not for this Court to second-guess Congress and amend the statute on its own.

Accordingly, the Court finds that the statute of limitations within § 2462 has not run on the SEC's claims.

## C.  Failure to State a Claim

Finally, Defendants assert that the Complaint must be dismissed for failure to state a claim, pursuant to Federal Rule of Procedure 12(b)(6).

### 1.   Legal Standard

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "provide the grounds upon which [its] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).   A plaintiff must also allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[11] The Court also rejects Defendants' argument that the Hague Service Convention alters the effect of § 2462.  Section 2462 explicitly contemplates that its terms can be modified by subsequent act of Congress. 28 U.S.C. § 2462 ("Except as otherwise provided by Act of Congress . . . .").  According to Defendants, by ratifying the Hague Service Convention and providing for service on the global stage, Congress essentially modified § 2462.  (*See* Mem. 19; Reply 12–13.)  However, such an argument is unavailing because, even assuming that Defendants were amenable to service via the Hague Service Convention in the six years prior to actual service, Defendants nevertheless could not be "found within the United States."   Moreover, as Defendants acknowledge, the Hague Service Convention does not contain a more specific statute of limitations (Tr. 22:24–23:3) and, therefore, is not the type of congressional act contemplated by § 2462's introductory phrase.

544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that only offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

## 2. Whether the Complaint Adequately Alleges that Defendants Made Use of United States Interstate Commerce

Defendants argue that the Complaint fails to allege facts sufficient to show that Defendants "ma[de] use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of any offer, payment, promise to pay, or authorization of the payment of any money . . . or . . . anything of value" to "any foreign official." 15 U.S.C. § 78dd-1(a); (*see* Mem. 22–25; Reply 14–17). The Complaint alleges that Balogh used emails in furtherance of the bribe scheme by attaching drafts of the Protocols, the Letter of Intent, and copies of consulting contracts with third-party intermediaries (Compl. ¶ 39) – all of which were the alleged means by which Defendants concealed the true nature of the payments offered to the Macedonian government officials (*id.* ¶¶ 19, 31–32, 35). The Complaint further alleges that the emails were "sent from locations outside the

United States, but were routed through and/or stored on network servers located within the United States." (*Id.* ¶ 39.)

As an initial matter, it is undisputed that the use of the Internet is an "instrumentality of interstate commerce." (Reply 15–16; Tr. 30:13–14); *see, e.g.*, *United States v. MacEwan*, 445 F.3d 237, 244 (3d Cir. 2006); *SEC v. Solucorp. Indus. Ltd.*, 274 F. Supp. 2d 379, 419 (S.D.N.Y. 2003). However, the parties dispute whether 15 U.S.C. § 78dd-1(a) requires some element of knowledge or intent with respect to the use of "the mails or any means or instrumentality of interstate commerce." According to Defendants, because the SEC fails to allege that Defendants *personally knew* that their emails would be "routed through and/or stored" on servers within the United States, the SEC's allegations cannot state a claim under the FCPA's bribery provision. (*See, e.g.*, Mem. 22.)

The issue of whether § 78dd-1(a) requires that a defendant intend to use "the mails or any means or instrumentality of interstate commerce" is a matter of first impression in the FCPA context. Section 78dd-1(a) is not a model of precision in legislative drafting: its text does not make immediately clear whether "corruptly" modifies the phrase "make use of the mails or any means or instrumentality of interstate commerce" or the phrase "any offer, payment, promise to pay, or authorization of the payment of any money . . . or . . . anything of value." *See CSX Transp.*, 131 S. Ct. at 1107. The use of the adverb "corruptly" appears to modify the verb "use," but the word's delayed placement in the statutory text appears to reflect a legislative choice to modify the grouping of words that follows: "offer, payment, promise to pay, or authorization of the payment of any money . . . or . . . anything of value." 15 U.S.C. § 78dd-1(a); (*see* Tr.

31:12–13 (acknowledging that "certainly corruptly can modify the nouns, the gifts, the bribes, the offers")). Because the plain language of the provision is ambiguous, even when read in context and after applying traditional canons of statutory construction, the Court turns to the legislative history, which is instructive:

> The word "corruptly" is used in order to make clear that the offer, payment, promise, or gift, must be intended to induce the recipient to misuse his official position in order to wrongfully direct business to the payor or his client, or to obtain preferential legislation or a favorable regulation. The word "corruptly" connotes an evil motive or purpose, an intent to wrongfully influence the recipient.

S. Rep. No. 95-114, at 10 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4098, 4108; *see Colasuonno*, 697 F.3d at 173 (noting that, when a court discerns ambiguity in statutory text, it may "resort first to canons of statutory construction, and, if the meaning remains ambiguous, to legislative history"). Thus, the legislative history reveals that, although Congress intended to make an "intent" or *mens rea* requirement for the underlying bribery, it expressed no corresponding intent to make such a requirement for the "make use of . . . any means or instrumentality of interstate commerce" element.[12]

Such a reading is consistent with the way that courts have interpreted similar provisions in other statutes. For instance, courts have held that the use of interstate commerce in furtherance of violations of the securities laws, the mail and wire fraud statutes, and money laundering statutes is a jurisdictional element of those offenses. *See United States v. Blackmon*, 839 F.2d 900, 907 (2d Cir. 1988) ("This court has unambiguously held that there is no *mens rea* requirement as to the purely jurisdictional element of interstate communication under the wire fraud statute."); *SEC v. Boock*, No. 09 Civ. 8261 (DLC), 2011 WL 3792819, at *17 n.20 (S.D.N.Y. Aug. 25, 2011) ("The jurisdictional requirement[ ] of . . . Rule 10b–5 [is] broadly construed, so as to be satisfied by any activity connected with a national securities exchange, by intrastate telephone calls, and by even the most ancillary mailings." (alterations in original) (internal quotation marks omitted)); *United States v. Victor Teicher & Co., L.P.*, 726 F. Supp. 1424, 1431 (S.D.N.Y. 1989) (noting that "use of the mails, means or instrumentality of interstate commerce" is a jurisdictional element of a Rule 10b-5 violation). As such, defendants need not have formed the particularized *mens rea* with respect to the instrumentalities of commerce. *See United States v. Feola*, 420 U.S. 671, 676 n.9 (1975); *see also United States v. Cooper*, 482 F.3d 658, 664 (4th Cir. 2007) ("[J]urisdictional elements generally assert federal jurisdiction but do not create additional statutory elements as to which defendants must have formed the appropriate mens rea in order to have broken the law."). Although no court appears to have addressed whether the use of interstate

---

[12] This is not to say that a defendant need know that he is violating the FCPA by bribing an official – only that he intends to wrongfully influence that official. *See Stichting Ter Behartiging Van de Belangen Van Oudaadeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 181 (2d Cir. 2003) ("Knowledge by a defendant that it is violating the FCPA – that it is committing all the elements of an FCPA violation – is not itself an element of the FCPA crime. Federal statutes in which the defendant's knowledge that he or she is violating the statute is an element of the violation are rare; the FCPA is plainly not such a statute." (footnote omitted)).

commerce is also a jurisdictional element of an FCPA violation, the similarity of the language in § 78dd-1(a) and the laws noted above weighs in favor of finding that Congress intended a similar application of the requirement in the FCPA context. *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well.").

Defendants nonetheless argue that the mail and wire fraud and money laundering statutes are distinguishable because, unlike the FCPA – which applies to individuals who "make use of . . . any means or instrumentality of interstate commerce," 15 U.S.C. § 78dd-1(a) – these statutes cover individuals who, respectively, "deposit[] or cause[] to be deposited" or "cause[] to be delivered by mail," 18 U.S.C. § 1341, or "transmit[] or cause[] to be transmitted" by the wires, 18 U.S.C. § 1343. (Reply 15 n.14.) Similarly, Defendants argue that Rule 10b-5 is distinguishable from the FCPA because it applies to "direct[] or indirect[]" use of an instrumentality of interstate commerce. (Reply 17 n.17 (citing 17 C.F.R. § 240.10b-5).) Thus, according to Defendants, the scope of those statutes is broader and applies even when a defendant does not personally use an instrumentality of interstate commerce. However, Defendants' argument is strained and appears intended to create a meaningful distinction where none exists. The difference between "causes to" and "uses" is not so great as to enable the Court to divine a congressional intent to impart a different meaning to one statutory provision and not to another. Moreover, the mere fact that § 78dd-1(a) does not include the phrase "directly or indirectly" does not indicate that the requirement "make use"

implies that a defendant must have made *direct* use.[13]

Therefore, the Court finds that the Complaint sufficiently pleads that Defendants used the means or instrumentalities of interstate commerce, pursuant to the FCPA.[14]

---

[13] The Court also rejects two of Defendants' additional arguments. First, the Court rejects Defendants' argument that the SEC has failed to allege that there was *any* "use" whatsoever of the instrumentalities of interstate commerce. (Tr. 31:18–19.) As noted above, the Complaint specifically alleges that Balogh emailed, on behalf of Defendants, drafts of the Protocols, the Letter of Intent, and copies of consulting contracts to third-party intermediaries, and that the emails were "routed through and/or stored on network servers located within the United States." (Compl. ¶ 39.) The mere fact that Defendants may not have had personal knowledge that their emails would be routed through or stored in the United States does not mean that they did not, in fact, use an instrument of interstate commerce sufficient for purposes of conferring jurisdiction. Second, the Court rejects Defendants' argument that it was not foreseeable that emails sent over the Internet in a foreign country would touch servers located elsewhere. The Court does not disagree with Defendants that "[t]he [I]nternet is a huge, complex, gossamer web" (Tr. 35:5–6), but that is all the more reason why it should be foreseeable to a defendant that Internet traffic will not necessarily be entirely local in nature.

[14] Defendants also assert that the Complaint fails to sufficiently allege that Defendants used the means or instrumentalities of interstate commerce "in furtherance" of their FCPA violations. (Mem. 24–25.) Specifically, they argue that the Complaint alleges only that Defendants executed a "scheme" to bribe Macedonian government officials and not that they made an "'offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value.'" (*Id.* at 24 (citing 15 U.S.C. § 78dd-1).) However, Defendants ignore the fact that the Complaint specifically alleges that Defendants sent the Protocols and Letter of Intent, which were essentially their offers to pay or promises to pay the alleged bribes, to Macedonian government officials. (*See* Compl. ¶¶ 21–23, 25–26, 29–30.) These emails

3.   Whether the Complaint Adequately
Alleges the Involvement of
"Foreign Officials"

Defendants argue that the Complaint fails to allege sufficient facts to establish that their intended bribe recipients were "foreign officials" under the FCPA.  (*See* Mem. 27–28; Reply 17–18.)   As noted above, pursuant to 15 U.S.C. § 78dd-1(a), the recipient of an unlawful bribe must be a "foreign official," which the statute defines as "any officer or employee of a foreign government or any department, agency, or instrumentality thereof . . . , or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization." 15 U.S.C. § 78dd-1(f)(1)(A).

By its plain terms, "[t]he language of the statute does not appear to require that the identity of the foreign official involved be pled with specificity."  *SEC v. Jackson*, No. H-12-0563 (KPE), 2012 WL 6137551, at *11 (S.D. Tex. Dec. 11, 2012).   Such a requirement would be at odds with the statutory scheme, which targets actions (such as making an "offer" or "promise") without requiring that the "foreign official" accept the offer or reveal his specific identity to the payor.  *See* 15 U.S.C. § 78dd-1(a).   Indeed, the fact that the FCPA prohibits using "any person" or an intermediary to facilitate the bribe to any "foreign official" or "any foreign political

party" suggests that the statute contemplates situations in which the payor knows that a "foreign official" will ultimately receive a bribe but only the intermediary knows the foreign official's specific identity.   15 U.S.C. § 78dd-1(a)(1)–(3) (prohibiting, *inter alia*, an offer, payment, or promise of payment to "any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official, to any foreign political party or official thereof, or to any candidate for foreign political office").   As one district court has aptly noted:

> [I]t would be perverse to read into the statue a requirement that a defendant know precisely which government official, or which level of government official, would be targeted by his agent; a defendant could simply avoid liability by ensuring that his agent never told him which official was being targeted and what precise action the official took in exchange for the bribe.

*Jackson*, 2012 WL 6137551, at *12; *see also id.* ("The Court seriously doubts that Congress intended to hold an individual liable under [the FCPA] only if he took great care to know exactly whom his agents would be bribing and what precise steps that official would be taking.").

In light of the fact that there is no requirement that the "foreign official" be specifically named and that reading such a requirement into the FCPA would be contrary to the statutory scheme, the Court finds that the Complaint satisfies Federal Rule of Civil Procedure 8(a).   Specifically, the Complaint alleges, *inter alia*, that: (1) Magyar's subsidiaries retained an intermediary to facilitate negotiations with

---

also included reference to the alleged "sham" contracts used to conceal the true nature of Defendants' bribes.   (*See id.* ¶¶ 19, 31–32, 35.)  Accordingly, such allegations are sufficient to satisfy the "in furtherance" language of § 78dd-1.   *See United States v. Kay*, 513 F.3d 432, 453–54 (5th Cir. 2007) (holding that allegedly false documents sent in United States interstate commerce that were used to calculate bribes were sufficiently "in furtherance" of the bribes to state an offense under the FCPA).

"Macedonian government officials" on Magyar's behalf; (2) the Protocols were signed by specific senior Macedonian officials from the majority and minority political parties of the governing coalition; (3) the Protocols "required government official to ignore their lawful duties" and recording obligations; (4) the government officials had the power to ensure both that "the government delayed or precluded the issuance of the third mobile telephone license" and that MakTel was exempted "from the obligation to pay an increased frequency fee"; (5) officials from the minority party in the governing coalition "occupied senior positions in the telecommunciations regulatory agencies with jurisdiction over the tender of the third mobile license"; and (6) Balogh communicated directly with the government officials of both parties in furtherance of the bribery scheme. (Compl. ¶¶ 22–23, 25, 27, 31, 34.) Such allegations are sufficient to put Defendants on notice of the substance of the SEC's claims and that the allegedly bribed officials were acting in their official capacities.

Accordingly, the Court finds that the SEC has satisfied its pleading obligations under *Iqbal* and *Twombly* with regard to the term "foreign official" in the FCPA.

### 4.   Claim Pursuant to Exchange Act Rule 13b2-2

Defendants next argue that the Complaint fails to allege false statements to investors, in violation of Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2, in connection with the management and sub-management letters prepared for the audit of Magyar's 2005 financial statements. A plaintiff pleading a violation of Rule 13b2-2 must sufficiently allege that (1) the individual is a director or an officer of an issuer (2) who "directly or indirectly" made

or caused to be made "a materially false or misleading statement" or omission to an accountant (3) in connection with an SEC filing or audit. 17 C.F.R. § 240.13b2-2(a). The parties do not dispute that the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies to this claim. (*See* Mem. 29; Opp'n 35–36.) Pursuant to Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). In order to satisfy Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted)). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99. In the context of alleged violations of the federal securities laws, a complaint must not merely rely on the so-called "group pleading doctrine" to "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent." *See In re UBS AG Sec. Litig.*, Master File No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *9–11 (S.D.N.Y. Sept. 28, 2012) (internal quotation marks omitted).

As a preliminary matter, the Court rejects Defendants' argument that the Complaint impermissibly relies on the group pleading doctrine. The Complaint identifies the specific statements that were misleading, why they were misleading, which Defendant said them, and the SEC filings or audits for which they were made. For instance, the Complaint alleges that Straub stated in the management representation letters he signed

between July 2005 and January 2006 that "we have made available to you all financial records and related data"; "we are not aware of any accounts, transactions or material agreement not fairly described and properly recorded in the financial and accounting records underlying the financial statements"; and "we are not aware of any violations or possible violations of laws or regulations." (Compl. ¶ 63.) The Complaint also alleges that these statements were false or misleading because Straub knew that: (1) Magyar "entered into at least seven bogus contracts . . . in 2005 and 2006 related to its Macedonian and Montenegrin subsidiaries"; (2) "all or a portion of the payments under the seven contracts" would be used for the purpose of bribing government and political party officials in Macedonia and Montenegro; and (3) the contracts and the supporting documents justifying expenditures under those contracts "did not accurately reflect the true purpose of the payments," and, as a result, Magyar's "accounting books, records, and accounts were . . . rendered false." (*Id.* ¶¶ 65–67.) Additionally, the Complaint alleges that Straub failed to disclose to Magyar's auditors the existence of the Protocols, the Letter of Intent, and other documents "concerning the scheme to bribe" Macedonian and Montenegrin government and political party officials. (*Id.* ¶¶ 68–69.)

As for Balogh and Morvai, the Complaint alleges that they made misstatements by signing sub-representation letters for quarterly and annual reporting periods in 2005, allegedly falsely certifying that "all material information related to my area was disclosed accurately and in full (actual and accruals) and in agreement with the subject matter of the management representation letter." (*Id.* ¶ 64.) At the time that they made these representations, Balogh and Morvai allegedly possessed the same knowledge that Straub had when he

signed the management representations. (*Id.* ¶¶ 65–69.)

Based upon these allegations, the Court has little difficulty finding that, rather than lumping Defendants together, the Complaint states with particularity the circumstances constituting the alleged fraud as to *each* Defendant. *See* Fed. R. Civ. P. 9(b). As the SEC rightly notes, "that all [D]efendants were aware of the same set of underlying facts, and that it was this common set of facts that made their statements to Magyar's auditors misleading, does not equate to the impermissible use of 'group pleading.'" (Opp'n 37.)[15]

Although the Complaint satisfies the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), the question remains whether each Defendant's alleged misstatements were "material" pursuant to Rule 13b2-2. The traditional definition of materiality under the securities laws is "[w]hether the defendants' representations, taken together and in context, would have misled a reasonable investor." *In re Morgan Stanley Info Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (internal quotation marks omitted) (stating the definition of materiality in the context of § 10(b) of the Exchange Act and §§ 11 and 12(a)(2) of the Securities

---

[15] Defendants argue that the Complaint does not indicate how many management letters are alleged to have been signed by Defendants. (Reply 18–19.) However, the Court finds that while Defendants' argument is *technically* true, it is irrelevant. The Complaint alleges that Straub signed management representation letters "[b]etween July 2005 and January 2006" and that Balogh and Morvai signed management sub-representation letters for quarterly and annual reporting periods in 2005. (Compl. ¶¶ 63–64.) Because the number of quarterly and annual reporting periods is finite, the allegations as pled are sufficient to place Defendants on notice of which management representation letters contain the alleged fraudulent misstatements.

Act).[16]   The parties dispute, however, whether the so-called "reasonable investor" standard under the securities laws is applicable to Rule13b2-2, which speaks not in terms of misrepresentations to investors but to "accountants."   *See* 17 C.F.R. § 240.13b2-2.

The Second Circuit has not addressed this precise question.   (*See* Reply 19.) However, the other courts to have addressed the issue have held that, for purposes of Rule13b2-2, a statement is material if "'a reasonable auditor would conclude that it would significantly alter the total mix of information available to him.'"   *SEC v. Patel*, No. 07 Civ. 39 (SM), 2009 WL 3151143, at *30 (D.N.H. Sept. 30, 2009) (quoting *United States v. Goyal*, No. CR 04-00201 (MJJ), 2008 WL 755010, at *5 (C.D. Cal. Mar. 21, 2008), *rev'd on other grounds*, 629 F.3d 912 (9th Cir. 2010)); *accord SEC v. Retail Pro, Inc.*, No. 08 Civ. 1620 (WQH) (RBB), 2010 WL 1444993, at *6 (S.D. Cal. Apr. 9, 2010).   Such an interpretation of Rule 13b2-2 is reasonable given that the Rule speaks about the relationship between a corporation's director or officer and an *accountant* rather than an *investor* or recipient of a registration statement. *Compare* 17 C.F.R. § 240.13b2-2(a), *with*

17 C.F.R. § 240.10b-5(b).   Indeed, it would make little sense to import the reasonable investor standard to a Rule that does not even require that the misstatement ever be communicated to an investor in order to establish a violation.

Here, the Complaint alleges that "[h]ad Magyar['s] auditors known [the facts alleged in the Complaint regarding the alleged bribery scheme], they would not have accepted the management representation letters and other representations provided by Straub[, n]or would the auditors have provided an unqualified auditor opinion to accompany Magyar['s] annual report on Form 20-F." (Compl. ¶ 70.)   In light of the SEC's allegations noted above and the fact that the materiality of the misstatements made to the auditors is "a mixed question of law and fact that generally should be presented to a jury," *see Press v. Chem. Inv. Serv. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999), the Court finds that the Complaint sufficiently alleges the materiality of Defendants' alleged misstatements to Magyar's auditors, *cf. In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *10–11 (noting, in the context of claims under the Securities Act and the Exchange Act, that "[c]ourts do not grant motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on grounds of immateriality, unless the misstatements are so obviously unimportant to a reasonable [auditor] that reasonable minds could not differ on the question of their importance" (internal quotation marks omitted)); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 439 (S.D.N.Y. 2009) (same).

Accordingly, the Court finds that the SEC's Rule 13b2-2 claim survives Defendants' motion.

---

[16] According to Defendants, the Complaint fails to sufficiently plead materiality under Rule 13b2-2 because: (1) the allegedly fraudulent representation and sub-representation letters were submitted in connection with the auditor's review of Magyar's 2005 financial statements; (2) the issuance of those financial statements was delayed until 2007, and the financials were not based on Defendants' representations and certifications; and (3) there are no allegations that anybody detrimentally relied on those letters. (Mem. 31.)   As noted above, the SEC generally is "not required to prove reliance when it brings enforcement actions under the securities laws." *KPMG*, 412 F. Supp. 2d at 375.   Therefore, for the reasons stated *supra*, the Court rejects Defendants' arguments regarding detrimental reliance.

### III. CONCLUSION

For the foregoing reasons, the Court denies Defendants' motion in its entirety. Specifically, the Court finds that: (1) it has personal jurisdiction over Defendants; (2) the SEC's claims are not time barred; and (3) the Complaint states claims as to the causes of action that Defendants challenge under Federal Rule of Civil Procedure 12(b)(6). Accordingly, the Clerk of Court is respectfully directed to terminate the motion located at Doc. No. 36.

In light of the Court's ruling, IT IS HEREBY ORDERED that the parties shall appear for a status conference on April 3, 2013 at 4:00 p.m. in Courtroom 905 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York 10007.

IT IS FURTHER ORDERED that, by March 25, 2013 at 4:00 p.m., the parties shall submit to the Court a proposed case management plan and scheduling order. A template for the order is available at http://nysd.uscourts.gov/cases/show.php?db =judge_info&id=347.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: February 8, 2013
New York, New York

\*    \*    \*

The SEC is represented by Jeffrey Thomas Infelise, Kara Novaco Brockmeyer, and Robert Irving Dodge, Esqs., Securities and Exchange Commission, 100 F Street, N.E., Washington, District of Columbia 20549.

Elek Straub is represented by Amanda Grier and Saul M. Pilchen, Esqs., Skadden, Arps, Slate, Meagher, & Flom LLP, 1440 New York Avenue, N.W., Washington, District of Columbia 20005, and Carl S. Rauh, Esq., Hogan Lovells LLP, 555 Thirteenth Street, N.W., Washington, District of Columbia 20004.

Andras Balogh is represented by John A. McMillan and William Michael Sullivan, Jr., Esqs., Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, N.W., Washington, District of Columbia 20037.

Tamas Morvai is represented by Michael Louis Koenig and Victoria Pauline Lane, Esqs., Greenberg Traurig, LLP, 54 State Street, Albany, New York 12207.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-8-13

22