F3kgstrc

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    SECURITIES AND EXCHANGE
3   COMMISSION,

4              Plaintiff,

5          v.                          11 CV 9645(RJS)

6   ELEK STRAUB, ANDRAS BALOGH,
    and TAMAS MORVAI,
7
               Defendants.
8
    ------------------------------x
9                                    New York, N.Y.
                                     March 20, 2015
10                                   10:30 a.m.

11  Before:

12                 HON. RICHARD J. SULLIVAN,

13                                     District Judge

14                        APPEARANCES

15  SECURITIES AND EXCHANGE COMMISSION
         Attorneys for Plaintiff SEC
16  ROBERT DODGE
    THOMAS BEDNAR
17  JOHN WORLAND

18  HOGAN LOVELLS (US), LLP
         Attorneys for Defendant Straub
19  ROBERT BUEHLER
    LISA FRIED

20  PILLSBURY WINTHROP SHAW PITTMAN, LLP
         Attorneys for Defendant Balogh
21  THOMAS HILL
    WILLIAM SULLIVAN
22  KRISTEN BAKER

23  GREENBERG TRAURIG, LLP
         Attorneys for Defendant Morvai
24  MICHAEL LOUIS KOENIG
    VICTORIA LANE
25
```

F3kgstrc

1              (Case called)

2              MR. DODGE:  Robert Dodge.  Good morning.

3              MR. BEDNAR:  Tom Bednar and Jack Worland, your Honor.

4              THE COURT:  Good morning.

5              For the defendants, I guess we'll go my left to right.

6              MR. BUEHLER:  Robert Buehler and Lisa Fried for

7      Mr. Straub.

8              THE COURT:  Good morning.

9              MR. SULLIVAN:  Good morning, your Honor.  William

10     Sullivan, Tom Hill and Kristen Baker on behalf of Mr. Balogh.

11             THE COURT:  Mr. Sullivan, Mr. Hill and Ms. Baker.

12             MR. KOENIG:  Michael Koenig and Victoria Lane on

13     behalf of Tamas Movai.  Good morning.

14             THE COURT:  Good morning to you, Ms. Lane.

15             MS. LANE:  Thank you.

16             THE COURT:  Thanks for coming.  I always feel guilty

17     dragging people up from D.C.  For those who make the trip, you

18     are always free to ask if you want to appear telephonically or

19     through the miracle of video teleconference.  That's always an

20     option.  Keep that in mind.

21             We have got a couple of issues that have been tee'd

22     up.  I got letters from the parties back in February involving

23     discovery disputes that I have resolved but also involving some

24     other disputes that we're going to talk about today.

25             In no particular order, but I think this is the order

F3kgstrc

1   we should go, we have the plaintiff's contemplated motion for

2   summary judgment on a variety of grounds; we have the

3   defendants' motion to exclude the testimony of Slobodan

4   Bogoevski on a couple of grounds; and then we have the

5   plaintiff's motion to amend the complaint.

6          Let's start with the motion for summary judgment.

7   This isn't a typical motion that you're contemplating here,

8   Mr. Dodge, right?  It seems to me like it's a preemptive

9   summary judgment designed to neutralize what might be a summary

10  judgment motion you're contemplating from the defense.

11         MR. DODGE:  It's a motion for partial summary

12  judgment.

13         THE COURT:  But a partial summary judgment on

14  particular elements of causes of action and on jurisdiction,

15  right?

16         MR. DODGE:  That's correct, to eliminate defenses with

17  respect to, for example, statute of limitations.  But we

18  believe that given the Court's analysis of the law and the

19  facts that have been developed during discovery, that it's

20  proper at this time for the Court to rule as a matter of law on

21  personal jurisdiction, on the statute of limitations and on the

22  use of interstate commerce.

23         THE COURT:  Let me ask the defendants.  Are you

24  contemplating motions for summary judgment, any of you?

25         MR. SULLIVAN:  William Sullivan on behalf of

F3kgstrc

1    Mr. Balogh.  Yes, we are, your Honor.

2              THE COURT:  We haven't gotten there yet because I

3    think the deadline for premotion letters -- I have to take a

4    look at the schedule I set -- but I think it's usually after

5    discovery is all wrapped up.

6              MR. SULLIVAN:  That's correct.

7              THE COURT:  You were contemplating waiting until after

8    expert discovery is done?

9              MR. SULLIVAN:  Yes.  We have about ten expert

10   depositions.  I think as we outlined in our premotion

11   conference letter or our case management status letter, to be

12   more precise, we have expert depositions going through the late

13   spring through the summer.  And I think we anticipate filing

14   motions in the late summer, early fall.

15             THE COURT:  I'm not going to hold you to this, but

16   you're contemplating a motion as to the inverse of the motions

17   that Mr. Dodge is thinking about?

18             MR. SULLIVAN:  I don't think we'll move on statute of

19   limitations, but I think that we probably will be doing the

20   obverse of what Mr. Dodge contemplates.

21             THE COURT:  For jurisdiction?

22             MR. SULLIVAN:  Jurisdiction, absolutely, and for the

23   interstate commerce.

24             THE COURT:  Okay.  For you, of course, that would mean

25   you win.  If Mr. Dodge wins on that, then he's got one less

F3kgstrc

1    element to worry about, I suppose.  If you win on any of those,

2    then that basically eliminates an entire claim or all claims,

3    right?

4              MR. SULLIVAN:  That would be our hope.

5              THE COURT:  I think that's probably the more logical

6    way to do this, is to tee it up that way.  If it were only the

7    plaintiff's contemplated motions, I would say that's almost

8    really more what I would handle as part of a motion *in limine*

9    after a joint pretrial order where I ask the parties to specify

10   whether there's jurisdiction.  And if there's a dispute, I

11   would resolve that.  Then I would probably look to see if there

12   are other undisputed facts that could be resolved before it

13   went to the jury, I think.

14             But if the defendants are moving for summary judgment

15   on claims, then obviously you can make a countermotion for

16   summary judgment, and I think that would be tee'd up pretty

17   clean.

18             Mr. Buehler.

19             MR. BUEHLER:  Thank you, your Honor.  Robert Buehler

20   for Mr. Straub.  Your Honor, I just wanted to indicate that I

21   think for purposes of the defendants' summary judgment motions,

22   both Mr. Straub and Mr. Morvai would also be moving

23   affirmatively on statute of limitations grounds because we have

24   a factual basis for that as well.  This kind of begins bleeding

25   into the next issue that I think your Honor would be taking up:

F3kgstrc

```
 1    The defendants would also contemplate even more sweeping
 2    summary judgment claims were we to succeed in precluding the
 3    testimony of Mr. Bogoevski.
 4            THE COURT:  We'll get to that in a minute.  I can't
 5    tell somebody they can't make a motion, and I wouldn't, but I
 6    certainly can control the timing.
 7            Mr. Dodge, I think we ought to hold off on these until
 8    I have all of my summary judgment motions in a row and then
 9    I'll figure out what we've got.
10            MR. DODGE:  Yes, sir.  It was not our intention to
11    file a summary judgment motion now; it's simply that the
12    Court's scheduling order did require premotion letters on
13    summary judgment by last month, but our expectation is
14    consistent with the defense.
15            THE COURT:  Did I then amend the scheduling order
16    since then?
17            MR. DODGE:  I think it was amended after we submitted
18    our claim.
19            THE COURT:  That may be it.
20            MR. DODGE:  In any case, we thought we complied with
21    the Court's deadline, but our expectation is we complete expert
22    discovery first, and then all the parties would file
23    cross-motions for summary judgment.  That was always our
24    expectation.
25            THE COURT:  I think we can put that on ice for now and
```

F3kgstrc

1   we'll have this conversation, I'm sure, again later given what

2   you have told me.  And I don't think I even need to hear from

3   anyone else about contemplated summary judgment motions because

4   there's no point.  Things may change based on the expert

5   discovery.

6           Let's now talk then about the motion to exclude the

7   testimony of Mr. Bogoevski.  This is the defendants' motion.  I

8   don't know who is carrying the ball on this one.  I read the

9   letters on this.  There are two principal objections:  One is

10  the fact that the witness adopted statements made previously in

11  a proceeding at which the defendants were not present; also,

12  there's the suggestion, somewhat general at this point, that

13  this is hearsay or a large proportion of his testimony was

14  hearsay.  I'm not sure if people really want to brief this

15  further or if we have enough here and you want me to just deem

16  the motion made and resolve it.

17          MR. BUEHLER:  Your Honor, if you were going to grant

18  the defendants' motion, we would be happy to rely on the

19  letters, but we do think it is a very significant motion.  I

20  will tell you, we struggled to get in as much as we possibly

21  could into the letter that we did.

22          Mr. Bogoevski, we agree with the SEC, he's a crucial

23  witness.  He's crucial for them for a different reason than for

24  us.  We feel he is an eleventh-hour witness who is, frankly,

25  not a credible one who is testifying almost exclusively based

F3kgstrc

1   on information that he received from others.

2            THE COURT:  He's a coconspirator.  He's at least

3   presented as a coconspirator, right?

4            MR. BUEHLER:  That's correct.  That's how he's

5   presented by the SEC.  We would take great issue with that.  I

6   don't even think he characterizes himself as a coconspirator if

7   you look at his testimony carefully.  But because of the space

8   limitations, we were general as to the hearsay, but we are

9   doing essentially a line-by-line question-by-question analysis.

10  We do not believe there is virtually any admissible testimony

11  that is available.

12           We also want to make it clear, your Honor, that while

13  we focused on the adoption issue, the adoption issue is really

14  just the tip of the iceberg.  What happened here, your Honor,

15  is, in this proceeding, during the course of fact discovery

16  when we were constantly dealing with the SEC on arranging and

17  taking all sorts of depositions all over the world on notice

18  properly done, the SEC found this individual; and without

19  giving us notice, contrary to what Rule 30(b)(1) requires, that

20  we must be given written notice, they went off on their own and

21  conducted a videotaped interview with an eye towards using that

22  at trial, using that as admissible evidence; and then

23  afterwards deciding that they were going to use that as their

24  direct examination in the course of a deposition, thereby

25  undercutting, eviscerating the notice requirements of Rule 30,

F3kgstrc

1    we'd also say Rule 30(c)(1), which requires examination and

2    cross-examination to proceed as they would at trial, which

3    would not be the case because we weren't present.  We weren't

4    available to essentially examine and object.

5    　　　　THE COURT:  Well, I'm not there yet, right?  I don't

6    know how they're planning to use the testimony of

7    Mr. Bogoevski.  Maybe he'll show up for all I know.  That's

8    really a motion *in limine*, isn't it?

9    　　　　MR. BUEHLER:  Yes.  I would say, your Honor, a few

10    issues.  I do not think he's going to show up.  He is currently

11    in jail.  He has well over a year to serve in jail.  It's not

12    at all clear when he will get out of jail.

13    　　　　THE COURT:  It's not at all clear when we're going to

14    have a trial in this case.

15    　　　　MR. BUEHLER:  And whether or not he's going to be able

16    to travel.  And he's made extensive comments on the record and

17    I believe also to the SEC indicating that he refuses to leave

18    Macedonia.

19    　　　　THE COURT:  But there are ways to have testimony, even

20    if he doesn't leave Macedonia, right?  I have this great gadget

21    here that will allow us to have testimony by video.  I just did

22    it in a criminal trial last month.

23    　　　　MR. BUEHLER:  I would note that wouldn't solve the

24    issues here because the evidentiary issues – we wouldn't be

25    wasting your Honor's time – are still going to have to be

F3kgstrc

```
1   resolved before he testifies.  And since we would like to make

2   dispositive summary judgment motions on all of the claims and

3   we do feel that Mr. Bogoevski's testimony is really the only

4   possible way that the SEC could dispute the issues that we

5   would be seeking summary judgment on, we do think those issues

6   should be resolved before the summary judgment process.

7           THE COURT:  But those issues are the hearsay issues,

8   right?

9           MR. BUEHLER:  That is correct, your Honor.

10          THE COURT:  Because the adoption issue, what we have

11  called broadly the adoption issue, seem to me to turn on how

12  his testimony is introduced at trial, right?

13          MR. BUEHLER:  Your Honor, that's true, but Rule 56

14  does talk in terms of the admissibility of evidence.

15          THE COURT:  Right.

16          MR. BUEHLER:  And we would say that as it's presently

17  constituted, that evidence is not admissible, not only for the

18  evidentiary reasons, but for the procedural reasons.  It is not

19  testimony that is consistent with trial.  It could not be used.

20          THE COURT:  If he testifies live, then there's no

21  issue, right?

22          MR. BUEHLER:  Your Honor, that could be the case, your

23  Honor, but at that point, you would have already made the

24  evidentiary rulings and it would be clear that his videotapes

25  wouldn't be useable.  If he shows up, we can deal with that
```

F3kgstrc

1    issue.  I think it's highly unlikely, if your Honor reviews the

2    record, that he will ever agree to testify, but if he did, that

3    would be dealt with at another time.

4            We'd also argue, your Honor, that even then, we would

5    have been deprived of our right to depose him in a proper

6    fashion consistent with Rule 30, and we would object to his

7    even appearing, even if he did walk in the door.

8            THE COURT:  You did depose him, right?

9            MR. BUEHLER:  I would say depose in the most loosest

10   of terms possible.

11           THE COURT:  How many hours did you have with the

12   witness?

13           MR. BUEHLER:  I would say, your Honor, we were in the

14   same videoconference with him a total of somewhat less than six

15   hours over the course of three different sessions, which were

16   repeatedly afflicted with not only technological issues,

17   translation issues, disputes over the translation, the witness

18   refused to answer a number of questions that we put to him,

19   which we think right there is a basis to strike his testimony.

20   He withheld documents that he clearly possessed that he

21   wouldn't turn over.  And he abruptly ended the deposition when

22   he still clearly had testimony to provide.  He basically

23   dictated the terms of how, when, where and on what subjects he

24   would be questioned.

25           So, were we able to pose some questions to him?  Yes.

F3kgstrc

 1    Did it constitute a proper deposition or proper

 2    cross-examination?  We think it was far from that.

 3            THE COURT:  It sounds like you want to brief this

 4    further.

 5            Mr. Dodge, I'll give you a chance to respond to what

 6    Mr. Buehler just said, but I think it's likely we're going to

 7    have to delve into this in a little more detail.  The premotion

 8    letters are designed to help tee up an issue.  They're not

 9    designed to replace a brief.  Sometimes, frankly, they can

10    because there's not much more to say on a subject, especially

11    if it's a legal one, but this I think may not be one of those

12    easily resolved ones.

13            Go ahead.

14            MR. DODGE:  Procedurally, we agree that this issue

15    should be briefed by the parties.  It's an important issue for

16    both sides, and it should be briefed fully before the Court

17    rules.

18            With respect to the statement that the witness gave on

19    December 28, we're not aware of anything in the federal rules

20    that would prohibit the SEC from interviewing a potential

21    witness.

22            THE COURT:  Clearly there's nothing wrong with you

23    interviewing a potential witness.  It's a closer call as to

24    whether the interview, which is then taped and under oath, can

25    be introduced at trial as his testimony.

F3kgstrc

1              Are you planning to do that?

2              MR. DODGE:  Our expectation, your Honor, is that yes,

3    we will; that he made a statement that was subsequently adopted

4    during his deposition.

5              THE COURT:  I get that, but it's a little cute, right?

6    It's a little cute that you could have a deposition at which

7    they can object and they can say things like, whoops, wait a

8    minute, wait a minute, not a good question.  They didn't get to

9    do that here.

10             MR. DODGE:  I don't think it's cute at all, your

11   Honor.

12             THE COURT:  Let me just finish.  It's also the case

13   that normally you'd interview a witness, you'd notice that this

14   is a guy you're going to rely on at trial, and then you'd give

15   them a chance to depose.  And you're not going to spend any

16   time at a deposition doing your debrief, right, normally?  If

17   it were a normal witness?

18             MR. DODGE:  I'm not sure I follow the question.

19             THE COURT:  I'm just saying I think this is the point

20   I'm trying to make in your favor.  This is a situation where

21   you're not obliged to sort of run through your direct

22   examination in a deposition, right?  If you've met with a

23   witness, you know what he's going to say, you're comfortable

24   this is a good witness for you, then you're going to notice him

25   to the other side and the other side then gets to take a crack

F3kgstrc

1    at it.  And they effectively do cross-examination in probing,

2    broad cross-examination, but you're not necessarily going to be

3    asking a ton of questions at that deposition, right?

4              MR. DODGE:  Exactly.  That assumes, of course, that

5    the witness will be available for trial.  And in this case, our

6    expectation was that we have no confidence that he will be.

7              THE COURT:  Why can't we get him here on this screen?

8              MR. DODGE:  Well, he'll be in prison.

9              THE COURT:  So?  We take him out for a day.

10             MR. DODGE:  That may or may not be allowed by the

11   authorities.

12             THE COURT:  It happens all the time.  I would imagine

13   it just requires a request – you probably ought to get on it

14   now – you say we want him, we could set a trial date.  And then

15   we can go through the proper channels to get him lined up so he

16   can testify under oath here in this courtroom, or we have a

17   Rule 15 deposition type situation.

18             MR. DODGE:  We can make that request and we are

19   certainly prepared to do that.  I cannot have an enormous

20   amount of confidence that it will be granted.  We don't have

21   any control over the authorities in Macedonia.  The level of

22   cooperation we have received over there has not been high from

23   the government.

24             THE COURT:  In the videotaped meeting that you had

25   with him, the interview, who posed the questions to the

F3kgstrc

1    witness?

2              MR. DODGE:  I did.

3              THE COURT:  You did?  Okay.  So you were allowed to do

4    that?

5              MR. DODGE:  Yes.  I was allowed to fly into the

6    country and meet with the witness; yes.

7              THE COURT:  So, is there any reason to think that you

8    wouldn't be allowed to do that again, this time with defense

9    counsel and do the whole thing there with us watching on a

10    screen?

11              MR. DODGE:  I simply have no personal knowledge about

12    what procedures would be involved in trying to do that with an

13    individual who is in custody.

14              THE COURT:  Was he in custody at the time you

15    interviewed him?

16              MR. DODGE:  He was not.  He had been ordered to begin

17    serving his prison sentence at that time on December 29, and I

18    met him on December 28.

19              THE COURT:  Frankly, I think it is quite doable.  I

20    don't know about Macedonia.

21              MR. DODGE:  I hope it is doable, and if it is doable,

22    we'll certainly do it.  I just don't know if it is.

23              THE COURT:  Let's talk about the hearsay issues,

24    though, because those are the ones that would still be issues

25    to be discussed before he gave live testimony to the jury.

F3kgstrc

1          MR. DODGE:  There are several aspects to his testimony

2     that really not hearsay at all.  The witness testified from

3     personal knowledge with respect to, for example, his handling

4     of key documents relating to the bribe scheme that he had in

5     his possession, his authentication of those documents, and his

6     delivery of those documents to us.

7          He also discussed or testified about his role in the

8     bribe scheme, his role in terms of giving legal advice on

9     documents, his involvement in managing the delivery of money.

10    And there are things that he was personally involved in, for

11    example --

12         THE COURT:  Are you suggesting he's a coconspirator?

13         MR. DODGE:  Yes, we are.

14         THE COURT:  You are.

15         MR. DODGE:  Part of his testimony is based on his

16    direct knowledge.  Part of his testimony is based on statements

17    that other coconspirators made to him.

18         THE COURT:  In the course of the conspiracy?

19         MR. DODGE:  In the course of the conspiracy, yes,

20    during the conspiracy and part of it.

21         THE COURT:  So, that's the whole ballgame, right?

22    Mr. Buehler disagrees with that characterization, and I guess

23    that's what we're going to see.  The devil's in the details.  I

24    have to see the statements and assess based on what he said in

25    the deposition.

F3kgstrc

```
 1            MR. DODGE:  Yes.

 2            THE COURT:  Do you agree?

 3            MR. DODGE:  Yes.  Exactly.  Those issues need to be

 4    resolved.  Our suggestion is, when it comes to specific

 5    questions, particularly about second-level hearsay and a

 6    statement made by a coconspirator in furtherance of the

 7    conspiracy, I think it probably makes sense to give us a chance

 8    to designate what testimony we intend to use before going

 9    through every single line of all of his testimony.

10            THE COURT:  What do you propose for the purposes of

11    this motion?  You would do that?

12            MR. DODGE:  For the purposes of this motion, I don't

13    think it makes sense for us to designate his testimony now

14    because we haven't completed discovery yet.  What I think does

15    make sense --

16            THE COURT:  Well, fact discovery is completed, right?

17            MR. DODGE:  Right, but our expectation is that we

18    would be designating testimony to use at trial when we get to

19    the pretrial stage of the case.

20            THE COURT:  That's my point.  Typically, a motion to

21    preclude certain evidence is usually what comes up as a motion

22    in limine.  That's when I get it.  They want to use these

23    deposition designations.  They can't.  That's clearly hearsay.

24    That's an objectionable question or answer and I shouldn't

25    allow it.  That's typically what happens.
```

1          Here, you're asking me to do it because it's relevant

2     to your motion and I guess the defense's motion ultimately for

3     summary judgment as to whether certain evidence is admissible.

4     And if it is admissible, then maybe I decide that summary

5     judgment motion one way and if it's not admissible, maybe it

6     goes the other way.  Right?

7          MR. DODGE:  We're not asking the Court to decide this

8     issue now.  We do view it as a motion *in limine* and something

9     that could properly be dealt with later, but to the extent that

10    the defendants seek to file essentially a motion to strike the

11    witness' testimony in its entirety, that would be at least ripe

12    for adjudication, and we're certainly prepared to take that on.

13    So, for example, if the defense wants to move that his entire

14    testimony ought to be stricken because six hours of

15    cross-examination wasn't enough for them, then we're prepared

16    to address that and brief it.

17         If, for example, they want to file a motion that says

18    we should not be allowed to adopt his prior statement because

19    maybe somewhere out there, there's a law that says you can't

20    have a witness adopt a prior statement, then we're prepared to

21    take that on, too.  But we don't think it makes sense to go

22    through line-by-line of the transcript and say if the SEC

23    designates this, then it's a hearsay problem, there's no

24    foundation, whatever.  I don't think that makes sense.  That's

25    properly a motion *in limine* subject.

F3kgstrc

1          THE COURT:  I think this is helpful.

2          Mr. Buehler, it sounds like you're planning to do a

3   line by line.

4          MR. BUEHLER:  That's correct.  Under Rule 56, parties

5   can only rely on evidence that's admissible.  So, whether or

6   not we do this at trial, whether or not we do this on summary

7   judgment, they have to have admissible testimony.  If they're

8   not going to rely on Mr. Bogoevski's testimony in response to

9   our summary judgment motion, that would be one thing, but we

10  don't understand that to be the case.

11         THE COURT:  Your motion is to strike his testimony as

12  a whole.

13         MR. BUEHLER:  I would say that's certainly the

14  ultimate goal, your Honor.  We think we have ample grounds to

15  do that, but we're doing it with a really specific purpose in

16  mind, and that is so we can seek summary judgment because we

17  think we're entitled to it.

18         THE COURT:  Right.  Then you're having me do summary

19  judgment twice, right?  Normally, what would happen in summary

20  judgment is you are each going to make your motion, submit your

21  briefs, talk about what are undisputed facts or disputed facts,

22  you're going to rely on things like deposition testimony.  And

23  then in responding to the other side, you're going to say, hey,

24  that's not admissible evidence because it's hearsay or because

25  of something else, and then I would resolve that as part of the

1      motion for summary judgment.

2              You're asking me to do all of that in advance as part

3      of a motion to strike, and then if you don't win on the motion

4      to strike, I'll do it again on a motion for summary judgment?

5              MR. BUEHLER:  No, your Honor.  I think we view it as,

6      and this I think is a great way to lay it out, we do not plan

7      on doing it again for summary judgment.  We do not think,

8      though, that given the breadth of the issues here, and there

9      are significant ones, that we should do that in the course of a

10     summary judgment motion.  I don't want to speak for the Court,

11     but I don't think it's going to be a particularly good way to

12     tee it up for the Court.  It is certainly not what we think

13     would be the most sufficient way to deal with the issue.

14             We would be making a summary judgment motion and

15     within it would be a rather massive motion to strike the

16     testimony of this witness; we think we should do that first.

17     If we do that first, it will make summary judgment considerably

18     more clearer.  If your Honor says it's in, then summary

19     judgment is really simplified.  If your Honor says it's out, we

20     think summary judgment will be similarly simplified and there

21     will not be any evidentiary issues that your Honor will have to

22     deal with as part of summary judgment.

23             THE COURT:  Again, I don't know why it would be so

24     massive.  I think it will just turn on whether broad categories

25     of statements by the witness are admissible evidence for

F3kgstrc

1    purposes of trial; and if they're not, then they won't be

2    considered and summary judgment will be effected.

3             MR. BUEHLER:  I think the admissibility issue is not

4    just based on the rules of evidence.  We think it does go to

5    the very nature of whether or not Mr. Dodge is able to

6    essentially conduct the deposition in violation of Rule 30.

7             THE COURT:  I'm sorry to interrupt you, but it seems

8    to me that the motion that we ought to be focused on now is

9    whether or not procedurally you got what you need that

10   justifies the deposition being available and useable on a

11   motion for summary judgment.

12            Broad arguments like this adoption was improper under

13   the law or broad arguments like his leaving without permission,

14   his basically refusing to answer questions, those things

15   effectively prevented you from being able to depose him.  Those

16   are the kinds of arguments that I would generally consider on a

17   motion to strike the entire deposition.

18            The fine-tuned review of every statement, that seems

19   to me to be something I'm not inclined to do now because I

20   don't even know which of these statements are going to be

21   relevant for the summary judgment motion, and I don't want to

22   get into that now.  I can only imagine how long this motion

23   will be if I'm doing that.  So why don't we do it in two

24   pieces:  Broad argument that the entire deposition should be

25   struck because of the irregularities or the improper methods by

F3kgstrc

```
 1    which it was conducted, which means either I strike it or I
 2    give you another opportunity to depose him, perhaps.  That's an
 3    alternative resolution.  I think that's the way I'm inclined to
 4    do this.  And then if I don't strike it, then you can make
 5    arguments about which particular parts of it that they're
 6    relying on or would need to rely on for their causes of action
 7    are inadmissible.  That's I think part of summary judgment.
 8           MR. BUEHLER:  I think that's absolutely acceptable to
 9    the defense.  We would like the opportunity to do that.
10           THE COURT:  That's fair.  So, then we will set a
11    briefing schedule for that.  We have also got a motion to
12    amend, but I think that really is part and parcel with this
13    motion to strike the deposition.
14           Do you agree with that, Mr. Dodge?
15           MR. DODGE:  I'm not sure it's part and parcel.
16           THE COURT:  Let me interrupt you.  I'm sorry.  That's
17    the great thing about being a judge.  I get to interrupt people
18    all the time, but I don't mean to be rude.  I just mean I want
19    to be more clear about what I'm asking.
20           It seems to me that you are looking to extend the
21    period of the conduct here from March or May to January of
22    2005, right?
23           MR. DODGE:  Yes.
24           THE COURT:  And that's based exclusively on
25    Mr. Bogoevski's testimony?
```

F3kgstrc

1          MR. DODGE:  Principally, not exclusively, but

2     principally his testimony.

3          THE COURT:  Now, if I strike, if I were to grant the

4     defense's motion to strike his testimony, his deposition is

5     out, can't rely on it, there's other bases that would support

6     the changes that you're proposing for your amendment?

7          MR. DODGE:  We would have a circumstantial argument

8     that the bribe scheme began at an earlier point.  The state of

9     the evidence when we filed the complaint established that the

10     negotiations between the company and the government took place

11     between late December 2004 and into the middle of 2005.  The

12     clearest evidence of actual bribery would have supported a

13     statement that bribes were made beginning in May of 2005.  We

14     believe they were made earlier, but we didn't have hard

15     evidence of that.  You can make a circumstantial case that they

16     were made earlier, but Mr. Bogoevski testifies that, no, the

17     bribes were first explicitly offered in January of 2005.

18          THE COURT:  Are there any other amendments that you're

19     contemplating?

20          MR. DODGE:  No.  It's very, very narrow.  It's simply

21     that.

22          THE COURT:  I guess we can do this two ways:  We can

23     decide that motion at the same time that we decide the motion

24     to strike or we can just let you amend.  Usually the standard

25     is pretty low for that.  And then if I end up striking, you'll

F3kgstrc

1    have a heck of a tough time proving the conduct that took place

2    before March or May of 2006 or '05?  I'm trying to remember.

3    2006?

4                MR. DODGE:  2005.

5                THE COURT:  2005.

6                MR. DODGE:  I guess my suggestion would be that you

7    simply let us amend, but I know the defense has objected to

8    that.

9                THE COURT:  I want to hear what they have to say, but

10   I don't see what the big deal is.  I don't know how they're

11   prejudiced by this.  If it turns out that the evidence you are

12   seeking to rely on to prove that to the fact finder is out,

13   you're probably going to wish you hadn't amended.

14               MR. DODGE:  Well, it may be that we make allegations

15   that we're unable to prove at the end of the day.

16               THE COURT:  Right.

17               MR. DODGE:  We don't expect that, but that could

18   happen.  But the real question on whether or not we should be

19   allowed to amend the complaint, which should focus on prejudice

20   to the defense and whether there is any additional discovery

21   that would be required, we can't conceivably see any additional

22   discovery that would be made necessary by an amended complaint.

23               THE COURT:  Who is covering this?  Mr. Sullivan,

24   you're on this one?

25               MR. SULLIVAN:  Thank you, your Honor.  As the SEC has

F3kgstrc

1    effectively conceded, an amended complaint would uniquely rely

2    on the representations of Mr. Bogoevski.

3          THE COURT:  I'm not sure he did concede that.  I think

4    he suggested that there was other evidence that would support

5    an inference of an earlier start date but that Bogoevski is

6    sort of the direct evidence.

7          MR. SULLIVAN:  Right, and without the direct evidence,

8    no inference would lie.  We think it makes much more sense, as

9    you have articulated, since you're going to be looking at a

10   broad-based motion with regard to the admissibility of all of

11   the evidence of Mr. Bogoevski, based both on both procedural

12   and evidentiary grounds, whereupon you'll have an opportunity

13   to review the statements of Mr. Bogoevski -- and, quite

14   frankly, from the defense side, he doesn't say anything

15   remotely resembling what Mr. Dodge has articulated in terms of

16   the proffering of bribes as early May of 2005.  We simply don't

17   read his evidence that way.

18         THE COURT:  Can I interrupt you.  It seems to me the

19   standard for a motion to amend is not the standard for a motion

20   for a summary judgment.

21         MR. SULLIVAN:  That's correct.

22         THE COURT:  On a motion for summary judgment, they'd

23   have to have admissible evidence.  On a motion to amend, they

24   just have to have basically a good-faith basis to change,

25   right?

F3kgstrc

1          MR. SULLIVAN:  Absolutely right, and that leads me to

2     the second point, which is, as you noted earlier, that you may

3     strike this, so it may not be in play at all; and, therefore,

4     there wouldn't be anything to rely upon substantively or

5     inferentially; and, third, prejudice would accrue to the

6     defense.

7          THE COURT:  What prejudice?

8          MR. SULLIVAN:  Again, another public pronouncement of

9     an illegal act through the outlining of it yet again in a

10     complaint, the potential to do extra discovery and to draw --

11          THE COURT:  What extra discovery is going to be needed

12     based on this amendment, March 2005 back to January 2005?

13          MR. SULLIVAN:  Since this evidence just developed in

14     December/January, December 2014/January 2015, we were not on

15     notice and had no opportunity to track any parallel avenues of

16     information relating to our ability to challenge the

17     suggestions that the bribes or potential bribes, alleged bribes

18     may have occurred as early as May 2005.  We'll have to go and

19     do that now.

20          It will accrue to the detriment, as I said,

21     reputationally to the defendants, and it will simply encourage

22     and necessitate more work on our part.  It seems premature in

23     light of all of those considerations, particularly when we have

24     a well-framed and the meritorious motion to strike that will be

25     before you as you determine in accordance with your briefing

F3kgstrc

```
1    schedule, it may eliminate this person's purported evidence
2    entirely rendering this early exercise unnecessary and
3    uneconomical frankly.
4              THE COURT:  If I rule against you and the defendants
5    on the motion to strike, then you have no objection to them
6    amending?  In other words, you think they're tethered, that
7    they're joined at the hip.
8              MR. SULLIVAN:  I don't want to commit right here.  I'd
9    like to review the amended complaint again, but I would not
10   suggest that we would have any significant, substantive
11   objections to the extent that you allow that evidence in.
12             THE COURT:  Okay.
13             MR. SULLIVAN:  But, again, we'll review it before we
14   make a final determination.  There may be other grounds that
15   I'm not contemplating here that we may have in reserve, but I
16   do believe it is substantially tied, as the SEC has conceded,
17   to Mr. Bogoevski.  The inference is, and I think we can all
18   agree, that the direct evidence relies on the admissibility of
19   what Mr. Bogoevski purports to offer.
20             THE COURT:  Mr. Dodge, are you prejudiced by waiting
21   until I resolve the motion to strike as to when you amend?  I
22   assume it doesn't matter to you, right?
23             MR. DODGE:  It doesn't matter to us really so much
24   when the complaint is amended.  I would make two observations,
25   your Honor.  The first is that even if a motion to strike were
```

F3kgstrc

```
1    granted, as the Court has already pointed out, Mr. Bogoevski is

2    potentially available as a live witness at trial.  And his

3    availability as a live witness at trial, even if that's

4    uncertain, gives us a basis to amend the complaint regardless

5    of how the Court rules on a motion to strike.

6            THE COURT:  I don't know.  If I'm striking his

7    deposition testimony finding, in essence, that he wasn't

8    available to be deposed, do you think you'd nonetheless just

9    get to call him at trial?

10           MR. DODGE:  We would certainly ask the Court for leave

11   to do that.

12           THE COURT:  There might be a basis to do that.  I'm

13   not sure that that's something I'm resolving now on this

14   contemplated motion or really that's a motion *in limine* down

15   the road.

16           MR. DODGE:  I guess it depends, your Honor.  For

17   example, if the effect of the Court's ruling were that

18   Mr. Bogoevski was simply never to appear in the case one way or

19   the other, then, of course, that would undermine the basis for

20   our motion to amend to a large extent.  But what happens on a

21   motion to strike, that could be resolved in any number of

22   different ways it seems to me.

23           THE COURT:  I think your point is that if I resolve

24   the motion to strike in your favor, then there's no question

25   that you're going to get to amend.  If I resolve it against
```

F3kgstrc

1    you, there's still a chance that you'd have a basis to amend.

2            MR. DODGE:  That's exactly right.

3            THE COURT:  Okay.

4            MR. DODGE:  The second point finally with respect to

5    prejudice to us and what the SEC's motivation is seeking to

6    amend the complaint in the first instance, one of the causes of

7    action in the case involves lying to auditors and that cause of

8    action is subject to Rule 9 of the federal rules.  And because

9    it involves allegations of fraud, we have to plead that with

10   particularity.  So, it's necessary for us to identify each of

11   the statements that we allege are fraudulent.  And for that

12   reason, we believe it's necessary, at least sometime between

13   now and trial, to have the complaint encompass all of the

14   statements that we contend to be fraudulent.

15           THE COURT:  Let me ask Mr. Sullivan and Mr. Buehler,

16   or anybody who wants to answer, wouldn't it in some ways make

17   more sense to have the complaint amended?  Then you know what

18   you're shooting at, and then you can assess the motion to

19   strike and the testimony that you think is clearly hearsay

20   through a finer prism.

21           MR. BUEHLER:  Yes, your Honor.  As currently laid out,

22   the motion to amend is not particularly major.  It's a handful

23   of dates here and there changed.  It's much less than what we

24   understood previously from a prior iteration that the SEC was

25   looking to amend.  At this point, the upshot, while I'm not

F3kgstrc

1   standing up here conceding or consenting to anything, I'm

2   willing to admit it's not a massive change to what we would be

3   facing.  We really do think the motion to strike is the key

4   issue here and that's certainly what we're going to be focusing

5   on.

6           THE COURT:  Mr. Sullivan.

7           MR. SULLIVAN:  For Mr. Balogh's part, we think it's an

8   unnecessary step.  The issues will be very well framed and

9   refined.  After the Court's evidentiary ruling with regard to

10  Mr. Bogoevski, if the Court deems that that information is

11  going to be relevant and have a bearing on the matter at trial

12  for purposes of evidentiary production, then the SEC can amend

13  in conformity with the Court's ruling.  Right now, that is a

14  contested issue.  Right now, the amendment as stated is

15  accurate in connection with discovery that has been adduced in

16  this case.  We would have an extra step to deal with if the

17  Court rules against the admission of Mr. Bogoevski's testimony

18  and the amendment will therefore be written in terms that

19  suggest the evidence produced by Mr. Bogoevski that would be

20  admissible and used at trial and we would have to reverse that

21  step.  It's an extra step.

22          THE COURT:  I don't know that we would have to reverse

23  that step.  Again, a motion to amend is not applying the same

24  standard as a motion for summary judgment.  A motion to amend,

25  they just have to have basically a good-faith basis to change

F3kgstrc

1    it.  And then they have to demonstrate it wasn't done in bad

2    faith, it's not a dilatory motive, no undue prejudice to the

3    defendants or futility, but futility of the amendment means

4    that it basically can't pass the 12(b)(6) standard, so there's

5    no point in allowing an amendment because it still fails to

6    meet 12(b)(6).  On its face, there wouldn't be sufficient facts

7    alleged that could support the cause of action, but that's not

8    what we're talking about here.

9           You're suggesting that if I keep out Bogoevski's

10   testimony, then they don't have any basis or any way to prove

11   this at trial, but I don't think that's part of the standard on

12   a motion to amend.  I don't think I get into, well, how are you

13   going to prove this at trial.  I think I'm really focused on

14   whether they're acting in bad faith or by whether you are going

15   to be unduly prejudiced.  And I don't see any of those at this

16   point.  And since the standard is that these things should be

17   granted, I'm inclined to allow it, though, maybe, frankly,

18   Mr. Dodge, you may want to wait to see whether or not you win

19   on the motion to strike because you may not want to have a

20   complaint that lays out claims you can't support and lays out

21   facts you can't support.

22           MR. DODGE:  We really don't see any legitimate basis

23   for the motion to strike.  We'll brief that more fully, but we

24   really don't see that as being a well-founded motion.  And we

25   certainly do intend to move to amend the complaint.

F3kgstrc

1          MR. SULLIVAN:  My final point, and then I'll defer

2     with the Court's indulgence to Mr. Koenig, my final point is at

3     this stage, I think the prejudice occurring to the defendants

4     outweighs and overwhelms --

5          THE COURT:  What's the prejudice?  That there's going

6     to be another document that sort of sullies the reputation?  Is

7     that what you mean?

8          MR. SULLIVAN:  That's part of it.

9          THE COURT:  But I don't think that's ever part of the

10    analysis for purposes of a motion to amend.

11         MR. SULLIVAN:  The additional effort and consumption

12    of time for purposes of developing the tributary issues related

13    to the evidence that this individual seeks to offer here as

14    Mr. Dodge suggested the inferences, the details back in time

15    from May 2005, even potentially before that time into

16    January 2005.  There will be additional discovery required.

17         THE COURT:  That's an argument of undue prejudice, it

18    seems to me, which hasn't been developed.  Mr. Buehler seemed

19    to be suggesting that it wasn't going to be prejudicial.  What

20    is the prejudice?  What would you need to do?  Assuming the

21    date goes back to January, what do you need to do that you

22    didn't do before that you couldn't have known you needed to do

23    before because you thought it was March instead of January?

24         MR. SULLIVAN:  It was after May instead of January,

25    and now it's linked back to May when we thought it was

F3kgstrc

1    substantially later in the year, and now the inference is it

2    may even go back as early as January.  Those are two additional

3    timing steps that we're going to have to pursue and investigate

4    that was not part of this case before purely on what we

5    consider to be unsubstantiated hearsay evidence of this

6    gentleman produced in a way that's procedurally deficient.

7              THE COURT:  But they're allowed to.  They're allowed

8    to amend the complaint before there's even been a deposition.

9    They don't have to meet an evidentiary burden or a procedural

10   burden before they are allowed to rely on evidence for purposes

11   of an amended complaint.

12             MR. SULLIVAN:  Based on a good-faith understanding,

13   yes.  I'm not sure they have that here.  I'll defer to

14   Mr. Koenig.

15             THE COURT:  Yes.  He looks like he has good stuff.

16             MR. KOENIG:  The only point I want to make on

17   prejudice as to the questions you were just asking Mr. Sullivan

18   is, we conducted over 20 depositions in this case with an

19   expectation of what the time frames were.  We didn't ask any

20   question to any of the people who were the auditors about any

21   of the times the SEC now wants to add in.  So we have been

22   precluded from knowing that we should have asked questions

23   about this now-seemingly relevant time frame, which wasn't in

24   the complaint.  That's the prejudice.  The key people who might

25   have been able to answer questions about the relevant time

F3kgstrc

| | |
|---|---|
| 1 | period -- unless we want to redepose 20 people again and go |
| 2 | back, that is what the prejudice is. |
| 3 | THE COURT:  That would be the kind of prejudice that a |
| 4 | motion to amend is focused on. |
| 5 | MR. KOENIG:  Precisely. |
| 6 | THE COURT:  Everybody was very slow to get to that. |
| 7 | It seemed a minute ago, nobody was too worried about that, but |
| 8 | if that's a real concern, let's brief that as well.  I want one |
| 9 | brief on the two motions and a section with respect to the |
| 10 | prejudice that will be felt by the defendants as a result of |
| 11 | this amendment.  It's two months, right?  March 2005 to |
| 12 | January 2005; is that right?  I don't have them in front of me. |
| 13 | MR. DODGE:  I think the original complaint does use |
| 14 | the March date at one point.  But your Honor, with respect to |
| 15 | the prejudice issue, the parties have known from our original |
| 16 | complaint, from the very beginning of this case, that the |
| 17 | factual narrative encompasses a period of time from |
| 18 | December 2004 up until the middle of 2006, and all of the |
| 19 | discovery taken has covered that entire period of time. |
| 20 | Everybody knew that the negotiations between the government and |
| 21 | the company were taking place from December of 2004 until the |
| 22 | middle of 2005, so that time period has always been on the |
| 23 | table.  There are no surprises. |
| 24 | The only difference is that toward the end of the |
| 25 | discovery period, a new fact came to the light, it came to |

F3kgstrc

1    light to all parties, which was that the first discussion of

2    explicit bribery took place earlier than any of the parties

3    earlier knew.  It happens in discovery.  You learn facts all

4    the way through.

5         THE COURT:  I get it.  Let me cut you off.  You folks

6    can brief this.  I can't imagine I'm not going to let them

7    amend if I deny the motion to strike.  I just can't imagine

8    that the standard is, as I said, very different than a summary

9    judgment standard and it's very difficult for me to imagine

10   that there's going to be the kind of prejudice here that would

11   preclude an amendment of this modest a nature.  But I'm not

12   going to rule today.  I'll give you a chance to flesh out these

13   arguments, but I wouldn't bet the house on it if you're a

14   betting man.

15        I think that's what I wanted to cover.  Are there

16   other issues that we need to address?  Expert discovery is just

17   bumping along, right?

18        MR. DODGE:  It is.  I think we have some scheduling

19   issues with respect to summary judgment briefing that the

20   parties are not in sync on.  And I think there are also some

21   outstanding paper discovery issues that we wanted to bring to

22   the Court's discussion.  Mr. Bednar is going to handle those

23   issues for us, but there are some paper discovery issues.

24        THE COURT:  I thought I had resolved the discovery

25   issues.  What are the paper discovery issues that I'm missing?

F3kgstrc

1              MR. BEDNAR:  They are relatively discrete and

2    hopefully they'll take care of themselves.  We're hoping to get

3    an update today.  We have two aspects of discovery requests

4    that have been outstanding since August with respect to

5    defendants Balogh and Straub.  They regard minutes of

6    interviews that both defendants had with the Hungarian National

7    Police regarding events central to this case.

8              We have received an update from defendant Straub that

9    earlier this month he has submitted a written request now to

10   the Hungarian National Police, so we're hoping that issue will

11   be resolved with respect to him.  We don't know where we stand

12   with respect to defendant Balogh, so we're hopeful his counsel

13   could update the Court today.  Again, we're hoping to avoid

14   having to involve the Court in resolving those issues.

15             THE COURT:  You and me both.

16             MR. BEDNAR:  But they have been open since August, so

17   we're hoping to get an update on where we stand.

18             THE COURT:  That's right with respect to Straub?

19             MR. BUEHLER:  Yes, your Honor.  We have made a

20   request.  I do want to just note for the record we had

21   previously made a written request to the central prosecution

22   authority in Budapest.  They indicated they were unable to

23   locate those records.  We also made an oral request to the NBI,

24   the National Bureau of Investigation in Hungary.  They also

25   were unable to respond with any specificity as to where these

F3kgstrc

1    minutes were.  So we have followed up with a written request,

2    but I did want to let you know it wasn't just earlier this

3    month that we first tackled this issue.  We have been dealing

4    with it for a while.

5            THE COURT:  So you get an "A." very good, Mr. Buehler.

6            Mr. Sullivan, how are you doing?

7            MR. SULLIVAN:  Very well.  Happy to address this

8    issue.

9            THE COURT:  Let's see if you're going to get an "A."

10            MR. SULLIVAN:  First of all, we're entertaining to

11    comply with the discovery requests made by the SEC to produce

12    materials to enhance third parties even though we don't believe

13    the federal rules of discovery mandate it.

14            THE COURT:  Right.  I think we have covered all of

15    that, right?

16            MR. SULLIVAN:  Nevertheless, we have undertaken to

17    reach out to both the Hungarian National Police as well as the

18    Hungarian Financial Supervisory Authority.

19            THE COURT:  In writing?

20            MR. SULLIVAN:  In writing.

21            THE COURT:  When was that?

22            MR. SULLIVAN:  Within the past month.  I don't have

23    the specific date.  The problem is we have been hamstrung by

24    information provided to us by the SEC itself.  The contact

25    individuals at these agencies are either no longer there or

F3kgstrc

1    have had our mail returned to us for no apparent reason.

2            Moreover, in the final roadblock we were evaluating,

3    your Honor, and we don't believe we really have the obligation

4    to pursue this, the Hungarian Financial Supervisory Authority

5    has advised us that for purposes of addressing our written

6    request, we need to proceed through local counsel by way of a

7    power of attorney.  This is going to require my client to

8    engage the services of a local Hungarian lawyer for the

9    purposes of executing a power of attorney to be submitted to

10   the Hungarian Financial Authority.

11           Our position is that we're reevaluating this, but I'm

12   also inclined to suggest that it may be well beyond the

13   obligation of an individual defendant in a civil enforcement

14   action to pursue a foreign national agency for purposes of

15   engaging local counsel to comply with specific rules and

16   requirements of that agency which require legal work, in this

17   case, the power of attorney.

18           I think at some point, our efforts have been

19   worthwhile, meritorious, well intentioned, but I think they

20   must cease at a certain level, and I think we have reached that

21   point.

22           THE COURT:  Mr. Buehler, did you have to do a power of

23   attorney thing?

24           MR. BUEHLER:  Mr. Straub happened to have local

25   counsel in Hungary, so he was able to handle that on

F3kgstrc

1   Mr. Straub's behalf.

2           THE COURT:  And if the SEC were to cover the cost of

3   local counsel, would that solve the problem?

4           MR. SULLIVAN:  I think that would be very helpful.

5   We'd welcome that solution.

6           MR. BEDNAR:  In addition, we have proposed, and we're

7   still willing, if defendant Balogh would prefer to execute a

8   very limited power of attorney, we have a local counsel who can

9   take care of submitting the request if that power of attorney

10  is executed if the defendant would rather not go through the

11  expense of engaging local counsel.

12          THE COURT:  I have to believe that a local Hungarian

13  attorney for the purposes of this has got to be a lot cheaper

14  than Mr. Sullivan.  So, I think it probably behooves everybody

15  to get this done with a minimal amount of back and forth and

16  briefing and getting the Court involved, seems to me.  And I

17  say that with admiration, Mr. Sullivan, you have no idea how

18  much.

19          MR. SULLIVAN:  As long as that's on the record, and I

20  believe it is, I'm very pleased.

21          We still have to work through the issue of actually

22  who to direct our well-intentioned correspondence to with

23  regard to the Hungarian National Police.  And we have not had

24  any helpful suggestions on the part of the SEC, but we're happy

25  to work with them.

F3kgstrc

```
1          THE COURT:  I can't help you.  I don't know anybody
2    over there.  Colombia would be a different story, so that's one
3    issue.  What else?
4          MR. BEDNAR:  Your Honor, we had intended to discuss
5    scheduling issues with the Court because of very different
6    summary judgment schedules that we proposed.  I think that's
7    been overtaken by how the Court has proposed to handle the
8    different briefing issues here, so we'll defer to the Court on
9    scheduling for those.  Of course our preference is to begin and
10   complete the briefing in an expeditious manner.
11         THE COURT:  For summary judgment?
12         MR. BEDNAR:  For summary judgment, as well as for any
13   motion to strike --
14         THE COURT:  We're going to set a schedule now for the
15   motion to strike, right?  Summary judgment, I think we're going
16   to wait until the end of discovery.  That's what I would be
17   inclined to do now.
18         The motion to strike, how long do we need to brief
19   that, Mr. Buehler?
20         MR. BUEHLER:  First, I just wanted to make sure
21   that we were on the same page as the Court.  My understanding
22   of the motion to strike would just be to deal with the various
23   procedural issues that we raised that go to the legitimacy or
24   integrity of the process that we'd use and we will save the
25   evidentiary issues for summary judgment depending on how your
```

F3kgstrc

1    Honor rules on the motion to strike.

2              THE COURT:  Yes, because otherwise we would be

3    spending a lot of time on facts and statements they're not

4    planning to rely on, and it's just irrelevant.

5              MR. BUEHLER:  No.  Understood.  I just wanted to make

6    sure we were on the same page.

7              THE COURT:  We're on the same page, you and I.

8              MR. BUEHLER:  Your Honor, I think in our letter that

9    we had submitted to the Court assumed your Honor would

10   entertain this, and you will and we really appreciate that, we

11   suggested April 3, which is two weeks from today for us to

12   submit our motion.

13             THE COURT:  That's fine with me.  April 3.  And how

14   long for --

15             MR. BUEHLER:  If your Honor would indulge, since we

16   submitted that, my schedule had changed a little bit.

17             THE COURT:  If I had said it like this, ah, April 3,

18   all right, I guess, then you would just shut up?

19             MR. BUEHLER:  I was always taught to try to read the

20   Court, your Honor.  If we can get a little more time, it would

21   be appreciated.

22             THE COURT:  What day do you want?

23             MR. BUEHLER:  If we can have one week more.

24             THE COURT:  April 10.  That's my birthday, so I'm

25   bound to be in a good mood that day.

F3kgstrc

1         MR. BUEHLER:  That would be our gift to you, your

2    Honor.

3         THE COURT:  Always thinking of me.  Thanks,

4    Mr. Buehler.

5         What sort of birthday gift would you like to give me,

6    Mr. Dodge?

7         MR. DODGE:  I think the schedule that the defense

8    initially proposed, the increments of time seem fine with us.

9    They proposed May 11 as an opposition date, but if we extend

10   that by a week as well to May 18, that would be fine with us.

11        THE COURT:  I don't envision this being a terribly

12   complex and lengthy motion at this point, but I'll give you

13   that time if you want it, but I would think everybody wants to

14   get this puppy going.

15        MR. DODGE:  We'll stick with May 11 for our

16   oppositions, and then June 1 for the reply.

17        THE COURT:  Generally, I give a week for the reply.

18   Are you guys planning to travel in the month of May?  I'm

19   talking to the defendants.

20        Mr. Buehler, May 11, are you going to have this

21   response?  How long do you need for a reply?

22        MR. BUEHLER:  A week is fine.

23        THE COURT:  I'll give you two weeks.  Let's do it

24   before Labor Day, okay?

25        MR. BUEHLER:  Great.

F3kgstrc

1              THE COURT:  May 25.

2              MR. BUEHLER:  Perfect.

3              THE COURT:  I will issue an order or a minute entry

4    that lays out these dates, just if there's any question, okay?

5              Is there anything else we need to cover today?

6              MR. DODGE:  Yes.

7              THE COURT:  The answer I was looking for was "no."

8              MR. DODGE:  I apologize, your Honor.  The briefing on

9    the motion to amend, am I to assume that would follow the same

10   schedule?

11             THE COURT:  This is going to be a consolidated

12   briefing with respect to the two motions.

13             MR. DODGE:  Both issues at the same time?

14             THE COURT:  I think that's right.  We can make this as

15   formal as we want, but I just don't think there's any point in

16   having crossing motions.  You can file your motion to amend

17   tomorrow if you want, but let's just have their opposition and

18   then your reply as it were.

19             MR. DODGE:  One set of briefs that deal with both

20   issues.  That's our preference, too.

21             THE COURT:  It is fully on the tail of the motion to

22   strike.  I really don't think the motion to amend is going

23   anyplace.  I'm going to grant the motion to amend for sure if I

24   deny the motion to strike.  I'm likely to grant the motion to

25   amend even if I grant the motion to strike.  I can't imagine

F3kgstrc

1    that the prejudice is going to be such here that it causes me

2    to say no, you can't amend.  But I'm going to give defense

3    counsel an opportunity to brief this with respect to prejudice.

4    I think that's the only issue that's up for grabs.  I don't

5    think there's bad faith.  I don't think it's being done for

6    purposes of delay.  Futility is not the issue.  I think

7    prejudice is the only issue, and I'll let them develop it, but

8    you just need to respond to that.  I don't want a separate set

9    of briefs on that.

10             MR. DODGE:  Thank you.

11             THE COURT:  It's always good to see you.  It's always

12   a pleasure to have good lawyers who know what they're doing.  I

13   mean that sincerely.  Thank you for your time.

14             Let me thank the court reporter also.  If anyone needs

15   a copy of the transcript, let me ask you to take that up with

16   her later through the website, just because I have another

17   matter I want to start.

18             Thanks.  Have a nice day.  Get out of here before the

19   snow.  Happy spring.

20             (Adjourned)

21

22

23

24

25