UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ELEK STRAUB,<br>ANDRÁS BALOGH, and<br>TAMÁS MORVAI,<br><br>Defendants. | <u>FILED UNDER SEAL</u><br><br>No. 11-CV-9645 (RJS)<br><br>DECLARATION OF<br>ROBERT I. DODGE |

I, Robert I. Dodge, make the following declaration:

1. I am an Assistant Chief Litigation Counsel at the United States Securities and Exchange Commission ("SEC") and one of the attorneys of record in the above-captioned lawsuit. I make this declaration pursuant to 28 U.S.C. § 1746 and in support of the SEC's opposition to the defendants' motion to strike the testimony of Slobodan Bogoeski. I am personally familiar with the facts set forth herein.

2. I first became aware of the identity of Slobodan Bogoeski on or about Friday, December 19, 2014, when I received a telephone call from Biljana Panova, the SEC's local counsel in Skopje, Macedonia. Ms. Panova advised me that an interview of Mr. Bogoeski had appeared several days earlier in the Macedonian press. She informed me that in the interview Mr. Bogoeski had made wide-ranging allegations of corruption involving senior officials in the government of Macedonia. Mr. Bogoeski had also discussed his involvement with Dimitris Contominas and had made some reference to corruption involving Magyar Telekom's

Macedonian subsidiary MakTel. Ms. Panova advised that her office was already at work translating the 5,600 word interview into English.

3. At 12:57 pm on December 19, I received an email message from Ms. Panova attaching Mr. Bogoeski's December 12 interview in the newspaper *Fokus* (*фокус*), along with the English translation that Ms. Panova's office had prepared. After reading the article in *Fokus*, at 1:42 pm I instructed Ms. Panova to make contact with Mr. Bogoeski and find out if he would be willing to speak with her.

4. Prior to December 19, I was entirely unfamiliar with Mr. Bogoeski. I later learned that allusions to him had appeared in various contexts in the SEC's voluminous investigative file (such as in the FBI interview of Michael Kefaloyannis, attached as Exhibit 24). Those references, however, did not alert the SEC to Mr. Bogoeski's role in the bribe scheme or to the nature of the evidence he was able to provide. To my knowledge, the SEC had made no previous effort to contact Mr. Bogoeski.

5. On Monday, December 22, I received a telephone call from Ms. Panova. She told me that she had spoken with Mr. Bogoeski. According to Ms. Panova, Mr. Bogoeski was extremely concerned about security. He said that as a result of the article in *Fokus* he had received threats against his and his children's lives. He would not communicate substantively with Ms. Panova by telephone or email, but agreed to do so only face-to-face and only in a discreet location.

6. Mr. Bogoeski told Ms. Panova that he did have personal knowledge of the Magyar Telekom bribe scheme and in fact had participated in it. He said that he was willing to provide information to the SEC and that he had retained documents relating to the scheme. He

also told her that he had been summoned to report to prison the following week, on Monday, December 29. Ms. Panova advised me that she would meet Mr. Bogoeski again the next day.

7. On Tuesday, December 23, I received another telephone call from Ms. Panova. She told me that she had met with Mr. Bogoeski a second time that morning for approximately three hours. During this meeting he described his involvement in the Magyar Telekom bribe scheme in detail. Mr. Bogoeski also provided Ms. Panova with documents relating to the scheme. *Exs. 1, 3, 5, 7.*

8. Mr. Bogoeski advised Ms. Panova on December 23 that he would be willing to give a statement to the SEC, but only to the SEC. He made it clear that the statement had to be given in a way that maintained his confidentiality. Given the upcoming Christmas holiday and the December 29 deadline for Mr. Bogoeski to report to prison, the only available date for him to meet with the SEC was Sunday, December 28.

9. If it had been possible to arrange a Rule 30 deposition of Mr. Bogoeski on December 28, I would have made every effort to arrange one. Nonetheless, because Mr. Bogoeski appeared to have information that was unique in its importance, I flew to Skopje on December 26 to take his statement. My flight was a red-eye through Vienna, Austria, arriving in Skopje on Saturday, December 27.

10. On Sunday, December 28, I met with Mr. Bogoeski at Ms. Panova's office at 9:00 a.m., along with Ms. Panova and an interpreter. I spoke with Mr. Bogoeski informally for about 90 minutes, from 9:00 until about 10:30 a.m. before the interview began. The purpose of this discussion was to introduce myself, explain the SEC's role in the pending litigation, and to get an understanding of what Mr. Bogoeski knew and how he knew it. I also wanted to build a rapport with the witness.

11. At around 10:30, Mr. Bogoeski was placed under oath by a Macedonian notary and interviewed on video. My intent in taking the statement under oath and on the record was to preserve Mr. Bogoeski's testimony with as much formality as was possible under the circumstances. I had no expectation at the time that his statement would later be incorporated into a Rule 30 deposition because I understood that he would report to prison before any deposition could be arranged.

12. Mr. Bogoeski's interview concluded around 5:00 p.m. With time out for breaks, the interview lasted about five and one-half hours. The breaks occupied, in total, about one hour. During much of that time Mr. Bogoeski was outside the office smoking. To the extent that any substantive discussion took place with the witness during breaks, that discussion was audio recorded and later transcribed and produced to defense counsel. At no time, either before the interview began or during breaks, did I attempt to coach Mr. Bogoeski or shape his testimony.

13. The first notice I received that Mr. Bogoeski had been able to delay his December 29 prison reporting date was on Tuesday, December 30, when Ms. Panova reported that he had signed the notary's registration book. That same day, I notified defense counsel by email that the SEC had obtained a videotaped statement from an eyewitness who was not listed in the SEC's Rule 26 disclosures. *Ex. 13 at 1.* I asked defense counsel if they would agree to the entry of a Protective Order, which would allow the SEC to disclose the witness's identity and statement to them. *Id.*

14. The following day, Wednesday, December 31, I asked Ms. Panova to make contact with Mr. Bogoeski to find out how long he expected to remain out of prison. Although defense counsel had not yet responded to my December 30 email, I sent second email notifying them that "the witness is not located in the United States" and that "there is a high probability

4

that the witness will become unavailable for deposition in the very near future, if the witness is not already unavailable." *Ex. 13 at 3*. I urged defense counsel "to get in contact with me as soon as you possibly can." *Id.*

15. On Friday, January 2, I received telephone calls from counsel for all defendants advising that they would agree to maintain the witness's identity in confidence until an appropriate Protective Order could be issued by the Court. With that assurance, I sent copies of the December 28 interview video to counsel by overnight mail that day, *Ex. 13 at 5*, along with copies of the interview exhibits by email.

16. On Monday, January 5, it was still uncertain how long Mr. Bogoeski would remain at liberty, and I asked Ms. Panova to inquire whether the witness would be willing to sit for a deposition during the week of January 12. Mr. Bogoeski responded on Thursday, January 8, that he would be willing to give a deposition, which was then scheduled for Thursday, January 15.

17. On the afternoon of Friday, January 9, I received a telephone call from Robert Buehler and Lisa Fried, counsel for defendant Straub, regarding the logistics of the deposition. I understood that they were calling on behalf of all defendants. During that call, I advised that it was the SEC's intention to maximize the available time for cross-examination by having Bogoeski adopt his prior statement rather than have him repeat it verbatim.

18. In response to an inquiry from the defense, on Monday, January 12, I advised all counsel by email that the SEC expected the January 15 deposition to last approximately six hours. *Ex. 13 at 7*. The deposition took place on January 15, beginning at 6:00 a.m. in Washington, DC (noon in Skopje), and ended at noon in Washington, DC, (6:00 p.m. in Skopje).

19. At the request of defense counsel, Bogoeski agreed to sit for an additional two hours of deposition testimony, and he did so on February 19, 2015. Later that same day, I received word from Ms. Panova that the Macedonian police had arrived at Bogoeski's home and taken him to prison. It is my understanding that he remains in prison.

20. Attached hereto as Exhibits 1 through 15 are true and accurate copies of documents as identified in the following Index to Exhibits. On certain exhibits (Exs. 3, 4, 5, and 6), the SEC has highlighted portions of the text to assist the Court in locating relevant passages.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 11, 2015.

_____
Robert I. Dodge

Index to Exhibits

1. Draft Protocol of Cooperation (provided by Bogoeski)

2. Executed Protocol of Cooperation (recovered from the Athens office safe of Dimitris Contominas)

3. May 2005 draft Non Paper (provided by Bogoeski) [highlighting by SEC]

4. May 31, 2005 email from Balogh to Straub with attached "Agenda" [highlighting by SEC]

5. Signed, undated letter from Prime Minister Buckovski to Elek Straub (provided by Bogoeski) [highlighting by SEC]

6. May 17, 2006 email to Elek Straub describing Government of Macedonia's position on MakTel share buyback [highlighting by SEC]

7. May 29, 2006 draft Memorandum of Understanding (provided by Bogoeski)

8. May 29, 2006 email to Elek Straub attaching draft Memorandum of Understanding

9. Transcript of Dec. 28, 2014 interview

10. Transcript of Jan. 15, 2015 deposition

11. Transcript of Feb. 19, 2015 deposition

12. Transcript of Dec. 28, 2014 off-the-record discussion

13. Selected correspondence between the SEC and defense counsel regarding the testimony of Slobodan Bogoeski

14. FBI Form 302 summarizing May 28, 2009, interview of Michail Kefaloyannis (excerpt).

15. FBI Form 302 summarizing Dec. 18-19, 2008, interview of Dimitris Contominas (excerpt).