UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ELEK STRAUB,<br>ANDRÁS BALOGH, and<br>TAMÁS MORVAI,<br><br>Defendants. | No. 11-CV-9645 (RJS)<br><br><br>SECOND AMENDED COMPLAINT |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY

1.     This action arises from violations of the Foreign Corrupt Practices Act of 1977 (the "FCPA") by defendants Elek Straub ("Straub"), the former Chairman and Chief Executive Officer of Magyar Telekom, Plc. ("Magyar Telekom"); and András Balogh ("Balogh") and Tamás Morvai ("Morvai"), two former senior executives in Magyar Telekom's Strategy Department.

2.     In 2005 and 2006, Straub, Balogh, and Morvai executed a scheme to bribe government officials in the Republic of Macedonia to block the entry of a competitor to Magyar Telekom's Macedonian telecommunications subsidiaries. In connection with the scheme, Magyar Telekom made payments of €4.875 million to an intermediary under the guise of bogus "consulting" and "marketing" contracts. Straub, Balogh, and Morvai authorized the payments with the knowledge, the firm belief, or under circumstances that

made it substantially certain, that all or a portion of the money would be forwarded to Macedonian government officials. In return, the officials agreed to adopt regulatory changes favorable to Magyar Telekom's business and to prevent a new competitor from entering the market. Straub, Balogh, and Morvai also offered officials of a Macedonian minority political party a valuable business opportunity in return for the party's support of Magyar Telekom's desired benefits.

3.      Magyar Telekom and Deutsche Telekom lacked sufficient internal accounting controls to prevent and detect violations of the FCPA. As a result, the sham contracts relating to the Macedonia scheme was not subject to meaningful review. Substantially all the corrupt payments called for under the contracts were made without question.

4.      Straub, Balogh, and Morvai caused the payments made under the sham contracts to be falsely recorded in Magyar Telekom's books and records. The payments were recorded as fees for legitimate consulting and marketing services, when no such bona fide services were provided, or intended, under the contracts. The false entries in Magyar Telekom's books and records were consolidated into the books and records of its parent company, Deutsche Telekom AG ("Deutsche Telekom"), which reports the results of Magyar Telekom's operations in its consolidated financial statements.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

6.      Venue in this District is proper pursuant to Section 27 of the Exchange Act because acts or transactions constituting federal securities law violations occurred within the Southern District of New York.

7.      Defendants, directly or indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in furtherance of the acts, practices and courses of business described herein.

8.      At the time of the violations, Magyar Telekom and Deutsche Telekom's securities were publicly traded through American Depository Receipts listed on the New York Stock Exchange and registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78l]. Magyar Telekom and Deutsche Telekom were issuers of securities in the United States and filed reports on Form 20-F with the Commission pursuant to Section 13 of the Exchange Act [15 U.S.C. § 78m].

## **DEFENDANTS**

9.      **Elek Straub** was the Chairman and Chief Executive Officer of Magyar Telekom from July 17, 1995, until December 5, 2006. Straub is a Hungarian citizen believed to be residing in Hungary.

10.      **Andras Balogh** was the Director of Central Strategic Organization of Magyar Telekom from April 1, 2002, until August 8, 2006. Balogh is a Hungarian citizen believed to be residing in Hungary.

11.      **Tamas Morvai** was the Director of Business Development and Acquisitions in the Central Strategic Organization of Magyar Telekom from July 2004 until July 10, 2006. Morvai is a Hungarian citizen believed to be residing in the Netherlands.

## OTHER RELEVANT ENTITIES

12.     **Magyar Telekom** is a limited liability stock corporation organized under the laws of Hungary and headquartered in Budapest, Hungary. Magyar Telekom is the largest telecommunications company in Hungary. Magyar Telekom operates subsidiaries in Macedonia, Montenegro, and other countries. At the time of the violations, Magyar Telekom's securities were publicly traded through American Depository Receipts ("ADRs") listed on the New York Stock Exchange ("NYSE") and registered with the Commission pursuant to Section 12(b) of the Exchange Act. On November 12, 2010, Magyar Telekom voluntarily delisted its ADRs from trading on the NYSE.

13.     **Deutsche Telekom** is a private stock corporation organized under the laws of Germany and headquartered in Bonn, Germany. Deutsche Telekom acquired an approximately 60% controlling interest in Magyar Telekom in July 2000 and reports the results of Magyar Telekom's operations in its consolidated financial statements. At the time of the violations, Deutsche Telekom's shares were publicly traded through ADRs listed on the NYSE and registered with the Commission pursuant to Section 12(b) of the Exchange Act. On June 18, 2010, Deutsche Telekom voluntarily delisted its ADRs from trading on the NYSE.

14.     **Makedonski Telekommunikacii A.D. Skopje ("MakTel")** is the former state-owned telecommunications services provider in Macedonia. In January 2001, the government of Macedonia sold a portion of MakTel to a consortium that included Magyar Telekom. By late 2004, Magyar Telekom had increased its stake in MakTel to 51% by purchasing additional shares from the Macedonian government and from private shareholders. Magyar Telekom now holds its MakTel shares through a wholly-owned

holding company. The Macedonian government currently retains an approximately 35%
stake in MakTel.

## FACTUAL ALLEGATIONS

### A.    Violations of the FCPA

15.     During 2005 and 2006, Straub, Balogh, and Morvai offered and/or paid
bribes to Macedonian government and political party officials. In return, the officials
provided Magyar Telekom with secret competitive advantages and regulatory benefits.

16.     Straub, Balogh, and Morvai caused Magyar Telekom's subsidiaries in
Macedonia to pay at least €4.875 million to a third-party intermediary under a series of
sham marketing and consulting contracts. Straub, Balogh, and Morvai caused the
payment with the knowledge, the firm belief, or under circumstances that made it
substantially certain that the third-party would forward all or part of the payment to
government officials in exchange for the officials' approval of business and regulatory
benefits to Magyar Telekom. Straub, Balogh, and Morvai also offered a Macedonian
minority political party within the coalition government the opportunity to designate the
beneficiary of a business venture in exchange for the minority party's support of Magyar
Telekom's desired benefits.

17.     In early 2005, the Macedonian Parliament enacted a new Electronic
Communications Law, which liberalized the telecommunications market in a manner that
would have been unfavorable to Magyar Telekom. The law authorized the
telecommunications regulatory authorities in Macedonia to hold a public tender for a
license to operate a third mobile telephone business. The party that obtained that license

would have become a direct competitor of Magyar Telekom's subsidiary MakTel in Macedonia. The Electronic Communications Law also increased frequency fees and imposed other regulatory burdens on MakTel.

18.     Straub, Balogh, and Morvai devised and, beginning around January 2005, executed a scheme to bribe government officials from both political parties in Macedonia's coalition government to defeat or mitigate the effects of the new law. Straub, Balogh, and Morvai memorialized elements of their scheme in a secret document maintained on their Magyar Telekom computers. Later, when Magyar Telekom instituted an internal investigation, Balogh and Morvai in approximately February 2006 attempted to destroy evidence of the document from their computers.

19.     In furtherance of the scheme, Magyar Telekom's Macedonian subsidiaries retained an intermediary, a Greek "lobbying consultant," to facilitate negotiations with Macedonian government officials on Magyar Telekom's behalf. The negotiations, which took place between late December 2004 and May 2005, resulted in a secret agreement, entitled "Protocol of Cooperation," with senior Macedonian government officials. Under the Protocol of Cooperation, the Macedonian officials would ensure that the government delayed or precluded the issuance of the third mobile telephone license. The officials would also mitigate the other adverse effects of the new law, including exempting MakTel from the obligation to pay an increased frequency fee. In return, the government of Macedonia was to receive its full €14.8 million dividend and the officials would receive undisclosed bribe payments from Magyar Telekom.

20.     On or about May 25, 2005, Straub approved the Protocol of Cooperation on behalf of Magyar Telekom. Balogh signed the Protocol of Cooperation on or about

May 27, 2005. The Protocol of Cooperation was countersigned by a senior Macedonian government official from the majority political party on or about the same date. Magyar Telekom's entry into the Protocol of Cooperation was also approved by senior executives within Deutsche Telekom.

21.     To prevent public disclosure, the only executed original copy of the Protocol of Cooperation was retained by the Greek intermediary. No signed copies were retained in the files of either Magyar Telekom or Deutsche Telekom. The existence and purpose of the agreement were kept secret within Magyar Telekom and Deutsche Telekom, known only to Straub, Balogh, Morvai, and a few others.

22.     The Protocol of Cooperation was unlawful under Macedonian law, and it required government officials to ignore their lawful duties. The Protocol of Cooperation required the government to refrain from tendering the third mobile license and to collect inappropriately reduced radio frequency fees from Magyar Telekom in contravention of the new Electronic Communications Law. The senior Macedonian government official who signed the Protocol of Cooperation failed to record it as an official government document, as required under Macedonian law.

23.     Straub, Balogh, and Morvai obtained the senior government official's consent to the Protocol of Cooperation by offering to pay up to €10 million in bribes, in three installments. Between 2005 and 2006, as Magyar Telekom received the benefits promised in the Protocol of Cooperation, Straub, Balogh, and Morvai authorized MakTel and other Magyar Telekom subsidiaries to pay €4.875 million to the Greek intermediary under sham "success fee based" contracts for "consulting" or "marketing" services. Straub, Balogh, and Morvai authorized the contracts with the knowledge or firm belief

that some or all of the payments would be forwarded to government officials, or under circumstances that made such a result substantially certain to occur.

24.     The support of the minority coalition party in the Macedonian government was a necessary condition to implementing the objectives of the Protocol of Cooperation. Members of the minority political party occupied senior positions in the telecommunications regulatory agencies with jurisdiction over the tender of the third mobile license. Straub, Balogh, and Morvai understood, and confirmed in writing on or about May 31, 2005, that officials within the minority political party would "torpedo [or 'wreck'] the agreement within 2 months if we don't pay" bribes to those officials.

25.     Straub, Balogh, and Morvai discussed various options for structuring bribe payments to the minority political party. In one attachment to an electronic mail message, Balogh proposed:  "we could pay, for instance EUR 2 million, one million each to a Macedonian and an Albanian consulting firm from Telemacedonia [a Magyar Telekom subsidiary in Macedonia]… / ...or we could pay the Albanians only one million each in two installments./  We should pay more than this only if we have [an additional contract with the designee of the minority party] in our hands and the bylaws satisfactory to us are adopted."

26.     In their effort to secure the benefits sought by Magyar Telekom, Straub, Balogh, and Morvai also corruptly promised to provide a valuable business opportunity to the minority political party. Magyar Telekom offered to have its Macedonian subsidiary construct a mobile telecommunications infrastructure in a neighboring country and allow a designee of the minority political party to operate using the company's network backbone. Early drafts of a letter agreement (the "Letter of Intent") to this effect

identified the prospective business partner only as "a company to be named by the [minority political] Party." On or about August 30, 2005, Straub executed the Letter of Intent with the minority party's nominee. The business opportunity ultimately was not developed.

27.     On or about May 31, 2005, with Balogh and Morvai's knowledge and complicity, Straub entered into a second, nearly-identical version of the secret Protocol of Cooperation with a senior Macedonian government official belonging to the minority political party. As with the first agreement, the only executed copy of this version of the Protocol of Cooperation was retained by the Greek intermediary. The existence and intent of the agreement was unknown to anyone within Magyar Telekom or Deutsche Telekom other than Straub, Balogh, Morvai, and a small number of additional participants. The second version of the Protocol of Cooperation violated the law of Macedonia for the same reasons the first one did.

28.     In an untitled document prepared by Balogh on or about June 1, 2005, Balogh proposed to "structure" the corrupt payments intended for the government officials from the respective political parties in the form of "success fee based" contracts. Balogh volunteered to "be present when signing the contracts or meet[] with the representatives of both sides and inform[] them about the source of the money."  Later, during an investigation conducted by Magyar Telekom's Audit Committee, Balogh attempted to destroy evidence of this document from his computer.

29.     Between 2005 and 2006, Straub, Balogh, and Morvai authorized Magyar Telekom to enter into at least six sham contracts with the Greek intermediary for "consulting" and "marketing" services that were never provided. The phony contracts

were designed so as to circumvent Magyar Telekom's internal controls. The contracts served no legitimate business purpose, and no bona fide services were rendered under them. Instead, the contracts were used to channel corrupt payments indirectly to government officials in a manner that would not be detected. Straub, Balogh, and Morvai referred to the routing of payments through such sham contracts using the code term "logistics."

30.     Straub, Balogh, and Morvai considered selecting companies proposed by the Greek intermediary to handle the so-called "logistics" payments. The Greek intermediary initially proposed several Cyprus-based shell companies to serve as Magyar Telekom's counterparty under fake consulting contracts. However, none of the proposed Cyprus-based counterparties could sustain even minimal background checks, as none had good corporate standing. Balogh and Straub then considered using companies affiliated with the Greek intermediary as a "bridge" until a more acceptable payment intermediary could be identified. However, Magyar Telekom could not rely on the Greek intermediary to disclose which government official "got how much at what time."  Despite this risk, Straub, Balogh, and Morvai caused Magyar Telekom's subsidiaries in Macedonia to make the payments to entities affiliated with the Greek intermediary with the knowledge, the firm belief, or under circumstances that made it substantially certain, that some or all of the corrupt payments would be forwarded to government officials.

31.     In an electronic mail message dated June 16, 2005, to representatives of the Greek intermediary, Balogh asked that he be provided with "feedback, after the transaction, from high level representatives of both sides acknowledging that they received what we promised."

32.     Straub, Balogh, and Morvai acted with fraud, deceit, manipulation, or deliberate or reckless disregard of regulatory requirements in structuring and approving the 2005 and 2006 consulting and marketing contracts on behalf of Magyar Telekom because the contracts:  (1) served no legitimate business purpose; (2) concealed the fact that all or a portion of the payments were offered or paid to influence government officials to provide Magyar Telekom with secret competitive advantages and regulatory benefits; (3) were supported by false performance certificates or fabricated evidence of performance; (4) were in many cases backdated; and (5) were in many cases purportedly success-based, but entered into after the relevant contingencies had already been satisfied.

33.     The 2005 and 2006 consulting and marketing contracts were structured so as to circumvent Magyar Telekom's internal controls and avoid detection. The payments called for were consistently set just below internal control thresholds that would have required Board approval. In some cases, the contracts and performance certificates were re-executed to name different contracting parties as a means to avoid "attract[ing] too much attention."

34.     As part of MakTel's business plan, Magyar Telekom prepared internal documents projecting the financial benefit MakTel would receive from the Protocol of Cooperation. Magyar Telekom projected that the benefit from eliminating the adverse effects of the Electronic Communications Law would be far in excess of the €4.875 million it paid under the six sham consulting and marketing contracts.

35.     Magyar Telekom received the benefits promised in the Protocol of Cooperation. As a result of the corrupt payments, the Macedonian government delayed

the introduction of a third mobile telephone competitor until 2007. By that time, an
intervening election had occurred and a new coalition government had obtained control in
Macedonia, and Straub, Balogh, and Morvai had resigned from Magyar Telekom. The
Macedonian government also, as agreed, reduced the frequency fee tariffs imposed on
MakTel.

36.    Electronic mail messages in furtherance of the bribe scheme, including
those attaching drafts of the Protocol of Cooperation, the Letter of Intent, and copies of
consulting contracts with a third-party intermediary, were transmitted through the means
or instrumentalities of United States interstate commerce. The electronic mail messages
were sent from locations outside the United States, but were routed through and/or stored
on network servers located within the United States. Some of these electronic mail
messages were sent or received by defendant Balogh.

37.    The payments made under the six sham marketing and consulting
contracts were recorded on Magyar Telekom's books and records in a manner that did not
reflect the true purpose of the contracts. The resulting false records were consolidated
into Deutsche Telekom's financial statements. At the time the payments were made,
Magyar Telekom and Deutsche Telekom lacked sufficient internal accounting controls to
provide reasonable assurances that the transactions were legitimate and recorded
appropriately.

**B.    Straub, Balogh, and Morvai Lied to Magyar Telekom's Auditor**

38.    Straub, Balogh, and Morvai made false or misleading statements or
omissions to Magyar Telekom's auditors in connection with the preparation of the
company's 2004 and 2005 financial statements.

39.     Between January 2005 and January 2006, Straub signed management representation letters to Magyar Telekom's auditor falsely stating: "we have made available to you all financial records and related data"; "we are not aware of any accounts, transactions or material agreement not fairly described and properly recorded in the financial and accounting records underlying the financial statements"; and "we are not aware of any violations or possible violations of laws or regulations . . . ."

40.     Balogh and Morvai signed management sub-representation letters for quarterly and annual reporting periods in 2004 and 2005 falsely certifying that "all material information related to my area was disclosed accurately and in full (actuals and accruals) and in agreement with the subject matter of the management representation letter."

41.     Straub, Balogh, and Morvai knew that that Magyar Telekom entered into at least six bogus contracts, as described above, in 2005 and 2006 related to its Macedonian subsidiaries.

42.     Straub, Balogh, and Morvai knew that all or a portion of the payments under the six contracts described above would be used corruptly in furtherance of their offers to pay government and political party officials in Macedonia for the purposes of influencing their acts or decisions, securing an improper advantage, or inducing them to use their influence, to assist Magyar Telekom in obtaining or retaining business.

43.     Straub, Balogh, and Morvai knew that the six contracts, and the supporting documents justifying expenditures under the contracts, did not accurately reflect the true purpose of the payments. They also knew that Magyar Telekom's accounting books, records, and accounts were thereby rendered false.

44.     Straub, Balogh, and Morvai failed to disclose to Magyar Telekom's auditors the existence of the Protocol of Cooperation, the Letter of Intent offering the benefit of a business deal to the designee of the minority political party, and other documents described above concerning the scheme to bribe Macedonian government and political party officials to obtain secret competitive advantages and regulatory benefits.

45.     Had Magyar Telekom's auditors known these facts, they would not have accepted the management representation letters and other representations provided by Straub. Nor would the auditors have provided an unqualified audit opinion to accompany Magyar Telekom's annual report on Form 20-F.

## FIRST CLAIM FOR RELIEF

### Straub, Balogh, and Morvai Violated
### Section 30A of the Exchange Act

**(Anti-Bribery Provisions of the Foreign Corrupt Practices Act)**

46.     Paragraphs 1 through 45 are realleged and incorporated herein by reference.

47.     Straub, Balogh, and Morvai, who were officers, directors, employees, or agents of Magyar Telekom, a United States issuer, made use of the mails or other means or instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to foreign officials for the purposes of influencing their acts or decisions, securing an improper advantage, or inducing them to use their influence to assist the issuer in obtaining or retaining business.

48.     By reason of the foregoing, Straub, Balogh, and Morvai violated Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

## SECOND CLAIM FOR RELIEF

### Straub, Balogh, and Morvai Aided and Abetted the Violation of Section 30A of the Exchange Act

### (Anti-Bribery Provisions of the Foreign Corrupt Practices Act)

49.     Paragraphs 1 through 48 are realleged and incorporated herein by reference.

50.     Straub, Balogh, and Morvai knowingly or recklessly provided substantial assistance to Magyar Telekom in its violations of, and caused Magyar Telekom to violate, Section 30A of the Exchange Act.

51.     By reason of the foregoing, Straub, Balogh, and Morvai violated Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)] by aiding and abetting Magyar Telekom's violations of Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

## THIRD CLAIM FOR RELIEF

### Straub, Balogh, and Morvai Aided and Abetted Magyar Telekom's Violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B)

### (Company Books and Records and Internal Controls)

52.     Paragraphs 1 through 51 are realleged and incorporated herein by reference.

53.     Section 13(b)(2)(A) of the Exchange Act requires issuers to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their assets.

54.     Section 13(b)(2)(B) of the Exchange Act requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's general or specific authorization; and transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

55.     Straub, Balogh, and Morvai knowingly or recklessly provided substantial assistance to Magyar Telekom in its violations of, and caused Magyar Telekom to violate, Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B).

56.     By reason of the foregoing, Straub, Balogh, and Morvai violated Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)] by aiding and abetting Magyar Telekom's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and (B)].

## FOURTH CLAIM FOR RELIEF

### Straub, Balogh, and Morvai Violated Sections 13(b)(5) of the Exchange Act and Exchange Act Rule 13b2-1

#### (Falsifying Books and Records)

57.     Paragraphs 1 through 56 are realleged and incorporated herein by reference.

58.     As described above, Straub, Balogh, and Morvai knowingly falsified, and directly or indirectly caused to be falsified books, records, or accounts of Magyar Telekom, an issuer subject to Section 13(b)(2) of the Exchange Act [15 U.S.C. §78m(b)(2)]. As a result of Straub, Balogh, and Morvai's conduct, the books and records

of Magyar Telekom falsely recorded the corrupt payments under sham "consulting" and "marketing" contracts described above as payments for legitimate business services. By falsifying documents, structuring the contracts just below review thresholds, and authorizing the sham contracts, Straub, Balogh, and Morvai knowingly circumvented Magyar Telekom's internal accounting controls.

59.     By reason of the foregoing, Straub, Balogh, and Morvai violated Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. §240.13b2-1].

## FIFTH CLAIM FOR RELIEF

### Straub, Balogh, and Morvai Violated Exchange Act Rule 13b2-2

#### (False or Misleading Statements to Accountant or Auditor)

60.     Paragraphs 1 through 59 are realleged and incorporated herein by reference.

61.     Straub, Balogh, and Morvai made or caused to be made materially false or misleading statements or omissions to an accountant or auditor in connection with audits of Magyar Telekom's financial statements.

62.     By reason of the foregoing, Straub, Balogh, and Morvai violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.     Enter a final judgment permanently enjoining Straub, Balogh, and Morvai from violating, or aiding and abetting violations of, Sections 30A [15 U.S.C. §78dd-1],

13(b)(2)(A) [15 U.S.C. §78m(b)(2)(A)], 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)] and

13(b)(5) [15 U.S.C. § 78m(b)(5)] of the Exchange Act and Rules 13b2-1 [17 C.F.R.

§ 240.13b2-1] and 13b2-2 [17 C.F.R. § 240.13b2-2] promulgated thereunder;

  D. Enter a final judgment ordering Straub, Balogh, and Morvai to disgorge all

ill-gotten gains wrongfully obtained as a result of their illegal conduct, plus prejudgment

interest;

  E. Enter a final judgment ordering Straub, Balogh, and Morvai to pay civil

penalties pursuant to Sections 21(d) [15 U.S.C. § 78u(d)] and 32 [15 U.S.C. § 78ff] of the

Exchange Act; and

  F. Grant the Commission such other relief as is just and appropriate.


Dated:  September 1, 2015    Respectfully submitted,


           __/s/ Robert I. Dodge_____
           Robert I. Dodge
           Thomas A. Bednar
           John D. Worland, Jr.
           Adam J. Eisner
           Securities and Exchange Commission
           100 F Street, N.E.
           Washington, D.C. 20549-5949
           (202) 551-4421 (Dodge)
           DodgeR@sec.gov
           BednarT@sec.gov
           WorlandJ@sec.gov
           EisnerA@sec.gov
           Attorneys for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I certify that on September 1, 2015, a copy of the foregoing document was served upon all counsel of record via the Court's electronic filing system, which sends notification to the following parties:

Robert B. Buehler (robert.buehler@hoganlovells.com)
Carl Rauh (carl.rauh@hoganlovells.com)
Lisa J. Fried (lisa.fried@hoganlovells.com)

Counsel for defendant Elek Straub

William Sullivan (wsullivan@pillsburylaw.com)
Kristen Baker (kristen.baker@pillsburylaw.com)

Counsel for defendant András Balogh

Michael L. Koenig (mkoenig@haslaw.com)
Victoria Lane (vlane@haslaw.com)

Counsel for defendant Tamás Morvai


_____/s/ Robert I. Dodge_____