# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | **No. 11-Civ-9645 (RJS)** |
| **Plaintiff,** | |
| **v.** | |
| **ELEK STRAUB,** **ANDRÁS BALOGH, and** **TAMÁS MORVAI,** | |
| **Defendants.** | |

## PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN SUPPORT OF ITS <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Robert I. Dodge
Thomas A. Bednar
John D. Worland, Jr.
Adam J. Eisner
U.S. Securities & Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-5985

(202) 551-4421 (Dodge)
DodgeR@sec.gov
Attorneys for Plaintiff

Dated: October 5, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 4

    1.  The Bribe Scheme ................................................................................... 5

    2.  Concealment of the Key Documents ..................................................... 7

    3.  Laundering the Payments ....................................................................... 8

    4.  Destruction of Evidence ........................................................................ 11

    5.  False Representations to Auditors and the SEC ................................... 13

ARGUMENT .................................................................................................................. 15

    1.  Summary Judgment Standard ................................................................ 16

    2.  As a Matter of Law, the Court May Exercise Personal
        Jurisdiction Over the Defendants .......................................................... 17

        A.  The Standard for Personal Jurisdiction ............................................ 17

        B.  The Undisputed Facts Prove that the Defendants Are Subject
             to this Court's Jurisdiction ................................................................ 22

            i.  All three defendants engaged in conduct directed at the
               United States .............................................................................. 22

            ii.  The defendants' actions were the means by which they
               concealed the bribe scheme ....................................................... 24

            iii.  The SEC's allegations "arise out of" or "relate to" the
               defendants' U.S. contacts ........................................................... 24

    3.  The SEC's Claims are not Time-Barred by the Five-Year Statute
        of Limitations in 28 U.S.C. § 2462 ....................................................... 26

        A.  The Statute Runs Only While a Defendant Can be Found Within
             the United States .............................................................................. 26

       B.  Defendants' Cannot Re-Write Section 2462 .......................................................... 29

4.  Defendants Made Use of "Any Means or Instrumentality of
Interstate Commerce." ................................................................................ 30

       A.  The Defendants Used Email to Further their Scheme, and
Certain of those Emails Passed Through and Were Stored on
Internet Servers in the United States ...................................................... 31

            i.  There is no requirement that each defendant in a scheme
personally use an instrumentality of interstate commerce .............................. 32

            ii.  There is no requirement that the jurisdictional element of
interstate commerce involve any intent, "corrupt" or otherwise .................... 33

       B.  In Connection with the Bribe Scheme, Defendants Participated in the
Preparation of SEC Filings that Were Transmitted to and Stored on
Internet Servers in the United States ...................................................... 34

5.  Defendants Balogh and Morvai Violated SEC Rule 13b2-1 by
Falsifying Magyar Telekom's Books and Records ...................................... 35

       A.  The Legal Standard for Rule 13b2-1 .................................................... 35

       B.  There Is No Genuine Dispute that Balogh and Morvai Signed a
Backdated Letter Authorizing the Stonebridge Contracts ...................... 37

6.  Defendants Straub and Balogh Violated SEC Rule 13b2-2 by Falsely
Certifying that they had Disclosed all "Transactions or Material
Agreements" to Magyar Telekom's Auditor ................................................ 38

       A.  The Legal Standard for Rule 13b2-2 .................................................... 39

       B.  As Officers of Magyar Telekom, Straub and Balogh Represented
to PricewaterhouseCoopers that all "Accounts, Transactions or
Material Agreements" Had Been Made Available ................................ 39

       C.  The Protocol of Cooperation Was an Undisclosed Transaction
or Agreement ...................................................................................... 41

       D.  The Protocol of Cooperation was Material .......................................... 42

CONCLUSION .................................................................................................... 43

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................16

*Asahi Metal Industry Co. Ltd. v. Super. Ct. of Cal., Solana Cty.*, 480 U.S. 102 (1987)........................................................................................................................20

*Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975) .........................................18

*Binder & Binder PC v. Barnhart*, 481 F.3d 141 (2d Cir. 2007) ........................................16

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ...........................................................................34

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)...............................................19, 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................................17

*Clark v. Martinez*, 543 U.S. 371 (2005) ............................................................................28

*CRA Realty Corp. v. Crotty*, 878 F.2d 562 (2d Cir. 1989)................................................39

*CSX Transp., Inc. v. Ala. Dep't of Revenue*, 131 S.Ct. 1101 (2011).................................29

*D'Amico v. City of N.Y.*, 132 F.3d 145 (2d Cir. 1998).......................................................16

*Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003 (D.N.J. 1996)....................................................................................................................21

*Franklin Sav. Bank of N.Y. v. Levy*, 551 F.2d 521 (2d Cir. 1977) ....................................32

*Gabelli v. SEC*, 133 S.Ct. 1216 (2013) ..............................................................................29

*Hallwood Realty Partners, L.P. v. Gotham Partners L.P.*, 104 F. Supp. 2d 279 (S.D.N.Y. 2000) ...........................................................................................................18, 20

*Hanson v. Denckla*, 357 U.S. 235 (1958) ..........................................................................19

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) .................19, 25

*Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996) .................................................26

*Howgate v. United States*, 7 App. D.C. 217 (D.C. Cir. 1895) ...........................................28

*In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279 (E.D.N.Y. 2002).............................21

*In re Parmalat Sec. Lit.*, 376 F. Supp. 2d 449 (S.D.N.Y. 2005)..........................................21

*In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F. Supp. 2d 509 (D.N.J. 2005) ..........21

*Int'l Shoe Co. v. State of Washington*, 326 U.S. 310 (1945).........................................18, 19

*Itoba Ltd. v. LEP Group PLC*, 930 F.Supp. 36 (D.Conn. 1996) .......................................22

*J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S.Ct. 2780 (2011) ......................................18

*Kerzer v. Kingly Mfg.*, 156 F.3d 396 (2d Cir. 1998)..........................................................16

*Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98 (S.D.N.Y. 1989) .............................................................................................................................17, 21

*Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972), *abrogated on other grounds by Morrison v. Nat'l Australian Bank Ltd.*, 561 U.S. 247 (2010).............................................................................................................17

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...............16

*Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996) ..............18, 20

*R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54 (2d Cir. 1997)..................................................16

*Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241 (S.D.N.Y. 1984)...............18, 21

*RTC Mortgage Trust 1995–S/N1 v. Polmar Realty, Inc.*, No. 91 Civ. 6685 (SAS), 1996 WL 689281 (S.D.N.Y. Nov. 27, 1996) ..............................................................17

*SEC v. Boock*, No. 09 Civ. 8261, 2011 WL 3792819 (S.D.N.Y. Aug. 25, 2011) .............33

*SEC v. Carrillo*, 115 F.3d 1540 (11th Cir. 1997) ..............................................................25

*SEC v. Compania Internacional Financiera, S.A.*, No. 11 Civ. 4904 (DLC), 2011 WL 3251813 (S.D.N.Y. Jul. 29, 2011) ........................................................................18

*SEC v. Espuelas*, 767 F.Supp.2d 467 (S.D.N.Y. 2011) .........................................36, 39, 42

*SEC v. Funinanga*, No. 13 Civ. 1658 (JCM) (CWH), 2014 WL 4977334 (D. Nev. Oct. 3, 2014) ..............................................................................................................30

*SEC v. Koenig*, 469 F.2d 198 (2d Cir. 1972) ....................................................................36

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998).....................................................36, 39, 42

iv

*SEC v. Softpoint, Inc.*, No. 95 Civ. 2951(GEL), 2001 WL 43611 (S.D.N.Y. Jan. 18, 2001) ........................................................................................18, 19, 20, 32

*SEC v. Solucorp Indus. Ltd.*, 274 F. Supp. 2d 379 (S.D.N.Y. 2003) .................................31

*SEC v. Stanard*, No. 06 Civ. 7736 (GEL) (S.D.N.Y. May 16, 2007) (unpublished transcript) ........................................................................................20, 36

*SEC v. Straub*, 921 F.Supp.2d 244 (S.D.N.Y. 2013) .................................................. *passim*

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ....................................................18, 19

*SEC v. World-Wide Coin Invest., Ltd.*, 567 F. Supp. 724 (D. Ga. 1983) ..........................36

*United States v. Blackmon*, 839 F.2d 900 (2d Cir. 1988) ....................................................33

*United States v. Cashin*, 281 F.2d 669 (2d Cir. 1960) ........................................................32

*United States v. Cooper*, 482 F.3d 658 (4th Cir. 2007) ......................................................33

*United States v. Edelman*, 873 F.2d 791, 794 (5th Cir. 1989) ...........................................33

*United States v. Feola*, 420 U.S. 671 (1975) .....................................................................33

*United States v. Hornaday*, 392 F.3d 1306 (11th Cir. 2004) .............................................30

*United States v. Johnson*, 553 F.Supp.2d 582, 622 (E.D.Va. 2008) ..................................32

*United States v. Langford*, 946 F.2d 798 (11th Cir. 1991) ................................................32

*United States v. MacEwan*, 445 F.3d 237 (3d Cir. 2006) ...................................................30

*United States v. MacKay*, 491 F.2d 616 (10th Cir. 1973)...................................................32

*United States v. Santos*, 553 U.S. 507 (2008) ....................................................................28

*United States v. Victor Teicher & Co., L.P.*, 726 F. Supp. 1424 (S.D.N.Y. 1989)............33

*United States v. Yermian*, 468 U.S. 63 (1984) ...................................................................33

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) ....................................................................16

# FEDERAL STATUTES

**Securities Exchange Act of 1934**

Section 3(a)(37), 15 U.S.C. § 78c(a)(37) ..........................................................36

Section 13(a), 15 U.S.C. § 78m(a) .................................................................22

Section 13(b)(2)(A), 15 U.S.C. 78m(b)(2)(A) ...............................................1, 24

Section 13(b)(2)(B), 15 U.S.C. 78m(b)(2)(B) ...............................................1, 24

Section 13(b)(5), 15 U.S.C. 78m(b)(5) ..........................................................1, 24

Section 27, 15 U.S.C. 78aa ............................................................................17

Sections 30A, 15 U.S.C. 78dd-1…...........................................................1, 2, 3, 30

**Other Federal Statutes**

28 U.S.C. § 2462 .................................................................................. *passim*

# REGULATIONS

17 C.F.R. ¶ 240.3b-2 .....................................................................................39

17 C.F.R. ¶ 240.13b2-1 ............................................................................ *passim*

17 C.F.R. ¶ 240.13b2-2 ............................................................................ *passim*

# FEDERAL RULES

Fᴇᴅ. R. Cɪᴠ. P. 56(a) ..................................................................................1, 16

# OTHER AUTHORITIES

S. Rep. No. 95-114 (1977) *reprinted in* 1977 U.S.C.C.A.N. 4098…................................25

SEC Release Nos. 33-8099, 34-45922 (May 14, 2002)…...............................................34

SEC Release No. 34-15570, 1979 WL 173674 (Feb. 15, 1979)…........................35, 36, 39

SEC Release No. 34–17500, 1981 WL 36385 (Jan. 29, 1981)..........................................36

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, plaintiff U.S. Securities and Exchange Commission ("SEC") submits this memorandum in support of its motion for partial summary judgment.

## PRELIMINARY STATEMENT

The SEC charges that defendants Elek Straub, András Balogh, and Tamás Morvai engaged in a scheme to bribe senior Macedonian public officials in return for regulatory actions benefitting their employer, Magyar Telekom. Between December 2004 and May 2005, the defendants negotiated two secret agreements with Macedonian officials. The first of these, entitled "Protocol of Cooperation," outlined regulatory benefits the officials would arrange for Magyar Telekom's Macedonian subsidiaries. The second, entitled simply "Non Paper," listed the bribes that Magyar Telekom would pay in return. The promised bribes totaled €19.5 million and were to be paid to then-Prime Minister Vlado Buckovski and senior officials from the ethnic Albanian coalition party, Ali Ahmeti and Musa Xhaferi. The defendants paid approximately €4.875 million of the promised bribes before the scheme unraveled in 2006.

The SEC's complaint charges the defendants with violating Exchange Act Sections 30A (offer or payment of bribes), 13(b)(2)(A) (failure to keep accurate books and records), 13(b)(2)(B) (failure to maintain adequate internal controls), and 13(b)(5) (circumventing internal controls), along with SEC Rules 13b2-1 (falsifying books and records) and 13b2-2 (making false statements to Magyar Telekom's auditor).

The SEC moves for partial summary judgment on five discrete issues. As a matter of law, the SEC is entitled to judgment that:

(1)     the Court may exercise personal jurisdiction over the defendants;

(2)     the SEC's claims are not time-barred under 28 U.S.C. § 2462;

(3)      the defendants made "use of the mails or any means or instrumentality of interstate commerce" with respect to the SEC's claim under 15 U.S.C. § 78dd-1(a);

(4)      defendants Balogh and Morvai violated SEC Rule 13b2-1 by falsifying the books, records, or accounts of Magyar Telekom; and

(5)      defendants Straub and Balogh violated SEC Rule 13b2-2 by making materially false or misleading statements or omissions to Magyar Telekom's auditor.

The Court has personal jurisdiction over the three defendants because each of them signed management representation letters or made related sub-certifications for Magyar Telekom's auditor. The periodic delivery of a management representation letter to PricewaterhouseCoopers was an essential step in the preparation of Magyar Telekom's SEC filings in the United States. Defendants Straub and Balogh also signed false Sarbanes-Oxley certifications and sub-certifications, respectively. The SEC's claims arise out of these United States contacts because the representation letters and Sarbanes-Oxley certifications denied the existence of any known fraud, undisclosed agreements, or inaccurate financial reporting at Magyar Telekom. The representations were thereby instrumental in concealing the defendants' bribe scheme.

The five-year statute of limitations in 28 U.S.C. § 2462 requires "by its plain terms, that an offender must be physically present in the United States" for the statute to run. *SEC v. Straub*, 921 F.Supp.2d 244, 260 (S.D.N.Y. 2013). The defendants are all Hungarian nationals who live and work outside the United States. There is no dispute that none of them spent five years in this country prior to the filing of the SEC's complaint. Straub and Morvai maintain that they visited the United States for brief periods during the fall of 2005. As a matter of law and logic, however, a five-year statute cannot run to completion during a few days or weeks. Nor can it begin to run while an unlawful scheme is ongoing. Section 2462 therefore does not bar any of the SEC's claims.

The undisputed factual record satisfies the jurisdictional element of the SEC's claim under Exchange Act Section 30A:  namely, that the defendants "ma[de] use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of any offer, payment, promise to pay, or authorization of the payment" to a foreign official.  15 U.S.C. § 78dd–1(a).  All three defendants engaged in a course of conduct that foreseeably involved modern electronic communications such as email.  There is no genuine dispute that at least two email messages relating to the scheme, including one sent by Balogh and another received by him, passed through servers in the United States.  Further, as part of the preparation of Magyar Telekom's SEC filings in the United States, all three defendants signed management representation letters, Sarbanes-Oxley certifications, or made related sub-certifications that misrepresented, and thereby concealed, their illegal conduct.

SEC Rule 13b2-1 provides that "no person shall, directly or indirectly, falsify or cause to be falsified, any book, record, or account" subject to the Exchange Act's reporting provisions.  17 C.F.R. § 240.13b2-1.  There is no genuine dispute that Balogh and Morvai[1] falsified Magyar Telekom's books and records when they signed a backdated letter authorizing a subordinate to enter into consulting contracts valued at €1,970,000 that were themselves backdated.  The defendants signed the authorization letter on or after August 31, 2005, as established by surrounding email correspondence, but they backdated the letter to May 31, 2005.  The associated contracts were signed on or after September 1 and backdated to June 1, 2005.

SEC Rule 13b2-2 provides that "no director or officer of an issuer shall, directly or indirectly, make or cause to be made a materially false or misleading statement to an accountant in connection with" an audit, review, or SEC filing.  17 C.F.R. § 240.13b2-2.  The Rule also

---

[1]     The SEC intends to pursue its claim under Rule 13b2-1 against defendant Straub at trial.

prohibits materially false or misleading omissions.  *Id.*  The management representation letters

that Straub signed, and to which Balogh and Morvai attested, stated, "[A]ll financial and

accounting records and related data have been made available to you.  We are not aware of any

accounts, transactions or material agreements not fairly described and properly recorded in the

financial and accounting records underlying the financial statements."  *Ex. 10 at 2.*  This

statement was false as to Straub and Balogh[2] because they had entered into the Protocol of

Cooperation with Macedonian government officials and had intentionally kept that agreement

out of Magyar Telekom's books and records and inaccessible to the company's auditors.

　　　　The Court should grant partial summary judgment to the SEC, dismissing three of the

defendants' affirmative defenses:  personal jurisdiction, statute of limitations, and use of

interstate commerce.  The Court should further enter judgment in favor of the SEC on its

affirmative claims under Rule 13b2-1 as to defendants Balogh and Morvai, and under Rule

13b2-2 as to Straub and Balogh.

## STATEMENT OF FACTS

　　　　From December 2004 through June 2006, Straub, Balogh, and Morvai engaged in a

scheme to bolster the dominant market position of Magyar Telekom's Macedonian subsidiaries

by bribing the Prime Minister and other senior Macedonian public officials.[3]  The corrupt

bargain they struck in May 2005 was memorialized in the Protocol of Cooperation and Non

Paper.  The defendants laundered the bribe payments through sham consulting contracts with

---

[2]　　　　The SEC contends that defendant Morvai also made false statements to Magyar's auditor
in violation of Rule 13b2-2.  The SEC intends to pursue its Rule 13b2-2 claim against Morvai at
trial.

[3]　　　　This Statement of Facts is intended to provide background on the SEC's allegations and
therefore includes references to disputed facts.  All facts that the SEC contends to be beyond
genuine dispute and material to the SEC's motion for partial summary judgment are identified in
the Rule 56.1 Statement of Undisputed Facts ("R.56.1 Stmt.") filed herewith.

entities controlled by their Greek payment intermediary and co-conspirator Dimitris Contominas. To conceal the paper trail, the defendants stashed the Protocol and Non Paper with Contominas in Athens, Greece; structured the sham consulting contracts to avoid board scrutiny; installed special software to destroy evidence from their computers; and signed false certifications and sub-certifications in connection with Magyar Telekom's SEC filings in the United States.

1.     **The Bribe Scheme**

The benefits that the bribe scheme sought to achieve were embodied in the Protocol of Cooperation. *Ex. 1.* The parties prepared two substantively identical versions of the document. The first was between Magyar's CEO Elek Straub and Prime Minister Vlado Buckovski, and the second between Straub and Telecommunications Minister Xhemali Mehazi (representing the ethnic Albanian minority party DUI). Balogh signed the first Protocol on Straub's behalf.[4] *Balogh 7/28/14 tr. 78-79; R.56.1 Stmt ¶57.* Straub signed the second document himself. *Straub 7/31/14 tr. 165-66; R.56.1 Stmt ¶58.* Morvai drafted a portion of the Protocol, *Morvai 9/29/14 tr. 148-50,* and traveled to Macedonia with Straub and Balogh when they negotiated the Protocol. *Balogh 7/28/14 tr. 63-65.*

The Protocol contained four key concessions in favor of Magyar Telekom: (1) It restricted the entry of a third mobile phone company into Macedonia. *Ex. 1 at 1.* (2) It lowered the regulatory fees ("frequency fees") that Magyar Telekom paid for the right to make use of Macedonia's broadcast spectrum. *Id.* (3) It gave the government's consent to the rebranding of Magyar Telekom's Macedonian subsidiaries under the T-Mobile and T-Com labels. *Ex. 1 at 2.* (4) It promised that the implementing regulations ("by-laws") adopted under the recently enacted

---

[4]     Citations to discovery materials are as follows:  Deposition testimony is cited as "*Balogh 7/28/14 tr. 78.*"  Reports of expert witnesses are cited as "*Brown rpt. ¶ 49.*"  In an effort to remain in compliance with Rule 2.H of the Court's Individual Rules of Practice, not all discovery materials cited in this memorandum are attached as Exhibits.

Macedonian telecommunications law would be those proposed by Magyar Telekom.  *Id*.  In internal documents, Magyar Telekom estimated the value of these concessions, over a four-year period, at between €37 and €68 million.  *Ex. 6 at 4; R.56.1 Stmt ¶62*.

The Protocol imposed only two obligations on Magyar Telekom:  First, the Protocol required Magyar Telekom's subsidiary MakTel to pay a 2004 dividend of €95 million, of which €44.8 million was due to the Macedonian government as a co-owner of MakTel.  *Ex. 1 at 1; R.56.1 Stmt ¶¶59-60*.  The dividend reflected profits that, having been earned, were already payable to MakTel's shareholders, but which Magyar Telekom had withheld for negotiating leverage.  Second, in a gesture toward the government's minority Albanian representatives, Magyar Telekom agreed that its mobile telephone subsidiary MobiMak would "expand its network coverage into Kosovo."  *Id*.  The latter commitment was one that Magyar never fulfilled and, according to Balogh, never intended to fulfill.  *Balogh 7/28/14 tr. 167*.

To induce Buckovski and his ethnic Albanian coalition partners to sign the Protocol, the defendants simultaneously agreed to a second agreement, the Non Paper, signed by Straub and Buckovski.  *Ex. 2 (unsigned draft copy)*.  In return for the Protocol's concessions, Straub agreed to pay bribes of  €7.5 million in three installments:  "Euro 2.5 million on the day of signing the Protocol; Euro 2.5 million [by] 30th December 2005, and Euro 2.5 million in June 2006."  *Id*.  Of the €7.5 million total, one third would go to Buckovski ("the 'representative' of the Party 'A'"), and another €5 million to Macedonia's two most powerful ethnic Albanian officials, Ali Ahmeti and Musa Xhaferi (identified in the document as "the 'friends' from Tetovo ('A.A.' and 'M.G.')").  *Id*.  Ahmeti is a former paramilitary commander who founded and currently heads the DUI party.  Xhaferi was and still is a Deputy Prime Minister.  *Brown rpt. ¶¶ 49, 52, 60, 69, 77*.

In the Non Paper, Straub offered to pay an additional €12 million in bribes to the same three officials in return for the government's authorization to rebrand Magyar Telekom's mobile subsidiary as part of the T-Mobile family. *Ex. 2.* The Non Paper also contained Buckovski's promise to sell 9.99% of the government's MakTel stock to Magyar Telekom, in lieu of making the government's entire share available for purchase by Magyar Telekom's competitors. *Id.* All the activities in the Non Paper were assigned a deadline of June 30, 2006.[5] This date was carefully selected to occur just prior to the Macedonian general elections in early July, which ultimately removed Buckovski from power. *Bogoeski 12/28/14 tr. 49-50.*

Because they were under-the-table arrangements, the Protocol of Cooperation and Non Paper were never envisioned to be enforceable in court. Instead, the parties sought to enforce their respective commitments through reciprocity. The Protocol made this mechanism explicit, stating that "elements of the Agreement are constantly monitored and the full or partial execution from [Magyar Telekom] is subject to appropriate progress of the respective parts of the Protocol." *Ex. 1 at 2.* Straub's testimony was consistent. "[N]either party should accept that the other one is doing steps without the other one also realizing what is promised . . . ." *Straub 7/31/14 tr. 193; R.56.1 Stmt ¶61.*

## 2. Concealment of the Key Documents

The defendants followed strict procedures to ensure that the Protocol and Non Paper remained secret. No copies of the signed documents were made. Even though they had been executed by Magyar Telekom's Chief Executive Officer and a sitting Prime Minister, the signed agreements were never recorded in the Macedonian government archives. *Buckovski 2/7/14 tr.*

---

[5]     Magyar Telekom acquired 9.99% of the government's MakTel shares, plus an additional 0.01% tranche on June 6, 2006. Magyar Telekom publicly announced the rebranding of its mobile subsidiary from Mobimak to T-Mobile Macedonia on June 13, 2006.

*43-45*.  Nor were they placed in Magyar Telekom's official corporate records.  *Balogh 7/28/14 tr. 81-85, 91*; *Straub 7/31/14 tr. 156-59; R.56.1 Stmt ¶¶68-71*.  Instead, Balogh delivered Magyar Telekom's original counterparts to be hidden away in Athens by the Greek payment intermediary Contominas.  In late 2006, when American lawyers conducting Magyar Telekom's independent investigation questioned Straub about a draft of the Protocol, Straub denied any recollection of ever having signed such a document.  *Straub 7/26/06 int. mem. 92-93*.  Ultimately, the signed Protocol did not see the light of day until February 2011, when Greek law enforcement authorities recovered it from Contominas.

The Protocol and the Non Paper had to be kept secret for related but different reasons. Bribery is a crime in Macedonia, *Buckovski 2/7/14 tr. 147*, and the Non Paper on its face disclosed the offer of bribes.  *See Bogoeski 1/15/15 tr. 95* (The Non Paper was "the criminal base" behind the Protocol.).  The Protocol, unlike the Non Paper, contained no explicit reference to bribery.  But it did call upon the Prime Minister to violate his official duties.  During the Protocol's negotiation, the Minister's advisors raised concerns that it would violate Macedonian law to sign Magyar Telekom's draft version of the document.  *Ex. 3 at 3*.  If such an agreement were to be become known, the advisors predicted a "negative reaction" from the public, accusations from "the opposition that the Government is violating the Constitution and the Law" by providing "a privileged position to one company," and a risk that it would trigger "a procedure by the Anti-corruption Commission."  *Id*.  The final document was renamed "Protocol of Cooperation" but otherwise contained most of the same substantive terms as the earlier draft.

**3.**     **<u>Laundering the Payments</u>**

In the days following the signing of the Protocol and Non Paper, Balogh wrote to Straub and Morvai to address how to make the Protocol's "separate payments."  *Ex. 5 at 7*.  Citing the

same payment deadlines set in the Non Paper, Balogh reminded Straub and Morvai that "the original agreement was for 10 million[6] EUR in 3 installments (immediate, December 2005, June 2006)" and that "the Albanians will torpedo the agreement within two months if we don't pay." *Id*. Consistent with the Protocol's principle of reciprocity, Balogh proposed a structure under which, after the first payment, subsequent installments would be made only when "by-laws suitable to us have been approved." *Id*. In a subsequent email to a Greek payment intermediary, Balogh stressed that "we would like to get feedback, after the transaction, from high level representatives of both sides acknowledging that they received what we promised." *Ex. 5 at 10*.

The defendants laundered the first tranche of payments through three sham consulting contracts drafted, at Balogh's instruction, by a junior in-house lawyer. *Herczegh 2/12/14 tr. 29-46, 53-55*. All three contracts were entered into with Chaptex Holdings, a company controlled by the Greek payment intermediary Contominas. The contracts were structured to provide the Contominas company with "success fees" after the company had ostensibly lobbied the Macedonian government to achieve regulatory benefits on MakTel's behalf. By the time the contracts were drafted, however, the identified "success elements" -- lowering MakTel's frequency fee, securing a revised Labour Law, and enacting favorable by-laws -- had already been achieved. *Herczegh 2/12/14 tr. 62-63, 66-69 (frequency fee elements achieved); Halasi 1/27/15 tr. 71-74 (Labour Law elements achieved); Galig 1/20/15 tr. 155-58 (by-laws achieved)*.

The contracts therefore required the Contominas company to perform no actual services. Once the contracts were drafted and signed, Chaptex immediately issued invoices for the full contract amounts and promptly received payment. *Dubal rpt. 17-19*. The contracts were

---

[6] Balogh's reference to €10 million, rather than the €7.5 million figure specified in the Non Paper, may be attributable to a commission due to Contominas for his role as Magyar Telekom's intermediary. Balogh's emails to Straub and Morvai described the amounts the company was obligated to *pay*; the Non Paper identified the amounts the government officials were to *receive*.

backdated, *Herczegh 2/12/14 tr. 68-69, 82-83, 89-97, 119-20, 125-27*, in order to conceal the

absence of a legitimate business purpose and create the appearance of actual performance. The

following table sets forth the dates applicable to each contract:

| Contract | Date Signed | Success Achieved | Backdated Date |
|----------|-------------|------------------|----------------|
| Frequency Fee contract | July 11, 2005 | May 27, 2005 | May 1, 2005 |
| By-Laws contract | Sept. 1, 2005 | July 27, 2005 | June 1, 2005 |
| Labour Law contract | Sept. 1, 2005 | July 22, 2005 | June 1, 2005 |

One crucial element of concealing the payments was to minimize the scrutiny that the

consulting contracts would receive. By statute, MakTel's Board of Directors was required to

approve any contract over €1 million. *Herczegh 2/12/14 tr. 56, 58*. In order to bypass this

review, the payment amounts on the first three contracts were structured, *Herczegh 2/12/14 tr.*

*58, 76, 99-100*, to be just below that threshold:

| Contract | Payment |
|----------|---------|
| Frequency Fee contract | €980,000 |
| By-Laws contract | €990,000 |
| Labour Law contract | €980,000 |

Even this subterfuge, however, was not enough. As the second and third of the contracts

were being finalized, a subordinate's email to Balogh and Morvai expressed the concern that,

even without formal board approval, the "direct MakTel connection" to three such large

contracts "would attract too much attention." *Ex. 8 at 2*. The defendants' solution was to revise

the By-Laws and Labour Law contracts to remove MakTel as the contracting party. In its place,

Balogh and Morvai substituted MakTel's parent company Stonebridge. *Ex. 8 at 3*. Because

Stonebridge was a holding company that had no operations of its own, *Morvai 9/29/14 tr. 23-24,*

*49,* and existed solely as a legal entity to own the shares of MakTel, there was no business

justification for the change.

In this stage of the cover-up, Morvai, in his capacity as Stonebridge's Chairman of the

Board, *Morvai 9/30/14 tr. 288,* served an essential role. Morvai and Balogh jointly signed a

backdated letter, *Ex. 9; R.56.1 Stmt ¶93*, authorizing Stonebridge's nominal CEO (a Magyar Telekom in-house lawyer) to execute the re-drafted By-Laws and Labour Law contracts. *Morvai 9/30/14 tr. 341-42.* "I signed it . . . as chairman of the board of StoneBridge to give him comfort that he can enter those contracts." *Id. at 342.* Morvai and Balogh signed the authorization letter on or after August 31, 2005, *Ex. 8 at 3; R.56.1 Stmt ¶¶91-94,* but backdated it to May 31, *Ex. 9 at 2*; *R.56.1 Stmt ¶93,* creating the appearance that the letter pre-dated Chaptex's retention. *See Herczegh 2/12/14 tr. 115-20 (re backdating of the related contracts).*

In total, the defendants orchestrated six sham contracts with entities controlled by their Greek payment intermediary Contominas. The second tranche of phony agreements included one for €900,000[7] in due diligence services never provided on cable television acquisitions, one for €750,000[8] in marketing services never provided in connection with the lease of an international communications ("IPLC") line, and one for €900,000 for marketing services never provided for retail stores. *Dubal rpt. 9-11.* Before the scheme unraveled in mid-2006, the defendants had managed to funnel some €4.875 million in corrupt payments through the companies controlled by their Greek payment intermediary. *Id.*

## 4. Destruction of Evidence

The beginning of the end came in January 2006, when PricewaterhouseCoopers, Magyar Telekom's auditor, raised questions about two consulting contracts involving the company's Montenegro subsidiary. *Kos 5/28/14 tr. 39-40, 52-54.* Because the contracts implicated senior officers at Magyar Telekom, the auditors advised that they would not sign an audit opinion until the company conducted an independent investigation. *Id. at 57-58; Farkas 10/7/14 tr. 32-36.*

---

[7] Of the €900,000 total contract amount, only an "up-front" payment of €450,000 was ultimately paid before the contract was terminated. *Dubal rpt. at 11, 18.*

[8] Of the €750,000 total contract amount, only an "up-front" payment of €575,000 was ultimately paid before the contract was terminated. *Dubal rpt. at 11, 18.*

Led by the company's audit committee, Magyar Telekom retained the law firm White & Case to investigate. *Farkas 10/7/14 tr. 38-39.* On January 24, almost immediately after arriving on the scene, the White & Case attorneys notified Straub that they proposed to create forensic images of specified computer hard drives, two of which belonged to Balogh and Morvai.

Once Balogh and Morvai became aware of the White & Case request, Balogh obtained "data wiping" software ("Absoluteshield File Shredder") that promised to "completely erase files" by overwriting them "several times with junk data." *Smith rpt. 9-10.* At 3:41 pm on February 2, 2006, Balogh installed the File Shredder software on his computer and spent one hour and fifteen minutes permanently wiping all files pertaining to Macedonia. *Id. at 11-12; Balogh 7/29/14 tr. 426-30.* Later that evening, Balogh telephoned Morvai and explained the need to wipe similar Macedonia-related data from Morvai's computer as well. *Morvai 9/30/14 tr. 374-78.* Morvai gave Balogh his username and password. *Id.* Balogh then spent nearly three hours permanently wiping data from Morvai's computer, before finally uninstalling the software at 10:13 pm. *Smith rpt. 11-12.*

Balogh needed to enlist Morvai in the evidence destruction because Morvai "was the one who was working" on matters in Macedonia at "a similar level of confidentiality" and "importance" as Balogh. *Balogh 7/29/14 tr. 455.* After the data wiping was completed, Balogh reported the evidence destruction to Straub. *Balogh 7/29/14 tr. 431-33.* Straub chose not to report the actions of his subordinates to White & Case or to the audit committee. *Farkas 10/7/14 tr. 56-59.* Later, in April 2006 when White & Case independently discovered the data wiping, Straub purported to be "very upset to learn of this news." *Straub 7/26/06 int. mem. 87-88.*

5. **False Representations to Auditors and the SEC**

In addition to secreting the Protocol and Non Paper with their Greek co-conspirator, laundering payments through sham consulting contracts, and destroying evidence on their computers, the defendants also concealed their bribe scheme by circumventing the controls that Magyar Telekom was bound to follow as a public company registered with the SEC. Defendant Straub signed false management representation letters to Magyar Telekom's auditor, *Ex. 10*, and submitted false Sarbanes-Oxley certifications to the SEC, *Ex. 13*. Balogh signed false sub-certifications in connection with both the management representation letters, *Ex. 11*, and the Sarbanes-Oxley certifications, *Ex. 14*. Morvai made false management representation sub-certifications. *Ex. 12*.

At the end of each year and each quarterly accounting period, Magyar Telekom's CEO, defendant Straub, along with the CFO, signed a management representation letter to PricewaterhouseCoopers. They signed additional representation letters to cover the stub period between the end of each reporting period and the release of the company's financials, as well as the 20-F filing. Each year-end representation letter referred explicitly to "management's responsibility for . . . the 20-F to be filed with the United States Securities and Exchange Commission." *Ex. 10 at 1.*[9] And each contained the statement:

> All . . . financial and accounting records and related data have been made available to you. We are not aware of any accounts, transactions or material agreements not fairly described and properly recorded in the financial and accounting records underlying the financial statements.

---

[9] Because the management representation letters are lengthy and the text relevant to this motion is identical in each, the SEC is submitting as exhibits only portions of the representations made by Straub, Balogh, and Morvai. The SEC's Rule 56.1 Statement identifies every relevant letter and sub-certification. Copies of the complete documents can be provided to the Court upon request.

*Id. at 2.* The content of the year-end representation letter, including this representation, was incorporated by reference into each subsequent quarterly and stub period letter. *Id. at 5, 8.*

Before each representation letter was prepared in final form, a draft in both English and Hungarian was circulated by email to all senior officers, including both Balogh and Morvai. Each officer was asked to review the draft and, after making all necessary corrections, certify, "All material information relating to my area of responsibility was disclosed accurately and in full . . . and in agreement with the subject matter of the Management Representation letter for the period . . . ." *Ex. 11, 12.*

In addition to the management representation letters, on May 11, 2005, just two weeks before the Protocol of Cooperation and Non Paper were finalized, Straub signed an annual report to the SEC on Form 20-F. *R.56.1 Stmt ¶¶24-25.* That filing included certifications signed by Straub under Sections 302 and 906 of the Sarbanes-Oxley Act. *Ex. 13.* The Section 302 certification represented that Straub had "disclosed . . . to the Company's auditors . . . [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting." *Id. at 1; R.56.1 Stmt ¶24.*

On April 15, 2005, in connection with that same Form 20-F filing, defendant Balogh signed a certification "that the section I provided for the 20-F report to be filed with the United States Securities and Exchange Commission presents the true and fair information and it is free of material misstatements, including omissions." *Ex. 14 at 1.* Separately, on June 28, 2005, as part of Magyar Telekom's Sarbanes-Oxley obligations, Balogh certified through a subordinate that "there were no fraud events" known to Balogh's Central Strategy Group. *Id. at 5.*

Each of these representations and certifications was directed toward Magyar Telekom's periodic SEC filings in the United States, and each was instrumental in concealing the defendants' bribe scheme.

## ARGUMENT

In its denial of the defendants' motion to dismiss, the Court carefully considered the legal standards applicable to personal jurisdiction, the statute of limitations, and the use of interstate commerce. *SEC v. Straub*, 921 F. Supp. 2d 244 (S.D.N.Y. 2013). None of the legal principles that guided the Court's ruling on those issues have changed. Now, with discovery having been completed, the material facts with respect to these issues are not in genuine dispute. The SEC is entitled to judgment as a matter of law on all three defenses because (1) the defendants directed their conduct toward the United States by signing management representation letters and Sarbanes-Oxley certifications or making related sub-certifications; (2) the defendants were not present in the United States for the five years necessary for the limitations period of 28 U.S.C. § 2462 to run; and (3) the defendants made use of an instrumentality of interstate commerce by engaging in email communications that moved through U.S. networks and by making certifications necessary for Magyar Telekom's electronic SEC filings.

With respect to the SEC's affirmative claims, there remain disputed issues of fact as to the defendants' bribe scheme. There are, however, two claims for relief that the Court should resolve on summary judgment because the material facts do not require proof of bribery. There is no dispute that Balogh and Morvai signed a letter authorizing an in-house lawyer to sign two of the Chaptex contracts and that the letter and contracts were backdated. That falsification of Magyar Telekom's books and records violated SEC Rule 13b2-1. There is also no dispute that Straub and Balogh signed the Protocol of Cooperation, intentionally excluded the agreement

from Magyar Telekom's books and records, and then falsely certified to PricewaterhouseCoopers that "all financial and accounting records and related data have been made available to you." That misrepresentation to Magyar Telekom's auditor violated SEC Rule 13b2-2.

### 1. Summary Judgment Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where: (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (*quoting R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997)). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as

the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is entitled to judgment as a matter of law on an issue if: (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' -- that is, point[s] out . . . -- that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

The Court may enter partial summary judgment on affirmative defenses where the material underlying facts are not in genuine dispute. *See RTC Mortgage Trust 1995–S/N1 v. Polmar Realty, Inc.*, No. 91 Civ. 6685 (SAS), 1996 WL 689281, at *4 (S.D.N.Y. Nov. 27, 1996) (affirmative defenses, "without any additional supporting evidence, are legally insufficient to preclude the imposition of summary judgment").

## 2. As a Matter of Law, the Court May Exercise Personal Jurisdiction Over the Defendants.

This Court has personal jurisdiction over these defendants because their personal conduct -- *i.e.*, the signing of management representation letters and Sarbanes-Oxley certifications, and the making of related sub-certifications -- was directed toward the United States. Because their representations were instrumental to concealing the defendants' bribe scheme, the SEC's claims "arise out of" or "relate to" the defendants' conduct. The evidence of the defendants' actions with respect to their certifications and sub-certifications is undisputed. It is therefore appropriate to resolve personal jurisdiction on summary judgment.

### A. The Standard for Personal Jurisdiction

Section 27 of the Exchange Act, 15 U.S.C. § 78aa, establishes the basis for personal jurisdiction in securities cases. *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d

1326, 1339-40 (2d Cir. 1972), *abrogated on other grounds by Morrison v. Nat'l Australian Bank Ltd.*, 561 U.S. 247 (2010); *Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98, 101 (S.D.N.Y. 1989). Section 27 "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (*citing Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 998 (2d Cir. 1975)).

"The due process test for personal jurisdiction has two related components: the 'minimum contacts inquiry' and the 'reasonableness' inquiry. The court must first determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (citations omitted). "If such contacts are found, the court may assert personal jurisdiction so long as 'it is reasonable [to do so] under the circumstances of the particular case.'" *SEC v. Softpoint, Inc.*, No. 95 Civ. 2951(GEL), 2001 WL 43611, at *2 (S.D.N.Y. Jan. 18, 2001) (*quoting Metro. Life Ins. Co.*, 84 F.3d at 567); *see Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945) (holding that due process requires that each defendant must have "minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice"). *See also Hallwood Realty Partners, L.P. v. Gotham Partners L.P.*, 104 F. Supp. 2d 279, 283 (S.D.N.Y. 2000) (personal jurisdiction exists under the Exchange Act when minimum contacts test is satisfied).

A foreign defendant's actions create personal jurisdiction when he "performs an act that he knows or has good reason to know will have effects in the forum, and if the exercise of jurisdiction by that forum is not unreasonable." *Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1259 (S.D.N.Y. 1984) (*citing Leasco*, 468 F.2d at 1341). "[I]n some cases, as with an intentional tort, the defendant might well fall within the [forum's] authority by reason of his

attempt to obstruct its laws." *SEC v. Compania Internacional Financiera, S.A.*, No. 11 Civ. 4904 (DLC), 2011 WL 3251813, at *5 (S.D.N.Y. Jul. 29, 2011) (*quoting J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S.Ct. 2780, 2787 (2011)).

A nonresident defendant need not be physically present in the forum in order for personal jurisdiction to exist. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Instead, the Court may exercise jurisdiction upon a showing that a defendant has purposefully directed his activities toward the residents of the forum state, or otherwise "purposefully avail[ed him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

Under Section 27, the Court's inquiry must focus on the defendants' contacts with the entire United States. "Second Circuit authority clearly establishes that the constitutionality of *in personam* jurisdiction in federal question cases where Congress has provided for worldwide service is to be determined by national, rather than local, contacts." *SEC v. Softpoint, Inc.*, 2001 WL 43611, at *5 (*citing Unifund*, 910 F.2d at 1033). Where, as here, the Court is exercising jurisdiction "in a suit arising out of or related to the defendants' contacts with the forum," the Court exercises "specific," as opposed to general, jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8 (1984).

Once it has been decided that a defendant purposefully established minimum contacts with the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 320. The factors to be considered are: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief;

(4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metro. Life Ins.*, 84 F.3d at 568 (*citing Asahi Metal Industry Co. Ltd. v. Super. Ct. of Cal., Solana Cty.*, 480 U.S. 102, 113-14 (1987)).

"The burden is on the defendant to demonstrate that the assertion of jurisdiction in the forum will 'make litigation so gravely difficult and inconvenient that [he] unfairly is at a severe disadvantage in comparison to his opponent.'" *Softpoint*, 2001 WL 43611, at *5 (*quoting Burger King*, 471 U.S. at 478). "This prong of the inquiry rarely defeats jurisdiction where a defendant has sufficient forum contacts . . . and is largely academic in non-diversity cases brought under a federal law that provides for nationwide service of process." *Id.* (*citing Asahi*, 480 U.S. at 116). "In the last analysis, the question is whether the burden on [the defendants] of litigating this case in New York is so severe that the exercise of personal jurisdiction over [them] is arbitrary, shocks the conscience, or offends fundamental principles of ordered liberty, notwithstanding the strong federal interest in efficient and effective enforcement of the securities laws." *Hallwood Realty*, 104 F. Supp. 2d at 286-87.

In Section 27, Congress recognized that the United States has a compelling interest in the enforcement of the federal securities laws. *Hallwood Realty*, 104 F. Supp. 2d at 286. Unlike a private diversity action, there is no alternative forum available to the government. If the SEC cannot proceed against the defendants in the federal courts of the United States, then the defendants will effectively have been immunized for the securities violations with which they are charged. It clearly does not "shock the conscience" to require the defendants to answer the SEC's charges in this Court.

In securities cases, courts routinely uphold personal jurisdiction over foreign defendants whose actions abroad are directed at the United States by virtue of their involvement in falsifying financial statements filed with the SEC. In *SEC v. Stanard*, No. 06 Civ. 7736 (GEL) (S.D.N.Y. May 16, 2007) (unpublished transcript, attached as *Ex. 15*), the court denied a jurisdictional challenge by a Senior Vice President of an SEC-registered reinsurance company who engaged in sham transactions designed to "smooth" the company's earnings. *Id. at* 2-4. Because the defendant "conceived and implemented a strategy for entering a sham transaction and specifically intended that his work would result in false statements by [the reinsurer] in its publicly-filed financial statements in the United States," the defendant's actions rendered him subject to jurisdiction here. *Id. at 3*. As the court held in *Stanard*: "Where an executive of a foreign securities issuer, wherever located, participates in a fraud directed to deceiving United States shareholders in violation of federal regulations requiring disclosure of accurate information" he has caused consequences in the forum. *Id.* "SEC regulations would be meaningless as applied to foreign issuers of U.S.-traded securities if the United States courts lacked jurisdiction over executives abroad who violate those regulations." *Id.*

Judge Lynch's decision in *Stanard* is consistent with a long line of precedent in this and other courts. *See In re Parmalat Sec. Lit.*, 376 F. Supp. 2d 449, 454-56 (S.D.N.Y. 2005) (jurisdiction upheld over Italian auditor in connection with misleading financial statements filed with the SEC); *Landry*, 715 F. Supp. at 102 (jurisdiction upheld over a Canadian board member who orchestrated a fraudulent corporate acquisition resulting in misleading financial statements filed with the SEC); *Reingold*, 599 F. Supp. at 1259 (jurisdiction upheld over Australian auditor of fraudulent registration statement); *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 305-06 (E.D.N.Y. 2002) (jurisdiction upheld over Canadian general counsel for signing a fraudulent

registration statement); *In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F. Supp. 2d 509, 551

(D.N.J. 2005) (jurisdiction upheld over British corporate official who signed SEC filings

containing misleading statements about petroleum reserves); *Derensis v. Coopers & Lybrand*

*Chartered Accountants*, 930 F. Supp. 1003, 1014 (D.N.J. 1996) (jurisdiction upheld over

Canadian corporate officers who approved financial statements that overstated the inventory of a

gold mining company); *Itoba Ltd. v. LEP Group PLC*, 930 F.Supp. 36, 40-41 (D.Conn. 1996)

(jurisdiction upheld over British board chairman who approved a fraudulent Form 20-F filing

with the SEC).

**B.** **The Undisputed Facts Prove that the Defendants Are Subject
to this Court's Jurisdiction.**

Straub, Balogh, and Morvai were senior executive officers of Magyar Telekom, a public

company that was registered with the SEC and whose securities traded on the New York Stock

Exchange. As a registrant, Magyar Telekom filed annual and quarterly reports with the SEC.

*See* 15 U.S.C. § 78m(a). All of Magyar's filings were made available to analysts and investors

in the United States.

**i.** **All three defendants engaged in conduct directed at the
United States.**

All three defendants engaged in purposeful conduct that was directed at the United States,

and in particular, Magyar Telekom's regulatory filings with the SEC. During the pendency of

the bribe scheme, Straub signed management representation letters to PricewaterhouseCoopers

for annual, quarterly, and stub periods. *R.56.1 Stmt ¶¶17-29.* These representation letters stated:

> All . . . financial and accounting records and related data have been made
> available to you. We are not aware of any accounts, transactions, or material
> agreements not fairly described and properly recorded in the financial and
> accounting records underlying the financial statements.

We are not aware of any violations or possible violations of laws or regulations the effects of which should be considered for disclosure in financial statements . . . .

There are no significant deficiencies . . . in the design or operation of internal controls over financial reporting . . . .

We have no knowledge of any fraud or suspected fraud affecting the company involving . . . management [or] employees who have significant roles in internal control over financial reporting . . . .

We have disclosed to you all significant facts relating to any frauds or suspected frauds known to us that may have affected the Company.

*Ex. 10 at 2; R.56.1 Stmt ¶17.* Straub also, during the pendency of the scheme, signed Sarbanes-Oxley certifications stating:

. . . I have disclosed . . . to the Company's auditors and the audit committee . . . [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

*Ex. 13 at 1; R.56.1 Stmt ¶24.*

Balogh and Morvai each submitted sub-certifications attesting to the accuracy and completeness of Straub's management representation letters. *Ex. 11, 12; R.56.1 Stmt ¶¶31, 35, 37, 41, 43, 46, 47, 49 (Balogh); R.56.1 Stmt ¶¶51-56 (Morvai).* In addition, as Magyar Telekom's Chief Strategy Officer, Balogh made his own Sarbanes-Oxley certification that "there were no fraud events" connected to the Strategy Department. *Ex. 14 at 5; R.56.1 Stmt ¶¶38-39.*

Each of these actions was integral to Magyar Telekom's periodic SEC filings and, more broadly, to the regulatory requirements that the company had to comply with as an SEC registrant, including the Sarbanes-Oxley Act. Further, each of these certifications made clear on its face that it was in connection with an SEC filing.

All three defendants served in senior executive positions and understood that Magyar Telekom was an SEC registrant. Straub established his professional reputation as the CEO of the

first Eastern European company ever to be listed on the New York Stock Exchange. *8/1/12 Joint ltr. to Ct. at 2*. Balogh was Magyar Telekom's Chief Strategy Officer and in that role was responsible for oversight of the company's entire Sarbanes-Oxley compliance function. *Straub 8/1/14 tr. 497-99*. Morvai had served as both a Controller and Chief Financial Officer of major corporations before his arrival at Magyar Telekom. *Morvai 9/29/14 tr. 17-20*.

### ii. The defendants' actions were the means by which they concealed the bribe scheme.

The defendants' management representation letters, Sarbanes-Oxley certifications, and sub-certifications were instrumental in concealing the bribe scheme. Most directly, the defendants denied the existence of any known illegal activity involving the company's management, thus belying the existence of the scheme. Beyond that, the defendants represented that all material agreements had been made available to the auditor and properly recorded in Magyar Telekom's books. The defendants also represented that there were "no significant deficiencies" in the operation of Magyar Telekom's internal controls. None of these statements could have been true in the presence of a bribe scheme.

### iii. The SEC's allegations "arise out of" or "relate to" the defendants' U.S. contacts.

Because the defendants' contacts with the United States were instrumental to the concealment of their scheme, the SEC's allegations "arise out of" or "relate to" those contacts. The defendants' efforts to conceal the bribe scheme was part and parcel of the scheme itself.

When Congress passed the FCPA in 1978, the Act's provisions included not only prohibitions against bribery, but also the books and records, internal controls, and lying to auditors requirements set forth at Exchange Act Sections 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5). 15 U.S.C. §§ 78m(b)(2)(A), (b)(2)(B), and (b)(5). Congress recognized that bribery cannot

thrive in an organization without the accompanying efforts to conceal corrupt payments, bypass internal controls, and mislead auditors.  As a result, Congress intended from the start that these FCPA enforcement provisions would operate in a unified manner.  The accounting standards in the FCPA are intended to operate in tandem with the criminalization provisions of the bill to deter corporate bribery.  The FCPA expresses a public policy which encompasses a unified approach to the matter of corporate bribery.  The Senate Report made this clear.  *S. Rep. No. 95-114* at 7 (1977) *reprinted in* 1977 U.S.C.C.A.N. 4098, 4104-05.

Consistent with the enforcement framework envisaged by Congress, the SEC did not charge the defendants only with bribing government officials in Macedonia.  The SEC charged Straub, Balogh, and Morvai with a larger, more comprehensive bribery scheme that included covering up their bribes by falsifying Magyar's books and records, circumventing its internal controls, and lying to its auditors. The bribes themselves may have taken place outside this country (as is true almost by definition in FCPA cases), but the concealment of those bribes -- which was both integral to the scheme and essential for its success -- was directed at the United States in the form of Magyar's SEC filings, which the defendants each had a hand in falsifying. The corpus of the defendants' violations, therefore, is not limited to Macedonia but extends to the United States as well.

The SEC's charges here all "arise out of or relate to" the defendants' contacts with the forum, as required for the Court's exercise of specific jurisdiction.  *Helicopteros*, 466 U.S. at 414, n.8.  The defendants' actions in giving false information to Magyar Telekom's auditors and signing false Sarbanes-Oxley certifications fed directly into the preparation of the company's quarterly and annual reports with the SEC.  The defendants' contacts with the forum serve not only as the basis for the SEC's books and records and internal controls claims, but for its bribery

claims as well. The defendants' actions in paying bribes and covering up those bribes

constituted a single, unified course of conduct, with a common nucleus of operative fact. *See*

*SEC v. Carrillo*, 115 F.3d 1540, 1544 (11th Cir. 1997) (contacts are "related to" the cause of

action where "each of the contacts was a step by which the allegedly fraudulent scheme was

carried out").

Because the material facts supporting the Court's exercise of personal jurisdiction over

the defendants are not in genuine dispute, summary judgment should be granted in favor of the

SEC on this issue.

3.   **The SEC's Claims are not Time-Barred by the Five-Year Statute of Limitations in 28 U.S.C. § 2462.**

"The application of a statute of limitations . . . is a question of law for the court, not for

the jury." *Hilao v. Estate of Marcos*, 103 F.3d 767, 779 (9th Cir. 1996). Because it is

undisputed that no defendant was physically present in the United States for the full limitations

period during any time relevant to this litigation, *R.56.1 Stmt ¶¶106-11*, the Court should rule as

a matter of law that there is no time bar in this case as to any defendant or claim, and the issue of

limitations should not be presented to the jury.

A.   **The Statute Runs Only While a Defendant Can be Found Within the United States.**

"[T]o the extent that the SEC's claims are subject to a statute of limitations, the catchall

limitations period set forth in 28 U.S.C. § 2462 applies." *Straub*, 921 F. Supp. 2d at 259. That

statute provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding
> for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or
> otherwise, shall not be entertained unless commenced within five years from the
> date when the claim first accrued if, within the same period, the offender or the
> property is found within the United States in order that proper service may be
> made thereon.

28 U.S.C. § 2462.

"Here, the operative language in § 2462 requires, by its plain terms, that an offender must be physically present in the United States for the statute of limitations to run." *Straub*, 921 F. Supp. 2d at 260. As the Court held, and as the statute flatly states, being "found within the United States" is a prerequisite for any running of the limitations period.

All three defendants are Hungarian nationals who have lived and worked outside the United States for the entire period relevant to the statute of limitations. Prior to the filing of the SEC's complaint in 2011, Balogh admits he was never present in the United States. *Balogh Answer ¶10; Motion to Dismiss at 1; R.56.1 Stmt ¶¶108-09*. Morvai admits he was outside the United States for the entire period, with the exception of one brief trip to the United States he claims he took in 2005.[10] *R.56.1 Stmt ¶110-11*. Straub's only presence in the United States during the relevant period was in September 2005, according to a representation from counsel. *8/21/15 pre-motion ltr. at 2. (Dkt. 199). R.56.1 Stmt ¶106-07*. Since it is undisputed that no defendant maintained physical presence in this country for the five-year limitations period, *R.56.1 Stmt ¶¶106-11*, judgment is proper as a matter of law.

The brief visits to the United States by Morvai and Straub in 2005 have no bearing on the statute of limitations analysis. As a matter of statutory construction, the five-year limitations period would have run at most only during the days or weeks when the defendants were actually

---

[10] Morvai testified at his deposition that the U.S. vacation took place in June and July 2005. *Morvai 9/30/14 tr. 451-52*. But defendants' August 21, 2015 pre-motion letter states that the trip was in October 2005. *Dkt. 199 at 2*. The difference between these dates is not material to the limitations analysis.

present in the United States.[11]  Once they returned to Hungary, they no longer would have been "found within the United States" and the statute therefore stopped running.[12]

Congress could not have intended that an offender could cause the entire five-year statutory period to run just by setting foot in the United States for a fleeting moment.  "Upon this theory, it would be in the power of any man" "to defeat the ends of justice by remaining within the jurisdiction a week, a day, or an hour perhaps," and "yet upon this theory the statute would go on to operate none the less, and immunity could be perfected by flight."  *Howgate v. United States*, 7 App. D.C. 217, 243 (D.C. Cir. 1895) (considering similar "fleeing from justice" carve-out in criminal case, and canvassing both criminal and civil statutes of limitations).  Had Congress desired such a nonsensical result, it would have made specific provision.  Instead, as the Court observed, Section 2462's physical presence requirement made sense in light of the context in which it was enacted, and Congress has chosen not to amend it.  *Straub*, 921 F.Supp.2d at 261.

That Section 2462 can only continue running during an offender's actual physical presence is particularly apparent in light of Section 2462's dual application to the forfeiture and seizure of physical property.  It would be nonsensical for a limitations period to continue running in a forfeiture action after the subject property was removed from the country, since an action *in rem* generally cannot be maintained against property outside the reach of seizure.  By ignoring this aspect of Section 2462, defendants ask the Court to interpret the limitations period

---

[11]  The SEC does not concede that a defendant's brief visit to the United States would even qualify as being "found within the United States" for purposes of 28 U.S.C. § 2462.  However, the Court need not decide this point in order to resolve the statute of limitations issue.

[12]  Even if the entire five-year statutory period could run as a result of Straub's and Morvai's brief U.S. visits, the SEC disputes that its causes of action against these defendants accrued prior to mid-2006, when the last acts in the bribe scheme took place.  Because the defendants clearly did not spend five years in the United States, however, the Court need not rule on when the SEC's claims accrued in order to resolve the statute of limitations issue in the SEC's favor.

differently with respect to people and property, even though the statute treats both the same. The Supreme Court has "forcefully rejected" the "interpretive contortion" of "giving the same word, *in the same statutory provision*, different meanings in *different factual contexts*" because "to hold otherwise would render every statute a chameleon." *United States v. Santos*, 553 U.S. 507, 522-23 (2008) (italics in original) (*quoting Clark v. Martinez*, 543 U.S. 371, 386 (2005)). Since physical presence is the *sine qua non* for continued running of Section 2462 and the defendants cannot demonstrate their continued physical presence, the SEC is entitled to judgment on this issue.

**B.    Defendants Cannot Re-Write Section 2462.**

The Court has already ruled twice on the plain meaning of Section 2462, *Dkt. 48 at 12-14; Dkt. 68 at 7*, and it should reject any further efforts by defendants to re-write the statute. "Statutory interpretation begins with the text and, where the meaning of a statutory provision is unambiguous, a court should proceed no further." *Straub*, 921 F. Supp. 2d at 260 (*citing CSX Transp., Inc. v. Ala. Dep't of Revenue*, 131 S.Ct. 1101, 1107 (2011)).

The Court properly rejected the defense contention that the statute could run against a defendant who was out of the country but located in a jurisdiction where he could be served with process under the Hague Convention. "Defendants essentially seek to amend the statute to run against a defendant if he is *either* 'found within the United States' *or* subject to service of process elsewhere by some alternative means. Such a reading would be a dramatic restatement of the statutory language and would render the clause 'if . . . found within the United States' mere surplusage." *Straub*, 921 F.Supp.2d at 260 (italics in original).

The Court has also previously rejected the defendants' prior efforts to shoehorn the Supreme Court's inapposite decision in *Gabelli v. SEC*, 133 S.Ct. 1216 (2013), into the statute of

limitations analysis for this case. *Gabelli* was a focus of the defendants' unsuccessful effort to seek interlocutory review of the Court's ruling on the motion to dismiss. *Dkt. 63 at 11-12.* But in *Gabelli*, the Court held that in fraud actions the limitations period of Section 2462 was not tolled by the common law "discovery rule." 133 S.Ct. at 1224. The Court did not address the statutory provision for defendants not "found within the United States." 28 U.S.C. § 2462. *See SEC v. Funinaga*, No. 13 Civ. 1658 (JCM) (CWH), 2014 WL 4977334, at *6 (D. Nev. Oct. 3, 2014) ("*Gabelli* ultimately dealt with the meaning of 'when the claim first accrued,' not the applicability of section 2462.").

The Court should dismiss the defendants' affirmative defense under 28 U.S.C. § 2462 as a matter of law.

### 4. Defendants Made Use of "Any Means or Instrumentality of Interstate Commerce."

The "interstate commerce" prong of Exchange Act Section 30A, 15 U.S.C. § 78dd-1(a) reads in relevant part as follows:

> It shall be unlawful for any issuer . . . or for any officer, director, employee, or agent of such issuer . . . to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value . . . .

The undisputed facts show that the defendants used "an instrumentality of interstate commerce" to further their bribery scheme in two independently sufficient ways:

First, defendants furthered the bribery scheme by sending and receiving scheme-related email messages that were routed through internet servers located in the United States. *R.56.1 Stmt ¶¶99-105.*

Second, defendants furthered the bribery scheme by participating in the preparation of falsified SEC filings that were posted to and accessible from the SEC's EDGAR internet web site in the United States. *R.56.1 Stmt ¶¶17-56*.

Both sets of actions by the defendants made use of internet facilities located in the United States. It is beyond dispute that the use of the internet in the United States is an instrumentality of interstate commerce. *SEC v. Straub*, 921 F.Supp.2d 244, 262 (S.D.N.Y. 2013); *United States v. MacEwan*, 445 F.3d 237, 244 (3d Cir. 2006); *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004); *SEC v. Solucorp Indus. Ltd.*, 274 F. Supp. 2d 379, 419 (S.D.N.Y. 2003). These facts and this law mandate summary judgment on the interstate commerce issue.

A. **The Defendants Used Email to Further their Scheme, and Certain of those Emails Passed Through and Were Stored on Internet Servers in the United States.**

It cannot be disputed that the defendants used email messages in the course of conduct that is at the heart of the SEC's bribery allegations. The defendants used email to paper over the scheme by contributing to the creation of the Protocol of Cooperation and sham consulting contracts, all of which were attached to emails during the operation of the scheme. Defendant Balogh personally used email to transmit the Protocol of Cooperation, *Ex. 4 at 2*; *R.56.1 Stmt ¶99*, and to receive drafts of sham consulting contracts, *id. at 5*; *R.56.1 Stmt ¶¶100-01*, through computer servers located in the United States. *Id. at 1; R.56.1 Stmt ¶102-05*. These email messages originated in Europe, but were routed through and stored on network servers maintained by Microsoft Corporation in the United States. *Id.*

The Protocol of Cooperation was one of the two documents that memorialized the defendants' agreement to pay bribes to government officials in return for specific benefits for

Magyar Telekom.  The sham consulting contracts were the mechanism by which the bribe payments were made and laundered.

      i.        **There is no requirement that each defendant in a scheme personally use an instrumentality of interstate commerce.**

In their pre-motion letters, the defendants insinuate that Straub and Morvai had no involvement with interstate commerce because they neither received nor sent the relevant emails that passed through, and were stored in, the United States.  This claim is of no legal significance.

It is "fundamental that an accused need not carry out the mailing or use of an instrumentality of commerce.  If he causes it to be carried out by setting forces in motion which foreseeably result in use of the mails, his action is sufficient."  *United States v. MacKay*, 491 F.2d 616, 619 (10th Cir. 1973).  *Accord United States v. Johnson*, 553 F.Supp.2d 582, 622 (E.D.Va. 2008) ("A securities fraud conviction does not depend upon the defendant's personal use of the instrumentality of interstate commerce.").  The jurisdictional element requiring use of interstate commerce is "broadly construed, so as to be satisfied by . . . even the most ancillary mailings."  *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 865 (S.D.N.Y. 1997) (*citing Franklin Sav. Bank of N.Y. v. Levy*, 551 F.2d 521, 524 (2d Cir. 1977) ("The use of the mails need not be central to the fraudulent scheme and may be entirely incidental to it.") (*quoting United States v. Cashin*, 281 F.2d 669, 673-74 (2d Cir. 1960)).  So long as the use of interstate commerce is "incident to the carrying out of the scheme," *MacKay*, 491 F.2d at 620, the jurisdictional element is satisfied.

The emails in question here were far more central to the defendants' scheme than required by the "entirely incidental" standard for interstate commerce.  All three defendants participated in the scheme.  They all used email as part of their activities in the scheme.  That some of that email traffic was routed through the United States, using the "instrumentality of interstate commerce" known as the internet, is neither surprising nor unforeseeable.

**There is no requirement that the jurisdictional element of interstate commerce involve any intent, "corrupt" or otherwise.**

The defendants have previously argued that the use of the term "corruptly" in the applicable FCPA provision imposes an intent requirement for satisfying the interstate commerce prong of the statute. This Court has previously rejected the defendants' attempt to impose such a requirement. *See Straub,* 921 F. Supp. 2d at 262-64.

The use of interstate commerce in furtherance of a violation of the securities laws is a jurisdictional element of those offenses. *See United States v. Langford*, 946 F.2d 798, 803 n.20 (11th Cir. 1991) (use of the mails is "merely a jurisdictional requirement" of Section 10(b)); *United States v. Victor Teicher & Co., L.P.*, 726 F. Supp. 1424, 1431 (S.D.N.Y. 1989) ("use of the mails, means or instrumentality of interstate commerce . . ." is a jurisdictional element of violation of Rule 10b-5); *accord SEC v. Boock*, No. 09 Civ. 8261, 2011 WL 3792819, at *17 n.20 (S.D.N.Y. Aug. 25, 2011). The "jurisdictional element of a federal offense states the basis of Congress' power to regulate the conduct at issue: its 'primary purpose is to identify the factor that makes the [conduct] an appropriate subject for federal concern.'" *United States v. Cooper*, 482 F.3d 658, 664 (4th Cir. 2007) (*quoting United States v. Yermian*, 468 U.S. 63, 68 (1984)). "[P]roof of an interstate nexus is merely a jurisdictional prerequisite, not an essential element of the crime." *United States v. Edelman*, 873 F.2d 791, 794 (5th Cir. 1989) (collecting cases).

Thus, courts have consistently held there is no requirement to plead or prove that a defendant intended to or knowingly used a means or instrumentality of interstate commerce. *See United States v. Blackmon*, 839 F.2d 900, 907 (2d Cir. 1988) (no *mens rea* requirement to the purely jurisdictional element of interstate communication under the wire fraud statute). "The significance of labeling a statutory requirement as 'jurisdictional' is not that the requirement is

viewed as outside the scope of the evil Congress intended to forestall, but merely that the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." *United States v. Feola*, 420 U.S. 671, 676 n.9 (1975); *see Cooper*, 482 F.3d at 665 ("[J]urisdictional elements generally assert federal jurisdiction but do not create additional statutory elements as to which defendants must have formed the appropriate mens rea in order to have broken the law."). Therefore, the complaint need not contain factual allegations that defendants formed a *mens rea*, let alone a "corrupt" one, with respect to their use of the means or instrumentalities of interstate commerce.

There is no basis for the Court to find that Congress intended to impose a *mens rea* requirement on the use of interstate commerce in the FCPA when Congress did so nowhere else in the securities laws. *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well.").

**B.    In Connection with the Bribe Scheme, Defendants Participated in the Preparation of SEC Filings that Were Transmitted to and Stored on Internet Servers in the United States.**

As detailed above in the discussion of personal jurisdiction, each of the defendants had personal involvement in activities that enabled Magyar to fulfill its obligations in making SEC filings. This included, on Straub's part, the signing of management representation letters and Sarbanes-Oxley certifications. *Ex. 10, 13*; *R.56.1 Stmt ¶¶17-29*. On Balogh's part, this included the making of management representation sub-certifications, *Ex. 11*; *R.56.1 Stmt ¶¶31, 35, 37, 41, 43, 46- 47, 49*, as well as his own Sarbanes-Oxley certifications, *Ex. 14; R.56.1 Stmt ¶32-33, 38- 39, 44, 50*. On Morvai's part, this included the making of management representation sub-

certifications.  *Ex. 12*; *R.56.1 Stmt ¶¶51-56.*  Each of these actions helped advance the bribe scheme by circumventing the internal controls that otherwise would have detected it, and each of these actions necessarily implicated the use of United States interstate commerce because each was a necessary step in the preparation of Magyar Telekom's annual and quarterly SEC filings.

Beginning in November of 2002, all SEC forms for foreign issuers are required to be filed through the SEC's EDGAR system.  SEC Release Nos. 33-8099, 34-45922, Mandated Edgar Filing for Foreign Issuers (May 14, 2002.).  Hence, all of the SEC filings at issue in this case were filed through the internet in the United States, and have resided on the U.S.-based SEC's EDGAR internet web site from their inception.  Summary judgment is thus appropriate because the evidence establishes the use of an instrumentality of commerce incident to the carrying out of the scheme.

5. **Defendants Balogh and Morvai Violated SEC Rule 13b2-1 by Falsifying Magyar Telekom's Books and Records.**

Even if the facts underlying the SEC's bribery charges are contested, there can be no genuine dispute that Balogh and Morvai falsified Magyar Telekom's books and records by signing a backdated letter authorizing an in-house lawyer to execute two backdated consulting contracts.  In doing so, these defendants violated SEC Rule 13b2-1, and the SEC should be granted summary judgment on this issue.

A. **The Legal Standard for Rule 13b2-1**

SEC Rule 13b2-1 provides that "[N]o person shall, directly or indirectly, falsify or cause to be falsified, any book, record, or account" subject to the Exchange Act's reporting provisions.  17 C.F.R. § 240.13b2-1.

The SEC enacted Rules 13b2-1 and 13b2-2 "to promote the reliability and completeness of financial information that issuers are required to file with the Commission or disseminate to

investors." *SEC Release No. 34-15570*, 1979 WL 173674, at *1 (Feb. 15, 1979). "The maintenance of accurate books and records by publicly-held companies is a necessary concomitant of the existing requirement for full, fair and accurate periodic reports." *Id. at* *8. The Rules regulate "the internal activities of reporting companies," and violation does not require "the dissemination of materially false or misleading information to investors." *Id. at* *6. Further, the application of the Rules is "not directed solely to the problem of questionable or illegal corporate payments" and does not require that violation be in connection with bribery. *Id. at* *8.

The meaning of "books, records, or accounts" under Rule 13b2-1 is broad. The Exchange Act defines "records" to include "accounts, correspondence, memorandums, tapes, discs, papers, books, and other documents or transcribed information of any type." 15 U.S.C. § 78c(a)(37). "[V]irtually any tangible embodiment of information made or kept by an issuer is within the scope of section 13(b)(2)(A)." *SEC v. World-Wide Coin Invest., Ltd.*, 567 F. Supp. 724, 748-49 (N.D. Ga. 1983).

Materiality is not an element of a Rule 13b2-1 claim. *SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2009 WL 196023, at *29 (S.D.N.Y. Jan. 27, 2009). *See SEC Release No. 34–17500*, 1981 WL 36385, at *5 (Jan. 29, 1981) ("[S]uggestions have been made to qualify these provisions by superimposing a 'materiality' test on the requirement that corporate records be accurate and on the scope of the internal controls provision . . . . Despite these suggestions, however, Congress determined not to incorporate such a limitation . . . . Internal accounting controls are not only concerned with misconduct that is material to [investors but] also with a great deal of misconduct which is not."); *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) ("The Commission's interpretations of § 13 and of its own regulations thereunder are entitled to

deference."). Rule 13b2-1 does not, however, demand "a degree of exactitude and precision which is unrealistic." *SEC Release No. 34-15570*, 1979 WL 173674, at *9. It requires instead that the issuer's records "reflect transactions in conformity with accepted methods of recording economic events." *Id.*

Primary violations of Rule 13b2-1 do not require proof of *scienter*. *McNulty*, 137 F.3d at 740-41 *(citing SEC v. Koenig*, 469 F.2d 198, 200 (2d Cir. 1972)). Instead, "liability is predicated on standards of reasonableness." *SEC v. Espuelas*, 767 F.Supp.2d 467, 479 (S.D.N.Y. 2011).

**B.    There Is No Genuine Dispute that Balogh and Morvai Signed a Backdated Letter Authorizing the Stonebridge Contracts.**

The material facts underpinning Balogh's and Morvai's violation of Rule 13b2-1 are not in genuine dispute. Balogh and Morvai have not challenged the authenticity of their signatures on the letter to Zoltan Kisjuhasz, *Ex. 9*, authorizing the two Stonebridge contracts. *Morvai 9/30/14 tr. 340; R.56.1 Stmt ¶93*. The letter bears the date May 31, 2005, but there is no genuine dispute that it was not actually signed until some three months later. *R.56.1 Stmt ¶¶91-94*. The subject of the letter -- the decision to revise the Labour Law and By-Laws contracts to make Stonebridge the contracting party -- was not made until after August 30, when the idea was first proposed to Balogh and Morvai. *Ex. 8 at 2, 3; R.56.1 Stmt ¶91*. There is no dispute that the associated contracts, worth a combined €1,970,000, were similarly backdated to June 1, 2005. *Id. at 6-7; R.56.1 Stmt ¶¶96-97*. The drafting history of the Labour Law and By-Laws contracts establishes beyond any genuine dispute that they were not created until August 31, 2005. *Herczegh 2/12/14 tr. 115-20; R.56.1 Stmt ¶¶94-97*.

The preparation of the backdated letter does not reflect a transaction "in conformity with accepted methods of recording economic events." The date of a transaction has meaning. It

marks the point in time when an event of legal significance took place. Here, the Labour Law and By-Laws contracts were recorded in Magyar Telekom's books and records as success fee-based arrangements. But the contracts were not drafted and signed until after the success elements had already been achieved, thus fundamentally altering the nature of the transactions. *See Herczegh 2/12/14 tr. 115-20.* The contracts were backdated to June 1, 2005, which concealed their *post hoc* preparation. The letter that Balogh and Morvai signed was backdated to May 31, 2005, which did the same.

The backdating of the Balogh/Morvai letter could not have been an inadvertent mistake or typographical error. The drafting history of the Labour Law and By-Laws contracts and the letter authorizing them leaves no doubt that the dates were carefully chosen to misrepresent when the documents were signed and when the agreements were entered. The defendants may dispute whether the contracts served as a vehicle for the laundering of bribe payments, but they cannot pretend that they signed the authorization letter in the reasonable belief that it accurately reflected the underlying transaction. The Court should therefore enter judgment for the SEC on Balogh's and Morvai's violation of Rule 13b2-1.

**6.     Defendants Straub and Balogh Violated SEC Rule 13b2-2 by Falsely Certifying that they had Disclosed all "Transactions or Material Agreements" to Magyar Telekom's Auditor.**

Defendants Straub and Balogh violated SEC Rule 13b2-2 by making false representations to Magyar Telekom's auditor. Both defendants certified that "all financial and accounting records and related data have been made available" and that they were "not aware of any accounts, transactions or material agreements not fairly described and properly recorded" in the company's books and records. *See, e.g., R.56.1 Stmt ¶¶17, 27, 42, 43.* These representations were false because these defendants had both signed the Protocol of Cooperation and had

deliberately excluded the document from Magyar Telekom's official files, leaving it instead in the hands of their Greek payment intermediary in Athens.

## A.    <u>The Legal Standard for Rule 13b2-2</u>

SEC Rule 13b2-2 provides that "[n]o director or officer of an issuer shall, directly or indirectly . . . make or cause to be made a materially false or misleading statement to an accountant in connection with" an audit, review, or SEC filing. 17 C.F.R. § 240.13b2-2(a). The Rule also prohibits the omission of "any material fact necessary in order to make statements made" to an accountant not misleading. *Id.* The Rule applies not only to "the audit of financial statements by independent accountants," but also to "any other work performed by an accountant that culminates in the filing of a document with the Commission." *SEC Release No. 34-15570*, 1979 WL 173674, at *11. As with Rule 13b2-1, Rule 13b2-2 does not require a showing of *scienter*. *McNulty*, 137 F.3d at 740-41; *Espuelas*, 767 F.Supp.2d at 480.

"Officer" is defined in SEC Rule 3b-2 to include "a president, vice president, secretary, treasury or principal financial officer, comptroller or principal accounting officer, and any person routinely performing corresponding functions with respect to any organization whether incorporated or unincorporated." 17 C.F.R. ¶ 240.3b-2. Regardless of an individual's actual title, an officer within the meaning of this provision is someone who "perform[s] important executive duties." *CRA Realty Corp. v. Crotty*, 878 F.2d 562, 566 (2d Cir. 1989).

## B.    <u>As Officers of Magyar Telekom, Straub and Balogh Represented to PricewaterhouseCoopers that all "Accounts, Transactions or Material Agreements" Had Been Made Available</u>.

There is no dispute that Straub and Balogh qualified as "officers" of Magyar Telekom. Straub was the Chief Executive Officer and Chairman of the Board of Directors. *Straub Answer ¶ 9; Balogh Answer ¶¶ 1, 9; R.56.1 Stmt ¶2.* Balogh was the Director of Strategic Organization,

or Chief Strategy Officer. *Balogh Answer ¶¶ 1, 10; R.56.1 Stmt ¶3*. The titles were not merely ceremonial, as both unquestionably performed "important executive duties" at the company. *See Balogh Answer ¶ 1 (Balogh a "senior executive" in the Strategy Department); R.56.1 Stmt ¶3*.

There is no dispute that Straub signed quarterly and annual management representation letters to PricewaterhouseCoopers, *Straub 8/1/14 tr. 500-02; Ex. 10; R.56.1 Stmt ¶¶17-29*, and Balogh certified to the accuracy of those letters, *Balogh 7/29/14 tr. 536-39; Ex. 11; R.56.1 Stmt ¶¶30-50*. The content of those letters is equally not in dispute. The representation letter for each year-end audit contained the following standard language:

> All . . . financial and accounting records and related data have been made available to you. We are not aware of any accounts, transactions or material agreements not fairly described and properly recorded in the financial and accounting records underlying the financial statements.

*Ex. 10 at 2*; *R.56.1 Stmt ¶¶17, 29*. This representation was incorporated by reference into the letter covering each subsequent quarterly review. The quarterly review letters also stated affirmatively, "We have made available to you . . . [a]ll financial records and related data." *Id. at 8; R.56.1 Stmt ¶¶21, 26, 27*. Defendant Straub signed letters making these representations on January 17, April 15, July 19, and October 17, 2005, and January 13, 2006. *R.56.1 Stmt ¶¶17, 21, 26, 27, 29*.

Before each annual and quarterly representation letter was signed, all senior executives, including Balogh and Morvai received a draft by email with instructions to certify: "All material information relating to my area of responsibility was disclosed accurately and in full . . . and in agreement with the subject matter of the Management Representation Letter for the period . . . ." *Ex. 11 at 3; Ex. 12 at 2; R.56.1 Stmt ¶¶30, 34, 36, 40, 42, 45, 48*. Balogh made such certifications on April 13, April 27, May 9, July 18, and October 14, 2005; and January 13 and February 8, 2006. *R.56.1 Stmt ¶¶31, 35, 37, 41, 43, 46, 49*.

C.    **The Protocol of Cooperation Was an Undisclosed**
      **Transaction or Agreement.**

There is no dispute that Straub and Balogh each signed a version of the Protocol of

Cooperation.  *Straub 7/31/14 tr. 165-66; Balogh 7/28/14 tr. 78-79*; *R.56.1 Stmt ¶¶57-60*.  There

is no dispute that the Protocol was purposefully excluded from Magyar Telekom's books and

records, and Straub and Balogh knew this.  *Ex. 7; Straub 7/31/14 tr. 156-59; Balogh 7/28/14 tr.*

*81-85, 91; R.56.1 Stmt ¶¶65-71*.  The Protocol was therefore not made available to

PricewaterhouseCoopers, *Kos 5/28/14 tr. 77*; *R.56.1 Stmt ¶81*, and Straub and Balogh knew this

as well.

There can be no genuine dispute that the Protocol constituted a "transaction or

agreement" within the meaning of the representations made to Magyar Telekom's auditor.  The

Protocol was expressly structured as such.  "[T]he Parties to *this Agreement* signed and delivered

this Agreement on 27 May 2005."  *Ex. 1 at 2* (emphasis added); *R.56.1 Stmt ¶¶59-60*.  By its

terms, the Protocol contained significant commitments by the two parties, expressly

contemplated performance of those commitments, and imposed specific deadlines for their

completion.

> *[Magyar Telekom] agrees that MobiMak will expand* its network coverage into
> Kosovo  . . .
>
> *[Magyar Telekom] agrees that MakTel will pay* an increased dividend of Euro 95
> million to its shareholders . . . (*no later than 4 July 2005*).  . . .
>
> For 2006 [the] *MakTel Group will pay* a frequency fee of Euro 1.2 million.  . . ."
>
> "The Government, at the time and place of signing this Agreement, presents its
> instructions to the appropriate authorities . . . .  *The instructions . . . will be*
> *enforced by the Government*."

*Id. at 1,2* (emphasis added); *R.56.1 Stmt ¶¶59-60*.

Once the Protocol was signed, the two sides promptly began performing on their obligations. Prime Minister Buckovski saw to it that the frequency fee was immediately lowered to the agreed levels; and MakTel's board of directors immediately declared the €95 million dividend. *R.56.1 Stmt ¶¶63-64*.

**D. The Protocol of Cooperation was Material.**

The representations letters set the standard for "materiality," specifying that a "material" item is one "involving potential amounts normally greater than MHUF 500," or approximately €2 million. *Ex. 10 at 1*; *R.56.1 Stmt ¶29*. The Protocol of Cooperation was material because it contained financial obligations far above that threshold, including the payment of a €95 million dividend. *Ex. 1*; *R.56.1 Stmt ¶¶59-60*. The defendants themselves projected the Protocol's economic impact on Magyar's business at between €37 and €68 million over four years. *Ex. 6 at 4; R.56.1 Stmt ¶62*.

Because it was an under-the-table deal, the Protocol was never intended to be enforceable in a court of law. But this did not make it any less material to Magyar Telekom's business. The document was negotiated over several months and signed with formality by a Chief Executive Officer and a Prime Minister. *Balogh 7/28/14 tr. 87-88; R.56.1 Stmt ¶57*. Straub testified that it was an "important" agreement, in which Magyar "made certain promises to the government" of Macedonia and Magyar's "commitment to pay" was subject to reciprocal obligations by the government. *Straub 7/31/14 tr. 152, 156, 181, 192-3, 216-7*.

Nicholas Kos, the Magyar Telekom audit engagement partner for Pricewaterhouse Coopers, testified that the Protocol of Cooperation "should have been provided to us in the normal course of the audit" but "was not provided." *Kos 5/28/14 tr. 77; R.56.1 Stmt ¶72, 81*. Because the agreements were not provided, PricewaterhouseCoopers was "not able to evaluate

the impact" of the Protocols or to determine "whether they would have . . . required any modification to the financial statements." *Kos 5/28/14 tr. 76*; *R.56.1 Stmt ¶72-78*. The Protocols "should have been evaluated for that purpose." *Id*.

Rule 13b2-2 does not require a showing of *scienter*. *McNulty*, 137 F.3d at 740-41; *Espuelas*, 767 F.Supp.2d at 480. But the record leaves no room for dispute that there was nothing inadvertent about the defendants' decision to keep the Protocol of Cooperation out of Magyar Telekom's books and records. That decision required the affirmative act of placing the document in the hands of the defendants' Greek payment intermediary. When other company personnel asked for copies of the final agreement, Straub and Balogh were at pains to explain the "special circumstances" that prevented their colleagues from access to it. *Ex. 7 at 1*; *R.56.1 Stmt ¶¶70-71*.

The Court does not need to find that the Protocol of Cooperation was part of a larger bribe scheme in order to rule that it constituted a "transaction or material agreement" that was not made available to Magyar's auditor. There is no genuine dispute that defendants Straub and Balogh made materially false statements to Magyar Telekom's auditor, and the Court should grant summary judgment as to them for violations of SEC Rule 13b2-2.

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment to the SEC dismissing the affirmative defenses regarding personal jurisdiction, statute of limitations, and use of the means or instrumentalities of interstate commerce. The Court should also grant partial summary judgment to the SEC on its affirmative claims against defendants Balogh and Morvai for violations of SEC Rule 13b2-1 and against Straub and Balogh for violations of SEC Rule 13b2-2.

Dated:  October 5, 2015                    Respectfully submitted,


                                            ____/s/ Robert I. Dodge_____
                                            Robert I. Dodge  (RD 0433)
                                            Thomas A. Bednar
                                            John D. Worland, Jr.
                                            Adam J. Eisner
                                            U.S. Securities & Exchange Commission
                                            100 F Street, N.E.
                                            Washington, D.C. 20549-5949
                                            (202) 551-4421 (Dodge)
                                            DodgeR@sec.gov
                                            Attorneys for Plaintiff

<u>EXHIBIT LIST</u>

1. Protocols of Cooperation
   Vlado Buckovski signature
   Xhemali Mehazi signature

2. Non Paper - unsigned

3. May 5, 2005 memo from advisors to Prime Minister Buckovski
   May 5, 2005 draft "Agreement" (from Balogh's computer)

4. Declaration of Microsoft Corporation records custodian
   May 31, 2005 email message
   July 5, 2005 email message (edited for length)

5. May 31, 2005 Balogh emails to Morvai and Straub with attached "Agenda"
   June 16, 2005 Balogh email to Kefaloyannis

6. June 8, 2005 Balogh email to Straub with attached "benefits of the agreement"

7. May 31 to June 22, 2008 email chain among Straub, Balogh, and Daniela Backes

8. August 30, 2005 Vaczlavik email to Balogh and Morvai
   August 31, 2005 Herczegh email to Kefaloyannis, Balogh, Morvai with attached
       "amended consultancy agreements" (edited for length)

9. Letter from Balogh and Morvai to Kisjuhasz, backdated to May 31, 2005

10. Selected management representation letters by Straub (edited for length)
    January 17, 2005
    May 11, 2005
    October 17, 2005

11. Selected management representation sub-certifications by Balogh (edited for length)
    October 14, 2005
    January 13, 2006

12. Selected management representation sub-certifications by Morvai (edited for length)
    April 13, 2005
    October 13, 2005
    January 12-13, 2006

13. May 11, 2005 Sarbanes-Oxley certifications by Straub
    Section 302 certification
    Section 906 certification

14.    Sarbanes-Oxley and SEC Form 20-F sub-certifications by Balogh
           April 15, 2005 accuracy and completeness of SEC Form 20-F filing
           June 28, 2005 Sarbanes-Oxley certification of no fraud events
           April 11, 2006 accuracy and completeness of SEC Form 20-F filing

15.    Hearing transcript, *SEC v. Stanard*, No. 06-cv-7736-GEL (S.D.N.Y. May 16, 2007)

<u>CERTIFICATE OF SERVICE</u>

I certify that on October 5, 2015, a copy of the foregoing document was served upon all counsel of record via the Court's electronic filing system, which sends notification to the following parties:

Robert B. Buehler (robert.buehler@hoganlovells.com)
Carl Rauh (carl.rauh@hoganlovells.com)
Lisa J. Fried (lisa.fried@hoganlovells.com)

Counsel for defendant Elek Straub


William Sullivan (wsullivan@pillsburylaw.com)
Kristen Baker (kristen.baker@pillsburylaw.com)

Counsel for defendant András Balogh


Michael L. Koenig (mkoenig@haslaw.com)
Victoria Lane (vlane@haslaw.com)

Counsel for defendant Tamás Morvai


_____/s/  Robert I. Dodge_____