# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____ :
 :
U.S. SECURITIES AND EXCHANGE :
COMMISSION, :
 :
                           *Plaintiff*, :
 :
           -v- :        No. 11 Civ. 9645 (RJS)
 :
ELEK STRAUB, :
ANDRÁS BALOGH, and :
TAMÁS MORVAI, :
 :
               *Defendants*. :
_____ :

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HOGAN LOVELLS US LLP
Robert B. Buehler
Lisa J. Fried
875 Third Avenue
New York, NY 10022
(212) 918-3000
robert.buehler@hoganlovells.com
lisa.fried@hoganlovells.com

Carl S. Rauh
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
carl.rauh@hoganlovells.com

*Counsel for Elek Straub*

PILLSBURY WINTHROP SHAW
PITTMAN LLP
William M. Sullivan, Jr.
Thomas C. Hill
2300 N Street, NW
Washington, DC 20037-1122
(202) 663-8027
william.sullivan@pillsburylaw.com
thomas.hill@pillsburylaw.com

*Counsel for András Balogh*

HINCKLEY, ALLEN & SNYDER LLP
Michael L. Koenig
Victoria P. Lane
30 South Pearl Street, Suite 901
Albany, NY  12207
(518) 396-3100
mkoenig@haslaw.com
vlane@haslaw.com

*Counsel for Tamás Morvai*

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................. 1

RELEVANT FACTUAL BACKGROUND.............................................................. 2

    I.    MESSRS. MORVAI AND STRAUB WERE PRESENT IN THE
        UNITED STATES IN LATE 2005.......................................................2

    II.    FOR PURPOSES OF ESTABLISHING ITS FCPA CLAIMS, THE SEC
        HAS IDENTIFIED FIVE ELECTRONIC MAIL MESSAGES ON
        WHICH IT RELIES TO ESTABLISH THAT DEFENDANTS MADE
        USE OF AN INSTRUMENTALITY OF INTERSTATE COMMERCE. .............3

ARGUMENT ......................................................................................................... 4

    I.    THE COURT LACKS PERSONAL JURISDICTION OVER THE
        DEFENDANTS. .........................................................................4

    II.    THE SEC CANNOT ESTABLISH THAT THE DEFENDANTS MADE
        USE OF AN INSTRUMENTALITY OF INTERSTATE COMMERCE. ............10

    III.    THE SEC'S CLAIMS ARE BARRED BY THE STATUTE OF
         LIMITATIONS..........................................................................15

        A.    The Statute of Limitations Has Run Against All Three Defendants
            Because Section 2462 Articulates a Strict Five Year Rule That
            Does Not Provide For Tolling or For Excluding Defendants Who
            Are Outside The United States. .................................................17

            i.    Gabelli v. SEC ........................................................17

            ii.    The plain meaning and congressional intent.................................19

            iii.    Legislative purpose and history of Section 2462.........................24

        B.    The Statute of Limitations Has Run Against Mr. Straub and Mr.
            Morvai Even Under the Court's Previous Ruling Because They
            Were Present in the U.S. After the SEC's Claim Had First
            Accrued. ...............................................................................28

        C.    Section 2462 Requires Dismissal of All Claims for Relief in this
            Case.....................................................................................32

CONCLUSION..................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Woods*,
　　2 Cranch 336 (1805) ...........................................................................................18

*Asahi Metal Indus. Co. v. Super. Ct. of Cal.*,
　　480 U.S. 102 (1987)...........................................................................................6, 9

*Asarco LLC v. Goodwin*,
　　756 F.3d 191 (2d Cir. 2014)..................................................................................30

*Aslanidis v. United States Lines, Inc.*,
　　7 F.3d 1067 (2d Cir. 1994)...................................................................................20

*Bechtel v. Competitive Technologies, Inc.*,
　　448 F.3d 469 (2d Cir. 2006)..................................................................................25

*Benton v. Cameco Corp.*,
　　375 F.3d 1070 (10th Cir. 2004) ..............................................................................5

*Burger King Corp. v. Rudzewicz*,
　　471 U.S. 462 (1985)................................................................................................6

*Chevron Corp. v. Donzinger*,
　　974 F.Supp.2d 362 (S.D.N.Y. 2014).....................................................................15

*Core-Vent Corp. v. Nobel Indus. AB*,
　　11 F.3d 1482 (9th Cir. 1993) ..................................................................................8

*Gabelli v. SEC*,
　　133 S. Ct. 1216 (2013) .................................................................................. passim

*Int'l Shoe Co. v. Washington*,
　　326 U.S. 310 (1945)................................................................................................4

*ITL Int'l, Inc. v. Constenla, S.A.*,
　　No. 1:10CV467 LG-RHW, 2010 WL 4537931, at *10 (S.D. Miss. Nov. 2, 2010),
　　*aff'd*, 669 F.3d 493 (5th Cir. 2012) ........................................................................5

*Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*,
　　89 F.R.D. 497 (C.D.Ca. 1981) ..............................................................................10

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
　　84 F.3d 560 (2d Cir. 1996)...................................................................................6, 9

*Miller v. AXA Winterthur Ins. Co.*,
  694 F.3d 675 (6th Cir. 2012) ..................................................................5

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
  134 S.Ct. 736 (2014)..............................................................................20

*Norvel Ltd. v. Ulstein Propeller AS*,
  161 F. Supp. 2d 190 (S.D.N.Y. 2001).....................................................5

*Railroad Telegraphers v. Railway Express Agency, Inc.*,
  321 U.S. 342 (1944)...............................................................................19

*Riordan v. S.E.C.*,
  627 F.3d 1230 (D.C. Cir. 2010) .............................................................33

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997)...............................................................................24

*Rotella v. Wood*
  528 U.S. 549, 555 (2000)..................................................................18, 19

*S.E.C. v. Bartek*,
  484 Fed. Appx. 949, 2012 WL 3205446 (5th Cir. Aug. 7, 2012)...........33

*S.E.C. v. Graham*,
  21 F. Supp. 3d 1300 ..........................................................................33, 34

*S.E.C. v. Kasirer*,
  No. 04 C 4340, 2005 WL 645246 (N.D. Ill. Mar. 21, 2005) .................10

*S.E.C. v. Magyar Telekom, PLC*,
  Civil Action No. 11-9646 (S.D.N.Y. 2011) ...........................................34

*SEC v. Rosenthal*,
  650 F.3d 156 (2d Cir. 2011)...................................................................18

*SEC v. Straub*,
  921 F. Supp. 2d 244 (S.D.N.Y. 2013)........................................... passim

*Tamam v. Fransabank Sal*,
  677 F. Supp. 2d 720 (S.D.N.Y. 2010).....................................................7

*U.S. v. Kay*,
  513 F.3d 432 (5th Cir. 2007) .................................................................15

*U.S. v. Kay*,
  Nos. 05-20604, 05-20606, 2006 WL 5582336 (5th Cir. Dec. 27, 2006)................................15

*United States v. Brown,*
　24 F. Cas. 1263 (D. Mass. 1873) ........................................................................19

*United States v. Jones,*
　476 F. Supp. 2d 374 (S.D.N.Y. 2007).................................................................34

*United States v. Lockheed Corp.,*
　No. CR.A. 194CR226MHS., 1995 WL 17064259 (N.D. Ga., Jan. 9, 1995)..........30

*United States v. Magyar Telekom, Plc.,*
　Criminal Action No. 11-597 (E.D. Va. 2011).....................................................34

*Wilson v. Garcia,*
　471 U.S. 261 (1985).............................................................................................19

*Wood v. Carpenter,*
　101 U.S. 135 (1879).............................................................................................19

*WorldCare Corp. v. World Ins. Co.,*
　767 F. Supp. 2d 341 (D. Conn. 2011)....................................................................5

*World–Wide Volkswagen Corp. v. Woodson,*
　444 U.S. 286 (1980)...............................................................................................6

**STATUTES**

15 U.S.C. § 78dd-1 ........................................................................................ passim

15 U.S.C. § 78*l*................................................................................................30

15 U.S.C. § 78*o*(d) ........................................................................................30

28 U.S.C. § 2462.................................................................................................. passim

10 U.S.C.A. § 843(c) .....................................................................................22-23

12 U.S.C.A. § 1782(e) .........................................................................................24

12 U.S.C.A. § 1787(b)(14)(B).............................................................................24

12 U.S.C.A. § 1821(c)(14)(B) .............................................................................24

12 U.S.C.A. § 1977(2) .........................................................................................23

12 U.S.C.A. § 3419...............................................................................................23

12 U.S.C.A. § 4617(b)(12)(B).............................................................................24

12 U.S.C.A. § 5390(a)(10)(B).............................................................................24

15 U.S.C.A. § 16(i) ........................................................................................................23

15 U.S.C.A. § 714b(c) ...................................................................................................24

15 U.S.C.A. § 6606(e)(4) ...............................................................................................23

18 U.S.C.A. § 1964(c) ...................................................................................................24

18 U.S.C.A. § 2255(b) ...................................................................................................23

18 U.S.C.A. § 2712(e) ...................................................................................................23

18 U.S.C.A. § 3282(b)(2) ...............................................................................................24

18 U.S.C.A. § 3287(3) ...................................................................................................23

18 U.S.C.A. § 3290 ........................................................................................................24

18 U.S.C.A. § 3292(a)(1) ...............................................................................................23

19 U.S.C.A. § 1592 ........................................................................................................21

19 U.S.C.A. § 1592(d) ...................................................................................................21

19 U.S.C.A. § 1593a(d) .................................................................................................21

19 U.S.C.A. § 1621 ........................................................................................................21

21 U.S.C.A. § 1604(b)(3)(C) ...........................................................................................23

22 U.S.C.A. § 1631k(c) .................................................................................................23

26 U.S.C.A. § 547(f)(1) .................................................................................................23

26 U.S.C.A. § 860(h)(1) .................................................................................................23

26 U.S.C.A. § 982(c)(2) .................................................................................................23

26 U.S.C.A. § 982(e) ......................................................................................................23

26 U.S.C.A. § 4961(c)(3) ...............................................................................................23

26 U.S.C.A. § 6038A(e)(4)(D) .......................................................................................23

26 U.S.C.A. § 6330(e)(1) ...............................................................................................23

26 U.S.C.A. § 6331(i)(5) ...............................................................................................23

26 U.S.C.A. § 6531 ........................................................................................................22

26 U.S.C.A. § 6672(c) ..................................................................................................24

26 U.S.C.A. § 7507(c)(4) ..............................................................................................23

26 U.S.C.A. § 7609(e) ...................................................................................................23

26 U.S.C.A. § 7611(e) ...................................................................................................23

28 U.S.C.A. § 1332(d)(11)(D) .......................................................................................23

28 U.S.C.A. § 2501 ........................................................................................................24

29 U.S.C.A. § 255(d) .....................................................................................................23

29 U.S.C.A. § 1854(f) ....................................................................................................23

30 U.S.C.A. § 1724(d) ...................................................................................................23

38 U.S.C.A. § 1984(b) ...................................................................................................23

38 U.S.C.A. § 4327(b) ...................................................................................................24

42 U.S.C.A. § 233(p)(3)(A)(ii) ......................................................................................23

42 U.S.C.A. § 247d-6d(e)(4)(A) ....................................................................................24

42 U.S.C.A. § 247d-6e(d)(2) .........................................................................................23

42 U.S.C.A. § 254o(e) ....................................................................................................24

42 U.S.C.A. § 292f(i) .....................................................................................................24

42 U.S.C.A. § 300aa-16(c) .............................................................................................23

42 U.S.C.A. § 9612(d) ...................................................................................................24

42 U.S.C.A. § 9613(g) ...................................................................................................24

42 U.S.C.A. § 9658(b)(4)(B) .........................................................................................23

46 U.S.C.A. § 53911(d) .................................................................................................23

48 U.S.C.A. § 1489 ........................................................................................................24

50 App. U.S.C.A. § 8(c) ................................................................................................23

50 App. U.S.C.A. § 32(d) ..............................................................................................24

50 App. U.S.C.A. § 32(e) ..............................................................................................24

50 App. U.S.C.A. § 34(a)....................................................................................................24

50 App. U.S.C.A. § 36(c)....................................................................................................23

50 App. U.S.C.A. § 570(c)..................................................................................................23

1 Stat. 119 § 32 (1790).......................................................................................................21

5 Stat. 322 § 4 (1839)...........................................................................................25, 26, 27

Securities and Exchange Act of 1934 ................................................................................33

**OTHER AUTHORITIES**

Federal Rule of Civil Procudre 56 .......................................................................................1

Defendants Elek Straub, Tamás Morvai and András Balogh (together, the "Defendants") respectfully submit this memorandum of law in support of their motion pursuant to Federal Rule of Civil Procedure 56 for summary judgment.

## INTRODUCTION

The Defendants seek summary judgment in connection with three specific points about which there are no disputed issues of material fact.  *First*, the Court lacks personal jurisdiction over the Defendants.  This case should be dismissed because all three Defendants are citizens of a foreign country who have no ties to the United States.  Forcing the Defendants to litigate this case in this Court has been, and will continue to be, unduly burdensome and constitutionally unreasonable.  The discovery taken in this case has confirmed the extent of this burden in that virtually all of the witnesses, evidence, and documents are located in multiple European countries that are outside the jurisdiction of this Court.  As a result, the Defendants have been and will be deprived of critical evidence in support of their defense.  More generally, they have been and would continue to be forced to defend against claims in a country where none of them works or lives.

*Second*, Plaintiff the Securities and Exchange Commission (the "SEC") cannot establish that the Defendants used an instrumentality of interstate commerce as is required to prove the SEC's claims under the Foreign Corrupt Practices Act (the "FCPA"), and the Court therefore should grant summary judgment to the Defendants on the SEC's First and Second Claims For Relief.

*Third,* the SEC's claims are time-barred under 28 U.S.C. § 2462 and should be dismissed. The Court previously denied the Defendants' motion to dismiss based on the statute of limitations.  However, the Supreme Court's subsequent decision in *Gabelli v. SEC*, 133 S. Ct.

1216 (2013); the SEC's Second Amended Complaint alleging that the purported bribe scheme in this case was complete no later than mid-2005; and the undisputed fact that two of the Defendants – Messrs. Straub and Morvai – were present in the United States during the limitations period, now compel a different result.

There are no genuine issues of material fact as to any of these issues, and summary judgment should therefore be granted to Defendants.

## RELEVANT FACTUAL BACKGROUND

## I.     MESSRS. MORVAI AND STRAUB WERE PRESENT IN THE UNITED STATES IN LATE 2005.

The Court's 2013 ruling on Defendants' motion to dismiss was based on the assumption that "Defendants were not physically located within the United States during the limitations period."  *SEC v. Straub*, 921 F. Supp. 2d 244, 259-60 (S.D.N.Y. 2013).  It has since been established, however, beyond dispute, that Messrs. Morvai and Straub were indeed present in the U.S. in late 2005.  In particular, Mr. Straub visited New York and Boston during the week of September 6, 2005, and Mr. Morvai was present in the U.S. on two separate occasions in 2005 (traveling through San Francisco in June and July 2005 and through New York in October 2005).  *See* Declaration of Elek Straub, dated October 1, 2015 (the "Straub Decl.", submitted herewith), at ¶¶ 1-2, Ex. A; Declaration of Tamas Morvai, dated October 4, 2015 (the "Morvai Decl.", submitted herewith), at ¶¶ 3-5, Ex. A; Declaration of Andrea Cseh, dated October 4, 2015 ("Cseh Decl."), at ¶¶ 3-5, Ex. A.  Mr. Straub's declaration and passport confirm that Mr. Straub traveled to New York on September 6, 2005.   *See* Straub Decl., at ¶¶ 1-2, Ex. A.  Mr. Morvai's declaration and passport and Ms. Cseh's declaration and passport confirm that Mr. Morvai and his wife arrived in San Francisco on June 23, 2005 (and stayed for approximately one month)

2

and arrived in New York on October 21, 2005 (and stayed for three to four days). *See* Morvai

Decl. at ¶¶ 3-5, Ex. A; Cseh Decl. at ¶¶ 3-5, Ex. A.

## II. FOR PURPOSES OF ESTABLISHING ITS FCPA CLAIMS, THE SEC HAS IDENTIFIED FIVE ELECTRONIC MAIL MESSAGES ON WHICH IT RELIES TO ESTABLISH THAT DEFENDANTS MADE USE OF AN INSTRUMENTALITY OF INTERSTATE COMMERCE.

During discovery, the SEC identified five electronic mail messages, involving either a

sender or recipient with a Hotmail email address, upon which it relied in alleging that the

Defendants made use of an instrumentality of U.S. interstate commerce in furtherance of an offer

or payment to a foreign official. The five messages were either sent or received by only two

individuals with Hotmail email addresses – Attila Szendrei, the CEO of MakTel in Macedonia,

and Jovan Pejkovski, an advisor to the Prime Minister of Macedonia. The five messages are:

- January 8, 2005, email from Jovan Pejkovski (pejkovski@hotmail.com) to Michael Gunther, Re: *letter*, with attachment (DOJ01_00017583-84);

- March 9, 2005, email from Attila Szendrei to Jovan Pejkovski (pejkovski@hotmail.com), Re: *Frequency fee arrangement* (MT-MAK 0133488);

- May 31, 2005, email from Andras Balogh to Attila Szendrei (aszendrei@hotmail.com), Re: *megállapodás*, with attachment (MT-MAK 0802476-78) (Pl. Ex. 35);

- July 5, 2005, email from Peter Danko to Andras Balogh and Attila Szendrei (aszendrei@hotmail.com), Re: *Consultancy Agreement* (MT-MAK 1052139); and

- July 5, 2005, email from Peter Danko to Andras Balogh and Attila Szendrei (aszendrei@hotmail.com), cc'ing Zsolt Herczeg, Re: *Consultancy Agreement*, with attachment (MT-MAK 0008310-27) (Pl. Ex. 42).[1]

---

[1]     The SEC identified these five messages in its Response to Defendant Straub's First Set of Interrogatories on November 1, 2013. *See* Declaration of Lisa J. Fried, dated October 5, 2015, submitted herewith (the "Fried Decl."), at ¶ 2, Ex. A.

3

Neither Mr. Straub nor Mr. Morvai sent any of these messages.  And the single email sent by Mr. Balogh merely attached a draft of a non-binding memorandum of understanding between the two main shareholders of Maktel – the "Protocol of Cooperation".[2]

## ARGUMENT

## I.   THE COURT LACKS PERSONAL JURISDICTION OVER THE DEFENDANTS.

Requiring Defendants to defend against the SEC's claims in this Court has been, and continues to be, unreasonable and a violation of due process.  In particular, the burden that the exercise of jurisdiction will impose on Defendants, and the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, militate against the exercise of jurisdiction over the Defendants here.  The Defendants are foreign citizens, who live and work outside the U.S.  Virtually all of the discovery propounded in this action has been aimed at documents, witnesses and information located overseas, much of which was inaccessible to Defendants (despite Defendants' best efforts to secure it).  The significant burden imposed on Defendants by forcing them to defend against claims in the U.S makes clear that this Court should not exercise jurisdiction over the Defendants.   In addition, a U.S. court's assertion of jurisdiction over the Defendants is even less justifiable where the judicial authorities in Hungary and Macedonia quite clearly would have a greater interest in pursuing allegations of bribery by Hungarian executives of Macedonian government officials than would those in the U.S.

Constitutional due process requires that personal jurisdiction be reasonable under "traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (internal quotations omitted).   The lack of reasonableness is an independent

---

[2]      The SEC does not dispute that the Protocol of Cooperation was a non-binding memorandum of understanding.  *See, e.g.,* Letter from Robert I. Dodge dated August 21, 2015 to the Court (Dkt. No. 200), at 3 ("[T]he Protocol was never meant to be a legally enforceable contract….").

4

basis to deny personal jurisdiction, even if minimum contacts exist.[3]  *See, e.g.*, *Norvel Ltd. v. Ulstein Propeller AS*, 161 F. Supp. 2d 190, 207 (S.D.N.Y. 2001) ( "it would be unreasonable to exercise jurisdiction" over defendant even though minimum contacts existed); *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 681 (6th Cir. 2012) (affirming district court holding that personal jurisdiction over Swiss defendant would be unreasonable); *ITL Int'l, Inc. v. Constenla, S.A.*, No. 1:10CV467 LG-RHW, 2010 WL 4537931, at *10 (S.D. Miss. Nov. 2, 2010), *aff'd*,  669 F.3d 493 (5th Cir. 2012) (finding jurisdiction over defendant to be unreasonable despite the presence of minimum contacts); *Benton v. Cameco Corp.*, 375 F.3d 1070, 1079 (10th Cir. 2004) (finding minimum contacts but holding that exercising jurisdiction over foreign defendant "would be inconsistent with traditional notions of fair play and substantial justice"); *WorldCare Corp. v. World Ins. Co.*, 767 F. Supp. 2d 341, 361 (D. Conn. 2011) (holding that "[e]ven had [defendant] possessed the requisite 'minimum contacts' with [the forum], personal jurisdiction over [defendant] would fail the "reasonableness test" because such jurisdiction does not comport with the "traditional notions of fair play and substantial justice").

In evaluating the reasonableness of asserting jurisdiction over a foreign defendant, courts consider five factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states

---

[3]      Defendants do not concede the existence of minimum contacts and, indeed, anticipate disputing, in opposition to the SEC's own motion for summary judgment, that the SEC can demonstrate that Defendants had minimum contacts with the U.S. Under the controlling authorities, the SEC, in order to prevail on the ultimate question of personal jurisdiction, would need to prove *both* that Defendants have minimum contacts *and* that the exercise of personal jurisdiction over Defendants would be reasonable.  *See Straub*, 921 F. Supp. at 252.  In contrast, if Defendants establish the absence of *either* of those requirements – minimum contacts *or* reasonableness – this action must be dismissed as against them.

in furthering substantive social policies." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996); *see also Asahi Metal Indus. Co. v. Super. Ct. of Cal.,* 480 U.S. 102, 113-14 (1987); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476-77 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292 (1980).  Here, at a minimum, the first and fourth *Metro. Life* factors clearly militate <u>against</u> the assertion of jurisdiction over the Defendants.  Where, as here, a case involves jurisdiction over a citizen of a foreign country and involves largely international facts, witnesses, and documents, the Supreme Court has specifically cautioned that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have *significant weight* in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi,* 480 U.S at 114 (emphasis added).  Moreover, when "the plaintiff is not a [forum] resident, [the forum's] legitimate interests in the dispute have considerably diminished." *Id.*

Exercising personal jurisdiction over Defendants on the facts of this case would be constitutionally unreasonable.  Most importantly, the burden on Defendants of defending themselves in a foreign legal forum has been – and will continue to be – heavy. *See id.* at 114.  Discovery sought in this case proves the extent of the burden.  Discovery, which closed earlier this year, was a costly and time-consuming exercise, primarily because virtually all of the relevant witnesses, evidence and documents  are located in foreign jurisdictions, including Macedonia, Hungary, Germany, and Greece.  Defendants served requests under the Hague Convention on the Taking of Evidence Abroad seeking deposition testimony from 31 foreign individuals (the "Hague Requests").  Twelve of those Hague Requests – which sought testimony

from eight witnesses in Macedonia and four witnesses in Germany – were denied.[4]  *See* Fried

Decl. at ¶ 4.

Defendants therefore have been deprived of critical evidence in support of their defense.

This was particularly prejudicial with regard to the seven witnesses the Defendants sought – but

were unable – to depose in Macedonia, the very country in which the SEC alleges the bribes took

place.  Macedonia's complete lack of cooperation with the Hague Requests prevented the

Defendants from developing any relevant evidence in the country whose political leaders were

alleged to have accepted the bribes in the first place.  The Defendants were similarly prejudiced

by German authorities' refusal to assist them in obtaining depositions of, among others, the CFO

of the Macedonian subsidiary of Magyar Telekom and the CFO of Deutsche Telekom, parent

company of Magyar Telekom.  Thus, the Defendants were deprived of testimony from numerous

witnesses that they had sought, solely because those witnesses are beyond the reach of this U.S.

court.  *See Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 732 (S.D.N.Y. 2010) ("[L]itigating

this entirely foreign claim in the United States will be burdensome to Defendants, all of which

operate in Lebanon.").

The parties' dealings with the SEC's key witness, Slobodan Bogoeski, also perfectly

illustrate the unduly burdensome challenges the Defendants have faced as they have worked to

defend this action in a foreign land.  On December 30, 2014, the SEC alerted the Defendants that

it had suddenly learned of the existence of a witness who the SEC unilaterally interviewed on

December 28, 2014 – Slobodan Bogoeski, the former head of Macedonia's secret service, who

had recently been convicted of serious money laundering charges completely unrelated to this

---

[4]      While the Parties were waiting to hear from judicial authorities outside the U.S. regarding
their Hague Requests, the SEC was able to voluntarily obtain the testimony from one of the
witnesses in Macedonia.  *See* Fried Decl. at ¶ 4.

action and who is now serving a prison sentence in Macedonia.  As the Court knows, the propriety of the SEC's dealings with, and interview and subsequent "deposition" of, Mr. Bogoeski has been the subject of considerable debate and motion practice in this case, but what is beyond dispute is that: (a) the SEC has characterized Mr. Bogoeski as a critical witness in its case, and (b) Mr. Bogoeski presently resides far outside this Court's jurisdiction and was deposed – in Defendants' view, insufficiently and improperly – only because he agreed to make himself available, at least partially, for such deposition.  Even the limited, problematic deposition testimony that the parties were able to obtain from Mr. Bogoeski was plagued by translation difficulties and numerous logistically daunting videoconferences and negotiations.  *See* Fried Decl., at ¶ 5.  To say that obtaining this testimony was "burdensome" is a considerable understatement.  To this day, the defense is unable to complete its questioning of Mr. Bogoeski, and this Court has even acknowledged that it is unable to order him to submit to such questioning. *See* Op. & Order at 13 (Aug. 24, 2015) (Dkt. No. 203) ("Ordinarily the Court would simply issue an order compelling such a recalcitrant witness to reappear for a deposition and answer the questions previously put to him.  That approach may prove difficult here, however, since Bogoeski is a foreign national who is currently incarcerated in Macedonia." (internal citations omitted)).

Equally significant is the fact that none of the Defendants are U.S. citizens, and all of the Defendants live and work half a world away.  Because the Defendants have no connections whatsoever to the U.S., asserting jurisdiction over them has been and continues to be unreasonable.  *See Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1488 (9th Cir. 1993) (assertion of personal jurisdiction over Swedish defendants that "have no ongoing connection to or relationship with the United States" unreasonable).  In addition, Mr. Straub is nearly 71 years

old, and suffers from a rare form of leukemia for which he requires regular treatment.  He has been instructed by his doctors to avoid physical and mental stress.  *See* Straub Decl. at ¶¶ 3-5. Since being diagnosed with the disease, Mr. Straub has limited his travel in order to stay in close proximity to his doctor and travelled to the United States only once for the purposes of providing his deposition testimony in this matter.  *See id.*  Subjecting Mr. Straub to travel to New York for purposes of defending against the SEC's allegations therefore would be gravely burdensome. Messrs. Balogh and Morvai, for their part, have significant family obligations that prevent them from traveling half way around the world for extended periods of time.  *See, e.g.,* Morvai Decl. at ¶ 6.  Requiring all three Defendants to uproot their lives and travel long distances in order to attend and testify at the trial of this matter is by itself highly unreasonable.  *See* Straub Decl. at ¶¶ 4-6; Morvai Decl. at ¶ 6.  These burdens must be given "significant weight" in the reasonableness analysis.  *Asahi,* 480 U.S. at 114.

In addition, the efficient administration of justice – the fourth factor identified by the *Metro. Life* court – would not be well-served by adjudication of this suit in this forum.  In the context of a case that essentially alleges bribery by Hungarian executives of Macedonian government officials, Hungary and Macedonia have much greater interests in adjudicating the issues in this action than does the U.S.  And for the reasons discussed above, adjudication of those issues – which would depend on documents, witnesses and other evidence located almost entirely outside the U.S. – could be accomplished more "efficiently" in those countries than in the U.S.

Continuing to extend jurisdiction over the Defendants also would require substantial time and participation from jurors for the adjudication of claims completely unrelated to their home state or country.  Additionally, all but one witness deposed during discovery reside *outside* of the

9

U.S., and Defendants therefore will not have the ability to compel trial testimony from any of these witnesses.  Thus, the parties will have to rely primarily on deposition testimony from these foreign witnesses.  Deposition testimony is no substitute for live trial testimony.  "Depositions, deadening and one-sided, are a poor substitute for live testimony especially where, as here, vital issues of fact may hinge on credibility."  *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League,* 89 F.R.D. 497, 501 (C.D.Ca. 1981); *S.E.C. v. Kasirer*, No. 04 C 4340, 2005 WL 645246, at *3 (N.D. Ill. Mar. 21, 2005) ("Our system of justice, however, prefers trials that involve live testimony. . . to 'minimize the risk of 'trial by deposition'" (citation omitted)).  Trial by deposition would also likely result in further difficulties because parsing through all of the objections could result in incomplete and choppy testimony.  This would result in grave prejudice and injustice to the three Defendants.

In light of the foregoing, the continued assertion of jurisdiction over the Defendants would be fundamentally unreasonable, and Defendants respectfully submit that the Court should decline to do so.

## II.    THE SEC CANNOT ESTABLISH THAT THE DEFENDANTS MADE USE OF AN INSTRUMENTALITY OF INTERSTATE COMMERCE.

In order to prove the First and Second Claims against the Defendants, the SEC must establish that the Defendants "ma[d]e use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to any foreign official."  15 U.S.C. § 78dd-1(a).  In order to satisfy the "instrumentality of interstate commerce" element, the SEC alleges that electronic mail messages "in furtherance of the bribe scheme, including those attaching drafts of the Protocol of Cooperation, the Letter of Intent, and copies of consulting contracts with a third-party

10

intermediary, were transmitted through the means or instrumentalities of United States interstate commerce."  Second Am. Compl. (Dkt. No. 213) ¶ 36.[5]  However, these sweeping allegations are unsupported by the evidence.

As an initial matter –  and yet another example of why exercising jurisdiction over the Defendants is fundamentally unreasonable and, more generally, violates due process – even after discovery, the SEC has been able to identify only *five* emails that even allegedly touched the U.S. as support for the instrumentality of interstate commerce element it must establish.  *See* Fried Decl. at ¶ 2, Ex. A.

More importantly, the SEC cannot establish *any* such use of an instrumentality of interstate commerce by Defendants Straub and Morvai.  And the SEC cannot demonstrate that the single electronic mail message it has identified as having been sent by Defendant Balogh in Hungary to a colleague in Macedonia was a sufficient use of an instrumentality of interstate commerce in furtherance of any alleged offer or payment to a foreign official.  Summary judgment must therefore be granted to the Defendants on the First and Second Claims in the Complaint.

During discovery, the SEC identified five electronic mail messages, involving either a sender or recipient with a Hotmail email address, upon which it relied in alleging that the Defendants made use of an instrumentality of interstate commerce in furtherance of an offer or payment to a foreign official.  The five messages were either sent or received by only two individuals with private Hotmail email addresses – Attila Szendrei, the CEO of MakTel in

---

[5]        In its Complaint, the SEC acknowledged that such electronic mail messages, "some of [which] were sent or received by defendant Balogh," "were *sent* from locations outside the United States."  Second Am. Compl. ¶ 36 (emphasis added).  The SEC cannot dispute that such messages were also *received* by individuals located outside the United States.  The SEC therefore opts to focus on its assertion that such messages "were routed through and/or stored on network servers located within the United States."  *Id.*

Macedonia, and Jovan Pejkovski, an advisor to the Prime Minister of Macedonia – and only one email was sent by a Defendant in this action.[6]  The five messages are:

- January 8, 2005, email from Jovan Pejkovski (pejkovski@hotmail.com) to Michael Gunther, Re:  *letter*, with attachment (DOJ01_00017583-84);

- March 9, 2005, email from Attila Szendrei to Jovan Pejkovski (pejkovski@hotmail.com), Re:  *Frequency fee arrangement* (MT-MAK 0133488);

- May 31, 2005, email from Andras Balogh to Attila Szendrei (aszendrei@hotmail.com), Re:  *megállapodás*, with attachment (MT-MAK 0802476-78) (Pl. Ex. 35);

- July 5, 2005, email from Peter Danko to Andras Balogh and Attila Szendrei (aszendrei@hotmail.com), Re:  *Consultancy Agreement* (MT-MAK 1052139); and

- July 5, 2005, email from Peter Danko to Andras Balogh and Attila Szendrei (aszendrei@hotmail.com), cc'ing Zsolt Herczeg, Re: *Consultancy Agreement*, with attachment (MT-MAK 0008310-27) (Pl. Ex. 42).[7]

Neither Mr. Straub nor Mr. Morvai sent or received any of the email messages relied upon by the SEC.  And the SEC has not pointed to anything during discovery suggesting that the emails were sent at the direction of, or on behalf of, Mr. Straub or Mr. Morvai.[8]  While this Court

---

[6]     The SEC relies on a single-page declaration from a Microsoft Corporation Online Services Custodian of Records, produced to the Defendants on the final evening of the fact discovery period, to support its position that "all emails to and from the Outlook.com [formerly known as MSN/Hotmail] accounts aszendrei@hotmail.com and pejkovski@hotmail.com would necessarily have passed through, and been stored on, servers located in the United States."  *See* Decl. of Microsoft Corporation Records Custodian ¶ 5 (Dec. 17, 2014), a true and correct copy of which is attached as Exhibit B to the Fried Declaration.

[7]     The SEC identified these five messages in its Response to Defendant Straub's First Set of Interrogatories on November 1, 2013.  *See* Fried Decl. at ¶ 2, Ex. A.

[8]     *See Straub*, 921 F.Supp.2d at 264 n.13  (rejecting the Defendants' argument that the SEC failed to allege that there was *any* use of the instrumentalities of U.S. interstate commerce because "the Complaint specifically alleges that Balogh emailed, *on behalf of Defendants*, drafts of the Protocols, the Letter of Intent, and copies of consulting contracts to third party intermediaries." (emphasis added)).  The Court's language suggests that if the SEC cannot demonstrate that Messrs. Straub and Morvai *themselves* made use of an instrumentality of U.S.

12

previously held that the SEC did not need to demonstrate an *intentional* or *direct* use of an

instrumentality of U.S. interstate commerce by the Defendants,[9] the SEC still must establish

*some* use by the Defendants.  And it simply cannot do so here, with respect to Defendants Straub

or Morvai.  Accordingly, because the SEC cannot demonstrate that Defendants Straub and

Morvai "ma[d]e use of the mails or any means or instrumentality of [United States] interstate

commerce corruptly in furtherance of an offer [or] payment . . . to any foreign official," under 15

U.S.C. § 78dd-1, the Court must grant summary judgment in favor of Defendants Straub and

Morvai on the SEC's First and Second Claims for Relief.

       Although Defendant Balogh appears to have received two of the five identified messages,

and sent one such message, the SEC cannot demonstrate that the single electronic mail message

sent by Defendant Balogh was *in furtherance of* a bribe.  We focus our analysis on the single

---

interstate commerce, it would have to show that they had taken some affirmative action to
request or direct Mr. Balogh to do something that resulted in *his* making use of an
instrumentality of U.S. interstate commerce *on their behalf*.  This cannot be demonstrated.

[9]    *See Straub*, 921 F.Supp.2d at 262-64.  This was in response to the Defendants' argument
that any electronic mail messages sent to a Hotmail email address were not intentionally or even
knowingly sent through an instrumentality of U.S. interstate commerce; rather, they were
allegedly routed through a server located in the U.S. by an independent third party or other force.
The Defendants obviously disagree with the Court's resolution of this legal issue in its Order
denying their Motion to Dismiss.

In addition, even if Defendants were to concede that *direct* use of an instrumentality of U.S.
interstate commerce is not necessary under 15 U.S.C. § 78dd-1 (i.e., that, because an
independent third party or other force caused an email sent by one Defendant to be routed
through a U.S. server, that Defendant "ma[d]e use of" an instrumentality of U.S. interstate
commerce), which they do not, they would contest the Court's assumptions regarding what
might have been a foreseeable *indirect* use.  Granted, "the Internet is a huge, complex, gossamer
web," *see id.* at 264 n.13, and thus, arguably, it may have been "foreseeable . . . that Internet
traffic will not necessarily be entirely local in nature," *id.*; however, it is quite a leap from those
propositions to the conclusion that it would be foreseeable to Defendant Balogh that his single
email, sent from Hungary to a colleague in Macedonia, as discussed in greater detail, *infra*,
would travel through a U.S. server, thus subjecting him to liability under a U.S. statute requiring
such a nexus.

email that Defendant Balogh *sent* because merely *receiving* emails does not constitute affirmatively "mak[ing] use of" an instrumentality of U.S. interstate commerce.

The message at issue is a May 31, 2005, email from Mr. Balogh, sitting in Hungary, to a colleague, Attila Szendrei, sitting in Macedonia.  In his email, which contained no text in the body, Mr. Balogh simply attached an unsigned copy of the Protocol of Cooperation.  This single transmission is not an electronic mail message "*in furtherance of* an offer [or] payment . . . to any foreign official," for a multitude of reasons.  First, it is not a message to a foreign government official or a potential bribe recipient, or any representative or agent thereof, and it does not contain an offer to pay or promise to pay an alleged bribe.  At the Motion to Dismiss stage, the Court rejected the Defendants' argument that the SEC could not satisfy the "in furtherance of" element of 15 U.S.C. § 78dd-1(a), because, according to the allegations in the Complaint, "Defendants sent the Protocols and Letter of Intent, which were essentially their offers to pay or promises to pay the alleged bribes, *to Macedonian government officials*."  *See Straub*, 921 F.Supp.2d at 264 n.14 (emphasis added).  Discovery has revealed that the SEC's allegations relied upon by the Court at the motion to dismiss stage, are simply not true.  There were *no* electronic mail messages sent by *any* of the Defendants to *any* Macedonian government officials that would have even arguably passed through an instrumentality of U.S. interstate commerce, much less any messages transmitting what could in any way be characterized as "offers to pay or promises to pay the alleged bribes."

Second, the May 31, 2005 email from Mr. Balogh was not sent with the purpose of facilitating the progress of any alleged offer or payment, or of making it more likely to occur.  It did not discuss an alleged bribery scheme or the means of carrying out such a scheme.  It was not

14

"an essential step" in the offer or payment of any alleged bribes; there is no suggestion that any alleged offer or payment of bribes would not have occurred, had this message not been sent.[10]

Accordingly, because the SEC cannot demonstrate that any of the Defendants "ma[d]e use of the mails or any means or instrumentality of [United States] interstate commerce corruptly *in furtherance of* an offer [or] payment . . . to any foreign official," under 15 U.S.C. § 78dd-1 (emphasis added), the Court must grant summary judgment in favor of the Defendants on the SEC's First and Second Claims for Relief.

## III.   THE SEC'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

It is undisputed that the statute of limitations set forth in 28 U.S.C. § 2462 governs this action.  *See Straub*, 921 F. Supp. at 259.  Section 2462 provides as follows:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when

___

[10]     In contrast, *see*, *e.g.*, Appellate Brief of the United States, *U.S. v. Kay*, Nos. 05-20604, 05-20606, 2006 WL 5582336, at *50-52 (5th Cir. Dec. 27, 2006)  ("The false documents [sent through the means of U.S. interstate commerce to Haitian government officials] were an essential step in the authorization and payment of the bribes, because the defendants would not have authorized the bribes, and the ARI employees in Haiti would not have paid the bribes, unless the Haitian officials accepted them for processing.  The false shipping documents, therefore, represented an essential part of the *quid pro quo* of the bribes:  In return for the payment of bribes, the Haitian officials accepted false shipping documents. . . .The use of interstate facilities is 'in furtherance of' a bribe only when, as in this case, it promotes or advances the payment of the bribe.").

The Fifth Circuit found in favor of the United States on this issue.  *See U.S. v. Kay*, 513 F.3d 432, 454 (5th Cir. 2007) (holding that the indictment, by alleging that the false documents transported by interstate means were transported "in furtherance of" bribes, accurately tracked the interstate commerce element of the FCPA and was supported by evidence from the case).

*See also Chevron Corp. v. Donzinger*, 974 F.Supp.2d 362, 596-97 (S.D.N.Y. 2014)  (holding that U.S. citizen's use of emails explicitly directing recipient to transfer funds that were ultimately used for a bribe payment, and discussing details of a bribe scheme, were sufficient to show use of an instrumentality of interstate commerce under the FCPA).  The instant case is wholly distinguishable from *Kay* and *Chevron*, because nothing about the email in question remotely suggests it was an essential step – or, indeed, *any* step – in the offer or payment of any bribes.

the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462 (2015).

The Court denied Defendants' earlier motion to dismiss, ruling that "the operative language in § 2462 requires, by its plain terms, that an offender must be <u>physically present</u> in the United States for the statute of limitations to run." *Straub*, 921 F. Supp. 2d at 260 (emphasis added). There have been significant case law and factual developments since the Court's February 8, 2013 ruling on the motion to dismiss, however, and those developments make clear that this action is time-barred.

*First*, the Supreme Court ruled in *Gabelli v. SEC*, 133 S. Ct. 1216, 1223 (2013), that Section 2462 begins to run when the claim *first accrues* (rather than when discovered), citing Chief Justice Marshall, that it "would be utterly repugnant to the genius of our laws" if actions for penalties could be brought "at any distance of time." *Id.* at 1223. An indefinite delay in bringing suit is exactly what the SEC advocated in this case and what the Court's 2013 ruling would permit. *Second*, it has now been established that a key assumption underlying the Court's 2013 denial of the Defendants' motion to dismiss was inaccurate; in fact, two of the defendants were in the United States in 2005, <u>*after*</u> the SEC's claim "first accrued."

There are no material facts in dispute with respect to Defendants' statute of limitations defense. The SEC filed the instant lawsuit on December 29, 2011. This was more than *six* years after the claims first accrued in June 2005. As detailed below, Mr. Straub and Mr. Morvai were both present in the U.S. later in 2005 – i.e., well within the limitations period. Even after they left the U.S., Messrs. Straub and Morvai, along with Mr. Balogh, could have been served under the Hague Convention at any time within the five-year limitations period. The SEC, for reasons it has never articulated, simply chose to wait.

16

Under the only reasonable reading of Section 2462 in light of *Gabelli*, summary judgment should be granted as to all three Defendants here. Even under the SEC's excessively broad reading of Section 2462, the statute of limitations has run with respect to Messrs. Straub and Morvai.

A.  **The Statute of Limitations Has Run Against All Three Defendants Because Section 2462 Articulates a Strict Five Year Rule That Does Not Provide For Tolling or For Excluding Defendants Who Are Outside The United States.**

Section 2462 provides that a suit for penalties and forfeiture "shall not be entertained unless commenced within five years" and only if "within the same [five year] period" the offender "is found within the United States in order that proper service may be made therein." In other words, if a suit is not commenced within five years of first accrual and the defendants are not found within the United States during the five year period so that proper service may be made, the statute of limitations has run and the SEC cannot bring the suit. This reading of the statute provides for a strict five-year rule with no tolling, which as detailed below is consistent with: (1) the holding of *Gabelli*, (2) the plain meaning of the statute and the fact the Congress is always explicit and clear when it wants to provide for tolling in a statute of limitations; and (3) the legislative purpose and history of Section 2462. The SEC's reading is inconsistent with each of these considerations.

i.  **Gabelli v. SEC**

The SEC has taken the position that, if an offender is not found within the U.S. within five years, then the statute of limitations simply evaporates and the SEC can then bring suit at *any time* in the future. The SEC also claims it can serve alleged foreign offenders outside the U.S. anytime it likes under the Hague Convention and yet, at the same time, wields Section 2462 as a weapon to eliminate any statute of limitations with respect to alleged offenders located outside the U.S. The SEC's interpretation of Section 2462 would lead to the unjust result that it

17

could choose to sue a foreign defendant 10, 15 or even 20 years after the claim first accrued, thereby capitalizing on fading memories and vanishing evidence.[11]  The Court should reject such an absurd result.  *SEC v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011) (acknowledging that it is "well-established" that "[a] statute should be interpreted in a way that avoids absurd results.").

The SEC's position, which was accepted by the Court at the motion to dismiss stage of this case, is at complete odds with the observation of Chief Justice John Marshall in 1805, which was reaffirmed by Chief Justice John Roberts in 2013.  As Chief Justice Roberts observed in *Gabelli*, "Chief Justice Marshall used particularly forceful language in emphasizing the importance of time limits on penalty actions, stating that it '<u>would be utterly repugnant to the genius of our laws' if actions for penalties could 'be brought at any distance of time</u>.'"  *Gabelli*, 133 S.Ct. at 1223 (*quoting Adams v. Woods*, 2 Cranch 336, 342 (1805)) (emphasis added).  *Gabelli* was decided after this Court ruled on the motion to dismiss.

In *Gabelli*, the Supreme Court rejected the SEC's position of imposing on Section 2462 a rule delaying the running of its statute of limitations until the SEC discovered the alleged misconduct, finding that such a reading of the statute "would leave defendants exposed to Government enforcement action not only for five years after their misdeeds, but for an additional uncertain period into the future."  *Id.* at 1223.  The Supreme Court reinforced the importance of a fixed statute of limitation under 2462, stating:

> This reading sets a fixed date when exposure to the specified Government enforcement efforts ends, advancing "the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities."  *Rotella v. Wood*,

---

[11]     The SEC clearly employed this strategy in this case.  SEC attorneys communicated to counsel for the Defendants as early as June 23, 2010 – which was already five years after the claim first accrued – that they intended to bring this action (*see, e.g.,* Declaration of Michael Koenig, dated October 5, 2015, submitted herewith, at ¶ 2, Ex. A).  Nonetheless, the SEC waited another 18 months to file its complaint.

528 U.S. 549, 555 (2000).  Statutes of limitations are intended to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Railroad Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 348-349 (1944).  They provide "security and stability to human affairs." *Wood v. Carpenter*, 101 U.S. 135, 139 (1879).  We have deemed them "vital to the welfare of society," *ibid.*, and concluded that "even wrong-doers are entitled to assume that their sins may be forgotten," *Wilson v. Garcia*, 471 U.S. 261, 271 (1985).

*Id.* at 1221.

The SEC and this Court at the motion to dismiss stage relied on dictum from an 1873 district court case in Massachusetts to support its position.  *United States v. Brown*, 24 F. Cas. 1263 (D. Mass. 1873).  However, *Brown* was a criminal case, and the court there ruled that the two-year statute of limitations for criminal actions under the statute at issue was *not* tolled because the defendant was at sea and was therefore outside the United States during the two years after the offense.  *Id.* at 1264.  In any event, disagreement about the meaning of *Brown*'s dictum is overshadowed by the recent Supreme Court language in *Gabelli* making clear that reading an indefinite tolling provision into Section 2462 is "utterly repugnant to the genius of our laws." [12]

### ii.     The plain meaning and congressional intent

The SEC's position that the statute of limitations under Section 2462 is tolled indefinitely as long as the defendant or defendants remain outside the U.S., despite the fact that no such tolling is expressly stated in the statute, is also at odds with the plain language of the statute.

---

[12]     In its brief opposing Defendants' motion to dismiss, the SEC mischaracterized the dictum of *Brown* as a "holding that…would prevent the statute from running in a civil action for money penalties." *See* Pl. SEC's Mem. in Opp. to Defs' Joint Mot. to Dismiss the Compl. at 24 (Dkt. No. 41).

"When looking at its language, a court should presume that the statute says what it means."  *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1073 (2d Cir. 1994).  Section 2462 makes it clear that a lawsuit for penalties, fines, or forfeitures "shall <u>not</u> be entertained" by the courts "<u>unless</u>" it is brought "within five years from the date when the claim first accrued" and only "if" the defendant can be found in the U.S. during that "same period" "in order that proper service may be made thereon."  (emphasis added.)  Put simply, Section 2462 has two requirements in order to bring suit: (1) the case must be filed within five years and (2) the offender must be found within the United States so proper service can be made within that time. There is no provision for tolling or extending the running of the statute while persons are outside the United States, nor are persons outside the United States excluded from this statute of limitations.  *Aslanidis*, 7 F.3d at 1073 (rejecting the argument that ambiguous language in a statute should be construed as tolling the statute of limitations when it was clear that Congress knew how to write a statute tolling the statute of limitations and had not done so).

Where Congress wants to toll the statute during a person's absence, it does so expressly with very specific and precise language – such as the language used in every other statute of limitations that we were able to review (detailed below at pages 24 to 26) – indicating its intent to toll the statute of limitations.  *See, e.g.*, *Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S.Ct. 736, 742 (2014) (rejecting a statutory interpretation because Congress "easily could have drafted language to that effect" and did not).   Section 2462, in contrast, simply makes clear that a case cannot be brought unless commenced within five years, and unless the offender is located "within the same period" "within the United States" so he can be served.

Congress well knew how to include tolling language if that was its intent.  In 1790, for example, Congress enacted the following statute of limitations, which applied to crimes and criminal fines and forfeitures:

> *And be it further enacted*, That no person or persons shall be prosecuted, tried or punished for treason or other capital offense aforesaid, willful murder or forgery excepted, unless the indictment for the same shall be found by a grand jury within three years next after the treason or capital offence aforesaid shall be done or committed; nor shall any person be prosecuted, tried or punished for any offence, not capital, nor for any fine or forfeiture under any penal statute, unless the indictment or information for the same shall be found or instituted within two years from the time of the committing the offence, or incurring the fine or forfeiture aforesaid:  *Provided*, <u>that nothing herein contained shall extend to any person or persons fleeing from justice.</u>

Law of April 30, 1790, Sess. 11, Ch. 9, 1 Stat. 119 § 32 (1790) (emphasis added) (the "1790 Act").  The proviso that "nothing herein contained shall extend to any person or persons fleeing from justice," makes it clear that Congress at that time knew how to exclude classes of people who were not physically present from a statute of limitations.

Defendants have identified a federal statute of limitations addressing penalties under custom laws, 19 U.S.C.A. § 1621, where "the time of the absence from the United States of the person subject to the penalty" is expressly excluded from the statute of limitations by absolutely clear language: "shall not be reckoned within the 5-year period of limitation."[13]  The inclusion of

---

[13]      19 U.S.C.A. § 1621: "No suit or action to recover any duty under section 1592(d), 1593a(d) of this title, or any pecuniary penalty or forfeiture of property accruing under the customs laws shall be instituted unless such suit or action is commenced within five years after the time when the alleged offense was discovered, or in the case of forfeiture, within 2 years after the time when the involvement of the property in the alleged offense was discovered, whichever was later; except that—

(1) in the case of an alleged violation of section 1592 or 1593a of this title, no suit or action (including a suit or action for restoration of lawful duties under subsection (d) of such sections) may be instituted unless commenced within 5 years after the date of the alleged violation or, if such violation arises out of fraud, within 5 years after the date of discovery of fraud, and

this language underscores the fact that Congress knew how to exclude someone absent from the United States from a statute of limitations and to toll the statute during that absence. When Congress wanted to exclude or except a person's absence from the United States, it did so by express and clear language. Other federal statutes of limitation contain similar express language to create tolling provisions for persons outside the United States. *See, e.g.*, 26 U.S.C.A. § 6531 ("The time during which the person committing any of the various offenses arising under the internal revenue laws is outside the United States or is a fugitive from justice…shall not be taken as any part of the time limited by law for the commencement of such proceedings."); 10 U.S.C.A. § 843(d) ("Periods in which the accused was absent from territory in which the United States has the authority to apprehend him…shall be excluded in computing the period of limitation prescribed in this article.").

Likewise, a review of every current federal statute of limitations identified by Defendants demonstrates that federal statutes of limitations that include tolling provisions do so by clear and express language. Of 135 federal statutes of limitations that Defendants have identified, 57 statutes contain a tolling provision, as detailed below. In each and every one of these 57 provisions, the tolling or suspension of the statute of limitations is absolutely clear and expressly stated.

---

(2) the time of the absence from the United States of the person subject to the penalty or forfeiture, or of any concealment or absence of the property, shall not be reckoned within the 5-year period of limitation."

The predecessor statute, first enacted in 1930, was likewise very clear and used expressed language to toll the statute of limitations: "No suit or action to recover any pecuniary penalty or forfeiture of property accruing under the customs laws shall be instituted unless such suit or action is commenced within five years after the time when such penalty or forfeiture accrued: *Provided*, That the time of the absence from the United States of the person subject to such penalty or forfeiture, or of any concealment or absence of the property, shall not be reckoned within this period of limitation."

Federal statutes tolling or suspending the running of the statute of limitations

unambiguously state that the statute of limitations period "**shall toll**" (18 U.S.C.A. § 2712(e); 21

U.S.C.A. § 1604(b)(3)(C)); "**shall be tolled**" (29 U.S.C.A. § 1854(f); 15 U.S.C.A. § 6606(e)(4);

42 U.S.C.A. § 233(p)(3)(A)(ii); 42 U.S.C.A. § 247d-6e(d)(2)); "**shall be deemed tolled**" (28

U.S.C.A. § 1332(d)(11)(D)); "**shall be deemed to be tolled**" (12 U.S.C.A. § 3419); "**shall be**

**suspended**" (26 U.S.C.A. § 547(f)(1); 26 U.S.C.A. § 860(h)(1); 26 U.S.C.A. § 982(c)(2); 26

U.S.C.A. § 982(e); 26 U.S.C.A. § 4961(c)(3); 26 U.S.C.A. § 6038A(e)(4)(D); 26 U.S.C.A. §

6330(e)(1); 26 U.S.C.A. § 6331(i)(5); 26 U.S.C.A. § 7507(c)(4); 26 U.S.C.A. § 7609(e); 12

U.S.C.A. § 1977(2); 15 U.S.C.A. § 16(i); 18 U.S.C.A. § 3287(3); 22 U.S.C.A. § 1631k(c); 50

App. U.S.C.A. § 8(c); 50 App. U.S.C.A. § 36(c); 50 App. U.S.C.A. § 570(c)); "**shall be deemed**

**suspended**" (29 U.S.C.A. § 255(d)); "**is suspended**" (38 U.S.C.A. § 1984(b); 10 U.S.C.A. §

843(f); 46 U.S.C.A. § 53911(d)); "**shall suspend**" (18 U.S.C.A. § 3292(a)(1)); "**shall be**

**excluded**" (10 U.S.C.A. § 843(c); 10 U.S.C.A. § 843(d)); "**is extended**" (10 U.S.C.A. § 843(e));

or "**shall be stayed**" (42 U.S.C.A. § 300aa-16(c)).  When there might be a reasonable question

on the tolling issues, and Congress wanted to resolve it in the negative, federal statutes of

limitations also make clear when the period of limitations "**shall not be suspended**" (26

U.S.C.A. § 7611(e)) or "**shall not be suspended, tolled, extended, or enlarged**" (30 U.S.C.A. §

1724(d)).[14]

---

[14]     There are also a number of federal provisions that toll the bringing of a lawsuit while the
plaintiff is legally disabled, such as being underage or mentally incapacitated.  These provisions
expressly state that the period of limitation begins to run only after the plaintiff's disability has
ended by using language such as "**[The disabled plaintiff] shall have [period of] years in
which to bring suit after the removal of their disabilities**" (38 U.S.C.A. § 1984(b); "**not later
than [period of] years after the disability**" (18 U.S.C.A. § 2255(b)); "**[The commencement
date] means…the date on which [the plaintiff loses the legal disability]**" (42 U.S.C.A. §
9658(b)(4)(B)); "**A petition on the claim of a person under legal disability or beyond the
seas at the time the claim accrues may be filed within three years after the disability**

As shown here, Congress has always been explicit about its intent to toll a given statute through its use of clear language to that effect.  No such express and clear tolling language was used in Section 2462, and this Court should not read into the statute language that is not there.

### iii.   Legislative purpose and history of Section 2462

In reviewing a statute, the Court should consider the context in which it originally was enacted.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").  The predecessor statute to Section 2462 was first enacted in 1839 and reads as follows:

---

ceases." (28 U.S.C.A. § 2501); or **"in the event that the person bringing such suit shall have been under legal disability or beyond the seas at the time the right accrued, the suit shall have been brought within three years after the disability shall have ceased or within six years after the right accrued on which suit is brought, whichever period is longer."** (15 U.S.C.A. 714b(c)).

In addition, there are federal provisions that expressly state that the statute of limitations will not start to run against the plaintiff until a certain event occurs, such as discovery of the injury. Under these provisions, Congress has used the language **"shall start to run"** (18 U.S.C.A. § 1964(c)); **"shall not be deemed to have accrued until"** (12 U.S.C.A. § 1782(e)); **"begins to run"** (12 U.S.C.A. § 1787(b)(14)(B); 12 U.S.C.A. § 1821(c)(14)(B); 12 U.S.C.A. § 4617(b)(12)(B); 12 U.S.C.A. § 5390(a)(10)(B)); or **"shall not be subject to the limitations period…until…"** (18 U.S.C.A. § 3282(b)(2)).  Conversely, federal statutes have used clear language to indicate when an event **"shall not stop the running of the statute of limitations"** (42 U.S.C.A. § 247d-6d(e)(4)(A)); when the limitations period **"shall not begin to run"**  (42 U.S.C.A. § 9612(d); 42 U.S.C.A. § 9613(g)); when **"no…statute of limitations shall run, or continue to run,"** (48 U.S.C.A. § 1489); or when a certain period **"shall not be included for the purpose of determining the application of any statute of limitations"** (50 App. U.S.C.A. § 32(d); 50 App. U.S.C.A. § 32(e); 50 App. U.S.C.A. § 34(a)).

Finally, there are federal provisions which expressly state that there is no statute of limitations, or that the action may be brought indefinitely.  These federal statutes include language such as **"No statute of limitations shall extend to any person [under a certain condition]"** (18 U.S.C.A. § 3290); or **"there shall be no limit [or limitation] on the period [for filing]"** (38 U.S.C.A. § 4327(b); 42 U.S.C.A. § 292f(i); 42 U.S.C.A. § 254o(e)).  A related category or subcategory contain language barring a suit or preventing the court from even hearing a suit by saying **"no…proceeding in court…shall be made, begun, or prosecuted until…"** (26 U.S.C.A. § 6672(c)).

24

> Sec. 4.  *And be it further enacted*, That no suit or prosecution shall be maintained, for any penalty or forfeiture, pecuniary or otherwise, accruing under the laws of the United States unless the same suit or prosecution shall be commenced within five years from the time when the penalty or forfeiture accrued; *Provided*, The person of the offender or the property liable for such penalty or forfeiture shall, within the same period, be found within the United States; so that the proper process may be instituted and served against such person or property therefor.

Law of Feb. 28, 1839, Sess. 111, Ch. 36, 5 Stat. 322 § 4 (1839) (the "1839 Act").  This was part of an act passed by Congress on February 28, 1839, and described as "[a]n act in amendment of the acts respecting the Judicial System of the United States."  *Id.*

A court "must interpret a specific provision in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part."  *Bechtel v. Competitive Technologies, Inc.*, 448 F.3d 469, 471 (2d Cir. 2006) (internal citations and quotations omitted).  The entirety of the 1839 Act itself was focused on defendants receiving service of process before a lawsuit could be initiated.  Section 1 of that statute provided courts with the jurisdiction to proceed to decide lawsuits even if all parties had not been properly served, so long as the court proceeded only with respect to *"the parties who may be properly before it"* and did not issue any judgment that would "prejudice other parties" not before the court – such as those who had not been served because they were *"not inhabitants of nor found within the district."*  1839 Act, at § 1 (emphasis added).  Section 3 of that statute then authorized a proceeding to recover penalties or forfeitures "in any court of competent jurisdiction in the State or district where such penalties or forfeitures have accrued, *or in which the offender or offenders may be found*."  *Id.* at § 3 (emphasis added.)

Read in this context, Section 4 of the 1839 Act reinforced what Congress stated in Section 1: there was no jurisdiction to proceed against a particular specific defendant unless the defendant was properly served in the district in which he was "found" and the Court was

adjudicating the rights of "parties who may be properly before it."  Section 4 then made clear that permission to entertain lawsuits for penalties and forfeiture in Section 3 was subject to a five-year statute of limitations which required the defendant to be served in that time. If the "Provided" clause was not included in the 1839 Act, then it could have been read to authorize the lawsuit without there first being service on the offender.  The thrust of the 1839 Act was about requiring service before a lawsuit could go forward, so it made complete sense that the "Provided" clause would have been included *solely* for this reason.

Reading Section 2462 against the backdrop of its predecessor, Section 4 of the 1839 Act, the 1790 Act that created a criminal statute of limitations, and numerous other federal statutes of limitations, it is clear that Congress did not intend to toll the running of the statute of limitations or exclude persons from its operation while they were outside of the United States.  Section 2462 does not say anything about the offender being absent from the United States or about not counting as part of the limitations period any time spent by the offender outside the United States. What Section 2462 deals with is finding or locating the offender within the United States so that service can be made upon him in order that the suit can commence within five years.  Otherwise, "no suit . . . shall be maintained."

Section 4 of the 1839 Act plainly provides that "<u>no</u> suit or prosecution shall be maintained for any penalty or forfeiture . . . <u>unless</u> . . . ."  1839 Act, at § 4 (emphasis added.) The "unless" clause then requires the commencement of the suit "within five years" in order to maintain the action.  The statute goes on to say that a plaintiff can maintain the suit if brought within five years, "<u>provided</u>" that "within the same [five-year] period," the offender can "be found within the United States" "so that the proper process may be instituted and served." Simply stated, the government cannot bring suit and the Court cannot allow the suit to be

maintained unless the suit is filed within five years and the alleged offender "within the same
[five-year] period" can be found and served "so that proper process may be instituted."  Stated
another way, the government can only maintain a suit if it files within five years after the action
arises, and is able to serve the adverse party within that time.  The purpose of the "Provided"
clause was to ensure that a suit or prosecution could not be "commenced" and "maintained"
without proper service on the defendant, which at that time in our history could only be done in
person in the United States.

    Section 2462 is constructed in the same way as Section 4 of the 1839 Act, with some
minor language updates.  It states that a suit for "civil fine, penalty or forfeiture" "shall <u>not</u> be
entertained <u>unless</u>" "commenced within five years" "if, within the same period" the alleged
offender "is found within the United States in order that proper service may be made."  28 U.S.C.
§ 2462 (2015) (emphasis added).  Again, the suit must be filed within five years, and service on
the defendant or defendants must be made "within the same period."

    The critical language here in Section 2462 is the clause stating:  "if, within the same
period, the offender or the property is found within the United States in order that proper service
may be made thereon."  28 U.S.C. § 2462 (2015) (emphasis added.)  The "same period" is the
"five years" referred to in the preceding "unless commenced within five years" clause.  Thus, the
critical language being interpreted only deals with the five-year period after "the claim first
accrued."  By its plain language, the statute does not go beyond the five-year period.  Thus, to
argue that the clause tolls the running of the statute if the case is not brought in five years is
totally inconsistent with the language "within the same period."  There is nothing in Section
2462 that states that if the offender is found and served after five years, a court can allow a suit
to be entertained.  The SEC has misinterpreted this clause and persuaded this Court at the motion

to dismiss stage that the language means the statute is tolled indefinitely if the offender or property is not found within the United States.  This interpretation ignores the plain language of "within the same period" and creates a tolling provision where Congress did not expressly create one. Moreover, this clause looks nothing like any of the tolling provisions that Congress has enacted as part of the U.S. Code.  Simply put, if the offender is not found within the United States in the five year period, the "unless" clause is not operative and the suit cannot be maintained.

For all of these reasons, Section 2462 should be interpreted as imposing a five-year statute of limitations running from the date of first accrual.  As there is no dispute that the SEC chose to initiate this action more than six years after the claims first accrued, summary judgment should be granted in favor of the Defendants

**B.     The Statute of Limitations Has Run Against Mr. Straub and Mr. Morvai Even Under the Court's Previous Ruling Because They Were Present in the U.S.  After the SEC's Claim Had First Accrued.**

Summary judgment is separately appropriate even under the Court's previous interpretation of Section 2462 because Messrs. Straub and Morvai were physically present in the U.S. after the SEC's claim first accrued.  The Court's ruling on the motion to dismiss was based on the assumption that "Defendants were not physically located within the United States during the limitations period."  *Straub,* 921 F. Supp. 2d at 259-60.  The Court added:  "Thus, according to the SEC, because Defendants were not 'found' in this country <u>at any point</u> during the limitations period in question, the Court's inquiry should end.  The Court agrees."  *Id.* (emphasis added.)  It is now clear that this conclusion, made in the context of a motion to dismiss, is not supported by the evidence; indeed, the evidence contradicts it.[15]

---

[15]     The Second Circuit's rule at the time was that Section 2462 did not begin to run until the SEC discovered the alleged misconduct, which in this case was in 2006.  The Supreme Court

The undisputed summary judgment evidence is that: (i) the SEC's claims "first accrued" no later than June 2005; (ii) Elek Straub and Tamas Morvai were thereafter "physically present" in the U.S. (as Mr. Straub visited New York and Boston during the week of September 6, 2005, and Mr. Morvai traveled to San Francisco in June 2005 and stayed in the U.S for approximately one month and traveled to New York in October 2005 and stayed in the U.S. for three to four days); and (iii) more than five years passed between June 2005 and December 29, 2011, when the SEC finally commenced this action.  Under these circumstances, there is no genuine issue of material fact, and the statute of limitations had run before the SEC filed its complaint.[16] Therefore, at a minimum, summary judgment must be granted in favor of Messrs. Straub and Morvai.

Citing the plain language of the statute, the Supreme Court has made clear that the statute of limitations begins to run under Section 2462 when the claim "first accrues," not when the claim is discovered or when it last accrues.  *Gabelli*, 133 S. Ct. at 1221.  "In common parlance a right accrues when it comes into existence . . . ."  *Id.* at 1220 (internal citations omitted).  "The 'standard rule' is that a claim accrues when the plaintiff has a complete and present cause of action."  *Id.* (internal citations omitted).  In *Gabelli*, the Supreme Court declined to "graft a discovery rule onto the statute of limitations of § 2462" given the "lack of textual, historical or equitable reasons" to do so.  *Id.* at 1224.  In similar contexts, when Congress is clear about when the statute of limitations begins to run, the Second Circuit has rejected policy-based arguments that seek to delay the running of those statutes of limitations.  *See, e.g.*, *Asarco LLC v. Goodwin*,

---

reversed the Second Circuit rule in *Gabelli*, and established the "when the claim first accrued" rule, which in this case was June 2005.

[16]    This Court has already held that "[i]t is undisputed that more than five years have elapsed since the SEC's claims first accrued."  *See Straub*, 921 F. Supp. 2d at 260.

756 F.3d 191, 202 (2d Cir. 2014).   As alleged by the SEC, its claims "first accrued" no later than

June 2005.  A party violates the FCPA where it:

> make[s] use of the mails or any means or instrumentality of interstate commerce
> corruptly in furtherance of an offer, payment, promise to pay, or authorization of
> the payment of any money, or offer, gift, promise to give, or authorization of the
> giving of anything of value to . . . any person, while knowing that all or a portion
> of such money . . . will be offered, given, or promised, directly or indirectly, to
> any foreign official . . . for purposes of … influencing any act or decision of such
> foreign official . . . in his  . . . official capacity . . ., inducing such foreign
> official . . . to do or omit to do any act in violation of the lawful duty of such
> foreign official . . . .

15 U.S.C. § 78dd-1(a).  The essential elements of a violation of § 78dd–1(a)(1) are:

> (1) An issuer (i.e. one who issues or proposes to issue any security), or any officer,
> employee, director or agent of such issuer acting on behalf of the issuer;
>
> (2) which is required to file reports under § 78*o*(d) or has a class of securities
> registered pursuant to § 78*l*;
>
> (3) makes use of the mails or any means or instrumentality of interstate commerce;
>
> (4) corruptly;
>
> (5) in furtherance of an offer, payment, promise to pay, authorization of the
> payment, promise to give, or the authorization of the giving of anything of value
> to
>
> (6) any foreign official (as defined in § 78dd–1(f)(1));
>
> (7) for the purpose of (a) influencing any act or decision of such foreign official in
> [her] official capacity, or (b) inducing such foreign official to do or omit to do any
> act in violation of the lawful duty of such official.

*See United States v. Lockheed Corp.*, No. CR.A. 194CR226MHS., 1995 WL 17064259, *

5 (N.D. Ga., Jan. 9, 1995).

Even as alleged in the Complaint, the SEC could allege such violations by June 2005.

The Complaint alleges that:

- Messrs. Straub, Balogh, and Morvai devised, and beginning *around January 2005*,
  executed a scheme to bribe government officials from both political parties in

30

Macedonia's coalition government to defeat or mitigate the effects of the new law. Second Am. Compl. (Dkt. No. 213) at ¶ 18.

- Magyar Telekom's Macedonian subsidiaries retained an intermediary to facilitate negotiations with Macedonian government officials and those negotiations took place between *late December 2004 and May 2005*, resulting in a secret agreement entitled the Protocol of Cooperation. Under the Protocol of Cooperation, the officials would receive bribe payments from Magyar Telekom. *Id*. at ¶ 19.

- *By May 27, 2005*, the Protocol of Cooperation was signed by a senior Macedonian official and authorized by Messrs. Straub and Balogh. *Id*. at ¶ 20.

- The support of the minority coalition party was a necessary condition to implementing the objectives of the Protocol of Cooperation. Messrs. Straub, Balogh and Morvai understood, and confirmed in writing *on or about May 31, 2005*, that officials within the minority political party would "torpedo [or 'wreck'] the agreement within 2 months if we don't pay" bribes to those officials. *Id*. at ¶ 24.

- In an untitled document prepared by Balogh *on or about June 1, 2005*, Balogh proposed to "structure" the corrupt payments intended for the government officials from the respective political parties in the form of "success fee based" contracts. *Id*. at ¶ 28.

Every element of every claim alleged by the SEC was alleged to have occurred no later than June 2005. The Complaint relies on claims that Defendants (i) violated the anti-bribery statute (by executing a scheme to bribe foreign officials in early 2005), (ii) aided and abetted Magyar Telekom's violation of the anti-bribery statute (through the same activity), and (iii) aided and abetted Magyar Telekom's failure to maintain adequate books and records (by authorizing a Protocol of Cooperation not reflected in Magyar Telekom's books and records on May 27, 2005). Because the SEC could allege "a complete and present cause of action" by June 2005, the SEC's claims "first accrued" prior to Mr. Straub's visit to the U.S. in September 2005 and Mr. Morvai's visits to the U.S. in June and July 2005 and October 2005.

The other necessary elements of a statute of limitations defense are not subject to dispute. Mr. Straub's declaration and passport confirm that Mr. Straub traveled to the U.S. on September

6, 2005 and was in the country for several days after that.  *See* Straub Decl. at ¶¶ 1-2, Ex. A.  Mr. Morvai's and his wife's declarations and passports confirm that Mr. Morvai visited the U.S. twice after the SEC's claims first accrued—he flew into San Francisco, California, with his wife on June 23, 2005 and stayed in the U.S. for approximately one month, and then separately flew to New York on October 21, 2005 on his way to meet friends in Connecticut.  *See* Morvai Decl. at ¶¶ 3-5, Exhibit A; Cseh Decl. ¶¶ at 3-5, Ex. A.  Under the language of Section 2462, and the Court's previous ruling on the meaning of that statute, Mr. Straub and Mr. Morvai therefore were "found in the United States" after the SEC's claim first accrued.  But the SEC did not file a complaint until December 29, 2011.  *See* Complaint (Dkt. No. 1).  More than five years passed from June 2005 to December 29, 2011, and the SEC's claims therefore are time-barred.[17]

Because there is no genuine issue of material fact with respect to any element of the statute of limitations defense, summary judgment should be granted, at a minimum, in favor of Mr. Straub and Mr. Morvai.  They were in the U.S. within the five-year period following when the claims against them first accrued, and they could be served at that time in person or at any other time in the relevant five-year period under the Hague Convention.

**C.**    <u>**Section 2462 Requires Dismissal of All Claims for Relief in this Case**</u>

While conceding that Section 2462 applies to its claim for civil fines and penalties, the SEC previously argued that its claims for a permanent injunction and disgorgement were not subject to Section 2462 because they were not civil fines or penalties.  That argument ignores well-reasoned cases concluding that courts have to examine the facts and circumstances of each case to determine whether remedies such as disgorgement and injunctive relief are an attempt to

---

[17]    Even accepting the SEC's apparent argument that the five-year statute of limitations was tolled until, at a minimum, their claims had accrued *and* the Defendants were in the U.S., the SEC's claims would have been time-barred no later than September 2010 – five years after Messrs. Straub and Morvai were in the country.

punish and not an attempt to return the parties to any *status quo*. *See, e.g.*, *S.E.C. v. Bartek*, 484

Fed. Appx. 949, 2012 WL 3205446, \*6 (5th Cir. Aug. 7, 2012) (holding that a permanent

injunction was a penalty and not remedial where it would have "a stigmatizing effect and long-

lasting repercussions" and it would not "address the prevention of future harm in light of the

minimal likelihood of similar conduct in the future").  As one federal district court described it

last year,

> the injunctive relief sought by the SEC in this case forever barring defendants
> from future violations of the federal securities laws can be regarded as nothing
> short of a penalty "intended to punish," especially where, as here, no evidence (or
> allegations) of any continuing harm or wrongdoing has been presented. Finally,
> the disgorgement of all ill-gotten gains realized from the alleged violations of the
> securities laws— *i.e.,* requiring defendants to relinquish money and property—
> can truly be regarded as nothing other than a forfeiture (both pecuniary and
> otherwise), which remedy is expressly covered by § 2462. To hold otherwise
> would be to open the door to Government plaintiffs' ingenuity in creating new
> terms for the precise forms of relief expressly covered by the statute in order to
> avoid its application.

*S.E.C. v. Graham*, 21 F. Supp. 3d 1300, 1311-12 (S.D. Fla. 2014); *see also Riordan v. S.E.C.*,

627 F.3d 1230, 1234 (D.C. Cir. 2010) (observing in dicta that "[i]t could be argued that

disgorgement is a kind of forfeiture covered by § 2462, at least where the sanctioned party is

disgorging profits not to make the wronged party whole, but to fill the Federal Government's

coffers").

Mr. Straub retired from his position as the Chief Executive Officer of Magyar Telekom

on December 5, 2006 and has not served since that time in any capacity for a company that was

an issuer under the Securities and Exchange Act of 1934.  *See* Straub Decl. at ¶ 3.  Similarly, Mr.

Morvai left Magyar Telekom on July 10, 2006 and has not worked for any company that trades

securities on any U.S. exchanges since that time.  Morvai Decl. at ¶ 7.  Moreover, there is no

evidence that any of the Defendants received any ill-gotten gain from Magyar Telekom's

dealings with Macedonia.  *See, e.g.*, *United States v. Jones*, 476 F. Supp. 2d 374, 386 (S.D.N.Y.

2007) (granting summary judgment on a disgorgement claim because the SEC could not set forth

evidence that the defendants personally profited on the project and attempted to rely on

testimony that the compensation "might have been affected" by allegedly improper conduct).

Under these circumstances, and consistent with the ruling of *S.E.C. v. Graham*, the SEC's claims

for injunctive relief and for disgorgement here represent nothing more than an attempt to punish

the Defendants, to put a stain on their reputations, and to circumvent the restrictions placed on

the government by Section 2462.[18]

     For all of these reasons, summary judgment should be granted to the Defendants on

statute of limitations grounds.

---

[18]     The Court can take judicial notice, for the purpose of this motion, of two SEC and DOJ
enforcement actions as further evidence that the disgorgement claims are intended to punish
Defendants and not intended to return the parties to a *status quo*.  In a consent judgment filed
before the Honorable Colleen McMahon, the SEC has already collected disgorgement of
$25,249,772 from Magyar Telekom.  *S.E.C. v. Magyar Telekom, PLC*, Civil Action No. 11-9646
(S.D.N.Y. 2011).  At the same time, the Justice Department collected $59.9 million in penalties
from Magyar Telekom in connection with a deferred prosecution agreement.  *United States v.
Magyar Telekom, Plc.*, Criminal Action No. 11-597 (E.D. Va. 2011).  In that case, the Justice
Department represented to a federal judge that the pecuniary gain to Magyar Telekom from the
alleged events at issue was $9,067,244.  The United States has therefore received
"disgorgement" several times over what it has alleged to be the ill-gotten profit to Magyar
Telekom.

## CONCLUSION

For the reasons set forth herein, the Defendants respectfully request that the Court issue an order granting their summary judgment motion and granting any such further relief to which the Court concludes they are entitled.

Dated:  October 5, 2015                    Respectfully submitted,
        New York, New York

                                      /s/ Robert Buehler
                                      Robert B. Buehler
                                      Lisa J. Fried
                                      **Hogan Lovells US LLP**
                                      875 Third Avenue
                                      New York, NY 10022
                                      (212) 918-3000
                                      robert.buehler@hoganlovells.com
                                      lisa.fried@hoganlovells.com

                                      /s/ Carl S. Rauh
                                      Carl S. Rauh
                                      **Hogan Lovells US LLP**
                                      Columbia Square
                                      555 Thirteenth Street, NW
                                      Washington, DC 20004
                                      (202) 637-5600
                                      carl.rauh@hoganlovells.com

                                      *Counsel for Elek Straub*

                                      /s/ William M. Sullivan, Jr.
                                      William M. Sullivan, Jr.
                                      Thomas C. Hill
                                      **Pillsbury Winthrop Shaw Pitman LLP**
                                      2300 N Street, NW
                                      Washington, DC 20037-1122
                                      (202) 663-8027
                                      william.sullivan@pillsburylaw.com
                                      thomas.hill@pillsburylaw.com

*Counsel for András Balogh*
/s/ Michael L. Koenig
Michael L. Koenig
Victoria P. Lane
**Hinckley, Allen & Snyder LLP**
30 South Pearl Street, Suite 901
Albany, NY 12207
(518) 396-3100
mkoenig@haslaw.com
vlane@haslaw.com

*Counsel for Tamás Morvai*

**CERTIFICATE OF SERVICE**

I, Lisa J. Fried, an attorney, hereby certify that on October 5, 2015, Defendants'

Memorandum of Law in Support of Defendants' Motion for Summary Judgment was served on

all parties via the Court's electronic filing system.

/s/ Lisa J. Fried
Lisa J. Fried