# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ELEK STRAUB,**<br>**ANDRÁS BALOGH, and**<br>**TAMÁS MORVAI,**<br><br>**Defendants.** | **No. 11-Civ-9645 (RJS)** |

## PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO THE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Robert I. Dodge
Thomas A. Bednar
John D. Worland, Jr.
Adam J. Eisner
U.S. Securities & Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-5985

(202) 551-4421 (Dodge)
DodgeR@sec.gov
Attorneys for Plaintiff

Dated:  November 6, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

STATEMENT OF FACTS ........................................................................................................3

ARGUMENT ...........................................................................................................................5

I.   DEFENDANTS FAIL TO SHOW THAT THE COURT SHOULD
SURRENDER ITS JURISDICTION OVER THEM .....................................................5

     A.  The Legal Standard for Personal Jurisdiction ..........................................................5

     B.  There Is No Dispute that Defendants Have Met the Minimum
Contacts   Threshold ...............................................................................................6

     C.  There Is Nothing Unreasonable About Litigating this Action in New York ..........6

          1.  Defendants' Argument on the Fourth *Metro Life* Factor Makes
No Sense ......................................................................................................8

          2.  Defendants' "Discovery" Burden Was Shared Equally by the
SEC, and Their "Trial" Burden Arguments Could Be Made in
any Case Involving Foreign Defendants ......................................................9

II.  DEFENDANTS FAIL TO SHOW THAT THEY DID NOT USE AN
INSTRUMENTALITY OF INTERSTATE COMMERCE ...............................................13

     A.  The Email Messages Are a Sufficient Basis for Finding the Use of an
Instrumentality of Interstate Commerce .................................................................13

     B.  Defendants Also Used an Instrumentality of Interstate Commerce
by Submitting False Certifications in Connection with Magyar
Telekom's Electronic SEC Filings.........................................................................18

III. DEFENDANTS FAIL TO ESTABLISH THAT THE STATUTE OF
LIMITATIONS HAS RUN AGAINST THE SEC'S CLAIMS .......................................19

     A.  Defendants' Interpretation of Section 2462 Is Wrong ...........................................19

          1.  The Court Correctly Held that 28 U.S.C. § 2462 Requires
Defendants to be Found Within the United States for the
Limitations Period to Run.........................................................................19

a.   The History of Section 2462 Shows that Congress Intended to Require a Defendant's Physical Presence.............20

b.   It is Not Unusual for Limitations Periods to Have Exceptions for Absent Defendants...........................................23

c.   There is No Legal Support for Defendants' Interpretation of Section 2462 .................................................23

2.   Section 2462 Is Not a Long-Arm Statute...................................................24

B.   The Limitations Period of Section 2462 Runs Only When a Defendant Is Found Within the United States, and Does Not Continue to Run When a Defendant Leaves the Country.....................................27

1.   Straub and Morvai Cannot Evade Liability by Spending a Few Days in the United States ...................................................28

2.   Straub and Morvai's Trips to the United States Occurred While their Scheme Was Ongoing and the Limitations Period Had Not Begun to Run .................................................29

C.   There is No Statute of Limitations on the SEC's Claims for Equitable Relief .............................................................................31

CONCLUSION........................................................................................................33

# TABLE OF AUTHORITIES

## FEDERAL CASES

*3M Co. (Minn. Min. & Mfg.) v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994) .................21, 22

*Adams v. Woods*, 6 U.S. 336 (1805) ................................................................22

*Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102 (1987) .............8

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985).......................................8

*Chevron Corp. v. Donzinger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014).........................13, 17

*CityFed Financial Corp. v. Office of Thrift Supervision*, 919 F. Supp. 1
    (D.D.C. 1994) .......................................................................30

*Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482 (9th Cir. 1993) ................................11

*Franklin Savings Bank of N.Y. v. Levy*, 551 F.2d 521 (2d Cir. 1977)................................17

*Gabelli v. SEC*, 133 S.Ct. 1216 (2013) ..................................................26, 27, 30

*Hallwood Realty Partners, L.P. v. Gotham Partners L.P.*, 104 F. Supp. 2d
    279 (S.D.N.Y. 2000) ................................................................1, 2, 3

*Howgate v. United States*, 7 App. D.C. 217 (D.C. Cir. 1895) ........................................7, 8

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)...........................................6

*McGlinchy v. United States*, 16 F. Cas. 118 (C.C.Me. 1875) ......................................23, 24

*Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996) ..............6, 7, 8

*Riordan v. SEC*, 627 F.3d 1230 (D.C. Cir. 2010) ..............................................31

*SEC v. Amerindo Inv. Advisors, Inc.*, Case No. 05-CV-5231 (RJS),
    2014 WL 405339 (S.D.N.Y. Feb. 3, 2014)................................................30

*SEC v. Bartek*, 484 Fed. App. 949 (5th Cir. 2012) ...........................................31

*SEC v. Compania Internacional Financiera S.A.*, No. 11 Civ. 4904(DLC),
    2011 WL 3251813 (S.D.N.Y. July 29, 2011) ............................................8

*SEC v. Dunn*, 587 F. Supp. 2d 486 (S.D.N.Y. 2008)......................................8

iii

*SEC v. Fujinanga*, No. 13-CV-1658 (JCM), 2014 WL 4977334
(D. Nev. Oct. 3, 2014) ................................................................................ 31

*SEC v. Graham*, 21 F. Supp. 3d 1300 (S.D. Fl. 2014) ...................................................... 31

*SEC v. Kelly*, 663 F. Supp. 2d 276 (S.D.N.Y. 2009) ........................................................ 31

*SEC v. LeCroy*, 09-Civ-2238, 2014 WL 4403147 (N.D. Ala. Sept. 5, 2014) ................... 31

*SEC v. Softpoint Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997) ................................................ 17

*SEC v. Softpoint, Inc.*, No. 95 Civ. 2951 (GEL), 2001 WL 43611
(S.D.N.Y. Jan. 18, 2001) ...................................................................... *passim*

*SEC v. Spencer Pharmaceutical Inc.*, 57 F. Supp. 3d. 127 (D. Mass. 2014) ...................... 8

*SEC v. Stoecklien*, 15-Civ-0532, 2015 WL 6455602 (S.D. Cal. Oct. 26, 2015) .............. 31

*SEC v. Straub*, 921 F.Supp.2d 244 (S.D.N.Y. 2013) ................................................ *passim*

*SEC v. Straub,* 2013 WL 4399042 (S.D.N.Y. Aug. 5, 2013) ........................................... 31

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) .......................................................... 5

*SEC v. Vuono*, No. 13-MC-405, 2013 WL 6837568 (E.D.N.Y. Dec. 26, 2013) .............. 31

*SEC v. Wyly*, 56 F. Supp. 3d 394 (S.D.N.Y. 2014) ...................................................... 31, 32

*Stimpson v. Pond*, 23 F. Cas. 101 (D. Mass. 1855) .................................................... 22, 23

*United States v. Banks*, 115 F.3d 916 (11th Cir. 1997) .................................................... 31

*United States v. Cashin*, 281 F.2d 669 (2d Cir. 1960) ...................................................... 17

*United States v. Cook*, 84 U.S. 168 (1872) ....................................................................... 22

*United States v. Kay*, 513 F.3d 432 (5th Cir. 2007) ............................................... 13, 16, 17

*United States v. MacKay*, 491 F.2d 616 (10th Cir. 1973) ........................................... 14, 17

*United States v. Maillard*, 26 F. Cas. 1140 (S.D.N.Y. 1871) ..................................... 22, 23

*United States v. Platt*, 27 F. Cas. 546 (1840) .................................................................. 22

*United States v. Rutherford Oil Corp.*, 756 F. Supp. 2d 782
(S.D. Tex. 2010) ................................................................................. 24, 28, 30

iv

*United States v. Yip*, 248 F. Supp. 2d 970 (D. Haw. 2003) ...............................................29

*United States v. Westvaco Corp.*, 144 F. Supp. 2d 439 (2001)...................................29, 30

## FEDERAL STATUTES

10 U.S.C. § 843......................................................................................................23

15 U.S.C. § 78aa .....................................................................................................5

15 U.S.C. § 78dd-1 .................................................................................................14

18 U.S.C. 3282 .......................................................................................................23

18 U.S.C. 3290........................................................................................................23, 25

26 U.S.C. 6531........................................................................................................23, 25, 29

28 U.S.C. § 791 (1040 ed.) .....................................................................................21

28 U.S.C. §§ 2415 ..................................................................................................23, 26

28 U.S.C. § 2416.....................................................................................................23, 25, 26

28 U.S.C. 2462........................................................................................................*passim*

Act of Feb. 28, 1839, Ch. 36, § 4, 5 Stat. 322........................................................21, 22

FED. R. CIV. P. 26....................................................................................................4

FED. R. CIV. P. 30....................................................................................................3, 4, 5

FED. R. CIV. P. 56(a) ...............................................................................................1

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, plaintiff the United States Securities and Exchange Commission ("SEC") submits this opposition to Elek Straub, Andras Balogh, and Tamas Morvai's (collectively, "defendants'") motion for summary judgment.

All parties agree that there are no genuine issues of fact that would preclude the Court from entering summary judgment on three issues:  (1) personal jurisdiction; (2) defendants' use of an instrumentality of interstate commerce; and (3) the statute of limitations.  Defendants move for judgment on all three issues, and their motion should be denied as to all three.

First, with respect to personal jurisdiction, defendants' motion does not even attempt to argue that they lack sufficient minimum contacts with the United States.  Instead, they contend only that it would be "unreasonable" for them to litigate in this forum.  However, in an action brought by the federal government to enforce its laws, defendants must clear an exceptionally high bar.  The unreasonableness "prong of the inquiry rarely defeats jurisdiction . . . and is largely academic in non-diversity cases brought under a federal law that provides for nationwide service of process."  *SEC v. Softpoint, Inc.*, No. 95 Civ. 2951 (GEL), 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001).  Because there is no alternative forum in which the SEC could enforce the U.S. securities laws, the ruling defendants seek would effectively immunize them from the consequences of their actions.

Moreover, defendants fail to show that litigating this case in New York would be constitutionally unreasonable.  Defendants are not lacking in resources.  They are successful corporate executives, represented in this action by prominent global law firms.  The expense of that representation is being borne, not by defendants themselves, but by Magyar Telekom's CDO insurer.  In any FCPA action, taking international discovery is never simple or easy.  But whatever challenges defendants' well-funded and sophisticated legal counsel faced in this case

were shared equally by the SEC.  Nor has any defendant made a showing – or even expressly averred – that he is unable to attend the trial in New York.

Second, defendants' argument with respect to interstate commerce fails because it ignores one of the two factual bases by which the SEC satisfies this jurisdictional element.  In its pre-motion letter (*Dkt 210*), the SEC advised the Court and the defense that defendants made use of interstate commerce when they made false certifications and sub-certifications in connection with Magyar Telekom's SEC filings, all of which were submitted to the agency electronically. The defense motion does not even address the sufficiency of those certifications.

With respect to the second factual basis, the sending of email messages to "hotmail.com" addresses via servers located in the United States, defendants ignore the applicable legal standard.  Citing no authority, defendants assume that each defendant must personally transmit such a message and that each message must contain an explicit promise or payment of a bribe. This is not the law.  For purposes of this jurisdictional element, it is sufficient that the "hotmail" email messages were incident to the bribe scheme, that electronic communication was a component of the scheme, and that each defendant took steps to advance the scheme.

Finally, defendants make two alternative arguments on statute of limitations, both of which the Court should reject.  First, defying this Court's prior interpretation of the statute, defendants attempt to re-write 28 U.S.C. § 2462.  Instead of the statutory text as written – ". . . an action . . . shall not be entertained unless commenced within five years . . . *if*, within the same period, the offender . . . is found within the United States . . ." (emphasis added) – defendants propose to delete the word "if" and substitute "and."  By this alchemy, defendants would transform Section 2462 from a statute of limitations into something else entirely:  a statute that would strip the courts of long-arm jurisdiction over any defendant located outside the United

States.  Defendants contend that Section 2462 applies "a strict five-year rule" under which "if a suit is not commenced within five years . . . and the defendants are not found within the United States during the five year period so that proper service may be made, the statute of limitations has run." *Defense Memo at 17*.  In the 175 years since its original enactment, Section 2462 has never been construed in such an illogical manner.

Second, defendants contend that, even if (as this Court previously held) the five year statute does not run against parties outside the United States, the entire period nonetheless expired as to Straub and Morvai because they each briefly visited here in late 2005.  This argument fails because under any coherent reading of the statute, the limitations period could only have run against defendants while they were actually present here.  The clock would not have continued running after they returned to Hungary.  Moreover, the defense argument presumes that the SEC's claims accrued before the fall of 2005.  However, there is a genuine factual dispute on this point because the SEC has record evidence that proves its claims accrued no earlier than mid-2006.  Defendants' earlier visits to the United States are therefore irrelevant.

## STATEMENT OF FACTS

Long before the SEC ever sued these defendants, Magyar Telekom provided Straub, Balogh, and Morvai with sophisticated legal counsel, paid for by the company's CDO insurer. Counsel of record include three law firms with national reputations and offices spanning the globe.  With the benefit of this top-drawer representation, defendants have conducted effective international discovery and doggedly pursued their theories of the case.

Fact discovery included depositions under Fed. R. Civ. P. 30 and Hague Convention testimony in London, Budapest, Skopje, Linz am Rhein (Germany), New York, Philadelphia,

and Washington, DC.  At every session, each defendant was represented by counsel.  Typically, two or even more defense attorneys appeared for each defendant.

The SEC focused most of its non-party fact discovery efforts on taking depositions under Rule 30 of witnesses who either agreed to testify voluntarily or were subject to subpoena.  This included seven witnesses in four countries (excluding experts and defendants).  Defense counsel could have done the same, but chose instead to focus their discovery efforts on the Hague Convention.  Defendants took only one fact witness deposition under Rule 30, and chose not to depose many of the U.S.-based witnesses identified in the SEC's Rule 26 initial disclosure.

The parties submitted joint requests for judicial assistance under the Hague Convention to authorities in Germany, Greece, Hungary, and Macedonia.  *Dodge Decl. ¶ 8.* The requests sought the testimony of 31 witnesses (six in Germany, three in Greece, fourteen in Hungary, and eight in Macedonia).  *Id., at ¶9.*  Ultimately, substantive Hague Convention testimony was obtained from eleven witnesses.[1]  *Id., at ¶10.*  Of the remaining twenty, one agreed to testify outside the Hague process; five invoked their right not to testify to avoid incriminating themselves; three were unavailable to testify because they were ill or no longer in the jurisdiction; and one was deceased.  *Id., at ¶11.*  Testimony was not obtained from four witnesses[2] in Germany because the authorities there determined that the Hague Convention did not apply to an action brought by a government agency.  *Id., at ¶12.*  And testimony was not

---

[1]    Ten of these witnesses (Baranyai, Danko, Galig, Gunther, Halasi, Hausmann, Micsko, Szluha, Vaczlavik, and Winkler) were sought by the defense and one (Szendrei) was sought by the SEC.  *Id., at ¶10.*

[2]    Of the four witnesses in Germany, one (Hartmann) was sought by the SEC and three (Hauptmann, Hermann, and Plath) were sought by the defense.  *Id., at ¶12.*

obtained from six witnesses[3] in Macedonia because the Macedonian authorities never responded to the Hague Request, and none of the parties chose to initiate proceedings in the Macedonian courts to compel a response. *Id., at ¶13*.

In the end, no party was able to secure all the witness testimony it wanted.  There is nothing unusual in this.  Multinational litigation by its nature presents challenges in many different types of cases.  But here the tools for taking witness testimony – Rule 30 and the Hague Convention, primary among them – were equally available to all sides.  Using these tools, defendants and their able, well-financed counsel succeeded in collecting a substantial volume of discovery.

## ARGUMENT

### I.    DEFENDANTS FAIL TO SHOW THAT THE COURT SHOULD SURRENDER ITS JURISDICTION OVER THEM

All parties have moved for summary judgment on personal jurisdiction.  The SEC hopes to streamline the case for trial by having the Court decide the issue as a matter of law, based on the undisputed facts.  Defendants apparently hope to win the whole case on this issue.  Taken together, the two sets of motion papers establish that personal jurisdiction is ripe for summary disposition.  They also show that the Court has jurisdiction over defendants.

#### A.    The Legal Standard for Personal Jurisdiction

The SEC presented the legal framework for personal jurisdiction in its original moving papers.  *SEC Memorandum (Dkt.230) at 17-22*.  Defendants do not quarrel with the standards. Instead, they simply ignore the most compelling factor that controls this case – the fact that this litigation arises under the federal securities laws, with a federal jurisdictional statute.

---

[3]    Of the six witnesses in Macedonia, two (Firfov and Joveski) were sought by the SEC and four (Buzlevski, Crvenkovski, Davitovski, and Pejkovski) were sought by the defense.  *Id., at ¶13*.

Section 27 of the Exchange Act, 15 U.S.C. § 78aa, "permits the exercise of personal jurisdiction to the limit of the due process clause of the Fifth Amendment." *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (*citing Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 998 (2d Cir. 1975)). "The due process test for personal jurisdiction has two related components:  the 'minimum contacts inquiry' and the 'reasonableness' inquiry. The court must first determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).  "If such contacts are found, the court may assert personal jurisdiction so long as 'it is reasonable [to do so] under the circumstances of the particular case.'" *SEC v. Softpoint, Inc.*, No. 95 Civ. 2951 (GEL), 2001 WL 43611, at *2 (S.D.N.Y. Jan. 18, 2001) (*quoting Metro. Life Ins. Co.*, 84 F.3d at 567).  The issues for summary judgment are thus (1) minimum contacts and (2) the reasonableness of litigating this action in this forum.

> **B.**      **There Is No Dispute that Defendants Have Met the Minimum Contacts Threshold**

Defendants do not contest the existence of minimum contacts.  Their memorandum has a footnote indicating that they will not concede the issue for purposes of the SEC's summary judgment motion.  But for their motion they rely solely on the purported unreasonableness of litigating this action in this forum.

> **C.**      **There Is Nothing Unreasonable About Litigating this Action in New York**

Defendants and the SEC agree that with minimum contacts having been conceded, the exercise of personal jurisdiction must only comport with the standards of "fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945).  As articulated in this Circuit, the factors usually to be considered are:  "(1) the burden that the exercise of

jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the

case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate

judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the

shared interest of the states in furthering substantive social policies." *Metro. Life Ins. Co.*, 84

F.3d at 568.

      The five-factor test of *Metro Life* includes three that relate to jurisdictional issues arising

between U.S. states.  When the litigation involves a federal jurisdictional statute and a

recognized federal interest, as this case does, those three "state" factors blend into the federal

interest in pursuing the case in the most efficient manner.  As one court explained:

> [T]he interest of the federal government is not cabined by the need for the
> exercise of personal jurisdiction by state courts to respect the sovereignty and
> legitimate interests of other states. Moreover, the obligation of a citizen served
> with federal process to the issuing authority, the United States of America, is
> qualitatively different than that of a person served with process issued under the
> authority of a state of which that person is not a citizen or resident.  Hence, the
> balance between individual and governmental concerns necessarily differs in this
> context.
>
> Nationwide service provisions often are central to major federal regulatory efforts
> in areas at the core of Congress' power under the Commerce Clause, including
> antitrust and securities regulation.  In cases brought under these and comparable
> statutes, the personal jurisdiction analysis must give appropriate consideration to
> the strong federal concerns involved.

*Hallwood Realty Partners, L.P. v. Gotham Partners L.P.*, 104 F. Supp. 2d 279, 285-86 (S.D.N.Y.

2000).

      This does not mean that "reasonableness" is never an issue in a case under the federal

securities laws.  "There doubtless will be defendants who show sufficient hardship from being

subjected to the jurisdiction of a geographically remote court to overcome even a strong federal

interest." *Id*. at 287.   But the burden issue is the only real factor that a prospective defendant

can invoke, and that burden must be measured against the strong federal interest in enforcing

U.S. laws.  "In the last analysis, the question is whether the burden on [defendants] of litigating

this case in New York is so severe that the exercise of personal jurisdiction over [them] is

arbitrary, shocks the conscience, or offends fundamental principles of ordered liberty,

notwithstanding the strong federal interest in efficient and effective enforcement of the securities

laws."  *Id.* at 286-87.

Other SEC cases against foreign defendants follow the same approach.  "The burden is

on the defendant to demonstrate that the assertion of jurisdiction in the forum will 'make

litigation so gravely difficult and inconvenient that [he] unfairly is at a severe disadvantage in

comparison to his opponent.'"  *Softpoint*, 2001 WL 43611, at *5 (*quoting Burger King Corp. v.

Rudzewicz,* 471 U.S. 462, 478 (1985)).  "This prong of the inquiry rarely defeats jurisdiction

where a defendant has sufficient forum contacts . . . and is largely academic in non-diversity

cases brought under a federal law that provides for nationwide service of process."  *Softpoint*,

2001 WL 43611, at *5 (*citing Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*, 480

U.S. 102, 116 (1987)).  *Accord SEC v. Spencer Pharmaceutical Inc.*, 57 F. Supp. 3d 127, 137

(D. Mass. 2014); *SEC v. Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *5

(S.D.N.Y. July 29, 2011); *SEC v. Dunn*, 587 F. Supp. 2d 486, 510 (S.D.N.Y. 2008).

## 1.     Defendants' Argument on the Fourth *Metro Life* Factor Makes No Sense

Defendants assert that "the first and fourth *Metro Life* factors clearly militate against the

assertion of jurisdiction over the defendants."  *Defense Memo (Dkt. 228) at 6.*  Defendants

appear to assume that the "interstate judicial system" prong of the fourth *Metro Life* factor

requires a comparison of the legal interests of the United States, Hungary, and Macedonia.

*Defense Memo at 9.*  But this is silly.  Neither Hungary nor Macedonia has any interest in

enforcing the U.S. securities laws, and the SEC is not authorized to pursue this case anywhere

outside of a U.S. federal court.  While Hungary and Macedonia might have an interest in whether defendants violated those countries' laws, no Hungarian or Macedonian action would resolve the SEC's claims under the U.S. securities laws.  In any event, this Court's exercise of jurisdiction in no way precludes the Hungarian or Macedonian authorities from proceeding with their own enforcement efforts.

> **2.      Defendants' "Discovery" Burden Was Shared Equally by the SEC, and Their "Trial" Burden Arguments Could Be Made in any Case Involving Foreign Defendants**

Defendants make two burden arguments.  They contend first that discovery difficulties have made it unusually difficult for them to prepare for trial, *Defense Memo at 6-8,* and second that the trial itself will unnecessarily burden them.  *Id. at 8-10.*  Neither argument has merit.

With respect to defendants' first argument, the SEC understands the burdens of international discovery.  Indeed, the SEC had to endure them to the same extent as defendants.  But international discovery is a feature of any FCPA case, and there is nothing unusual about how that process unfolded here.

Defendantscite the parties' use of the Hague Convention to secure testimony overseas, *Defense Memo at 6-8*, and appear to claim that they were the sole authors of the Hague requests.  But that is not true.  The SEC also sought testimony through the Hague Convention.  Defendants assert that they were denied testimony "from eight witnesses in Macedonia and four witnesses in Germany," *Defense Memo at 7*, but this is not true either.  In Germany, the SEC sought testimony from one witness (Hartmann), and defendants sought testimony from five (Danko, Hauptmann, Hausmann, Hermann, and Plath).  The SEC did not get its witness, but defendants took testimony from two of the five that they sought (Danko and Hausmann).  In Macedonia, defendants sought testimony from six witnesses, one of whom had died (Siljanovski) and one of

whom (Mickovik) testified, through the SEC's efforts, outside the Hague process.  The SEC sought testimony from two Macedonian witnesses (Firfov and Joveski), neither of whom was made available.  All told, the Hague Convention process resulted in substantive testimony from eleven witnesses, of which one was sought by the SEC and ten were sought by defendants.[4]

The SEC also took testimony from the three defendants and seven other foreign fact witnesses who agreed to appear voluntarily or by subpoena. All told, defendants and the SEC each had the opportunity to depose eighteen foreign non-party fact witnesses.  Defendants' motion does not disclose that they made any effort, as the SEC did, to take the testimony of foreign witnesses outside the Hague process.  Defendants also could have obtained relevant testimony by deposing the White & Case attorneys who interviewed scores of foreign witnesses during Magyar Telekom's internal investigation, but the defense chose not to do so.

Not only did the defense succeed in collecting a substantial volume of international discovery, but they make no showing that (1) the discovery they could not get was in fact critical to their defense, or (2) they exhausted all available means of getting it.  Surely if a party claims to "have been deprived of critical evidence," *Defense Memo at 7*, it should be able to make some showing to back up that claim.  There should be some document that a witness could have explained, or a contradiction between other witnesses' accounts that could have been resolved.  But defendants identify nothing of the sort.  Even more telling is defendants' complete lack of interest in the interviews that White & Case conducted.  For example, defendants failed to obtain Hague Convention testimony from three German witnesses (Hauptmann, Hermann, and Plath).  All three sat for multiple-day interviews with White & Case, yet defendants make no showing of

---

[4]     This does not include five witnesses (Contominas, Kefaloyannis, Stavridis, Kisjuhasz, and Kustra) who appeared but invoked their rights under Greek or Hungarian law not to incriminate themselves.

any probative evidence that these witnesses possessed.  Nor do they identify any such information from the interview notes and exhibits.

Likewise, at least two of the Macedonian witnesses the defense sought for Hague Convention testimony (Davitovski and Siljanovski), including the one who had died by the time of the Hague requests (Siljanovski), were also interviewed by White & Case.  Again, defendants make no use of the White & Case material, or any other discovery material, to identify anything important these witnesses had to say.

Perhaps most telling is the absence of any indication that defendants made even the slightest effort to secure the testimony of these "critical" witnesses other than through the Hague Convention.  The SEC is aware of no steps by the defense to compel the German or Macedonian authorities to produce the witnesses.  And the defense motion is utterly silent as to any efforts to persuade the witnesses to sit for voluntary depositions.  In short, there is no substance to defendants' claim that they were precluded from taking meaningful discovery, let alone that they faced obstacles so fundamental so as to justify depriving the Court of jurisdiction.

With respect to defendants' second argument, their attempt to claim that a trial presents some unique burden for them is even less persuasive.  Defendants cite a Ninth Circuit case, *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482 (9th Cir. 1993), for the general proposition that it is unreasonable to subject any foreign defendant to U.S. jurisdiction if the prospective defendant has no ongoing connection to the United States.  But the case is entirely inapposite.  The *Core-Vent* case looked at the factors for assessing the reasonableness of state long-arm jurisdiction.  The most important of these in the court's analysis – and in the Ninth Circuit cases it cited – was the presence of an alternate forum:  Sweden.  Here, unlike a private party, the SEC has no other forum in which to pursue its U.S. federal securities law claims.  If the SEC cannot

proceed against defendants in the federal courts of the United States, then defendants will effectively have been immunized.

Defendants' effort to present their personal situations as being particularly burdensome fares no better. All three defendants managed to travel to London and New York to participate in their own depositions. Morvai offers a declaration saying that he has a wife and a child. *Morvai Decl. (Dkt. 225) at ¶ 6.* Balogh, we are told, also has family responsibilities, but the only supporting reference is a citation to Morvai's declaration, *Defense Memo at 9*, which does not mention Balogh. Straub's declaration describes a health issue that is potentially significant, but there is no declaration from a health professional to support the claim. The same Straub declaration represents: "I have been retired since December 2006 and have not held any part-time or full-time employment since then." *Straub Decl. (Dkt. 224) at ¶3.* But according to the public website of Day One Capital, a venture capital firm with at least seven full-time employees, Straub has been its Chairman of the Board and Managing Partner since 2010. *Ex. 1.* And from 2005 until 2012, Straub's public Linked-In profile identifies him as the President of the Hungarian Yachting Association. *Ex. 2.*

The SEC understands that travel and trials create burdens. But that does not make any travel or trial "constitutionally unreasonable," *Defense Memo at 6*, so as to require the denial of personal jurisdiction. This is particularly so where defendants have chosen to reap the benefits of the U.S. securities markets. Straub's declaration identifies a September 2005 trip to the U.S., which he recalls "lasted four to five days, [the purpose of which] was to participate in a road show in New York, New York and Boston, Massachusetts to present to investors of the Company the results of the Company's 2005 financials." *Straub Decl. (Dkt. 224) at ¶1.* Straub thus places himself in the United States, promoting Magyar Telecom as an investment for

12

American investors, at the exact same time he and his co-conspirators were engineering the bribery scandal in Macedonia and concealing their activity in false Sarbanes-Oxley and audit certifications and false SEC filings.  This is more than minimum contacts; it is an attempt to milk the U.S. securities markets while at the same time defying the laws that safeguard those markets.

This Court has personal jurisdiction over defendants as a matter of law.

## II. DEFENDANTS FAIL TO SHOW THAT THEY DID NOT USE AN INSTRUMENTALITY OF INTERSTATE COMMERCE

Defendants fail to address undisputed facts that the SEC cited in its pre-motion letter (*Dkt. 210*) as its basis for the use of interstate commerce – defendants' participation in creating false SEC filings made electronically on the EDGAR internet system for distribution to the U.S. investing public.  Further, when defendants do address the SEC's second factual basis for interstate commerce – the use of U.S.-based internet servers to transmit and maintain emails used in the bribery scheme – they disregard the applicable legal standards.  As a result, defendants' motion uses the wrong legal standards to assess the email issue, while ignoring the interstate commerce role played by their false SEC filings.

### A. The Email Messages Are a Sufficient Basis for Finding the Use of an Instrumentality of Interstate Commerce

Defendants have now written three briefs that address the use of emails routed through and stored on internet servers in the United States.  In so doing, they have found several cases showing that the incidental use of internet email (or regular mail) in an FCPA case is sufficient to establish the use of an instrumentality of interstate commerce.  *Defense Memo at 15, n.10, citing United States v. Kay*, 513 F.3d 432 (5th Cir. 2007); *Chevron Corp. v. Donzinger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014).  But after three tries, they have not found a single case holding that the use of emails and the internet did not satisfy the standard.

13

Defendants are left to argue that emails routed through the United States must have a specific content, scope, or purpose that is somehow missing here. First, they argue that each defendant must have personally sent an email message. (Receiving an email message is not enough in their view.) Because the emails identified by the SEC do not include ones sent (or received) by Straub or Morvai, defendants assert that at least those two individuals are entitled to summary judgment.[5] *Defense Memo at 11-13*.

But this theory was addressed in the SEC's pre-motion letters and the SEC's own moving papers for summary judgment. The contention that "each participant" in a scheme must independently make use of an instrumentality of interstate commerce is not the law. Rather, it is:

> fundamental that an accused need not carry out the mailing or use of an instrumentality of commerce. If he causes it to be carried out by setting forces in motion which foreseeably result in use of the mails, his action is sufficient.

*United States v. MacKay*, 491 F.2d 616, 619 (10th Cir. 1973). *Accord United States v. Johnson*, 553 F. Supp. 2d 582, 622 (E.D.Va. 2008) ("A securities fraud conviction does not depend upon the defendant's personal use of the instrumentality of interstate commerce.").

Defendants next challenge whether the emails were in "furtherance" of the bribery scheme. *Defense Memo at 11, 13-15*. Defendants argue that the emails were not in furtherance because they do "not contain an offer to pay or promise to pay an alleged bribe." *Id. at 14*. Further, the emails "did not discuss an alleged bribery scheme or the means of carrying out such a bribery scheme." *Id*. According to defendants, in order to satisfy the jurisdictional element of interstate commerce, one's use of interstate communication must explicitly refer to bribes or make clear on its face that bribery is involved. This sets up an interesting legal standard. On

---

[5]     Even if the defense theory on this point were correct as to defendants Straub and Morvai, it would offer them a potential defense only as to their primary violation of Exchange Act Section 30A (Count I of the complaint). This theory would offer no defense to the SEC's charge in Count II of the complaint that they aided and abetted violations of Section 30A.

defendants' theory, to be held accountable under the FCPA, one must be not only corrupt, but also brazen.

Of course the emails in this case do not trumpet their connection to bribery, because shrewd participants in a corrupt scheme try to avoid creating evidence against themselves. But when the emails are placed in context, it is not hard to see the connection to the scheme. For example, defendants examine at length the May 31, 2005 email from Balogh to MakTel's CEO Attila Szendrei. *Defense Memo at 14-15*. That email identifies its subject matter as "megallapodas," the Hungarian word for "agreement." It then attaches the Protocol of Cooperation. As the Court well knows, the SEC has significant evidence that the Protocol, which was kept secret, was a key document containing the benefits Magyar received from the bribe scheme. Transmitting the Protocol to Szendrei and identifying it as the "agreement" furthered the scheme.

Not only did the "agreement" affect MakTel's business, but Szendrei, as MakTel's CEO, had to know the deal's terms to manage the company's dealings with the government. The day before the May 31 email, the government had issued a press release touting that the government would receive a handsome dividend from MakTel and at the same time denying that it had made any "concessions" to MakTel. *Ex. 4*. In fact, the Protocol provided for the precise amount of the government's dividend, but also included significant concessions by the government. These included agreements on frequency fees, the enactment of new regulations (by-laws), and restrictions on competition in the mobile telephone market. Balogh had to alert the CEO to the precise terms of the deal for the scheme to have its intended value, and the choice to use Szendrei's personal "hotmail" address reflected the sensitivity of that communication.

Likewise, the two July 5, 2005 emails relating to the "consulting agreements" with Chaptex do not use the words "bribe" or "bribery."  But the SEC's evidence points to these "consulting agreements" as the mechanism by which the bribes were laundered.  Indeed, a June 16, 2005, email from Balogh to two of the "Greeks" suggests that such "consulting agreements" could work as a means to justify the money transfers while avoiding a "problem w/the auditor." *Ex. 5*.  One of the contracts Balogh proposed in the email was a "Success fee based contract on solving the frequency fee issue in a favorable way."  *Id*.  Of course, the frequency fee issue had been favorably resolved for MakTel several weeks earlier in the Protocol of Cooperation.  This shows that the contracts were shams, designed to justify payments to the "Greeks" without alerting the auditors.  Even though these emails do not use the term "bribe" or "bribery," they relate to the mechanism by which the bribes were paid and are thus integral to the scheme.

Defendants try to argue that the two July 5 emails do not satisfy the interstate commerce element because receiving emails "does not constitute" the use of an instrumentality of interstate commerce.  *Defense Memo at 13-14*.  However, defendants make this assertion without citing any legal support.  That Balogh received the July 5 emails rather than sent them is of no significance.  Balogh's June 16 email put the "consulting agreement" part of the scheme into motion (after having consulted Straub, as the email indicates).  Receiving the July 5 emails, containing drafts of the sham consulting contracts, was necessary to track the plan's progress.

The two cases that defendants try to distinguish also use the context of the bribe scheme to reveal how the emails at issue satisfied the interstate commerce element.  In *United States v. Kay*, 513 F.3d 432, 441, 453 (5th Cir. 2007), the documents that passed through interstate commerce were false invoices sent from Houston to Haiti to coincide with the arrival of a ship carrying rice.  The false documents underweighted the rice shipment and were used to reduce

16

customs duties.  The value of the reduction in customs duties was split – one-third to the customs

officials and two-thirds to the shipping company.  *Id.*, at 453-4.  The court held that the

documents were in furtherance of the bribery scheme even though there was nothing on their

face to indicate that the documents were false, let alone that the documents would be used to

calculate the bribe amount.  *Id.*

Similarly, in *Chevron Corp v. Donzinger*, 974 F. Supp. 2d 362, 595-97 (S.D.N.Y. 2014),

the documents that passed through interstate commerce were emails directing the payment of

fees to a court-appointed expert for a lawsuit in Ecuador.  The expert would have been entitled to

a fee if he had been doing the job he was appointed to do.  But the documents at issue related not

to legitimate court-approved payments but instead directed transfers into a secret bank account

for the expert.  The transfers were bribes to secure a favorable expert report for the plaintiffs

suing Chevron.  *Id.* at 596-97.  There is no indication that the emails said "pay the bribes," or

anything remotely that obvious.  As in the present case, the connection between the documents

passing through interstate commerce and the bribe scheme was evident only through an

understanding of the context of the emails and the payments.  *Id.* at 598.

The May 31 and July 5 emails attaching the Protocol of Cooperation and drafts of the

contracts used to launder the payments were in furtherance of the bribery scheme and were

therefore sufficient to constitute the use of an instrumentality of interstate commerce.  In

securities cases, the jurisdictional element is "broadly construed, so as to be satisfied by . . . even

the most ancillary mailings."  *SEC v. Softpoint Inc.,* 958 F. Supp. 846, 865 (S.D.N.Y. 1997)

(*citing Franklin Savings Bank of N.Y. v. Levy*, 551 F.2d 521, 524 (2d Cir. 1977) ("The use of the

mails need not be central to the fraudulent scheme and may be entirely incidental to it.") (*quoting*

*United States v. Cashin*, 281 F.2d 669, 673-74 (2d Cir. 1960)).  So long as the use of interstate

commerce is "incident to the carrying out of the scheme," *MacKay*, 491 F.2d at 620, the

jurisdictional element is satisfied.  Here, the emails were far more than ancillary – they related to

key components of the scheme.

The undisputed facts surrounding the "hotmail" emails establish that defendants' motion

for summary judgment on the use of an instrumentality of interstate commerce should be denied.

> **B.      Defendants Also Used an Instrumentality of Interstate**
> **Commerce by Submitting False Certifications in Connection**
> **with Magyar Telekom's Electronic SEC Filings**

Defendants ignore the second set of undisputed facts that satisfy the interstate commerce

element – defendants' concealment of the scheme in connection with the preparation of

electronic SEC filings.  This is surprising because the SEC highlighted this factor in its pre-

motion letter to the Court and the parties.  *Dkt. 210*.

Defendants endeavor to artificially cabin the SEC's evidence of interstate commerce by

pointing to the SEC's response to a defense interrogatory.  *Defense Memo at 3*.  However, the

SEC never represented in discovery that the "hotmail" emails were the sole basis for defendants'

use of interstate commerce, and the defense never propounded a contention interrogatory on the

subject.  The one interrogatory that defendants identify in their memorandum asked not for the

SEC's contentions regarding interstate commerce, but only for the SEC to identify the emails

cited in the complaint.

> 10.      Identify those electronic mail messages "routed through and/or stored on
> network servers located within the United States" referenced in Paragraph
> 39 of the Complaint.

*Ex. 3*.  While the SEC did refer to the "hotmail" emails in its complaint as a basis for satisfying

the interstate commerce element, the SEC also had a separate paragraph alleging the use of

interstate commerce more broadly.  *Second Amended Complaint (Dkt. 213) at ¶7*.

Because defendants make no effort to rebut the SEC's claim that the jurisdictional interstate commerce element was satisfied by their submission of false management representation letters, Sarbanes-Oxley certifications, and related sub-certifications in connection with electronic SEC filings, their motion for summary judgment on this issue must be denied.

## III.   DEFENDANTS FAIL TO ESTABLISH THAT THE STATUTE OF LIMITATIONS HAS RUN AGAINST THE SEC'S CLAIMS

Defendants also contend that the SEC's case is barred by the statute of limitations.  To do this, defendants advance three legally inaccurate arguments regarding the limitations period of 28 U.S.C. § 2462.  First, defendants contend that Section 2462 applies "a strict five-year rule" under which a suit must be commenced within five years *and* the defendant must be both found and served within the United States during that period.  *Defense Memo at 17*.  Second, defendants claim that the SEC's claims against Straub and Morvai are barred because they could be found within the United States for a few days during the applicable limitations period.  *Id., at 28-29*.  Third, Defendants aver that the equitable relief sought by the SEC is also barred.  *Id., at 32-34*.  All three arguments should be rejected.

### A.   Defendants' Interpretation of Section 2462 Is Wrong

#### 1.   The Court Correctly Held that 28 U.S.C. § 2462 Requires Defendants to be Found Within the United States for the Limitations Period to Run

The applicable statute of limitations is 28 U.S.C. § 2462, which states that government claims for a civil fine, penalty or forfeiture shall not be entertained unless commenced within five years of when the claim accrued, "if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon."

When this Court denied defendants' motion to dismiss, it gave ordinary effect to all the words of the statute and held that "the operative language in § 2462 requires, by its plain terms,

that an offender must be physically present in the United States for the statute of limitations to run." *SEC v. Straub*, 921 F. Supp. 2d 244, 260 (S.D.N.Y. 2013).  The Court's ruling is consistent with the text of the statute, its history, its construction by other courts, and with other similarly worded statutes.  The Court reaffirmed its interpretation of Section 2462 when it denied defendants' motion for leave to seek interlocutory review.  *Dkt. 68.*

In its motion to dismiss ruling, the Court rejected the defense argument that the limitations period of 28 U.S.C. § 2462 would run if a defendant were either "found within the United States" or located where he could be served under the Hague Convention.  *Straub*, 921 F. Supp. 2d at 259-61.  This time around, defendants arrive with an entirely new "plain meaning" of the statute.  Now they contend that a suit must be brought within five years *and* the defendant must be personally served within the United States during the same period.  In other words, the defendants now read Section 2462 to operate both as an absolute limitations provision (with no carve-out for offenders outside the jurisdiction) and as a bar to the Court's exercise of long-arm jurisdiction.  Nothing in the statutory text or legislative history supports such a radical revision of the statutory text.  This, defendants' third attempt to rewrite the statute, should be rejected.

### (a)  The History of Section 2462 Shows that Congress Intended to Require a Defendant's Physical Presence

The requirement that a defendant be physically present in the United States for the limitations period to run is consistent with the drafting history of Section 2462.  It made sense for Congress to include the physical presence proviso in the statute of limitations, because "the precursor to § 2462 was first passed in the 1790s, [when] legislators could only authorize proper service of process within the borders of the United States," and "[w]hen Congress added the language 'if found within the United States' in 1839, courts at the time understood that the statute of limitations would not begin to run while defendants were outside of the United States

and, therefore, not amenable to service." *Straub*, 921 F. Supp. 2d at 261.  Since "[e]ach

subsequent re-codification of the statute maintained the operative 'found within the United

States' language," any innovation in the ability to serve overseas defendants "does not change

the fact that Congress has maintained the statutory carve-out for defendants not found within the

United States." *Id.*  As such, "it is not for this Court to second-guess Congress and amend the

statute on its own." *Id.*

"It is unclear" what statute is the first ancestor to Section 2462, but "[e]arly cases gave

the nod" to a 1790 statute of limitations.  *3M Co. (Minn. Min. & Mfg.) v. Browner*, 17 F.3d 1453,

1458 n.7 (D.C. Cir. 1994).  But whatever the original source, Chapter 36, Section 4 of the 1839

Judiciary Act is clearly part of Section 2462's lineage.  Section 4 of the 1839 Act stated:

> That no suit or prosecution shall be maintained, for any penalty or forfeiture,
> pecuniary or otherwise, accruing under the laws of the United States, unless the
> same suit or prosecution shall be commenced within five years from the time
> when the penalty or forfeiture accrued; *Provided, The person of the offender* or
> the property liable for such penalty or forfeiture *shall, within the same period, be
> found within the United States*; so that the proper process may be instituted and
> served against such person or property therefor.

5 Stat. 322 (emphasis added) (Ex. 6).

Slight changes to this provision of the 1839 Act were made in an 1874 statute, which was

codified in 1911 as 28 U.S.C. § 791 and read as follows:

> No suit or prosecution for any penalty or forfeiture, pecuniary or otherwise,
> accruing under the laws of the United States, shall be maintained, except in cases
> where it is otherwise specially provided, unless the same is commenced within
> five years from the time when the penalty or forfeiture accrued:  *Provided, That
> the person of the offender*, or the property liable for such penalty or forfeiture,
> *shall, within the same period, be found within the United States*; so that the proper
> process therefor may be instituted and served against such person or property.

28 U.S.C. § 791 (1940 ed.) (emphasis added) (Ex. 6).

21

This was the immediate predecessor to Section 2462.  In 1948 this text was replaced with the current text of Section 2462, as part of a larger overhaul of the Judicial Code.  The Reviser's Notes on the rewriting of Section 2462 stated that: "Changes were made in phraseology." "When the Reviser's Notes describe the alterations as changes in phraseology, the well-established canon of construction is that the revised statute means only what it meant before 1948."  *3M v. Browner*, 17 F.3d at 1458 (construing Section 2462).

A comparison of the three versions of the statute is instructive.  What is now the "if found" clause was initially a "Provided" clause.  The statute "restricts the limitation of five years by the proviso . . . that the limitation shall not be operative unless the state of things named in the proviso shall exist, as to finding the person of the offender, or the property, within the United States, within the five years, so as to serve process."  *United States v. Maillard*, 26 F. Cas. 1140, 1141 (S.D.N.Y. 1871) (construing Section 4 of 1839 Act).  As a result, this is not a statute of "absolute limitations," but rather a "restricted and qualified limitation."  *Maillard*, at 1142.

The use of a "Provided" clause to create a condition to or exception from the running of a limitations period is not limited to Section 2462, but is common.  As noted, the first ancestor to Section 2462 may have been a 1790 law, *3M v. Browner*, 17 F.3d at 1458 n.7, which was construed by Chief Justice Marshall in *Adams v. Woods*, 6 U.S. 336 (1805).  That statute stated:

> Nor shall any person be prosecuted, tried or punished for any offence not capital, nor for any fine or forfeiture under any penal statue, unless the indictment or information for the same shall be found or instituted within two years from the time of committing the offence, or incurring the fine or forfeiture aforesaid: *Provided, that nothing herein contained, shall extend to any person or persons fleeing from justice*.

*Id*. at 337 (emphasis added).  Retaining a similar proviso in what is now Section 2462 served the congressional policy that a limitations period should not run for a person beyond the reach of justice.  Because the 1839 Act that is now Section 2462 was seen as simply creating a longer

22

statute of limitations for fines and forfeitures than that found in the 1790 Act, *United States v. Platt*, 27 F. Cas. 546, 550 (1840); *United States v. Cook*, 84 U.S. 168, 173 & nn.11, 12 (1872); *Stimpson v. Pond*, 23 F. Cas. 101, 101-02 (D. Mass. 1855), it was logical to retain the carve-out for offenders who could not be found.

**(b)      It is Not Unusual for Limitations Periods to Have Exceptions for Absent Defendants**

Congress has continued up to the modern day with its use of provisos conditioning statutes of limitations on a defendant's presence in the United States, and not only in Section 2462.  The exception to the 1790 criminal limitations period is present today in 18 U.S.C. § 3290, which conditions the catchall criminal limitations period of 18 U.S.C. § 3282 with a carve out for fugitives.  There are separate catchall limitations periods set forth in 28 U.S.C. §§ 2415 and 2416 applicable to government suits in contract, tort, and to recover money wrongly paid, each of which contains its own "provided" clauses to limit, condition, or make exceptions to the general limitations period.  Other catchall limitations provisions contain similar carve outs for absent defendants, such as the one for criminal violations of the Internal Revenue Code, 26 U.S.C. § 6531, and the Uniform Code of Military Justice.  10 U.S.C. § 843.

**(c)      There is No Legal Support for Defendants' Interpretation of Section 2462**

Defendants cite no caselaw to support their argument that Section 2462's "if found" clause is anything other than an exception to a statute of limitations, and the SEC is aware of none.  Those courts that have discussed Section 2462's "if found" clause have all found that it carves an exception to the running of the limitations period, requiring the physical presence of the offender or property for the period to run.  In addition to this Court's prior decision and *United States v. Maillard*, 26 F. Cas. at 1141, 1143, which observed in *dicta* that the absence of

23

the offender or *res* were "declared exceptions" to the limitations period, the district court in *McGlinchy v. United States*, 16 F. Cas. 118, 121 (C.C.Me. 1875), observed that the predecessor to Section 2462 fixed a five-year limitations period, "provided that the person of the offender . . . shall, within the same period, be found within the United States, so that process may be instituted and served."  More recently, a Texas district court observed that "§ 2462 includes a provision for tolling limitations if the defendant is absent from the United States so as to prevent service of process . . . ."  *United States v. Rutherford Oil Corp*., 756 F. Supp. 2d 782, 788-89 (S.D. Tex. 2010).

In sum, the text, purpose, and history of Section 2462 are all consistent with the Court's prior ruling.  Defendants' latest attack on that ruling must therefore be denied.

### 2.      Section 2462 Is Not a Long-Arm Statute

Defendants' statute of limitations argument suffers from a second fatal defect. Recognizing that they cannot simply read the "if . . . found within the United States" clause out of the statute, the defense takes a renewed shot at re-writing it by arguing that the statute imposes two requirements:  (1) "the case must be filed within five years" and (2) "the offender must be found within the United States so that proper service can be made within that time."  *Defense Memo at 20*.

Thus, defendants would amend the operative language of Section 2462 from this:

" . . . an action . . . shall not be entertained unless commenced within five years . . . ***if***, within the same period, the offender . . . is found within the United States in order that proper service may be made thereon." (emphasis added)

to  this:

" . . . an action . . . shall not be entertained unless commenced within five years . . . ***[and]***, within the same period, the offender . . . is found within the United States in order that proper service may be made thereon."

Juxtaposing Section 2462's actual text to defendants' preferred version is more than enough to show why their construction must be rejected. Defendants cannot by fiat change "if" to "and." Further, their reading would give operative effect to the clause "in order that proper service may be made thereon," contrary to this Court's prior ruling that the clause is only a "statement of purpose," not "operative language." *Straub*, 921 F. Supp. 2d at 260.

Since defendants need to do something with the statute's "if found" clause, they convert it from an exception to the limitations period into an additional set of requirements that must be met in order for a suit to be entertained. But if this reading were to be taken seriously, it would imply that no lawsuit subject to Section 2462 could ever be brought unless: (1) the defendant was physically present in the United States; (2) the defendant was personally served here; and (3) service was completed within five years. In other words, defendants would read Section 2462 to be something far more than a statute of limitations; they would also have it strip the federal courts of long-arm jurisdiction over any foreign defendant (or any American defendant located overseas) in any action subject to Section 2462.

No court has ever construed Section 2462 or its predecessor statutes in such a radical manner. Nor did this construction even occur to defendants when they moved to dismiss the complaint.

Defendants cannot articulate any coherent legislative intent that would induce Congress to condition other catchall statutes of limitations on an offender's not being a fugitive, 18 U.S.C. § 3290, or not being outside the United States, 28 U.S.C. § 2416; 26 U.S.C. § 6531, while at the same time creating an *incentive* in Section 2462 to run out the clock by fleeing the jurisdiction. But defendants' proffered reading of Section 2462 would achieve exactly this perverse result. If

defendants were right, then anyone who violated the securities laws could immunize himself from an enforcement action by the simple expedient of stepping over the border.

Defendants attempt to bolster their reading of Section 2462 with the contention that the "within the same period" clause "looks nothing like any of the tolling provisions that Congress has enacted as part of the U.S. Code." *Defense Memo at 28*.  But one such provision, which also appears in Title 28 and is conspicuously absent from defendants' compilation, is 28 U.S.C. § 2416, which addresses the tolling of actions brought by the United States.  Section 2416 operates quite a bit like Section 2462, stating:

> For the purpose of computing the limitations periods established in section 2415, there shall be excluded all periods during which –
>
> (a)     the defendant or the *res* is outside the United States . . . ; or
>
> (b)     the defendant is exempt from legal process . . . .

28 U.S.C. § 2416.  Like Section 2462, Section 2416 does not handicap the United States by forcing it to bring claims against a defendant who has been outside the jurisdiction for the vast majority of the applicable limitations period.

Defendants cite some 57 other federal statutes of limitations, omitting the closely analogous 28 U.S.C. § 2416.  But that survey proves only one thing:  When Congress enacts tolling provisions, it does so using a staggering variety of verbal formulations.[6]  In other words, there is no standard language missing from Section 2462 that would compel a court to ignore the plain meaning of its text.

---

[6]     The various phrasings include, among others, "shall toll," "be suspended," "is extended," "be stayed," "be enlarged," "after the removal of their disabilities," "shall not be deemed to have accrued until," "shall not be subject to the limitations period," "shall not be included for the purpose of," "no statute of limitations shall extend to," and "there shall be no limit."  *Defense Memo at 22-24*.

In addition to their unpersuasive textual arguments, defendants continue to cite the Supreme Court's decision in *Gabelli v. SEC*, 133 S.Ct. 1216 (2013), for the sweeping proposition that it "would be utterly repugnant to the genius of our laws" for a lawsuit to be brought more than five years after the cause of action accrued. This, of course, was not *Gabelli*'s holding. *Gabelli* did not even address the statutory language at issue here – the "if . . . found within the United States" clause. Nor do defendants make any effort to reconcile their use of *Gabelli* with the apparent ubiquity of federal limitations tolling provisions, so amply demonstrated by their own 57 statute survey. If Congress finds limitations tolling provisions so "utterly repugnant," the defense cannot explain why it uses them so often.

The *Gabelli* quotation reflects at best a generalized public policy favoring repose. But Section 2462, like any federal statute of limitations, is an act of Congress. Its scope is determined by the language that Congress chose to use, not by one flamboyant piece of *dictum* taken out of context from a Supreme Court decision.

### B.   The Limitations Period of Section 2462 Runs Only When a Defendant Is Found Within the United States, and Does Not Continue to Run When a Defendant Leaves the Country

Defendants next contend that even if Section 2462 did condition the running of limitations on their physical presence, Straub and Morvai would still have a defense because they made brief visits to the United States in 2005. This argument fails for two reasons. First, Section 2462 requires the defendant's presence here for the period to run at all, not just to begin running. Because these defendants did not spend five years in the United States, the statutory period did not elapse as to them. Second, the defense argument assumes that the SEC's claims accrued prior to the 2005 visits, and that there is no genuine factual dispute on that point. The

SEC has, however, advanced a factual basis for its claims to have accrued in mid-2006, long after the Straub and Morvai visits.

**1.    Straub and Morvai Cannot Evade Liability by
Spending a Few Days in the United States**

Straub and Morvai argue that their brief visits to the United States in 2005 caused the limitations period to run as to them.  As a matter of statutory construction and common sense, however, the limitations period could only have run while defendants were actually in the United States.  The clock did not begin running in 2005 and then continue even after they returned to Hungary.  "[T]he operative language in § 2462 requires, by its plain terms, that an offender must be physically present in the United States for the statute of limitations to run."  *Straub*, 921 F. Supp. 2d at 260.  *See also United States v. Rutherford Oil Corp.*, 756 F. Supp. 2d 782, 788-89 (S.D. Tex. 2010) ("§ 2462 includes a provision for tolling limitations if defendant is absent from the United States so as to prevent service of process," which results in "tolling" "when the defendant cannot be found within the United States to allow service of process.").

The defense's contrary theory not only defies the most straightforward reading of the statutory text, but it would produce absurd results that Congress could not possibly have intended.  Under the defense theory, an offender outside the United States, even one not subject to service of process, could run out the limitations period by taking a single connecting flight through JFK airport at any point during the five years.  Indeed, the defense theory would create an incentive for a domestic offender to flee the jurisdiction to avoid service of process until the five-year period had run.  As long as he was present in the United States just long enough to make his dash for the border, the offender could be secure in the knowledge that the statute would keep running even after he had made his escape.

Any such outcome would eviscerate the Congressional purpose underlying Section 2462. "Upon this theory, it would be in the power of any man" "to defeat the ends of justice by remaining within the jurisdiction a week, a day, or an hour perhaps," and "upon this theory the statute would go on to operate none the less, and immunity could be perfected by flight." *Howgate v. United States*, 7 App. D.C. 217, 243 (D.C. Cir. 1895) (considering a similar carve-out in a criminal case, and canvassing both criminal and civil statutes of limitations).

The congressional policy underlying conditions like that in Section 2462, and other statutes of limitations, is to preserve government claims when their pursuit is complicated by the defendant's absence. *See United States v. Yip*, 248 F. Supp. 2d 970, 973-74 (D. Haw. 2003) (construing 26 U.S.C. § 6531). If any momentary presence in the United States during the limitations period could cause the entire period to run, the "if found" clause would serve little purpose. Defendants cite no authority, and offer no rationale, why, when Congress saw fit to condition Section 2462 on an offender's presence in the United States, it would have allowed the condition to be so easily evaded.

### 2. Straub and Morvai's Trips to the United States Occurred While their Scheme Was Ongoing and the Limitations Period Had Not Begun to Run

The second fatal flaw in defendants' argument is their inability to prove beyond a genuine dispute of fact that the SEC's claims accrued prior to the fall of 2005. With regard to its bribery allegations, the SEC contends that the scheme began in 2005 and continued well into 2006. *Second Amended Complaint (Dkt. 213) at ¶¶ 2, 15, 23, 29, 32, 39, 41.* The factual basis for the scheme's duration need not be recounted at length. It is sufficient to note that defendants promised a series of bribe payments that would continue until June 2006, *Exs. 1, 6 to SEC's*

*Summary Judgment Memorandum (Dkt. 232)*; and the resulting payments were made via sham contracts as late as May 30, 2006.  *5/15/15 Expert Rpt. of Rajal Dubal, at 3.*

"Where a violation is 'continuing,' . . . a claim is not barred by the statute of limitations so long as it continues to accrue within the limitations period." *United States v. Westvaco Corp.*, 144 F. Supp. 2d 439, 442 (2001).  Because the bribery scheme continued into 2006, the SEC's claims did not accrue until well after Straub and Morvai made their short trips to this country in 2005.  The continuing violation doctrine applies to Section 2462, *see Westvaco*, 144 F. Supp. 2d at 442; *Rutherford Oil Corp.*, 756 F. Supp. 2d at 790-93 (continuing violation doctrine available under § 2462); *CityFed Financial Corp. v. Office of Thrift Supervision*, 919 F. Supp. 1, 6 (D.D.C. 1994) (applying continuing violation doctrine under § 2462).  As this Court has noted, *Gabelli* did nothing to change that.  *SEC v. Amerindo Inv. Advisors, Inc.*, Case No. 05-CV-5231 (RJS), 2014 WL 405339, at *9 (S.D.N.Y. Feb. 3, 2014) (*Gabelli* did not affect potential for continuing violation doctrine to apply in SEC penalty action).

The SEC also has non-bribery claims that did not accrue until well after the 2005 U.S. visits.  Defendants are charged with books and records violations based on the improper recording in 2006 of sham contracts used to mask the bribe payments.  Defendants made false statements to Magyar Telekom's auditors in 2006 when they signed management representation letters or made related sub-certifications.  Further, the SEC's disgorgement claims against Balogh and Morvai are based on the severance payments they received in 2006.  Under any conceivable interpretation of Section 2462, therefore, defendants' trips to the United States took place too early to bar the SEC's claims.

### C.      There is No Statute of Limitations on the SEC's Claims
            for Equitable Relief

Even if defendants' legal theories on the application of Section 2462 were not fatally

flawed, they would still be insufficient to reach the SEC's claims for equitable relief.

Defendants' argument to the contrary ignores this Court's prior ruling and the overwhelming

weight of authority in the Second Circuit.  This Court has already held that even if the SEC's

penalty claims were time-barred, "the claims for disgorgement and injunctive relief would still

survive." *SEC v. Straub,* 2013 WL 4399042, at *5 (S.D.N.Y. Aug. 5, 2013).  This holding is

consistent with other precedent in this Circuit, such as *SEC v. Kelly*, 663 F. Supp. 2d 276, 286-87

(S.D.N.Y. 2009) ("[T]he great weight of the case law in this jurisdiction supports the SEC's

contention that equitable remedies are exempted from section 2462's limitations period."); *SEC*

*v. Vuono*, No. 13-MC-405, 2013 WL 6837568, at *6 (E.D.N.Y. Dec. 26, 2013) (Section 2462

does not apply to disgorgement, and collecting cases); *SEC v. Wyly*, 56 F. Supp. 3d 394, 402

(S.D.N.Y. 2014) ("Disgorgement, being an equitable remedy, is not subject to the five year

statute of limitations under 28 U.S.C. § 2462.").

Disregarding the relevant in-Circuit law, defendants rely instead on *SEC v. Bartek*, 484

Fed. App. 949 (5th Cir. 2012), and *SEC v. Graham*, 21 F. Supp. 3d 1300 (S.D. Fl. 2014), as well

as *dicta* from *Riordan v. SEC*, 627 F.3d 1230 (D.C. Cir. 2010).  *Defense Memo at 33-34.*  No

court has followed *Graham*, while several, including another in the same Circuit, have

specifically rejected its reasoning.  *SEC v. LeCroy*, 09-Civ-2238, 2014 WL 4403147, *5 (N.D.

Ala. Sept. 5, 2014) (collecting cases, ruling that Section 2462 does not apply to SEC claims for

equitable relief); *see also SEC v. Stoecklien*, 15-Civ-0532, 2015 WL 6455602, at *3 (S.D. Cal.

Oct. 26, 2015) (declining to follow *Graham*, ruling that no limitations period applies to SEC

claims for equitable relief); *SEC v. Fujinanga*, No. 13-CV-1658 (JCM), 2014 WL 4977334, at *6

(D. Nev. Oct. 3, 2014) (declining to follow *Graham* due to controlling Ninth Circuit precedent). *Graham's* prospects on appeal are dim, given Eleventh Circuit precedent that Section 2462 does not apply to equitable claims. *United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997).

It would be premature for the Court to rule that any equitable relief it could award would necessarily be punitive, rather than remedial in nature. In a securities law case, "the primary purpose of the injunction cannot be to penalize – it must be protect against future harm. As such, the statute of limitations question merges with the substantive requirements for obtaining an injunction under the securities laws – if the substantive claim is viable, then it is, by definition, not subject to a statute of limitations." *SEC v. Wyly*, 950 F. Supp. 2d 547, 558 (S.D.N.Y. 2013) (denying defendant's motion for summary judgment that claims for injunctive relief were time barred).

The defense motion for summary judgment on the statute of limitations would require this Court to reverse its prior ruling in contravention of all judicial precedent, the statute's plain language, and the evident intent of Congress. Because the Court's prior ruling was the correct one, the defense motion should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny defendants' motion for summary

judgment.


Dated:  November 6, 2015                              Respectfully submitted,


                                                      ____/s/ Robert I. Dodge_____
                                                      Robert I. Dodge  (RD 0433)
                                                      Thomas A. Bednar
                                                      John D. Worland, Jr. (JW 1962)
                                                      Adam J. Eisner
                                                      U.S. Securities & Exchange Commission
                                                      100 F Street, N.E.
                                                      Washington, D.C. 20549-5949
                                                      (202) 551-4421 (Dodge)
                                                      DodgeR@sec.gov
                                                      Attorneys for Plaintiff

<u>EXHIBIT LIST</u>

1.    Public web page of Day One Capital

2.    Public LinkedIn profile of Elek Straub

3.    SEC's Response to Defendant Straub's First Set of Interrogatories, dated Nov. 1, 2013

4.    May 30, 2005 email to Balogh and Morvai attaching a press release by the Republic of Macedonia

5.    June 16, 2005 email from Balogh to Michael Kefaloyannis re:  "our conversation yesterday"

6.    28 U.S.C. § 2462 and predecessor statutes:

- 28 U.S.C. § 2462 (1948 ed.)
- 28 U.S.C. § 791 (1940 ed.)
- Act of Feb. 28, 1839, ch. 36, § 4, 5 Stat. 322

<u>CERTIFICATE OF SERVICE</u>

I certify that on November 6, 2015, a copy of the foregoing document was served upon all counsel of record via the Court's electronic filing system, which sends notification to the following parties:

Robert B. Buehler (robert.buehler@hoganlovells.com)
Carl Rauh (carl.rauh@hoganlovells.com)
Lisa J. Fried (lisa.fried@hoganlovells.com)

Counsel for defendant Elek Straub

William Sullivan (wsullivan@pillsburylaw.com)
Kristen Baker (kristen.baker@pillsburylaw.com)

Counsel for defendant András Balogh

Michael L. Koenig (mkoenig@haslaw.com)
Victoria Lane (vlane@haslaw.com)

Counsel for defendant Tamás Morvai

\_\_\_\_ /s/  Robert I. Dodge _____