## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____
                                            :
U.S. SECURITIES AND EXCHANGE                :
COMMISSION,                                 :
                                            :
                        *Plaintiff*,        :
                                            :
            -v-                             :        No. 11 Civ. 9645 (RJS)
                                            :
ELEK STRAUB,                                :
ANDRÁS BALOGH, and                          :
TAMÁS MORVAI,                               :
                                            :
                        *Defendants*.       :
_____     :

### DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
### UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT

HOGAN LOVELLS US LLP
Robert B. Buehler
Lisa J. Fried
875 Third Avenue
New York, NY 10022
(212) 918-3000
robert.buehler@hoganlovells.com
lisa.fried@hoganlovells.com

Carl S. Rauh
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
carl.rauh@hoganlovells.com

*Counsel for Elek Straub*

PILLSBURY WINTHROP SHAW
PITTMAN LLP
William M. Sullivan, Jr.
Thomas C. Hill
2300 N Street, NW
Washington, DC 20037-1122
(202) 663-8027
william.sullivan@pillsburylaw.com
thomas.hill@pillsburylaw.com
*Counsel for András Balogh*

HINCKLEY, ALLEN & SNYDER LLP
Michael L. Koenig
Victoria P. Lane
30 South Pearl Street, Suite 901
Albany, NY  12207
(518) 396-3100
mkoenig@haslaw.com
vlane@haslaw.com
*Counsel for Tamás Morvai*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

COUNTER-STATEMENT OF FACTS .................................................................3

    I.   FACTS RELEVANT TO DEFENDANTS' ARGUMENT THAT THE SEC'S
        CLAIMS ARE TIME-BARRED ...................................................................4

    II.  FACTS CONCERNING THE DEFENDANTS' ALLEGED USE OF AN
        INSTRUMENTALITY OF INTERSTATE COMMERCE.............................4

    III. DISPUTED MATERIAL FACTS CONCERNING MESSRS. BALOGH AND
        MORVAI'S ALLEGED VIOLATION OF RULE 13B2-1 ............................5

    IV. DISPUTED MATERIAL FACTS CONCERNING MESSRS. STRAUB AND
        BALOGH'S ALLEGED VIOLATION OF RULE 13B2-2 ...........................6

ARGUMENT .......................................................................................................12

    I.   DISPUTED ISSUES OF MATERIAL FACT PRECLUDE A FINDING THAT
        THIS COURT HAS PERSONAL JURISDICTION OVER THE
        DEFENDANTS. .........................................................................................12

    II.  THE SEC'S CLAIMS ARE TIME-BARRED ...........................................16

        A.  The SEC Asks This Court to Ignore the Supreme Court's Decision in
            *Gabelli*.............................................................................................16

        B.  The SEC's Latest Interpretation of § 2462 is Inconsistent with the SEC's
            and the Court's Prior Holding and Unsupported by Any Relevant Legal
            Authority............................................................................................17

        C.  The SEC's Latest Reading of the Statute is Inconsistent with its Plain
            Language and Statement of Purpose...................................................20

    III. DISPUTED ISSUES OF MATERIAL FACT PRECLUDE A FINDING THAT
        DEFENDANTS MADE USE OF AN INSTRUMENTALITY OF
        INTERSTATE COMMERCE .....................................................................22

    IV. THE SEC IS NOT ENTITLED TO SUMMARY JUDGMENT THAT
        DEFENDANTS BALOGH AND MORVAI VIOLATED SEC RULE 13B2-1...........25

V.   DISPUTED ISSUES OF MATERIAL FACT PRECLUDE A FINDING THAT
     DEFENDANTS STRAUB AND BALOGH VIOLATED SEC RULE 13B2-2 ............29

     A.   Defendants Dispute That Management Representation Letters and
          Certifications that Predate the Signing of the Protocol are Relevant to the
          SEC's Claim and That Mr. Straub Signed an Annual Representation Letter
          After the Protocol Was Signed. ...............................................................................30

     B.   The Protocol of Cooperation Was Not a "Transaction or Material
          Agreement" and Therefore its Non-Disclosure Was Not a
          Misrepresentation................................................................................................33

     C.   The Protocol Was Not a "Financial Record or Related Data" and
          Therefore its Nondisclosure Was Not a Misrepresentation. ..................................39

     D.   Nondisclosure of the Protocol of Cooperation Was Not "Material" and
          Any Dispute as to Materiality Should Be Submitted to the Jury.........................40

CONCLUSION.......................................................................................................................44

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.I. Trade Fin., Inc. v. Petra Bank,*
    989 F.2d 76 (2d Cir. 1993)........................................................................................12, 13

*Adams v. Woods,*
    6 U.S. (2 Cranch) 336 (1805).....................................................................................17, 20

*Basic, Inc. v. Levinson,*
    485 U.S. 224 (1988)...........................................................................................................42

*Burnham v. Sup. Ct. of Cal.,*
    495 U.S. 604 (1990) (plurality opinion) ...........................................................................19

*Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.,*
    945 F.2d 1226 (2d Cir. 1991)............................................................................................40

*DeMaria v. Andersen,*
    318 F.3d 170 (2d Cir. 2003)..............................................................................................42

*Derensis v. Coopers & Lybrand Chartered Accountants,*
    930 F. Supp. 1003 (D.N.J. 1996) .....................................................................................14

*Gabelli v. SEC,*
    133 S. Ct. 1216 (2013) ...............................................................................16, 17, 20, 21

*Howgate vs. United States,*
    7 App. D.C. 217, 243 (D.C. Cir. 1895).......................................................................18, 19

*In re Apple Computer Sec. Litig.,*
    886 F.2d 1109 (9th Cir. 1989) .........................................................................................42

*In re CINAR Corp. Sec. Litig.,*
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) .............................................................................14

*In re Parmalat Sec. Lit.,*
    376 F. Supp. 2d 449 (S.D.N.Y. 2005)..............................................................................14

*In re Royal Dutch/Shell Transport Sec. Litig.,*
    380 F. Supp.2d 509 (D.N.J. 2005) ...................................................................................14

*In re Urdang,*
    304 A.D.2d 586, 758 N.Y.S.2d 125 (2003) .....................................................................26

*In re WorldCom, Inc. Sec. Litig.,*
    352 F. Supp. 2d 472 (S.D.N.Y. 2005)..............................................................................42

*Itoba Ltd. v. LEP Group PLC*,
930 F. Supp. 36 (D. Conn. 1996) ........................................................................14

*Jazini v. Nissan Motor Co.,*
148 F.3d 181 (2d Cir. 1998) ...............................................................................12

*Johns Hopkins Univ. v. Hutton,*
422 F.2d 1124 (4th Cir. 1970), *aff'd in part, rev'd in part*, 488 F.2d 912 (4th Cir.
1973) ...................................................................................................................40

*Kadic v. Karadzic,*
70 F.3d 232 (2d Cir. 1995) .................................................................................19

*Landry v. Price Waterhouse Chartered Accountants*,
715 F. Supp. 98 (S.D.N.Y. 1989) ........................................................................14

*Mendell v. Greenberg,*
927 F.2d 667 (2d Cir. 1990) ........................................................................40, 41

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
134 S.Ct. 736 (2014) ..........................................................................................21

*Moskal v. U.S,*
498 U.S. 203 (1990) ............................................................................................21

*Reingold v. Deloitte Haskins & Sells*,
599 F. Supp. 1241 (S.D.N.Y. 1984) .....................................................................14

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,*
185 F.Supp.2d 389 (S.D.N.Y. 2002) ...................................................................42

*S.E.C. v. Straub, et al.*,
921 F. Supp. 244 (S.D.N.Y. 2013) ..........................................................12, 13, 22

*Schwartz v. Houss,*
No. 21741/04, 6 Misc. 3d 1035(A), 2005 WL 579152 (Sup. Ct. Kings Cnty. Jan. 3,
2005) ...................................................................................................................26

*SEC v. Patel,*
No. 07 Civ. 39 (SM), 2009 WL 3151143 (D.N.H. Sept. 30, 2009) .......................40

*SEC v. Reves,*
491 F.Supp.2d 906 (N.D. Cal. 2007) ..................................................................42

*SEC v. Stanard,*
No. 06 Civ. 7736 (GEL) (S.D.N.Y. May 16, 2007) ...............................................14

*SEC v. Straub*,
   921 F. Supp. 2d 244 (2013) ...................................................................................... passim

*Southland Distribs. Mktg. Co. v. S&P Co.*,
   296 F.3d 1050 (11th Cir. 2002) ........................................................................................26

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)..................................................................................................40, 42

*U.S. v. Colasuono*,
   697 F.3d 164 (2d Cir. 2012)...............................................................................................21

*U.S. v. Santos*,
   553 U.S. 507 (2008)...........................................................................................................19

*United States v. Goyal*,
   No. CR 04–00201 (MJJ), 2008 WL 755010 (C.D.Cal. Mar. 21, 2008), *rev'd on other
   grounds,* 629 F.3d 912 (9th Cir. 2010) ............................................................................40

*United States v. MacKay*,
   491 F.2d 616 (10th Cir. 1973) .....................................................................................24, 25

*Viacom Int'l, Inc. v. Tandem Prods., Inc.*,
   368 F. Supp. 1264 (S.D.N.Y. 1974), *aff'd*, 526 F.2d 593 (2d Cir. 1975)..............................26

## STATUTES

15 U.S.C. § 78dd-1(a) ...............................................................................................................24

15 U.S.C. § 78j(b) ......................................................................................................................24

15 U.S.C. § 78m ........................................................................................................................29

17 C.F.R. § 240.13b2-1 ("Rule 13b2-1")........................................................................... passim

17 C.F.R. § 240.13b2–2 ("Rule 13b2–2") ......................................................................... passim

18 U.S.C. § 1341 .......................................................................................................................24

28 U.S.C. § 2462.........................................................................................................16, 17, 19, 20

N.Y. Gen. Oblig. Law § 5-701.................................................................................................26

## FEDERAL RULES

Fed. R. Civ. P. 12(b)(2)........................................................................................................12, 14

Fed. R. Civ. P. 56 .......................................................................................................................1

**OTHER AUTHORITIES**

1-2 Corbin on Contracts § 2.9...................................................................................................26

Anthony Teasdale and Timothy Bainbridge, *THE PENGUIN COMPANION TO EUROPEAN UNION* (Jan. 10, 2012), http://penguincompanion toeu.com/additional_entries/non-paper/........................................................................................................................35

MacMillan Dictionary...............................................................................................................20

Merriam-Webster Dictionary....................................................................................................20

Defendants Elek Straub, Tamás Morvai and András Balogh (together, the "Defendants") respectfully submit this memorandum of law in opposition to Plaintiff United States Securities and Exchange Commission's (the "SEC") motion pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment.

**<u>INTRODUCTION</u>**

The SEC's summary judgment motion should be denied because it is wrong on the facts and on the law. *First*, disputed issues of material fact preclude a finding that the Court may exercise personal jurisdiction over the Defendants. By the SEC's own admission, "there remain disputed issues of fact as to the defendants' bribe scheme." SEC Mem. at 15. Because this Court previously ruled that the existence of that very bribe scheme would need to be established by a preponderance of the evidence to justify the Court's exercise of personal jurisdiction over the Defendants, *SEC v. Straub*, 921 F. Supp. 2d 244, 252 (2013), summary judgment as to this issue should be denied. In addition, as previously detailed in Defendants' opening memorandum of law in support of their own summary judgment motion, the exercise of personal jurisdiction over the defendants also would be constitutionally unreasonable.

*Second*, the SEC's argument that its claims were brought within the relevant statute of limitations is inconsistent with recent Supreme Court jurisprudence; with caselaw concerning tolling statutes; and with the argument previously made by the SEC and adopted by the Court concerning the statute of limitations in this very action. Under both controlling caselaw and this Court's own prior ruling, the SEC's claims are time-barred.

*Third,* the SEC cannot demonstrate that the Defendants used an instrumentality of U.S. interstate commerce to further an alleged bribe offer or payment because the SEC can only cite to *one* email sent by Mr. Balogh, to a colleague, with no text in the body of the email and

attaching the Protocol of Cooperation, and *one* email received by Mr. Balogh, from a colleague, attaching a draft Chaptex consultancy contract, that were allegedly routed through a U.S. server. Because the Defendants dispute that the Protocol of Cooperation memorialized an agreement to pay bribes and that the Chaptex consultancy agreements were "sham" contracts, and because Messrs. Straub and Morvai are not alleged to have sent or received any emails at all that were routed through a U.S. server, summary judgment on this point must be denied.

*Fourth,* disputed issues of material fact preclude a finding that Messrs. Balogh and Morvai violated 17 C.F.R. § 240.13b2-1 ("Rule 13b2-1") because the documents that the SEC characterizes as "backdated" merely memorialized oral agreements reached on the dates reflected in the documents, and because certain of the documents are not even "records" subject to Rule 13b2-1.

*Fifth*, disputed issues of material fact also preclude a finding that Messrs. Straub and Balogh made material misrepresentations in statements to auditors in violation of 17 C.F.R. § 240.13b2–2 ("Rule 13b2–2").  In particular, there are significant disputes concerning the fundamental nature and impact of the central document in this case, the Protocol of Cooperation, as well as whether that document was actually material to the Company's auditors.  In addition, where, as here, materiality is an element of the offense and is disputed, the relevant case law establishes that the issue should be submitted to the jury and should not be resolved on summary judgment.

For these reasons and those set forth below, partial summary judgment in the SEC's favor should be denied.

## COUNTER-STATEMENT OF FACTS

As a threshold issue, the more than 10-page recitation of "facts" in the SEC's opening memorandum of law consists almost entirely of "facts" that are very much in dispute, and in large part unsupportable by any testimony or documentary evidence elicited in discovery.  The SEC acknowledges as much, stating that its Statement of Facts "includes references to disputed facts."  SEC Mem. at 4, n.3.  That significant understatement is itself grossly misleading: what the SEC has actually done is spent a quarter of its brief accusing the Defendants of "engag[ing] in a scheme" (SEC Mem. at 4), "bribing the Prime Minister and other senior Macedonian public officials" (*id.*), entering into a "corrupt bargain" (*id.*), "launder[ing] bribe payments" (*id.*), "conceal[ing] the paper trail" (SEC Mem. at 5), and "sign[ing] false certifications and sub-certifications" (*id.*).  The SEC itself then plainly acknowledges, though, that "there remain disputed issues of fact as to the defendants' bribe scheme."  SEC Mem. at 15.  That statement, too, is a drastic understatement.  To be clear, the Defendants ***deny the existence of any bribe scheme whatsoever and likewise dispute that they engaged in any of the wrongdoing the SEC has alleged.***  Accordingly, in opposition to the SEC's summary judgment motion, Defendants have limited the following counter-statement of facts ***solely*** to those facts relevant to what the SEC describes as the "five discrete issues" (SEC Mem. at 1) raised in its summary judgment motion.[1]

---

[1]   Because the Defendants oppose the SEC's personal jurisdiction claim primarily on the basis of legal arguments, no factual discussion is included with respect to that aspect of the SEC's motion.

## I.   FACTS RELEVANT TO DEFENDANTS' ARGUMENT THAT THE SEC'S CLAIMS ARE TIME-BARRED

Mr. Straub traveled to New York and Boston during the week of September 6, 2005.  *See* Declaration of Elek Straub, dated October 1, 2015, submitted in support of Defendants' motion for summary judgment (Dkt. No. 237) ("Straub Decl."), at ¶¶ 1-2, Ex. A.  Mr. Morvai visited the U.S. twice in 2005—he flew into San Francisco, California, with his wife on June 23, 2005, and stayed in the U.S. for approximately one month, and then separately flew to New York on October 21, 2005, and remained in the United States for three to four days.  *See* Declaration of Tamás Morvai, dated October 4, 2015, submitted in support of Defendants' motion for summary judgment (Dkt.No. 238) ("Morvai Decl."), at ¶¶ 3-5, Ex. A; Declaration of Andrea Cseh, dated October 4, 2015, submitted in support of Defendants' motion for summary judgment (Dkt. No. 239) ("Cseh Decl."), at ¶¶ 3-5, Ex. A.

## II.  FACTS CONCERNING THE DEFENDANTS' ALLEGED USE OF AN INSTRUMENTALITY OF INTERSTATE COMMERCE

It is undisputed that on May 31, 2005, Defendant Balogh, using a Magyar Telekom email address in Hungary, sent an email to Attila Szendrei in Macedonia at Mr. Szendrei's Hotmail email address.  Declaration of Lisa J. Fried, dated November 6, 2015 and submitted herewith ("Fried Decl."), Ex. I.  Mr. Balogh's email did not contain any text in the body of the message and attached an unsigned draft of the Protocol of Cooperation.  *See id.*  It is also undisputed that on July 5, 2005, Magyar Telekom in-house attorney Zsolt Herczegh sent an email from Peter Danko's Magyar Telekom email address to Mr. Balogh, at Mr. Balogh's Magyar Telekom email address, and to Attila Szendrei, at Mr. Szendrei's Hotmail email address.  Fried Decl. Ex. J. None of the emails that the SEC has identified in support of its motion for partial summary judgment was sent or received by Mr. Straub or Mr. Morvai.  *See* SEC's R. 56.1 Stmt. ¶¶ 99-100.

### III.  DISPUTED MATERIAL FACTS CONCERNING MESSRS. BALOGH AND MORVAI'S ALLEGED VIOLATION OF RULE 13B2-1

Disputed issues of material fact exist concerning the Labour Law and Bylaw contracts and the letters authorizing these contracts.  In particular, and contrary to the SEC's assertion, the dates on those contracts accurately reflect the date upon which the parties reached those agreements, via an oral agreement.  *See* Fried Decl. Ex. A (Balogh Tr.) at 327:4-12 ("It was an oral agreement, probably an oral agreement or general agreement, that Chaptex and Cosmotelco will assist MakTel in the negotiations and will assist MakTel in concrete projects with concrete deliverables and concrete results.  I cannot recall what -- at this time, what specific date you asked. And there was a specific agreement about how much they would receive or how much they asked for . . . .").  Magyar Telekom in-house attorney Zsolt Herczegh testified at his deposition that a contract's date reflects when a contract has been established by the parties, and reflects the parties' intent and when their obligations begin (Fried Decl. Ex. D (Herczegh Tr.) at 161:7-14).   In addition, Mr. Herczegh acknowledged that oral agreements can later be memorialized in written agreements. *See id.* 161:23-162:1; 166:1-4 ("Q:  Sometimes oral contracts are memorialized with a subsequent written agreement, correct?  A:  Yes.").  This was corroborated by Mr. Balogh, who stated that, here, "there was [sic] services provided for a long period of time. These services had to be memorialized in a -- in a contract.  This was a subsequent realization of some previous intentions. They had to be put into a -- a legal framework and legal structure that needed certain activities and certain work from legal personnel and other individuals working for these companies. But these covered legitimate and performed activities that had been performed and delivered over a longer period of time." Fried Decl. Ex. A (Balogh Tr.) at 396:2-12.  For example, Mr. Balogh explained that work under the Company's contract with White and Case, related to the firm's independent investigation of

Magyar Telekom, began before a written contract was entered into. *Id.* at 413:18-414:7 ("If . . .
I recollect my memories concerning contracts that were formalized after the activity started, the
most striking example that . . . comes to mind . . . is a contract Magyar Telekom had with White
and Case to do this investigation when White and Cases started to work much before any written
contract, and written information, any details about the targets, about the means, and about any
of the details of this investigation had been communicated, shown, or sent to executives at
Magyar Telekom.  And, actually, I know . . . that the contract with White and Case had been
signed at a later stage than they actually prefer, started to work for Magyar Telekom.").

## IV.  DISPUTED MATERIAL FACTS CONCERNING MESSRS. STRAUB AND BALOGH'S ALLEGED VIOLATION OF RULE 13B2-2

There are significant disputes concerning the meaning, interpretation, nature and effect of
the key document in this case, the Protocol of Cooperation, as well as whether that document
was actually material to Magyar Telekom's auditors.  As an initial matter, the Defendants dispute
that any representation letters or certifications signed before the Protocol was finalized are
relevant to the Rule 13b2-2 claim and that the annual representation letter dated January 13, 2006
– the *only* annual representation letter that post-dated the Protocol – was signed or otherwise
authorized by Mr. Straub.

It is undisputed that the Protocol was signed in late May 2005.  The only representations
by Mr. Straub that are even arguably relevant to this discussion, therefore, are the two quarterly
representation letters, dated July 19, 2005 and October 17, 2005, that were issued after the
Protocol was signed (SEC R. 56.1 Stmt. ¶¶ 26-27).[2]  The SEC cites no evidence that Mr. Straub

---

[2]  For the same reason, the only misrepresentations allegedly made by Mr. Balogh that are even
arguably relevant to this discussion are contained in emails dated July 18, 2005, October 14,
2005, January 13, 2006, and February 8, 2006.  And Mr. Balogh would maintain they are *not*

*(cont'd)*

signed an annual representation letter after the Protocol was signed, or that he signed, or

"authorized to be sent," an annual representation letter on January 13, 2006.  In response to the

SEC's request for admission on this point, Mr. Straub specifically stated that he did not recall

signing that document.  Nor has the SEC ever produced a signed version of this document.

In addition, the Protocol of Cooperation was not, and was never intended to be, a formal,

binding contract between Magyar Telekom and the Government of Macedonia.  All witnesses

with knowledge of the Protocol described it as nothing more than a discussion document or a

general framework between MakTel's two shareholders – Magyar Telekom and the Government

of Macedonia – regarding prospective ways to resolve existing disputes in an attempt to

cooperate with one another.  *See, e.g.,* Fried Decl. Ex. G (Straub Tr.) at 116:14-16*; Id.* Ex. B

(Buckovksi Tr.) at 18:22-19:3.  In his deposition, Mr. Straub characterized the Protocol as a

"good faith start to solve [a] problem."  *Id.* Ex. G (Straub Tr.) at 150:2-3.  Similarly, Mr. Balogh

described the Protocol as "a wish list" or "memorandum of understanding" that set forth "the

framework [for] cooperation." *Id.* Ex. A (Balogh Tr.) at 82:8-24; *see id.* at 94:25-95:3 ("It set

forth how we are going to work together as MakTel and government of Macedonia as business

partners, as equity partners, and as a market player and a regulator."); *id* at 90:7-12 ("[G]uidance

for activities toward the future.").  Michael Gunther, an executive at Deutsche Telekom involved

in the negotiations surrounding the Protocol, noted that the Protocol "recorded the declarations of

intent" and was "nothing but the result of conversations between two shareholders of MakTel."

*Id.* Ex. C (Gunther Tr.) at 54; *id.* at 40 ("It is a transcript of results of a discussion.").  The former

---

*(cont'd from previous page)*
    relevant, based on Magyar Telekom's auditor's testimony that the audit company did not
    examine the sub-certifications and did not know how such sub-certifications were maintained
    at Magyar Telekom or what would happen if no response came back from the request.  *See*
    Fried Decl. Ex. E (Kos Tr.) at 188:9-24.

Prime Minister of Macedonia, Vlado Buckovski, who signed one copy of the Protocol, described it simply as "a memorandum of understanding" that was only "the first step to solve the relationship" between the two shareholders of MakTel.  *Id.* Ex. B (Buckovski Tr.) at 19:2-3; *see also id.* at 46:15-16 (describing the document as drafted "in the spirit of building a mutual trust").  Indeed, in further characterizing the Protocol, Prime Minister Buckovski stated, "[I] knew that everything [the parties] put on the paper, they won't be able to realize. It was more as a wish list."  *Id.* at 21:1-3.

In particular, at the time that the Protocol was signed, entry into Kosovo and the establishment of an MVNO in that dangerous area was nothing more than an "aspirational target" for which a business case had not yet even been completed by Magyar Telekom or any of the MakTel Group companies.  As Mr. Balogh explicitly stated during his deposition, "When I mentioned wish list or aspirational targets, paragraph number one is a very good example for that because it's Kosovo MVNO operation is definitely an aspirations target."  *See id.* Ex. A (Balogh Tr.) at 98:17-20; *id.* at 144-5-11 (noting that by the signing of the Protocol in May 2005, MakTel was at most ready to "[e]armark[] the budget, start[] to work on the business case" and noting that the Protocol "doesn't say that it's a firm commitment because it's not a firm commitment. It's a business case."); *id.* Ex. G (Straub Tr.) at 133:18-19 (describing the expansion into Kosovo, as described in the Protocol, as "only very preliminary plans"); Indeed, the goal was not ultimately reached.  *Id.* Ex. B (Buckovski Tr.) at 21:1-4 ("[I] knew that everything [the parties] put on the paper, they won't be able to realize. It was more as a wish list. For one, [the parties] never entered the Kosovo market."); *Id.* Ex. G (Straub Tr.) at 133:20-23 ("[N]othing has been realized from this MVNO at all because later on it turned out that there [were] . . . business arguments against it.").

In addition, the dividend payment discussed in the second paragraph of the Protocol also was contingent on approvals by several other bodies, including the boards of directors of MakTel and MobiMak, as well as the shareholder assemblies for both entities.  As Mr. Straub testified, "the agreement of Matav is not enough in this case to pay dividends because it has to be decided by the necessary board of directors and the necessary shareholders meeting of MakTel."  Fried Decl. Ex. G (Straub Tr.) at 137:4-8; *see also id.* at 136:16-19 (noting that payment of the dividend was "pending on the fact that the financial conditions of the company . . . will be as expected").   Mr. Balogh, too, pointed out that "[i]n order [to] actually declare this dividend . . . board approval [was] needed and another approval process had to be followed within the company."  *Id.* Ex. A (Balogh Tr.) at 101:13-16; *see id.* at 104:13-19 ("[Declaring the dividend] wasn't his [Elek Straub's] decision.  A lot of other parties have to be involved in making the final decision, like the board of Stonebridge, like the board of MakTel and probably the finance department of Magyar Telekom, including people from Deutsche Telekom."); *see also id.* Ex. H (MT-MAK 0820521) (discussing the MobiMak board of directors resolution related to the payment of the dividend and noting that "the Shareholder's Assembly of MobiMak can either pay the proposed dividend of MobiMak, can increase it to higher level or can reduce it to any level it wishes.").

Finally, MakTel's payment of a frequency fee of 1.2 million Euro could only be triggered by the issuance of an invoice by the appropriate regulatory authority in the Macedonian Government, not by the Protocol itself.  As Mr. Balogh testified, "It was a wish of Magyar Telekom and MakTel . . . to reduce the frequency fees; however, the frequency fee… is an amount that's invoiced by one of the organizations of the government, requir[ing] further decision-making."  *Id.* Ex. A (Balogh Tr.) at 108:9-14; *id* at 108:20-109:1 (noting that at the time

the Protocol of Cooperation was signed, individuals at Magyar Telekom at most "hoped" that the

invoiced amount would be 1.2 million Euro); *Id.* Ex. G (Straub Tr.) at 148:9-20 (noting that at

the time of signing the Protocol, the Government had not agreed to invoice the MakTel group at

that amount).

Notably, even the SEC is forced to acknowledge that the Protocol of Cooperation "was

never intended to be enforceable in a court of law."  SEC Mem. at 42.  The non-binding and

unenforceable nature of the Protocol was also corroborated by numerous witnesses.  As the

former Prime Minister and one of the signatories to the Protocol testified, the "Protocol did not

bind [the parties] with anything."  *See* Fried Decl. Ex. B (Buckovski Tr.) at 46:14-15; *id.* at 47:7-

9 (referring to the Protocol as a document "without the tools to force them to do one thing or the

government doing another thing"); *id.* at 44:9-10 (noting that the Protocol "is not . . . binding");

*Id.* Ex. F (Morvai Tr.) at 142:23-143:3 ("So when you put it on paper, it's still not a guarantee

that there is a clear deal, but the better chance that you have a common understanding. . . . [I]t

was not a contract."); *Id.* Ex. C. (Gunther Tr.) at 80 ("I couldn't have sued the government either

if they said, we changed our minds.").

Furthermore, there is no dispute that the auditors knew of those aspects of the Protocol

that were realized and had a financial impact on the Company.  For example, the auditors clearly

knew that the board of directors of MakTel had voted in 2005 to pay a dividend to the

Macedonian government.  *See* Fried Decl. Ex. G. (Straub Tr.) at 164:5-7 (noting that the

payment of the dividend was "known by everybody"); *see id.* Fried Decl. Ex. E (Kos Tr.) at

61:21-24 ("The management of the company told us . . . that they needed . . . audited financial

statements in order to pay a dividend that the government was demanding.").  Thus, contrary to

the SEC's assertions, the auditors of Magyar Telekom were not lied to by Mr. Straub or Mr. Balogh.

In arguing that failure to disclose the Protocol was somehow material, the SEC references testimony from both Mr. Straub and Nicholas Kos, the PricewaterhouseCoopers audit engagement partner for Magyar Telekom.  However, Mr. Straub unequivocally testified during his deposition that Magyar Telekom saw the Protocol as a document containing "no firm agreements," in which the purported "commitments" could not be triggered by the Protocol itself but only by future events outside of the parties' control.  *See id.* Ex. G (Straub Tr.) at 113:5-8; 144:10-16.  And when Mr. Kos was prompted by the SEC to state whether he considered the existence of the Protocol to be material for purposes of his audit, he stopped far short of saying the Protocol was obviously material, as required by the applicable case law.  Instead, Mr. Kos stated that a "further determination would need to be made."  Fried Decl. Ex. E (Kos Tr.) at 204:24-205:8.  Throughout his deposition, Mr. Kos refused to make a definitive statement that the Protocol was material, much less obviously material: "I can't make the determination . . . whether or not these protocols would have impacted the fair presentation."  *Id.* at 76:12-14.

Moreover, Mr. Kos made clear that his awareness and understanding of the Protocol was extremely limited.  In this regard, Mr. Kos testified that he had only seen the Protocol once before his deposition when it was shown to him by the U.S. Department of Justice in the context of an investigation involving the Company; had not participated in any discussions or negotiations regarding the Protocol; and had never spoken to any of the individuals who signed the Protocol.  *Id.* at 156:5-157:22.  Without this information, Mr. Kos, as he himself admitted, was not in a position to make a determination of whether the Protocol was material information.  Mr. Kos further clarified that when he testified about the Protocol, he did so based solely on a

review of the document on the "face of it" and under an uninformed impression that the Protocol

was a "contract" that "theoretically" contained "commitments" or "guaranteed" certain acts.  *See,*

*e.g., id.* at 65:9, 65:12-13, 66:4-8, 15.

<u>ARGUMENT</u>

**I.**   **DISPUTED ISSUES OF MATERIAL FACT PRECLUDE A FINDING THAT THIS COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS.**

Because the SEC itself concedes that "there remain disputed issues of fact as to the

defendants' bribe scheme" (SEC Mem. at 15), and this Court previously held that the SEC

would need to persuasively establish that the Defendants engaged in wrongdoing before the

Court could assert jurisdiction over them, the SEC's motion seeking summary judgment with

respect to personal jurisdiction should be denied.  In denying the Defendants' motion to dismiss

for lack of personal jurisdiction, the Court distinguished between the relatively low burden the

SEC faced at the pleading stage and the far higher showing the SEC ultimately would be

required to make to establish that the Defendants were subject to jurisdiction in this Court:

> "[P]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith ... legally sufficient allegations of jurisdiction, i.e., by making a *prima facie* showing of jurisdiction." *Jazini v. Nissan Motor Co.,* 148 F.3d 181, 184 (2d Cir. 1998) . . . *Eventually, however, "personal jurisdiction must be established by a preponderance of the evidence, either at an evidentiary hearing or at trial."* (citing *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993).

*S.E.C. v. Straub, et al.*, 921 F. Supp. 244, 251-2 (S.D.N.Y. 2013) (emphasis added and citations

omitted).  The Court went on to conclude, among other things, that the SEC – solely for purposes

of surviving a Fed. R. Civ. P. 12(b)(2) motion to dismiss – had adequately alleged that the

Defendants had sufficient minimum contacts with the U.S. and, further, that exercising

jurisdiction over the Defendants would not be unreasonable.  *Id.* at 256-9.

On the question of minimum contacts, the Court made clear that the fact that the Defendants may have signed certain management representation letter and certifications, on its own, was <u>not</u> sufficient to subject them to personal jurisdiction in a U.S court.  *Id.* at 257.  Noting that it was *not* creating a *per se* rule that would subject any employee of a foreign issuer to jurisdiction in the U.S., the Court stated that, instead, it based its denial of the Defendants' motion to dismiss:

> on a fact-based inquiry—namely, an analysis of the SEC's specific allegations regarding the Defendants' bribery scheme, Defendants' falsification of Magyar's books and records, and Defendants' personal involvement in making representations and sub-representations with respect to and in anticipation of Magyar's SEC filings.

*Id.* at 257.  Stated differently, the Court denied the Defendants' motion to dismiss not because the SEC had alleged that the Defendants had signed certain management representation letters and certifications, but because the SEC *also* had alleged that the Defendants had allegedly engaged in substantive underlying wrongdoing that they had failed to disclose in those representations and certifications.

While the SEC's allegations may have been sufficient to defeat a motion to dismiss, they do not entitle the SEC to summary judgment on the question of personal jurisdiction, because the SEC concedes – and the Defendants wholeheartedly agree – that "there remain disputed issues of fact as to the defendants' bribe scheme."  SEC Mem. at 15.  With this concession, the SEC is unable to establish (nor has it even to tried to establish), by a preponderance of the evidence, that it is entitled to judgment on the question of personal jurisdiction.  The SEC will need to persuasively establish that this Court can exercise jurisdiction over the Defendants, "either at an evidentiary hearing or at trial" (*see A.I. Trade Fin., Inc. v. Petra Bank*, 989 F. 2d 76, 79 (2d Cir. 1993)) – where the many disputed issues of material fact may be heard and resolved.

- 13 -

The authorities cited by the SEC reinforce the weakness of the SEC's position: the cases the SEC misleadingly cites for the notion that "courts routinely uphold personal jurisdiction over foreign defendants whose actions abroad are directed at the United States by virtue of their involvement in falsifying financial statements filed with the SEC" (SEC Mem. at 21) were all, without exception, decisions on motions to dismiss under Fed R. Civ. P. 12(b)(2), *not* on summary judgment motions like the instant one.  *See SEC v. Stanard,* No. 06 Civ. 7736 (GEL) (S.D.N.Y. May 16, 2007) (denying pre-discovery motion to dismiss); *In re Parmalat Sec. Lit.*, 376 F. Supp. 2d 449, 454-56 (S.D.N.Y. 2005) (same); *Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98, 101-02 (S.D.N.Y. 1989) (same); *Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1261-64 (S.D.N.Y. 1984) (same); *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 305-06 (E.D.N.Y. 2002) (same); *In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F. Supp.2d 509, 551 (D.N.J. 2005) (same); *Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003, 1014 (D.N.J. 1996) (same); *Itoba Ltd. v. LEP Group PLC*, 930 F. Supp. 36, 40-41 (D. Conn. 1996) (same) (all of the foregoing cited by the SEC at Mem. at 21-22).

Here, in contrast to the cases it cited in its motion, the SEC has had the benefit of complete discovery but still is unable to make even a *prima facie* showing of what this Court already has indicated is a required element to establish personal jurisdiction: that the alleged bribe scheme in question actually existed, and that the Defendants were not merely certifying truthfully that they were not aware of fraud at the Company.  While the SEC's allegations may have been enough to survive a motion to dismiss, far more is required here, where the SEC is seeking judgment on this issue.

The SEC argues that the "undisputed facts prove that the Defendants are subject to this Court's jurisdiction," but when one sets aside the disputed facts surrounding the alleged bribe scheme, all that remains are undisputed allegations that the Defendants may have signed some management representation letters, certifications and/or sub-certifications that did not disclose a purported bribery scheme, the existence of which is hotly in dispute.  In other words, the only point about which even the SEC states there is no dispute is that the Defendants signed and/or made certain representations and/or certifications to the effect that they were not aware of any fraud or suspected fraud.  In the absence of fraud, those representations and certifications would have of course been entirely truthful, proper and legal, and based on this Court's own previous statements, they would not be a sufficient basis on which to assert jurisdiction over the Defendants.

Notwithstanding the SEC's outright concession that "there remain disputed issues of fact as to the defendants' bribe scheme" – which, to be clear, include the Defendants themselves denying under oath the existence of any bribe scheme whatsoever – the SEC, in a noteworthy display of circular reasoning, states that the Defendants' management representation letters and certifications "were instrumental in concealing the bribe scheme."  SEC Mem. at 24.   The SEC goes on to catalog the Defendants' various representations that they were not aware of any fraud at the Company, "[n]one of" which "could have been true in the presence of a bribe scheme."  *Id.* Of course, those representations would have been *entirely* true in the *absence* of a bribe scheme. Given the disputed issues of fact concerning the existence of a bribery scheme, the only thing that is beyond dispute here is that the question of whether this Court can assert jurisdiction over the Defendants is not ripe for summary judgment.

At base, the SEC is simply incorrect when it says that the material facts supporting the Court's exercise of personal jurisdiction over the defendants are "not in genuine dispute." SEC Mem. at 26. The SEC itself acknowledges that genuine disputed issues of material fact exist with respect to the alleged bribery scheme, and because the SEC has not established by a preponderance of evidence that that bribe scheme existed – and has declined the opportunity even to try – summary judgment should be denied.[3]

## II.   THE SEC'S CLAIMS ARE TIME-BARRED

### A.   The SEC Asks This Court to Ignore the Supreme Court's Decision in Gabelli.

The SEC now argues that the statute of limitations under 28 U.S.C. § 2462 runs only if a defendant is physically present in the United States for an entire five year period. The SEC's exceedingly broad reading of § 2462 has no legal support and, in fact, is at complete odds with *Gabelli v. SEC*, 133 S. Ct. 1216, 1223 (2013), the only Supreme Court authority addressing section 2462.

As discussed in detail in Defendants' Joint Memorandum of Law in Support of its Motion for Summary Judgment (Dkt. No. 235), it is clear in light of *Gabelli* – decided after the Court's ruling on Defendants' Motion to Dismiss – that § 2462 provides for a strict five year statute of limitations period, with no tolling, that begins to run on the date the claim first accrued. In *Gabelli,* the Supreme Court expressly rejected exposing defendants "to Government enforcement actions not only for five years after their misdeeds, but for an additional uncertain period into the future." *Gabelli*, 133 S.Ct. at 1223. The Supreme Court, quoting Chief Justice Marshall, also

---

[3]   In addition and for the reasons detailed in Defendants' opening memorandum of law in support of their own summary judgment motion, the exercise of jurisdiction over them would also be constitutionally unreasonable. *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment (Dkt. No. 235, at 4-10).

reiterated the importance of setting a fixed date for when exposure to penalty actions ends, stating that it "would be utterly repugnant to the genius of our laws if actions for penalties could 'be brought at any distance of time.'"  *Id.* (quoting *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 364 (1805)).  The SEC wholly ignores *Gabelli* and instead seeks to read into the statute a tolling provision that is simply not there, which would continue indefinitely until each defendant spent five years living in the United States.  *See* SEC Mem. at 26-28.  The SEC's position is inconsistent with *Gabelli* and its motion concerning the statute of limitations should be denied on this basis alone.

### B.  The SEC's Latest Interpretation of § 2462 is Inconsistent with the SEC's and the Court's Prior Holding and Unsupported by Any Relevant Legal Authority.

Even this Court's pre-*Gabelli* ruling necessitates a denial of the SEC's motion for summary judgment with respect to the statute of limitations.  As the Court previously noted, it is undisputed that "more than five years have elapsed since the SEC's claims first accrued." *Straub*, 921 F. Supp. 2d at 259.  In opposition to the Defendants' motion to dismiss, the SEC argued, and the Court agreed at that time, that "because Defendants were not 'found' in this country at any point during the limitations period in question, the Court's inquiry should end." *Id.*  The Court also adopted the SEC's reading of the statute that "the operative language in § 2462 requires, by its plain terms, that an offender must be physically present in the United States for the statute of limitations to run."  *Id.* at 260.  It has now been established beyond dispute that two of the defendants, Messrs. Straub and Morvai, were physically present in the United States during the limitations period.  *See* Defs' R. 56.1 Stmt. at ¶¶ 1-2.  The SEC's claims against them are therefore time-barred under 28 U.S.C. § 2462.

Faced with the undisputed fact that two defendants meet the burden previously advocated by the SEC and adopted by the Court, the SEC does an about face and attempts to read into the

statute yet *another* requirement that defendants must be physically present in the United States for the entire five year statute of limitations period in order for the statute to have run.  Nothing in this Court's previous ruling, or in the plain language of the statute, remotely suggests that a defendant need be physically present in the United States for five years for the statute to run. Indeed, the Court itself said "at any point," not "at all points," "continuously," or any other similar characterization that supports the SEC's now expansive position.

Not surprisingly, the SEC cannot cite to any legal authority supporting its extraordinary new position; indeed, its interpretation is inconsistent with both the plain meaning and purpose of the statute.  Instead the SEC, citing a single criminal case decided 120 year ago, claims that Congress could not have intended that an "offender" could cause the entire five-year period to run by setting foot in the U.S. for a fleeting moment.  SEC Mem. at 28 (citing *Howgate vs. United States*, 7 App. D.C. 217, 243 (D.C. Cir. 1895)). The SEC's reliance on this case is entirely misplaced.

Not only was *Howgate* a criminal case, but the court was applying a statute that expressly stated that the statute of limitations "shall not extend to any person fleeing from justice." *Id*. at 244. The SEC conveniently neglects to mention that the question before the *Howgate* Court was the application of that express statutory exception or that the defendant had escaped from the custody of U.S. Marshalls while awaiting trial on several indictments and was a fugitive from justice for over twelve years.  *Id*. at 239.  The language cited by the SEC related solely to the Court's rejection of defendant's argument that, because the statute of limitations began to run before he fled from justice, the Court should ignore the statutory exception and find that the statute expired three years from the date of the commission of the crime.  *Id*. at 243. The Court

easily rejected defendant's argument because it would render the express statutory exception "an absolute nullity." *Id*.

*Howgate* is distinguishable from this case in every relevant respect.  First, this is not a criminal case. Second, this case involves an entirely different (civil) statute of limitations. Third, the Defendants were never fugitives from justice, but are instead foreign nationals who never lived or worked in the United States.  Further, the *Howgate* Court rejected the defendant's position not because the defendant was required to be present within the jurisdiction for the entire three year statute of limitations period, but because the statute expressly provided that a fugitive fleeing from justice would not be entitled to the benefit of the three year statute of limitations at all. *Id*. at 244.

The SEC's argument concerning *in rem* jurisdiction and reliance upon *U.S. v. Santos*, 553 U.S. 507 (2008) are similarly misplaced.[4]  *See* SEC Mem. at 28-29. Most importantly, Defendants are not asking the Court to interpret § 2462 differently with respect to people and property.  The length of time that the person or property is present within the United States simply has no bearing on the question.  If the government personally serves a defendant while in the United States for any period of time, it has jurisdiction over that person.  *See, e.g., Burnham v. Sup. Ct. of Cal.*, 495 U.S. 604, 619 (1990) (plurality opinion) (upholding the exercise of personal jurisdiction based on nothing more than physical presence); *Kadic v. Karadzic*, 70 F.3d 232, 246-47 (2d Cir. 1995) (upholding the exercise of personal jurisdiction over foreign national served with summons while physically present in the United States).  Similarly, if the

---

[4]   The language cited by the SEC is from § IV of the decision that was joined by only three justices and addresses their disagreement with the rationale behind the concurrence opinion of Justice Stevens. *See* 553 U.S. at 509 & 521-524.

government seizes property while it is in the United States, it has jurisdiction over the property.

The SEC's argument concerning jurisdiction over property is therefore a red herring.

It is not surprising that the SEC cannot cite any legal authority supporting its most recent interpretation of § 2462 because, as discussed *infra*, the SEC's interpretation is inconsistent with the statute's plain language.  The SEC's interpretation also ignores more than two hundred years of Supreme Court jurisprudence recognizing the importance of time limits on penalty actions. *See, e.g., Adams*, 6 U.S. at 342 (stating "[it] would be utterly repugnant to the genius of our laws" if actions for penalties could "be brought at any distance of time"); *Gabelli*, 133 S. Ct. at 1233 (rejecting SEC's attempt to graft a discovery rule onto § 2462 because "[i]t would leave defendants exposed to Government enforcement action not only for five years after their misdeeds, but for an additional uncertain period into the future").

### C. The SEC's Latest Reading of the Statute is Inconsistent with its Plain Language and Statement of Purpose

There is no language in the statute stating or suggesting that a defendant must be physically present in the United States for the entire five-year statute of limitations period in order for there to be service.  To the contrary, the statute provides that a claim "shall not be entertained unless commenced within five years from the date when the claim first accrued if, *within the same period*, the offender or the property is found within the United States in order that proper service may be made thereon." 28 U.S.C. § 2462 (emphasis added).  While the statute does not define the word "within," given its common meaning, it is clear that the drafters contemplated the defendant's presence in the United States for a period *less than* the entire five-year period described in the statute. *See, e.g*., MacMillan Dictionary (defining "within" as "inside a period of time"); Merriam-Webster Dictionary (defining "within" as "before the end of a particular period of time").  Adopting the SEC's interpretation would require the Court to

ignore the plain meaning of the phrase "within the same period" and replace it with "throughout the same period" or "continuously in the same period" or "cumulatively for five years."  The Court should reject the SEC's attempt to rewrite the statute.  *See U.S. v. Colasuono*, 697 F.3d 164, 173 (2d Cir. 2012) ("a court should give effect, if possible, to every clause and word of a statute") (quoting *Moskal v. U.S*, 498 U.S. 203, 109-110 (1990)).

The SEC is necessarily arguing that the applicable five year statute of limitations should be tolled while a defendant is outside the United States.  As set forth in Defendants' Joint Motion for Summary Judgment, however, when Congress intends to toll the statute in a person's absence, it does so with express and clear language. Defs' Mem. at 20-24. Here, Congress chose not to do so and the Court should reject the SEC's attempt to read into the statute a tolling provision that is not there.  *See Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S.Ct. 736, 742 (2014) (rejecting statutory interpretation on basis that Congress "easily could have drafted language to that effect," but did not).

The SEC's interpretation now is different from what it argued to this Court at the motion to dismiss stage.  There the Court stated:  "Thus, according to the SEC, because defendants were not 'found' in this country at any point during the limitations period in question, the Court's inquiry should end.  The Court agrees."  *Straub*, 921 F. 2d at 260 (emphasis added).  Now that the SEC knows that two of the defendants were in the United States during the limitations period, it argues that Defendants had to be present in the United States for the entire limitations period.  There is nothing in the statute that states or suggests this, and such an argument is at complete odds with the Supreme Court's reasoning in *Gabelli*.

Here, it is undisputed that more than five years have elapsed since the SEC's claims first accrued.  *Id.* at 259.  It is also undisputed that Mr. Straub and Mr. Morvai were both present in

the U.S. after the claims first accrued in June 2005 (Mr. Straub in September 2005 and Mr.

Morvai in June and July 2005 and again in October 2005).  As the SEC did not bring its claims

until December 29, 2011, the SEC's claims against Mr. Straub and Mr. Morvai are time-barred.[5]

## III.    DISPUTED ISSUES OF MATERIAL FACT PRECLUDE A FINDING THAT DEFENDANTS MADE USE OF AN INSTRUMENTALITY OF INTERSTATE COMMERCE

In support of the SEC's argument, it points to but a single email from Mr. Balogh and a

single email to Mr. Balogh that were alleged to have passed through a U.S. server.  The SEC

nevertheless has consistently used artful language to suggest that there is a much greater nexus to

U.S. interstate commerce than this.[6]  The SEC does so again in support of the instant motion.

After alleging that "The Defendants Used Email to Further Their Scheme, and *Certain of those

Emails* Passed Through and Were Stored on Internet Servers in the United States" (SEC Mem. at

31) (emphasis added), the SEC can only cite to *two* emails in support – from Mr. Balogh, sitting

---

[5]    In addition, for the reasons detailed in Defendants' opening memorandum of law in support of their own summary judgment motion, summary judgment should be granted in favor of the Defendants on statute of limitations grounds.  *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment (Dkt. No. 235, at 15-34).

[6]    *See*, *e.g.*, Sec. Am. Compl., Doc. No. 213 (Sept. 1, 2015) ¶ 36 ("Electronic mail messages in furtherance of the bribe scheme, including those attaching drafts of the Protocol of Cooperation, the Letter of Intent, and copies of consulting contracts with a third-party intermediary, were transmitted through the means or instrumentalities of United States interstate commerce.  The electronic mail messages were sent from locations outside the United States, but were routed through and/or stored on network servers located within the United States.  Some of these electronic mail messages were sent or received by defendant Balogh."); *Straub*, 921 F. Supp. 2d at 264, n. 13 ("First, the Court rejects Defendants' argument that the SEC has failed to allege that there was *any* 'use' whatsoever of the instrumentalities of interstate commerce. (Tr. 31:18–19.) As noted above, the Complaint specifically alleges that Balogh emailed, on behalf of Defendants, drafts of the Protocols, the Letter of Intent, and copies of consulting contracts to third-party intermediaries, and that the emails were 'routed through and/or stored on network servers located within the United States.' (Compl. ¶ 39).").

in Hungary, to a colleague, Attila Szendrei, sitting in Macedonia, and one from Mr. Peter Danko, sitting in Hungry, to Mr. Balogh, also sitting in Hungary, both alleged to have been routed through a U.S. server.[7]

Compounding this misrepresentation, the SEC paints Mr. Balogh's email to Mr. Szendrei as having been sent in furtherance of a bribe offer or payment notwithstanding that the email contains *no* text and merely attaches an unsigned copy of the Protocol of Cooperation.  Of course, the very existence of a bribery scheme is *the* disputed issue of material fact in this action. In particular, the Defendants vigorously dispute the SEC's allegations that the Protocol of Cooperation was a document that memorialized an agreement to pay bribes (SEC Mem. at 31). Furthermore, the Defendants dispute that the draft Chaptex consultancy agreement attached to the email that was sent to Mr. Balogh was a "sham consulting contract[]" (*id*.).  In light of these disputed issues of material fact, as well as for the reasons set forth in the Defendants' Motion for Summary Judgment (at 14-15), the SEC cannot establish that Mr. Balogh used email in furtherance of an alleged bribe offer or payment.

The SEC also relies on case law from other jurisdictions – concerning alleged violations of *different* securities laws containing far more precise language regarding the use of an instrumentality of interstate commerce and involving more extensive use of interstate commerce than what is alleged here – in an attempt to establish that the May 31, 2005 email from Mr.

---

[7]   As set forth in their  Motion for Summary Judgment, and in reliance on the language used by this Court in its Order denying their Motion to Dismiss (*see Straub*, 921 F. Supp. 2d at 264, n. 13, quoted in footnote 5, above (finding that the SEC had adequately alleged "use" of U.S. interstate commerce based on its allegations that "Balogh emailed, on behalf of Defendants, [various draft documents] to third-party intermediaries")), the Defendants object to the SEC's inclusion of the single email *sent* to Mr. Balogh as part of its evidence that there was affirmative use of an instrumentality of U.S. interstate commerce.

Balogh constituted "use" of an instrumentality of U.S. interstate commerce by Messrs. Straub and Morvai, as well.  In particular, the SEC cited *United States v. MacKay*, a 1973 Tenth Circuit opinion, for the notion that it need not demonstrate that the Defendants "carr[ied] out the mailing or use of an instrumentality of [U.S. interstate] commerce," but only that the Defendants "caused" such use "by setting forces in motion which foreseeably result in use of the mails" (SEC Mem. at 32).  This case is inapposite and should not be given weight here.

Under the FCPA, the SEC must establish that the Defendants "ma[d]e use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or . . . of anything of value to any foreign official."  15 U.S.C. § 78dd-1(a).  In contrast, under the different statutes at issue in *United States v. MacKay*, 491 F.2d 616 (10th Cir. 1973) – i.e., the mail fraud (18 U.S.C. § 1341) and securities fraud (15 U.S.C. § 78j(b)) statutes – the government is given more guidance regarding what "use" (or "caus[ing]" of use, under the mail fraud statute, or "indirect" use, under the securities fraud statute) it must establish.  *See* 18 U.S.C. § 1341 ("Whoever . . . places in any post office of authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits *or causes to be deposited* any matter . . . *or knowingly causes to be delivered* by mail."(emphasis added)); 15 U.S.C. § 78j(b) ("It shall be unlawful for any person, *directly or indirectly*, by the use of any means or instrumentality of interstate commerce . . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of [SEC rules and regulations]" (emphasis added)).  The language in the mail fraud statute, especially, but also in 15 U.S.C. § 78j(b), emphasized above, supports the Tenth Circuit's finding that *causing* the use of interstate commerce is sufficient to satisfy those statutes' requirements.

Moreover, unlike in the present case, the uses of interstate commerce alleged in *MacKay* were extensive, including multiple U.S.-focused mailings and flights, and a direct use of an instrumentality of interstate commerce by the defendants (i.e., the "mailing of 'lulling letters' by defendants to minority shareholders").  *MacKay*, 491 F.2d at 620, n.2.

To stretch the U.S. interstate commerce element to reach communications with which a Defendant had no involvement whatsoever in the creation, authorization, or direction of such communications goes too far.  The SEC has not, and *cannot*, allege that Messrs. Straub and Morvai played any role with respect to the sole email sent by Mr. Balogh.  Messrs. Straub and Morvai, therefore, did nothing to "set[] forces in motion which foreseeably result in use of [an instrumentality of interstate commerce]."  *See MacKay*, 491 F.2d at 619.

In apparent recognition of the weakness of its argument that a single email from one Defendant to a recipient outside of the U.S. constituted a use of an instrumentality of U.S. interstate commerce, the SEC raises for the first time the argument that the Defendants' signing or endorsement of Magyar Telekom's SEC filings constituted the use of an instrumentality of interstate commerce.  However, the SEC cites *no* authority in support of this argument, and it relies upon disputed issues of material fact regarding, again, the very existence of a bribery scheme (*see* SEC Mem. at 35).  Accordingly, this new argument regarding use of interstate commerce must be rejected.

## IV.   THE SEC IS NOT ENTITLED TO SUMMARY JUDGMENT THAT DEFENDANTS BALOGH AND MORVAI VIOLATED SEC RULE 13B2-1

The SEC has failed to demonstrate its entitlement to summary judgment against Defendants Balogh and Morvai under Rule 13b2-1.  Most significantly, the Defendants dispute that the documents in question were backdated at all; rather those documents merely memorialized oral agreements previously entered into by the relevant parties.  In addition, it is

not even clear that the letter to an in-house lawyer at Magyar Telekom upon which the SEC

relies so heavily is the type of "record" subject to Rule 13b2-1.

The SEC claims "there can be no genuine dispute" that Messrs. Balogh and Morvai

"falsified" Magyar Telekom's books and records by signing a "backdated" letter authorizing an

in-house lawyer to execute two "backdated" consulting contracts.  (SEC Mem. at 35.)  But the

purportedly "backdated" documents in question were not backdated at all; rather, they merely

memorialized oral agreements that had in fact been entered into by the date reflected on the

documents.  It is black letter law that parties to oral agreements are entitled to memorialize or

consummate those oral agreements in writing at a later date that reflects the date of the oral

agreement.  *See generally* 1-2 Corbin on Contracts § 2.9; *see also Southland Distribs. Mktg. Co.

v. S&P Co.*, 296 F.3d 1050, 1051 (11th Cir. 2002) (no question regarding the validity or

existence of the contract where one party wrote a backdated letter memorializing an oral

agreement six years later); *Schwartz v. Houss*, No. 21741/04, 6 Misc. 3d 1035(A), 2005 WL

579152, at *3 (Sup. Ct. Kings Cnty. Jan. 3, 2005) ("A writing memorializing an oral agreement

need not be made contemporaneously with that oral agreement" (citing N.Y. Gen. Oblig. Law §

5-701; *In re Urdang*, 304 A.D.2d 586, 587, 758 N.Y.S.2d 125, 126 (2003))).  "When a written

contract provides that it shall be effective 'as of' an earlier date, it generally is retroactive to the

earlier date." *Viacom Int'l, Inc. v. Tandem Prods., Inc.*, 368 F. Supp. 1264, 1270 (S.D.N.Y.

1974), *aff'd*, 526 F.2d 593 (2d Cir. 1975).  Thus, there was nothing false or inaccurate about the

letters or contracts at issue, which merely memorialized oral agreements and reflected the date of

the earlier oral agreement.

The evidence adduced during discovery could not make this clearer.  As an initial matter,

the SEC has not even established exactly when the May 31 Letter was signed.  Messrs. Balogh

and Morvai – the two alleged signatories – could not remember when it was signed.  *See* Fried

Decl. Ex. A (Balogh Tr.) at 407:16-17; *id.* Ex. F (Morvai Tr.) at 342:19-20.  No other witnesses

were questioned regarding the May 31 Letter, so the circumstances surrounding the signing of

the letter are unclear. In addition, with respect to the SEC's allegation that two of the 2005

contracts with Chaptex Holdings Ltd. were "backdated," the SEC ignores the fact that the

agreements in question merely memorialized the parties' previous oral agreement and therefore

were properly dated, as indicated by Mr. Balogh and a Magyar Telekom attorney deposed during

discovery.  *See* Fried Decl. Ex. A (Balogh Tr.) at 396:2-12 ("And my general understanding is

that there was services provided for a long period of time.  These services had to be memorialized

in a -- in a contract.  This was a subsequent realization of some previous intentions.  They had to

be put into a -- a legal framework and legal structure that needed certain activities and certain

work from legal personnel and  other individuals working for these companies.  But these

covered legitimate and performed activities that had been performed and delivered over a longer

period of time."); Fried Decl. Ex. D (Herczegh Tr.) at 161:23-162:1; 166:1-4 ("Q:  Sometimes

oral contracts are memorialized with a subsequent written agreement, correct?  A:  Yes."; "Q:  . . .

Sometimes people engage in agreements or associations and memorialize them later, isn't that

right?  A:  Yes.").

The SEC cites Mr. Herczegh's deposition testimony in support of its argument that the

Labour Law and Bylaws contracts were not dated and signed until *after* the success elements

contained therein had been achieved.  (SEC Mem. at 38.)  However, Mr. Herczegh agreed that a

contract's date reflects when a contract has been established by the parties, and reflects the

parties' intent and when their obligations begin (Fried Decl. Ex. D (Herczegh Tr.) at 161:7-14),

and – as referenced above – that oral agreements can be memorialized with a subsequent written

agreement (*id*. at 161:23-162:1).  Mr. Herczegh also admitted that he was not involved in the

parties' negotiations regarding the contracts that he drafted (*see id*. at 130:4-131:25), and that he

could not recall any conversations about the dating of such contracts with Mr. Balogh, and that

he did not have any conversations regarding the same with Mr. Morvai (*id*. at 120:22-121:8).

Accordingly, Mr. Herczegh could not contest that the dates appearing on the contracts

represented the dates the contracts had been established orally.  The SEC's use of "backdating,"

and its reliance on Mr. Herczegh's testimony in support thereof, is therefore misleading and a

mischaracterization of his testimony.

Discovery also made clear that Magyar Telekom routinely entered into business

agreements wherein services were agreed upon, and work performed, before a formal written

contract could be entered into.  *See id*. at 164:4-166:4 (discussing communication reflecting

advice and counseling provided by an outside law firm to Mr. Herczegh on an unrelated matter,

before an engagement letter had been prepared); *id*. Ex. A (Balogh Tr.) at 413:18-414:7 ("If . . . I

recollect my memories concerning contracts that were formalized after the activity started, the

most striking example that . . . comes to mind . . . is a contract Magyar Telekom had with White

and Case to do this investigation when White and Case started to work much before any written

contract, and written information, any details about the targets, about the means, and about any

of the details of this investigation had been communicated, shown, or sent to executives at

Magyar Telekom.  And, actually, I know . . . that the contract with White and Case had been

signed at a later stage than they actually prefer, started to work for Magyar Telekom.")

In addition, there is a disputed issue of material fact regarding whether the May 31 Letter

upon which the SEC relies so heavily even constitutes a business record of Magyar Telekom.

While the SEC, in his deposition, asked Mr. Balogh whether he considered a *contract* to be an

official business record of Magyar Telekom (which he did), it did not pose a similar question

regarding a *letter* authorizing a contract. *See id.* (Balogh Tr.) at 413:6-10.  Again, no other

witnesses were questioned regarding the letter, so no witness – fact or expert – shed any light on

whether the letter even was the type of record that Magyar Telekom was required to maintain

under Section 13 of the Securities Exchange Act, 15 U.S.C. § 78m.  The Defendants dispute that

such a letter would constitute a business record of Magyar Telekom, subject to Rule 13b2-1.

Accordingly, the Court should deny the SEC's motion for summary judgment as to the

Rule 13b2-1 claim.

**V.    DISPUTED ISSUES OF MATERIAL FACT PRECLUDE A FINDING THAT
DEFENDANTS STRAUB AND BALOGH VIOLATED SEC RULE 13B2-2**

Disputed issues of material fact also stand in the way of any finding that Messrs. Straub

and Balogh made material misrepresentations in statements to auditors in violation of 17 C.F.R.

§ 240.13b2–2 ("Rule 13b2–2").  Indeed, the evidence developed in discovery – much of which is

conveniently ignored by the SEC – contradicts every key element of the SEC's argument in

support of summary judgment on this claim.  In particular, the evidence establishes that there are

significant disputes concerning the fundamental nature and impact of the central document in

this case, the Protocol of Cooperation, as well as whether that document was actually material to

the Company's auditors.  Moreover, where, as here, materiality is an element of the offense and

is disputed, the relevant case law establishes that the issue should be submitted to the jury and

should not be resolved on summary judgment – something else that the SEC fails to address in

its motion.  Accordingly, in light of the numerous disputed issues of material fact raised by the

SEC's claim that Messrs. Straub and Balogh violated Rule 13b2-2, the Court should deny the

SEC's motion for summary judgment and instead permit a jury to consider and resolve these

factual disputes.

The essence of the SEC's claim appears to be that by failing to disclose the Protocol of Cooperation to Magyar Telekom's auditors, Messrs. Straub and Balogh made material misrepresentations in management and sub-management letters and certifications that they had disclosed all "transactions or material agreements," in violation of Rule 13b2-2.

The relatively small number of representations at issue gives rise to numerous material factual disputes which preclude the SEC from being granted summary judgment on its Rule 13b2-2 clam.  In particular, Defendants dispute: (1) that the management and sub-management letters and certifications that <u>predate</u> the signing of the Protocol are relevant to the claim, and that Mr. Straub signed or "authorized to be sent" <u>any</u> annual management representation letter after the Protocol was signed in May 2005; (2) that the Protocol was a "transaction or material agreement" that was required to be disclosed; (3) that the Protocol was a "financial record or related data" that was required to be disclosed; and (4) even assuming that the Protocol was required to be disclosed at all, that the failure to disclose the Protocol was material.

### A.  Defendants Dispute That Management Representation Letters and Certifications that Predate the Signing of the Protocol are Relevant to the SEC's Claim and That Mr. Straub Signed an Annual Representation Letter After the Protocol Was Signed.

In its motion seeking summary judgment on the Rule 13b2-2 claim, the SEC improperly relies on (1) a large number of management representation letters from Mr. Straub that were signed before the Protocol was executed in late May 2005, and (2) an annual representation letter as to which there is no evidence of Mr. Straub's signature or authorization.  Defendants dispute that any representation letters or certifications signed before the Protocol was finalized are relevant to the Rule 13b2-2 claim and that the annual representation letter dated January 13, 2006 – the only annual representation letter that post-dated the Protocol – was signed or otherwise authorized by Mr. Straub.

- 30 -

As an initial matter, the SEC's attempt to argue that Mr. Straub violated Rule 13b2-2 on the basis of management representation letters and certifications that pre-dated the Protocol of Cooperation should be swiftly rejected.  It is undisputed that the Protocol was signed in late May 2005.  Yet, the SEC inexplicably bases its claim on numerous letters and certifications that were signed by Mr. Straub <u>before</u> the Protocol came into being.  Notwithstanding the SEC's attempt to lard its motion with references to various letters and certifications that <u>preceded</u> the signing of the Protocol, any such letters and certifications clearly are irrelevant since the Protocol had not yet been signed when those letters and certifications issued.  The only representations by Mr. Straub that are even arguably relevant to this discussion, therefore, are the two quarterly representation letters, dated July 19, 2005 and October 17, 2005, that were issued after the Protocol was signed (SEC R. 56.1 Stmt. ¶¶ 26-27).[8]

Significantly, the evidence does not support a finding that the single annual representation letter that was completed after the Protocol was executed was signed by Mr. Straub, as the SEC maintains.  This disputed issue of material fact precludes a finding of summary judgment on the SEC's claim.  Specifically, the SEC's argument -- that, by failing to disclose the Protocol, Mr. Straub made a misrepresentation with respect to the Company's annual representation letters -- is fundamentally flawed because there is no evidence that Mr. Straub signed <u>any</u> annual representation letters after the Protocol was signed.  In its memorandum of law, the SEC self-servingly quotes from various annual representation letters

---

[8]   For the same reason, the only misrepresentations allegedly made by Mr. Balogh that are even arguably relevant to this discussion are contained in emails dated July 18, 2005, October 14, 2005, January 13, 2006, and February 8, 2006.  And Mr. Balogh would maintain they are *not* relevant, based on Magyar Telekom's auditor's testimony that the audit company did not examine the sub-certifications and did not know how such sub-certifications were maintained at Magyar Telekom or what would happen if no response came back from the request. *See* Fried Decl. Ex. E (Kos Tr.) at 188:9-24.

and quarterly representation letters the SEC alleges Mr. Straub signed on various dates in

January, April, July, and October 2005 and in January 2006.  However, the SEC fails to mention

that only two of those letters – namely the quarterly representation letters dated July 19 and

October 17, 2005 – were actually signed by Mr. Straub <u>after</u> the Protocol had been signed.

Simply put, the SEC cites no evidence that Mr. Straub signed an annual representation letter after

the Protocol was signed, or that he signed, or "authorized to be sent," an annual representation

letter on January 13, 2006.  In response to the SEC's request for admission on this point, Mr.

Straub stated that he did not recall signing that document.  Nor has the SEC ever – either in filing

this motion or at any time during the lengthy discovery period – produced a signed version of

this document.  It is just not enough for the SEC to state, without any factual support from the

record, that Mr. Straub signed or authorized the sending of an annual representation letter to the

Company's auditors in January 2006.

This is significant because only the annual representation letters (and not the quarterly

representation letters) contain the operative language on which the SEC relies in support of its

motion.  Specifically, the annual letters contain the statement that management is "not aware of

any accounts, transactions or material agreements not fairly described and properly recorded in

the financial and accounting records underlying the financial statements."  *See* SEC Mem. at 40;

SEC R. 56.1 Stmt. ¶ 17.  This representation, related to the disclosure of "transactions or material

agreements," is the sole focus of the SEC's Rule 13b2-2 argument.  However, this language does

<u>not</u> appear in any representation letters signed by Mr. Straub after the Protocol was entered into.[9]

---

[9]   In its memorandum of law, the SEC states, without any support, that subsequent quarterly
      filings "incorporated by reference" the representation in the annual letter that all
      "transactions or material agreements" have been made available to the auditors.  This is
      incorrect.  Although it is true that the quarterly representation letters incorporated the
      representations made in the annual representation letter of January 14, 2005, which Mr.

*(cont'd)*

Because there is no evidence that Mr. Straub signed any annual representation letters after the Protocol was signed <u>and</u> it is undisputed that no other management representation letters signed by Mr. Straub after the Protocol was entered into contains this language, the SEC simply cannot claim a misrepresentation related to the alleged nondisclosure of "transactions or material agreements."[10]

Without any evidence to support that Mr. Straub signed an annual representation letter after the Protocol was signed, he cannot be liable for alleged misrepresentations in that letter. Similarly, Mr. Straub cannot be held liable for not disclosing the Protocol in connection with annual and quarterly representation letters that preceded the signing of the Protocol in late May 2005.

>   **B.      The Protocol of Cooperation Was Not a "Transaction or Material Agreement" and Therefore its Non-Disclosure Was Not a Misrepresentation.**

The overwhelming evidence adduced during discovery demonstrates that the Protocol of Cooperation was not, and was never intended to be, a formal, binding contract between Magyar Telekom and the Government of Macedonia.  To the contrary, the evidence established that the

---

*(cont'd from previous page)*

Straub signed, it did so <u>only</u> as to the representations made in connection with the 2004 year-end audit (*i.e.* that all "transactions or material agreements" related to the Company's 2004 year-end audit have been reported as of the quarterly letter).  Since the Protocol was not signed until late-May 2005 – more than five months after the completion of the 2004 calendar year – there can be no dispute that Mr. Straub's representation in the January 15, 2005 letter did not apply to the Protocol.

[10]   In contrast, the two Quarterly Representation Letters signed by Mr. Straub after the Protocol was executed do <u>not</u> contain the representation that "transactions or material agreements" have been disclosed to the Company's auditors.  Instead, the *only* language from the quarterly letters that the SEC cites as a potential misrepresentation relates to the disclosure of "[a]ll financial records and related data."  As such, the only representations that are even arguably relevant to this discussion relates to the disclosure of "all financial records and related data" from the only two letters signed after the Protocol was entered into, namely the quarterly representation letters dated July 19 and October 17, 2005.

Protocol was merely an informal framework designed to provide a roadmap for the resolution of various disputes that had arisen between the two largest shareholders of MakTel. Consistent with this, the objectives set forth in the Protocol could not be achieved without action being undertaken by other entities that were not parties to the Protocol itself.

Therefore, even assuming that Mr. Straub signed or authorized an annual representation letter after the Protocol was created in May 2005 (which he did not), disputed issues of material fact nonetheless preclude a finding that the Protocol was a "transaction or material agreement" required to be disclosed to Magyar Telekom's auditors. In making its motion, the SEC completely ignored the numerous facts that make clear that the Protocol was – and was unambiguously understood by all parties to be – non-binding, non-self-executing, and entirely contingent on other events. For these reasons, the Protocol was not, and could not have been, a "transaction or material agreement" necessitating disclosure.

All witnesses with knowledge of the Protocol described it as nothing more than a discussion document between MakTel's two shareholders – Magyar Telekom and the Government of Macedonia – regarding prospective ways to resolve existing disputes and cooperate with one another. *See, e.g.,* Fried Decl. Ex. G (Straub Tr.) at 116:14-16*; id.* Ex. B (Buckovksi Tr.) at 18:22-19:3. In his deposition, Mr. Straub characterized the Protocol as a "good faith start to solve [a] problem." *Id.* Ex. G (Straub Tr.) at 150:2-3. Mr. Balogh described the Protocol as "a wish list" or "memorandum of understanding" that set forth "the framework [for] cooperation." *Id.* Ex. A  (Balogh Tr.) at 82:8-24; *see id.* at 94:25-95:3 ("It set forth how we are going to work together as MakTel and government of Macedonia as business partners, as equity partners, and as a market player and a regulator."); *id* at 90:7-12 ("[G]uidance for activities toward the future."). Michael Gunther, an executive at Deutsche Telekom involved in

the negotiations surrounding the Protocol, noted that the Protocol "recorded the declarations of intent" and was "nothing but the result of conversations between two shareholders of MakTel." *Id.* Ex. C (Gunther Tr.) at 54; *id.* at 40 ("It is a transcript of results of a discussion.").  The former Prime Minister of Macedonia, Vlado Buckovski, who signed one copy of the Protocol, described it simply as "a memorandum of understanding" that was only "the first step to solve the relationship" between the two shareholders of MakTel.  *Id.* Ex. B (Buckovski Tr.) at 19:2-3; *see also id.* at 46:15-16 (describing the document as drafted "in the spirit of building a mutual trust").  Indeed, in further characterizing the Protocol, Prime Minister Buckovski stated, "[I] knew that everything [the parties] put on the paper, they won't be able to realize. It was more as a wish list."  *Id.* at 21:1-3 [11]

In stark contrast to the SEC's one-sided recitation of the facts, the "significant commitments by the two parties" (SEC Mem. at 41) outlined in the Protocol were neither binding nor self-executing.  Instead, each so-called "commitment" discussed in the Protocol was instead nothing more than an aspiration, an objective, or a hoped for outcome, the completion of which remained entirely contingent on actions of other parties or bodies who were under no obligation to comply with the terms set out in the Protocol.  Deposition testimony and contemporaneous documents produced during discovery make abundantly clear that each goal outlined in the Protocol could be effectuated only by the acts of others:

---

[11] Even the name ultimately chosen for the document – "Protocol of Cooperation" – indicates that the document was intended merely to memorialize the parties' intentions to work toward various shared goals.  Indeed, earlier drafts of the Protocol of Cooperation were called a "Non Paper", a term commonly used in the European Union for preliminary documents designed simply to stimulate discussion on a particular issue.  *See* Anthony Teasdale and Timothy Bainbridge, THE PENGUIN COMPANION TO EUROPEAN UNION (Jan. 10, 2012), http://penguincompanion.toeu.com/additional_entries/non-paper/ (noting that the "non-papers seek to test the reaction of other parties to possible solutions, without necessarily committing the proposer or reflecting his or her public position up to that point").  Thus, by definition, a non-paper, such as the Protocol, is a non-binding document.

***Paragraph One of the Protocol of Cooperation – expansion into Kosovo***

At the time that the Protocol was signed, entry into Kosovo was nothing more than an "aspirational target" for which a business case had not yet even been completed by Magyar Telekom or any of the MakTel Group companies.  As Mr. Balogh explicitly stated during his deposition, "When I mentioned wish list or aspirational targets, paragraph number one is a very good example for that because it's Kosovo MVNO operation is definitely an aspirations target." *See Id.* Ex. A (Balogh Tr.) at 98:17-20; *id.* Ex. G (Straub Tr.) at 133:18-19 (describing the expansion into Kosovo, as described in the Protocol, as "only very preliminary plans"); *id.* Ex. A (Balogh Tr.) at 144:5-11 (noting that by the signing of the Protocol in May 2005, MakTel was at most ready to "[e]armark[] the budget, start[] to work on the business case" and noting that the Protocol "doesn't say that it's a firm commitment because it's not a firm commitment. It's a business case.").  Indeed, the goal was not ultimately reached.  *Id.* Ex. B (Buckovski Tr.) at 21:1-4 ("[I] knew that everything [the parties] put on the paper, they won't be able to realize. It was more as a wish list. For one, [the parties] never entered the Kosovo market."); *Id.* Ex. G (Straub Tr.) at 133:20-23 ("[N]othing has been realized from this MVNO at all because later on it turned out that there [were] . . . business arguments against it.").

The first paragraph of the Protocol, and its call for cooperation toward entry into Kosovo through the creation of the MVNO, therefore, perfectly illustrates the entirely conditional nature of the Protocol.

***Paragraph Two of the Protocol of Cooperation – payment of dividend***

The dividend payment discussed in the second paragraph of the Protocol also was in no way a certainty simply because it was included as a provision in the Protocol.  To the contrary, payment of the dividend was contingent on approvals by several other bodies, including the

boards of directors of MakTel and MobiMak, as well as the shareholder assemblies for both

entities.  As Mr. Straub testified, "the agreement of Matav is not enough in this case to pay

dividends because it has to be decided by the necessary board of directors and the necessary

shareholders meeting of MakTel."  Fried Decl. Ex. G (Straub Tr.) at 137:4-8; *see also id.* at

136:16-19 (noting that payment of the dividend was "pending on the fact that the financial

conditions of the company . . . will be as expected").   Mr. Balogh, too, pointed out that "[i]n

order [to] actually declare this dividend . . . board approval [was] needed and another approval

process had to be followed within the company."  *Id.* Ex. A (Balogh Tr.) at 101:13-16; *see id.* at

104:13-19 ("[Declaring the dividend] wasn't his [Elek Straub's] decision.  A lot of other parties

have to be involved in making the final decision, like the board of Stonebridge, like the board of

MakTel and probably the finance department of Magyar Telekom, including people from

Deutsche Telekom."); *see also id.* Ex. H (MT-MAK 0820521) (discussing the MobiMak board

of directors resolution related to the payment of the dividend and noting that "the Shareholder's

Assembly of MobiMak can either pay the proposed dividend of MobiMak, can increase it to

higher level or can reduce it to any level it wishes.").

The Protocol's discussion of a dividend payment, on its own, did not (and could not)

impose any financial obligations upon the Company.  Again, this provision of the Protocol only

set forth the objective of the two shareholders of Maktel, which both stood to benefit from the

issuance of a dividend.  However, neither of the shareholders had the authority to issue such a

dividend on its own; instead, approvals from other bodies, none of which were parties to the

Protocol, were needed in order to realize this objective.

***Paragraph Three of the Protocol of Cooperation – frequency fee reduction***

Similarly, MakTel's payment of a frequency fee of 1.2 million Euro could only be triggered by the issuance of an invoice by the appropriate regulatory authority in the Macedonian Government, not by the Protocol itself.  As Mr. Balogh testified, "It was a wish of Magyar Telekom and MakTel . . . to reduce the frequency fees; however, the frequency fee . . . is an amount that's invoiced by one of the organizations of the government, requir[ing] further decision-making."  *Id.* Ex. A (Balogh Tr.) at 108:9-14; *id* at 108:20-109:1 (noting that at the time the Protocol of Cooperation was signed, individuals at Magyar Telekom at most "hoped" that the invoiced amount would be 1.2 million Euro); *id.* Ex. G (Straub Tr.) at 148:9-20 (noting that at the time of signing the Protocol, the Government had not agreed to invoice the MakTel group at that amount).

Finally, not only was the Protocol just a framework to resolve disputes between the shareholders of Maktel <u>and</u> required action on the part of other entities before any of its objectives could be achieved, but the Protocol was also plainly non-binding.  Notably, even the SEC is forced to acknowledge that the Protocol of Cooperation "was never intended to be enforceable in a court of law."  SEC Mem. at 42.  The non-binding and unenforceable nature of the Protocol was also corroborated by numerous witnesses.  As the former Prime Minister and one of the signatories to the Protocol testified, the "Protocol did not bind [the parties] with anything."  *See* Fried Decl. Ex. B (Buckovski Tr.) at 46:14-16; *id.* at 47:7-9 (referring to the Protocol as a document "without the tools to force them to do one thing or the government doing another thing"); *id.* at 44:9-10 ("[T]his contract is not . . . binding."); *id.* Ex. F *(*Morvai Tr.) at 142:23-143:3 ("So when you put it on paper, it's still not a guarantee that there is a clear deal, but the better chance that you have a common understanding. . . . [I]t was not a contract."); *Id.* Ex. C

(Gunther Tr.) at 80 ("I couldn't have sued the government either if they said, we changed our

minds.").

Therefore, it is clear that the Protocol was not a "transaction or material agreement" – it

was, in fact, neither – and that it was not required to be disclosed to the Company's auditors.

The SEC is not entitled to summary judgment on these grounds.

### C.   The Protocol Was Not a "Financial Record or Related Data" and Therefore its Nondisclosure Was Not a Misrepresentation.

The SEC can not avoid the fact that the Protocol was not a binding agreement by instead

arguing that the Protocol was a "financial record or related data" necessitating disclosure under

the Company's quarterly management representation letter.  There is no way that the Protocol

can be fairly characterized as a "financial record" of Magyar Telekom.

Not surprisingly, because the Protocol is neither a financial record nor related data, the

SEC nowhere addresses this issue in its motion.  In addition, to the extent that a discussion item

in the Protocol may have ultimately been accomplished and may -- even arguably – have had a

material financial impact, the SEC does not argue – nor could it – that the auditors were not

aware of that financial impact.  There is no dispute that the auditors knew of those aspects of the

Protocol that were realized and had a financial impact on the Company.  For example, the

auditors clearly knew that the board of directors of MakTel had voted in 2005 to pay a dividend

to the Macedonian government.  *See* Fried Decl. (Straub Tr.) at 164:5-7 (noting that the payment

of the dividend was "known by everybody"); *see id.* (Kos Tr.) at 61:21-24 ("The management of

the company told us . . . that they needed . . . audited financial statements in order to pay a

dividend that the government was demanding.").

**D.      Nondisclosure of the Protocol of Cooperation Was Not "Material" and Any Dispute as to Materiality Should Be Submitted to the Jury.**

The SEC also offers no support for the notion that any misrepresentation alleged to have occurred in connection with the Protocol was material.  To the contrary, the evidence demonstrates that because the Protocol was non-binding and could not by itself compel the execution of any of its primary objectives, its nondisclosure to the auditors could not be material. Indeed, a review of the testimony of Magyar Telekom's lead auditor reveals that even he was unable to conclude that the Protocol was material.  In any event, although the SEC chose to ignore it, the relevant case law makes plain that disputes as to materiality should be submitted to a jury and should not be resolved on summary judgment.

In the context of an alleged material misrepresentation for purposes of Rule 13b2-2, something is deemed material "if 'a reasonable auditor would conclude that it would significantly alter the total mix of information available to him.'"  *Straub*, 921 F. Supp. 2d at 268 (quoting *SEC v. Patel,* No. 07 Civ. 39 (SM), 2009 WL 3151143, at *30 (D.N.H. Sept. 30, 2009); *United States v. Goyal,* No. CR 04–00201 (MJJ), 2008 WL 755010, at *5 (C.D.Cal. Mar. 21, 2008), *rev'd on other grounds,* 629 F.3d 912 (9th Cir. 2010)).  Significantly, only if the alleged misrepresentations are "'so obviously important to an [auditor] that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (footnotes omitted; quoting *Johns Hopkins Univ. v. Hutton,* 422 F.2d 1124, 1129 (4th Cir. 1970), *aff'd in part, rev'd in part*, 488 F.2d 912 (4th Cir. 1973)); *see also Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.,* 945 F.2d 1226, 1242 (2d Cir. 1991); *Mendell v. Greenberg,* 927 F.2d 667, 673 (2d Cir. 1990).  Where, as here, the alleged misrepresentation is far from "obviously important" to the auditor, summary judgment is not warranted.

In arguing that failure to disclose the Protocol was somehow material, the SEC mischaracterizes testimony from both Mr. Straub and Nicholas Kos, the PricewaterhouseCoopers audit engagement partner for Magyar Telekom.  As detailed above, Mr. Straub unequivocally testified during his deposition that Magyar Telekom saw the Protocol as a document containing "no firm agreements," in which the purported "commitments" could not be triggered by the Protocol itself but only by future events outside of the parties' control.  *See id.* Ex. G (Straub Tr.) at 113:5-8; 144:10-16.  And when Mr. Kos was prompted by the SEC to state whether he considered the existence of the Protocol to be material for purposes of his audit, he stopped far short of saying the Protocol was obviously material, as required by the applicable case law. Instead, exercising obvious caution, Mr. Kos responded by explaining that a "further determination would need to be made."  Fried Decl. Ex. E (Kos Tr.) at 204:20-205:8. Throughout his deposition, Mr. Kos refused to make a definitive statement that the Protocol was material, much less obviously material: "I can't make the determination . . . whether or not these protocols would have impacted the fair presentation."  *Id.* at 76:12-14.

Moreover, Mr. Kos made clear that his awareness and understanding of the Protocol was extremely limited.  In this regard, Mr. Kos testified that he had only seen the Protocol once before his deposition when it was shown to him by the U.S. Department of Justice in the context of an investigation involving the Company; had not participated in any discussions or negotiations regarding the Protocol; and had never spoken to any of the individuals who signed the Protocol.  *Id.* at 156:5-157:22.  Without this information, Mr. Kos, as he himself admitted, was not in a position to make a determination of whether the Protocol was material information. Mr. Kos further clarified that when he testified about the Protocol, he did so based solely on a review of the document on the "face of it" and under an uninformed impression that the Protocol

was a "contract" that "theoretically" contained "commitments" or "guaranteed" certain acts. *See, e.g., id.* at 65:9, 65:12-13, 66:4-8, 15. Mr. Kos' testimony is a far cry from a statement that the Protocol "would significantly alter the total mix of information available to him," (s*ee Straub*, 921 F. Supp. 2d at 268) or that any alleged nondisclosure of the Protocol was "'so obviously important to an [auditor] that reasonable minds cannot differ on the question of materiality,'" *see TSC Indus.*, 426 U.S. at 450.

Significantly, this dispute surrounding the alleged materiality of the Protocol is one that should be determined by a jury, not the Court. Ultimately, since materiality is a fact-intensive determination, "the Supreme Court has noted that materiality is particularly well suited for jury determination." *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* 185 F.Supp.2d 389, 400 (S.D.N.Y. 2002) (citing *TSC Indus.,* 426 U.S. at 450). The determination of materiality requires "delicate assessments" involving the significance of the allegedly false information in the "total mix of information;" those assessments are "peculiarly ones for the trier of fact." *TSC Indus.,* 426 U.S. at 450; *see also SEC v. Reves*, 491 F.Supp.2d 906, 909 (N.D. Cal. 2007) (noting that "a summary judgment motion is rarely the appropriate vehicle for resolving the inquiry" regarding materiality). The inquiry as to the alleged material misstatements "must focus not on whether 'particular statements, taken separately, were literally true, but whether defendants' representations, *taken together and in context,* would have misled.'" *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 491 (S.D.N.Y. 2005) (emphasis in original) (quoting *DeMaria v. Andersen,* 318 F.3d 170, 180 (2d Cir. 2003); *Straub,* 921 F.Supp.2d at 268 (noting that materiality of alleged misstatements made to auditors is "a mixed question of law and fact that generally should be presented to a jury" (citation and internal quotations omitted); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989); *see also Basic, Inc. v. Levinson*, 485

U.S. 224, 238 (1988).

Ignoring this established case law and applicable legal standards, the SEC instead seeks to use its own standard for determining materiality on this motion.  Even under the SEC's own self-serving formulation of materiality, there are still clearly disputed issues of material fact that prevent summary judgment from being granted on this crucial element.  This is so because, as discussed above, the Protocol itself was not responsible for any expenditures by the Company.

In any event, the SEC's attempt to adopt the "standard for materiality" that is set forth in just one of the representation letters confuses the issue at hand.  Only the annual representation letter signed by Mr. Straub on January 17, 2005, more than four months before the Protocol was signed, contains a definition of materiality, defining as "material" "any item . . . involving potential amounts normally greater than MHUF 500."  Neither the quarterly representation letter signed by Mr. Straub on October 17, 2005, nor any sub-certification signed by Mr. Balogh, included a definition for "material."  More importantly, the definition of the term "material," as relied upon by the SEC and included in the annual representation letter, is applicable only to the question of whether the Protocol was a "material agreement" for purposes of the disclosure described in paragraph three of the annual representation letter.  The materiality analysis required under a Rule 13b2-2 claim, as discussed in detail above, concerns a broader (and different) analysis of the materiality of the alleged misrepresentation.

Moreover, the management representation letter – which the SEC seeks to adopt here -- specifically notes that its definition of "material" is not intended to represent the materiality threshold for disclosure purposes.  This contradicts the very purpose for which the SEC seeks to adopt this standard.  In addition, even if this threshold applied in representation letters signed after the Protocol had been signed, there is, at minimum, a disputed issue of fact concerning

whether the Protocol, due to its non-self-executing nature, involved amounts greater than two million Euros.

In the end, not only is the SEC's conclusory assertion that the Protocol was material wholly unsupported by any admissible evidence, it also is contradicted by the evidence in the record.  As set forth above, the Protocol was a non-binding, informal framework that was not self-executing.  Under circumstances such as these, a reasonable trier of fact could certainly conclude that the Protocol was not material information which would "significantly alter the mix of information available to the auditor," something that Mr. Kos did not dispute in his deposition. The much-disputed issue of the Protocol's purported materiality therefore should be left to the jury to decide.

For the reasons stated herein, the SEC is not entitled to summary judgment on its Rule 13b2-2 claim.

## CONCLUSION

For the reasons set forth herein, the Defendants respectfully request that the Court issue an order denying the SEC's summary judgment motion and granting any further relief to which the Court concludes Defendants are entitled.


Dated:  November 6, 2015                    Respectfully submitted,
          New York, New York

                               /s/ Robert Buehler
                               Robert B. Buehler
                               Lisa J. Fried
                               **Hogan Lovells US LLP**
                               875 Third Avenue
                               New York, NY 10022
                               (212) 918-3000
                               robert.buehler@hoganlovells.com
                               lisa.fried@hoganlovells.com

/s/ Carl S. Rauh
Carl S. Rauh
**Hogan Lovells US LLP**
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
carl.rauh@hoganlovells.com

*Counsel for Elek Straub*

/s/ William M. Sullivan, Jr.
William M. Sullivan, Jr.
Thomas C. Hill
**Pillsbury Winthrop Shaw Pitman LLP**
2300 N Street, NW
Washington, DC 20037-1122
(202) 663-8027
william.sullivan@pillsburylaw.com
thomas.hill@pillsburylaw.com

*Counsel for András Balogh*
/s/ Michael L. Koenig
Michael L. Koenig
Victoria P. Lane
**Hinckley, Allen & Snyder LLP**
30 South Pearl Street, Suite 901
Albany, NY 12207
(518) 396-3100
mkoenig@haslaw.com
vlane@haslaw.com

*Counsel for Tamás Morvai*

**CERTIFICATE OF SERVICE**

I, Lisa J. Fried, an attorney, hereby certify that on November 6, 2015, Defendants' Memorandum of Law in Opposition to United States Securities and Exchange Commission's Motion for Summary Judgment was served on all parties via the Court's electronic filing system.

/s/ Lisa J. Fried
Lisa J. Fried