# EXHIBIT D

```
 1                 UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF NEW YORK
 3    U.S. SECURITIES AND EXCHANGE      :
      COMMISSION,                       :
 4                                      :
                 Plaintiff,             :
 5                                      :
         vs.                            :   No.11 Civ.9645
 6                                      :   (RJS)
      ELEK STRAUB,                      :
 7    ANDRÁS BALOGH, and                :
      TAMÁS MORVAI,                     :
 8                                      :
                 Defendants.            :
 9
10
11
12       VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
                              OF
13                       ZSOLT HERCZEGH
14
                              on
15
             Wednesday, February 12, 2014
16              commencing at 9.59 a.m.
17                     Taken at:
                      Nabarro LLP
18                    Lacon House
                  84 Theobald's Road
19                London, WC1X 8RW
                   United Kingdom
20
21
22
23
24
25    Reported by:  Thelma Harries, MBIVR, ACR
```

Page 34

```
 1    Hungarian, could you just read it out --
 2        A    Yes.
 3        Q    -- loud, please?
 4        A    The Hungarian says "egyes szerzödéses
 5    feltételekröl".  In English it is "certain
 6    contractual conditions".  So this should read, this
 7    sentence, like, "could certain terms of the
 8    contractual conditions be settled by phone" and not
 9    "the first".
10        Q    Okay.  So let's go back to the e-mail
11    at the centre of the page, on the second page, from
12    Mr. Balogh to you with a copy to Mr. Kisjuhász and
13    Mr. Dankó dated July 5th, 2005, at 10:20 a.m.
14             Is that an e-mail that -- that you
15    received from Mr. Balogh at about -- at about that
16    date and time?
17        A    Yes.
18        Q    And is that forwarding an e-mail from
19    Mr. Szendrei to Mr. Balogh dated July 4th, 2005?
20        A    Yes.
21        Q    Okay.  And moving up to the top of
22    the page, the e-mail says it's from Dr. Zsolt
23    Herczegh addressed to Mr. András Balogh dated July
24    5th, 2005, 10:05.
25             Is that an e-mail that you sent to
```

Page 35

```
 1    Mr. Balogh at about 10:05 on July 5th, 2005?
 2        A    Yes.
 3        Q    And you describe the question that
 4    you were asking Mr. Balogh.
 5             Did you have conversations with
 6    Mr. Balogh following sending him this e-mail?
 7        A    Yes.
 8        Q    Tell me about that conversation or
 9    those conversations?
10        A    As I recall, it was a phone
11    conversation -- a phone conversation, and we
12    discussed by phone how to finalise the draft
13    agreement by putting into the specific details.
14        Q    Was Mr. Balogh providing you the
15    specific details to put into the agreement?
16        A    Yes.
17        Q    And do you recall what specific
18    details he provided to you?
19        A    By now I don't have a memory on this;
20    on the details.
21             MR. SULLIVAN:  I'll just note for the
22    record again, in connection with the e-mail chain,
23    Bob, it looks like there was an e-mail sent by
24    Mr. Balogh to Mr. Herczegh at 10:20, 5.7.2005, and,
25    according to the testimony, he responded to
```

Page 36

```
 1    Mr. Balogh after receiving that e-mail, thanking
 2    Mr. Balogh for the material, but the time is 10:05.
 3             I can follow up on cross, if you
 4    want.
 5    BY MR. DODGE:
 6        Q    Mr. Herczegh, do you see the time
 7    references that Mr. Sullivan just referred to?
 8        A    I see the time reference.
 9        Q    Do you have any understanding as to
10    how that -- how the timing of those two e-mails
11    relate to one another?
12        A    No, I don't know why there is
13    a difference in the timing.
14        Q    Okay.  So on the page, the e-mail
15    that -- that you sent in response, appears to have
16    an earlier time than the e-mail you were responding
17    to.  Is that the way you see it?
18        A    Based on this paper, yes.  However,
19    there could be technical details which I'm not able
20    to explain.
21        Q    Okay.  So do you have any firsthand
22    knowledge of how Magyar Telekom's computer system
23    applied date and time stamps to -- to e-mails?
24        A    No.  It's too technical.
25        Q    Okay.  Do you have a general
```

Page 37

```
 1    recollection as to the sequence of the e-mails?
 2    Which one came first and which one came second?
 3        A    The sequence in this printed version
 4    is accurate.
 5        Q    Okay.  So when you say that, do you
 6    mean to say that the e-mail with the time stamp of
 7    10:05 was sent after the e-mail with the time stamp
 8    10:20?
 9        A    Yes.
10        Q    Is that right?
11             And do you have a recollection as to
12    whether the dates, July 5th, 2005, on both e-mails,
13    whether that appears to be consistent with your
14    memory?
15        A    Yes, it's consistent with my memory.
16             MR. DODGE:  I'm handing you a
17    document that's been marked Exhibit 96.
18             Exhibit 96 is a 2-page document Bates
19    number MT-MAK 1052083, the second page number
20    1052083-T.  The first page is an e-mail written in
21    Hungarian dated July 5th, 2005, 5:19 a.m. from
22    András Balogh to Zsolt Herczegh.  The second page
23    appears to be an English language translation of
24    the first page.
25
```

Page 118

```
 1   this, if the signing party is StoneBridge.
 2        Q    So, in other words, is it correct
 3   that you double-checked to see whether the board of
 4   directors of StoneBridge would have to approve
 5   these two agreements?
 6        A    Yes.  It refers to a double-check,
 7   yes.
 8        Q    You note in your e-mail that Zoltán
 9   Kisjuhász, the Chief Executive Officer of
10   StoneBridge.  Do you see that?
11        A    Yes.
12        Q    Did you discuss these agreements with
13   Mr. Kisjuhász?
14        A    As I recall, yes.
15        Q    And what do you recall from those
16   discussions?
17        A    I do not have specific memory or
18   recollection on this but, as I recall, I informed
19   him that there is a change in the contracting
20   parties, and he, at that time or around that time,
21   CEO of that company, would be the signing party.
22        Q    What did Mr. Kisjuhász say to you, if
23   anything?
24        A    I don't have a specific recollection
25   on this.
```

Page 119

```
 1        Q    When did that conversation take
 2   place?
 3        A    On or about 31st August, 2005.
 4        Q    If you look at the first page of the
 5   labour law agreement, which is Bates number MT-MAK
 6   1010430, the document says "concluded on June 1st,
 7   2005", do you see that?
 8        A    Yes.
 9        Q    If -- now, this is a document that
10   you prepared on -- on or about August 31st, 2005 --
11        A    Yes.
12        Q    -- is that right?
13             If you prepared it on August 31st,
14   2005, why did you put the date June 1st, 2005?
15        A    As I recall, I received instruction
16   for that date.
17        Q    From whom?
18        A    Most probably from Mr. Ferenc
19   Vaczlavik.
20        Q    Did you have any understanding as to
21   why that date should be chosen?
22        A    No.
23        Q    Now, the same thing for the second
24   agreement.  It's on page 1010439.  It has the same
25   -- it's concluded on June 1st, 2005, date.  Do you
```

Page 120

```
 1   see that?
 2        A    I see that.
 3        Q    And did you put that date in for the
 4   same reason?
 5        A    Yes.
 6        Q    Your e-mail on Exhibit 54 was sent to
 7   -- you sent it to Mr. Balogh, Mr. Morvai and
 8   Mr. Dankó.
 9             Did you have any discussions with any
10   of those individuals about the dating of these
11   documents.
12        A    My general recollection is that, that
13   I raised the issue of dating to Mr. Dankó.
14        Q    And is this the conversation that you
15   referred to earlier in your testimony?
16        A    Yes.
17        Q    And thinking back on your earlier
18   testimony on that subject, is there any more detail
19   that you didn't give us earlier that you can give
20   us now?
21        A    No.
22        Q    Did you ever have any discussions
23   with Mr. Balogh about the dating of these
24   contracts?
25        A    I don't recall that.
```

Page 121

```
 1        Q    Did you ever have -- ever have any
 2   discussions with Mr. Morvai about the dating of
 3   these contracts?
 4        A    No.
 5        Q    Did you ever have any conversations
 6   with Mr. Straub, Elek Straub, about the dating of
 7   these contracts?
 8        A    No.
 9        Q    Was -- what was -- what was
10   StoneBridge?
11        A    My general understanding was that
12   StoneBridge is a holding company with a registered
13   office in Macedonia.  By that time, August 2005, it
14   was 100 per cent owned subsidiary of Magyar
15   Telekom.
16             Earlier there were three shareholders
17   in that company, but the other two co-shareholders
18   were both out by Magyar Telekom as part of share
19   purchase transactions.
20        Q    You said -- you referred to
21   StoneBridge as a -- as a holding company.  Do you
22   know whether Mr. -- whether Stone -- whether
23   StoneBridge had any telecommunications operations
24   in Macedonia?
25        A    I don't have specific information on
```

Page 130

```
 1   Mr. Balogh, primarily by e-mail, is that right?
 2       A    By e-mail and, as I recall, there
 3   were one or two phone calls.
 4       Q    But in your telephone conversations
 5   with -- that you just referenced, you never
 6   specifically discussed, or even generally
 7   discussed, Mr. Balogh's negotiations or
 8   interactions with regard to putting the consultancy
 9   agreements together with counterparties, is that
10   right?
11           MR. DODGE:  Objection.  Form.
12           MR. SULLIVAN:  I'm happy to rephrase
13   it.
14   BY MR. SULLIVAN:
15       Q    In those conversations --
16       A    Yes, please.
17       Q    -- did you ever discuss with
18   Mr. Balogh his negotiations with the parties to the
19   consultancy agreements, as opposed to what the
20   agreements would contain?
21       A    My general recollection, from that
22   time, that he was the one who discussed with
23   Mr. Kefaloyannis.  That's how I can answer your
24   question.
25       Q    Right.  And you never discussed with
```

Page 131

```
 1   him what he discussed with Mr. Kefaloyannis with
 2   regard to negotiating the consultancy agreements?
 3       A    No.
 4           MR. DODGE:  Objection.  Form.
 5   BY MR. SULLIVAN:
 6       Q    That's fine.  You can answer.
 7       A    My answer is, no, I don't know the
 8   background details.
 9       Q    Okay.  You never attended Magyar
10   Telekom board of director meetings where these
11   negotiations might have been discussed, right?
12       A    I didn't attend to Magyar Telekom
13   board meetings around that time.
14       Q    All right.  And you never attended
15   any negotiation sessions or management meetings
16   where the consultancy agreements or their terms
17   were discussed, correct?
18       A    No, I didn't attend to -- correct.
19   I didn't have attend to top management meetings to
20   discuss these term.
21       Q    Now, in fact, you basically weren't
22   senior enough to personally discus the negotiation
23   aspects of these consultancy agreements with top
24   Magyar Telekom executives, true?
25       A    True.
```

Page 132

```
 1       Q    Now, just so that I'm clear, you
 2   played no role in the Magyar Telekom internal
 3   investigation, correct?
 4       A    I had certain coordination efforts
 5   throughout the internal investigation at Magyar
 6   Telekom starting from 2006.
 7       Q    Didn't those coordination efforts
 8   primarily relate to helping people obtain counsel
 9   in connection with the internal investigation?
10       A    I can provide you a general answer
11   without going to too much details, not to breach
12   any kind of privilege related --
13       Q    I understand.
14       A    -- issues.  But the answer in
15   general, yes.
16       Q    And in that regard -- and I won't go
17   beyond this limited question.
18           In that regard did you have any role
19   in regard to my client and his retention of me or
20   my firm as counsel?
21       A    Yes.
22       Q    And what was that?
23       A    My general recollection is that, as
24   the internal investigation started, White & Case,
25   the law firm engaged with the internal
```

Page 133

```
 1   investigation, started to interview executives at
 2   the company, as well as the SEC also notified the
 3   company that it would like to interview certain top
 4   executives.  And, based on the general negotiations
 5   with the company's law firm, Crowell & Moring, it
 6   was recommended that, to encourage the cooperation
 7   of these executives, the company retains US legal
 8   counsel for that purpose.
 9           My involvement generally was that to
10   keep contact with Crowell & Moring on this, and
11   keep also contact with the law firms or potential
12   law firms for that purpose.
13       Q    Okay, thank you.  Let me turn to the
14   2001 acquisition by Magyar of MakTel.
15           My understanding is that you don't
16   have any information related to that acquisition
17   because you weren't at the company during 2001, is
18   that right?
19       A    That is right.
20       Q    All right.  Let me move to the 2004
21   buy-out of Cosmotelco shares.
22       A    Yes.
23       Q    You talk about that with Mr. Dodge
24   earlier, right?
25       A    Yes.
```

Page 158

```
 1    to and not according to a specific date.  So
 2    doesn't that suggest that task is elevated above
 3    date?
 4              MR. DODGE:  Objection.  Form.
 5              (Interruption)
 6    BY MR. SULLIVAN:
 7         Q    If you're comfortable answering, you
 8    can answer.  You don't have to wait.
 9         A    That section suggests -- suggests
10    that the completion itself is more important than
11    the date.
12         Q    Thank you.  Okay, let's turn to
13    Exhibit 45.  I want to draw your attention to page
14    2 of Exhibit 45.  And particularly with regard to
15    page 2, do you see Section 2.4?
16         A    Yes.
17         Q    And 2.4 states,
18              "The Parties agree that it shall be
19    provided that nothing shall breach the provisions
20    of the United States Foreign Corrupt Practices
21    Act."
22              Do you see that?
23         A    I see that.
24         Q    And do you understand that the FCPA
25    prohibits the bribery of foreign officials?
```

Page 159

```
 1         A    At that time I was not aware of the
 2    US Foreign Corrupt Practices Act.  Later on
 3    I understood the requirements under this Act.
 4         Q    But it's fair to say that that
 5    provision was inserted as a result of the
 6    negotiations that ensued and, in fact, were led by
 7    Mr. Balogh, isn't that right?
 8              MR. DODGE:  Objection.  Lack of
 9    foundation.
10              MR. SULLIVAN:  If he knows.
11              THE WITNESS:  Let me refresh my
12    memory by reading these documents.
13    BY MR. SULLIVAN:
14         Q    Certainly.
15         A    (Witness reviewed the document)  If
16    we see Plaintiff's Exhibit Number 97, which is the
17    e-mail chain with Mr. Balogh, Mr. Kefaloyannis and
18    myself, there is an attachment, we already
19    discussed and covered in the previous section.  And
20    it also has Section 2.4 on page 3, which also
21    contains the same reference of this Act.
22              So I think the reason to having this
23    section in the signed version, discussed under
24    Plaintiff's Exhibit 45, is this.  It's coming from
25    that template.
```

Page 160

```
 1         Q    Okay, but all of the templates were
 2    premised upon negotiations between the parties,
 3    isn't that right?
 4              MR. DODGE:  Objection.  Lack of
 5    foundation.
 6    BY MR. SULLIVAN:
 7         Q    Well, let me just simply ask you
 8    this.
 9              There were negotiations between
10    representatives of Magyar, including my client and
11    representatives of the other parties, whereby
12    provisions were -- resulted.  Isn't that fair?
13              MR. DODGE:  Objection.  This witness
14    has already testified that he wasn't involved with,
15    in or present for any of those negotiations.
16    BY MR. SULLIVAN:
17         Q    Did you understand Mr. Balogh to be
18    a part of those negotiations?
19         A    My general understanding was that,
20    that he is one of the contact persons with respect
21    to the negotiations.
22         Q    And --
23         A    In which I was not involved.
24         Q    All right.  And, Mr. Herczegh, you
25    didn't add the FCPA provision, right?
```

Page 161

```
 1         A    No, I didn't add this provision.
 2    I added by using the template I received;
 3    template, the sample I received.
 4         Q    Now, we've established earlier,
 5    Mr. Herczegh, that you are a lawyer, correct?
 6         A    Yes.
 7         Q    And you understand that a contracts
 8    date is when the contract has been established by
 9    the contracting parties, correct?
10         A    Yes.
11         Q    You also understand that the date is
12    chosen to reflect the parties' intent and when
13    obligations begin, right?
14         A    Yes.
15         (Witness continued to review the documents)
16         Q    Mr. Herczegh, can I have your
17    attention for these series of questions?
18         A    Yes.
19         Q    Thank you very much.
20              All contracts are proper and
21    appropriate under Hungarian law, right?
22         A    Yes.
23         Q    Sometimes oral contracts are
24    memorialised with a subsequent written agreement,
25    correct?
```

Page 162

```
 1      A    Yes.
 2      Q    Hadn't you, in fact, done that with
 3 other vendors?  That is, accept services and then
 4 have a memorialisation or a relationship
 5 afterwards?
 6      A    I didn't have experience at Magyar
 7 Telekom at that time in this aspect.
 8      Q    Well, actually, at that time, while
 9 you were at Magyar, you received advice and
10 counselling from lawyers, or at least one lawyer,
11 before you actually had an engagement letter, isn't
12 that right?
13      A    Can you rephrase the question,
14 please?
15      Q    On at least one occasion you received
16 legal advice from a lawyer without having an
17 engagement letter which you subsequently executed
18 later, isn't that right?
19      A    What do you mean on that?  I don't
20 understand the question, sorry.
21      Q    All right.  My question is, sometimes
22 people engage parties to work before they have
23 a signed written agreement, and I've asked you if
24 you've ever done that while at Magyar Telekom?
25      A    At that time in 2004?
```

Page 163

```
 1      Q    Ever.  I'll say ever?
 2      A    I mean, that could be an example for
 3 that.
 4      Q    Okay.  And that actually was an
 5 example that specifically related to you, where you
 6 received advice from a lawyer, took it, and then
 7 asked to prepare an engagement letter later, right?
 8      A    At that time I didn't engage, as an
 9 in-house counsel, outside counsel.
10           Sorry if my answer is confusing.
11 I just connected your question to 2004, October,
12 but, by that time, Baker & McKenzie was already
13 engaged for that purpose.
14           But I must -- I would like to add
15 that I can imagine a situation when parties start
16 to work and include their oral agreement in
17 a written form.
18      Q    And that they memorialise their
19 understanding at a later time?
20      A    Yes.
21      Q    All right.
22           MR. SULLIVAN:  And, in fact, I'm
23 going to show you Defendant's Exhibit 2 just to
24 clarify my earlier questions.
25
```

Page 164

```
 1           (Exhibit Defendant's 2 marked for
 2 identification)
 3 BY MR. SULLIVAN:
 4      Q    This is an e-mail chain -- if we
 5 start at the top --from Ballas Pelecanos &
 6 Associates.  This is back in 2004, October 22nd,
 7 2004 to you.
 8           "Believe me I know 'hurry'.
 9           " Take care and have a wonderful
10 weekend.  Grace."
11           Earlier you tell Grace,
12           "Thanks for your e-mail.  You are
13 right, my e-mail was contradictory.  Do not take
14 further steps in this matter."
15           She clarifies that below, "Do not
16 take further steps".
17           And at the beginning of the next
18 page,
19           "Thank you very much for your letter,
20 Grace, and explanation.  This is sufficient for us.
21           "I did not find an engagement letter
22 between your firm.  I would be grateful if you
23 could prepare a draft engagement letter between
24 your firm and mine."
25           And the earlier part of the e-mail
```

Page 165

```
 1 relates to the work and the information that she
 2 was giving you.
 3           So, in fact, does that clarify your
 4 recollection that with many people and many
 5 circumstances agreements are reached that are
 6 memorialised later?
 7      A    Yes.  Now I see your point.  Sorry
 8 I -- I -- I didn't recognise or realise what you
 9 meant.
10           This e-mail correspondence appears to
11 be 2004 October transaction, as part of which I was
12 requested, as I recall by Mr. Dankó, to make
13 a quick company search, and that is why, just right
14 before the signing of the agreement, just to check
15 the contracting party.  And, since it was a signing
16 and closing, we have done this in a hurry and,
17 first, I got the contact for a law firm to ask for
18 quick assistance, and, as part of this job,
19 I realised that there is no engagement -- no
20 written engagement between MT and that law firm, so
21 I referred that just to complete that one as well.
22           So now I realise and recognise what
23 you meant.
24      Q    Understood, and thank you for that
25 clarification.
```

```
                                    Page 166
 1            So just to reiterate.  Sometimes
 2   people engage in agreements or associations and
 3   memorialise them later, isn't that right?
 4       A    Yes.
 5       Q    Okay.  Now, earlier I referenced
 6   a statement about a contracts dates as being when
 7   a contract has been established by the parties and
 8   has chosen to reflect their parties and when
 9   obligations begin.  Do you remember that?
10       A    Earlier, you mean you asked today?
11       Q    Earlier I asked you -- yes, those
12   questions.
13            Do you agree that a contracts date is
14   when the contract has been established by the
15   parties and it's chosen to reflect their intent and
16   when obligations begin?
17       A    If it reflects the intent, yes.
18       Q    Okay.  Now, we've been through a lot
19   of different versions of the consultancy
20   agreements, correct?
21       A    Yes.
22       Q    All right.  I just want to reference
23   the three final versions, Exhibit 45, 51 and 52.
24   To make it easy, I'm just going reference
25   Exhibit 45.  Do you see Exhibit 45?
```

```
                                    Page 167
 1       A    Yes, I see that.
 2       Q    Can you see Exhibit 51?  I'm going to
 3   reference Exhibit 51 for you in this dialogue, but
 4   I just want to make sure you're familiar with 45,
 5   51 and 52, okay?
 6       A    45?
 7       Q    45 -- fifty --
 8       A    51.
 9       Q    -- one and 52.
10       A    And 52.
11       Q    And they are what you've testified
12   earlier to, as being final executed consultancy
13   agreements between Chaptex and MakTel relating to
14   labour law, frequency fee, and Macedonian
15   electronic communication issues --
16   telecommunication issues, is that right?
17       A    Yes.
18       Q    All right.  The first page of
19   Plaintiff's Exhibit 51 references the statement
20   "concluded on June 1st, 2005".  Do you see that?
21       A    I see that.
22       Q    You have no way to contradict that
23   that date does -- does reflect the activity being
24   established by the contracting parties?
25       A    Can you repeat, please?
```

```
                                    Page 168
 1       Q    The June 1st, 2005 date on the first
 2   page is something that you can't contradict as
 3   being the date when the contract was established by
 4   the contracting parties?
 5            MR. DODGE:  Objection to the form.
 6            THE WITNESS:  I can -- cannot say
 7   anything on the contrary.  It doesn't refer to the
 8   signing date.  That's what I can add.
 9   BY MR. SULLIVAN:
10       Q    Understood.  But I'm not asking you
11   about signing because, as we've established
12   earlier, sometimes signing, memorialisation, occurs
13   after the intent is formed, the promises are made,
14   and the obligations begin.  Isn't that right?
15       A    I see your point.  That could refer
16   to the origination of the agreement of the
17   contracting parties.
18       Q    All right.  And if we move forward to
19   the last page, page 9.  Page 9 references the
20   completion of required performances as having been
21   completed on August 15, 2005.  Do you see that?
22       A    Which exhibit?
23       Q    I'm sorry.  The same exhibit, last
24   page, the performance certificate protocol.
25       A    I see that.
```

```
                                    Page 169
 1       Q    Okay.  And regardless of the signing,
 2   you are in no position to contest or contradict the
 3   representation that, as of that date, August 15th,
 4   the results were achieved as contemplated under the
 5   performance section of the contract;  the
 6   modification of the rules relating to participation
 7   of the Trade Union.  Isn't that right?
 8            MR. DODGE:  Objection to the form.
 9            THE WITNESS:  I'm not in the position
10   to contest or to say anything on the contrary.
11            MR. SULLIVAN:  Okay.  Let me take
12   5 minutes.
13            Thank you very much, Mr. Herczegh.
14   I may have a few additional questions, I may not.
15            VIDEOGRAPHER:  Going off the record
16   at 3:13.
17            (A short recess at 3:13 p.m.)
18            (Resumed at 3:20 p.m.)
19            VIDEOGRAPHER:  Going back on the
20   record at 3:20 p.m.
21            MR. SULLIVAN:  Thank you,
22   Mr. Herczegh.  I don't have any questions on behalf
23   of Mr. Balogh at this time.
24            THE WITNESS:  Thank you.  Understood.
25            CROSS-EXAMINATION
```