# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - -

U.S. SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v. Civil Action No. 11-Civ-9645 (RJS)

ELEK STRAUB,
ANDRAS BALOGH, and
TAMAS MORVAI,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF NICK KOS
Wednesday, May 28, 2014
AT: 10:02 a.m.

Taken at:
The offices of Nabarro LLP
Lacon House
84 Theobald's Road
London WC1X 8RW

MR. HILL: Maybe we should have -- maybe we should agree that an objection by one if us is on behalf of all three unless otherwise noted?
MR. INFELISE: I would be pleased.
MR. KOENIG: Would you like a lengthy explanation as to why?
MR. INFELISE: No, I don't think it's necessary. I'm sure Judge Sullivan would, but no, I don't think it's necessary.
Q. All right, sir, I'll ask the question one more time: Do you recall the names of the subsidiaries, or Magyar subsidiaries in -- in Montenegro --
MS. FRIED: Objection.
BY MR. INFELISE:
Q. -- that PwC audited?
A. I believe it was Monet and Telekom Crne Gore.
Q. The second name, I'm going to refer to as TCG --
A. All right.
Q. -- is that all right?
What type of business did TCG do?
MS. FRIED: Objection.
A. It was a telecoms business, I believe.
BY MR. INFELISE:
Q. What about Monet?
A. It was a mobile phone business --
MS. FRIED: Objection.

A. -- to the best of my recollection.
(Reporter clarification.)
WITNESS: Fixed-line telecoms business.
BY MR. INFELISE:
Q. The -- TCG was a fixed-line --
A. I believe so, yeah.
Q. And Monet, you believe --
A. Was a mobile business.
Q. Mobile phone business?
A. Mobile phone business.
Q. Okay. Now --
A. To the best of my recollection, yeah.
Q. I'm sorry.
Did -- as part -- in 2005, did PwC audit the Magyar subsidiaries in Macedonia?
A. I believe so.
Q. All right. Do you recall the names of those subsidiaries?
A. Telemacedonia, I think, and MobiMak. And potentially Stonebridge was another one we may have audited.
Q. Do you recall whether you did audit Stonebridge or not?
A. I believe so, but I'm not absolutely certain.
Q. When you refer to "Telemacedonia," was it also -- was it a company that you actually audited, MakTel?
A. MakTel.

Q. Was it MakTel?
A. MakTel, yes.
Q. Okay.
Mr. Kos, when PwC conducts an audit of a company, is there any normal procedure by which PwC requires management to make representations to PwC concerning the financial statements?
A. Yes.
Q. What is that?
A. Typically we ask for a representation letter at the conclusion of either an interim review or a -- or an audit, annual audit.
Q. You -- I'm sorry, do you do that before or after you do --
A. After the finalization procedures, yeah.
Q. All right.
A. Finalization procedure stage.
Q. And is -- are those --
MR. HILL: Can I ask Mr. Kos to keep his voice up a little bit? I'm having trouble with ...
MR. INFELISE: Sure.
Q. Now, are these representations done in writing?
A. Yes.
Q. Who normally signs, on behalf of the company, these management representation letters?

A. Normally the CEO and the CFO of the respective company.
Q. Do you recall whether in 2005 and 2006, Magyar provided management representation letters as part of the audit and interim reviews that PwC did of those companies?
A. To the best of my recollection, yes.
Q. Do you have any recollection of who actually signed those representation letters?
A. For the group audits, it would have been -- or for the group interim reviews in 2005, it would have been Klaus Hartmann, I believe, and -- and Elek Straub, for the -- for the group, for the interim. For the -- for the year end, 2005 and 2006, there were some changes.
Q. I see. Now let me ask you this, Mr. Straub -- excuse me; Mr. Kos.
I'm going to show you what we've previously marked as plaintiff's exhibit 19, a multiple-page document, Bates-numbered MT-PC-REPS-00134 through 00140. Just take a moment and take a look at it, would you, please, Mr. Kos.
All right. Do you recognize this document, Mr. Kos?
A. Yes.
Q. What is it?
A. It's a Magyar representation letter.
Q. And by looking at it, can you tell whether this is a representation letter for an audit, or for an interim

A. Magyar Telekom.
Q. Magyar Telekom?
A. Yes.
Q. All right. So did the discovery of the Sigma and Rawleigh contracts have any impact on the 2005 end-of-year audit of Magyar?
A. Yes.
Q. And what was that again?
A. We were unable -- we were not in a position to sign off the 2005 year-end audit of Magyar Telekom at the expected time, or ultimately prior to the expiration of -- of certain regulatory deadlines.
Q. Sir, do you recall whether during the course of the 2005 end-of-year audit of the Montenegrin subsidiaries, any other contracts were brought to your attention by Mr. Trow?
MR. HILL: Objection.
(Reporter clarification.)
MR. HILL: Mine.
A. I wasn't myself directly involved in the audit of the Montenegrin subsidiaries, but during the course of the investigation, not necessarily by Mr. Trow, two other contracts were brought to my attention.
BY MR. INFELISE:

Q. Do you recall what the response from anyone at the board of directors meeting in February of 2006 was to your statement that PwC was not in a position to sign off on their 2005 end-of-year audit, or end-of-year financial statements?
A. I think there were -- there were many board meetings and -- and audit committee meetings over the period, so -- so some of those things, in terms of the memory, tend to -- to gel together. But -- but over the period of those meetings, I think the initial meeting, there was certainly a -- I think it's fair to say there was a -- there was a certain level of -- of shock at the position we were taking, and the discovery of -- of issues.
I believe there was -- there was clear expressions made in all of those meetings that the appropriate process would be undertaken to -- to -- with the purpose of clearing the senior management of the -- of the company of any -- of any implications in any wrongdoing, to allow us to sign off the financial statements.
During the course of further meetings, there were various different scenarios being played out around signing off financial statements; what were the requirements, what were the legal requirements, whether the financial statements should be approved by the board

or whether they shouldn't be approved by the board, et cetera, et cetera.
But it was quite complex and quite -- quite lengthy in terms of the -- the types of -- of activities during the board meetings.
Q. I see.
Now -- well, let me ask you this, sir: You mentioned one of the things that concerned you and Mr. Trow about the Monet -- excuse me, the Rawleigh and Sigma contracts were their size; and that was with respect to TCG?
A. Yes, certainly with respect to TCG, but -- but mostly even with respect to -- to Magyar Telekom. We contract with Magyar Telekom, and I understand the process of contracting with them; and certainly, from our perspective, a contract the size of €2.5 million -- or dollars, or whatever -- would have been subject to intense scrutiny.
Q. When you talk about a contract that was worth two and a half euros, are you referring to one the contracts, either the Rawleigh or the Sigma contract?
A. To Rawleigh.
Q. All right.
Sir, during the course you talked about subsequent discussions with the board of Magyar concerning PwC

signing off on the audit. What, if any, discussions were there about PwC just signing off on some portion of the audit -- of the financial statements?
A. There were discussions with management, and I can't recall directly whether that was stated at the board, but I think at least one -- at least at one point in time, it must have been mentioned that the board -- that we were going through a process of looking at whether or not we could perform additional procedures on certain of the subsidiaries so that we could sign those subsidiaries off with a view to meeting the statutory deadlines.
Q. Do you recall which subsidiaries that you were considering?
A. I do recall that we were -- we were put under pressure to sign off Macedonia Telekom.
Q. Would that have been MakTel?
A. MakTel.
Q. And why -- do you know why you were -- received pressure to sign off on the financial statements of MakTel?
A. The management of the company told us that -- that they needed signed financial -- audited financial statements in order to pay a dividend that the government was demanding.
Q. And do you recall --

Page 62

MR. KOENIG: "Pay" -- I'm sorry, you trailed off there.
WITNESS: "That the government was demanding." The government of Macedonia.
BY MR. INFELISE:
Q. Thank you for that clarification.
Do you recall who it was that was putting pressure on you to sign off on the financial statements for MakTel?
A. It was the CFO and the CEO of MakTel, at that time, which I believe was -- CEO was Szendrei Attila, and I think -- or Attila Szendrei -- and the CFO was Rolf Plath.
Q. All right. Was -- who, if anyone, at Magyar was putting pressure on you to sign off on the financial statements for MakTel?
A. I can't recollect anybody specifically at this point in time.
Q. All right.
A. However, as I said, there was -- there were various instances in the board meetings and in the audit committee meetings where certain members were expressing a desire for us to sign off the financial statements of the group, and at various different times, potentially some of the subsidiaries.
Q. What was your response to the request to sign off on the

Page 63

financial statements for MakTel?
A. If I recall, I think initially, we -- we offered to do some additional forensic-type procedures to try and get ourselves comfortable with -- with MakTel overall, and whether or not there were similar issues or concerns as -- as discovered in Montenegro, so that we may be in a position to -- to get the desired level of comfort to sign off an opinion on those financial statements.
Q. And what was the response of Magyar -- excuse me -- what was the response of Magyar to those -- to that offer?
A. If I recollect, we -- we made an offer to do that, and -- and then, I believe, if I understand, we were told that -- that we weren't required to do that.
I think they -- I think we may have asked them also to look at the possibility of paying the dividend without having audited financial statements.
Q. When you said you were told you were not required to do that, who told you that?
A. I can't recall, but I -- I suspect it was the -- the management of -- of MakTel.
Q. Sir, let's then turn to Macedonia and the subsidiaries there.
Sir, during the 2005 end-of-year review of Magyar and MakTel, did you ever become aware of signed protocols of cooperation between Magyar and the

Page 64

government of Macedonia?
A. During that period?
Q. Yes.
A. During the audit period?
Q. Yes.
A. No.
Q. I'm going to show you -- I'm going to hand you, sir, two exhibits, plaintiff's exhibit 11 and plaintiff's exhibit 12. They are both two-page documents. Just take a moment and take a look at those.
Have you had a chance to look at exhibits -- plaintiff's exhibits 11 and 12, Mr. Kos?
A. Yes.
Q. Do you recognize these documents?
A. Yes.
Q. And again, let me ask you this: During the 2005 end-of-year audit of Magyar, were these documents ever brought to your attention by anyone at Magyar?
A. No, I don't think they were ever brought to my attention by anybody at Magyar.
MR. HILL: I'm sorry --
MS. FRIED: I'm sorry, I'm having difficulty hearing.
WITNESS: "They were never brought to my attention by anybody at Magyar."
MR. INFELISE: Thank you.

Page 65

Q. Based on your experience, and after reviewing these protocols of cooperation, do you believe that these two documents, or these protocols of cooperation, plaintiff's exhibits 19 and 20, are the type of documents that should have been maintained in the books and records of Magyar?
MS. FRIED: Objection.
MR. KOENIG: Objection.
A. On the face of it, absolutely, I believe so.
BY MR. INFELISE:
Q. Why do you say that?
A. There are certain elements to these contracts which may have a financial impact. Some of the numbers in here are quite substantial. There's -- there's reference to agreement that -- that also may have an accounting impact, for example, on the financial statements, may require certain treatment.
MR. DODGE: Excuse me a second.
(Discussion off the written record.)
MR. INFELISE: Oh. Yeah. Thank you.
Q. I've misidentified the two -- the two protocols I'm showing you are exhibits 11 and 12.
Now, could you specifically identify those paragraphs that you're talking about with respect to the -- one, the significant numbers; and two, the audit

Page 66

issues that were -- financial accounting issues that were raised?

MS. FRIED: Objection.

A. I -- I guess, theoretically, if you -- if you go through the letter, in paragraph 1, there's a commitment potentially to -- to a network build, which may be a capital commitment which may need to be disclosed in the financial statements.

There is -- there's also an agreement with the government around licensing in the future, which may also need to be disclosed, because it gives potential advantages to the company that would need to be assessed from a disclosure point of view.

The second paragraph, where -- the paragraph entitled number 2 refers to a guaranteed dividend, I guess, if I look at that just briefly; so that would need to be evaluated, whether that should be shown within the financial statements as a -- as a declared dividend, for example. There are other -- other elements to that which also may have an accounting impact on how that -- that would be treated.

In paragraph 3, it appears to dictate the frequency fee payments for certain periods of time, whether or not those were the actual frequency payments, fee payments, according to the financial statements, I don't know, but

Page 67

that would need to be evaluated in terms of the financial statements.

Rebranding; there's a commitment to rebranding which would need to be evaluated as to the accounting for that, because if there's a commitment made to rebranding, very often there's costs associated with that which need to be -- may or may not need to be recognized up front, so there may be a devaluation of -- of an existing brand, or a replacement with a new brand.

Paragraph 6, I am not sure; again, it's something that's a significant agreement with a major -- with a major partner and customer.

There's a frequency fee issue referred to in paragraph 7. Again, if we're trying to assess the accounting treatment of a -- for example, if this is a contingent liability-type issue, then this -- this information may materially affect the accounting treatment for that.

Planning further investments in the country; again, this may relate to capital commitment type of disclosure.

The registration of -- of MT as the sole shareholder of Stonebridge, again, that may have an impact of how that's recognized within the financial statements, and -- I can't -- I can't give a definitive answer in any of

Page 68

these, but all of these are questions that we would -- we would need to assess.

And I guess -- I'm not absolutely sure on this, but I think there's -- typically, within the 20-F, probably a list of significant contracts that would need to be disclosed as well, or -- I don't know. An appendix, potentially, to the -- to the 20-F for the -- for the registration -- or for the reporting purposes in the US.

So -- so there's a few implications -- there's quite a few, I guess, implications to this that would need to be evaluated in terms of the financial statements.

BY MR. INFELISE:

Q. Based on your review of the two protocols of cooperation, plaintiff's exhibits 11 and 12, are these the type of documents that should have been brought to PwC's attention during the course of the 2005 end-of-year audit?

MS. FRIED: Objection.

MR. HILL: Objection.

MR. KOENIG: Objection.

A. I believe so.

BY MR. INFELISE:

Q. Thank you.

Oh, if you would, just for a moment, look at plaintiff's exhibit number 12. On the second page,

Page 69

there is a signature block, and it appears to have been -- it's for Elek Straub.

During the course of any of the conversations you had with Mr. Straub during the 2005 end-of-year audit at Magyar, did Mr. Straub ever mention that he had signed a protocol of cooperation with officials of the government of Macedonia?

A. Not to my recollection.

Q. During the course of the 2005 audit of Magyar, did Mr. Balogh ever mention that he had signed a protocol of cooperation with the government of Macedonia?

MR. HILL: Objection.

A. Not to my recollection.

BY MR. INFELISE:

Q. Next I'd like you to go to what we previously marked as plaintiff's exhibit number 13. This is a four-page document, Bates-numbered MT-MAK 1051986 through 1987, and MT-MAK 1051986-T to 1987-T.

And, sir, you'll see that the first two pages are in Hungarian; the second two pages are what appear to be English translations of those emails. I was going to direct your attention to the second two pages, which are the English translation.

And if you take a moment to look through this -- again, recognizing that, you know, consistent with the

Page 74

the 2005 audit, and of your audit of Magyar, did he ever tell you that Magyar had decided, intentionally, not to include signed copies of protocols of cooperation in its books and records?
MR. HILL: Objection.
MS. FRIED: Objection.
A. No.
BY MR. INFELISE:
Q. During the course of the 2005 audit of Magyar, did Mr. Straub ever tell that you Magyar intentionally decided not to include copies of protocols of cooperation, plaintiff's exhibits 11 and 12, in its books and records?
MS. FRIED: Objection.
A. No.
BY MR. INFELISE:
Q. During the course of the audit of 2005, end-of-year audit of Magyar, did Mr. Balogh ever tell you that Magyar intentionally decided not to include copies of the protocols of cooperation, plaintiff's exhibits 11 and 12, in its books and records?
MR. HILL: Objection.
A. No.
BY MR. INFELISE:
Q. All right, sir. If you would now go back to plaintiff's

Page 75

exhibit 19 and 20, which I believe were the management representation letters, the first ones I showed you.
Having had a chance to look at plaintiff's exhibits 11, 12, 13 and 14, sir, did the existence of those documents and those emails in any way affect any of the statements that were made by Magyar with respect to those interim audits in 2005?
MR. HILL: Objection.
A. Yes.
BY MR. INFELISE:
Q. Are there any specific representations that would be relevant here?
MS. FRIED: Objection.
A. I need to check the date -- it's May 2005, yeah.
So, because these existed in the second quarter, then potentially they would have had an impact on the financial statements.
BY MR. INFELISE:
Q. "These" being plaintiff's exhibits 11 and 12?
A. 11 and 12.
Q. Okay. Thank you.
A. They may have impact on the financial statements that were referenced in these two representation letters, so both the second quarter and the third quarter of 2005.
At the beginning, it talks about:

Page 76

"... the purpose of determining whether any material modification should be made to the interim consolidated financial statements for them to confirm with International Financial Reporting Standards... "
We -- we were not able to evaluate the impact of -- of these protocols and whether they would have made -- required any modifications to the financial statements. They should have been evaluated for that purpose.
"We confirm that we are responsible for the fair presentation in the interim consolidated financial statements..."
I can't make a determination -- the determination whether or not these protocols would have impacted the fair presentation.
Q. And, sir, what you're reading from is plaintiff's exhibit number 19?
A. Number 19, yes.
Q. Thank you.
A. But similarly, the same clause is in 20.
Q. All right.
A. Unless -- if you want me to go through it separately, I can do that; that's -- that's fine.
Q. Only -- only to the extent that there may be a difference. Otherwise, you can just indicate that your comments would apply to 19 and 20.

Page 77

A. Okay. Number 2:
"The interim consolidated financial statements referred to above are fairly presented in conformity with IFRS."
That may be impacted by the protocols, for the reasons that we've outlined before.
Number 4 -- I'm ignoring number 3, because we didn't have any unadjusted differences related to the protocol, because we didn't review them.
Number 4:
"[We've] made available to you ...
"... All financial records and related data."
I believe that this was not provided to us. I believe it should have been provided to us in the normal course of the audit, and -- and the purpose of -- I think, clearly, the purpose of this representation in the management representation letter is to ensure that people are reminded -- management are reminded of their responsibility to provide us with -- with that sort of information and data.
"There are" -- number 5:
"There are no significant deficiencies, including material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the company's

Page 154

the two contracts.
Q. Did you have any one-on-one discussions about this with Mr. Straub following that meeting?
A. We did have a one-on-one discussion with Mr. Straub; I'm not quite sure of the time -- not a one on one, sorry, it was with two others. But we did have a discussion about how to -- how to proceed with -- with matters, with a view to clearing him with regard to the -- the concerns.
Q. Did Mr. Straub say during that meeting that -- you know, this has become a source of frustration because the company was trying to be cooperative and -- and compliant, and do what was necessary to complete the audit?
A. I can't recall directly.
Q. Okay.
Now, I may go back to some of the individual documents you referred to earlier today, but to jump ahead in the chronology of it, it's the case that you and PwC ultimately agreed to approve the 2005 financial statements at the end of 2006; correct?
A. Correct.
Q. But isn't it the case that you agreed to that only on the basis of certain conditions?
A. We agreed to that on the basis that the financial

Page 155

statements were approved by the audit committee and by the board of directors.
Q. Was it also a condition that Mr. Straub resign from his position?
A. I'm not sure that I recollect it as being a condition, per se. But we were not in a position, following the reports by White & Case, as the investigators, and nor were they in a position -- they were not in a position, I guess, to clear him with regard to the allegations, and therefore we were unable to rely on his representation.
Q. And he in fact did resign at the December 5th, 2006, audit committee meeting; correct?
A. I can't recall exactly, but that sounds --
Q. Okay.
A. -- like it could be right, yeah.
Q. I'd like to ask you about a few of the documents that were put in front you this morning --
A. Mm-hmm.
Q. -- by Mr. Infelise. In particular, I'm referring to plaintiff's exhibits 11 and 12, the protocol of cooperation. I'll give you a moment to pull out ...
A. Sure.
Okay.
Q. I believe you said you didn't -- these documents weren't

Page 156

provided to you during the time period which -- during which PwC was actually performing the 2005 audit; is that correct?
A. That's my recollection, yeah.
Q. And when were these documents ultimately provided to you?
A. I -- I don't know if they were ever provided to me. I think I saw them when I had that meeting with the DOJ in -- in Washington for the first time, is my recollection, and then -- they may have been in the package yesterday, but then I think I saw them today for the first time.
Q. Okay.
A. Or -- not the first time, but -- but I don't think I've ever received them.
Q. Other than in the context of the investigation, or this lawsuit?
A. Other than the context of -- yes, the -- yes, but -- but I have not received them.
Q. Understood.
A. They've been shown to me.
Q. Okay.
A. Yeah.
Q. Then am I also correct in assuming that you've never discussed these documents with Ladu Bukowski, Elek

Page 157

Straub, or Izimali Mehazi?
A. Apart from Elek Straub, I don't think I've ever met the other two gentlemen.
Q. And you've not discussed these documents with Mr. Straub?
A. I don't believe I've ever discussed these documents with Mr. Straub.
Q. Okay.
A. I -- you know, I don't think I've had much of a conversation with Mr. Straub post me first seeing these documents, in fact, yeah.
Q. Okay. Is it in fact the case that you had never discussed the contents or negotiation or discussions leading up to these documents with any senior executives at Magyar Telekom?
A. I don't believe I had, no.
Q. Okay. In fact, do you know whether any of the provisions that I believe were characterized this morning as "contract terms" were ever actually performed or satisfied?
A. I -- I have done no further work on these protocols whatsoever.
Q. Okay.
I'd also like to ask you a few questions about plaintiff's exhibit 15, which is the document, four-page

Page 186

Q. -- is that a -- is that a required process in the --
A. Not that I'm aware of, no.
Q. So is it -- is it a process that -- well, the purpose of the -- of that process is to enable the CEO or the CFO who's providing the management representation the information he or she needs in order to make the representations; that's the purpose. Am I right?
A. I think that's a determination for the CEO or the CFO to make. It's -- for our purpose, we need to be satisfied that -- that they understand their business, they have the ability to make the sort of representations -- and we may get comfortable with that on many different ways.
Q. So in a company, for example, like Magyar, of the size of Magyar --
A. Mm-hmm.
Q. -- is the existence of a cert -- subcert process a necessary component of allowing you to be comfortable ultimately with the management representations?
A. It's not a requirement that -- that we have of a company, but it certainly contributes to the comfort that we take from the -- from the process, yeah.
Q. But PwC doesn't impose that as a requirement?
A. No, I don't believe so.
Q. And am I fundamentally correct in what I said a minute ago, that the purpose, really, if there is such

Page 187

a process, is to make sure that the -- that those giving the management representations have the information they need in order to be accurate?
A. That -- you know, again, as I said, that's a determination for them to make, because -- you know, they may decide they don't need that; they may decide that they have other means for -- for getting comfortable that they can actually make the declarations in the -- in the representation letter.
Q. Okay. I thought I heard you this morning -- but I may have misheard -- I thought I heard you this morning say that you -- that you had an understanding that Magyar had a subcertification process.
A. Yes. I had an understanding of that, yeah.
Q. Okay. Again, in 2009, let me -- I'll represent to you in 2009, when you spoke with the Department of Justice and the FBI, their memorialization of what you said was that you were "not sure whether subcertifications were used at Magyar"?
MR. INFELISE: Objection.
BY MR. HILL:
Q. Is it possible that you have sort of -- again, through the process of your -- that was -- you know, five years ago; you've learned things in the last five years, you've read things, obviously, that you've become aware

Page 188

of something that you weren't previously aware of?
A. I mean, I was -- I was aware, and I remain aware, because I remember that, because sometimes we had to wait for the -- for the representation letter until the account -- the controller of accounting, or the director of -- director of accounting, Tom Stumpf, was satisfied that they had got all the subcertifications that -- that they needed.
But -- but we didn't examine those subcertifications, and maybe that's the -- the misunderstanding, because of that.
Q. So the -- when you say you didn't examine them, in other words, the -- whatever subcertifications there were were not reviewed by PwC?
A. I don't believe so, no.
Q. Do you know if they were maintained or compiled in any fashion?
A. I -- I believe they probably would have been, yeah.
Q. Do you know whether or not the -- what the significance to PwC would have been if in fact they -- there were -- there were requests for the subcertifications, and they -- no response came back from the request?
A. That would have been something for the management to deal with.
Q. And the management in this -- with respect, at least, to

Page 189

Macedonia -- would have been -- Mr. Trow would have been the one in charge of that? He would have had to make a determination, for example?
A. No, no, no. Mr. Trow would have been requesting the representation letter. If the management there didn't receive all the subcertifications that they wanted, it was their determination whether or not to sign the representation letter.
Q. So it would be not a factor from PwC's review of -- PwC has to independently certify; correct? At least on an annual basis?
A. We issue our audit opinion on -- on the annual basis, but the -- we need the representation letter signed by the CEO and the CFO; that's what we request.
Q. And that's a predicate to issue when you need to?
A. Yeah, but -- but at the same time, if we -- if we are of the opinion that the CEO and the CFO don't know their business, don't have the ability to -- to give that certification, then we would potentially ask them to perform whatever procedures they should perform to get knowledgeable about their financial statements.
But we didn't -- I don't believe we had those concerns about Elek Straub or Klaus Hartmann. Now, whether they had a process of subcertification or not was, from my perspective, to give them comfort. It may

Q. With regard to White & Case, you said you met with them several times?
A. Yeah.
Q. Okay. By phone and in person, or just --
A. Yeah.
Q. -- in person?
A. Both, I guess, yeah.
Q. Okay. In all the times you were -- did you meet with them in person more than twice?
A. Oh, I think so, yes.
Q. More than five times?
A. I believe so.
Q. Okay. When you were meeting with White & Case, were there people from White & Case there taking notes during the meeting? To the extent you recall.
A. Certainly in the first interview, when we -- when we talked through the -- the background to --
Q. And do you remember when that was?
A. Early January 2006.
Q. Okay. So when you met with them subsequent to that, do you know if they were --
A. I -- I don't -- I don't recall that they were -- they weren't in the context of interviews; it was more in the context of audit committee meetings, briefings on the progress that we're making in regard to --

Q. I see.
A. -- the investigations, et cetera, et cetera.
Q. Okay.
MR. KOENIG: All right. Could I just have one second.
(Discussion off the written record.)
MR. KOENIG: I'm 1 minute past your 5 o'clock, but I'm done.
A. Thank you. Appreciate it. Thank you.
MR. INFELISE: I just have a couple of followup questions, if you don't mind.
VIDEOGRAPHER: Going off the record at 2 minutes past 5. Recording has stopped.
(A break was taken.)
VIDEOGRAPHER: Back on the record at 2 minutes past 5.
Examination by MR. INFELISE
BY MR INFELISE:
Q. Mr. Kos, just a couple of questions.
Mr. Straub's counsel asked you some questions about statements you made in 2005 concerning your opinion of Magyar and its procedures. Let me just ask you, sir, was -- when you made those statements, were you aware of the Sigma and Rawleigh contracts?
A. No.
Q. And when you made those statements, was that before you stated you lost confidence in representations Mr. Straub was making to you?

A. Yes.
Q. And when you made those statements, was that before there was an internal investigation conducted by White & Case?
A. Yes.
Q. And when you made those statements, was that before you were aware of the findings of that investigation by White & Case?
A. Yes.
Q. Second, Mr. Straub's counsel asked you some questions about your interaction with Mr. Straub and whether or not you discussed basic procedures and testing procedures. And I'm not sure I recall exactly the questions, but let me ask you this, sir: If you had discussions with Mr. Straub, and he was aware that Magyar intentionally did not include contracts for protocols of cooperation with a foreign government in their books and records, would you have expected him to tell you that?
MR. KOENIG: Objection.
MS. FRIED: Objection.
A. Yes.
BY MR INFELISE:
Q. And was the existence of protocols and cooperation between Magyar and a foreign government, was that

information that would have been material to your audit of Magyar?
MS. FRIED: Objection.
MR. KOENIG: Objection.
A. As we've gone through this before, the -- that determination would need to be made, but -- but they would certainly require further investigation and further questions, from our perspective.
BY MR INFELISE:
Q. And, sir, just to be clear, would the existence of backdated contracts entered into by Magyar's subsidiaries, would the existence of those backdated contracts have been potentially material to the audit of Magyar and its subsidiaries?
A. Potentially, but that would be --
MR. KOENIG: Objection.
MS. FRIED: Objection.
MR. HILL: Objection.
A. That would be the subject of further investigation, but that would be required, yeah.
BY MR INFELISE:
Q. And finally, Mr. Kos, would the existence of duplicate contracts, where two subsidiaries of Magyar entered into an identical contract with the same company, on the same date, to provide the same service, would those existence