# EXHIBIT G

# In The Matter Of:

*U.S. Securties and Exchange Commission v.*
*Elek Straub, Andras Balogh and Tamas Morvai*

---

*Elek Straub*
*Vol. 1*
*July 31, 2014*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California  94105*
*(415) 597-5600*

Original File 24472StraubV1.txt
**Min-U-Script® with Word Index**

Page 113

1 target. It was always depending everything on
2 the concrete situation in that given time. So,
3 so we were prepared for such a situation, and we
4 don't really laid back knowing that there is an
5 agreement. There was no agreement. There were
6 intentions that were, let's say, assumptions and
7 promises made each other, but no firm agreements
8 as you would call something legally binding.
9     Q.  Uh-huh?
10    A.  So, so it was very well possible that,
11 that despite the fact that at a meeting where 20
12 people are around the table somebody says that,
13 yes, we will do this or that; next day the
14 situation has changed. So it was a moving thing,
15 yes.
16    Q.  Okay. And one of the issues that was
17 important to the government of Macedonia was the
18 payment of the dividends; is that right?
19    A.  Yes. It was important for them, but it
20 was the same time important for us for the
21 reasons I have I think earlier explained to you.
22 We were fairly, fairly nervous having more than
23 100 million euros in that country, which on its
24 own was very shaky, very difficult. Banking
25 system very weak. So all in all, it was better

Page 114

1 for us to see that money out of the country.
2     Q.  One of the issues that was important to
3 MakTel was the implementation of bylaws that --
4 that the company considered appropriate; is that
5 right?
6     A.  It was an important element for our
7 position at that time, yes.
8     Q.  So was there a concern that MakTel
9 might make the dividend payment that the
10 government wanted but then not receive the
11 appropriate bylaws that it wanted?
12    A.  Let me formulate it in the following
13 way: It would have been a big problem if we are
14 paying a higher dividend with the assumption that
15 the regulatory regime would support a normal
16 business development of the company and the
17 profitability of the company because of a -- of
18 disadvantages regulation goes down.
19        So we had to be very careful to pay
20 only dividends in case we can foresee that the
21 regulatory environment is supporting the
22 profitability of the company. So I think that's
23 why I was telling because the connection is a
24 little bit the other way around. It's not that
25 we are only paying dividends if, but we can only

Page 115

1 pay dividends if the regulatory regime is
2 according to the assumptions in the business
3 plan, but the connection between these two
4 elements is clear, yes.
5     Q.  So I guess there is maybe a separation
6 between the dividend for the 2004 year and then
7 the dividend for 2005 and future years?
8     A.  No. No. Unfortunately not because the
9 situation is the following: If we foresee a
10 significant deterioration of the profitability of
11 the company, then we have to make reserves for
12 the future years and not be paying out all the
13 money because then the company stands there naked
14 in the market. So practically even the amounts
15 which are in the budget or are in the -- in the
16 banks for the company, let's put it this way,
17 cannot be paid out if for the future we see a
18 significant deterioration of the budget. So it's
19 not only the future but also the present impacted
20 by the out -- business outlook, so to say.
21    Q.  Okay. Now, was it also the case,
22 though, that the payment of the higher dividend
23 in 2005 gave MakTel some negotiating leverage
24 with respect to the government on all of the
25 issues that you were negotiating?

Page 116

1     A.  I think the government, and especially
2 the prime minister, was understanding that there
3 is a significant connection between the how the
4 market is regulated and how -- what are the
5 abilities of the company to pay dividends. Two
6 shareholders, I mean, Magyar Telekom and the
7 other shareholder, the government, has an
8 agreement on the fact that dividends can only be
9 paid after the level the company is profitable;
10 and the company's profitability is very much
11 depending on the regulatory regime.
12        Of course, in another hat, the
13 government, the prime minister has other
14 interests as well; but basically we are
15 negotiating with them like shareholders with
16 other shareholders.
17    Q.  Do you have any understanding of how
18 the size of the proposed dividend, which as I
19 recall at this time somewhere in the neighborhood
20 of 90 million euros total?
21    A.  Yes.
22    Q.  So the government's share would be
23 something less than half of that?
24    A.  Less than half of that.
25    Q.  Forty-three, forty-four million euros?

Page 133

comes to that. But of course, that's -- that was thought to becoming a reality in the future only. At this time we are at the very beginning of a certain path.

Q. Now why was the Macedonia MVNO, why were those provisions linked to Kosovo MVNO in this paragraph?

A. Again, this is giving and taking. If we can or MakTel would have been able to expand its activities into another market and gaining certain additional revenues with it, then it would have been easier and more open to give up a certain part of its business in Macedonia vis-a-vis the third entrant in the form of an MVNO.

Q. Okay.

A. However, let me stress because it was not told until now, that these were only very preliminary plans. As we know today already, that nothing has been realized from this MVNO at all because later on it turned out that there are, let's say, arguments, business arguments against it.

Q. Now, the second sentence of this paragraph says, "Consequently, an MVNO in

Page 134

Macedonia shall be subject to the success of the Kosovo MVNO model."

A. Yes.

Q. What does that -- what does that mean, success of the Kosovo model?

A. Financially, financially viable. It proves that in that market an MVNO is viable and can work and the know-how is there, and the company's understanding this whole, whole solution as such.

    The -- to run an MVNO operation is, let's say, at least questionable. Whether it is a rationality exists from a business point of view, if experts are there who can do that, if the market is accepting that as a real offer and so on and so the services can be sold.

    Now, this was unknown at that time, and so it was reasonable to say that we don't enter into a bigger MVNO operation unless there is some pilot proving that this is really flying.

Q. Okay. So is it correct, then, for me to understand that -- withdrawn.

    Is it correct to say, then, that from Magyar Telekom's position that Magyar was not willing to agree to an MVNO in Macedonia unless

Page 135

there was already before that a successful MVNO project operating in Kosovo?

A. I am not really -- word is I think cannot be -- cannot be expressed the situation. We were subject of the law of Macedonia and subject of the decisions, so we were at maximum having strong feelings against it, but at the end of the day, the government had the freedom to make its decision. We may have argumented [sic] against it. We may have shown that this is not reasonable, but at the end of the day the decision was in the hands of -- this was a kind of harmonizing different interests in a form which is acceptable for both parties.

Q. Okay. So but at least the intentions of the parties as expressed in the Protocol of Cooperation --

A. Yes.

Q. -- was it that there would not be an MVNO in Macedonia --

A. Unless.

Q. -- unless and until there was a successfully operating MVNO already in Kosovo?

A. Yes. As a pilot, yes.

Q. Then Paragraph 2 deals with the payment

Page 136

of the increased dividend.

A. Yes.

Q. And is it correct this is an agreement by Magyar Telekom that a 95 million euro dividend would be issued no later than July 4th, 2005; is that right?

A. Yes.

Q. I am sorry. I didn't hear the answer.

A. Yes. It is, as it says, Matav agrees. Of course based on at least two things, based on the assumption that -- that the necessary decisions are made, and I think later on there are some notes about that, the necessary decisions by the shareholders meeting and so on.

Q. Uh-huh.

A. And of course, also pending on the fact that the financial conditions of the company as it is described very -- in very detailed here will be as expected. Yes.

Q. Right. Now, the paragraph, Paragraph 2 has different provisions, I believe, with respect to the 2004 dividend and the 2005 dividend; is that right?

A. Yes, yes, yes.

Q. So for the 2004 dividend it simply says

Page 137

1  that the payment will be made in full within the
2  shortest legally possible timeframe no later than
3  4th of July 2005; is that right?
4     A.   Yes.  But let me stress again that the
5  agreement of Matav is not enough in this case to
6  pay dividends because it has to be decided by the
7  necessary board of directors and the necessary
8  shareholders meeting of MakTel.
9     Q.   Right.  And there are other provisions
10 dealing with that in the document, right?
11    A.   I think so, yes.
12    Q.   Yes.  And then also the same paragraph
13 that we are talking about, Number 2, speaks to
14 the 2005 dividend --
15    A.   Yes.
16    Q.   -- is that right?
17         And as I read it, "A dividend for the
18 subsequent financial year of the same level is
19 subject to, one, the sole discretion of the
20 shareholders of MakTel; and two, the company's
21 financial performance and condition on 31st
22 December 2005 (payable during the first half of
23 2006); and three, the reliability of the
24 regulatory framework of the telecommunications
25 market in Macedonia."

Page 138

1     A.   Yes.
2     Q.   So were those three conditions placed
3  on the payment of a comparable dividend for the
4  2005 year?
5     A.   These -- these were the general
6  conditions of any share -- so it's kind of
7  commonplace to nail these -- nail these
8  preconditions down, but because a dividend is
9  always depending on these -- on these elements
10 and, of course, that expressed here as an
11 intention for the future pending on certain
12 preconditions.
13    Q.   Is it correct to understand that --
14 that one of the conditions for payment of a 95
15 million a year dividend in 2005 would have been
16 the implementation of appropriate bylaws with
17 respect to the telecommunications laws?
18    A.   This does not talk about the bylaws.
19 It talks about an actual requirement, and that is
20 the reliability of the regulatory framework.  And
21 let me stress again the connection between the
22 payment and the regulatory framework is a little
23 bit opposite.
24         If the company is able to produce
25 profits enough, then based also on the regulatory

Page 139

1  framework, then, of course, it will pay
2  dividends.  So I would not really connect that in
3  the other way around.
4     Q.   Okay.  But the reference to the
5  regulatory framework --
6     A.   Yes.
7     Q.   -- one component of that would be the
8  bylaws; is that right?
9     A.   One component, among many, yes.
10    Q.   But the bylaws would be an important
11 component; is that right?
12    A.   One among many.
13    Q.   So you don't think they would not be
14 important?
15    A.   Like you say, for example, the law
16 itself is more important.  So I cannot measure
17 the importance of it.  It's one element of the
18 regulatory framework, which is generally defining
19 how a company is regulated.  Bylaws are also
20 contributing to that.
21    Q.   Right.  But by the time the protocol
22 was signed, the law was already in place, right?
23    A.   Yes.  But we were requesting from the
24 government to change that law.  So we were in
25 discussion with the government to change that law

Page 140

1  because -- and I don't want to elaborate on
2  that -- we were talking.  It was against the
3  concession contract.  It was against the European
4  Union, the guidelines, and so on.  So there were
5  several problems with it.
6     Q.   Okay.  And so those discussions would
7  also have been related to the payment of -- or
8  the level of the 2005 dividend; is that right?
9     A.   No.  No.  Again, the -- there is only
10 one connection:  How profitable the company is,
11 and based on that, how much dividend one can
12 issue.  There is no other connection.  If the
13 company has money, then it is paying dividends.
14    Q.   Okay.  Well, but these were specified
15 as separate conditions in the protocol, right?
16 Item Number 2 talks about the company's financial
17 performance and condition on 31st December 2005;
18 and then Number 3, a separate condition, the
19 reliability of the regulatory framework.
20    A.   The -- yes, because the financial
21 performance of the company may depend on other
22 elements as well.  So let me give you one
23 explanation for that.
24         Let's assume that there is an optimal
25 regulatory framework, which we only can dream

Case 1:11-cv-09645-RJS   Document 246-7   Filed 11/06/15   Page 6 of 11

| U.S. Securities and Exchange Commission v. | Elek Straub - Vol. 1 |
|---|---|
| Elek Straub, Andras Balogh and Tamas Morvai | July 31, 2014 |

Page 141

1  about, but the company's marketing is working
2  lousy. So the revenues are not coming. In that
3  case, of course, again, we are unable to pay
4  dividends.
5      So that's why it's a separate item,
6  both leading to the same conclusion: If the
7  company is profitable, we can issue dividends.
8  And the profitability of the company is, of
9  course, depending either on the performance of
10 the company itself, that is, let's say that's an
11 internal, internal thing, how smart the managers
12 are and how good the company is, how efficient
13 the company is working and external factors.
14 These are the regulatory -- that's the regulatory
15 framework. So actually, internal and external
16 factors. That's why it's 1 -- 1, 2, 3 listed
17 here.
18     Q.   Right. But if -- to carry on your
19 hypothetical, if the company was highly
20 profitable in 2005, but the regulatory framework
21 in place at the time was one that the company
22 found highly objectionable --
23     A.   I am sorry. Yes.
24     Q.   -- was one that the company objected
25 to --

Page 142

1      A.   Yes.
2      Q.   -- the language of the Protocol of
3  Cooperation would give -- would give the company
4  a basis to lower the dividend; is that right?
5      A.   Very hypothetical. In an unfavorable
6  regulatory regime, a company cannot be
7  profitable. The regulatory regime is a -- is a
8  precondition, but not the only precondition for
9  the company's profitability. Without favorable
10 or acceptable, and we are again taking the
11 European Union standards as a baseline.
12     Q.   Uh-huh.
13     A.   If the regulation is according to the
14 European Union standards, then that's the minimum
15 criteria to allow a company to be profitable, and
16 then the next level is, of course, how smart the
17 management is and all the internal things.
18     So there is no way to even to imagine a
19 company which is highly profitable despite the
20 fact that it is, let's say, subject of an
21 incorrect regulation.
22     Q.   So is it your testimony, then, that it
23 would be impossible for MakTel to be profitable,
24 to be highly profitable, and at the same time
25 have portions of the regulatory framework in

Page 143

1  place that it objected to?
2      MR. BUEHLER: I would object to that.
3      But you can answer.
4      THE WITNESS: These are so hypothetical
5  questions that it's really very difficult to
6  answer.
7      The regulatory regime, let me go then into
8  detail, does contain regulations concerning the
9  different prices, interconnection prices, end
10 user prices and so on. It contains obligations
11 to share the infrastructure. It can be, of
12 course, in a very wide range how much they have
13 shared and so on. The regulatory regime does
14 contain provisions for -- for the quality of the
15 regulatory body and organization, and I could go
16 on and on.
17     Now, of course you can take something where
18 some elements are highly preferential for us and
19 the others are very bad, but that's -- that's
20 what we are talking. This was a very simple
21 formulation of the following fact. There are
22 external -- the dividend of the company is -- can
23 be only paid if all the external, like regulation
24 in general, and it's not specified, and all the
25 internal and I'm not specifying the management,

Page 144

1  and the marketing and anything else; but internal
2  preconditions are good enough for paying higher
3  dividends.
4      Q.   Right. And the first of these
5  conditions is that, that would all be within the
6  sole discretion of the shareholders of MakTel; is
7  that right?
8      A.   As --
9      Q.   Is that what the agreement says?
10     A.   Yes. At the end of the day, at the end
11 of the day, even if the preconditions do exist,
12 the shareholders have the legal right to decide
13 upon the dividends and the shareholders'
14 assembly, as in every other corporation, in this
15 case as well. They have to vote according to the
16 shares they have.
17     Q.   And then in Paragraph Number 3, speaks
18 to the frequency fee?
19     A.   Yes.
20     Q.   It says, "Matav agrees that the MakTel
21 Group, ie., MakTel and MobiMak, is willing to pay
22 the frequency fee for the 2004 on a pro rata
23 basis until the fall 2005 year. The total amount
24 pro rata 2004 and full year 2005 will be euro
25 2.4 million for the entire MakTel Group, ie.,

Case 1:11-cv-09645-RJS   Document 246-7   Filed 11/06/15   Page 7 of 11

| U.S. Securities and Exchange Commission v. | Elek Straub - Vol. 1 |
| --- | --- |
| Elek Straub, Andras Balogh and Tamas Morvai | July 31, 2014 |

Page 145

1  MakTel and MobiMak."
2      Was -- so at this point was there an
3  agreement between the MakTel Group and the
4  government of Macedonia on what the -- on the
5  frequency fee for those years?
6    A.  If I read this sentence, it says that
7  Matav agrees to pay that much.
8    Q.  Uh-huh.
9    A.  I don't see that the government agrees
10 to accept that level.  And --
11   Q.  Well, let's look on the second page.
12   A.  And -- yes.
13   Q.  Number 7 says, "Matav and the
14 government agree on the following procedure
15 alongside signing the protocol based on the
16 above-listed principles."
17   A.  Yes.
18   Q.  "The government at the time and place
19 of the signing of this agreement presents its
20 instructions to the appropriate authorities to
21 solve the pending frequency fee issue with the
22 MakTel Group."
23   A.  Yes.
24   Q.  "The instructions will include the
25 amount of the fee for 2004, 2005, 2006 and beyond

Page 146

1  respectively, and it will be enforced by the
2  agreement."
3    A.  Yes.
4    Q.  So was there an agreement at this point
5  between the MakTel Group and the government on
6  the frequency fee?
7    A.  There was an agreement to solve the
8  problem in the future as we read this.  So
9  practically, we have expressed how much we are
10 ready to pay.  That was, by the way, not an
11 arbitrary number.  It was not, let's say, taken
12 from the air.  It was not an invention.  It was
13 based on very detailed calculation where we have
14 looked to benchmarks, to our original agreements
15 and so on.  So and this was expressed in the
16 third paragraph or bullet point.
17   Q.  Uh-huh.
18   A.  Okay?  Now, we did know that with that
19 we are far from the end of an agreement with the
20 government.  So we have to get an agree -- to an
21 agreed position.  This may be very well, this one
22 what's here or this may be something is different
23 if we cannot agree upon.  And so we had -- we
24 wanted to ask the government and the government
25 has signed this.  So they have committed

Page 147

1  themselves, so to say, that, yes, they start to
2  solve this problem, I would say in good faith
3  based on this.  Whether at the end, at the end,
4  these amounts will come out as the -- as the --
5  instructed fees, I -- I don't even remember, but
6  it does definitely says that we should start to
7  solve the pending frequency issue.  So it was not
8  solved at this time and not agreed upon in
9  necessary detail.
10   Q.  I am sorry.  Where you said -- where do
11 you see the language start to solve the frequency
12 fee issue?
13   A.  My -- I read this as something to be
14 started.  "Presents each instructions to the
15 appropriate authorities to solve."
16      If you are instructing something to
17 solve, then this is the start of the solution
18 process.  That's my understanding of the --
19 that's the English language.
20   Q.  Okay.  And the instructions would be
21 instructions to the regulatory authorities to
22 charge frequency fees in the amounts set forth in
23 the protocol; is that correct?
24   A.  It's not defined, unfortunately.  So I
25 cannot say that there was a security that this

Page 148

1  will be the instruction.  The instruction from
2  this was only that they have to start -- they
3  have to solve in the coming period the frequency
4  fee issue.
5      Now, unfortunately, there was no
6  commitment that they will solve it in fully
7  harmony with our -- with our -- let's say, our
8  position stated in Number 3.
9    Q.  So when you say there was no
10 commitment, meaning even though these figures
11 were written in the Protocol of Cooperation --
12   A.  Yes.
13   Q.  -- and even though the prime minister
14 had signed the document, the government at this
15 point had not agreed to these numbers?
16   A.  No.  From this I don't read that
17 because if they would have agreed upon, then
18 there would have been no need for this starting
19 to solve -- to solve the problems and so on
20 because then we would agree that Matav and the
21 government agrees that the Matav group should pay
22 so much.
23   Q.  So --
24   A.  Unfortunately, this was not the case.
25 So I had to assume that there is no agreement on

Page 149

1  the fixed now -- on the numbers.
2     Q.  Was the government advocating for a
3  different frequency fee payment amount at this
4  time?  I mean as of May 27, 2005?
5     A.  I don't -- I don't remember the exact
6  timing, but I clearly remember that they were
7  requesting much more and going beyond request.
8  They were also invoicing more earlier.  Yes.
9     Q.  So is it then -- I guess what I am
10 wondering is why -- why you would sign the
11 agreement if the frequency fee was a major issue,
12 and you didn't have a agreement on it, why would
13 you sign the agreement?
14    A.  First of all is, I don't consider this
15 as an agreement in legal terms.  This was a
16 protocol which was signed in order to show where
17 did we stand, in which direction we would like to
18 go.
19        Now, this despite its weakness, which
20 you have identified, despite its weaknesses, it
21 shows a direction.  A, it clearly says what Matav
22 is ready to do --
23    Q.  Uh-huh?
24    A.  -- without, without let's say disputing
25 further legal elements, and I will come to that;

Page 150

1  and there is another point that the government is
2  ready to with good faith start to solve the
3  problem.
4        Now, these two things were more than
5  nothing, and I think in such a difficult
6  negotiation this is already something we have
7  achieved.
8        Now, let me come to this point which I
9  was now mentioning.  I told you that there was
10 the -- we did frequency fee.  It was not only --
11 the only problem that how much it should be.  The
12 problem was that they have retroactively invoiced
13 the money --
14    Q.  Uh-huh.
15    A.  -- without earlier agreement.  So
16 practically in a very theoretical way even the
17 ground for invoicing could have been challenged.
18 Now, Matav is in this case expressing its
19 position that we don't challenge the legal
20 background.  We don't challenge the whole
21 process, which was as lousy as it can be, we are
22 ready to pay this much because we think this is
23 reasonable.  And then we have reached an
24 agreement with the government and that's the
25 agreement, part of it, let's say.  Here we

Page 151

1  have -- we are in an agreement with the
2  government that they start to work and solve the
3  problem.  Again, I estimate it's not here in good
4  faith.  That was the expectation.
5     Q.  Okay.  So Number 5, Rebranding?
6     A.  Yes.
7     Q.  This is on the second page.
8     A.  Yes.
9     Q.  Says, "The government agrees that
10 MobiMak and MakTel could be renamed to T-Mobile
11 Macedonia and/or T-Com Macedonia respectively at
12 Matav/Deutsche Telekom's discretion."
13        So was that a solution of the
14 rebranding issue in MakTel's favor?"
15    A.  That was a resolution of this problem.
16 Yes, we could say in MakTel's favor.  We could
17 say that in the favor of the joint company, yes.
18    Q.  Okay.  But under these terms that the
19 company had discretion to rebrand or not rebrand?
20    A.  Yes.  But basically the intention was
21 to rebrand, yes.
22    Q.  Okay.  But it left the decision in the
23 hands of Magyar Telekom and Deutsche Telekom?
24    A.  Yes.  Yes.  The government as a
25 shareholder partner of ours was giving its

Page 152

1  consent to rebrand the company.
2     Q.  Okay.  And then Item Number 6 speaks to
3  the bylaws.  And it says, "The bylaws will be
4  brought in a previous consultation with MakTel
5  and Matav.  The government of Macedonia will
6  accept all proposals for the bylaws which will be
7  given by MakTel/Matav and which provide an equal
8  and fair treatment on the market and/or in
9  accordance with the new law and the European
10 practice."
11        So did that provision give MakTel what
12 it wanted with respect to the drafting of bylaws?
13    A.  We were getting a promise from the
14 government, which is expressed here, that they
15 will treat us fairly in the regulations.  It does
16 not specify the very long list of different
17 provisions.  It does not commit in certain
18 provisions to the concrete solution.  In that
19 sense, of course, we wished to have more.  It
20 would have been better for us to have a draft set
21 of bylaws attached to this and signed, but
22 unfortunately, this was not possible.
23        So we were, let's say, at least having
24 an assurance, a kind of intention that, yes, we
25 will behave in a -- in a European manner and work

Page 161

 1  public, that that might threaten the efforts to
 2  join the European Union?
 3      A.   That may have been the -- the feeling.
 4  I don't know about that, but it may have been the
 5  feeling by somebody, but as the matter of fact,
 6  we were much better in knowledge of what the
 7  European Union is expecting from a country than
 8  the Macedonians who were just at the very, very
 9  beginning of the -- of this process, and we see
10  after ten years they are still very well before
11  the possibility joining the European Union or
12  perhaps a little bit even further down the road,
13  I mean, going backwards.  So their feelings in
14  that sense were not really meaningful.
15      Q.   Were -- was it an unusual practice at
16  Magyar Telekom for a signed document, a document
17  signed by a chief executive officer of the
18  company on his behalf, you know, with at least
19  important enough to be also signed by a prime
20  minister, for a document like that not to be
21  retained in the company's files at least in a
22  signed version?
23      A.   First of all, I have to say that I was
24  not dealing with the filing.  So, as such, I can
25  only say that most probably these documents are

Page 162

 1  normally stored somewhere, but I was not dealing
 2  with this.  But let me say that you said that
 3  under normal circumstances or usual, something
 4  like that you have said in your question, these
 5  were not usual circumstances.
 6           Again, let me say that the tension in
 7  the country was -- was uncomparable [sic] to the
 8  usual circumstances.  Again, three years before
 9  this time people were on the streets fighting
10  each other with weapons.  Our -- our technology
11  there was threatened and also damaged
12  significantly.  Two -- two partners in the
13  coalition government were fighting against.  The
14  Albanians mostly did call themselves freedom
15  fighters, and they were even very young.  So I
16  would not call that situation a usual one, and
17  unusual situation was calling for in that sense
18  unusual discretion.
19      Q.   So when you were first informed that
20  the only original of the Protocol of Cooperation
21  was being taken to Greece --
22      A.   Yes.
23      Q.   -- did you have a conversation with
24  Mr. Balogh about that or anyone else?
25      A.   Yes.  And what I was telling to you now

Page 163

 1  about the reasons was basically coming from him
 2  and with my -- it did meet my understanding.
 3      Q.   And so what did you tell Mr. Balogh, if
 4  anything?
 5      A.   I understand this, and that's -- and we
 6  have the unsigned copies which are was the same,
 7  and if necessary, we can get this signed copy any
 8  time from -- from Mr. Contominas as I see this
 9  here.
10      Q.   Uh-huh.  And did you have any
11  conversations about this with Mr. Gunther?
12      A.   Yes.  Yes.  I was explaining to him the
13  same because he's asking for the signed version
14  and then later on accepting my explanation and
15  with that, the story was practically solved again
16  like we stress especially because all of these
17  points, and here we have I think seven or
18  nine points, all of these points were dealt with
19  in different, totally different appropriate
20  documentation.  So let me perhaps elaborate on
21  that.
22           For the MVNO project, which was not
23  realized later on, which was abandoned due to
24  business reasons, we had separate many business
25  cases, plans, maps, whatsoever.  And of course

Page 164

 1  there everything was clearly documented and
 2  visible to those who should see that.
 3           The dividend question was developed by
 4  our finance function.  It was a proposal.  It was
 5  approved by everybody.  It was first full
 6  supported by our financial division.  So all in
 7  all, this was known by everybody.
 8           The frequency fee was going up to
 9  Brussels because we were complaining in Brussels
10  due to this very high frequency fee and asking
11  from Brussels from our experts on comparable
12  standards and so on.
13           So I could continue, but I should not.
14  So all in all, all of these separate points were
15  dealt upon in the necessary places.
16           So actually, let me come back to my
17  original remark.  This Protocol of Cooperation
18  was a collection of items which were anyway
19  handled, negotiated, documented, as well.  So
20  the -- so there was no real need for me to have
21  this concrete document in my safe, so to say.
22      MR. DODGE:  Can I have Number 22, please,
23  Exhibit 12?
24      (Exhibit 12, Protocol of Cooperation, Bates
25  stamped GREEK-MLAT-000009 and 10, marked for

# In The Matter Of:

*U.S. Securties and Exchange Commission v.*
*Elek Straub, Andras Balogh and Tamas Morvai*

---

*Elek Straub*
*Vol. 2*
*August 1, 2014*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California  94105*
*(415) 597-5600*

Original File 24485StraubV2.txt
**Min-U-Script® with Word Index**

Case 1:11-cv-09645-RJS   Document 246-7   Filed 11/06/15   Page 11 of 11
U.S. Securities and Exchange Commission v.                                              Elek Straub - Vol. 2
Elek Straub, Andras Balogh and Tamas Morvai                                              August 1, 2014

Page 513

1   Q.   -- during that time period, did your
2   understanding of the nature of the
3   representations change in any significant way or
4   were the representations generally pretty
5   consistent from letter to letter during that
6   period?
7   A.   Could you repeat this question?  So
8   maybe I did not only -- so if you can --
9   Q.   It may be a poorly framed question.
10      We have discussed the
11  representations --
12  A.   Yes.
13  Q.   -- made in one particular letter.
14  A.   Yes.  Yes.
15  Q.   And during the course of 2005, there
16  were additional letters that -- that you signed
17  for Pricewaterhouse, representation letters in
18  connection with quarterly reports.
19  A.   A report, yes.
20  Q.   And was it your understanding that the
21  nature of the representations you were making was
22  generally -- generally the same from letter to
23  letter or were there significant changes that you
24  knew of from quarter to quarter?
25      MR. BUEHLER: Objection.

Page 514

1       THE WITNESS: If I recall it well, these
2   representations did contain certain -- certain
3   elements which were almost the same from quarter
4   to quarter, and then those letters did contain
5   certain concrete items which were changing,
6   staying for a while or changing.  So practically
7   they were always updated to the necessary status
8   of the knowledge, so to say.
9   BY MR. DODGE:
10  Q.   Okay.
11  A.   I could find examples for, but --
12      MR. DODGE: Let's -- that's fine.  I think
13  that answers my question.
14      Could I have 133 or 134?
15      (Plaintiff's Exhibit 172, Document dated
16  May 11, 2005, marked for Identification.)
17      (Plaintiff's Exhibit 173, Document dated
18  May 11, 2005, marked for Identification.)
19  BY MR. DODGE:
20  Q.   Mr. Straub, I have handed you documents
21  that have been marked Exhibits 172 and 173, both
22  dated May 11, 2005.  These have been printed out
23  from an online service under the SEC's Edgar,
24  E-D-G-A-R, website which maintains public filings
25  of public companies.

Page 515

1   A.   Yes.
2   Q.   And I wonder if you -- after having
3   reviewed them, can you identify Exhibit 172 as a
4   certification pursuant to Section 302 of the
5   Sarbanes-Oxley Act that -- that you signed or
6   authorized to be signed on your behalf on or
7   about May 11, 2005?
8   A.   Unfortunately, I don't recall anymore
9   the -- the type of the document.  So I am
10  expecting your questions, but I don't remember
11  the document.
12  Q.   Okay.  Do you generally recall signing
13  certifications pursuant to the Sarbanes-Oxley Act
14  in connection with the company's 20-F filings?
15  A.   I don't think I would use the word
16  "generally" because we started to report
17  according to Sarbanes-Oxley only in -- according
18  to my recollection, in 2005, and then I have left
19  the company.  So it's actually -- it was not a
20  general practice, for me at least.
21  Q.   Okay.
22  A.   But we have done what was requested
23  from us to do, we have done.
24  Q.   Magyar Telekom's 20-F filing for the
25  calendar year 2004, if I represented to you that

Page 516

1   that was filed on or about May 11, 2005, would
2   that sound like the right time period?
3   A.   Yes.
4   Q.   And if Exhibit 172 and Exhibit 173
5   appear as part of the 20-F filing that was made
6   by Magyar Telekom in May of 2005, would you have
7   any reason to doubt that -- that the
8   certifications are the certifications that you,
9   in fact, made in connection with the 2004 20-F
10  filing?
11  A.   I wouldn't doubt it.  No.
12      MR. DODGE: Okay.  I am ready to pass the
13  witness now.  I apologize for the --
14      MR. BUEHLER: Fine.  I would be interested
15  to take a five-minute break just to be organized.
16  I guess we can go off the record.
17      MR. DODGE: Off the record, please.
18      THE VIDEOGRAPHER: We are now off the
19  record.  The time is 4:40 p.m., August 1st, 2014.
20      (Break taken.)
21      THE VIDEOGRAPHER: We are now back on the
22  record.  The time is 4:53 p.m., August 1st, 2014.
23  EXAMINATION BY
24  MR. BUEHLER:
25  Q.   Okay.  Mr. Straub, I am going to be