# Exhibit 16

# In The Matter Of:

*U.S. Securties and Exchange Commission v.*
*Elek Straub, Andras Balogh and Tamas Morvai*

---

*Andras Balogh*
*Vol. 1*
*July 28, 2014*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94103*
*(415) 597-5600*

Original File 24455BaloghV1.txt
Min-U-Script® with Word Index

Case 1:11-cv-09645-RJS   Document 248-1   Filed 11/16/15   Page 3 of 15

U.S. Securities and Exchange Commission v.                                    Andras Balogh - Vol. 1
Elek Straub, Andras Balogh and Tamas Morvai                                        July 28, 2014

Page 61

1  Q  Mr. Balogh, I'd like you to take a look at
2  Exhibit 130 and tell me if you can identify this as an
3  e-mail that you sent to Mr. Straub on or about May 2nd,
4  2005?
5  A  I can't remember the e-mail. I see my name
6  and Mr. Straub's name. It could be my e-mail.
7  Q  Okay. So you have no reason to doubt that
8  you faxed this e-mail?
9  A  No, but I don't remember this e-mail
10 either.
11 Q  Okay. And in the first sentence, at least
12 according to the translation it says, there is still no
13 answer to the nonpaper. In the translation it says
14 because of the Orthodox Eastern. I'm wondering if that
15 in the original means Orthodox Easter?
16 A  Obviously it does, yes.
17 Q  Okay. It says, however, they have already
18 informed us that they cannot really meet in Greece or
19 Vienna next week because they cannot justify the travel
20 officially.
21      Can you tell me what meeting you were
22 referring to there?
23 A  I don't know.
24 Q  Okay. Do you have any idea who the "they"
25 in the sentence refers to?

Page 62

1  A  I don't remember the circumstances of
2  writing this e-mail. Actually, I don't even remember
3  writing this e-mail. So I can't answer specific
4  questions about that.
5  Q  Okay. Do you recall any discussions
6  involving meetings with Macedonia government officials
7  that would take place in early May 2005?
8  A  I don't remember specific meetings that
9  took place in early 2005, or early May 2005, but I
10 would not rule out that there were such meetings as
11 there were negotiations between MakTel and the
12 government of Macedonia. Actually there could have
13 been negotiations meeting. I don't remember what this
14 may refer to.
15 Q  All right. Do you recall any discussions
16 about meeting with Macedonia officials in Vienna in
17 particular?
18 A  In Vienna, no.
19 Q  Okay. Instead of this they recommend Orind
20 [sic] by keeping the journalists away (I don't know how
21 they are going to warrant this, but they have promised
22 they would keep secret everything).
23      Do you have any understanding of what that
24 reference is to, why it would be necessary to keep
25 something secret, or keep a meeting secret?

Page 63

1  A  I don't know. It was about the general
2  confidentiality. A lot of information was flying
3  around about negotiations within the general public
4  that was not -- that was not liked by any stakeholders
5  of these negotiations.
6  Q  So was it important in the spring of 2005
7  to keep the negotiations secret, in your view?
8  A  I think in all negotiations with the
9  government of Macedonia confidentiality was a very high
10 priority.
11 Q  And who were you concerned might learn
12 about the meetings, or about the subject of the
13 meetings?
14 A  General e-mail. This e-mail mentions, as I
15 read it hear, this mentions journalists. So,
16 obviously, journalists could be a concern.
17 Q  All right, sir, but, as you sit here today,
18 you have no recollection at all of what meeting is
19 being discussed, whether it happened, whether it did
20 not happen?
21 A  No.
22      (Balogh Exhibit 131 marked for purposes of
23 identification.)
24 BY MR. DODGE:
25 Q  I'm handing you a document that's been

Page 64

1  marked Exhibit 131. This is about a ten-page document,
2  mostly in Hungarian, and it appears to be a set of
3  travel records that have been produced to us by Magyar
4  Telekom.
5       The Bates numbers are MT-LON 40118 through
6  MT-LON 40129, and I don't expect that you've seen this
7  before, so I'm not going to ask you if you have; but I
8  would ask you to turn to page 40123, and then also the
9  following page 124.
10 A  All right.
11 Q  And there are certain entries on those two
12 pages. Let's turn first to page 124. There's entries
13 that have been blocked out, enclosed in a box?
14 A  Yes.
15 Q  And it appears to be travel records for
16 you, as I read it, from Budapest to Skopje, May 5th and
17 6th of 2005.
18      Does this refresh your recollection at all
19 whether you traveled to Skopje on May 5th and 6th of
20 2005?
21 A  Mr. Dodge, according to this information
22 that I have no reason to believe not to be accurate. I
23 must have been there; however, I told you that I was
24 traveling back and forth between Hungary and Macedonia.
25      I can't remember the exact dates. Even if

Page 65

1  I see it, I can't remember the details of that visit.
2  That was nine years ago.  It says I was there, it could
3  be.
4     Q     If you look at the prior page, there are
5  similar entries for Mr. Elek Straub and Mr. Tamas
6  Morvai for the same dates.  Do you have any
7  recollection at all of a meeting on or about May 5th
8  and 6th, 2005, with your went to Macedonia with Mr.
9  Straub and Mr. Morvai?
10    A     No, I can't remember that specifically
11 meeting.
12          (Previously marked Exhibit 30 for purposes
13 of identification.)
14 BY MR. DODGE:
15    Q     I'm handing you a document that's been
16 previously marked as Exhibit Number 30.  And this is --
17 Exhibit Number 30 is a three-page document.  First page
18 is an e-mail from Jovan Pejkovski to Andras Balogh
19 dated May 16th, 2005, with an attached two-page letter.
20 Bates numbers are MT-MAK 1049185 to 187.
21          Mr. Balogh, I'd ask you to take a look at
22 Exhibit 30 and tell me if this is indeed an e-mail that
23 you received from Mr. Pejkovski in May of 2005.
24    A     It appears so.
25    Q     Okay.  Do you recall receiving this e-mail?

Page 66

1     A     No.
2     Q     Do you have any reason to believe you did
3  not receive it?
4     A     I have no reason to believe it.
5     Q     Take a look at the attached letter, which
6  is signed by Jovan Pejkovski and Mr. Ljupco Farmakoski.
7  We've already discussed Mr. Pejkovski.  Will you tell
8  me who Mr. Farmakoski was?
9     A     Mr. Farmakoski probably was the colleague
10 or associate of Mr. Pejkovski, and they were
11 negotiating together on behalf of the government.
12    Q     And then the first paragraph of the letter
13 says, we would like to inform you on the final attitude
14 of the government of the Republic of Macedonia related
15 to the proposed Protocol for Cooperation between the
16 GOM and Matav which we agreed in Skopje.
17          Where it says, "we agreed in Skopje", does
18 that refresh your recollection as to any meetings that
19 you were involved in in early part of May of 2005?
20    A     It doesn't refresh any memories.  All I can
21 say that this could be possible, but I don't remember,
22 still don't remember the meeting even if I read this
23 document.
24    Q     Okay.  So not only do you not remember what
25 happened at the meeting, you don't remember even

Page 67

1  whether that particular meeting took place?
2     A     Whether that particular meeting took place,
3  I can't remember because I don't know what happened on
4  that particular meeting, but there were meetings and
5  meetings I participated in.  I told you already, there
6  were meetings.  Which meeting was that, on what day, I
7  can't tell you after nine years.
8     Q     If you turn to the bottom of the letter it
9  says, GOM proposes to exclude from the proposed
10 protocol all items that are essentially related to the
11 strategic interests of the GOM, which were an integral
12 part of the protocol.  And then it continues on the
13 following page that 250 new employees will be
14 recruited, that the monthly fee will not be increased
15 without a previous agreement with the GOM, that the
16 head count reduction in the company will be performed
17 based on an agreement between the trade union and the
18 management.
19          Do you recall what those issues refer to?
20    A     Generally issues listed in this letter --
21 give me some more time to review it.
22    Q     Sure.
23    A     (Witness reviewing document.)
24          This lists the key issues and themes of the
25 negotiations concerning the cooperation between the

Page 68

1  government and Macedonia, between the company and the
2  government of Macedonia, that obviously and related to
3  the Protocol of Cooperation, and these are important
4  issues that were the subject of negotiations.
5           The line item you were requesting, it
6  appears to me that it's a reference to the labor
7  reductions or redundancy.
8           THE WITNESS:  Talking to interpreter.
9           THE INTERPRETER:  To allow people to leave
10 or to remove people or to something, let them go.  To
11 let them go.
12          THE WITNESS:  I mean, it's not allow people
13 to leave, it's firing people.  It's firing people.  So
14 it's making redundancies.  In general, it was a big
15 issue for the government because the unemployment rate
16 was very high in Macedonia.  I can't tell you now what
17 percentage, but it is really, really high.
18 BY MR. DODGE:
19    Q     If I said 37 percent, would that sound
20 about right?
21    A     37 percent?
22    Q     Does that sound right?
23    A     I mean, it sounds low.  Maybe it wasn't
24 that.  In a country 37 percent is the unemployment.  I
25 mean, I'm just thinking out loud, that's quite a lot,

Page 77

1   A    No.
2   Q    And you don't recall --
3   A    As I read it today, you know, I can
4   interpret that on the 5th and 6th of May there was an
5   agreement about cooperation issues between the
6   government and MakTel.
7        MR. DODGE: Number 18, please.
8        (Balogh Exhibit 132 marked for purposes of
9   identification.)
10  BY MR. DODGE:
11  Q    I'm handing you a document that's been
12  marked Exhibit 132. Exhibit 132 is an e-mail chain,
13  three pages -- well, the total document is six pages.
14  First three pages are an e-mail chain that are
15  partially -- actually all in English. Bottom three
16  pages are Hungarian originals with partially in
17  Hungarian and partially in English.
18       The top e-mail of the e-mail chain --
19  actually the bottom e-mail in the first page of the
20  e-mail chain is from Andras Balogh dated May 17th,
21  2005, to Peter Danko, Elek Straub, and Tamas Morvai.
22       Take a look, please, at Exhibit 132 and
23  tell me whether you recognize this e-mail chain?
24  A    (Witness reviewing document.)
25       Not that I specifically wrote this e-mail.

Page 78

1   I see my name on the e-mail. So I have no reason to
2   believe that I have not sent it or received these
3   e-mails.
4        MR. DODGE: I think I'm going to move on.
5   21 and 22.
6        (Previously marked Exhibit 11 for purposes
7   of identification.)
8        (Previously marked Exhibit 12 for purposes
9   of identification.)
10  BY MR. DODGE:
11  Q    Mr. Balogh, I'm handing you two documents
12  that have been previously marked Plaintiff's Exhibits
13  11 and 12. Each of them is two-page document with the
14  heading Protocol of Cooperation.
15       The first bears -- Exhibit 11 bears the
16  Bates numbers GREEK-MLAT-7 and 8. Exhibit 12 has the
17  Bates numbers GREEK-MLAT-9 and 10.
18       I'd like you to review those, please, and
19  tell me if you've seen them before?
20  A    It appears to be signed Protocol of
21  Cooperation.
22  BY MR. DODGE:
23  Q    So let's take a look at Exhibit 11 first.
24  And this is in the -- on the first page it says, this
25  Protocol of Cooperation is entered into on the date

Page 79

1   indicated below and between the government of --
2   Republic of Macedonia represented by His Excellency,
3   Mr. Vlado Buckovski and then on behalf of Matav
4   represented by Elek Straub.
5        If you look at the second page on the
6   signature lines, over the signature line for Elek
7   Straub, do you recognize that signature?
8   A    I do.
9   Q    And is that your signature?
10  A    Yes, it is.
11  Q    So did you sign this document on Mr.
12  Straub's behalf?
13  A    That's right.
14  Q    Do you recognize the signature of
15  Mr. Buckovski?
16  A    No.
17  Q    Okay. There are initials on both pages
18  starting on the bottom left corner.
19       Do you recognize those initials?
20  A    Bottom left I recognize. This appears to
21  be my initials.
22  Q    Okay. And then there's a series of
23  initials on the bottom right.
24       Do you recognize those?
25  A    No.

Page 80

1   Q    So tell me about the circumstances under
2   which you signed Exhibit 11?
3        MR. SULLIVAN: Object to form.
4        Can you narrow and refine that a little
5   bit?
6        MR. DODGE: Okay.
7   BY MR. DODGE:
8   Q    The agreement is dated May 27th, 2005. Did
9   you sign Exhibit 11 on May 27th, 2005?
10  A    I don't remember on which day I signed this
11  document. I do not remember the exact date. I have no
12  reason to believe it wasn't on the 27th of May.
13  Q    Do you know where you were when you signed
14  it?
15  A    I don't really remember, but, as I recall,
16  you know, I vaguely remember it, and from the
17  circumstances of this document I should have been or I
18  must have been in -- somewhere in Macedonia to sign it.
19  Q    Okay. Did you sign this document together
20  with Mr. Pejkovski?
21  A    Definitely not.
22  Q    And you're certain about that? So tell me
23  about your recollection.
24  A    I'm pretty certain about that, because if I
25  signed something with a prime minister, any prime

Page 81

1 minister, I should remember that. The prime minister
2 is somebody. I definitely do not remember signing
3 anything with the prime minister.
4    Q    Do you know whether you signed this
5 document before the prime minister or after the prime
6 minister?
7    A    I can't say.
8    Q    Do you remember who also was with you when
9 you signed the document?
10   A    I don't know.
11   Q    Were any of the Greeks with you?
12   A    I have no idea.
13   Q    After you signed it, after you signed
14 Exhibit 11, what did you do with the document? Did you
15 make a copy? Did you keep a copy?
16   A    As I told you, I don't remember.
17   Q    Do you know whether the only original of
18 the -- of Exhibit 11 was taken by Mr. Kefaloyannis?
19   A    It could be that he could take the
20 original, yes.
21   Q    Did you understand at the time that there
22 were going to be no copies of the signed Protocol of
23 Cooperation?
24   A    Well, the Greeks acted as a trusted third
25 party in these negotiations. So it wasn't surprising

Page 82

1 that they take the original version as they were acting
2 as kind of peacemakers between two parties, I mean,
3 between MakTel and Magyar Telekom and the government of
4 Macedonia. So it wasn't anything unusual.
5    Q    Did you keep a signed copy of the protocol?
6    A    I did not.
7    Q    Why not?
8    A    Because I did not need a signed copy of the
9 protocol because I most likely had everything as an
10 electronic version. The protocol was not a binding
11 document, Mr. Dodge. I mean, I had no reason to keep
12 it signed or not signed. It's a wish list.
13       It's more a memorandum of understanding
14 than a proper contract for anybody, and, again, I gave
15 you the big picture. More import is the general
16 relationship between the company and the government
17 than what is the exact form. That's a formality.
18       The real rationale behind is that we set
19 forth the framework of cooperation, and, as I sit here
20 today and I interpret what I see and my recollection
21 whether it was signed or not, whether I had a signed
22 copy or not, and the fact that you said that a signed
23 copy was kept with the Greeks or Mr. Kefaloyannis, it's
24 not surprising at all.
25   Q    Well, you signed this protocol on behalf of

Page 83

1 your chief executive officer, Mr. Straub; is that
2 right?
3    A    Yes. That's why it says PP.
4    Q    Did you bring a signed copy of the
5 agreement back to Mr. Straub?
6    A    I can't remember if -- you know, if I had
7 taken back a signed copy to the chief officer, then why
8 did you say that the only copy was with Mr.
9 Kefaloyannis. So most likely I did not.
10   Q    Wouldn't Mr. Straub expect to get a signed
11 copy of the protocol --
12   A    I don't think so.
13   Q    -- if a document is signed under his name?
14   A    I signed it on his behalf, so.
15   Q    Did you have permission from Mr. Straub not
16 to bring a signed copy back with you?
17   A    I had permission from Mr. Straub to sign
18 the document on his behalf, obviously.
19   Q    Does -- is there a formal archive system
20 exist at Magyar Telekom when you were there?
21   A    Yes. There are archive systems, yes.
22   Q    And was it part of that system that
23 contracts entered into on behalf of the corporation
24 were maintained in the archives?
25   A    That wasn't my responsibility to take care

Page 84

1 of maintaining contracts in the archives. Frist of
2 all, the archives, if I remember, were electronic
3 archives. No hard copy archives, and, second, such
4 archives have been maintained by the legal department
5 or the financial department.
6       Both the legal department and the financial
7 department were involved in creating or drafting or
8 finalizing these Protocol of Cooperation. That, in
9 fact, was not a contract, Mr. Dodge. This is a
10 memorandum of understanding.
11   Q    And did you get authorization from anybody
12 in Magyar's in-house legal department or from the
13 archives department to not -- not provide a written
14 copy for the archives?
15       MR. SULLIVAN: Objection to form.
16       Go ahead.
17       THE WITNESS: What authorization do you
18 mean? I didn't get any authorizations from the legal
19 departments. They were not supposed to authorize me to
20 do this or that. They had a copy, so they kept it in
21 the copy of their electronic files.
22 BY MR. DODGE:
23   Q    You said "they had a copy"?
24   A    They had a copy of the document. I didn't
25 say they had a signed copy of the document. They had a

Page 85

1 copy of the document. They had a copy of the text.
2 It's a framework. It's -- you know, I don't want to
3 call it a wish list, but it's basically a wish list.
4       Some of the items are realistic. Some of
5 the items are not realistic. This is a desired
6 framework of cooperation, a result of a bargaining
7 process. Obviously, all sides know that some of the
8 things could be realized and some could not be
9 realized.
10      If a wish list is put into an archive as a
11 signed version, unsigned version, I think it doesn't
12 make a difference; and most possibly the legal people
13 saw it the same way. They had a copy and they maintain
14 the archives.
15   **Q    To your knowledge, did anyone in the legal**
16 **department know that the agreement had been signed, but**
17 **that no signed copy would be placed in the archive?**
18   A    I assume at least the head counsel,
19 Mr. Peter Danko, knew about that the document is
20 signed. I don't remember who told him. I don't
21 remember if I told him, but he was heavily involved in
22 the negotiations. So I would be really surprised if
23 after the signature somebody from within the company,
24 possibly me, would not have told him that there is a
25 signed version.

Page 86

1       This document had not been kept secret at
2 Magyar Telekom. It was very well-known that
3 negotiations are going on to sign such a framework
4 agreement, or a kind of memorandum of understanding how
5 to move ahead. It was very transparent within the
6 company.
7   **Q    Did you discuss with Mr. Danko that no**
8 **signed copy would be placed within the archives?**
9   A    I don't think I discussed this with him.
10  **Q    Why not keep a signed copy?**
11  A    You know --
12      MR. SULLIVAN: Objection to form.
13      He's not testified that there wasn't a
14 signed copy. He doesn't know.
15 **BY MR. DODGE:**
16  **Q    Was there any reason, was there -- was**
17 **there any reason not to bring a signed copy back?**
18  A    It was not --
19      MR. SULLIVAN: Asked and answered,
20 objection.
21      MR. DODGE: No, it's not answered.
22 **BY MR. DODGE:**
23  **Q    Please answer.**
24  A    Could you repeat the question?
25  **Q    Was there any reason not to keep a signed**

Page 87

1 copy of the protocol?
2  A    There was a signed copy kept of the
3 protocol by the Greeks.
4  **Q    Was there any reason not to keep a signed**
5 **copy of the protocol in the files of Magyar Telekom?**
6  A    I answered this question already.
7  **Q    No, you did not. Please give me the**
8 **answer.**
9  A    Okay. I'll start again. This was a
10 memorandum of understanding. The meaning of the
11 document was to set a framework of cooperation. There
12 was no need to have a signed copy to put into the
13 archives of Magyar Telekom because it's not a contract.
14 **Q    Okay. So this is a document that you and**
15 **others at Magyar Telekom had been negotiating for**
16 **several months; is that right?**
17 A    That's right.
18 **Q    And the negotiations had been conducted at**
19 **a high level of both the company and the government of**
20 **Macedonia; is that right?**
21 A    Exactly.
22 **Q    Is that right?**
23 A    Exactly, yes.
24 **Q    And, in fact, the chief executive of Magyar**
25 **Telekom had been involved in those negotiations?**

Page 88

1 A    Yes.
2 **Q    And the prime minister of the country of**
3 **Macedonia had been involved in those negotiations?**
4 A    Yes.
5 **Q    And officials from the Albanian political**
6 **party in the Macedonia had been involved in**
7 **negotiations; is that right?**
8 A    Officials? Whom do you mean? What
9 officials?
10 **Q    Let me withdraw that question.**
11     **And the agreement had been signed both**
12 **by -- at least by the prime minister of Macedonia and**
13 **on behalf of the chief executive officer of Magyar**
14 **Telekom; is that right?**
15 A    Mr. Dodge, I can tell you again. I signed
16 it. I did not sign this with the prime minister. I
17 don't know when the prime minister signed it. Maybe
18 the prime minister signed it after me. I know -- I can
19 tell you what I know because I told you.
20     I would remember meeting the prime minister
21 as I suppose anybody here in American would remember
22 meeting the president of a country. I did not sign
23 this with him. I signed it on behalf of the chief
24 officer. Maybe the prime minister signed it after
25 that, most likely actually.

Page 89

1   Q   Okay. But the prime minister signed it?
2   A   Yes.
3   Q   And you signed for the CEO?
4   A   Yes.
5   Q   But notwithstanding that, your testimony is
6   the document wasn't important enough even to keep a
7   copy of; is that right?
8   A   No, no, no, that's not what I'm saying.
9   You are misinterpreting what I said.
10  Q   Then please clarify.
11  A   I want to make it very clear, so I would
12  like to tell it in Hungarian.
13       THE WITNESS: (Speaking in Hungarian).
14       THE INTERPRETER: I signed the document in
15  the name of the chief executive officer. I don't know
16  when the document has been signed by the prime
17  minister.
18       THE WITNESS: (Speaking in Hungarian).
19       THE INTERPRETER: Consequently, I cannot
20  say with any certainty whatsoever that when I departed
21  from Macedonia there was already existing copy signed
22  by both individuals, meaning me and the Macedonian
23  party.
24       THE WITNESS: (Speaking in Hungarian).
25       THE INTERPRETER: The document was

Page 90

1   important. The document was an important document, and
2   it was mostly important because of what was included in
3   that document, the points that were brought up.
4        THE WITNESS: (Speaking in Hungarian).
5        THE INTERPRETER: The intent of signing
6   these documents, this document, was that it would be
7   almost like a guidance for activities towards the
8   future pointing toward future activities.
9        THE WITNESS: (Speaking in Hungarian).
10       THE INTERPRETER: This purpose, the
11  guidance, was indicative of future cooperation between
12  the parties.
13       THE WITNESS: (Speaking in Hungarian).
14       THE INTERPRETER: And in this regard it was
15  less important that we would have in our possession a
16  copy signed by both parties.
17       Presumably both the government, Macedonian
18  government and Hungarian Telecom was fully aware that
19  the legal -- the legalized copy signed by both
20  parties --
21       THE WITNESS: I didn't say "legalized".
22       THE INTERPRETER: I'm sorry.
23       The signed copy of this document would be
24  deposited with a trusted third party, in this case, the
25  Greeks.

Page 91

1        THE WITNESS: (Speaking in Hungarian).
2        THE INTERPRETER: Since this is not a
3   contract. This appeared to be reasonable to us -- to
4   me.
5   BY MR. DODGE:
6   Q   So would you -- when you came back to
7   Hungary from Macedonia, you knew that you did not have
8   a signed copy of the protocol?
9   A   Mr. Dodge, I don't remember. I assume I
10  did not have the signed copy of the Protocol of
11  Cooperation because then I would have taken it with me
12  and I would have shown it to the CEO or the head lawyer
13  or whatever, and I cannot recall that that happened.
14  So I assume a signed copy was not with me when I left
15  Macedonia, but I don't remember.
16  Q   But you know that later on other executives
17  at Magyar Telekom and at Deutsche Telekom asked you for
18  a signed copy and you had to explain why you didn't
19  have one; is that right?
20  A   I don't know what kind of request do you
21  mean?
22  Q   There was a request in Michael Gunther for
23  a signed copy of the agreement; is that right?
24  A   I don't remember. Maybe there was.
25  Q   And you had to explain to him why he

Page 92

1   couldn't have it; is that right?
2   A   I don't remember.
3   Q   Okay. Was there anything bad that would
4   have happened had you kept the sign copy?
5        MR. SULLIVAN: Objection. What do you mean
6   by "bad"?
7        THE WITNESS: Yes, what do you mean by
8   "bad"?
9   BY MR. DODGE:
10  Q   Not good.
11       MR. SULLIVAN: What do you mean by "not
12  good". Did you have a particular issue that you want
13  to the explore?
14  BY MR. DODGE:
15  Q   Would there have been any adverse
16  consequences to you or to Magyar Telekom that you were
17  aware of that provided a reason for not keeping a
18  signed copy of the protocol?
19  A   Not at all. Not at all. We would have
20  been happy to keep a signed copy of the protocol.
21  Q   What discussions did you have with the
22  Greeks about whether to keep a signed copy of the
23  Protocol?
24       MR. SULLIVAN: Objection to form.
25       THE WITNESS: I can't recall any

Page 165

1  e-mail to Mr. Straub?
2  A    It appears so.
3  Q    So why did you use the word "logistics"?
4  A    As I said, the Greek partners, who had the
5  original idea to put the Kosovo MVNO operation as a
6  part of the negotiation package of the Protocol of
7  Cooperation, they referred to this business case as a
8  relatively simple exercise because all you have to do
9  is to transport and put down the existing base
10 stations, existing antennas, and existing containers
11 that will sell the sim cards on the ground.  They said,
12 it mainly requires logistics expertise and it requires
13 some engineering and construction expertise.
14      We refer to this project from then on as
15 the Macedonian or Greek logistics operation because
16 it's sounded much better than to call it an unlicensed
17 mobile operation in a country where we did not have
18 anything to do.
19 Q    Well, why would it be unlicensed?  Wouldn't
20 would you get a license before you installed it?
21 A    Because we didn't have a license and the
22 Greeks did not have a license.  Nobody had a license in
23 Kosovo.
24 Q    Were you actually doing --
25 A    Actually, there was no government in

Page 166

1  Kosovo.  The idea was to put up the base stations and
2  the antennas on the border, provide service in that
3  direction to Macedonia and to that direction in Kosovo
4  without the license, you know, just -- you provide the
5  coverage and that's it.
6       Who can use it, can use it.  Who can use it
7  goes to the container and buys a sim card.  That's it.
8  It was a very simplified approach.  That's the reason
9  actually, and after a lot of discussions and
10 contemplations and technical and financial and legal
11 analysis, this whole idea was abandoned; however,
12 because of the important ethnic nature -- because of
13 the ethnic nature of the country, the Albanians, and
14 then the idea was to serve the Albanian ethnic minority
15 with such a service, it was high on the political
16 agenda of our negotiation partners.  And for the Greeks
17 they see it as an excellent business opportunity for
18 them.
19      They, as they provide the contractor, would
20 have controlled the budget to actually execute the
21 business case.  That's why it was important for them.
22 It was more for them and for the government and for the
23 Macedonia all than for us.  We were the least
24 interested in setting up a business because it was an
25 unlicensed operation.  It was not something that we

Page 167

1  were very happy to touch.
2  Q    But you negotiated for it in the Protocol
3  of Cooperation, right?
4  A    Yes.
5  Q    And --
6  A    Because but it was pushed by the partners,
7  and that's why it cannot be a binding document,
8  Mr. Dodge, because you cannot expect that we are going
9  to start an unlicensed operation, we put, you know, an
10 unlicensed operation in a contract.  We just can't do
11 that.
12 Q    Well, but this is -- the MVNO was an
13 alternative to the government of Macedonia creating a
14 license for a third mobile operator in the Macedonia;
15 is that right?
16 A    You're wrong.  You're wrong.  If you read
17 number one, and probably as far as I see it's here in
18 front of you, there are two MVNO services.  If you read
19 it you will see that one of the service, the MVNO
20 service in Kosovo, which is was an unlicensed
21 operation, and the second one was the MVNO substitute
22 for a third mobile license in Macedonia.  Totally
23 different things.
24 Q    But the success of the MVNO in Kosovo was
25 going to be used as the basis for an extension into

Page 168

1  Macedonia?
2  A    But that doesn't make sense at all.  I
3  mean, it's put down there because they wanted to write
4  it this way, but if you think about it, what's the
5  relation.  Yes, the model, the success of the model in
6  an MVNO model can work in Macedonia; but an MVNO model
7  is totally different from a proper mobile operation
8  model.  You said you are aware of the MVNO operation,
9  so you know that.
10 Q    When the telecommunications law was passed
11 in Macedonia in early 2005, it contemplated the entry
12 of a third mobile phone operator in the Macedonia; is
13 that right?
14 A    I don't remember.  I should see the role.
15 Q    You don't remember that at all.
16 A    That it contemplated?  What does it mean,
17 it considered?
18 Q    Do you remember whether that was an issue
19 that you and others at Magyar Telekom spent a great
20 deal of time discussing in the early part of 2005?
21 A    It was a part of the Protocol of
22 Cooperation because it was one of the very important
23 agenda items between the company and the government of
24 Macedonia.
25 Q    Okay.  Let me just make sure I understand

# In The Matter Of:

*U.S. Securties and Exchange Commission v.*
*Elek Straub, Andras Balogh and Tamas Morvai*

*Andras Balogh*
*Vol. 2*
*July 29, 2014*

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94103*
*(415) 597-5600*

Original File 24459BaloghV2.txt
Min-U-Script® with Word Index

Case 1:11-cv-09645-RJS   Document 248-1   Filed 11/16/15   Page 11 of 15

U.S. Securities and Exchange Commission v.                                    Andras Balogh - Vol. 2
Elek Straub, Andras Balogh and Tamas Morvai                                         July 29, 2014

**Page 423**

1 five interviews or less?
2    A    When I refer to the ballpark of five, that
3 included all kinds of interviews I had.
4    Q    Okay.  So both with the PSZAF and with the
5 Hungarian police?
6    A    Yes.
7    Q    Okay.  Any other government agencies?
8    A    Not that I currently remember.
9    Q    Do you know whether anyone else gave
10 interviews to either the PSZAF or to the Hungarian
11 police?
12   A    I don't know.  I assume they did, yes.  I
13 assume I wasn't the only person interviewed by those
14 authorities, but I didn't know who they were and I
15 didn't know what kind of interviews they gave -- they
16 gave and when.
17   Q    Okay.  So no one else told you that they
18 had been interviewed?
19   A    I can't give you an answer to that, because
20 I don't remember.  It was a -- it was a known fact that
21 there are interviews going on.  So whether I -- I know
22 about it only as a rumor or whether or not somebody
23 told me directly that they were or were not
24 interviewed, I cannot tell you, because I cannot
25 remember.

**Page 424**

1    Q    Okay.  Do you remember any -- any names of
2 people that you believed gave interviews?
3    A    No.
4    Q    And is it correct that both in the
5 interviews with the PSZAF and with the Hungarian
6 police, you discussed what you believed were improper
7 actions taken by White and Case; is that right?
8    A    No.
9    Q    Were there improper actions that you
10 believed White and Case had taken?
11   A    I did not discuss the improper actions of
12 White and Case in those interviews.  I answered the
13 questions of the authorities.  I didn't discuss
14 anything with them.  I answered their questions, and as
15 I said, I have no idea what questions they asked.  I
16 don't remember.
17   Q    Okay.  But I thought I -- I thought I heard
18 you say earlier that the information in your -- in the
19 document you submitted with the notary public --
20   A    Yes.
21   Q    -- that that -- that that did include
22 concerns you had about what White and Case was doing.
23   A    Yes.
24   Q    And I thought I -- I thought I understood
25 you to say that you had shared some or all of that

**Page 425**

1 information with the authorities in Hungary.
2    A    We have to go back to the record, because I
3 don't remember saying that.  If you understood that,
4 that was not probably my intention to say or I
5 misunderstood your question.
6         I did not say that in -- with the
7 authorities I was discussing the material with the --
8 that -- that I put down with the notary public.  With
9 the authorities, I answered their questions.  If they
10 asked questions about White and Case, I must have
11 answered them.  Do I remember if they did?  I don't.
12 Can I answer the question?  No.
13   Q    And would that answer be the same for the
14 PSZAF and for the Hungarian police?
15   A    Yes.
16   Q    When did you first become aware of the --
17 the White and Case investigation?
18   A    After I came back from holiday in '06.
19   Q    Okay.  In 2006.
20        And so it would have been in early 2006,
21 correct?
22   A    Somewhere in the end of January.
23   Q    And do you recall how you first learned
24 about the investigation?
25   A    I don't really remember.  Probably from the

**Page 426**

1 website; probably from rumor; probably I got a call
2 from -- I don't really remember.
3    Q    Okay.  In late 2006, what did you
4 understand about the types of information -- withdraw
5 that question.
6         In late -- in late January 2006, what did
7 you understand about what sort of investigation White
8 and Case was going to undertake?
9    A    Again, I have to be very specific with the
10 timing.  I can't specify a date.  Late January, early
11 February, I don't know.  I can't remember.  What I
12 know, that I had a very vague understanding with very
13 limited information that there is something going on
14 about some contracts in Montenegro by somebody who most
15 likely are -- these things are -- are being performed
16 by American lawyers.  That's what I heard.
17   Q    Okay.  And you -- you don't recall how you
18 learned that?
19   A    I can't remember.
20   Q    Okay.  And then on February 1st of 2006,
21 you obtained some data-wiping software; is that right?
22   A    I don't remember the date.  I -- I don't
23 remember the date of obtaining the data-wiping
24 software.
25   Q    Okay.  But at some point in early 2006,

Page 427

1  whether it was February 1st or some other date, is it
2  correct that you obtained some data-wiping somewhere?
3     A    I don't remember.
4     Q    Do you remember whether you deleted any
5  data from your computer in early 2006?
6     A    I did.
7     Q    Do you remember the circumstances of that?
8     A    I -- I have a, you know, a recollection of
9  that event, yes.
10    Q    And do you recall whether or not you used
11 data-wiping somewhere to -- to delete that data?
12    A    I think I did.
13    Q    And where did you obtain the wiping
14 software?
15    A    I don't remember.
16    Q    Was that -- is it unusual for you to use
17 dating -- data-wiping software at that time?
18       MR. SULLIVAN: Objection to form.
19       THE WITNESS: I can't say --
20       MR. SULLIVAN: What -- what is unusual?
21       THE WITNESS: That's what I was going to
22 ask: What is -- what is usual and unusual?
23 BY MR. DODGE:
24    Q    Was that the first time you had used
25 data-wiping software?

Page 428

1     A    I knew what a data -- data-wiping software
2  is.
3     Q    You knew what it was.
4        Had you used it before?
5     A    I don't remember if I used it before.
6     Q    Where did you get it?
7     A    I don't remember.
8        MR. SULLIVAN: Objection, asked and
9  answered.
10 BY MR. DODGE:
11    Q    Do you know whether you purchased it or --
12    A    I don't remember.
13    Q    -- downloaded it?
14    A    I don't know. Download, purchase, I don't
15 know. I don't remember.
16    Q    Okay. Do you know whether you --
17    A    Maybe it was on the computer. I don't
18 know. I don't know.
19    Q    Okay. But somehow you came into possession
20 of data-wiping software in early 2006 and you used that
21 software to delete data from your computer; is that
22 right?
23       MR. SULLIVAN: Objection, compound
24 question.
25       Can you break it down?

Page 429

1  BY MR. DODGE:
2     Q    Do you have the question in mind?
3     A    Could you break it down, please?
4     Q    Somehow in early 2006, you obtained
5  data-wiping software; is that right?
6     A    Yes.
7     Q    And you used that data-wiping software to
8  delete data from your computer, right?
9     A    Yes.
10    Q    Why did you use data-wiping software rather
11 than simply deleting the data using the operating
12 system of the computer?
13    A    Because I knew that some people in the
14 delete button on the computer doesn't mean anything.
15 You can retrieve information, files, anything with a
16 very basic information technology knowledge if only the
17 delete button is used.
18    Q    And what data did you delete?
19    A    I deleted -- if I recall it perfectly well,
20 I deleted data concerning Macedonia.
21    Q    Do you remember roughly how much data you
22 deleted?
23    A    I don't know how much data. I -- as far as
24 I remember, I deleted a directory that included files
25 concerning Macedonia.

Page 430

1     Q    Okay. Do you remember the name of the
2  directory?
3     A    No. It must have had a reference to
4  Macedonia, though.
5     Q    What caused you to delete that data?
6     A    I had concerns that I heard and I -- I
7  cannot be specific what exactly I heard, because as I
8  said in the beginning, in the start of the
9  investigation, we had only very vague information was
10 going on. But what I heard was concerning to me, that
11 there are going to be people coming to my office,
12 sitting down to my computer, and will check that
13 computer for files.
14       At that time, my understanding was -- and
15 this is how I can recall the events. My understanding
16 was that people, most likely American lawyers, are
17 going to come. They are going to use certain
18 employees' offices and computers and will check their
19 computers, will check their data as they are performing
20 some kind of investigation concerning Montenegro.
21    Q    And before you deleted the data, were you
22 given any instruction from anyone at Magyar Telekom or
23 White and Case that you should delete data?
24    A    That I should delete data?
25    Q    Yes.

Page 455

1  I asked you?
2  A    I did understand the question.
3  Q    Okay. And you're satisfied that your
4  answer was complete?
5  A    Yes.
6  Q    You testified about the conversation you
7  had with Mr. Morvai.
8       Why did you call Mr. Morvai and not anyone
9  else on the subject of the data deletion?
10 A    Because Mr. Morvai was the one who was
11 working on the same level of confidentiality -- or a
12 similar level of confidentiality or similar level of
13 importance in terms of Macedonia, as myself. And
14 Mr. Morvai was also the one who was, according to my
15 information, and that's based on hearsay and rumors on
16 the list of people who are going to be -- who were
17 going to be asked during this investigation, because he
18 was the one that was on the Montenegro team and was in
19 the Macedonia team as well.
20 Q    So did you consider, for example, maybe
21 calling Mr. Szendrei about deleting his data relating
22 to Macedonia?
23 A    Mr. Szendrei was not -- he was not involved
24 in Montenegro at all.
25 Q    Okay. So in your mind, it would have been

Page 456

1  unlikely for the American lawyers to want to speak to
2  Mr. Szendrei?
3  A    Mr. Szendrei was placed in Macedonia. At
4  that time, there was -- there was no pension or no
5  reason whatsoever that he would be visited by anybody.
6  Q    Okay. Did you have any concerns that Mr.
7  Straub might have confidential data relating to
8  Macedonia?
9  A    You know, I did not, but, you know, again,
10 that's many, many, many years ago. But at -- at that
11 time of the investigation, it was quite, you know -- it
12 seemed quite unlikely, I could say even -- even --
13 again, I'm looking for the words. It's -- it's a long
14 deposition, so I'm sorry if I can't find the words
15 immediately. It's very unfortunate that the translator
16 is not here when it really would be needed.
17      But it seemed like outrageous or almost
18 impossible that the chief officer of the company would
19 be hassled with such a case.
20 Q    Okay. So you didn't expect Mr. Straub to
21 be interviewed by the American lawyers, or you didn't
22 expect the American lawyers to at least go through his
23 computer; is that right?
24 A    No, I did not expect. I mean, I -- I did
25 not expect that American lawyers would go to the -- to

Page 457

1  the computer of the chief officer, no. Or would be
2  allowed by security of the company or whoever.
3       (Balogh Exhibit 149 marked for purposes of
4  identification.)
5  BY MR. DODGE:
6  Q    Mr. Balogh, I'm handing you a document
7  that's been marked Exhibit 149. 149 is a two-page
8  document. It's on Magyar Telekom letterhead. It's a
9  letter, a format of a letter, or memorandum, addressed
10 to Andras Balogh, Peter Danko, Andras Dunai, Eszter
11 Kocsardi, several others from Elek Straub and Klaus
12 Hartmann dated February 1st, 2006, with a RE line,
13 retention and preservation of files. Bates numbers
14 MT-MAK 806918 and 806919.
15      Mr. Balogh, would you take a look at
16 Exhibit 149, please, and tell me if you can identify
17 this?
18 A    It's from 2006. I can -- I can read it, as
19 it said, it's retention of the preservation of files.
20 Q    I'm sorry, I'd ask you to speak up a little
21 bit so that --
22 A    I recognize my -- my signature on this --
23 on this document. So I assume it's a copy of the
24 original data retention request.
25 Q    Okay. So you can identify Exhibit 149 as

Page 458

1  a -- as a copy of a data retention request that you
2  received?
3  A    Yes.
4  Q    And the data next to your signature, is
5  that February 2nd, 2006? Not a very good copy, but --
6  A    Not a very good copy. I mean, the 6 is a
7  question, but I think it must be a 6.
8  Q    And would it be your understanding that --
9  well, the word next to your signature is "received."
10      So did you receive this document and sign
11 it on February 2nd, 2006?
12 A    Yes.
13 Q    Did you receive Exhibit 49 before or after
14 you deleted the data from your computer?
15 A    Definitely after.
16 Q    Okay. Did you have any understanding that
17 you were going to receive a letter like this before you
18 deleted the data?
19 A    No.
20      (Balogh Exhibit 150 marked for purposes of
21 identification.)
22 BY MR. DODGE:
23 Q    Mr. Balogh, I'm handing you a document
24 that's marked Exhibit 150, 1-5-0. Exhibit 150 is a
25 three-page document, Bates numbers MT FARKAS 21032 to

Page 535

1  lawsuit, right?
2  A  I don't know about that.
3  Q  You never heard about that?
4  A  I've never heard about that in any detail
5  or what -- what charges those were. I heard that there
6  are various political maneuvers in Macedonia.
7  Q  Okay. And did you ever become aware of any
8  investigations alleging corruption in Greece involving
9  Mr. Contominas?
10  A  No.
11     MR. DODGE: Okay. I think we'd like to
12  take a five-minute break just to recap and see if we --
13  see what may be left to cover.
14     MR. SULLIVAN: It sounds good.
15     THE VIDEOGRAPHER: We're going off the
16  video at 5:41 p m.
17     (Deposition recessed at 5:41 p m.)
18     (Deposition resumed at 5:48 p m.)
19     THE VIDEOGRAPHER: We are back on the video
20  record at 5:48 p m.
21     MR. BEDNAR: Mr. Sullivan, I think you had
22  a representation.
23     MR. SULLIVAN: Yes. We're going to make a
24  point of clarification.
25     We had, of course, proceeded without the

Page 536

1  interpreter, and I noted earlier that there may have
2  been a language issue with regard to a couple of
3  previous questions. I think instead of deferring, Mr.
4  Balogh has some points of clarification that may render
5  deferring any questions on that line unnecessary and,
6  therefore, would be most expedient and productive.
7     Go ahead, Mr. Balogh.
8     THE WITNESS: So the word I use,
9  "precessional" became quite obvious that this is
10  misunderstandable word and not the right word,
11  unfortunately. Because of the lack of translator, I
12  couldn't find the right word. So in terms of the -- in
13  terms of the certifications issues that you asked, when
14  I use the word "precessional," what I meant to say,
15  that the process itself was clerical and
16  administrative, and I did not pay too much attention
17  to the process itself; however, obviously, in the text
18  that was a part of the certification or that was the
19  substance of the certification, I had substantive
20  information or the representations I gave. They were
21  accurate. And all the representations, they were
22  cleared, that there were no fraud, no bribes, no
23  anything what -- whatsoever in -- in this field. There
24  were accurate information, and I accurately certify
25  that.

Page 537

1     In terms of your bribes question or the
2  bribery question, I also want to make it very clear,
3  never there was an issue about bribery. I never
4  discussed bribery. There was no bribery. And bribery
5  had -- had never been discussed, had never been
6  mentioned. No bribery relates to anything in -- in
7  this case in our discussions with -- either with Magyar
8  Telekom, MakTel, its -- its -- its partners, whoever.
9     MR. BEDNAR: Just to follow up on -- on
10  your clarification there, which is appreciated.
11     What did you do to ensure that the
12  representations that you signed were substantively
13  correct and accurate?
14     THE WITNESS: I -- I reviewed -- I -- I had
15  an understanding of the text that was a part of the
16  certification. And understanding the text means that I
17  understand the accurateness of the text and the -- that
18  it -- it represents appropriate, accurate information.
19  BY MR. DODGE:
20  Q  So, Mr. Balogh, when -- when you signed
21  certifications for Magyar's annual filing and quarterly
22  filings, was it your understanding that one of the
23  things you were certifying to was that there was no
24  corruption that you were aware of at Magyar Telekom?
25  A  What -- what I understood, that I had to

Page 538

1  certify that accurate, corruption-free practices are
2  going on in the -- in these areas.
3  Q  Okay. Did you also understand that you
4  were certifying that as -- as far as you were aware,
5  Magyar's books and records were maintained accurately?
6  A  That's -- in terms of the -- the process,
7  as I said, I did not pay attention to understanding the
8  full process or where this information is going to be
9  used or how it's going to be used. The substance I
10  certified are accurate, and we're clear that there was
11  no corruption and no fraud whatsoever in this regard.
12     How and where and in what process this
13  information or this certificates were going to be used,
14  that not was my concern or that not was my
15  understanding. That was more the clerical and the
16  administrative activity I did not pay attention to.
17  Q  Okay. But in terms of the -- the substance
18  of your certification, did you understand that the
19  substance of your certification included that the books
20  and records of Magyar Telekom were maintained
21  accurately?
22  A  I -- I -- no. I'm not a financial expert,
23  so I don't know what exactly books and -- and records
24  means here.
25     What I -- what I said, that what

Case 1:11-cv-09645-RJS Document 248-1 Filed 11/16/15 Page 15 of 15

| U.S. Securities and Exchange Commission v. | Andras Balogh - Vol. 2 |
| Elek Straub, Andras Balogh and Tamas Morvai | July 29, 2014 |

Page 539

1 certification I gave were accurate and were clear, that
2 there was no bribery or no fraud associated with those
3 certificates. Again, where it went, books and records,
4 whatever, how it kept, that's -- that wasn't my -- you
5 know, that wasn't in my knowledge.
6     Q    Were you aware that -- that Magyar Telekom
7 provided management representation letters to its
8 auditor, PricewaterhouseCoopers, on a periodic basis?
9     A    I wasn't aware how the process was really
10 taking place. So I -- I -- I can't -- you know, I -- I
11 don't know how the process was happening, and I don't
12 know what is management representation letter, and I
13 don't know what is a certification. You know, I don't
14 really know the difference between those.
15     Q    Okay. But if you were provided with a
16 draft of a management representation letter to
17 PricewaterhouseCoopers and were asked to certify that
18 as far as you knew the content of that letter was --
19 was accurate, would you have reviewed the letter and
20 made sure that your certification was -- was correct?
21     A    If I was presented with -- with a draft
22 that concerned the area of my responsibility, the
23 certification I gave were accurate. What draft, for
24 what use, management representation letter, other
25 certificates, I did not know, and I -- I did not pay

Page 540

1 attention to.
2     Q    So I'm just trying to understand sort of
3 the -- the -- the process.
4         If you received an e-mail with a --
5 attached with an attachment that's a draft of a
6 management representation letter and you're asked to
7 provide a certification to that, would you read the
8 attachment? Was that your -- was that what you would
9 normally do?
10     MR. SULLIVAN: Objection.
11     This is a hypothetical, Bob. I think he's
12 been as clear as he possibly can in terms of his
13 verification of the accuracy, the substance of the
14 certifications.
15     Is there a new question, perhaps?
16     THE WITNESS: I -- I -- I don't remember in
17 each and every case how it went. I don't even remember
18 how many of these representation certificates,
19 whatever, were -- were flying around as e-mails.
20     What I -- what I was saying, what I wanted
21 to be sure that -- that my words are clear, because I
22 used the wrong words, substantively what I certified
23 were accurate and did not contain any bribe, any fraud,
24 anything.
25 BY MR. DODGE:

Page 541

1     Q    Okay. And when you say "anything," would
2 that include --
3     A    I mean bribe, fraud --
4     MR. SULLIVAN: Corruption.
5     THE WITNESS -- corruption, whatever, you
6 know. Similar words exist in the vocabulary with the
7 same meaning.
8 BY MR. DODGE:
9     Q    At any time since you left Magyar Telekom,
10 have you had any conversations with Mr. Elek Straub
11 about the -- the allegations in this case?
12     A    We had conversations with Mr. Elek Straub
13 in a -- in a few occasions. We met socially. We met
14 on business. And we discussed, you know, certain
15 aspects of this entire investigation. Maybe from the
16 process perspective, maybe -- mainly about how
17 depositions may or may not take place. Where, when,
18 how.
19     Q    Did you have any conversations about what
20 each of you would -- would say in your depositions?
21     A    No, we did not go into these conversations.
22     Q    When -- when was the -- the most recent
23 such conversation you had?
24     A    Well, before the -- the timing of -- of
25 this deposition. That means in the -- in the last ten

Page 542

1 days, two weeks. In the recent period, we had two,
2 three telephone exchanges, telephone conversations,
3 discussing especially the location and the timing and
4 the -- and the -- and the whole process of the
5 deposition.
6     Q    And since your departure from Magyar
7 Telekom, have you had any conversations with Mr. Morvai
8 about the allegations in this case?
9     A    With Mr. Morvai, I had less contact.
10 Socially we met once or twice a year. And, again,
11 before the deposition, I had two, three telephone
12 conversations with him, also about the deposition, the
13 location of the deposition. That was -- that was a key
14 issue that we discussed.
15     Q    Okay. When was the most recent
16 conversation you had with Mr. Morvai?
17     A    Again, before the deposition, the -- the
18 week prior to the deposition.
19     Q    Meaning week -- the last week?
20     A    Last week.
21     MR. DODGE: Anything else on that?
22 BY MR. DODGE:
23     Q    Beyond what you've already testified to,
24 have you had any other discussions with Mr. Straub or
25 Mr. Morvai about the allegations of the case?