# Exhibit 19

```
 1
 2
              UNITED STATES DISTRICT COURT
 3            SOUTHERN DISTRICT OF NEW YORK
 4

   _____
 5                                   :
   US SECURITIES AND EXCHANGE        : Civil Action No:
 6 COMMISSION                        : 11-Civ-9645-RJS (S.D.N.Y.)
                                     :
 7              Plaintiff            :
                                     :
 8              -v-                  :
                                     :
 9 ELEK STRAUB,                      :
   ANDRAS BALOGH, and                :
10 TAMAS MORVAI                      :
                                     :
11              Defendants           :
   _____     :
12
13
                       DEPOSITION
14
                          OF
15
                    DR. ADAM FARKAS
16
17       On Tuesday, October 7th 2014
18
             Commencing at 9:38 am
19
20              Taken at:
21            White & Case LLP
              5 Old Broad Street
22                 London
                  EC2N 1DW
23             United Kingdom
24 Reported by: Miss Pamela Henley
25 Job No: 84988
```

Page 30

1  Dr Adam Farkas
2  that the -- that if there are any irregularities
3  that these are discovered and spotted and dealt
4  with.
5       And if there are no irregularities
6  there is a robust and comprehensive control
7  process in place with a firm to ensure that what
8  investors get reported is a reliable, true and
9  fair representation of what the company is
10 actually doing.
11      Q.   Did you understand whether the
12 Sarbanes-Oxley Act was an American law?
13      A.   Yes.
14      Q.   And was Magyar Telekom subject to
15 the Sarbanes-Oxley Act?
16      A.   Yes.  As a registrant -- as a US
17 registrant it was, or SEC Registrant it was
18 subject to that.
19          MR SULLIVAN:  Objection, legal
20 conclusion.
21 BY MR DODGE:
22      Q.   Do you have an understanding of
23 what Section 10A of the Sarbanes-Oxley Act was?
24      A.   Yes, I have an understanding of
25 that.  The 10A provisions provide some rules, or I

Page 31

1  Dr Adam Farkas
2  would say -- I would rather say descriptive rules
3  as to what the auditor is supposed to do if
4  irregularities or suspected illegal acts are
5  discovered in the process of the audit.  And this
6  section of the law is describing the appropriate
7  behaviour the auditor has to follow in that case.
8       To go into a little bit more detail
9  basically it obliges the auditor to first of all
10 understand and seek for the background of these
11 potential irregularities or illegal acts, ensure
12 that remedial action is taken.
13      If it is not taken report it to the
14 securities regulator.  And in case of this
15 cannot -- if remedial action -- if the
16 irregularities cannot be dispelled and remedial
17 action is not taken one potential step of the
18 auditor is to resign from its function and refuse
19 the completion of the audit work.  So it is a very
20 serious consequence of -- in case irregularities
21 are discovered.
22      Q.   Are you familiar with Section 404
23 of the Sarbanes-Oxley Act?
24      A.   Not particularly with that section.
25      Q.   That is fine.  We will move on.

Page 32

1  Dr Adam Farkas
2       Now, I am going to ask you to turn
3  your attention to January of 2006, particularly in
4  the middle of January 2006, and ask whether there
5  came a time in January 2006 when you became aware
6  of an issue at Magyar Telekom involving
7  Montenegro?
8       A.   Yes.
9           MR SULLIVAN:  Objection, Montenegro
10 is no longer part of this case.  Go ahead.
11 Relevance.
12      A.   The circumstances of that period
13 were that I had just taken up a new job in a full
14 time capacity on 9th January of that year with
15 Allianz, with this international group, and
16 literally a week in my job I received a phone call
17 from Klaus Hartmann, then chief financial official
18 of Magyar Telekom who, of course, was a major
19 counterparty to the audit committee in this
20 function.  And he asked me for an urgent meeting
21 about a serious matter.  This happened on the 16th
22 January.  We agreed to meet in person 2 days later
23 at the premises of Magyar Telekom.
24      Q.   This is January 18th?
25      A.   January 18th, and we had a meeting

Page 33

1  Dr Adam Farkas
2  in the morning in his offices which was -- to my
3  best recollection it was attended by three of us;
4  it was Nick Kos, the independent auditor,
5  Klaus Hartmann, the CFO, and myself as the
6  chairman of the audit committee.
7       In that meeting Nick Kos raised the
8  issue of a very recent discovery of some
9  suspicious contacts in the course of the regular
10 audit work in the Montenegrin subsidiary of Magyar
11 Telekom, and he mentioned Chapter 10A or Section
12 10A, and mentioned that for the auditor to proceed
13 an independent investigation of -- into the
14 circumstances of these two contracts were
15 necessary because otherwise he could not proceed
16 with the audit.
17      The relevance of the problem was
18 that these two suspicious contracts, or these two,
19 let us say, contracts with unknown purpose, were
20 approved by senior people within the Magyar
21 Telekom Group and, therefore, the auditor
22 indicated that this fact is putting into question
23 whether the auditor, PwC, can rely on senior
24 representation made by senior Magyar Telekom
25 executives to underpin the audit process.

Page 34

Dr Adam Farkas

Q. Did Mr Kos identify who the senior management people were?

A. Yes. At that point in time he identified Mr Tamas Morvai, who was part of the corporate bodies of the subsidiary approving one of these contracts. And Andras Balogh, who was present at the meeting when one of these contracts were approved. And, of course, they were very senior managers of Magyar Telekom, and that raised the point of how much PwC could rely on -- of senior management representation from Magyar Telekom.

Q. Mr Kos mentioned two contracts is that right?

A. Yes.

Q. Do you remember the names by which those contracts -- or the names of the counterparties?

A. Yes. One of them was called Rawleigy, R-A-W-L-E-I-G-Y. And the other one was Sigma, which is S-Y-G-M-A. I think. There were several spellings.

Q. Let me make a suggestion on the spelling, is it possible that it was

Page 35

Dr Adam Farkas

R-A-W-L-E-I-G-H?

A. Yes.

Q. And the other one, is it possible the spelling was S-I-G-M-A?

A. Yes, either Y or I, yes.

Q. So you described the meeting on January 18th?

A. Yes.

Q. What happened after that?

A. In that meeting what was explained was that the expectation -- well, Mr Kos faced the issue of resigning, or the other option was, of course, that would have led -- a resignation would have led to an immediate reporting to the Securities and Exchange Commission and the Hungarian authorities, and it would have led to an immediate trigger of an official investigation into these matters by the authorities.

The other alternative was to set up a robust and independent internal investigation into the question whether these contracts are legitimate and they serve legitimate business purposes which at that time was questioned. And, therefore, whether the senior Magyar Telekom

Page 36

Dr Adam Farkas

representatives or managers can be cleared or ringfenced from any potential wrongdoing, and, therefore, the representation can be relied upon. This was -- I think these two options were on the table. We agreed that it is in the best interest of the company, it is in the best interest of the shareholders that we try to conduct such an independent investigation and we initiate an investigation within the shortest timeframe possible.

I have to also say that this was something that was unprecedented in Hungary at the time because, as I mentioned, it was not -- there were not too many companies exposed to these regulations at the time. So for me personally it was something I had to get into gradually. But the objective was very clear, and Nick Kos made it very clear that he wanted the audit committee to oversee this independent investigation because the audit committee and its chair, myself, was completely independent of the executive management.

And given that the concern was related to the senior management of the company

Page 37

Dr Adam Farkas

the audit committee was the only body to independently supervise such an investigation.

Also in that meeting we already started talking about who could be the law firm which could do this independent investigation. It was very clear that we needed independent counsel to do this.

And we did an initial search of potential law firms in that room between the three of us based on a few criteria. And the criteria we tried to set was, it has to be ideally -- or optimally it has to be a law firm with strong US expertise of securities law, and, potentially, criminal law. It -- in ideal circumstances it has to have a Budapest office to be able to support the investigation from a Hungarian law perspective and also logistically and operationally. It has to be ideally a firm which is not conflicted, so not a firm that is doing work or has done work recently with Magyar Telekom on behalf of or representing Magyar Telekom.

And that was, of course, a difficult hurdle to pass because Magyar Telekom was a major local company doing a lot of

Page 38

1  Dr Adam Farkas
2  international activities using extensively
3  international law firms in that period. So we had
4  to look at potential conflicts in that respect and
5  we, sort of, narrowed down the scope and
6  identified White & Case as one of these potential
7  firms.
8      And at that time Klaus Hartmann --
9  we agreed with Klaus Hartmann that he would go to
10 legal and double-check the conflict situation, or
11 if the legal department of Magyar Telekom could
12 identify another law firm that would fit the bill.
13 So that was the discussion at that time.
14     Q.  And did you then come to make
15 contact with White & Case?
16     A.  Yes. We contacted White & Case, I
17 think, either on that day or on the 19th January,
18 the next day. And I remember that 19th January we
19 already had a meeting with White & Case with an
20 initial discussion on how such an investigation
21 would be set up and how the firm would be engaged
22 and what the scope of that investigation would be.
23     Again, this happened in a very,
24 very short period of time and events were
25 unfolding very, very quickly and, again, I did

Page 39

1  Dr Adam Farkas
2  this as a part-time job so I have to do my
3  full-time job as well as trying to set this up.
4  So this was a very busy few days agreeing on
5  engaging White & Case.
6      By 20th January, we were discussing
7  a formal engagement letter with White & Case
8  lawyers. By then the Washington office of White &
9  Case was also brought into the picture in full.
10 So that was the process of engagement.
11     Q.  And was there an engagement letter
12 signed with White & Case?
13     A.  Yes, there was an engagement letter
14 signed, I think, on the 20th if I remember
15 correctly, or around the 20th.
16     Q.  And who signed that?
17     A.  The engagement letter on behalf of
18 the company was signed by Klaus Hartmann because
19 he was a board member and he could accept
20 contracts on behalf of the company.
21     I as the audit committee chairman
22 according to Hungarian corporate governance laws
23 could not sign contracts on behalf of the company
24 at that time. So I countersigned the engagement
25 letter as the chairman of the audit committee to

Page 40

1  Dr Adam Farkas
2  signal that it was -- the investigation was under
3  the auspices of the audit committee. But
4  commercially speaking the signature was
5  Klaus Hartmann's who was a board member.
6      Q.  And did any attorneys from White &
7  Case come out to Budapest around that time?
8      A.  As far as I can remember the first
9  time White & Case attorneys from the Washington
10 office came was the 23rd January, a few days after
11 lawyers came to Budapest. Of course, the Budapest
12 office was not in itself familiar with an
13 independent -- the requirements of an independent
14 investigation under the US standards or US laws so
15 we had to bring in lawyers with the appropriate
16 expertise.
17     Q.  And who from White & Case came out
18 to Budapest around the 23rd?
19     A.  I think it was Bill Currier who
20 came first.
21     Q.  Were there any document retention
22 requests prepared around that time?
23     A.  Well, immediately after that
24 engagement the first step which we took was to
25 prepare a protocol for the first investigative

Page 41

1  Dr Adam Farkas
2  steps and to make considerations for two things;
3  one was an immediate need to retain documents that
4  could be relevant to the investigation, and the
5  second, which was raised by the White & Case
6  Budapest office, legitimately, was to deal with
7  the data protection laws of Hungary that were
8  very, let us say, strict, or very precise on
9  protecting so-called personal data stored on
10 computers and in documents.
11     So basically we started, or White &
12 Case lawyers started working on a document that
13 requested immediately the employees, and we
14 defined a circle of employees, a scope of
15 employees who appeared to be in connection with
16 the -- with these two contracts to ask them to
17 retain all documents, either electronic or paper
18 or in any other means that were available to them
19 for the purposes of the investigation.
20     And also at the same time work was
21 done to prepare a so-called consent form or waiver
22 form that would ask all these employees to
23 sign-off on the release for the purposes of the
24 investigation of the personal data contained in
25 these documents. That includes their names on an

Page 58

```
 1            Dr Adam Farkas
 2   we conducted it all the way from the first day
 3   until I left my role in the audit committee it was
 4   an investigation by the company, supported by the
 5   company, in the interests of the company to either
 6   dispel the concerns relating to these contracts,
 7   or find justification for the concerns expressed
 8   by the auditor.
 9            Deleting anything, or let us say
10   destroying evidence that might be relevant to this
11   investigation is just -- by common sense is
12   something that potentially undermines this notion
13   of an independent company initiated investigation
14   because it simply makes it more difficult to
15   arrive to a conclusion in the course of the
16   investigation.
17            So hence I would say that, of
18   course, destruction of evidence or deletion of
19   potential evidence of documents would have been
20   significant and it would have been, in a sense,
21   negatively significant for the purposes of the
22   investigation.
23       Q.   So now also at the same time
24   period, 13th February 2006, did you have any
25   knowledge or awareness of any possibility that
```

Page 59

```
 1            Dr Adam Farkas
 2   data might have been deleted from Mr Morvai's
 3   computer?
 4            MS LANE:  Objection.
 5            MR KOENIG:  Objection.
 6       A.   No.
 7   BY MR DODGE:
 8       Q.   And the same question that I asked
 9   about Mr Balogh; had such facts been made known to
10   you on February 13th, 2006, would you have found
11   that significant?
12            MS LANE:  Objection.
13            MR KOENIG:  Objection.
14       A.   I would have found it significant
15   for the same reasons.
16   BY MR DODGE:
17       Q.   At this time did it ever happen --
18   did Mr Balogh ever come to you and identify
19   particularly sensitive data that he had and asked
20   for your assistance in maintaining the
21   confidentiality of that data in connection with
22   the investigation?
23            MS LANE:  Objection.
24       A.   No. I met Andras Balogh in one of
25   the meetings we organised in mid-February with the
```

Page 60

```
 1            Dr Adam Farkas
 2   explicit purpose to provide information to
 3   employees concerned about the purpose of the
 4   investigation, the protocol of the investigation,
 5   the need for their co-operation and so on and so
 6   forth and with respect to any questions they might
 7   have had.  In the course of that meeting I met
 8   personally Andras Balogh, but not in a one-on-one
 9   setting, but in a meeting room similar to this one
10   in the company's offices.
11            MR DODGE:  I am handing you a
12   document now --
13            THE COURT REPORTER:  Would it be
14   possible to have a comfort break?
15            MR DODGE:  Yes.
16            (Off the record at 10.43 am)
17            (On the record at 10.55 am)
18   BY MR DODGE:
19       Q.   Dr Farkas, before the break I
20   handed you Exhibit 202 which is a four-page
21   document, at the top of the first page it says
22   minutes of the meeting that commenced at 3:00 pm
23   on February 14, 2006, can you identify
24   Exhibit 202?
25            (Exhibit 202 marked for identification)
```

Page 61

```
 1            Dr Adam Farkas
 2       A.   Yes.
 3       Q.   And what is it?
 4       A.   It is summary minutes of a meeting
 5   which was not an official body or constituent of
 6   the company.  It was an ad hoc meeting organised
 7   by myself and White & Case lawyers with the
 8   explicit purpose of providing an opportunity for
 9   the employees who were first identified, let us
10   say, in the first round and requested to retain
11   documents and provide consent, to address their
12   concerns, their questions, give them accurate and
13   genuine information about the investigation.
14            This meeting was organised in
15   Budapest, in the offices of Magyar Telekom.  But
16   given that individuals were involved in the scope
17   from Montenegro we allowed the senior management
18   of the Montenegrin company to dial in and attend
19   the meeting.
20       Q.   So you attended the meeting, is
21   that right?
22       A.   I attended the meeting, yes. I am
23   on it.
24       Q.   Who else attended the meeting in
25   person?
```