# Exhibit 22

```
 1                UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF NEW YORK
 3    U.S. SECURITIES AND EXCHANGE      :
      COMMISSION,                       :
 4                                      :
                 Plaintiff,             :
 5                                      :
         vs.                            :  No.11 Civ.9645
 6                                      :  (RJS)
      ELEK STRAUB,                      :
 7    ANDRÁS BALOGH, and                :
      TAMÁS MORVAI,                     :
 8                                      :
                 Defendants.            :
 9
10
11
12      VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
                            OF
13                     ZSOLT HERCZEGH
14
                            on
15
            Wednesday, February 12, 2014
16             commencing at 9.59 a.m.
17                    Taken at:
                    Nabarro LLP
18                  Lacon House
                84 Theobald's Road
19               London, WC1X 8RW
                 United Kingdom
20
21
22
23
24
25    Reported by:  Thelma Harries, MBIVR, ACR
```

Page 26

1   written in, partially in Hungarian partially in
2   English. The second page appears to be an English
3   language translation of the first page. And the
4   third and fourth pages appear to be an attachment
5   to the e-mails with handwritten notations.
6           (Exhibit Plaintiff's 94 marked for
7   identification)
8   BY MR. DODGE:
9       Q   Mr. Herczegh, can you tell me whether
10  you have seen Exhibit 94 before?
11      A   Yes, I have seen this document
12  before.
13      Q   And can you tell me what it is?
14      A   It's an e-mail chain with an
15  attachment and with a password to open the document
16  file.
17      Q   So reading from the bottom up, the
18  bottom part appears to be an e-mail sent from
19  Mr. Szendrei to András Balogh on July 5th, 2005,
20  and the top appears to be that e-mail being
21  forwarded from András Balogh to yourself and
22  Mr. Kisjuhász also on July 5th, 2005. Is that --
23  is that what this e-mail chain is?
24      A   Yes, I see the same.
25      Q   Okay. So is this an e-mail that you

Page 27

1   received from Mr. Balogh?
2       A   Yes.
3       Q   On about July 5th, 2005?
4       A   Yes.
5       Q   And can you tell me what the
6   attachment is?
7       A   That attachment contains the list of
8   contributed -- four contributed services, and the
9   service fee proportion table to be put into the
10  agreement.
11      Q   Okay. Is this the same attach --
12  apart from the handwritten notes, is this the same
13  attachment as we saw in Exhibit 93?
14      A   It appears to be the same document.
15      Q   Okay. Do you recognise the
16  handwritten notations?
17      A   It could be mine. It could be
18  others.
19      Q   Do you recognise the language the
20  handwritten notations are written in?
21      A   The language is Hungarian.
22      Q   If you take a look at the first and
23  second pages of Exhibit 94, can you tell me whether
24  the English language translation appears to be an
25  accurate translation of the Hungarian on the first

Page 28

1   page?
2       A   Yes.
3       Q   I need a complete answer, please.
4   Do you mean, yes, it is accurate?
5       A   Yes, it -- it seems to be an accurate
6   translation.
7       Q   And if you look at the notations on
8   the third and fourth pages, can you tell me what
9   they pertain to? What they say?
10      A   Can you rephrase the question,
11  please?
12      Q   The handwritten notations on the
13  third and fourth pages of Exhibit 94, can you tell
14  me --
15      A   The handwritten notations?
16      Q   The handwritten notations, what they
17  are pertain to?
18      A   First, I see here approved by P. P
19  could be Parliament or something. The second one,
20  it's -- can be hardly written -- readable. It's --
21  it' hardly legible.
22      Q   Okay, you can't make it out?
23      A   No.
24      Q   What about the third notation?
25      A   The third notation, the end part is

Page 29

1   until 6 months.
2       Q   Okay. Do -- do these notations
3   refresh your recollection in any way about any
4   conversations that you may have had around this
5   time period with anyone?
6       A   It could be, but I do not have
7   exactly a recollection on this.
8       Q   Do you have any general recollection?
9       A   I had conversations during that time
10  on this.
11      Q   And who did you have conversations
12  with?
13      A   Mr. Balogh, and could be
14  Mr. Vaczlavik.
15      Q   Okay. Do the -- do the handwritten
16  notations refresh your memory as to specific
17  subjects you discussed with either of those
18  individuals?
19      A   No.
20      Q   So -- but the attachment in
21  Exhibit 94, is that something that you received in
22  the e-mail from Mr. Balogh on July 5th, 2005?
23      A   Yes.
24      Q   And what do you recall -- did you
25  have discussions with Mr. Balogh around that time?

```
                                    Page 30
 1      A   I had discussion with Mr. Balogh
 2  around that time.
 3      Q   Okay. What do you recall about those
 4  discussions?
 5      A   It was about general terms of the
 6  agreement, how to finalise it, how to put it into
 7  the content of the draft agreement.
 8      Q   Was Mr. Balogh giving you
 9  instructions on those things?
10      A   Yes.
11      Q   And were his instructions consistent
12  with the terms of the attachment on Exhibit 94?
13      A   Yes.
14          (PREVIOUSLY MARKED: Exhibit 4 was
15  tendered to the witness for identification)
16      Q   I'm handing you an exhibit that's
17  been marked at a prior deposition as Exhibit
18  Number 4.
19          Exhibit Number 4 appears to be about
20  fifteen pages long. The front page, the caption
21  reads Consultancy Services Agreement among
22  Telemacedonia, Matáv RT, Chaptex Holdings Limited
23  and Cosmotelco Telecommunication Services SA. It's
24  dated 22 October, 2004.
25          Mr. Herczegh, have you seen Exhibit 4
```

```
                                    Page 31
 1  before?
 2      A   Yes, I have seen Exhibit 4 before.
 3      Q   And what is it?
 4      A   It's a consultancy services agreement
 5  between Telemacedonia, Matáv, Magyar Telekom at
 6  that time, Chaptex and Cosmotelco.
 7      Q   Is it correct that Matáv, M-a-t-á-v,
 8  was the prior corporate name of Magyar Telekom?
 9      A   Yes, that is correct.
10      Q   And was Exhibit 4 -- is this a copy
11  of the document that you testified about earlier
12  that you used as a model for the 2005 draft?
13      A   Yes. This was the template, the
14  sample, to prepare the 2005 agreement.
15      Q   And where did you -- where did you
16  get your copy of -- of this agreement?
17      A   I had the electronic version of this
18  document in my computer and, in the end of October,
19  2004, I was involved in the finalisation of this
20  document and the signing and closing tasks related
21  to this document.
22      Q   When you say "this document", you
23  mean Exhibit 4?
24      A   Yes.
25          MR. DODGE: I'm handing you a
```

```
                                    Page 32
 1  document that's been marked Exhibit 95
 2          Exhibit 95 is a 2-page document,
 3  Bates numbers MT-MAK 1049241 and MT-MAK 1049241-T
 4  The first page is an e-mail chain that appears to
 5  be written in Hungarian, and the second page is an
 6  e-mail chain written in English  That appears to
 7  be an English language translation of the first
 8  page
 9          (Exhibit Plaintiff's 95 marked for
10  identification)
11  BY MR DODGE:
12      Q   Mr Herczegh, have you seen
13  Exhibit 95 before?
14      A   Yes, I have seen Exhibit 95 before
15      Q   And can you tell me what it is?
16      A   It's an e-mail chain in which, at the
17  end, I ask -- I inform Mr Balogh that I received
18  the material, the content, and I'm asking
19  Mr Balogh, "Can we talk about the details how to
20  complete, finalise the draft agreement?"
21      Q   First of all, I ask you to take a
22  look at the Hungarian on the first page and the
23  English on the second page, and can you tell me
24  whether the English translation appears to be an
25  accurate translation of what's written in
```

```
                                    Page 33
 1  Hungarian?
 2      A   (Witness reviewed the documents)
 3  Yes, it appears to be an accurate translation.
 4      Q   So I'm looking at the English version
 5  on the second page. You can look at either the
 6  English or the Hungarian.
 7          Starting with the e-mail on the
 8  bottom, it's from András Balogh to Zsolt Herczegh
 9  with a copy to Zoltán Kisjuhász and Peter Dankó.
10  The date is -- the date appears to be July 5th,
11  2005, at 10:20 a m., and -- actually, you know
12  what. Let me scratch that. I think I started
13  reading from the wrong place, didn't I?
14      A   Excuse me, may I correct my previous
15  statements?
16      Q   Sure.
17      A   There is a minor translation which
18  could be relevant. The second sentence says,
19  "Could the terms of the first agreement be settled
20  by", but the Hungarian doesn't says "first". It
21  says "certain".
22      Q   Okay. Will you just read the
23  statement for the record in Hungarian, please?
24  I take it that you're talking about -- the language
25  that you're talking about in the original
```

Zsolt Herczegh                                                                           February 12, 2014

London, UK

Page 34

1  Hungarian, could you just read it out --
2       A    Yes.
3       Q    -- loud, please?
4       A    The Hungarian says "egyes szerzödéses
5  feltételekröl". In English it is "certain
6  contractual conditions". So this should read, this
7  sentence, like, "could certain terms of the
8  contractual conditions be settled by phone" and not
9  "the first".
10      Q    Okay. So let's go back to the e-mail
11 at the centre of the page, on the second page, from
12 Mr. Balogh to you with a copy to Mr. Kisjuhász and
13 Mr. Dankó dated July 5th, 2005, at 10:20 a.m.
14           Is that an e-mail that -- that you
15 received from Mr. Balogh at about -- at about that
16 date and time?
17      A    Yes.
18      Q    And is that forwarding an e-mail from
19 Mr. Szendrei to Mr. Balogh dated July 4th, 2005?
20      A    Yes.
21      Q    Okay. And moving up to the top of
22 the page, the e-mail says it's from Dr. Zsolt
23 Herczegh addressed to Mr. András Balogh dated July
24 5th, 2005, 10:05.
25           Is that an e-mail that you sent to

Page 35

1  Mr. Balogh at about 10:05 on July 5th, 2005?
2       A    Yes.
3       Q    And you describe the question that
4  you were asking Mr. Balogh.
5            Did you have conversations with
6  Mr. Balogh following sending him this e-mail?
7       A    Yes.
8       Q    Tell me about that conversation or
9  those conversations?
10      A    As I recall, it was a phone
11 conversation -- a phone conversation, and we
12 discussed by phone how to finalise the draft
13 agreement by putting into the specific details.
14      Q    Was Mr. Balogh providing you the
15 specific details to put into the agreement?
16      A    Yes.
17      Q    And do you recall what specific
18 details he provided to you?
19      A    By now I don't have a memory on this;
20 on the details.
21           MR. SULLIVAN: I'll just note for the
22 record again, in connection with the e-mail chain,
23 Bob, it looks like there was an e-mail sent by
24 Mr. Balogh to Mr. Herczegh at 10:20, 5.7.2005, and,
25 according to the testimony, he responded to

Page 36

1  Mr. Balogh after receiving that e-mail, thanking
2  Mr. Balogh for the material, but the time is 10:05.
3            I can follow up on cross, if you
4  want.
5  BY MR. DODGE:
6       Q    Mr. Herczegh, do you see the time
7  references that Mr. Sullivan just referred to?
8       A    I see the time reference.
9       Q    Do you have any understanding as to
10 how that -- how the timing of those two e-mails
11 relate to one another?
12      A    No, I don't know why there is
13 a difference in the timing.
14      Q    Okay. So on the page, the e-mail
15 that -- that you sent in response, appears to have
16 an earlier time than the e-mail you were responding
17 to. Is that the way you see it?
18      A    Based on this paper, yes. However,
19 there could be technical details which I'm not able
20 to explain.
21      Q    Okay. So do you have any firsthand
22 knowledge of how Magyar Telekom's computer system
23 applied date and time stamps to -- to e-mails?
24      A    No. It's too technical.
25      Q    Okay. Do you have a general

Page 37

1  recollection as to the sequence of the e-mails?
2  Which one came first and which one came second?
3       A    The sequence in this printed version
4  is accurate.
5       Q    Okay. So when you say that, do you
6  mean to say that the e-mail with the time stamp of
7  10:05 was sent after the e-mail with the time stamp
8  10:20?
9       A    Yes.
10      Q    Is that right?
11           And do you have a recollection as to
12 whether the dates, July 5th, 2005, on both e-mails,
13 whether that appears to be consistent with your
14 memory?
15      A    Yes, it's consistent with my memory.
16           MR. DODGE: I'm handing you a
17 document that's been marked Exhibit 96.
18           Exhibit 96 is a 2-page document Bates
19 number MT-MAK 1052083, the second page number
20 1052083-T. The first page is an e-mail written in
21 Hungarian dated July 5th, 2005, 5:19 a.m. from
22 András Balogh to Zsolt Herczegh. The second page
23 appears to be an English language translation of
24 the first page.
25

10 (Pages 34 to 37)

Alderson Reporting Company
1-800-FOR-DEPO

Page 38

1           (Exhibit Plaintiff's 96 marked for
2      identification)
3      BY MR. DODGE:
4           Q    Mr. Balogh(sic), have you seen
5      Exhibit 96 before.
6               MS. CONRY:  Mr. Herczegh.
7      BY MR. DODGE:
8           Q    I'm sorry.  Mr. Herczegh.
9      I apologise.
10          A    Yes, I have seen Exhibit 94 before.
11          Q    96?
12          A    96.
13          Q    And can you tell me what Exhibit 96
14     is?
15          A    It's just a response from Mr. Balogh
16     responding my previous question under Exhibit 95.
17          Q    Is the first page of Exhibit 96 an
18     e-mail that you, in fact, received from Mr. Balogh
19     on or about July 5th, 2005?
20          A    Yes.
21          Q    And can you take a look at the
22     Hungarian on the first page, and the English on the
23     trans -- on the second page, and tell me whether
24     the English language translation appears to be an
25     accurate translation of the original Hungarian?

Page 39

1           A    The English language translation
2      appears to be an accurate transcription of the
3      Hungarian.
4           Q    Did -- the English says, "Of course,
5      just call me at any time".  Did you call Mr. Balogh
6      after receiving this e-mail message?
7           A    Yes.
8           Q    And was that the conversation that
9      you just testified about a few moments ago?
10          A    Yes.
11              MR. SULLIVAN:  Note my recognition of
12     the appearing erroneous time.  Again, I'll follow
13     up on cross.
14              (PREVIOUSLY MARKED:  Exhibit 42 was
15     tendered to the witness for identification)
16     BY MR. DODGE:
17          Q    I'm handing you a document now that's
18     been marked Exhibit Number 42.  (Same handed)
19              Exhibit 42 appears to be a 17/18 page
20     document.  The first page is an e-mail message
21     written in Hungarian from Péter Dankó to András
22     Balogh, Mr. Szendrei and Mr. Herczegh.  The second
23     page appears to be an English language translation
24     of the first page, and the pages that follow are an
25     attachment with the heading consultancy agreement.

Page 40

1               Mr. Herczegh, have you seen
2      Exhibit 42 before?
3           A    Yes, I have seen Exhibit 42 before.
4           Q    Can you tell me what it is?
5           A    It's an e-mail in which the draft
6      consultancy agreement is sent out to Mr. Balogh and
7      Mr. Szendrei.
8           Q    Can you -- will you please take a
9      look at the original Hungarian on the first page
10     and the English on the second page, and can you
11     tell me whether the English translation appears to
12     be an accurate translation of the original
13     Hungarian?
14          A    (Witness reviewed the documents)  It
15     seems to be an accurate translation.
16          Q    Can you tell me who sent this e-mail?
17          A    My recollection is that, that it was
18     me who sent out this e-mail from Mr. -- from
19     Mr. Péter Dankó's e-mail account.
20          Q    And why did you send the e-mail from
21     Mr. Dankó's e-mail account?
22          A    As I recall, he requested me, before
23     leaving to holiday, to send out the document from
24     his e-mail account.
25          Q    Okay.  So on Exhibit 42, is this, in

Page 41

1      fact, at least the original Hungarian and the
2      attachment, is that -- is that an e-mail that you
3      sent on or about July 5th, 2005, to Mr. Andràs
4      Balogh, to Mr. Attila Szendrei, with a copy to
5      yourself?
6           A    Yes.
7           Q    And tell me about the attachment.
8      What is the attachment?
9           A    There are two attachments.  The first
10     one is a draft consultancy agreement to be
11     concluded between Telemacedonia and Chaptex.  It
12     contains the advisory services and the success fee
13     element table, which I received earlier under the
14     previously discussed exhibits.  It's a draft
15     agreement.  The date is blank, and the amount of
16     the advisory services are also blank because at
17     that time I didn't have the information about these
18     details.
19              And the second attachment is a draft
20     comfort letter based on the general information and
21     the guidances I received from Mr. Péter Dankó.
22          Q    And when you refer to -- when you
23     said the comfort letter, are you referring to the
24     last page of Exhibit 42, Bates number 8327-T?
25          A    Yes.

Zsolt Herczegh                                                                    February 12, 2014
London, UK

Page 42

1   Q   And are these -- these are doc -- are
2   these documents that you prepared?
3   A   Yes.
4   Q   Did -- now, noticing on the first
5   page of Exhibit 42, the e-mail address for
6   Mr. Szendrei is aszendrei@hotmail.com. Do you see
7   that?
8   A   Yes.
9   Q   Why did you use that e-mail address?
10  A   As I recall, I was instructed to use
11  that e-mail address.
12  Q   By whom?
13  A   It could be from Mr. Vaczlavik.
14  Q   Who else could it be from?
15  A   Excuse me?
16  Q   Who else could it have been from,
17  that instruction?
18      MR. SULLIVAN: Objection to the
19  speculation.
20      THE WITNESS: I don't want to
21  speculate on this. I do not have crystal clear
22  recollection. It could be Mr. Vaczlavik, but I'm
23  not 100 per cent sure on this.
24  BY MR. DODGE:
25  Q   Okay. Who at -- can you tell me the

Page 43

1   names of all the people you were having
2   conversations with on the -- on the subject of this
3   e-mail at about this time?
4   A   Mr. Balogh and Mr. Vaczlavik.
5   Q   Okay. And is it correct that someone
6   gave you instructions to use this e-mail for
7   Mr. Szendrei --
8   A   Yes.
9   Q   -- is that right?
10      Would those instructions have had to
11  come from one of the people that you were
12  communicating with at that time?
13  A   Yes.
14  Q   So who -- what is the complete list
15  of people who could have given you that -- that
16  instruction?
17  A   Mr. Vaczlavik and Mr. Balogh.
18  Q   Were you given any explanation as to
19  why to use this particular e-mail address for
20  Mr. Szendrei?
21  A   I have a vague recollection or memory
22  on this, but something like he was concerned that
23  he is being tabbed.
24  Q   "He" meaning Mr. Szendrei?
25  A   Yes.

Page 44

1   Q   You wrote in your e-mail -- I'm
2   looking at the English language version in the
3   first paragraph, the second sentence of your
4   e-mail -- you write,
5       "The draft was elaborated not as an
6   addendum to the contract concluded between
7   Telemacedonia, Chaptex, Matáv and Cosmotelco at the
8   end of October 2004, but - though connected to the
9   thematic area of the latter - as an independent new
10  contract to be signed only by Telemacedonia and
11  Chaptex".
12      Can you explain why you wrote that
13  sentence? What you were trying to communicate?
14  A   As I recall, these were the
15  instructions, came from Mr. Dankó, or the
16  information came from Dankó, Mr. Dankó, that this
17  is not going to be a supplement or an addendum of
18  the previously discussed agreement under Exhibit
19  Number 4, but this should be a separate new
20  agreement.
21  Q   And then, following on, there's
22  a parenthetical which says,
23      "(in case MakTel will be the main
24  representative instead of Telemacedonia, please let
25  me know, because then we [will] have to change the

Page 45

1   draft)".
2       Did -- did you have a clear
3   understanding on July 5th, 2004, who the
4   contracting party was going to be in this draft
5   agreement?
6   A   My instruction was that to prepare
7   the document in a way that it's going to be
8   concluded between Telemacedonia and Chaptex, but,
9   if there is a change, we should amendment the
10  draft.
11      But my initial understanding was that
12  Telemacedonia is going to be the contracting party.
13  Q   Now, when you said that -- you refer
14  to -- you used the phrase "connected to the
15  thematic area". What did -- what did you mean by
16  -- by that particular phrase?
17  A   That phrase means that it is somehow
18  connected to the October 2004 agreement.
19  Q   Did you have any understanding, in
20  July of 2005, whether there was overlap between the
21  services to be provided in the 2004 agreement and
22  the services to be provided in the 2005 agreement?
23  A   I did not analyse independently
24  whether there is an overlap or not between the two
25  documents.

12 (Pages 42 to 45)

Zsolt Herczegh                                                                                February 12, 2014
London, UK

```
                                    Page 46                                                     Page 48
 1      Q   Did you have any understanding in          1       A   Mr. Dankó.
 2   2005, just based on -- on your role and the roles  2      Q   And one other thing about Exhibit 42,
 3   of other people in the company, who at Magyar     3   you said the attachments are documents that -- that
 4   Telekom would have been responsible for determining 4  you prepared, is that right?
 5   whether the services being provided under the 2005 5     A   Yes.
 6   agreement were already covered in the 2004        6       Q   And if you look at the page numbering
 7   agreement?                                        7   on the draft agreement?
 8      A   I do -- I didn't have a crystal clear      8       A   Yes.
 9   understanding.  What my understanding was, foreign 9       Q   You'll notice it goes from page 13 to
10   subsidiaries, including Macedonia, were belonging 10   page 15.  These are Bates numbers 8323-T and
11   to the strategic area of Magyar Telekom at that   11   8324-T.  Does there appear to be a page missing
12   time.                                             12   there?
13      Q   Okay.  And who was in charge of the        13      A   It appears to be page number 14 is
14   strategic area at that time?                      14   missing.
15      A   At that time, Mr. András Balogh was        15      Q   When you drafted the -- this draft
16   the head of the strategic area of Magyar Telekom. 16   consultancy agreement, did it have a page 14?
17      Q   Did you have any conversations with        17      A   Yes.
18   Mr. Balogh about whether the work to be done under 18     Q   So, apart from the missing page 14,
19   the 2005 agreement should have been done under the 19  have you been able to look at the draft consulting
20   2004 agreement instead?                           20   agreement and can you tell me whether this appears
21      A   I didn't have a recollection -- I do       21   to be otherwise an accurate copy of the draft that
22   not have a recollection on this.                  22   you prepared?
23      Q   Going back to the discussion in your       23      A   Yes, other than this, it seems to be
24   e-mail about whether Telemacedonia or MakTel would 24  an appropriate copy.
25   be the contracting party under the 2005 draft, what 25    Q   On the comfort letter, the last page,

                                    Page 47                                                     Page 49
 1   was your understanding of what Telemacedonia was?  1   it's prepared for the signature of Mr. Elek Straub,
 2      A   My understanding was that                   2   is that right?
 3   Telemacedonia at that time was 100 per cent owned  3       A   Yes.
 4   subsidiary of Magyar Telekom, and it was           4       Q   And who was Mr. Straub?
 5   responsible for advisory-related activities.  It   5       A   At that time Mr. Elek Straub was the
 6   was one of the investments of Magyar Telekom in    6   chief executive officer of Magyar Telekom.
 7   Macedonia.                                         7       Q   And do you know whether Mr. Straub
 8      Q   And what was -- what was MakTel,            8   ever signed a version of this comfort letter?
 9   M-a-k-T-e-l?                                       9       A   No, I do not have information on
10      A   MakTel at that time was the national      10   this.
11   telecommunications company in Macedonia.         11       Q   And I believe you testified, just
12      Q   MakTel was an abbreviation, is that      12   correct me if I'm wrong, that the dates were left
13   right.                                          13   blank in the draft agreement and the draft comfort
14      A   Yes.                                     14   letter, and I believe you testified that you didn't
15      Q   And what was the full name?              15   have information on what dates to put in, is that
16      A   Makedonski TeleComunikac II.             16   right?
17      Q   You notice I didn't try to say that      17       A   Yes, it was sent out as draft
18   myself; I let you say it.                       18   documents but leaving the date blank.  Paragraph
19          Looking at the last page of              19   number 3 of the cover e-mail explains this.
20   Exhibit 42, this is the comfort letter that you 20       Q   So are you referring to the language
21   described?                                      21   on the bottom of your e-mail where it says, "fill
22      A   Yes.                                     22   in the data from the square brackets accordingly
23      Q   Did you draft the comfort letter?        23   (dates on the title page and the 3rd page,
24      A   Yes.                                     24   success-based fee on the 5th page, signatories on
25      Q   Who told you to prepare it?              25   the 13th page)"?
```

Zsolt Herczegh                                                                                                           February 12, 2014
London, UK

Page 50

1  A  Yes, I was referring to that part.
2  Q  So the -- the draft consulting
3  agreement attached to Exhibit 42, do you know if
4  that -- if the agreement was ever executed in that
5  form or did the agreement undergo subsequent
6  changes?
7  A  The draft was subject later on
8  changes.
9  MR. DODGE: I'm handing you a
10 document that's been marked as Exhibit Number 97.
11 Exhibit Number 7(sic) appears to be
12 approximately...
13 Exhibit Number 97 appears to be
14 approximately 10/12 pages long. The first three
15 pages appear to be an e-mail chain. Actually, the
16 first page appears to be an e-mail chain, partially
17 in English and partially in Hungarian. The second
18 page and the third page appear to be an English
19 language translation of the first page. And then
20 on the fourth page to the end, appear to be an
21 attachment to the e-mail chain.
22 (Exhibit Plaintiff's 97 marked for
23 identification)
24 BY MR. DODGE:
25 Q  Mr. Herczegh, can you tell me whether

Page 51

1  you've seen Exhibit 97 before?
2  A  Yes, I have seen Exhibit 97 before.
3  Q  And what is it?
4  A  It's an e-mail chain starting from
5  Mr. Balogh to Mr. Mihail Kefaloyannis, and then
6  continuing from Mr. Kefaloyannis to Mr. Balogh, and
7  then from Mr. Balogh to me.
8  Q  So is this e-mail chain in Exhibit 97
9  a message that you received from Mr. Andràs Balogh
10 on or about July 7, 2005?
11 A  Yes.
12 Q  And if you take a look at the
13 Hungarian portion on the first page of Exhibit 97
14 and the English language translation on the second
15 page and tell me if the English translation appears
16 to be an accurate translation of the original
17 Hungarian?
18 A  (Witness reviewed the documents) It
19 seems to be an accurate translation.
20 Q  And turning your attention to the
21 bottom of the -- the bottom of the first page,
22 the original where it says original message
23 from Andràs Balogh dated July 6, 2005,
24 kefaloyannism@cosmotelco.com, do you see that?
25 A  Yes.

Page 52

1  Q  Do you -- can you identify that as
2  an e-mail address belonging to Mr. Mihail
3  Kefaloyannis?
4  A  It appears to be an e-mail address
5  connected to Mr. Kefaloyannis.
6  Q  Okay. And I think we already
7  testified about your understanding of who
8  Mr. Kefaloyannis was, is that right?
9  A  Yes. My understanding was that he is
10 connected to the Cosmotelco group.
11 Q  And the e-mail text on the bottom
12 says,
13 "Michael, This text will be amended
14 and MakTel will contract with Chaptex. Deliverable
15 scope will be divided into 4 and one will be used
16 for the immediate transaction".
17 Did you have an understanding of what
18 it meant where it said "deliverable scope will be
19 divided into 4"?
20 A  My understanding was that; that,
21 compared to the consultancy tasks, attached to
22 previous e-mails, discussed under previous
23 exhibits, those would be divided into four.
24 Q  So the one contract would be divided
25 into four separate contracts, is that right?

Page 53

1  A  Yes. One omnibus contract should
2  have been divided into four.
3  Q  And where it says "MakTel will
4  contract with Chaptex", did you have an
5  understanding of what that meant?
6  A  My understanding was that it meant
7  that the contracting party should have been
8  amended.
9  Q  Amended from what to what?
10 A  From Telemacedonia to MakTel.
11 Q  Did you ever -- did you receive any
12 explanation as to why that change would be made?
13 A  I don't recall for an explanation on
14 this.
15 Q  And then, if you look at the middle
16 -- the middle e-mail, it says -- this appears to be
17 an e-mail message from Mr. Kefaloyannis to
18 Mr. Balogh. Is that how you understand that?
19 A  Yes.
20 Q  And Mr. Kefaloyannis writes, "Andràs,
21 The draft you sent me is too complicated. I am
22 sending you simpler draft". And then the -- the
23 text -- the text goes on.
24 Did you receive a copy of the
25 simplified draft Mr. Kefaloyannis was referring to?

14 (Pages 50 to 53)

Zsolt Herczegh                                                    February 12, 2014

London, UK

## Page 54

1   A   Yes, I have received the simplified
2   draft.
3   Q   Okay. Was the simplified draft
4   attached to e-mail -- Exhibit 97?
5   A   Yes, the simplified draft is attached
6   to Exhibit 97.
7   Q   Okay. So is that the document at
8   Bates numbers MT-MAK 8330-T to MT-MAK 8340-T?
9   A   Yes.
10  Q   And then, if you look at the top
11  e-mail from Mr. Balogh to you, July 7, 2005, he
12  writes, "Please read it ASAP. I myself agree with
13  the simplification. We should finalize it" -- "We
14  should finalize it today with Szendrei Attila".
15           Can you tell me what your
16  understanding was of this e-mail?
17  A   It was basically an instruction to
18  forget the previous draft I sent out from
19  Mr. Dankó's account, and discussed under a previous
20  exhibit, and use the new draft.
21  Q   The one prepared by Mr. Kefaloyannis?
22  A   The one attached to the e-mail chain
23  with Mr. Balogh and Mr. Kefaloyannis. I don't know
24  whether he prepared or someone else the changes;
25  the additions.

## Page 55

1   Q   I appreciate the -- the
2   clarification.
3           So the new draft would be the one
4   that Mr. Kefaloyannis sent to Mr. Balogh, and
5   Mr. Balogh forwarded to you, is that right?
6   A   Yes, and the new draft is
7   going to be the new starting point.
8   Q   You testified earlier that
9   Mr. Szendrei was the CEO of MakTel, is that right?
10  A   Yes.
11  Q   And did he -- was -- where was he
12  located at that time? Where did he work?
13  A   On this day, he was in Budapest.
14  Q   Okay. In general, where did he work?
15  A   My general understanding was that he
16  is located in Macedonia.
17  Q   But you said that on July 7, 2005,
18  Mr. Szendrei was in -- was in Budapest?
19  A   Yes, on a business trip.
20  Q   Okay. Did you meet with
21  Mr. Szendrei?
22  A   Yes.
23  Q   And tell me about the discussions you
24  had?
25  A   It was a personal discussion. My

## Page 56

1   recollection is that -- that it took place in
2   Mr. Balogh's office Mr. Balogh was not present, so
3   it was a face-to-face conversation about finalising
4   the agreement in this new form.
5   Q   Do you remember anything more about
6   what either Mr. Szendrei said to you or what you
7   said to him during that meeting?
8   A   Yes. My recollection is that the
9   conversation covered the signing authority within
10  MakTel, and it also covered a double-check, what
11  kind of agreements should be approved by the board
12  of directors of MakTel and what kind of agreements
13  can be signed by the CEO and the CFO of MakTel.
14  Q   So what did -- what did you and
15  Mr. Szendrei discuss on those subjects?
16  A   We had --
17  Q   Let me start -- let me start with you
18  mentioned board approval. So what did you and
19  Mr. Szendrei discuss on the subject of board
20  approval?
21  A   The discussion was about that, above
22  one million Euro, contracts should be approved by
23  MakTel's board, and, below one million Euro, the
24  contract can be signed by Mr. Szendrei and
25  Mr. Plath, at that time the CFO of MakTel.

## Page 57

1   Q   You said Mr. Plath, P-l-a-t-h, was
2   the CFO of MakTel at that time, is that right?
3   A   Yes, that was my understanding.
4   Q   And turning back to -- I'm sorry,
5   Exhibit 97, the proposed attachment. Is there
6   a fee schedule attached to this? Is there a fee
7   amount in this?
8   A   Excuse me, which exhibit?
9   Q   97?
10  A   97, yes. (Witness reviewed the
11  document) Yes, there is a fee schedule.
12  Q   Can you bring me to the right page?
13  A   It's on page 10.
14  Q   Okay. I have that as the success
15  elements. I'm wondering if the exhibits attached
16  to Exhibit 97 identifies the amount -- the amount
17  of the payments that would be made under this
18  draft? Or was that still left blank?
19  A   If we see page number 3 of the
20  attachment.
21  Q   So this is at Bates MT-MAK 8332-T, is
22  that right?
23  A   Yes.
24  Q   And is there a reference in here to
25  the amount of payment that would be made under this

Page 58

1  draft?
2     A  Yes.
3     Q  And what is the amount of the
4  payment?
5     A  The amount is Euro 9 thousand --
6  sorry, 980,000.
7     Q  And was that amount part of the
8  discussion that you had with Mr. Szendrei on
9  July 7th?
10    A  We have generally discussed the
11 approval threshold limit, so yes.
12    Q  Okay.  So, in connection with the
13 draft attached to Exhibit 97 with a maximum payment
14 of 980,000 Euros, am I correct that your discussion
15 with Mr. Szendrei on July 7th had to do with board
16 approval being required for contracts above
17 a million Euros?
18    A  Yes, it covered the double-check by
19 myself in the so called by-laws of the board of
20 directors of MakTel.
21    Q  And what sort of double-check did you
22 do?
23    A  I checked the document, which
24 included the scope of authority of MakTel's board.
25 So it was a check -- I don't recall whether it was

Page 59

1  an electronic version or a paper version, but
2  a document.
3     Q  Did Mr. Szendrei ask you to -- to
4  check that?
5     A  I have a vague recollection that
6  it could be a request from him.  It was
7  a double-check.
8     Q  You said you were meeting with
9  Mr. Szendrei in Mr. Balogh's office.  Was anyone
10 else present?
11    A  No, no-one else was present.
12       MR. SULLIVAN:  Excuse me, Bob.
13       MR. DODGE:  You're looking at your
14 watch?
15       MR. SULLIVAN:  I am.  I'm just
16 wondering if there might be a break.  I think the
17 court reporter might be interested.
18       MR. DODGE:  We'll take a short break
19 now.
20       MR. SULLIVAN:  5, 10 minutes is fine,
21 yes.
22       VIDEOGRAPHER:  Going off the record
23 at 11:13 a.m.
24       (A short recess at 11:13 a.m.)
25       (Resumed at 11:28 a.m.)

Page 60

1        VIDEOGRAPHER:  Going back on the
2  record at 11:28 a.m.
3        MR. SULLIVAN:  Bob, before you begin,
4  I just want to, for the record, lodge a hearsay
5  objection to testimony relating to conversations
6  with others who are not defendants in this case
7  under 803 hearsay rule.  Thanks.
8        MR. DODGE:  I'm prepared to stipulate
9  that all hearsay objections are preserved.
10       MR. SULLIVAN:  That's the only reason
11 we're going to bring it up.
12       MR. KOENIG:  The last time we had the
13 same issue with regard to what objections were
14 preserved or not.  You agree that we preserve all
15 objections.
16       MR. DODGE:  Hearsay objections are
17 preserved.  Form objections -- I mean, this is my
18 understanding of the Federal Rules, that form
19 objections you need to make here because that will
20 give me an opportunity to correct the question.
21 But hearsay objections are preserved.
22       MR. SULLIVAN:  I appreciate that.  We
23 just didn't do the stips beforehand, but you're
24 right.
25

Page 61

1  BY MR. DODGE:
2     Q  Okay, so, Mr. Herczegh, you're
3  looking still at Exhibit 97, and if you'd turn to
4  the second page, page 8328-T?
5     A  Yes.
6     Q  And in the top portion of the e-mail
7  from Mr. Balogh to you he writes, "We should
8  finalize it today with Szendrei Attila".  Do you
9  see that?
10    A  Yes.
11    Q  So what were you -- what was your
12 understanding of what needed to be finalised?
13    A  The draft document to be prepared to
14 send out.
15    Q  Okay.  Were you given any instruction
16 as to why it needed to be finalised that day?
17    A  I don't have a specific recollection
18 on this.  I felt my understanding at that time was
19 that I am under time pressure.
20    Q  Okay.  And the conversation you had
21 with Mr. Szendrei on July 7th, was that in response
22 to the e-mail instruction you received from
23 Mr. Balogh?
24    A  Yes.
25    Q  Okay.  Now, looking at the attachment

16 (Pages 58 to 61)

Zsolt Herczegh                                              February 12, 2014
London, UK

Page 62

1  to Exhibit 97, you're familiar with the Microsoft
2  Word software programme?
3      A    Yes.
4      Q    You're familiar with the track
5  changes feature?
6      A    Yes.  This document has a track
7  changes feature.
8      Q    Okay.  The changes that are reflected
9  in the attachment, were those changes that you made
10 to the document or, when you received the document,
11 did it already have those changes in it?
12     A    These documents -- or these
13 amendments and additions were already in the
14 document when I received it.
15     Q    I'm going to hand you document that's
16 been marked in a previous exhibit -- previous
17 deposition as Exhibit 43.  (Same handed)
18         (PREVIOUSLY MARKED: Exhibit 43 was
19 tendered to the witness for identification)
20         Exhibit 43 is about 8 to 10 pages in
21 length.  The first page is an e-mail from András
22 Balogh to Mihail Kefaloyannis.  And below that is
23 an e-mail from Zsolt Herczegh to András Balogh with
24 a copy to Ferenc Vaczlavik dated July 7, 2005.  And
25 then the second page and following appears to be an

Page 63

1  attachment with the label consultancy agreement.
2          Mr. Herczegh, turning your -- have
3  you seen Exhibit 43 before?
4      A    I have the e-mail in the bottom and
5  the attachment.  I had in 2005.
6      Q    So is it correct that -- I guess,
7  below the -- the horizontal line on the first page
8  of Exhibit 43, is this an e-mail that you sent on
9  or about July 7, 2005, to András Balogh and Ferenc
10 Vaczlavik?
11     A    Yes.
12     Q    And this e-mail is written in
13 English.  Did you initially compose it in English?
14     A    Yes.  This e-mail was written by me
15 in English.
16     Q    And why was that?
17     A    My general understanding was that,
18 that this were to be forwarded to Mr. Kefaloyannis,
19 and I wanted to make the colleagues' work easier,
20 and that's why I wrote in English.
21     Q    Did you have an understanding of
22 whether Mr. Kefaloyannis -- what -- what his
23 nationality was?
24     A    My general understanding was that,
25 that he's a Greek national.

Page 64

1      Q    And the attachment to Exhibit 43,
2  what is that?
3      A    The attachment is a new version of
4  the draft consultancy agreement, which I put
5  together based on the information received in
6  e-mails and documents covered under previous
7  exhibits.
8      Q    Okay.  And turning to your e-mail,
9  you began, "I reviewed the draft Consultancy
10 Agreement sent by Michael on 6th June".  Do you see
11 that?
12     A    Yes.
13     Q    Who does Michael refer to?
14     A    Michael here refers to Mr. Mihail
15 Kefaloyannis.
16     Q    And when you write 6th June, was that
17 date correct or are you thinking of a different
18 month?
19     A    It's an unintentional mistake by
20 myself.  It refers to the e-mail chain we discussed
21 under Exhibit 97.
22     Q    Okay.  So, instead of 6th June, what
23 would the correct date have been?
24     A    The correct date should have been
25 6th July.

Page 65

1      Q    And so when you referred to the draft
2  consultancy agreement, you were speaking of the
3  draft attached to Exhibit 97, is that right?
4      A    Yes.
5      Q    Now, if we look at the attachment,
6  the second page of Exhibit 43, on the bottom of the
7  first page of the attachment it says concerning
8  frequency fee related activities?
9      A    Yes, I see that.
10     Q    Can you describe the difference in
11 the scope of this draft of the consultancy
12 agreement from prior drafts that you had prepared?
13     A    The scope has been changed.  Instead
14 of four consultancy tasks, it is focusing on the
15 consultancy task number 1, advisory consultancy
16 activities created to frequency fee matters.
17     Q    I just want to make sure the court
18 reporter is getting this.  When you say -- you're
19 saying consultancy tasks, with a K, rather than
20 consultancy tests?
21     A    Tasks.
22     Q    T-a-s-k, right?
23     A    Yes.
24     Q    I just want to make sure that the
25 transcript is clear on that.

17 (Pages 62 to 65)

```
                                                    Page 66
 1           Now, on the second paragraph of your
 2   e-mail to Mr. Balogh, you write,
 3           "Please note that I inserted
 4   '30th June' as deadline for the fulfilment of the
 5   Consultant's obligations in Schedule 1".  Then the
 6   sentence goes on.
 7           But why did you insert June 30th as
 8   -- as the deadline?
 9       A   My general recollection is that
10   everything in the second paragraph, the information
11   is coming from the discussion with Mr. Szendrei on
12   this date.
13       Q   On?
14       A   On 7th July.
15       Q   2005?
16       A   2005, yes.
17       Q   Okay.  So is it your recollection
18   that you were instructed by Mr. Szendrei on
19   July 7th to insert June 30th as the -- as the
20   deadline?
21       A   I don't -- don't have a specific
22   recollection.  I would phrase this in a way that
23   every information I got channelled into that
24   result.  So I don't recall a specific instruction
25   on this to insert June 30th as a performance
```

```
                                                    Page 67
 1   certificate deadline.
 2       Q   But the June 30th date, was that --
 3   that wasn't a date that you came up with on your
 4   own, was it?
 5       A   I don't think that it was my
 6   invention.
 7       Q   Okay.  Is it your recollection that
 8   somebody gave you that date to put in the contract?
 9       A   Could be.
10       Q   But you're not sure?
11       A   I'm not 100 per cent sure on this.
12       Q   Is it possible that you made up the
13   date?
14       A   Excuse me?
15       Q   Is it possible that you made up the
16   date?
17       A   It could be possible.
18       Q   Now, at this time, your e-mail was
19   written on July 7th of 2005, and the June 30th date
20   was already a date in the past.
21           Did you have any understanding at
22   that time of why the performance deadline would be
23   earlier in time than -- than the date of your
24   e-mail?
25       A   No.
```

```
                                                    Page 68
 1       Q   Is that something that you came up
 2   with on your own?
 3       A   I -- I felt that the deadlines do not
 4   match.  That is why I wrote some kind of penalty
 5   notification or a warning in the third paragraph.
 6       Q   Okay.  Well, let's back up a little
 7   bit, and start with simply the insertion of the
 8   June 30th date into the draft agreement.
 9           And I want to get some clarification
10   on whether it was your idea to put the June 30th
11   date in the agreement or whether you had
12   instruction from someone else to put that date in
13   the agreement.
14           MR. SULLIVAN:  Objection.  That's
15   been asked and answered.
16           THE WITNESS:  I do not have a crystal
17   clear recollection on this.
18   BY MR. DODGE:
19       Q   Okay.  So let's look to the third
20   paragraph of your e-mail.  And you wrote,
21           "If the Consultant agrees with the
22   new draft, the signing date must be carefully
23   selected since the performance deadline was
24   30th June".
25           What were you intending to
```

```
                                                    Page 69
 1   communicate there?
 2       A   My intention by formulating these
 3   sentences was to notify the parties involved in
 4   this matter that the actual deadline of the
 5   correspondence and the potential signing of the
 6   agreement -- the potential date of the signing of
 7   this consultancy agreement do not match with those
 8   deadlines which were already expired.
 9       Q   And why did you think it was
10   important to make that notification?
11       A   I just wanted to notify them to think
12   it over.
13       Q   Was -- the fact that the performance
14   deadline was earlier than your e-mail, was that
15   something that you had some discomfort with?
16       A   I had a low level of discomfort with
17   this.
18       Q   And why -- why did you have a low
19   level of discomfort?
20       A   I had a general understanding at that
21   time that Magyar Telekom and its subsidiaries had
22   already established contractual relationship with
23   Chaptex, so the parties know each other.  They had
24   contracts; consultancy contract from October 2004.
25           Also another agreement, which we have
```

**Page 70**

1  discussed under Exhibit 97.  It is also referring
2  to an already signed agreement.  That is why my
3  understanding was that the parties are fine with
4  each other.
5       The other factor was that the
6  deadline was only a few days back in the past.
7       Q   Okay.  So are you -- the answer you
8  just gave me, are you explaining to me why your
9  concern was a low level rather than a high level?
10 Or are you explaining to me why you had a concern
11 at all?
12      A   It explains the low level discomfort.
13      Q   Okay.  Why did you have any
14 discomfort at all?
15      A   A simple fact that the dates do not
16 fit.
17      Q   Now, at this time in July of 2005,
18 how long had you been working for Magyar Telekom?
19      A   Less than 2 years.
20      Q   Less than 2 years.  And you testified
21 earlier that you were a junior attorney at the
22 company, is that right?
23      A   Yes.
24      Q   In your experience, had you seen any
25 other instances of a backdated contract such as

**Page 71**

1  this?
2       A   No.
3       Q   Did you have any understanding
4  whether it was proper or not proper to use
5  a backdated contract?
6       A   No.
7       Q   Did it raise a question in your mind
8  about whether it might or might not be proper to
9  use a backdated contract?  A backdated date?
10         MR. KOENIG:  I'm going to object to
11 the form of that question, Bob.
12 BY MR. DODGE:
13      Q   You can answer.
14      A   Can you please rephrase the question?
15         COURT REPORTER:  "Q.  Did it raise a
16 question in your mind about whether it might or
17 might not be proper to use a backdated contract?"
18         THE WITNESS:  In other words?
19 BY MR. DODGE:
20      Q   Okay.  Did -- on July 7, 2005, was
21 there any question in your mind about whether it
22 was proper to have a -- a backdated contract?
23         MR. KOENIG:  Object to form.
24         MS. FRIED:  Object to form.
25         THE WITNESS:  It didn't raise too

**Page 72**

1  many questions in my mind, but I wanted to notify
2  the parties that the sequence of the events would
3  not fit at the end.  But I considered the document
4  I sent out still as a draft.
5       Excuse me if I ask that for
6  rephrasing the question.
7       Q   No, I told you at the beginning; if
8  there's any question that I ask that you have any--
9  that you find unclear in any way, then I would like
10 you to let me know and give me a chance to ask the
11 question again and rephrase it in a way that -- to
12 clear that up.
13      A   Okay.
14      Q   So any future questions, if you find
15 anything confusing about them, please do let me
16 know.
17      A   Okay.
18      Q   Did anyone, around this time July 7,
19 2005, give you any -- give you any explanation as
20 to why the date of performance should be earlier
21 than the date that you were -- you were writing it?
22      A   No, I do not have a recollection on
23 this.
24      Q   In the last sentence of the first
25 page of Exhibit 43 you say, "we can use the

**Page 73**

1  document as a skeleton when we prepare the three
2  additional agreements".
3       What did you -- what did you mean
4  there?
5       A   The instruction I received and
6  discussed under earlier exhibits refers to that;
7  that the instruction was to separate the omnibus
8  contract and consultancy tasks into four separate
9  agreement.
10         And the last sentence refers to that;
11 this document could be a template for consultancy
12 agreements covering task -- tasks number 2, 3 and
13 4, discussed under earlier exhibits.
14      Q   Now, turning your attention to the
15 performance tasks identified in the draft
16 consultancy agreement.  So I'm speaking here of
17 schedule 1, where it says "The Services" on Bates
18 number MTA4289691.  Do you see that?
19      A   I see that.
20      Q   At this time, in July of 2005, did
21 you have an understanding of what -- what these
22 activities were?
23      A   I didn't have a general understanding
24 about the details of these activities.
25      Q   Did you have any understanding of who

19 (Pages 70 to 73)

Page 74

1   would perform these activities?
2       A    The general understanding was that
3   Chaptex, the consulting party, would perform these
4   activities.
5       Q    And what was the basis for that
6   understanding?
7       A    The basis was that Magyar Telekom and
8   Cosmotelco group had an established relationship
9   from the past.
10      Q    Okay.  Did anyone have any
11  discussions with you about -- you know, it says
12  here, "Achieving the decrease of the charged
13  frequency fee to an acceptable level", about how
14  that would be done, when that would be done,
15  anything like that?
16      A    No.
17      Q    Did you have any understanding in
18  July of 2005 when these activities would, in fact,
19  be done?
20      A    No.
21      Q    Did you have any understanding in
22  July of 2005 how those activities would be done?
23      A    No.
24      Q    Did you consider it part of your job
25  responsibilities to find out when and how those

Page 75

1   activities would be done?
2       A    No.  I didn't think that it belonged
3   to my job responsibilities to make a general --
4   make a detailed check of these activities.
5       Q    What did you consider to be your job
6   responsibilities with respect to this agreement?
7       A    To put together a draft using the
8   samples, the templates I received, put in the
9   details, i.e. the consultancy tasks and the success
10  fee elements, and send it out.
11      Q    So at the time you wrote and prepared
12  the draft with a performance deadline of June 30th,
13  did you know whether the activities had, in fact,
14  already been completed prior to June 30th?
15      A    I had the general understanding,
16  which is proved by paragraph number 2 of the cover
17  e-mail, starting with, "as I have been informed".
18      Q    Okay.  And will you just read the
19  portion of the e-mail that explains your answer?
20      A    The relevant part is, "I have been
21  informed with respect to tasks number 1 and 2, the
22  fulfilment can be evidenced by the
23  resolutions/orders of the relevant Macedonian
24  authority, while with respect to task number 3, an
25  informal background agreement has been reached

Page 76

1   earlier".
2       Q    If you turn to paragraph 5.1 of the
3   agreement, which is on Bates number MTA4289687.  Do
4   you see paragraph 5.1?
5       A    Yes, I see that.
6       Q    And it says, "the company shall pay
7   a success-based fee in the maximum amount of
8   EURO 980,000".  Do you see that?
9       A    Yes, I see that.
10      Q    How did you know to put in that this
11  would be a success-based fee?
12      A    Can you rephrase the question,
13  please?
14      Q    Did anyone tell you, in preparation
15  for drafting this agreement, that the fee would be
16  a success fee?
17      A    Yes.  I had the general understanding
18  that this is going to be a success fee based
19  contract, based on the attachments to the e-mails
20  covered by exhibits previously discussed.
21      Q    Okay.  Can you tell me which -- which
22  exhibit you're referring to?
23      A    If we see Exhibit 93?
24      Q    Okay.
25      A    And if we see the last page?

Page 77

1       Q    Mmmm.
2       A    There is a table about a service fee
3   or success fee proportion table.  That was the
4   starting point for that.
5       Q    So after -- turning back to Exhibit
6   43 and your e-mail to Mr. Balogh.  After you sent
7   the e-mail to Mr. Balogh on July 7, 2005, did you
8   have any conversations with Mr. Balogh on the
9   subject?
10      A    I didn't have a conversation with
11  Mr. Balogh on the subject.  A few days later there
12  was a follow-up in correspondence on this.
13      Q    I'm handing you a document that's
14  been marked Exhibit 46 in a prior deposition.
15           (PREVIOUSLY MARKED:  Exhibit 46 was
16  tendered to the witness for identification)
17           Exhibit Number 46 is a 3-page
18  document.  It's an e-mail chain on the first page
19  that is in English.  The first and second pages are
20  in English, and the third page is partially in
21  English and partially in Hungarian.  So the Bates
22  numbers go from 8353-T, 8354 and then 8353 on the
23  third page.
24           Mr. Balogh(sic), have you seen
25  Exhibit 46 before?  I'm sorry.  I'm sorry;

Zsolt Herczegh                                                                                                  February 12, 2014
London, UK

Page 78

```
 1  Mr. Herczegh.
 2       A    Yes, I have seen Exhibit 46 before.
 3       Q    And is the third page of Exhibit 46
 4  original?
 5       A    Yes, I have seen the last page.
 6       Q    Okay.  Can you tell me what
 7  Exhibit 46 is?
 8       A    Exhibit 46 is an e-mail chain
 9  starting from my e-mail from the 7th July.  A few
10  days later, because I didn't hear any information
11  what happened about the draft, I sent out
12  a follow-up e-mail to Mr. Balogh on the 11th July
13  asking that the modified draft was acceptable and
14  then do I need to prepare the other three
15  agreements.  I asked this because I felt time
16  pressured on and around on 7th July.  And, after
17  sending out draft, nothing happened.
18       Q    Okay.  So if you take a look at the
19  -- the Hungarian original, the third page of
20  Exhibit 46, and the translation into English on the
21  first page, can you tell me whether the English
22  translation appears to be an accurate version of
23  the original Hungarian?
24       A    (Witness reviewed the documents)  The
25  English translation seems to be accurate.
```

Page 79

```
 1       Q    So turning your attention to the
 2  middle portion of the first page of Exhibit 46,
 3  your e-mail to Andràs Balogh on July 11, 2005, at
 4  5:17 p m., so is this an e-mail that you sent to
 5  Mr. Balogh on about -- on or about that time?
 6       A    Yes.
 7       Q    And the reference to the modified
 8  draft, does that refer to Exhibit 43, the
 9  attachment to Exhibit 43?
10       A    Yes.
11       Q    And what response did you get from
12  Mr. Balogh?
13       A    Mr. Balogh responded that, "Thank
14  you, the agreement has been signed.  Please start
15  to prepare the others.
16       Q    And did you ever see the -- the
17  signed final frequency fee consulting contract?
18       A    Late -- much later on, during the
19  internal investigation at Magyar Telekom, I has
20  seen the signed version of the agreement.
21       Q    Okay.  So did you -- did you see the
22  signed version in 2007 then?
23       A    Yes.
24       Q    And, when you saw the signed version
25  in 2007, was that the first time you'd seen it?
```

Page 80

```
 1       A    As I recall, yes.
 2       Q    What did you do after receiving this
 3  e-mail from Mr. Balogh?
 4       A    My recollection is that I contacted
 5  later on Mr. Vaczlavik asking for further
 6  information.
 7            MR. DODGE:  We need to change the
 8  tape.  We need to take a short break for that.
 9            VIDEOGRAPHER:  Going off the record
10  at 11:59 a.m.  This is also the end of tape number
11  1.
12            (A short recess at 11:59 a.m.)
13            (Resumed at 12:06 p m.)
14            VIDEOGRAPHER:  This is tape number 2,
15  volume 1 in the video deposition of Zsolt Herczegh,
16  being held at the offices of Nabarro in London.
17  We're going back on the record at 12:06 p.m.
18  BY MR. DODGE:
19       Q    During the break, Mr. Herczegh, your
20  attorney mentioned to me that you might want to
21  clarify something in your prior testimony?
22       A    Yes.  May I add a clarification to
23  the document and questions related to Exhibit 43?
24            Questions covered that, who informed
25  me about the June 30th deadline to be included in
```

Page 81

```
 1  the agreement.  And let me correct my previous
 2  statement, that I don't recall that I invented that
 3  date, but I'm not sure who instructed me or
 4  requested me to do that.
 5       Q    Is there anything else you'd like to
 6  add?  Or is that --
 7       A    No, I just wanted to clarify this
 8  part which relates to the second paragraph of that
 9  e-mail.
10       Q    I'm going to hand you another
11  document.  This has been marked in a previous
12  deposition Exhibit Number 45.  (Same handed)
13            (PREVIOUSLY MARKED:  Exhibit 45 was
14  tendered to the witness for identification)
15            Exhibit Number 45 is a 7-page
16  document, 8-page document, Bates numbered
17  MT-LON 44903 to 44910.  It says consultancy
18  agreement on the first page.
19            Mr. Herczegh, have you seen
20  Exhibit 45 before?
21       A    Yes.
22       Q    And can you tell me what it is?
23       A    This is the final and signed
24  consultancy agreement concluded between MakTel and
25  Chaptex.
```

21 (Pages 78 to 81)

Alderson Reporting Company
1-800-FOR-DEPO