# Exhibit 23

```
 1                UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF NEW YORK
 3   U.S. SECURITIES AND EXCHANGE      :
     COMMISSION,                       :
 4                                     :
                Plaintiff,             :
 5                                     :
        vs.                            :   No.11 Civ.9645
 6                                     :   (RJS)
     ELEK STRAUB,                      :
 7   ANDRÁS BALOGH, and                :
     TAMÁS MORVAI,                     :
 8                                     :
                Defendants.            :
 9
10
11
12      VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
                           OF
13                    ZSOLT HERCZEGH
14
                           on
15
             Wednesday, February 12, 2014
16               commencing at 9.59 a.m.
17                    Taken at:
                    Nabarro LLP
18                  Lacon House
               84 Theobald's Road
19              London, WC1X 8RW
                United Kingdom
20
21
22
23
24
25    Reported by:  Thelma Harries, MBIVR, ACR
```

Zsolt Herczegh                                                                                                    February 12, 2014
London, UK

Page 82

1   Q   So is Exhibit 45 the -- the signed
2   version of the draft that you had been working on
3   and you testified about in the prior exhibits?
4   A   Yes.  This is the fully signed
5   version.
6   Q   And this is the signed version you
7   saw for the first time in 2007, is that right?
8   A   As I recall, yes.
9   Q   If you look at the first page of
10  Exhibit 45, and it says concluded on May 1st, 2005.
11  Do you see that?
12  A   Yes, I see that.
13  Q   Do you know who added that date to
14  the agreement?
15  A   No.
16  Q   And then, if you look at page 6 of
17  Exhibit 45, it says, "In witness whereof the
18  authorised representative of the Parties hereto
19  have set their hand on May 1st, 2005".  Do you see
20  that?
21  A   I see that.
22  Q   Do you know who added that date?
23  A   No.
24  Q   Do you know why the May 1st, 2005,
25  date was selected?

Page 83

1   A   No.
2   Q   Based on your involvement in
3   preparing this consultancy agreement, could it have
4   been signed on May 1st, 2005?
5   A   No.
6   Q   Take a look at the names of the
7   people who signed the agreement.  I'm looking at
8   page 6 of Exhibit 45.  There's the name Mr. Rolf
9   Plath, P-l-a-t-h.
10  A   I see that.
11  Q   Who was he?
12  A   My understanding was that he is the
13  CFO of MakTel at that time.
14  Q   CFO stands for Chief Financial
15  Officer?
16  A   Chief Financial Officer, yes.
17  Q   Did Mr. Plath ever discuss this
18  frequency fee agreement with you before he signed
19  it?
20  A   No.
21  Q   There's also a signature from
22  Mr. Attila Szendrei.  Do you see that?
23  A   I see that.
24  Q   Did Mr. Szendrei discuss the -- this
25  agreement with you before he signed it, other than

Page 84

1   --
2   A   No.
3   Q   Other than discussions we've
4   previously testified about during the drafting?
5   A   No, I didn't had other discussions.
6   Q   Okay.  And the third signature is
7   Mr. Mihail Kefaloyannis?
8   A   I see that.
9   Q   For Chaptex Holdings Limited.  Did
10  Mr. Kefaloyannis discuss the agreement with you
11  before he signed it?
12  A   No.
13  Q   So, you testified earlier that, after
14  you were instructed by Mr. Balogh on July 12th to
15  begin work on the -- the subsequent agreements, you
16  began working on them, is that right?
17  A   Yes.
18      MR. DODGE:  I'm handing you a
19  document that's been marked Exhibit 98.
20      Exhibit 98 is a 2-page document Bates
21  Number MT-MAK 8355 and 8355-T.  The first page is
22  a series of e-mail messages dated July 12th, 2005.
23  The first page is in Hungarian and the second page
24  appears to be an English language translation of
25  the first page.

Page 85

1       (Exhibit Plaintiff's 98 marked for
2   identification)
3   BY MR. DODGE:
4   Q   Mr. Herczegh, have you seen
5   Exhibit 98, please?  Have you seen it before?
6   A   Yes.
7   Q   Will you take a look at the English
8   and Hungarian and tell me whether the English
9   appears to be an accurate translation of what's
10  written in the Hungarian?
11  A   (Witness reviewed the documents)
12  Yes, it seems to be a correct translation.
13  Q   And is Exhibit 98 an e-mail that you
14  sent to Mr. Vaczlavik on July 12th, 2005?
15  A   Yes.
16  Q   Why did you send this e-mail to
17  Mr. Vaczlavik?
18  A   It is a follow-up e-mail, and the
19  reason is that I'm asking for information and
20  details to finalise the other draft agreements.
21  Q   Do you recall whether Mr. Vaczlavik
22  responded to you?
23  A   My recollection is that, that
24  I received an answer for more detailed information
25  in the second part of August 2005.

Zsolt Herczegh                                                         February 12, 2014
London, UK

Page 86

1  MR. DODGE: I'm handing you a
2  document that's been marked Exhibit Number 99.
3       Exhibit 99 is a 2-page document. The
4  first page appears to be an e-mail message written
5  partially in English and partially in Hungarian.
6  And the second page appears to be an English
7  language translation of the first page.
8       (Exhibit Plaintiff's 99 marked for
9  identification)
10 BY MR. DODGE:
11     Q    Have you seen Exhibit 99 before?
12     A    Yes.
13     Q    And what is it?
14     A    It is a -- it is an e-mail sent from
15 Mr. Vaczlavik to me about the details of two other
16 agreements, namely, agreements covering
17 e-communication and its by-laws related activities
18 and --
19     Q    And -- sorry.
20     A    -- and labour law activities. It
21 contains the details of the advisory tasks, plus
22 the performance deadlines, plus the success fee
23 element or rate.
24          It also refers to that fact that
25 other elements of the consultancy previously given,

Page 87

1  i.e. given in early July, should be disregarded.
2       Q    Okay. Is the e-mail in Exhibit 99
3  Mr. Vaczlavik's response to the question that you
4  asked of him in Exhibit 98?
5       A    Yes.
6       Q    On the first page of Exhibit 99, at
7  the very top of the page, is a notation in
8  brackets. It says,
9            "[The original e-mail was re-typed,
10 since the e-mail was sent confidentially (i.e the
11 system does not allow to execute instructions like
12 copying, printing, forwarding, etc.)]"
13          Did you write that?
14     A    Yes.
15     Q    And what did you mean?
16     A    I produced this document during the
17 internal investigation at Magyar Telekom. The
18 company, including they received document requests
19 from White & Case who conducted -- which company
20 conducted the internal investigation, to produce
21 consultancy activities related documents.
22          And, since I received this e-mail by
23 Mr. -- sent by Mr. Vaczlavik as a confidential
24 e-mail in the Lotus notes system, the system didn't
25 allow me to copy, to print, to forward at all, but

Page 88

1  the document provision must have been made in a
2  paper form. So, therefore, I started to retype the
3  e-mail to provide the necessary information for the
4  internal investigation.
5       Q    Okay. So am I correct in
6  understanding that, instead of simply printing out
7  the e-mail from your computer system, which was
8  impossible, you retyped the -- the substance of the
9  e-mail?
10     A    I retyped the e-mail.
11     Q    Okay. And when you retyped the
12 e-mail, did you retype it exactly as it appeared in
13 the original?
14     A    Yes.
15     Q    And if you -- the original e-mail was
16 in combination of Hungarian and English, is that
17 right?
18     A    Yes.
19     Q    And if you look at the second page,
20 the English translation, does that appear to be an
21 accurate translation of the portions that were
22 originally in Hungarian?
23     A    (Witness reviewed the documents)
24 Other than a typo I see, it seems to be a correct
25 translation.

Page 89

1       Q    And where is the typo?
2       A    In the first -- middle of the first
3  paragraph; "should".
4       Q    Oh, I see. The word "should", on the
5  second line of the first paragraph? Is that what
6  you're --
7       A    Yes.
8       Q    -- pointing to? And it's spelt
9  s-h-o-u-d-l instead of s-h-o-u-l-d?
10     A    Yes.
11     Q    Otherwise, it looks like an accurate
12 translation?
13     A    It looks like an accurate
14 translation.
15     Q    Okay. So I'll be asking you
16 questions from the English translation because
17 I can't read Hungarian.
18          And if you look at the -- under
19 agreement number 1, and then it says Tasks, and the
20 tasks are numbered 1 and 2. Do you see that?
21     A    I see that.
22     Q    And under task number 2, it gives a
23 deadline. Do you see that?
24     A    I see the deadline, yes.
25     Q    And the deadline is July 31st, 2005,

Zsolt Herczegh                                         February 12, 2014
London, UK

Page 90

1   is that right?
2        A    Yes.
3        Q    And is it correct that July 31st,
4   2005, was earlier than the date of the e-mail from
5   Mr. Vaczlavik?
6        A    Yes.
7        Q    And under agreement number 2, it also
8   has tasks number 1 and 2, and there are deadlines
9   associated with those tasks as well.  Do you see
10  those?
11       A    I see those.
12       Q    And those deadlines are August 15th,
13  2005, is that right?
14       A    Yes.
15       Q    And August 15th, 2005 was also prior
16  to the date of Mr. Vaczlavik's e-mail to you, is
17  that right?
18       A    Yes.
19       Q    Do you know how Mr. Vaczlavik came up
20  with these dates, July 31st and August 15th?
21       A    I just have a general understanding
22  that it was discussed in the background, but
23  I don't know the details for this.
24       Q    When you say it was discussed in the
25  background, does that mean it was discussed with

Page 91

1   you or it was discussed outside your presence?
2        A    Discussed by others, not with me.
3        Q    Do you see any reference in
4   Mr. Vaczlavik's e-mail in Exhibit 99 of the amounts
5   to be paid under the two contracts?
6        A    No.
7        Q    Did you ever receive that
8   information?
9        A    My recollection is that I received
10  verbine(?) information regarding the consultancy
11  amounts.
12       Q    Who did you receive that from?
13       A    Most probably from Mr. Vaczlavik.
14       Q    And do you have a recollection as to
15  when you received that information?
16       A    My recollection is that it was around
17  the end of August.
18       Q    2005?
19       A    2005.
20       Q    After you received Mr. Vaczlavik's
21  e-mail, Exhibit 99, what did you do?
22       A    I started to prepare the draft
23  agreements.
24            MR. DODGE:  I'm handing you
25  a document that's been marked Exhibit 100.

Page 92

1             Exhibit 100 appears to be a 10 or
2   15-page document, Bates Number MT-MAK 8357, the
3   next page 8357-T, and the last page MT-MAK 8367-T.
4             The first page appears to be an
5   e-mail message from Mr. Zsolt Herczegh to Mr.
6   András Balogh, Ferenc Vaczlavik, with copies to
7   Péter Dankó, Zoltán Kisjuhász.  The first page is
8   written in Hungarian with indications of two
9   attachments.  The second page appears to be an
10  English language translation of the first page.
11  And then the following pages of Exhibit 100 appear
12  to be attachments to the e-mail, they look two
13  documents both labelled consultancy agreement, the
14  first one beginning on 8358-T and the second one
15  beginning on page 8363-T.
16            (Exhibit Plaintiff's 100 marked for
17  identification)
18  BY MR. DODGE:
19       Q    Mr. Herczegh, have you ever seen
20  Exhibit 100 before?
21       A    Yes.
22       Q    Can you tell me what it is, please?
23       A    I have prepared these attachments and
24  the e-mail sent out to Mr. Balogh and
25  Mr. Vaczlavik, and I'm sending the new draft

Page 93

1   documents covering the electronic communications
2   activities and the labour law activities to be
3   concluded between MakTel and Chaptex.
4        Q    If you look at the first page of
5   Exhibit 100 and the second page, can you tell me
6   whether the English language translation appears to
7   be an accurate translation of the original
8   Hungarian?
9        A    (Witness reviewed the documents)  It
10  seems to be an accurate translation.  I just
11  spotted two minor typos in the name of Mr. Ferenc
12  Vaczlavik.  The English says Ferencz.  The
13  Hungarian says Ferenc.  But it's not material.
14       Q    Okay.  So the first --
15  Mr. Vaczlavik's first name is misspelled in the
16  translation, is that right?
17       A    Misspelled in translation, yes.
18       Q    And what's -- what's the other
19  correction you have?
20       A    In the e-mail address and in the
21  starting, "Dear András and Ferencz".
22       Q    Oh, okay.  So it's his first name is
23  misspelled twice?
24       A    Yes.
25       Q    Other those misspellings, does the

Zsolt Herczegh                                                                    February 12, 2014
London, UK

Page 94

1   translation appear to be accurate to you?
2       A    It appears to be accurate.
3       Q    And is the first -- is Exhibit 100,
4   apart from the translation, in fact a copy of the
5   e-mail that -- that you sent to Mr. Balogh and
6   Mr. Vaczlavik on or about August 23rd, 2005?
7       A    Yes.
8       Q    And you said that the two attachments
9   are documents that you prepared, is that right?
10      A    Yes.
11      Q    Turning your attention to the labour
12  law agreement, and page number MT-MAK 8361.  And if
13  we look at the -- where it says Schedule 1 on the
14  left, The Services.  Are you with me on the right
15  page?
16      A    (No response)
17      Q    Do you see in the first paragraph at
18  the end it says deadline 15 August, 2005?  Do you
19  see that?
20      A    I see that.
21      Q    And then the same thing in the -- at
22  the end of the second paragraph, deadline 15
23  August, 2005?
24      A    I see that.
25      Q    Is it correct that that date,

Page 95

1   15th August, is approximately 8 days earlier than
2   the date of your e-mail?
3       A    Yes, it's correct.
4       Q    And if I direct your attention to the
5   second agreement involving the e-commerce law on
6   page MT-MAK 8366?  This is the second to last page
7   of Exhibit 100.  Under Schedule 1, The Services,
8   there are three numbered paragraphs.  Do you see
9   that?
10      A    I see that.
11      Q    And at the end of each of those
12  paragraphs is a parenthetical with a deadline, and
13  in each case it says deadline 31st July, 2005, is
14  that right?
15      A    I see that.  That's right.
16      Q    Those are the deadlines that you
17  entered into the document, is that right?
18      A    Yes.
19      Q    And is it -- is it correct that on
20  July 31st, 2005, it was approximately 23 days
21  earlier than the date of your e-mail?
22      A    Yes.
23      Q    Did you ever discuss with Mr. Balogh
24  why the deadlines for performance for both
25  agreements were earlier than the date that the

Page 96

1   agreement was prepared; the agreements were
2   prepared?
3       A    I do not recall discussion with
4   Mr. Balogh on this.
5       Q    Okay.  Did you have any discussions
6   with anyone, anyone who was on this e-mail,
7   Mr. Balogh, Mr. Vaczlavik, Mr. Dankó,
8   Mr. Kisjuhász, about the fact that performance
9   dates were earlier than the preparation of the
10  contracts?
11      A    I recall that I had discussions with
12  Mr. Vaczlavik around the end of August about this
13  topic.
14      Q    Okay.  And tell me what you said to
15  Mr. Vaczlavik and tell me what Mr. Vaczlavik said
16  to you?
17      A    I don't have exactly a recollection
18  on this.
19      Q    What's your general recollection?
20      A    I had to finish the draft documents
21  and requested the information from him how to
22  finalise it, what to put in there.
23      Q    And do you have any general
24  recollection about what you said to Mr. Vaczlavik
25  and what Mr. Vaczlavik said to you?

Page 97

1       A    No.
2       Q    Did you have any discussions with
3   Mr. Dankó around this time on that subject?
4       A    Later on, yes.
5       Q    When -- tell me about that.  When --
6   approximately when did you speak to Mr. Dankó?
7       A    On or about the 31st August.
8       Q    And tell me what you recall of that
9   conversation; what you said to Mr. Dankó and what
10  Mr. Dankó said to you?
11      A    I do not have a crystal clear
12  recollection on this.  I raised my concerns about
13  dating of the draft agreements.
14      Q    Okay.  During this time period in
15  late August 2005, what concerns are you referring
16  to?
17      A    At the very end of August, I got an
18  instruction to change the contracting parties from
19  MakTel to StoneBridge.  That was one big change.
20  And also I got the instruction about dating of the
21  agreements.
22           So these two issues raised concerns
23  in me, and I felt discomfort, especially about the
24  date and handling agreements in this way.
25      Q    And do you recall anything about how

25 (Pages 94 to 97)

Alderson Reporting Company
1-800-FOR-DEPO

Page 98

1  you expressed those concerns to Mr. Dankó or anyone
2  else?
3      A    My recollection is that it was
4  a verbal conversation.
5      Q    Okay. And do you have any
6  recollection at all about what you may have said to
7  Mr. Dankó?
8      A    I -- I do not have specific
9  recollection. I have a memory of raising the
10 issue.
11     Q    Okay. Do you have any recollection
12 at all about what Mr. Dankó said to you in
13 response?
14     A    No.
15     Q    Do you have any recollection as to
16 how you felt after speaking to Mr. Dankó? Were you
17 reassured or were you still concerned?
18     A    I don't have specific recollection on
19 this but, at the very end of August, I sent out
20 from my e-mail account the redrafted versions of
21 the agreements.
22     Q    Now, I asked you how you felt, and
23 you told me what you did. Does that answer my
24 question?
25          MR. SULLIVAN: Objection to form.

Page 99

1           MR. KOENIG: Objection to form, yes.
2           MR. SULLIVAN: Do you have a question
3  pending that's substantive?
4           MR. DODGE: I've asked the question.
5  He can answer.
6           THE WITNESS: My general feeling was
7  a discomfort feeling.
8  BY MR. DODGE:
9      Q    Now, if you look at Exhibit 100 on
10 page 3359, and on the left side of the page under
11 Remuneration, paragraph 5.1, do you see that?
12     A    I see that.
13     Q    And do you see the amount of the --
14 of the fee is listed there as 980,000 Euros?
15     A    I see that.
16     Q    Why was that amount included?
17     A    My general recollection is that
18 I received the amount information to be put into
19 the agreement.
20     Q    Who provided that information to you?
21     A    Most probably Mr. Vaczlavik.
22     Q    Do you have any understanding as to
23 how that amount was arrived at?
24     A    No.
25     Q    If you look at page 8364. This is

Page 100

1  the e-com and by-laws agreement. And, again, on
2  the left side of the page, under the heading
3  Remuneration, in the second to last paragraph
4  numbered 5.1, do you see that?
5      A    I see that.
6      Q    And do you see the amount of the
7  success fee is listed as 990,000 Euros?
8      A    I see that.
9      Q    Same question. Why was that amount
10 included in the contract?
11     A    I received that instruction to insert
12 that amount.
13     Q    And who gave that instruction to you?
14     A    Most probably Mr. Ferenc Vaczlavik.
15     Q    Was that at the same time as you
16 received --
17          COURT REPORTER: Sorry. Most
18 probably?
19          THE WITNESS: Most probably by
20 Mr. Ferenc Vaczlavik.
21 BY MR DODGE:
22     Q    Would you have received the payment
23 amount instruction for both contracts at the same
24 time?
25     A    Yes.

Page 101

1      Q    And the same with this contract, did
2  you -- were you given any explanation as to how
3  that amount was arrived at?
4      A    I don't have a recollection on this.
5      Q    Do you know if these two consulting
6  agreements in Exhibit 100 were ever signed by
7  anyone?
8      A    Yes. Later on I received the
9  finalised and signed version of this agreement --
10 these agreements.
11          MR. DODGE: I'm handing you
12 a document that's been marked Exhibit 101.
13          Exhibit 101 looks to be about 15 --
14 15 pages long. The first page appears to be a fax
15 cover sheet on the letterhead of Magyar Telekom,
16 partially in English and -- actually, pretty much
17 all in Hungarian. The second page appears to be an
18 English language translation of the first page.
19 And following the first two pages are -- I believe
20 it's two consulting -- consultancy agreements, or
21 two documents labelled consultancy agreement. The
22 first one begins at page MT-MAK 8392-T, and the
23 second one begins on MT-MAK 8401-T.
24          (Exhibit Plaintiff's 101 marked for
25 identification)

Zsolt Herczegh  February 12, 2014
London, UK

```
                                    Page 102
 1   BY MR. DODGE:
 2        Q    Mr. Herczegh, have you ever seen
 3   Exhibit 101 before, please?
 4        A    Yes.
 5        Q    And what is it?
 6        A    I am sending out by fax the two
 7   agreements, two consultancy agreements, one
 8   regarding the electronic communication law
 9   activities, the other one relating to the labour
10   law activities, still in a draft form, to
11   Mr. Szendrei.
12        Q    If you take a look at the first page
13   in Hungarian and the second page in English and
14   confirm for me whether or not the English appears
15   to be an accurate translation of what was written
16   in Hungarian?
17        A    (Witness reviewed the documents)
18   I see one word missing from the English
19   translation.
20        Q    And what word is that?
21        A    It's in the first sentence of my
22   wording. "I am sending you the two requested
23   drafts in the attachment". So the word "requested"
24   is missing from the English translation.
25        Q    Okay. So the English translation
```

```
                                    Page 103
 1   says, "I am sending the two drafts in the
 2   attachment", and it should say what?
 3        A    It should say, "I am sending the two
 4   requested drafts in the attachment".
 5        Q    Okay. Otherwise, apart from that
 6   correction, does that -- does it appear to be an
 7   accurate translation?
 8        A    Yes.
 9        Q    Apart from the page with the
10   translation, is Exhibit 101 a copy of a facsimile
11   that you sent on or about August 29th, 2005 to
12   Mr. Attila Szendrei?
13        A    Yes.
14        Q    And why did you send this to
15   Mr. Szendrei?
16        A    Someone asked me to send this out by
17   fax to Mr. Szendrei.
18        Q    Who asked you?
19        A    I do not have a specific recollection
20   on this. It could be that Mr. Vaczlavik requested
21   me to send it out by fax, but I'm not 100 per cent
22   sure on this. That is why I mentioned that the
23   word "requested" is missing.
24        Q    So are the -- the blank drafts, the
25   unsigned drafts in Exhibit 101, are these the same
```

```
                                    Page 104
 1   documents that were attached to your e-mail in
 2   Exhibit 100?
 3        A    It appears to be the same. I didn't
 4   check it from word-by-word, but it appears to be
 5   the same.
 6        Q    Did you ever receive executed
 7   versions of the two agreements that you sent by
 8   e-mail and by fax?
 9        A    Later on I received the executed
10   versions of these agreements by fax.
11        Q    I'm now going to hand you two
12   documents that have been marked in a previous
13   deposition as Exhibits 51 and 52.
14             Exhibit 51 is a 9-page document
15   labelled consultancy agreement, and it says
16   concerning labour law related activities. It has
17   a line "concluded on June 1st, 2005", on the first
18   page, and then also a fax transmission line on the
19   top, 29 August, 2005.
20             Exhibit 52 is also a 9-page document.
21   It says consultancy agreement concluded on
22   June 1st, 2005, concerning Macedonian law on
23   electronic communication and its by-laws. It also
24   has a facsimile transmission line on top of the
25   first page, 29 August, 2005.
```

```
                                    Page 105
 1             (PREVIOUSLY MARKED: Exhibit 51 was
 2   tendered to the witness for identification)
 3             (PREVIOUSLY MARKED: Exhibit 52 was
 4   tendered to the witness for identification)
 5             Mr. Herczegh, have you seen exhibit
 6   51 and 52 before?
 7        A    Yes.
 8        Q    And can you --can you tell me what
 9   these are?
10        A    These are the executed versions of
11   the consultancy agreement; one covers the labour
12   law related consultancy activities, while the other
13   covers the electronic communications law related.
14   That exhibit -- activities. Both are fully
15   executed versions by MakTel and by Chaptex.
16        Q    Both exhibits 51 and 52 -- scratch
17   that.
18             Do you recognise -- there's
19   a facsimile transmission number at the top of both
20   Exhibit 51 and 52, the phone number 90038923126244.
21   Do you recognise that number?
22        A    Yes.
23        Q    And whose number is that?
24        A    If we see Exhibit 101, and if we see
25   the cover page, and see what is the fax number of
```

27 (Pages 102 to 105)

Zsolt Herczegh                                                                                           February 12, 2014

London, UK

|  | Page 114 |  | Page 116 |
|---|---|---|---|
| 1 | Exhibit 54.  (Same handed) | 1 | A    Yes. |
| 2 | (PREVIOUSLY MARKED:  Exhibit 54 was | 2 | Q    Why did you write this in English? |
| 3 | tendered to the witness for identification). | 3 | A    Because the instruction was that to |
| 4 | Exhibit 54 is a 15 to 20-page | 4 | send out the documents to Mr. Kefaloyannis |
| 5 | document.  The Bates number is MT-MAK 803328 | 5 | directly. |
| 6 | through -- actually, the numbers are not | 6 | Q    And was it your practice, when |
| 7 | continuous. | 7 | writing to Mr. Kefaloyannis, to write to him in |
| 8 | The first two pages are MT-MAK 803328 | 8 | English? |
| 9 | and 329.  The following pages are MT-MAK 1010427 | 9 | A    Yes, because, as I understood, he |
| 10 | through 1010447.  The first and second pages of | 10 | doesn't speak Hungarian. |
| 11 | Exhibit 54 appear to be an e-mail message from | 11 | Q    The first sentence you write, |
| 12 | Mr. Zsolt Herczegh to Michael Kefaloyannis with | 12 | "I refer to your telephone |
| 13 | copies to András Balogh, Tamás Morvai, Ferenc | 13 | conversation with Mr. Szendrei and Mr. Vaczlavik. |
| 14 | Vaczlavik, Péter Dankó, Zoltán Kisjuhász with | 14 | Further to their request, please find attached the |
| 15 | a series of attachments. | 15 | modified consultancy agreements to be included |
| 16 | Mr. Herczegh, have you seen | 16 | between StoneBridge AD (instead of MakTel) and |
| 17 | Exhibit 54 before? | 17 | Chaptex Holdings Limited, and the drafts of the |
| 18 | A    Yes. | 18 | applicable performance certificates". |
| 19 | Q    And can you tell me what it is? | 19 | When you write in the second line |
| 20 | A    This is an e-mail from me to the | 20 | "Further to their request", do you see that? |
| 21 | parties listed just beforehand, and this is the | 21 | A    Yes, I see that. |
| 22 | final version of the documents ready for signing. | 22 | Q    Who is the "their" referring to? |
| 23 | Q    And when you say "the documents", | 23 | A    "Their" refers to Mr. Szendrei and |
| 24 | what document are you referring to? | 24 | Mr. Vaczlavik. |
| 25 | A    I'm referring to four MakTel | 25 | Q    Were you given any explanation as to |

|  | Page 115 |  | Page 117 |
|---|---|---|---|
| 1 | documents, two consultancy agreements, one is about | 1 | why the two consulting agreements needed to be |
| 2 | labour law related activities, the second one is | 2 | changed from MakTel to StoneBridge? |
| 3 | about the electronic communications activities, and | 3 | A    At that time I do not recall |
| 4 | two corresponding performance certificate | 4 | a specific explanation for this. |
| 5 | protocols. | 5 | Q    Did you have any understanding why |
| 6 | Q    Is Exhibit 54 a copy of an e-mail | 6 | that change had to be made? |
| 7 | that you sent on or about August 31st, 2005? | 7 | A    At that time, no. |
| 8 | A    Yes, it is. | 8 | Q    If you look at the second paragraph |
| 9 | Q    And can you tell me the similarities | 9 | of your e-mail, the second sentence, you write, |
| 10 | and differences between the consultancy agreements | 10 | "We have double-checked the Statutes |
| 11 | attached to Exhibit 54 and the agreements we looked | 11 | of StoneBridge which provides that such agreements |
| 12 | at at Exhibits 51 and 52? | 12 | may be signed by the Chief Executive Office or |
| 13 | A    The major difference is, compared to | 13 | StoneBridge alone." |
| 14 | Exhibits 51 and 52, is the change in the | 14 | Do you see that? |
| 15 | contracting party, MakTel changed to StoneBridge. | 15 | A    I see that. |
| 16 | Q    Who instructed you to change the | 16 | Q    What were you trying to communicate |
| 17 | contracting party from MakTel to StoneBridge? | 17 | there? |
| 18 | A    Most probably by Mr. Ferenc | 18 | A    That I tried to communicate -- let me |
| 19 | Vaczlavik. | 19 | correct one thing, but it's a typo.  It's Chief |
| 20 | Q    And when -- when -- when were you | 20 | Executive Officer. |
| 21 | told to make that change? | 21 | Q    Not office? |
| 22 | A    On or about August 31st of 2005. | 22 | A    Not office. |
| 23 | Q    In your e-mail, Exhibit 54, it's | 23 | Q    Mmmm. |
| 24 | addressed to Mr. Kefaloyannis.  I notice that this | 24 | A    The goal of this message was that |
| 25 | e-mail is in English.  Was the original in English? | 25 | there is no specific board approval minute for |

30 (Pages 114 to 117)

Zsolt Herczegh                                                                                    February 12, 2014
London, UK

```
                                                Page 118                                                                   Page 120
 1   this, if the signing party is StoneBridge.                    1   see that?
 2        Q    So, in other words, is it correct                   2        A    I see that.
 3   that you double-checked to see whether the board of           3        Q    And did you put that date in for the
 4   directors of StoneBridge would have to approve                4   same reason?
 5   these two agreements?                                         5        A    Yes.
 6        A    Yes. It refers to a double-check,                   6        Q    Your e-mail on Exhibit 54 was sent to
 7   yes.                                                          7   -- you sent it to Mr. Balogh, Mr. Morvai and
 8        Q    You note in your e-mail that Zoltán                 8   Mr. Dankó.
 9   Kisjuhász, the Chief Executive Officer of                     9        Did you have any discussions with any
10   StoneBridge. Do you see that?                                10   of those individuals about the dating of these
11        A    Yes.                                               11   documents.
12        Q    Did you discuss these agreements with              12        A    My general recollection is that, that
13   Mr. Kisjuhász?                                               13   I raised the issue of dating to Mr. Dankó.
14        A    As I recall, yes.                                  14        Q    And is this the conversation that you
15        Q    And what do you recall from those                  15   referred to earlier in your testimony?
16   discussions?                                                 16        A    Yes.
17        A    I do not have specific memory or                   17        Q    And thinking back on your earlier
18   recollection on this but, as I recall, I informed            18   testimony on that subject, is there any more detail
19   him that there is a change in the contracting                19   that you didn't give us earlier that you can give
20   parties, and he, at that time or around that time,           20   us now?
21   CEO of that company, would be the signing party.             21        A    No.
22        Q    What did Mr. Kisjuhász say to you, if              22        Q    Did you ever have any discussions
23   anything?                                                    23   with Mr. Balogh about the dating of these
24        A    I don't have a specific recollection               24   contracts?
25   on this.                                                     25        A    I don't recall that.

                                                Page 119                                                                   Page 121
 1        Q    When did that conversation take                     1        Q    Did you ever have -- ever have any
 2   place?                                                        2   discussions with Mr. Morvai about the dating of
 3        A    On or about 31st August, 2005.                      3   these contracts?
 4        Q    If you look at the first page of the                4        A    No.
 5   labour law agreement, which is Bates number MT-MAK            5        Q    Did you ever have any conversations
 6   1010430, the document says "concluded on June 1st,            6   with Mr. Straub, Elek Straub, about the dating of
 7   2005", do you see that?                                       7   these contracts?
 8        A    Yes.                                                8        A    No.
 9        Q    If -- now, this is a document that                  9        Q    Was -- what was -- what was
10   you prepared on -- on or about August 31st, 2005 --          10   StoneBridge?
11        A    Yes.                                               11        A    My general understanding was that
12        Q    -- is that right?                                  12   StoneBridge is a holding company with a registered
13        If you prepared it on August 31st,                      13   office in Macedonia. By that time, August 2005, it
14   2005, why did you put the date June 1st, 2005?               14   was 100 per cent owned subsidiary of Magyar
15        A    As I recall, I received instruction                15   Telekom.
16   for that date.                                               16        Earlier there were three shareholders
17        Q    From whom?                                         17   in that company, but the other two co-shareholders
18        A    Most probably from Mr. Ferenc                      18   were both out by Magyar Telekom as part of share
19   Vaczlavik.                                                   19   purchase transactions.
20        Q    Did you have any understanding as to               20        Q    You said -- you referred to
21   why that date should be chosen?                              21   StoneBridge as a -- as a holding company. Do you
22        A    No.                                                22   know whether Mr. -- whether Stone -- whether
23        Q    Now, the same thing for the second                 23   StoneBridge had any telecommunications operations
24   agreement. It's on page 1010439. It has the same             24   in Macedonia?
25   -- it's concluded on June 1st, 2005, date. Do you            25        A    I don't have specific information on
```

Zsolt Herczegh                                                                                         February 12, 2014

London, UK

```
                                    Page 122                                                              Page 124
 1   that.  My understanding was that it's some kind of      1        A    Yes.  It appears to be the signed
 2   an intermediary holding company, but it also            2   versions of those documents.
 3   belonged to the investments of Magyar Telekom in        3        Q    Did -- in 2005, did you ever receive
 4   that country.                                           4   signed versions of the by-laws contract and the
 5        Q    I'm not sure if I understood your             5   labour law contract?
 6   answer.                                                 6        A    Let me add one thing to my previous
 7        A    I don't --                                    7   statement.
 8        Q    Let me -- let me try rephrasing it.           8        Q    Mmmm.
 9             Did you have any understanding in             9        A    Exhibit 56 and 57 contains, in the
10   2005 whether StoneBridge had any actual operations,    10   last pages, the finalised performance certificate
11   business operations, in Macedonia or anywhere?         11   protocol documents with the heading of Chaptex.
12        A    I -- I feel that "business                   12        Q    Okay.  And so that's both the last
13   operation", the term, is too broad, but I would        13   page of Exhibit 56 and the last page of Exhibit 57?
14   narrow it that I do not have specific information      14        A    Both the last pages, yes.
15   on that.                                               15        Q    And I don't recall if I got an answer
16        Q    Okay.                                        16   to my question.
17        A    Sorry, if I missed the question.             17             In 2005, did you ever receive signed
18        Q    No, I -- I want to get your testimony        18   versions of these two agreements?
19   and that -- I think I have your testimony on that.     19        A    Yes.  I do not have specific
20             Did you have any understanding why           20   recollection on this, but probably, yes.
21   StoneBridge was selected to be the -- the main         21        Q    Okay.  Now, if you look at the
22   party in these agreements?                             22   signature pages on Exhibit 56, page 43001, and on
23        A    At that time, no.                            23   Exhibit 57, page 43010?
24        Q    Did you ask anybody why?                     24        A    I see those.
25        A    No, I don't recall that.                     25        Q    In both cases the contracts say, "In

                                    Page 123                                                              Page 125
 1        MR. SULLIVAN:  Bob, as you know,                   1   witness whereof the authorised representatives of
 2   we're about 10 after 2.                                 2   the parties hereto have set their hands on June
 3        MR. DODGE:  One.  I can finish in                  3   1st, 2005".  Do you see that?
 4   about -- in less than 10 minutes.                       4        A    Yes.
 5        MR. SULLIVAN:  Sure.  That's fine.                 5        Q    Were the versions of these documents
 6        MR. DODGE:  It's your call.  I can                 6   that you sent out on August 31st, 2005, were those
 7   stop if you --                                          7   already signed?
 8        MR. SULLIVAN:  No, go ahead.  Let's                8        A    Excuse me?
 9   finish.  It just felt like 10 after 2.  Sorry.          9        Q    The drafts of these two agreements
10        MR. DODGE:  I'm always nervous with               10   that you sent out on August 31st, 2005, in
11   making projections.                                    11   Exhibit 54, were those already signed?
12   BY MR. DODGE:                                          12        A    No.  Documents attached to Exhibit 54
13        Q    Mr. Herczegh, I'm handing you two            13   are the unsigned Microsoft document versions.
14   documents that have been marked previously as          14        Q    Do you have any understanding whether
15   Exhibits 56 and 57.  (Same handed)                     15   Exhibit 56 and Exhibit 57 were, in fact, signed on
16        (PREVIOUSLY MARKED:  Exhibit 56 was               16   June 1st, 2005?
17   tendered to the witness for identification).           17        A    I do not have specific details what
18        (PREVIOUSLY MARKED:  Exhibit 57 was               18   were the signing on order and the method; whether
19   tendered to the witness for identification).           19   it was a fax signing or by distributing the
20             Mr. Herczegh, have you seen Exhibit          20   original version.  I see Exhibit 54 and it refers
21   56 and 57 before?                                      21   to signing original documents.
22        A    Yes.                                         22        Q    Okay.  In Exhibit 54, these two
23        Q    Do these appear to be the signed             23   documents you created on August 31st, 2005, is that
24   versions of the two agreements that you sent to        24   right?
25   Mr. Kefaloyannis on August 31st, 2005?                 25        A    Yes.
```

32 (Pages 122 to 125)

Alderson Reporting Company
1-800-FOR-DEPO

Zsolt Herczegh                                                                 February 12, 2014
London, UK

```
                    Page 126                                            Page 128
 1   Q   So would it have been possible for        1   agreement was entered into first on behalf of one
 2   those documents to have been signed on June 1st, 2   subsidiary and then re-executed on behalf of
 3   2005?                                          3   another subsidiary?
 4   A   Yes.                                       4   A   No, I didn't have experience on this.
 5   Q   Yes, it would have been possible?          5       MR. DODGE:  I'll pass the witness at
 6   A   It was impossible.                         6   this point.
 7   Q   It was impossible?                         7       We discussed taking a lunch break
 8   A   Im, impossible.                            8   between the direct and cross, so, if no-one
 9   Q   If you look at the performance             9   objects, we can break for lunch now.
10   certificates protocols, in Exhibit 56, page 43004, 10       MR. SULLIVAN:  That sounds fine.
11   and Exhibit 57, 43013.  In Exhibit 56, the   11       VIDEOGRAPHER:  Going off the record
12   performance certificate protocol is dated    12   at 1:17 p m.
13   July 31st, 2005?                              13       (A short recess at 1:17 p m.)
14   A   I see that.                               14       (Resumed at 2:15 p m.)
15   Q   Would it have been possible, given        15       VIDEOGRAPHER:  We're now going back
16   your involvement in preparing this document, for 16   on the record at 2.15 p m.
17   this performance certificate to have been signed on 17       CROSS-EXAMINATION
18   July 31st, 2005?                              18   BY MR. SULLIVAN:
19   A   Yes.                                      19   Q   Good afternoon, Mr. Herczegh.
20   Q   It would have been possible?              20   A   Good afternoon.
21   A   It would have been impossible.            21   Q   My name is Bill Sullivan.  I'm a
22   Q   Okay.  I need to speak more clearly.      22   lawyer with Pillsbury Winthrop but I represent
23   I think when I said possible you would hear   23   Mr. Balogh.
24   impossible.                                   24       I have a few questions for you today
25   A   Sorry about that.                         25   based on the testimony that you gave under

                    Page 127                                            Page 129
 1   Q   Let me rephrase my question so that        1   questioning by Mr. Dodge, and I'm hoping to clarify
 2   the record is clear.                           2   your testimony and enhance my understanding on
 3       Would it have been possible for this       3   behalf of Mr. Balogh.  Is that okay with you?
 4   performance certificate to have been signed on 4   A   Yes.
 5   July 31st, 2005?                               5   Q   All right.  During the time that you
 6   A   No, it was not possible.                   6   have discussed with Mr. Dodge, and specifically
 7   Q   And in Exhibit -- in Exhibit 57, the       7   regarding your role in connection with the
 8   performance certificate is dated August 15th, 2005. 8   consulting agreements while employed by Magyar
 9   Would it have been possible for this performance 9   Telekom, you reported to Péter Dankó, is that
10   certificate to have been signed on August 15th, 10   right?
11   2005?                                         11   A   Indirectly.
12   A   No, it was not possible.                  12   Q   Who was your primary report with
13   Q   In your experience, in 2005, was it      13   regard to the consulting agreements that we've
14   a standard policy at Magyar or its subsidiaries to 14   talked about today?
15   back-date performance certificates?          15   A   Can you repeat the question, please?
16   A   I did not --                              16   Q   Who was your direct superior
17       MR. KOENIG:  I'm going to object.         17   regarding the consultancy agreements that you
18   I'm going to object to the form of that.      18   testified about drafting today?
19   BY MR. DODGE:                                 19   A   The direct superior at the legal
20   Q   You can answer.                           20   area?
21   A   I did not have experience on that.        21   Q   In the legal department?
22   Q   In your history at Magyar Telekom,        22   A   At that time, with respect to these
23   other than -- other than the contracts we've been 23   matters, it was Mr. Dankó.
24   discussing today, did you ever see a circumstance 24   Q   Thank you.  Now, you testified that
25   in which fully executed -- the same fully executed 25   you had some interactions with my client,
```

33 (Pages 126 to 129)