# Exhibit 25

```
 1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
 2
 3
 4
 5   - - - - - - - - - - - - - - - - - - - - - - - - -
 6   U.S. SECURITIES AND EXCHANGE
     COMMISSION,
 7
 8           Plaintiff,
 9   v.                              Civil Action No.
                                     11-Civ-9645 (RJS)
10
     ELEK STRAUB,
11   ANDRAS BALOGH, and
     TAMAS MORVAI,
12
13           Defendants.
14   - - - - - - - - - - - - - - - - - - - - - - - - -
15
16
17
18           VIDEOTAPED DEPOSITION OF NICK KOS
19              Wednesday, May 28, 2014
20                 AT:  10:02 a.m.
21
22                   Taken at:
23                      The offices of Nabarro LLP
                              Lacon House
24                            84 Theobald's Road
                              London WC1X 8RW
25
```

Nick Kos
London, U.K.
May 28, 2014

Page 38

1    the basis for these objections
2    MR INFELISE: All right Do you want to have a standing
3        relevance objection? Although I don't think it's
4        necessary, because the only purpose here is to object on
5        form
6    MR KOENIG: I think the potential problem is the use to
7        which this deposition and the video and the transcript
8        may put to use
9    MR INFELISE: It's an issue of relevance
10   MR KOENIG: Yeah, but I'm -- I'm not sure we can do
11       a standing objection  I think, for the purposes that
12       this tape or transcript may be used, we have to object
13       on a question-by-question basis
14         So I understand and appreciate your willingness to
15       do that; in the normal course of things, it would be
16       fine  But given the way this matter may proceed, and
17       the way the trial may proceed, and the use to which this
18       transcript and/or video may be put, I think we have to
19       object on a question-by-question basis
20   MR DODGE: Now, why is that exactly? I mean, under the
21       federal rules --
22   MR INFELISE: Excuse me one second  Let's take a break; go
23       off the record
24   VIDEOGRAPHER: Going off the record at 20 to 11
25         Recording has stopped

Page 39

1          (A break was taken.)
2    VIDEOGRAPHER: We're back on the record at 10:54.
3    MR. INFELISE: First let me state that we have discussed the
4        issue of objections to reference to Montenegro with the
5        defense, and we've agreed and recognized that they have
6        a standing objection to relevance, and we agree that
7        preserves any objection they might have to relevance at
8        a later time.  Is that a fair statement?
9    MR. HILL: That's fine.
10   MR. INFELISE: All right. Thank you.
11   Q. All right, Mr. Kos, before we broke, I'd asked you about
12       two contracts, or you mentioned two contracts, one
13       involving Sigma and one involving Rawleigh. How did you
14       learn of those contracts?
15   A. I learned of those contracts from Mr. Trow.
16   Q. And what did Mr. Trow tell you?
17   A. Mr. Trow told me he was concerned about those two
18       contracts.
19   Q. Did he say why he was concerned about them?
20   MR. HILL: Objection.
21   A. He did.
22   BY MR. INFELISE:
23   Q. What did he tell you?
24   A. He told me he was concerned about the size of the
25       contracts, and the counterparties to the contracts.

Page 40

1    MR. KOENIG: I'm sorry, size of what?
2    A. Size, financial size.
3    BY MR. INFELISE:
4    Q. And the counterparties; correct?
5    A. And the counterparties.
6    Q. What did you do when Mr. Trow brought your attention --
7        to your attention the Sigma and Rawleigh contracts?
8    A. I beg your pardon? What did I do when it was --
9    Q. What did you do, yes, sir.
10   A. -- brought to my attention?
11         We -- we discussed those contracts. I asked them
12       to -- to do some more research into those contracts, and
13       I also had a conversation with their forensic people and
14       asked them to do some research into the counterparties.
15   Q. Did you actually see either the Rawleigh or Sigma
16       contracts?
17   A. I did not see those contracts at that point in time,
18       I don't believe.
19   Q. All right. Do you recall approximately the point in
20       time when Mr. Trow brought these contracts to your
21       attention?
22   A. Very early January.
23   Q. Of --
24   A. 2006.
25   Q. 2006; okay.

Page 41

1    MS. FRIED: I'm sorry, I -- I didn't hear that.
2    WITNESS: "Very early January 2006."
3    BY MR. INFELISE:
4    Q. Sir, I'm going to show what we've previously marked as
5        plaintiff's exhibit number 73 and ask you to take
6        a moment and look through it.
7          Have you had a chance to look at exhibit number 73,
8        Mr. Kos?
9    A. Yes.
10   Q. Do you recognize the document?
11   A. Yes.
12   Q. What is it?
13   A. It's a consultancy agreement between Telekom Montenegro
14       and Sigma Inter Corp.
15   Q. Do you recall whether this is the agreement,
16       consultancy agreement, that Mr. Trow brought to your
17       attention back in January 2006?
18   A. It would appear to be, yes.
19   Q. All right. And did you ultimately obtain a copy of this
20       contract to review yourself?
21   A. I may well have. I can't remember exactly when that
22       would have been or in what detail I reviewed that
23       contract.
24   Q. All right. If you would turn to the -- excuse me; it's
25       the third page of the document. The Bates number, as

11 (Pages 38 to 41)

Page 50

1   Q. Did you attempt to obtain a copy of the report from
2      Mr Morvai?
3   A. Yes.
4   Q. Do you recall approximately when that was?
5   A. Within a number of days, I believe, of the initial
6      conversation that I had with Mr. Trow. So
7      early-to-mid-January 2006.
8   Q. All right. And were you able to obtain a copy of the
9      report from Mr. Morvai?
10  A. No.
11  Q. Did you speak with Mr. Morvai concerning the report?
12  A. Yes.
13  Q. And do you recall the circumstances under which you were
14     able to actually make contact with Mr. Morvai?
15  A. Yes, I -- I do. It's -- it's somewhat hazy, but
16     I recollect that subsequent to my meeting with the CFO,
17     I was told that Mr. Morvai would -- would arrange for me
18     to receive a copy. I believe we had some contact
19     regarding the timing of -- of the arrival of that report
20     in Budapest. We agreed, I believe, on a -- on a time
21     when that would be available.
22        I was told then that Mr. Morvai was out of the
23     office for a week, I believe. I went -- I was in the
24     building, on that day, I went to his office. His
25     assistant, I think, either told me at that point of time

Page 51

1      or previously that he was out of the office for a week.
2      I noticed that his computer was on in his office.
3         I also had been talking to one of the other
4      financial people, who was at, I believe, an all-staff or
5      a senior management conference day; he told me
6      Mr. Morvai was there.
7         As I was leaving the building, he came back into --
8      into the building.
9   Q. "He" being -- who?
10  A. Mr. Morvai.
11        I asked him about the report, and he told me that
12     the report had been sent back to Montenegro because
13     there was an investigation about to be started.
14  Q. So Mr. Morvai did not provide you a copy of the report?
15  A. No.
16  Q. Did you ever get a chance to see the report?
17  A. Yes.
18  Q. Do you recall when that was?
19  A. Some weeks afterwards, I believe, I received a copy of
20     -- of the report from the investigation team, or --
21     through the -- the audit committee.
22  Q. Did you get a chance to actually read through the
23     report?
24  A. Yes.
25  Q. What was your reaction to the report?

Page 52

1   A. The report was -- was, from my perspective, quite
2      limited in size. It seemed to be quite straightforward
3      information, so I passed it to one of my colleagues to
4      review.
5   Q. All right. After you learned of the Sigma and the
6      Rawleigh contracts, did you have any discussions with
7      other individuals at Magyar concerning those two
8      consultancy agreements?
9   A. Yes.
10  Q. Who?
11  A. After internal consultation with our risk management and
12     our forensic people, it was decided that I should
13     discuss the matters with the chief financial officer of
14     Magyar -- Magyar Telekom.
15  Q. And at that time, in January 2006, who was the chief --
16  A. Klaus --
17  Q. -- financial officer?
18  A. Sorry.
19        Dr. Klaus Hartmann.
20  Q. All right. And did you discuss those contracts, the
21     Rawleigh and Sigma contracts, with Mr. Hartmann?
22  A. Yes.
23  Q. What did you say?
24  A. I beg your pardon?
25  Q. What did you tell him?

Page 53

1   A. I expressed my concerns about these two contracts and
2      the nature of them, the matters that I referred to
3      earlier. I expressed my surprise that -- that the
4      subsidiary would be engaging outside parties to perform
5      some of those activities, when -- when our understanding
6      was internally, within the Group and within the Deutsche
7      Telekom Group, there were significant capabilities
8      regarding this sort of research and -- and so on.
9         I expressed -- and I'm not sure whether at that
10     point in time I already had -- I didn't have a review of
11     the -- I didn't have the report; so that was later on.
12        And -- and generally, we expressed concern about the
13     level of authorization that was related to those
14     contracts, because they had been authorized by senior
15     officers of the group, through their relationship to --
16     to the Montenegro companies in their capacity,
17     I believe, as board members.
18        And also we were aware of -- of senior officers
19     being present at the meeting when they were approved,
20     so -- so that added to the -- the concern. Dr. Hartmann
21     accepted our concerns and -- and expressed surprise that
22     the Montenegrin companies were making such expenditures
23     when they'd recently asked for funding to pay for some
24     other issues that they -- that they had.
25  Q. Now, I think you said it was your understanding that

Nick Kos                                                                May 28, 2014
London, U.K.

Page 54

1  senior officers of Magyar were present when the -- these
2  contracts were authorized?
3  A. Yes.
4  Q. And do you know what senior officers were present?
5  A. Tamas Morvai was a member of the board and signed the
6     contract, as we've seen. I remember that Zoltan
7     Tisza, I think, who was a senior officer of the group,
8     was also on the board. I recollect that Andras Balogh,
9     I believe, may have been at this meeting, if I am not
10    mistaken, and I believe the CEO of the Magyar -- of the
11    Hungarian mobile business, of the Magyar Telekom mobile
12    business, was also a member of the board, if I correctly
13    recollect.
14 Q. If you look at plaintiff's exhibit number 74, the
15    contract between Rawleigh Trading and Monet. And if
16    you'd look at page 6, it's Bates-numbered
17    MT DOJ/SEC005370. The two signatures appear on behalf
18    of -- I guess TCG; one is Mr. Ivanovic, and the other is
19    Mr. Obradovic. So Mr. Morvai didn't sign this contract?
20 A. That's correct.
21 Q. When you said that you were -- talked about at least one
22    of the senior members authorizing this, were you
23    referring to plaintiff's exhibit number 73, the contract
24    with Sigma?
25 A. In terms of signing the contract, that's correct, yes.

Page 55

1  Q. Yes, sir. All right.
2       Other than Mr. Hartmann, did you discuss the Sigma
3     and Rawleigh contracts with any other of the officers of
4     Magyar Telekom?
5  A. The initial meeting was -- was with Dr. Hartmann.
6     I think a day or two after that, we met with the
7     chairman of the audit committee, and I think the head of
8     internal audit of Magyar Telekom.
9  Q. Do you recall, who was the chairman of the audit
10    committee at that time?
11 A. Adam Farkas.
12 Q. Did you have any discussions with Mr. Straub?
13 A. I don't believe I had any discussions with Mr. Straub
14    directly, no.
15 Q. Did you have any discussions with Mr. Balogh concerning
16    the Sigma and the Rawleigh contracts?
17 A. I don't recollect having any such discussions with
18    Mr. Balogh at that time.
19 Q. Other than your contact with Mr. Morvai to obtain a copy
20    of the report from the -- I believe the Rawleigh
21    contract, did you have any other discussions with him
22    concerning the Sigma and Rawleigh contracts?
23 A. I don't recollect any other discussions.
24 Q. Sir, do you recall attending a board meeting of Magyar
25    Telekom in February of 2006?

Page 56

1  A. Yes.
2  Q. And during the course of that meeting, was there any
3     discussion of the Sigma and Rawleigh contracts?
4  A. Yes.
5  Q. And do you recall -- well, let me ask you first: Did
6     you make any comments during that meeting concerning
7     those two contracts?
8  A. Yes.
9  Q. Was there anybody else who spoke at that board meeting
10    concerning those -- the Rawleigh and the Sigma
11    contracts?
12 A. Yes.
13 Q. Do you recall who they were?
14 A. I -- I do clearly recollect Mr. Straub talking about
15    those two contracts.
16 Q. And do you recall what Mr. Straub said concerning the
17    Rawleigh and Sigma contracts?
18 A. Yes.
19 Q. What did he say?
20 A. Mr. Straub mentioned that he had traveled to Montenegro,
21    I think the previous day, or -- or just prior to that,
22    to discuss with the management of the Montenegro
23    companies these two contracts. He explained that the
24    management were extremely concerned; they felt very much
25    threatened by PwC's comments. And he made it very clear

Page 57

1     that -- that he believed that PwC had caused damage to
2     the company by not reporting these contracts earlier.
3  Q. All right. And did you respond to Mr. Straub during
4     that meeting?
5  A. I may well have. I think that's in the minutes.
6     I can't recollect exactly what I said, but I do remember
7     that -- that counsel for the company did respond to
8     Mr. Straub with regard to his statement.
9  Q. And you -- but you say that you also made a statement
10    concerning the Sigma and Rawleigh contracts?
11 A. Yes.
12 Q. Do you recall the substance of those comments?
13 A. Yes. In -- in substance, we -- we explained that we had
14    been made aware of -- of these two contracts because of
15    the high-level nature of -- of people involved with the
16    approval of these contracts; and because of the
17    closeness in the relationship to some of those to the
18    CEO and the senior officers of the company, we didn't
19    believe we were in a position to accept their
20    representation. And so until such time there was
21    clarity around those matters and an appropriate
22    investigation had been carried out, we would not be in
23    a position to sign off on the financial statements.
24 Q. And when you say certain senior members of the company
25    were close to it, which company are you talking about?

15 (Pages 54 to 57)

Alderson Reporting Company
1-800-FOR-DEPO

Nick Kos                                                                                      May 28, 2014
London, U.K.

Page 74

```
 1     the 2005 audit, and of your audit of Magyar, did he ever
 2     tell you that Magyar had decided, intentionally, not to
 3     include signed copies of protocols of cooperation in its
 4     books and records?
 5   MR. HILL:  Objection.
 6   MS. FRIED:  Objection.
 7   A.  No.
 8   BY MR. INFELISE:
 9   Q.  During the course of the 2005 audit of Magyar, did
10     Mr. Straub ever tell that you Magyar intentionally
11     decided not to include copies of protocols of
12     cooperation, plaintiff's exhibits 11 and 12, in its
13     books and records?
14   MS. FRIED:  Objection.
15   A.  No.
16   BY MR. INFELISE:
17   Q.  During the course of the audit of 2005, end-of-year
18     audit of Magyar, did Mr. Balogh ever tell you that
19     Magyar intentionally decided not to include copies of
20     the protocols of cooperation, plaintiff's exhibits
21     11 and 12, in its books and records?
22   MR. HILL:  Objection.
23   A.  No.
24   BY MR. INFELISE:
25   Q.  All right, sir.  If you would now go back to plaintiff's
```

Page 75

```
 1     exhibit 19 and 20, which I believe were the management
 2     representation letters, the first ones I showed you.
 3        Having had a chance to look at plaintiff's
 4     exhibits 11, 12, 13 and 14, sir, did the existence of
 5     those documents and those emails in any way affect any
 6     of the statements that were made by Magyar with respect
 7     to those interim audits in 2005?
 8   MR. HILL:  Objection.
 9   A.  Yes.
10   BY MR. INFELISE:
11   Q.  Are there any specific representations that would be
12     relevant here?
13   MS. FRIED:  Objection.
14   A.  I need to check the date -- it's May 2005, yeah.
15        So, because these existed in the second quarter,
16     then potentially they would have had an impact on the
17     financial statements.
18   BY MR. INFELISE:
19   Q.  "These" being plaintiff's exhibits 11 and 12?
20   A.  11 and 12.
21   Q.  Okay.  Thank you.
22   A.  They may have impact on the financial statements that
23     were referenced in these two representation letters, so
24     both the second quarter and the third quarter of 2005.
25        At the beginning, it talks about:
```

Page 76

```
 1     "... the purpose of determining whether any material
 2     modification should be made to the interim consolidated
 3     financial statements for them to confirm with
 4     International Financial Reporting Standards... "
 5        We -- we were not able to evaluate the impact of --
 6     of these protocols and whether they would have made --
 7     required any modifications to the financial statements.
 8     They should have been evaluated for that purpose.
 9        "We confirm that we are responsible for the fair
10     presentation in the interim consolidated financial
11     statements..."
12        I can't make a determination -- the determination
13     whether or not these protocols would have impacted the
14     fair presentation.
15   Q.  And, sir, what you're reading from is plaintiff's
16     exhibit number 19?
17   A.  Number 19, yes.
18   Q.  Thank you.
19   A.  But similarly, the same clause is in 20.
20   Q.  All right.
21   A.  Unless -- if you want me to go through it separately,
22     I can do that; that's -- that's fine.
23   Q.  Only -- only to the extent that there may be
24     a difference.  Otherwise, you can just indicate that
25     your comments would apply to 19 and 20.
```

Page 77

```
 1   A.  Okay.  Number 2:
 2        "The interim consolidated financial statements
 3     referred to above are fairly presented in conformity
 4     with IFRS."
 5        That may be impacted by the protocols, for the
 6     reasons that we've outlined before.
 7        Number 4 -- I'm ignoring number 3, because we didn't
 8     have any unadjusted differences related to the protocol,
 9     because we didn't review them.
10        Number 4:
11        "[We've] made available to you ...
12        "... All financial records and related data."
13        I believe that this was not provided to us.
14     I believe it should have been provided to us in the
15     normal course of the audit, and -- and the purpose of --
16     I think, clearly, the purpose of this representation in
17     the management representation letter is to ensure that
18     people are reminded -- management are reminded of their
19     responsibility to provide us with -- with that sort of
20     information and data.
21        "There are" -- number 5:
22        "There are no significant deficiencies, including
23     material weaknesses in the design or operation of
24     internal control over financial reporting that are
25     reasonably likely to adversely affect the company's
```

Page 78

1    ability to record, process, summarize and report interim
2    financial data."
3       My understanding is that these documents,
4    11 and 12 --
5  Q. Yes, sir.
6  A. -- were not --
7  Q. The protocols of cooperation.
8  A. -- were not provided to us, but nor were they provided
9    to the finance department of Magyar Telekom, and
10   therefore I think the conclusion is there was
11   a deficiency in the controls which allowed those
12   documents to bypass the normal processes of -- of
13   financial statements preparation.
14      Number 6:
15      "We acknowledge our responsibility for the design
16   and implementation of programs and controls to prevent
17   and detect fraud."
18      I -- I guess that relates back to 5, in terms of the
19   controls being bypassed in this regard, and if they were
20   bypassed by the people who had the responsibility to
21   ensure the controls, then I guess that makes number 6
22   relevant as well.
23      Number 7 is not for my -- for me to determine in
24   this case. It refers back to the representation letter
25   from 2004, but I don't think these contracts were in

Page 79

1    existence at that point in time
2       So from my position, on my brief overview of it, it
3    impacts the representation letter in those respects at
4    least, yes
5  Q  Does the existence of plaintiff's exhibits 11, 12 and 13
6    and 14, that you were not made aware of, affect your
7    assessment of the reliability of the representations
8    that management made in plaintiff's exhibit 19 and 20?
9  MR HILL: Objection
10 A  Yes
11 BY MR INFELISE:
12 Q  I'm now going to show you, sir, what was previously
13   marked plaintiff's exhibit number 15  It's a multipage
14   document  Again, the second and third pages are in
15   Hungarian; the fourth and fifth are in English, what we
16   believe is accurate English translations  And the Bates
17   number is MT-MAK 1049404 to 4906, and MT-MAK 1049404-T
18   to 49406-T
19      And again, I think -- I believe you're looking at --
20   I would direct your attention to the English --
21 A  English, yeah
22 Q  -- translation  Thank you
23      Have you had a chance to look at plaintiff's
24   exhibit number 15, sir?
25 A  Yes

Page 80

1  Q  All right  And would I note the page, MT-MAK 1049404-T,
2    appears to be an email from Mr Balogh to Mr Straub
3       And if you look at the next page, 1049405-T,
4    I direct your attention to the sixth bullet point, which
5    starts:
6       "Question: what to do with the individual
7    payments  "
8       And you'll see a series of other bullet points below
9    this
10 A  Yes
11 Q  Now, let me ask you, sir:  During the course of any of
12   the interim audits of Magyar in 2005, or the end-of-year
13   audit of Magyar in 2005, did Mr Straub ever discuss
14   with you an obligation for Magyar to make a payment of
15   €10 million in three installments?
16 A  No
17 Q  To anyone?
18 MS FRIED: Objection
19 A  No
20 BY MR INFELISE:
21 Q  All right  And during any of the interim examinations,
22   reviews of Magyar's financial statements and the 2005
23   end-of-year audit of Magyar, did Mr Balogh ever discuss
24   with you an obligation by Magyar to make original --
25   payments of €10 million in three installments?

Page 81

1  MR. HILL: Objection.
2  A. No.
3  BY MR. INFELISE:
4  Q. Did either Mr. Balogh or Mr. Straub ever discuss with
5    you in 2005, during any audit, the obligation to make
6    Magyar have -- to make payments to individuals?
7  MS. FRIED: Objection.
8  MR. HILL: Objection.
9  A. No.
10 BY MR. INFELISE:
11 Q. If you will look at the fourth subbullet under the sixth
12   bullet, you'll see that it says:
13      "Payment is conceivable, but we might for example
14   pay 2m EUR, 1m each to a Macedonian and Albanian
15   consultancy firm from Telemacedonia..."
16      Sir, during the course of any of the interim
17   reviews, or the 2005 end-of-year audit, Magyar's
18   financial statements, did Mr. Straub ever discuss with
19   you making payments of €2 million, 1 million each to
20   a Macedonian and an Albanian consultancy firm?
21 MS. FRIED: Objection.
22 A. No.
23 BY MR. INFELISE:
24 Q. And similarly, did Mr. Balogh ever discuss with you,
25   during either an interim review or the 2005 end-of-year

Page 202

1   Q. With regard to White & Case, you said you met with them
2      several times?
3   A. Yeah.
4   Q. Okay. By phone and in person, or just --
5   A. Yeah.
6   Q. -- in person?
7   A. Both, I guess, yeah.
8   Q. Okay. In all the times you were -- did you meet with
9      them in person more than twice?
10  A. Oh, I think so, yes.
11  Q. More than five times?
12  A. I believe so.
13  Q. Okay. When you were meeting with White & Case, were
14     there people from White & Case there taking notes during
15     the meeting? To the extent you recall.
16  A. Certainly in the first interview, when we -- when we
17     talked through the -- the background to --
18  Q. And do you remember when that was?
19  A. Early January 2006.
20  Q. Okay. So when you met with them subsequent to that, do
21     you know if they were --
22  A. I -- I don't -- I don't recall that they were -- they
23     weren't in the context of interviews; it was more in the
24     context of audit committee meetings, briefings on the
25     progress that we're making in regard to --

Page 203

1   Q. I see.
2   A. -- the investigations, et cetera, et cetera.
3   Q. Okay.
4   MR. KOENIG: All right. Could I just have one second.
5         (Discussion off the written record.)
6   MR. KOENIG: I'm 1 minute past your 5 o'clock, but I'm done.
7   A. Thank you. Appreciate it. Thank you.
8   MR. INFELISE: I just have a couple of followup questions,
9      if you don't mind.
10  VIDEOGRAPHER: Going off the record at 2 minutes past 5.
11        Recording has stopped.
12           (A break was taken.)
13  VIDEOGRAPHER: Back on the record at 2 minutes past 5.
14        Examination by MR. INFELISE
15  BY MR INFELISE:
16  Q. Mr. Kos, just a couple of questions.
17     Mr. Straub's counsel asked you some questions about
18     statements you made in 2005 concerning your opinion of
19     Magyar and its procedures. Let me just ask you, sir,
20     was -- when you made those statements, were you aware of
21     the Sigma and Rawleigh contracts?
22  A. No.
23  Q. And when you made those statements, was that before you
24     stated you lost confidence in representations Mr. Straub
25     was making to you?

Page 204

1   A. Yes.
2   Q. And when you made those statements, was that before
3      there was an internal investigation conducted by
4      White & Case?
5   A. Yes.
6   Q. And when you made those statements, was that before you
7      were aware of the findings of that investigation by
8      White & Case?
9   A. Yes.
10  Q. Second, Mr. Straub's counsel asked you some questions
11     about your interaction with Mr. Straub and whether or
12     not you discussed basic procedures and testing
13     procedures. And I'm not sure I recall exactly the
14     questions, but let me ask you this, sir: If you had
15     discussions with Mr. Straub, and he was aware that
16     Magyar intentionally did not include contracts for
17     protocols of cooperation with a foreign government in
18     their books and records, would you have expected him to
19     tell you that?
20  MR. KOENIG: Objection.
21  MS. FRIED: Objection.
22  A. Yes.
23  BY MR INFELISE:
24  Q. And was the existence of protocols and cooperation
25     between Magyar and a foreign government, was that

Page 205

1      information that would have been material to your audit
2      of Magyar?
3   MS. FRIED: Objection.
4   MR. KOENIG: Objection.
5   A. As we've gone through this before, the -- that
6      determination would need to be made, but -- but they
7      would certainly require further investigation and
8      further questions, from our perspective.
9   BY MR INFELISE:
10  Q. And, sir, just to be clear, would the existence of
11     backdated contracts entered into by Magyar's
12     subsidiaries, would the existence of those backdated
13     contracts have been potentially material to the audit of
14     Magyar and its subsidiaries?
15  A. Potentially, but that would be --
16  MR. KOENIG: Objection.
17  MS. FRIED: Objection.
18  MR. HILL: Objection.
19  A. That would be the subject of further investigation, but
20     that would be required, yeah.
21  BY MR INFELISE:
22  Q. And finally, Mr. Kos, would the existence of duplicate
23     contracts, where two subsidiaries of Magyar entered into
24     an identical contract with the same company, on the same
25     date, to provide the same service, would those existence

## Page 206

```
 1    potentially -- would those contracts be potentially
 2    material to the audit of Magyar?
 3  MS FRIED: Objection
 4  MR KOENIG: Objection
 5  A  Subject to further questions and -- and investigation,
 6    yes, potentially, but
 7  MR INFELISE: Thank you, sir  I have no further questions
 8  MS FRIED: I have one more question
 9          Examination by MS FRIED
10  BY MS FRIED:
11  Q  Mr Kos, you were shown several documents today that you
12    said were not provided to you in the context of PwC
13    completing the 2005 audit of Magyar Telekom; is that
14    correct?
15  A  That is correct, yeah
16  Q  Isn't it also the case that you never asked anybody at
17    Magyar Telekom about the contents of any of those
18    documents, or the circumstances under which they may
19    have been created, since they were not provided to you
20    at the time?
21  A  I'm not sure I understand the question  I -- I wasn't
22    aware of the contracts; therefore I -- I couldn't ask
23    the question
24  MS FRIED: I have nothing further to ask
25  MR INFELISE: I have nothing further
```

## Page 207

```
 1      Mr Kos, thank you very much
 2  VIDEOGRAPHER: This is the end of tape 3 in volume 1 of the
 3    deposition of Nicholas Kos  Going off the record at
 4    6 minutes past 5
 5    Recording has finished
 6    (Whereupon the deposition concluded )
```

## Page 208

```
 4          CERTIFICATE OF DEPONENT

 6  I hereby certify that I have read and examined the
 7  foregoing transcript, and the same is a true and
 8  accurate record of the testimony given by me.
 9  Any additions or corrections that I feel are
10  necessary, I will attach on a separate sheet of
11  paper to the original transcript.

                    _____
14            Signature of Deponent

16  I hereby certify that the individual representing
17  himself/herself to be the above-named individual,
18  appeared before me this _____ day of _____,
19  2014, and executed the above certificate in my
20  presence.

                    _____
23       NOTARY PUBLIC IN AND FOR

                    _____
```

## Page 209

```
 1              County Name

 3  MY COMMISSION EXPIRES:
 4          CERTIFICATE OF COURT REPORTER

 6  I, FIONA FARSON, with Alderson Court Reporting, hereby
 7  certify that the testimony of the witness Nick Kos in the
 8  foregoing transcript, taken on Wednesday, May 28, 2014, was
 9  recorded by me in machine shorthand and was thereafter
10  transcribed by me; and that the foregoing transcript is a
11  true and accurate verbatim record of the said testimony.

13  I further certify that I am not a relative, employee,
14  counsel or financially involved with any of the parties to
15  the within cause, nor am I an employee or relative of any
16  counsel for the parties, nor am I in any way interested in
17  the outcome of the within cause.

22  Signed: ........................
23  FIONA FARSON
24  Dated:   Wednesday, May 28, 2014
```