# Exhibit 28

Magyar Telekom



PLAINTIFF'S
EXHIBIT
19
5/11/13

PricewaterhouseCoopers
1077 Budapest
Wesselényi u. 16.

We are providing this letter in connection with your review of the interim consolidated financial statements (balance sheet, income statement, cash flow statement) and the following Deutsche Telekom group reporting packages ("Group reporting package") of Magyar Telekom Rt. and its subsidiaries (the "Company") as of June 30, 2005 and for the six months then ended for the purpose of determining whether any material modifications should be made to the interim consolidated financial statements for them to confirm with International Financial Reporting Standards (IFRS) or with accounting principles generally accepted in the United States of America (USGAAP), as applicable:

- In respect of T-Mobile Hungary as of and for the period ended June 30, 2005 (including balance sheet, profit and loss statement, cash flow statement, notes and disclosures) prepared in accordance with IFRS and USGAAP,
- In respect of Mobimak A.D. as of and for the period ended June 30, 2005 (including balance sheet, profit and loss statement, cash flow statement, notes and disclosures) prepared in accordance with IFRS and USGAAP,
- In respect of Monet D.O.O, Montenegro as of and for the period ended June 30, 2005 (including balance sheet, profit and loss statement, cash flow statement, notes and disclosures) prepared in accordance with IFRS and USGAAP,
- In respect of the TCOM subgroup of the Magyar Telekom Group as of and for the period ended June 30, 2005 (including balance sheet, profit and loss statement, cash flow statement, notes and disclosures) prepared in accordance with IFRS and USGAAP.

We confirm that we are responsible for the fair presentation in the interim consolidated financial statements and the Group reporting packages for the six months ended 30 June 2005 of financial position, results of operations, and cash flows in conformity with generally accepted accounting principles.

We confirm, to the best of our knowledge and belief, as of July 18, 2005, the date of your report, the following representations made to you during your review:

1. The interim consolidated financial statements and the Group reporting packages referred to above have been prepared and presented in conformity with generally accepted accounting principles applicable to interim financial information and on a basis consistent with the corresponding interim period ended June 30, 2004 and, to the degree appropriate, with the audited financial statements and Group reporting packages for the year ended December 31, 2004.





2. The interim consolidated financial statements referred to above are fairly presented in conformity with IFRS. The Group reporting packages referred to above are fairly presented in conformity with IFRS and USGAAP as applied for the purposes of Deutsche Telekom Group accounting policies.

3. The Company has reviewed the Summary of Unadjusted Differences attached to the January 14, 2005 representation letter and its subsequent updates. After consideration of the types and amounts of items included therein, in addition to those items noted during the six months ended June 30, 2005 summarized in the accompanying schedule, the Company believes that the effects of the uncorrected financial statements misstatements are immaterial, both individually and in the aggregate, to the consolidated interim financial statements or Group reporting packages as of June 30, 2005 and for the six months then ended, taken as a whole.

4. We have made available to you:

   a. All financial records and related data.

   b. All minutes of the meetings of stockholders, directors, and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared. All significant board and committee actions are included in the summaries.

5. There are no significant deficiencies, including material weaknesses, in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the company's ability to record, process, summarize, and report interim financial data.

6. We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.

7. We have no knowledge of any fraud or suspected fraud affecting the company involving:

   a. Management;
   b. Employees who have significant roles in internal control over financial reporting; or
   c. Others where the fraud could have a material effect on the interim financial information.

8. We have no knowledge of any allegations of fraud or suspected fraud affecting the company in communications from employees, former employees, analysts, regulators, short sellers, or others.

9. We have reviewed our representation letter to you dated January 14, 2005, with respect to the audited financial statements for the year ended December 31, 2004. We now confirm that those representations, to the degree appropriate, apply to the interim consolidated financial statements and Group reporting package referred to above, and incorporate them herein, with the following changes:

2

Confidential Treatment Requested
by Magyar Telekom

Received from Price
Waterhouse Coopers

MT-PWC-REPS-00135



As a result of the continuous revision of the useful life of the Company's assets the lives of certain assets were changed as of January 1, 2005. These assets mainly included ISDN and ADSL equipment, other equipment and vehicles and the change in life resulted in HUF 1,152 million impact on depreciation in the six month period to June 30, 2005. We believe the revised lives appropriately reflect the expected useful economic lives of these assets.

The following changes happened in the investments of the Group through to June 30, 2005:

Magyar Telekom Rt. acquired 76.53% in Telekom Crne Gore in the course of the privatisation tender and thereafter. Telekom Crne Gore owns 100% of the share capital of Monet d.o.o. the Montenegro mobile company, 100% of the share capital of Internet Crna Gora, and 52% of the share capital of Montenegrocard.

We believe that the companies we acquired in Montenegro are appropriately consolidated as of June 30, 2005 on the basis that the Group acquired control over 73,04% of the shares on March 29 2005 by closing the transaction, fully paying the purchase price and acquiring rights to those shares. Additional 3.49% of the shares were acquired from minority owners in the period 1 April 2005 and 30 June 2005. The Company does not have any capital expenditure commitments either directly or through the entities in Montengro as a result of its shareholders agreement with the government of Montenegro or purchase agreements with the minority shareholders. The Company is not subject to any penalty in respect of non-fulfillment of any capital expenditure targets of the entities in Montenegro. Furher, we are not aware of any contingent liabilities or other adjustments associated with the entities in Montenegro requiring modifications to the interim consolidated financial statements or the Group reporting packages. The impact of recent modifications of interconnect rates in Montenegro are appropriately reflected in the interim consolidated financial statements.

On January 27, 2005 we sold our subsidiary Telit to DT Immobilien which provides real estate management services to the Group under the name DTI Hungary. We believe that DTI Hungary is appropriately not consolidated into the Magyar Telekom Group on the basis that:

- Magyar Telekom does not have any ownership direct, or indirect

- Magyar Telekom is not the only customer of DTI Hungary and already in the first year there will be at least appr. 30% revenue from other clients the ratio of which is expected to grow

- This is not Magyar Telekom's core business while it is that of DTI and for them it is a strategy to expand into this market and grow further

Confidential Treatment Requested
by Magyar Telekom

Received from Price
Waterhouse Coopers

MT-PWC-REPS-00136



- Magyar Telekom does not have any representation in board, supervisory board, management or any other decision making body or Magyar Telekom is not be involved in the management of the Company in any other way.

- Any profit above the 5% target ratio will be shared whereby 60% will go to DTI Hungary, ie. DTI Hungary will get the majority of the benefits of any savings, efficiencies achieved.

- While there is a volume based gain share (where Magyar Telekom would get 75%) it is difficult to measure and is not considered to be relevant and likely that this will be applied in practice.

- The termination costs of the employees performing tasks related to Magyar Telekom are covered by Magyar Telekom, however, these are likely to arise as a result of a decrease in business volume with Magyar Telekom in which case those would have been incurred by Magyar Telekom without the outsourcing arrangement. Management and employees transferred are not guaranteed a return to Magyar Telekom later on, and management is not compensated.

- While there is a minimum fee which is guaranteed by Magyar Telekom in the contract in practice it is unlikely that this will be applied for the following reasons:

1. There is a real strategic and business interest of DTI Hungary to be profitable and grow
2. The 3% efficiency improvement in each  year in the future is regarded as a target because only if it is met by DTI Hungary will enable Magyar Telekom to achieve its own efficiency and business targets.  The 3% will not be achieved just by making the minimum business and profit, ie.  if DTI Hungary only achieves 150 million or less in profit it automatically would mean that it failed to reach the 3% target and they immediately risk losing the Magyar Telekom contract (as in this case Magyar Telekom can terminate it with immediate effect).

On 31 March, 2005, Magyar Telekom Rt. established EurAccount, the share service center of Magyar Telekom Group with a subscribed capital of HUF 450 million. Magyar Telekom's share of ownership is 100% since establishment.

There have been no other changes in the entities that are controlled and consolidated by the Company since December 31, 2004. There are no other entities that are controlled and should be included as part of the consolidated group as of June 30, 2005 or otherwise disclosed.

4

Confidential Treatment Requested
by Magyar Telekom

Received from Price
Waterhouse Coopers

MT-PWC-REPS-00137



As of February 22, 2005, the General Meeting approved the rebranding of Matáv to Magyar Telekom. The rebranding started in May 2005 and is expected to be completed by December 31, 2005. It has been agreed that Deutsche Telekom supports the rebranding by reimbursement of the expenditures up to the amount of EUR 35 million. The impact of rebranding on the consolidated interim financial statements as of June 30, 2005 was the following:

> HUF 4,311 million of expenses were accounted for with the related reimbursement of HUF 4,311 million shown gross in the income statement under IFRS. In the T-Com USGAAP Group reporting package a similar treatment was applied.

The Company had until 30 September 2004 accrued liabilities of HUF 568 million and receivables of HUF 598 million in relation to the 2004 Fund for Universal Electronic Communications Support (Egyetemes Elektronikus Hírközlési Támogatási Kassza) based on the provisions of the 7/2004 (IV.20.) IHM decree on The Principles and Method of Determining Net Avoidable Costs of Universal Services. During the 4th quarter of 2004 such accruals were fully reversed based on an agreement between the regulatory authority and the majority of the operators, whereby the operators gave up their claims for these compensations in their modified universal contracts. We believe that this continues to be the case for 2005 therefore there was no need to accrue for any potential payments / receipts in this respect.

We consider that interest is correctly capitalized under the allowed alternative treatment of IAS 23 on tangible assets in the course of construction on the basis of expenditure incurred on construction financed by borrowings (excluding specific borrowings), the interest cost of such borrowings and the period of construction. Under USGAAP we believe we have appropriately capitalized interest using a general borrowing and capitalization rate which have resulted in a higher amount of interest to be capitalized than under IFRS.

The following loans were obtained from Deutsche Telekom during the six months period ended 30 June 2005:

| Amount (HUF million) | Interest rate | Maturity | Purpose |
|---|---|---|---|
| 28,000 | Six months BUBOR plus 0,34325 % margin | Oct. 7, 2009 | Acquisition of Telekom Crna Gora |
| 7,866 | One month BUBOR plus 0,475% margin | Dec. 30, 2005 | Financing of rebranding costs |
| 737 | One month BUBOR plus 0,475% margin | Dec.30, 2005 | Financing of rebranding costs |
| 20,000 | 7,5525% p.a. | Jan. 22, 2007 | Loan repayment, refinancing |
| 20,000 | 7,614% p.a. | May .29, 2007 | Loan repayment, refinancing |
| 20,000 | 7,447 % p.a. | Dec. 4., 2007 | 2004 dividend financing |
| 20,000 | 7,533% p.a. | Oct. 7., 2009 | 2004 dividend refinancing |

5



Management believes that the new loans were raised at terms that were equivalent to market terms at the time of the execution of the respective transactions.

The consolidated interim financial statements include a deferred tax asset of HUF 13,030 million in relation to tax losses carried forward and development tax incentives. We believe that this asset is recoverable through appropriate measures resulting in sufficiently positive tax base.

TMH exploited the opportunity proven by the Act on Corporate tax and Dividend tax of claiming the Development Tax Incentive on wideband Internet projects of 2005 from Ministry of Finance. Respecting that TMH's claim has not been considered until the deadline of statement preparation, TMH has incorporated the UMTS investments in the books in full amount, not decreased by the expected amount of Development Tax Incentive.

*Contingent liabilities*

Revenues (after certain deductible expenses) are subject to local tax at a maximum of 2% tax rate based on the districts and counties they are derived from in the territory of Hungary. An investigation by the Budapest tax authorities questioned the allocation of revenues between different territories by T-Mobile Hungary. An audit of local taxes for the years 1996-2001 was initiated by the Budapest Municipality in 2002. The Budapest Municipality in its report challenged the allocation method of T-Mobile Hungary for local taxes. Based on the final resolution of the Budapest Municipality a tax deficiency of HUF 1,197 million, HUF 419 million tax penalty and HUF 533 million late payment interest were direct debited from the bank account of T-Mobile Hungary in December 2003. T-Mobile Hungary appealed against the decision and initiated a court proceeding regarding the basis of allocation of local tax. On 17 May 2005 the Metropolitan Court refused the appeal which decision is legally binding and enforceable.

Taking the consequences of the court decision the T-Mobile Hungary submitted closing tax declarations to all concerned municipalities and requested them to refund the tax amounts paid to them during the tax-years of 1998-2005.

In the meantime the Budapest Municipality started another tax revision for the period of 2002-2003 which was suspended for the time of court proceedings. After the unfavorable refusal it is expected to close the revision stating a tax deficiency of HUF 519 million, a tax penalty of HUF 181 million and a late payment interest of HUF 164 million. Based on this calculation a provision of HUF 864 million was set up as of 30 June 2005.

T-Mobile Hungary also considered the amounts recoverable from other municipalities (HUF 2,258 million), and preparing for the expectable losses of non-payment or late payment set up a loss of value in receivables of HUF 248 million.

6

Confidential Treatment Requested
by Magyar Telekom

Received from Price
Waterhouse Coopers

MT-PWC-REPS-00139



Several litigations have been initiated against T-Mobile Hungary for compensation for loss of value of real estates caused by base stations installed on neighboring sites. As it was considered probable that these proceedings will result in a loss a provision of HUF 505 million was made as of 30 June 2005.

Maktel introduced retail ADSL service at the end of 2003. Based on the request of two major ISPs the Monopoly Authority initiated a procedure and issued a resolution against Maktel, Maktel was obliged to stop selling retail ADSL until wholesale ADSL is officially offered to all ISPs. Maktel's appeal was refused by second instance (Minister of Economy) on which Maktel filed a complaint with the Supreme Court. In the meantime Maktel officially offered wholesale ADSL to all ISPs. Referring to this case ON.net, one of the biggest ISPs filed a complaint to the Primary court asking for damages in the amount of EUR 2.1 million and issuing an interim measure for stopping future sales of Maktel retail ADSL. The court refused the interim measure on 29 July 2004. As of 30 June 2005 no provision was set up for this case as Maktel will most probably win the case.

To the best of our knowledge and belief, no events have occurred subsequent to the interim balance sheet date and through the date of this letter that would require adjustment to the aforementioned interim consolidated financial statements and Group reporting packages.

_19. 07. 2005._

Straub Elek
**Chief Executive Officer**

_19-07-05_

Dr. Klaus Hartmann

**Chief Financial Officer**

7

Confidential Treatment Requested
by Magyar Telekom

Received from Price
Waterhouse Coopers

MT-PWC-REPS-00140