# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

No. 11 Civ. 9645 (RJS)

_____

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

VERSUS

ELEK STRAUB, TAMÁS MORVAI, AND ANDRÁS BALOGH,

Defendants.

_____

OPINION AND ORDER
September 30, 2016

_____

RICHARD J. SULLIVAN, District Judge:

The Securities and Exchange Commission (the "SEC") brings this action against three former executives of Magyar Telekom, Plc. ("Magyar"), a Hungarian telecommunications company, alleging that Defendants (1) offered or paid bribes to foreign officials in violation of the anti-bribery provisions of the Foreign Corrupt Practices Act (the "FCPA"), 15 U.S.C. § 78dd-1, (2) aided and abetted violations of the same provisions, (3) aided and abetted Magyar's failure to maintain accurate books and records and sufficient internal controls in violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78m(b)(2)(A)–(B), (4) falsified Magyar's books and records in violation of Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and SEC Rule 13b2-1, 17

C.F.R. § 240.13b2-1, and (5) made false or misleading statements to an accountant or auditor in violation of SEC Rule 13b2-2, 17 C.F.R. § 240.13b2-2. Now before the Court are Defendants' motion for summary judgment on all of the SEC's claims and the SEC's cross motion for partial summary judgment. For the reasons that follow, the Court grants both motions in part and denies both in part.

## I. BACKGROUND

This action centers on an alleged scheme in which the Defendants – Elek Straub, Tamás Morvai, and András Balogh – offered or paid bribes to Macedonian government officials in exchange for favorable treatment for Magyar's Macedonian subsidiary. At this stage in the litigation, the parties agree that, for purposes of their cross motions for

summary judgment, there remain disputed issues of fact as to the alleged bribery scheme. Accordingly, neither the SEC nor Defendants seek summary judgment on the merits of the alleged violations of the FCPA's anti-bribery provisions. Rather, their motions focus on the issues of personal jurisdiction, use of an instrumentality of interstate commerce, the statute of limitations, and portions of the SEC's non-bribery claims. Nevertheless, to provide background and context for the motions at issue, the Court includes a brief summary of the allegations and claims made by the SEC.

A. The Alleged Bribery Scheme[1]

During the period relevant to this action, Straub, Balogh, and Morvai were Hungarian citizens residing in Hungary who served, respectively, as CEO, Director of Central Strategic Organization, and Director of Business Development and Acquisitions at Magyar, a Hungarian telecommunications company then trading publicly on the New York Stock Exchange and a registered issuer with the SEC. (SEC 56.1 ¶¶ 1–4, 10–11.) The SEC claims that, from December 2004 through June 2006, Defendants engaged in a scheme to bribe public officials in Macedonia to mitigate the effects of that country's new telecommunications legislation – legislation that would allow Macedonian regulatory authorities to license a new mobile telephone business that would compete with MakTel, a telecommunications services provider in Macedonia jointly owned by Magyar and the Macedonian government. (Compl. ¶¶ 2, 14, 17, 19; SEC 56.1 ¶¶ 5–7.) In exchange for bribe payments, Macedonian government officials purportedly would adopt regulatory changes favorable to MakTel and prevent a new competitor from entering the market. (Compl. ¶ 2; SEC 56.1 ¶ 62.) In furtherance of this scheme, Magyar allegedly retained a Greek lobbying consultant to facilitate negotiations with the Macedonian officials on Magyar's behalf. (Compl. ¶ 19; SEC 56.1 ¶¶ 83–97.) The negotiations allegedly resulted in two secret agreements executed around the end of May 2005: (1) the "Protocol of Cooperation," signed by Straub and Balogh in late May 2005, which outlined the regulatory actions that would be taken for Magyar's benefit in exchange for its agreement to have MakTel pay a dividend and to have another subsidiary expand into Kosovo (Dodge Decl. Ex. 1; SEC 56.1 ¶¶ 57–58), and (2) the "Non Paper," which promised 19.5 million Euros in bribes to Macedonian officials (Dodge Decl. Ex. 2). The SEC alleges that only Magyar's Greek consultant kept signed copies of the Protocol; Magyar did not, and the Macedonian officials who signed the documents did not record them as official government documents as they were

_____

[1] The Court draws the following information from the parties' Local Civil Rule 56.1 statements and counterstatements submitted in connection with their cross motions for summary judgment (Doc. Nos. 231 ("SEC 56.1"), 234 ("Def. 56.1"), 243, 245 ("Def. Counter 56.1")), as well as the SEC's second amended complaint (Doc. No. 213 ("Compl.")) and certain of Magyar's SEC filings, which are cited for background purposes only. Where the Court's rulings on the parties' motions rely on undisputed facts, those facts are set forth in the discussion section below. The Court has also considered in its analysis the SEC's memorandum of law in support of its motion (Doc. No. 230 ("SEC Mem.")), Defendants' memorandum in opposition (Doc. No. 244 ("Def. Opp'n")), the SEC's reply (Doc. No. 247 ("SEC Reply")), Defendants' memorandum of law in support of their motion (Doc. No. 235 ("Def. Mem.")), the SEC's memorandum in opposition (Doc. No. 241 ("SEC Opp'n")), Defendants' reply (Doc No. 249 ("Def. Reply")), and the declarations and exhibits submitted in connection with those briefs, including certain exhibits attached to the Declaration of Robert I. Dodge dated October 5, 2015 (Doc. No. 232 ("Dodge Decl."). The Court has also reviewed the transcript of the August 24, 2016 oral argument on the parties' motions. (Doc. No. 259 ("Tr.").)

required to do under Macedonian law. (Compl. ¶¶ 21–22; SEC 56.1 ¶¶ 65–69.)

Defendants allegedly paid Macedonian officials 4.875 million Euros in bribes before the scheme came to an end in 2006. (Compl. ¶ 2.) According to the SEC, at Balogh's suggestion (*id.* ¶ 28), Defendants made these payments through "sham" consulting contracts that each of the Defendants authorized Magyar to enter into with its Greek consultant, under which Magyar was to pay the consultant "success fees" for work that was never performed, or for which the "success" criteria had been met before the contract was executed. (*Id.* ¶¶ 29, 32; SEC 56.1 ¶¶ 83–97.) The Greek consultant would then forward the payments on to Macedonian officials. (Compl. ¶ 29.)

As further explained below, the SEC alleges that Defendants were able to conceal the bribe scheme until 2006 by maintaining inaccurate books and records that did not reflect the true nature of the consultancy contracts (*id.* ¶ 4) or the existence of the Protocol of Cooperation (SEC 56.1 ¶¶ 68–71) by submitting false management representation letters to Magyar's external auditor, PricewaterhouseCoopers, ("PwC") (Compl. ¶¶ 38–45), and by submitting false Sarbanes-Oxley Act certifications in connection with Magyar's SEC filings (SEC 56.1 ¶¶ 24–25). The SEC contends that, "[h]ad Magyar Telekom's auditors known these facts, they would not have accepted the management representation letters and other representations provided by Straub" and would not have "provided an unqualified audit opinion to accompany Magyar Telekom's annual report on Form 20-F" filed on May 11, 2005. (Compl. ¶ 45; SEC 56.1 ¶¶ 72–82, 98.)

## B. Representations to PwC and SEC Filings

Between 2004 and 2006, Magyar was an issuer of American depository receipts (securities traded on United States exchanges that represent a specified number of shares of a foreign company's stock) and made regular public filings with the SEC on its EDGAR website. (SEC 56.1 ¶¶ 11–13.) Among these was Magyar's annual report on Form 20-F for the fiscal year ended December 31, 2004, which Magyar filed on May 11, 2005 – well after the commencement of the alleged bribery scheme and only weeks before Defendants finalized the Protocol of Cooperation. Annual Report (Form 20-F) (May 11, 2005) (the "Annual Report"). Attached to the Annual Report was a certification by Straub pursuant to Section 302 of the Sarbanes-Oxley Act, dated May 11, 2005, which stated:

> 1. I have reviewed this annual report on Form 20-F of Magyar Telekom; . . .
>
> 5. The [c]ompany's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the [c]ompany's auditors and the audit committee of [c]ompany's board of directors (or persons performing the equivalent function):
>
> a.) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the [c]ompany's ability to record, process, summarize and report financial information; and

b.)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the [c]ompany's internal control over financial reporting.

*Id.* Ex. 12.1, *cited in* SEC 56.1 ¶ 24.

The Annual Report also attached an audit report from PwC, dated February 21, 2005, in which PwC opined that the Annual Report presented Magyar's financial position and results "fairly, in all material respects."  Annual Report at F-2.  In addition, the Annual Report attached a consent form from PwC, dated May 11, 2005, in which PwC consented to Magyar's filing of PwC's audit report with its Annual Report.  *Id.* Ex. 14.1.  In the months between the conclusion of the reporting period (December 31, 2004) and the filing of the Annual Report and these attachments (May 11, 2005), Magyar's management submitted letters to PwC, in which Straub and Magyar's chief financial officer made representations to PwC in connection with PwC's audit.  (*See* SEC 56.1 ¶¶ 16–23.)  In the first of these letters, dated January 17, 2005, Straub represented that, as of January 14, 2005, "[w]e are not aware of any violations or possible violations of laws or regulations the effects of which should be considered for disclosure in financial statements," "[w]e have no knowledge of any fraud or suspected fraud affecting the company" involving "management" or "employees who have significant roles in internal control over financial reporting," and "[w]e have disclosed to you all significant facts relating to any frauds or suspected frauds known to us that may have affected [Magyar]."  (*Id.* ¶ 17.)  On February 11, February 28, April 27, and May 11, 2005, Straub and Magyar's CFO submitted additional letters to PwC that reaffirmed

these representations as of each of those dates.  (*Id.* ¶¶ 19, 20, 22, 23.)

Moreover, other Magyar officers made representations to Magyar's accounting department in support of the representation letter sent to PwC.  Pertinent here, on April 27, 2005, in response to a request from Magyar's accounting department for a certification as part of a representation letter to PwC, Balogh sent an email containing his representation that, "[a]s of April 27, 2005, there are no reportable post balance sheet events related to my area of responsibility, i.e.[,] no material events occurring after December 31, 2014, having a material impact on my company's financial position."  (*Id.* ¶¶ 34–35.)  Similarly, on May 9, 2005, in response to a request from Magyar's accounting department for a certification in connection with the "Management Representation Letter for 20F 2004," Balogh sent an email in which he attested to the content of the representation letter.  (*Id.* ¶¶ 36–37.)

In addition to the Annual Report, Magyar filed quarterly reports with the SEC on Form 6-K, and although PwC did not audit these interim reports, Defendants continued to make representations to PwC and supporting representations in connection with the reports through 2005 and into 2006.  For instance, in support of Magyar's third quarter 2005 report, Straub and Magyar's CFO signed a letter to PwC on October 17, 2005 representing that Magyar's "interim consolidated financial statements . . . are fairly presented in conformity" with applicable accounting standards and that Magyar had "made available to [PwC] . . . [a]ll financial records and related data."  (*Id.* ¶ 27.)  As with his January 2005 letter, Straub also represented that he was not aware of any fraud, and he reaffirmed and incorporated by reference the representations made in his January 2005

letter with respect to Magyar's Annual Report. (*Id.*) Likewise, on October 14, 2005, both Balogh and Morvai made supporting representations. (*Id.* ¶¶ 42–43, 51.) Straub and Magyar's CFO then reaffirmed the accuracy of the company's financial disclosures in a letter to PwC dated November 7, 2005. (*Id.* ¶ 28.) Days later, on November 9, 2005, Magyar filed its third quarter 2005 earnings report with the SEC. *See* Report of Foreign Private Issuer (Form 6-K) (Nov. 9, 2005) ("3Q 2005 Quarterly Report"). This report and Magyar's Annual Report, including Straub's certification and PwC's audit opinion and consent form, remain available to the public today on the SEC's EDGAR website. *See* SEC, EDGAR, https://www.sec.gov/edgar.shtml (search for CIK 1047564).

C.  2006–2011

On February 13, 2006, Magyar announced that it was "currently inquiring [into] certain contracts . . . entered into by one of its subsidiaries to determine whether they ha[d] been entered into in violation of company policy or applicable law or regulation." Report of Foreign Private Issuer at 14 (Form 6-K) (Feb. 13, 2006). On March 30, 2006, Magyar announced that the investigation was ongoing and "being conducted by an independent law firm and supervised by the [a]udit [c]ommittee," that PwC would not complete its audit until Magyar completed the inquiry, and that, as a result, the company's annual meeting would be delayed. Report of Foreign Private Issuer at 2 (Form 6-K) (Mar. 30, 2006). A month later, Magyar announced that its annual meeting would be further delayed due to the ongoing investigation, that the company's board of directors "ha[d] decided to suspend certain employees," and that Magyar "ha[d] notified the Hungarian Financial Supervisory Authority, the [SEC,] and the U.S. Department of Justice of the

investigation" and planned to cooperate with those authorities. Report of Foreign Private Issuer at 2 (Form 6-K) (Apr. 26, 2006).

On July 3, 2006, Magyar filed a notice indicating that it would not be filing its annual report on time. Notification of Late Filing (Form 12b-25) (July 3, 2006). The notice discussed the ongoing investigation and disclosed that, "[p]ending the investigation," Magyar's board would not approve the company's annual financial statements and PwC would not issue an audit opinion. *Id.* As a result, Magyar did not expect its annual report to be completed on time and could not predict "when [the] investigation w[ould] be completed or [when] the[] financial statements w[ould] be available." *Id.* On December 5, 2006, Magyar announced that Straub had resigned. Report of Foreign Private Issuer at 2 (Form 6-K) (Dec. 5, 2006). Magyar continued to file updates as the investigation progressed. *See, e.g.*, Report of Foreign Issuer, interim management report at 1–3 (Form 6-K) (Feb. 25, 2010).

On December 29, 2011, the United States Department of Justice announced that Magyar and Deutsche Telekom AG, a German telecommunications company and majority owner of Magyar, had agreed to enter into a deferred prosecution agreement and pay a combined $63.9 million in criminal penalties to resolve FCPA charges set forth in an information filed in the United States District Court for the Eastern District of Virginia. Press Release, U.S. Dep't of Justice, Magyar Telekom and Deutsche Telekom Resolve Foreign Corrupt Practices Act Investigation and Agree to Pay Nearly $64 Million in Combined Criminal Penalties (Dec. 29, 2011). The information alleged that, "[d]uring 2005 and 2006, certain senior executives then employed by Magyar Telekom . . . engaged in a course of conduct with consultants, intermediaries[,]

and other third parties, including contracting through sham contracts to pay an aggregate amount of €4.875 million to [shell companies], under circumstances in which they knew, or were aware of a high probability that circumstances existed in which, all or a portion of the proceeds of such payments would be offered, given, promised[,] or paid, directly or indirectly, to Macedonian [g]overnment [o]fficial[s] . . . [and] Macedonian [p]olitical [p]art[ies] . . . with the intention of obtaining business and advantages for Magyar Telekom." Information ¶ 21, *United States v. Magyar Telekom, Plc.*, No. 11-cr-597 (CMH) (E.D. Va. Dec. 29, 2011) (capitalization removed).

D. Procedural History

On December 29, 2011 – the same day that the Department of Justice filed its information and announced its deferred prosecution agreement with Magyar – the SEC initiated this action, bringing claims against all Defendants for:  (1) bribery under the FCPA, (2) aiding and abetting bribery under the FCPA, (3) aiding and abetting Magyar's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, which require issuers to maintain accurate books and records and a sufficient system of internal controls, (4) falsifying books and records in violation of Section 13(b)(5) of the Exchange Act and SEC Rule 13b2-1, and (5) making false or misleading statements to an auditor or accountant in violation of SEC Rule 13b2-2.  (Doc. No. 1.)

On February 8, 2013, the Court denied Defendants' joint motion to dismiss the complaint, *see SEC v. Straub*, 921 F. Supp. 2d 244 (S.D.N.Y. 2013) ("*Straub I*"), and on August 5, 2013, the Court denied Defendants' joint motion seeking certification of an interlocutory appeal of that decision, *see SEC v. Straub*, No. 11-cv-9645 (RJS), 2013 WL 4399042 (S.D.N.Y.

Aug. 5, 2013) ("*Straub II*").   After Defendants answered the initial complaint on April 17, 2013 (Doc. Nos. 58, 59, 60), the parties proceeded to discovery, and on July 17, 2014, the SEC filed its first amended complaint (Doc. No. 155), which Defendants answered on August 4, 2014 (Doc. Nos. 166, 167, 168). On September 1, 2015, the SEC filed its second amended complaint (Doc. No. 213), which Defendants answered on September 18, 2015 (Doc. Nos. 217, 218, 219).  Discovery has concluded.

On October 5, 2015, the parties filed the instant cross motions for summary judgment.   (Doc. Nos. 229, 233.) Defendants' joint motion seeks summary judgment on the grounds that (1) the Court's exercise of personal jurisdiction over them would be constitutionally unreasonable, (2) the SEC cannot establish that Defendants used an instrumentality of interstate commerce with respect to the SEC's first and second claims under the FCPA's anti-bribery provisions, and (3) all of the SEC's claims are time-barred under 28 U.S.C. § 2462.  (Def. Mem. at 1–2.)  The SEC's cross motion seeks partial summary judgment in its favor on the three issues raised by Defendants' motion, namely that (1) the Court may exercise personal jurisdiction over Defendants, (2) Defendants used an instrumentality of interstate commerce with respect to the SEC's bribery claims, and (3) the SEC's claims are not time-barred under 28 U.S.C. § 2462.  (Doc. No. 229.)  The SEC separately asks the Court to grant summary judgment in its favor and declare that (4) Balogh and Morvai violated SEC Rule 13b2-1 by falsifying certain books, records, or accounts of Magyar, and (5) Straub and Balogh violated SEC Rule 13b2-2 by making materially false or misleading statements or omissions to Magyar's auditor.  (*Id.*)  The cross motions were fully briefed by

November 16, 2015 (Doc. Nos. 247, 249), and on July 12, 2016, Defendants submitted a letter notifying the Court of recently decided supplemental authority relevant to their motion (Doc. No. 255). The Court held oral argument on August 24, 2016.

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*,

481 F.3d 141, 148 (2d Cir. 2007). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## III. DISCUSSION

As indicated above, the parties' cross motions overlap with respect to personal jurisdiction, the use of an instrumentality of interstate commerce, and the statute of limitations. The Court will address these three issues first before turning to the SEC's books and records and false statements claims.

### A. Personal Jurisdiction

As plaintiff, the SEC bears "the ultimate burden of proving the court's jurisdiction by a preponderance of the evidence." *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir. 1983). To defeat Defendants' motion for summary judgment for lack of personal jurisdiction, the SEC must put forth "'an averment of facts that, if credited by the trier, would suffice to establish jurisdiction'" over the Defendants. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). By contrast, to prevail on

its own motion on the issue of personal jurisdiction, the SEC's burden is "even greater; [it] must demonstrate that there is no genuine issue as to any material fact on the jurisdictional question." *Beacon*, 715 F.2d at 762.

"A district court must have a statutory basis for exercising personal jurisdiction," be it the forum state's personal jurisdiction rules or a federal statute authorizing personal jurisdiction. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013). Here, the SEC's claims arise under the Exchange Act, "which provides for worldwide service of process and permits the exercise of personal jurisdiction to the limit of the Fifth Amendment's [d]ue [p]rocess [c]lause." *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 487–88 (S.D.N.Y. 2011) (citing 15 U.S.C. § 78aa and *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990)), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012). "The due process test for personal jurisdiction has two related components: the 'minimum contacts inquiry' and the 'reasonableness' inquiry." *Metro Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). Because the Exchange Act extends personal jurisdiction to the limits of the Fifth Amendment's due process clause, "it is not the State of New York but the United States which would exercise its jurisdiction over" Defendants here, *SEC v. Comm. on Ways & Means of U.S. House of Reps.*, 161 F. Supp. 3d 199, 222 (S.D.N.Y. 2015) (brackets omitted) (quoting *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974)), and Defendants thus must have minimum contacts "with the entire United States rather than with the forum state," *Straub I*, 921 F. Supp. 2d at 253; *see also Unifund*, 910 F.2d at 1033 (analyzing contacts with the United States).

Accordingly, the Court "must first determine whether [Defendants] ha[ve] sufficient contacts with the [United States] to justify the court's exercise of personal jurisdiction." *Metro Life*, 84 F.3d at 567. If such contacts exist, the Court must then determine "whether the assertion of personal jurisdiction [would] comport[] with 'traditional notions of fair play and substantial justice' – that is, whether it is reasonable under the circumstances of the particular case." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Defendants concede minimum contacts for the purpose of their motion (Def. Mem. at 4–5 & n.3) and instead argue that the Court's exercising personal jurisdiction over them would nevertheless be constitutionally unreasonable (*id.* at 4). Nevertheless, because the SEC argues on its motion that the Court's exercise of jurisdiction would both be reasonable and satisfy minimum contacts, the Court addresses minimum contacts first, since that analysis informs the reasonableness analysis.

1. Minimum Contacts

Because the language of the Fifth Amendment's due process clause is identical to that of the Fourteenth Amendment's due process clause, the same general principles guide the minimum contacts analysis under both clauses. Thus, even though Defendants' contacts with the entire United States are determinative here of the "minimum contacts" inquiry, the Court conducts the minimum contacts inquiry in accordance with principles developed in cases analyzing personal jurisdiction under the Fourteenth Amendment. In judging minimum contacts under the standard set forth in *International Shoe* and its progeny, courts focus on "'the relationship among the defendant, the forum, and the litigation.'" *Keeton v. Hustler Magazine, Inc.*, 465 U.S.

770, 775 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

The SEC's case is premised on an assertion of specific, rather than general, jurisdiction. (SEC Mem. at 19, 25.) A court may exercise "[s]pecific jurisdiction" where a suit "aris[es] out of or relate[s] to the defendant's contacts with the forum.'" *Metro. Life*, 84 F.3d at 567–68 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 n.8 (1984)). "The crucial question" under the due process analysis "is whether the defendant has 'purposefully avail[ed] itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws, such that [the defendant] should reasonably anticipate being haled into court there." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242–43 (2d Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–475 (1985)); *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (the due process clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit"). The Second Circuit has found this requirement satisfied for purposes of specific jurisdiction where a defendant has "purposefully directed" merchandise toward the forum and its residents, *see Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171–72 (2d Cir. 2010) ("In actually sending items to [the forum], there can be no doubt that [defendant's] conduct 'purposefully directed toward the forum . . . .'"), as well as where a defendant has "purposefully availed" itself of the forum's banking system, *see Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171–72 (2d Cir. 2013) ("It should hardly be unforeseeable to a bank that selects and makes use of a particular forum's banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use."). *See also J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality opinion) ("The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct.").[2]

These principles support finding minimum contacts here as a matter of law. It is undisputed that, during the period of the alleged violations, in the course of preparing Magyar's filings with the SEC, Straub signed management representation letters submitted in connection with PwC's audit of Magyar's financial disclosures and Sarbanes-Oxley certifications that were ultimately filed with those disclosures on the SEC's EDGAR website. (SEC 56.1 ¶¶ 17–29.) It is also undisputed that Balogh and Morvai made representations in support of the management representation letters. (*Id.* ¶¶ 30–56.) Thus, the undisputed facts show that Defendants "followed a course of conduct directed at the society or economy existing within the jurisdiction of [the United States], so that the [United States]

---

[2] In *Chloe* and *Licci*, the Second Circuit drew a distinction between "purposeful availment," which those cases relied on, and the so-called "effects test," which they did not rely on but permits a court to exercise jurisdiction over a defendant who "engage[s] in 'intentional, and allegedly tortious, actions . . . expressly aimed' at residents of the United States." *Licci*, 732 F.3d at 172–73 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)); *see also Chloe*, 616 F.3d at 172. While the facts here arguably also support personal jurisdiction under the effects test, the Court bases its finding of personal jurisdiction on the fact that Defendants purposefully availed themselves of a United States securities exchange to conceal the alleged wrongdoing.

has the power to subject [Defendants] to judgment concerning that conduct." *J. McIntyre Mach.*, 564 U.S. at 883–84.

Without directly challenging the facts surrounding the EDGAR filings and representation letters, Defendants nevertheless argue that the Court cannot find minimum contacts at this stage because the existence of the bribery scheme is disputed, and therefore the Court cannot find as a matter of law that Defendants directed *illegal* conduct toward United States investors. (Def. Opp'n at 13–15.) But this argument conflates proof of minimum contacts with proof of the alleged misconduct arising out of those contacts. To establish the Court's personal jurisdiction, the SEC need only prove Defendants' contacts with the United States and that the suit arises out of or relates to those contacts. *See Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) ("For a [forum] to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum . . . ."); *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016) ("specific (also called 'case-linked') jurisdiction" is available "when the cause of action sued upon arises out of the defendant's activities in a [forum]"); *Metro. Life*, 84 F.3d at 567–68 ("[s]pecific jurisdiction exists when 'a [forum] exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum'" (quoting *Helicopteros*, 466 U.S. at 415 n.8)). The SEC's claims here – that Defendants engaged in a bribery scheme and concealed that scheme from Magyar's investors and auditors by falsifying SEC filings and the company's books and records (Compl. ¶ 45; SEC Mem. at 3) – clearly "arise out of" Defendants' undisputed contacts with the United States, as set forth above, and the SEC is not required to prove those claims before the Court can exercise jurisdiction.

Consequently, the Court has little difficulty concluding that Defendants here had the requisite minimum contacts with the United States to meet the first prong of the due process test for personal jurisdiction.

### 2. Reasonableness

"'Once it has been decided that a defendant purposefully established minimum contacts within the forum . . . , these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.'" *Licci*, 732 F.3d at 170 (quoting *Burger King*, 471 U.S. at 476). "Relevant factors at this second step of the analysis may include: '(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff's interest in obtaining convenient and effective relief.'" *Id.* (quoting *Metro. Life*, 84 F.3d at 568. The parties' arguments on this point center on the SEC's interest in enforcing the federal securities laws versus the burden on Defendants, who reside in Hungary, of having to litigate in the United States.

As the Court noted previously, the United States "has a strong federal interest in resolving this issue here" because "this case was brought under federal law" and "there is no alternative forum available for the government" to enforce the FCPA. *Straub I*, 921 F. Supp. 2d at 259. Thus, any burden that this action has imposed or will impose on Defendants must be considered not only against the Court's finding that Defendants directed allegedly illicit activity toward the United States, but also against the SEC's significant interest in pursuing its claims here. *See SEC v. Dunn*, 587 F. Supp. 2d 486, 510 (S.D.N.Y. 2008) ("The interest of the United States in adjudicating the case

is substantial because there is a need to protect American shareholders and insure the integrity of trading securities [on American stock exchanges]. The SEC has a strong interest in obtaining convenient and effective relief because it is charged with the duty to enforce securities regulations."); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279, 286 (S.D.N.Y. 2000) ("[I]t cannot be gainsaid that nationwide service provisions often are central to major federal regulatory efforts in areas at the core of Congress'[s] power under the [c]ommerce [c]lause, including antitrust and securities regulation. In cases brought under these and comparable statutes, the personal jurisdiction analysis must give appropriate consideration to the strong federal concerns involved." (footnote omitted)).

Moreover, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477; *see also Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 116 (1987) (Brennan, J., concurring) (noting that only in "rare cases" will the "minimum requirements inherent in the concept of 'fair play and substantial justice' . . . defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities"); *Metro Life*, 84 F.3d at 568 ("the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry"). Thus, where a plaintiff has met the minimum contacts requirement, "[t]he reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process . . . because of the strong federal interests involved." *Comm. on Ways & Means*, 161 F. Supp. 3d at 223. "To date, while most courts continue to apply the test as a constitutional floor to protect litigants from truly undue burdens, few . . . have ever declined jurisdiction, on fairness grounds, in such cases." *Id.*

Discovery has produced no basis for altering the Court's prior conclusion that "this is not the rare case where the reasonableness analysis defeats the exercise of personal jurisdiction." *Straub I*, 921 F. Supp. 2d at 259. Defendants argue that litigating this case has been and will continue to be unreasonably burdensome. Specifically, Defendants contend that they have had difficulty obtaining evidence located in foreign jurisdictions, including both documents and deposition testimony. (Def. Mem. at 6–8.) As a "perfect[] illustrat[ion] [of] the unduly burdensome challenges [they] have faced . . . defend[ing] this action in a foreign land," Defendants point to their efforts to depose Slobodan Bogoeski, the former head of Macedonia's secret service and a "key witness" for the SEC. (*Id.* at 7.) Defendants take issue with the facts that the SEC "unilaterally interviewed" Bogoeski before alerting Defendants to his existence, and that Defendants have been unable to take a satisfactory deposition of Bogoeski due to logistical difficulties, including Bogoeski's incarceration in Macedonia on money laundering charges unrelated to this case. (*Id.* at 7–8.) While the Court does not doubt that discovery in this matter "was a costly and time-consuming exercise" (*id.* at 7), the difficulties chronicled in Defendants' briefs do not "present a compelling case" that the Court's assertion of jurisdiction would be unreasonable. *Burger King*, 471 U.S. at 477. As Defendants acknowledge, this litigation involves evidence from many countries, including Macedonia, Hungary, Germany, and Greece. (Def. Mem. at 7.) Defendants tellingly do not argue that

litigating in Hungary, their home country, would have made the deposition of Bogoeski any easier; rather, the reality is that the enforcement of a statute that prohibits bribery of foreign officials produces discovery complexities not present in wholly domestic litigation or more mundane commercial litigation. The mere fact that such complexities existed here does not establish a burden so compelling as to make this the rare case where asserting jurisdiction would be unconstitutional even though Defendants "purposefully . . . directed [their] activities at forum residents." *Burger King*, 471 U.S. at 477.

In addition to discovery burdens, Defendants argue that forcing Defendants to travel to the United States for trial would create an unconstitutional burden. (Def. Mem. 8–9.) As to Balogh and Morvai, Defendants cite nondescript "significant family obligations that prevent them from traveling half way around the world for extended periods of time." (*Id.* at 9.) While the Court understands that traveling for trial is burdensome, Balogh and Morvai are no differently positioned than any other foreign defendant with a family. As to Straub, Defendants argue that requiring him to travel for trial would be constitutionally unreasonable because Straub "is nearly 71 years old," retired, requires "regular treatment" for leukemia, and "has been instructed by his doctors to avoid physical and mental stress." (*Id.* at 8–9.) The SEC disputes these facts on the bases that Defendants submitted no declaration from a health professional and that Straub presently serves as a director and managing partner of a venture capital firm and as president of a yachting association (SEC Opp'n at 12) – positions Defendants argue require very little of Straub's time (Def. Reply at 4–5). Although Straub's circumstances certainly pose a closer question than Balogh's and Morvai's, the Court need not resolve this

factual dispute because any burden on Straub may be "accommodated through means short of finding jurisdiction unconstitutional," *Burger King*, 471 U.S. at 477, such as Straub's appearance at trial via videoconference or the submission of his deposition testimony.

Defendants also argue in their opening brief that the Court's assertion of jurisdiction would be unreasonable because the United States and United States jurors have little interest in a case involving the alleged bribery of Macedonian government officials by Hungarian corporate executives, whereas Hungary and Macedonia have a much greater interest in adjudicating the alleged bribery charges. (Def. Mem. at 9.) However, while it is true that Hungary and Macedonia may have an interest in prosecuting the alleged bribery under their own laws, and courts exercising personal jurisdiction over a foreign defendant should "consider the international judicial system's interest in efficiency and the shared interests of the nations in advancing substantive policies," *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 99 (S.D.N.Y. 2015) (emphasis removed) (citing *Asahi*, 480 U.S. at 115), nothing in Defendants' summary judgment papers suggests that this litigation has interfered or will interfere with any effort by those countries to enforce their own laws. Moreover, as set forth above and argued by the SEC (SEC Opp'n at 8–9), the United States has a considerable countervailing interest in enforcing its own laws to protect United States investors and ensure the integrity of its exchanges – a point Defendants did not contest in their reply brief or at oral argument.

Accordingly, in light of the United States' significant interest in enforcing its laws, the Court finds that the burdens articulated by Defendants, even if supported by undisputed facts, provide no basis for

concluding that the assertion of jurisdiction over Defendants would be unconstitutional. The Court thus grants the SEC's motion for summary judgment on this issue and holds that the Court may exercise personal jurisdiction over Defendants.

## B. Use of an Instrumentality of Interstate Commerce

Defendants next argue that summary judgment in their favor on the SEC's anti-bribery claims is warranted because the SEC cannot prove that Defendants, "in furtherance of" the alleged bribery scheme, "ma[d]e use of the mails or any means or instrumentality of interstate commerce." (Def. Mem. at 10 (quoting 15 U.S.C. § 78dd-1(a)).) Defendants made a similar argument in their motion to dismiss the initial complaint, although at the time the parties' dispute focused on Defendants' requisite states of mind with respect to their use of an instrumentality of interstate commerce. *See Straub I*, 921 F. Supp. 2d at 262 ("[T]he parties dispute whether 15 U.S.C. § 78dd-1(a) requires some element of knowledge or intent with respect to the use of 'the mails or any means or instrumentality of interstate commerce.'"). As set forth in *Straub I*, the Court ultimately interpreted the instrumentality of interstate commerce requirement as a "jurisdictional element" of the statute – for which the SEC need not establish *mens rea* – in light of "the way that courts have interpreted similar provisions in other statutes" such as mail and wire fraud and the securities laws. *See id.* at 263–64 (collecting cases). The Court then held that the SEC had pled the jurisdictional element by alleging that emails attaching drafts of the Protocol of Cooperation and consulting contracts, including "[s]ome" emails "sent or received by [D]efendant Balogh," were "sent from locations outside the United States, but were routed through and/or stored on network

servers located within the United States." (Doc. No. 1 ¶ 39, *cited in Straub I*, 921 F. Supp. 2d at 262.)

Discovery has since demonstrated the paucity of evidence in this regard, revealing only five emails that satisfy the SEC's description, including two emails received by Balogh, one sent by him, and no emails sent or received by Straub or Morvai. (*See* Def. 56.1 ¶¶ 3–4.) Although the SEC's cross motion for summary judgment maintains that even Balogh's single email routed through a United States server satisfies the jurisdictional element for all Defendants (*see* SEC Opp'n at 13–14), the SEC also advances an alternative theory not raised at the pleading stage – specifically, that Defendants used an instrumentality of interstate commerce by "participating in the preparation of falsified SEC filings that were posted to and accessible from the SEC's EDGAR internet web site" (SEC Mem. at 31). In response, Defendants argue that the SEC has failed to support the theory with legal authority (though Defendants cite none of their own) and that disputed facts preclude summary judgment on this issue. (Def. Opp'n at 25; Def. Reply at 7–9.) The Court disagrees.

The SEC's reliance on Magyar's EDGAR filings to satisfy the jurisdictional element raises two legal issues. The first is whether making such filings constitutes use of an instrumentality of interstate commerce, and it is easily answered. The Internet unquestionably constitutes an "instrumentality of interstate commerce." *Straub I*, 921 F. Supp. 2d at 262; *see also United States v. Konn*, 634 F. App'x 818, 821 (2d Cir. 2015) ("the Internet is a channel and instrumentality of interstate commerce"); *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1054 (10th Cir. 2008) (same); *United States v. Sutcliffe*, 505 F.3d 944, 953

(9th Cir. 2007) (same); *United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007) (same); *United States v. MacEwan*, 445 F.3d 237, 245 (3d Cir. 2006) (same); *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004) (same). And if that is true of the Internet generally, it is especially true here, where the website in question is one registered to the SEC and accessible to would-be investors and the public at large. Consequently, the Court has little difficulty concluding that a company uses an instrumentality of interstate commerce when it files documents publicly on the EDGAR website. *See SEC v. Stanard*, No. 06-cv-7736 (GEL), 2009 WL 196023, at *25 (S.D.N.Y. Jan. 27, 2009) (noting that defendant used "the [I]nternet (including e-mail and electronic SEC filings) to communicate with others regarding the . . . fraud"); *SEC v. Ramoil Mgmt., Ltd.*, No. 01-cv-9057 (SC), 2007 WL 3146943, at *8 (S.D.N.Y. Oct. 25, 2007) (defendant's use of EDGAR "qualifie[d] as an instrumentality of interstate commerce"); *SEC v. Solucorp Indus., Ltd.*, 274 F. Supp. 2d 379, 419 (S.D.N.Y. 2003) (use of Internet to disseminate false and misleading SEC filings satisfied interstate commerce requirement). Thus, based on the undisputed evidence, there can be no doubt that Magyar itself clearly used an instrumentality of interstate commerce (the Internet) when it made filings through EDGAR.

The second question is to what extent Defendants, who were senior officers of Magyar during the relevant period (SEC 56.1 ¶¶ 2–4), may be said to have "used" an instrumentality of interstate commerce by reason of Magyar's filings with the SEC. Courts have interpreted this jurisdictional element liberally in other contexts and have held that, in addition to direct use, it is sufficient if the defendant merely "act[s] 'with knowledge that'" the use of an

instrumentality of interstate commerce "'will follow in the ordinary course of business,'" or that "'such use can reasonably be foreseen, even though not actually intended.'" *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006) (quoting *Pereira v. United States*, 347 U.S. 1, 8–9 (1954)). Moreover, although the Supreme Court first articulated this foreseeability-based inquiry in *Pereira v. United States*, a mail fraud case, courts have since applied it in the contexts of wire fraud, *see, e.g.*, *Reifler*, 446 F.3d at 96, and securities law violations, *see, e.g.*, *United States v. Wolfson*, 405 F.2d 779, 783–84 (2d Cir. 1968), including civil actions under the securities laws, *see SEC v. Boock*, No. 09-cv-8261 (DLC), 2011 WL 3792819, at *17 (S.D.N.Y. Aug. 25, 2011) (citing *Wolfson*); *SEC v. Novus Techs., LLC*, No. 07-cv-235 (TC), 2010 WL 4180550, at *11 (D. Utah Oct. 20, 2010) (citing *Pereira*), *aff'd sub nom. SEC v. Thompson*, 732 F.3d 1151 (10th Cir. 2013); *cf. SEC v. Rana Research, Inc.*, 8 F.3d 29, 1993 WL 445101, at *4 (9th Cir. 1993) ("setting forces in motion which foreseeably result in use of mails will suffice as use of instrumentality of commerce" (citing *United States v. MacKay*, 491 F.2d 616, 619 (10th Cir. 1973))); *Alley v. Miramon*, 614 F.2d 1372, 1379–80 (5th Cir. 1980) (citing *MacKay* and holding that a letter "written on [defendant's] encouragement" and regulatory filings made by the defendant's company through the mails both satisfied the jurisdictional element as to defendant); *see also* 8 Louis Loss *et al.*, *Securities Regulation* 505 (4th ed. 2012) ("[I]t suffices to show that the defendant . . . might reasonably have foreseen that [use of the mails] would occur." (collecting cases)).

Whether *Pereira*'s foreseeability inquiry also applies to the jurisdictional element in the FCPA's anti-bribery provisions appears to be a matter of first impression, but the outcome is hardly in doubt. To be sure, the

wording of the FCPA's jurisdictional element differs from some other provisions of the securities laws, in which the jurisdictional element is phrased as the required means by which the offense is furthered. *See, e.g.*, 15 U.S.C. § 77l(a)(2) ("Any person who . . . offers or sells a security . . . *by the use of* any means or instruments of transportation or communication in interstate commerce or of the mails . . . ." (emphasis added)); 15 U.S.C. § 78j(b) ("It shall be unlawful for any person, directly or indirectly, *by the use of* any means or instrumentality of interstate commerce or of the mails . . . ." (emphasis added)).  In contrast, the wording of the FCPA suggests that the "use" of an instrumentality is the actionable conduct, and not merely a jurisdictional hook. *See* 15 U.S.C. § 78dd-1(a) ("It shall be unlawful for [a person] . . . *to make use of* the mails or any means or instrumentality of interstate commerce . . . ." (emphasis added); *see also* 8 Loss *et al.*, *supra*, at 497–98 & n.6 (discussing the "differences in the phraseology that is used to connect the jurisdictional elements with the substantive content" of the securities laws and observing that "[a]ll of these variations may result in nuances of construction").  Nevertheless, the Second Circuit has construed another provision under the securities laws that employs the same phrasing as the FCPA's anti-bribery provisions and found *Pereira* applicable.  Specifically, construing Section 5(a)(1) of the Securities Act of 1933, which makes it unlawful for any person, "directly or indirectly . . . *to make use of* any means or instruments of transportation or communication in interstate commerce or of the mails to sell [an unregistered] security," 15 U.S.C. § 77e(a)(1) (emphasis added), the Second Circuit has held that it too amounts to an adoption of *Pereira*'s foreseeability rule and reflects Congress's intent "to exert its power to the full constitutional extent

permitted by the commerce clause and the postal clause." *Wolfson*, 405 F.2d at 783.

In light of the Second Circuit's holding in *Wolfson*, the Court concludes that the *Pereira* foreseeability rule should also apply to the FCPA's jurisdictional element, under the canon of statutory construction that, absent evidence of congressional intent to the contrary, courts should interpret identical language in different parts of a statutory scheme consistently.  *See CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 290 (2d Cir. 2011) (where "the pertinent language of . . . two sections is identical, . . . harmonization of interpretation is normally necessary"); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) ("[T]he normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning." (internal quotation marks omitted)); *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears.").  Thus, for purposes of the FCPA's anti-bribery provisions, as with the jurisdictional elements of other securities law provisions, a defendant "make[s] use of the mails or any means or instrumentality of interstate commerce," 15 U.S.C. § 78dd-1(a), if he "'act[s] with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended,'" *Wolfson*, 405 F.2d at 783–84 (quoting *Pereira*, 347 U.S. at 8–9).

Applying that rule to the case at hand, there can be no genuine dispute that Magyar's filings with the SEC were a foreseeable consequence of Defendants' actions.  Specifically, in the months leading up to the filing of the Annual Report on May 11, 2005 – the period in which Defendants were allegedly negotiating the Protocol of

Cooperation and the Non Paper, Magyar's "give" and "get" in the bribery scheme – Straub made various written representations to PwC asserting that he was not aware of any violations of the law or fraud involving Magyar's management. (*See* SEC 56.1 ¶¶ 17, 19, 20, 22, 23.) Balogh similarly reported no unlawful conduct to Magyar's accounting department in connection with PwC's audit. (*See id.* ¶¶ 34–37.) Straub, Balogh, and Morvai continued to make these allegedly false representations and supporting representations through 2005 and into 2006, in connection with the filing of Magyar's quarterly earnings reports. (*See, e.g.*, *id.* ¶¶ 27–28, 42–43, 51.) Moreover, on May 11, 2005, Straub signed a certification to be filed with Magyar's Annual Report, which stated that he had disclosed to PwC "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Magyar's] internal control over financial reporting." (*Id.* ¶ 24.) And it was without question foreseeable to Balogh and Morvai – senior executives who periodically submitted their own representations in support of Magyar's financial reporting – that Straub, the company's senior-most executive, would be submitting a certification of this nature in support of the Annual Report. Magyar's Annual Report, including Straub's certification and PwC's clean audit opinion, was ultimately filed on May 11, 2005 on EDGAR, and Magyar's 3Q 2005 Quarterly Report was ultimately filed on November 9, 2005 on EDGAR, where these documents became (and remain) available via the Internet to United States investors.[3] In light

of these facts, there can be no genuine dispute that Defendants "'act[ed] with knowledge that,'" "'in the ordinary course of business,'" Magyar would be filing reports with the SEC reflecting both management's and PwC's assurance (whether explicit or implicit) that Magyar was not engaged in illegal activity. *See Wolfson*, 405 F.2d at 783–84 (quoting *Pereira*, 347 U.S. at 8–9). At the very least, Defendants should have reasonably foreseen such filings. *Id.* Thus, the SEC is entitled to summary judgment on the issue of whether Defendants used an instrumentality of interstate commerce.

Of course, the parties hotly dispute whether these filings were made in furtherance of a bribery scheme. Defendants deny the existence of any scheme (*see* Def. Counter 56.1 ¶¶ 57–82 (discussing the Protocol of Cooperation), 83–98 (discussing contracts with the Greek consultant); Def. Reply at 7–9 (arguing that the SEC's bribery claims rely "entirely and impermissibly on wholly conclusory and unsubstantiated allegations")), and even the SEC concedes that "there remain disputed issues of fact as to defendants' bribe scheme" (SEC Mem. at 15). These issues

---

[3] At oral argument, Defendants contended that Straub's Sarbanes-Oxley certification cannot support the jurisdictional element because it was made only with respect to the fiscal year ended December 31, 2004, which predated the scheme, and therefore could not have furthered that scheme. (*See* Tr. at 62–64.) But the face of the filing does not support that temporal limitation. Indeed, although some

paragraphs of the certification are qualified by an "as of" date, *see, e.g.*, Annual Report Ex. 12.1 ¶ 3 (certifying the Annual Report's accuracy "as of, and for, the periods presented in th[e] report"), the certification as to fraud is not qualified in this manner. This is hardly surprising, since the SEC and investors would presumably be interested in knowing whether those with a "significant role in the [c]ompany's internal control over financial reporting" were engaged in fraud *at the time of the financial reporting*, which necessarily would take place months after the earnings period. *Id.* Ex. 12.1 ¶ 5. Even if the Court accepted Defendants' argument, however, it would be no defense as to the other representations to PwC and supporting representations relating to Magyar's interim financial filings made well after the alleged scheme was underway.

will be resolved at trial, but the use of an instrumentality of interstate commerce cannot be debated.[4]

### C.  Statute of Limitations

Defendants also move for summary judgment on the ground that the statute of limitations has run on all of the SEC's claims. (Def. Mem. at 15.) The parties agree that, because the FCPA contains no statute of limitations, to the extent any statute of limitations applies to the SEC's claims, it is the catch-all limitations period set forth in 28 U.S.C. § 2462. (*Id.*; SEC Opp'n at 19.) Section 2462 provides as follows:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462. In denying Defendants' motion to dismiss based on the statute of limitations, the Court held that "[t]he operative language in [Section] 2462 requires, by its plain terms, that an offender must be physically present in the United States for the statute of limitations to run." *Straub I*, 921 F. Supp. 2d at 260. And although the SEC did not dispute at the motion to dismiss stage that five years had elapsed since its claims first accrued, there

was no allegation that Defendants were physically located within the United States at any point during the limitations period. *Id.* Accordingly, the Court held that the statute of limitations had not run on the SEC's claims because, as the SEC argued, "Defendants were not 'found' in this country at any point during the limitations period in question." *Id.* Discovery has since revealed, however, that, despite the SEC's allegations at the pleading stage, two of the defendants – Straub and Morvai – *were* physically present in the United States in 2005. Specifically, Straub traveled to New York and Boston during the week of September 6, 2005 (Def. 56.1 ¶ 1), and Morvai traveled to San Francisco on June 23, 2005 and, on a separate trip, to New York on October 21, 2005 on his way to Connecticut (*id.* ¶ 2). These undisputed facts require the Court to now consider what effect, if any, these visits have on the running of Section 2462's statute of limitations.

### 1.  Applicability of Section 2462 to the Remedies Sought by the SEC

To begin with, portions of all of the SEC's claims would survive any interpretation of Section 2462's limitations period because not all of the remedies the SEC seeks are subject to Section 2462, which applies only to an action for the enforcement of "any civil fine, penalty, or forfeiture, pecuniary or otherwise." 28 U.S.C. § 2462. Here, the SEC seeks three forms of relief:  (1) an injunction prohibiting Defendants from violating various provisions of the Exchange Act and rules promulgated thereunder, (2) disgorgement of "all ill-gotten gains wrongfully obtained as a result of [Defendants'] illegal conduct, plus prejudgment interest," and (3) civil penalties. (Compl. at 17–18.) The statute explicitly covers civil penalties and plainly does not cover injunctive relief.

---

[4] Accordingly, the Court need not address the SEC's alternative theory that Balogh's email, which was routed through servers in the United States, satisfies the jurisdictional element as to all Defendants.

As to the latter point, the Court recognizes that the Fifth Circuit, in an unreported opinion, held that an injunction that would "permanently enjoin the [d]efendants from violating any securities laws and bar the [d]efendants from serving as officers or directors at any public company" would be punitive rather than preventative because it "would have a stigmatizing effect and long-lasting repercussions" and would not "address[] past harm allegedly caused by the [d]efendants" or "address the prevention of future harm in light of the minimal likelihood of similar conduct in the future." *SEC v. Bartek*, 484 F. App'x 949, 956 (5th Cir. 2012). As Judge Scheindlin explained in *SEC v. Wyly*, however:

> [M]any forms of equitable relief intended to "undo prior damage or protect the public from future harm" will be perceived as the subject of the injunction as punitive. However, an injunction under the securities laws requires demonstrating a "cognizable danger of recurrent violation." In other words, the primary purpose of the injunction cannot be to penalize – it must be to protect against future harm. As such, the statute of limitations question merges with the substantive requirements for obtaining an injunction under the securities laws – if the substantive claim is viable, then it is, by definition, not subject to a statute of limitations.

950 F. Supp. 2d 547, 558 (S.D.N.Y. 2013) (footnotes omitted). Moreover, in the Second Circuit, "the SEC must 'go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence.'" *Id.* at 558 (quoting *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978)). Thus, Defendants'

assertions that they are unlikely to work for an issuer of securities in the United States in the future (Def. Mem. at 33–34) do not support their argument that the injunctive relief sought by the SEC is really a penalty covered by Section 2462; rather, these assertions would be relevant in determining whether the SEC has met the requirements for an injunction. Stated differently, if the SEC is entitled to injunctive relief here, that relief would not be covered by Section 2462. Accordingly, the Court rejects the reasoning of the Fifth Circuit and finds that the SEC's claims for injunctive relief are not subject to Section 2462's five-year limitations period.

The only reasonably disputed application of Section 2462 here pertains to disgorgement, which Defendants argue is not meaningfully different from civil forfeiture and is therefore covered by the statute. (*Id.* at 32–34.) "While the Second Circuit has not addressed the issue of whether disgorgement constitutes a civil forfeiture, it has specifically held that, due to its remedial nature, disgorgement does not constitute a penalty," *SEC v. Wyly*, 56 F. Supp. 3d 394, 402 (S.D.N.Y. 2014) ("*Wyly II*") (citing *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 n.8 (2d Cir. 2013)), "and is not analogous to *criminal* forfeiture," *id.* (citing *SEC v. Contorinis*, 743 F.3d 296, 306–07 (2d Cir. 2014)). Thus, as noted previously in this action, "'the great weight of the case law in this jurisdiction' supports the conclusion that disgorgement is 'exempted from [S]ection 2462's limitations period.'" *Id.* at 402–03 (quoting *Straub II*, 2013 WL 4399042, at *5, which in turn quotes *SEC v. Kelly*, 663 F. Supp. 2d 276, 286 (S.D.N.Y. 2009) (collecting cases)).

Nevertheless, Defendants have submitted as supplemental authority the Eleventh Circuit's recent decision in *SEC v. Graham*, in which the court "agree[d] with

the district court that for the purposes of [Section] 2462 forfeiture and disgorgement are effectively synonyms" and accordingly held that Section 2462's statute of limitations "applies to disgorgement." 823 F.3d 1357, 1363–64 (11th Cir. 2016). The court observed that there is no "meaningful difference" between the dictionary definitions of "disgorgement" and "forfeiture" (both involve defendants turning over money or property because of wrongdoing, the Supreme Court has used the terms interchangeably, and, even under the SEC's characterization of the two terms – specifically, that "disgorgement only includes direct proceeds from wrongdoing, whereas forfeiture can include both ill-gotten gains and any additional profit earned on those ill-gotten gains (i.e., secondary profits)" – disgorgement would be a "subset of forfeiture" and thus covered by Section 2462. *Id.*

While the *Graham* court's reasoning is logical, the Second Circuit has construed disgorgement as an expansive equitable remedy, *see generally Contorinis*, 743 F.3d at 301–07, and, as noted above, the weight of the authority in this jurisdiction holds that disgorgement, being a traditional equitable remedy, is not covered by Section 2462, *see Wyly II*, 56 F. Supp. 3d at 402. The Court declines, absent clearer guidance from the Second Circuit, to depart from this authority. Thus, for the reasons stated above, the Court concludes that Section 2462 does not apply to the SEC's claims to the extent those claims seek injunctive relief or disgorgement – it applies only to the SEC's claims for penalties.

2. Meaning of Section 2462's Requirement that the Offender Be Present in the United States "Within the Same Period"

Next, the Court must determine whether Straub's and Morvai's trips to the United States in 2005 affect the application of Section 2462 as to those defendants. To do so, the Court must first interpret Section 2462's requirement that actions within its scope be "commenced within five years from the date when the claim first accrued if, within the same period, the offender . . . is found within the United States in order that proper service may be made thereon." 28 U.S.C. § 2462. At the pleading stage, the Court ruled that "found within the United States" means "physically present" within the United States and construed the phrase "if, within the same period, the offender . . . is found within the United States" as the statute's "operative language," and the phrase "in order that proper service may be made thereon" as a "statement of purpose" that "might 'resolve an ambiguity in the operative clause'" but "'does not limit or expand the scope of the operative clause.'" *Straub I*, 921 F. Supp. 2d at 260 (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 577–78 (2008)). In light of these prior rulings by the Court, the parties' cross motions on the statute of limitations issue center on what "within the same period" means.

"Legislative interpretation begins with the plain text of the statute and, where the text is unambiguous, also ends there because the 'judicial inquiry is complete.'" *Alcantara v. Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 751 F.3d 71, 77 (2d Cir. 2014) (quoting *Hedges v. Obama*, 724 F.3d 170, 189 (2d Cir. 2013)); *accord Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). The Court finds that the plain terms of Section 2462 establish a five-year limitations period that begins to run on the date the subject claim accrues, and applies only if, at some point within that five-year period, the defendant is physically present within the United States. By following its articulation of a limitations period with the word "if," Section 2462

plainly conditions the application of the statute on the language that follows:   the presence of the offender in the United States "within the same [five-year] period."   The meaning of "within" as used in this latter clause is likewise clear.   The word "within" can mean "before the end" of (e.g., "troops would be withdrawn [within] two years after the end of the war"), "at any time during" (e.g., "died [within] the year of our redemption four hundred twenty-six"), or "not exceeding in quantity or degree" (e.g., "lived [within] his income").   *See Webster's Third New International Dictionary* 2627 (2002).   "Within" does not mean, under any definition known to the Court, "for the duration of" or "for the entirety of."   For that reason and others set forth below, the Court rejects the SEC's view that the limitations period "tolls" for any period while a defendant is absent from the United States. Thus, the Court finds that the language of the statute compels application of a strict five-year period even if the defendant's presence is only fleeting; however, it does not apply at all to a defendant who is absent from the United States for the entire five-year period, even if that defendant later returns to the United States.

The parties' briefs and the Court's own research have identified only a minuscule number of cases discussing Section 2462's requirement of a defendant's physical presence.   However, early case law interpreting Section 2462's precursor, the Act of February 28, 1839, ch. 36 § 4, 5 Stat. 321, 322 (the "1839 Act"), which differs only slightly from Section 2462, *see 3M Co. v. Browner*, 17 F.3d 1453, 1461–62 (D.C. Cir. 1994), is at least consistent with the Court's interpretation of Section 2462 as conditioning the application of the limitations period on defendant's physical presence at some point during (but not for the entire duration of) the five-year period. *See McGlinchy v. United States*, 16 F. Cas.

118, 121 (C.C.D. Me. 1875) (No. 8803) (the 1839 Act's limitations provision "would afford a remedy if the accused . . . was out of the jurisdiction of the court *during the whole period of the limitation*" (emphasis added)); *United States v. Brown*, 24 F. Cas. 1263, 1264 (D. Mass. 1873) (No. 14,665) ("[T]he proviso [in the 1839 Act] means, that in suits for pecuniary penalties there must have been, within the five years, an *opportunity* for personal service on the defendant . . . within the same period." (emphasis added)), *quoted in Carter v. New Orleans & N.E.R. Co.*, 143 F. 99, 101 (5th Cir. 1906); *see also United States v. Maillard*, 26 F. Cas. 1140, 1141 (S.D.N.Y. 1871) (No. 15,709) (holding that the 1839 Act's limitations period "shall not be operative unless the state of things named in the proviso shall exist, as to finding the person of the offender . . . within the United States, within the five years, so as to serve process").

By contrast, the parties' competing interpretations of Section 2462 can claim neither support from the statute's text nor consistency with what limited case law exists.   Defendants' preferred reading is that Section 2462 sets a five-year period within which the SEC must both (1) commence an action, *and* (2) serve the defendant.   (*See* Def. Mem. at 27 ("[T]he suit must be filed within five years, and service on the defendant or defendants must be made 'within the same period.'").)   The Court sees no basis in the statute's plain language for this interpretation, which would read the phrase "if, within the same period" as "*and*, within the same period"; in other words, Defendants assert that Section 2462 imposes not a limitations period with certain conditions, but a limitations period *and* a concurrent deadline for service.   Moreover, the Court does not see how it could interpret "found within the United States in order that proper service may be made thereon" as

imposing a service requirement without also finding that the statute requires such service to be made "within the United States" – a significant curtailment of the Court's long-arm jurisdiction that Defendants fail to reconcile with their proffered reading. (*See* Def. Reply at 13 (taking the seemingly inconsistent positions that "found within the United States" imposes a service requirement but that service need not be made "within the United States").) The Court accordingly rejects Defendants' interpretation.

The SEC's preferred interpretation fares no better. Specifically, the SEC asserts that "the statute runs only while a defendant can be found within the United States" (SEC Mem. at 26 (capitalization removed)), and that it tolls whenever the defendant is absent from the United States. The text of Section 2462, however, simply does not support that interpretation. To begin with, the statute contains none of the language typically associated with tolling provisions, such as references to a period being "tolled," "suspended," "excluded," "extended," or "enlarged." (*See* Def. Mem. at 21-23 (collecting tolling provisions from Defendants' impressive survey of 135 federal statutes of limitations).) The fact that Section 2462's language has barely changed since the 1839 Act, *see 3M*, 17 F.3d at 1461–62, cannot be blamed for this absence, as clear tolling language can be found even in contemporaries of the 1839 Act. *See, e.g.*, Act of June 22, 1874, ch. 391 § 22, 18 Stat. 186, 190 (providing that "[t]he time of the absence from the United States of [a] person subject to [a] penalty or forfeiture . . . *shall not be reckoned* within th[e] period of limitation" applicable to penalty actions under the customs laws (emphasis added)); Act of July 11, 1862, ch. 139 § 1, 12 Stat. 530, 531 (providing that limitations period for suits against sureties of postmasters "*shall not be considered as*

*running* in any State or part thereof, the inhabitants whereof have been by proclamation of the President declared in a state of insurrection, during the time the insurrection shall continue" (emphasis added)); Act of Apr. 30, 1790, ch. 9 § 32, 1 Stat. 112, 119 (setting limitations period for criminal fines and forfeitures and providing that "*nothing herein contained shall extend* to any person or persons fleeing from justice" (emphasis added)).

Moreover, the Court's own research has revealed virtually no cases even suggesting, much less holding, that Section 2462's limitations period tolls while a defendant is absent from the United States.[5] On the other hand, the early cases cited above at least suggest that the 1839 version of the statute did not toll. *See also United States v. One Dark Bay Horse*, 130 F. 240, 241–42 (D. Vt. 1904) (in case involving condemnation of property, analyzing both a Section 2462 predecessor and the 1874 customs limitations provision cited above, and considering whether there was "any concealment or absence of the property for any time" only in computing the limitations period under the customs statute). The SEC nevertheless argues that because some courts have noted that the "first ancestor to Section 2462 may have been" the 1790 criminal statute cited above (the "1790 Act"), Section 2462 should be read as "[r]etaining a similar proviso . . . that a limitations period should not run for a person beyond the reach of justice." (SEC

---

[5] The only case reaching that conclusion did so with no analysis whatsoever. *See United States v. Rutherford Oil Corp.*, 756 F. Supp. 2d 782, 788–89 (S.D. Tex. 2010) (stating that "[t]he fact that [Section] 2462 includes a provision for tolling limitations if the defendant is absent from the United States . . . , but does not include any provision for tolling based on the discovery rule, also weighs against applying the discovery rule").

Opp'n at 22.) But, as is clear from the statutes' language, the 1790 Act set a limitations period that excepted "persons fleeing from justice," while the 1839 Act contained no such language, and none of the cases cited by the SEC suggest that the 1839 Act imported the 1790 Act's "fleeing from justice" tolling; at most they note that the 1839 Act superseded the 1790 Act with respect to certain actions. *See United States v. Cook*, 84 U.S. (17 Wall.) 168, 173 (1872) (noting that "part of the [1790 Act] ha[d] been superseded by" the 1839 act); *Stimpson v. Pond*, 23 F. Cas. 101, 101–02 (C.C.D. Mass. 1855) (No. 13,455) (considering to what extent the 1839 Act superseded the 1790 Act); *United States v. Platt*, 27 F. Cas. 546, 550 (S.D.N.Y. 1840) (No. 16054A) (noting that "[t]he act of 1839 may very properly be considered" as extending from two to five years the limitations period for the "class of cases" covered by the 1790 Act, as that class was construed in *Adams v. Woods*, 6 U.S. (2 Cranch) 336 (1805)).

The Court also rejects the SEC's argument that, because the tolling provisions collected by Defendants and identified above show that, "[w]hen Congress enacts tolling provisions, it does so using a staggering variety of verbal formulations" (SEC Opp'n at 26 & n.6), Section 2462 should also be read to include such a provision. Varied as they may be, these tolling formulations nevertheless are clear articulations of the same concept – namely, the stopping or starting or exclusion of time – and their mere variety does not permit the Court to disregard the fact that the words in Section 2462 are categorically dissimilar to every tolling provision identified by the parties.

Because the Court's interpretation of Section 2462 is neither Defendants' nor the SEC's first choice, both sides have also presented passionate policy arguments for their respective theories. While "it is a sufficient answer to say" that Congress chose the words it chose, *see ASARCO LLC v. Goodwin*, 756 F.3d 191, 201–02 (2d Cir. 2014) (noting that it did not matter whether plaintiff had proposed "the most logical triggering event for the statute of limitations" because Congress chose a different date), the Court in any event finds the parties' policy arguments to be unfounded. For their part, Defendants argue that interpreting Section 2462 to in some cases preclude repose would be incompatible with the Supreme Court's holding in *Gabelli v. SEC*, 133 S. Ct. 1216 (2013), issued shortly after this Court's ruling on Defendants' motion to dismiss. But in that case, the Supreme Court simply held that the language of Section 2462 does not support applying a "discovery rule" to the determination of when a claim "first accrued." *See id.* at 1221. After considering the statutory language and the policy grounds supporting limitations periods, the Supreme Court found no "textual, historical, or equitable reason[]" to apply a discovery rule to a government penalty action covered by Section 2462. *Id.* at 1224. In discussing the policy rationale against doing so, the Supreme Court noted:

> Chief Justice Marshall used particularly forceful language in emphasizing the importance of time limits on penalty actions, stating that it "would be utterly repugnant to the genius of our laws" if actions for penalties could "be brought at any distance of time." *Adams v. Woods*, [6 U.S. (2 Cranch) 336, 342 (1805)]. Yet grafting the discovery rule onto [Section] 2462 would raise similar concerns.

*Id.* at 1223. Relying on this language, Defendants argue that any reading of Section 2462 that would allow for indefinite

tolling or delay would be inconsistent with *Gabelli* and "utterly repugnant to the genius of our laws." (Def. Mem. at 17–19.) The argument is absurd, however, as it ignores the fact that Congress has enacted potentially indefinite tolling provisions in other statutes. *See, e.g.*, 19 U.S.C. § 1621 (tolling while an offender of the customs laws is "absen[t] from the United States"); 26 U.S.C. § 6531 (tolling while an offender of the internal revenue laws is "outside the United States"). Similarly, the argument ignores the Supreme Court's acknowledgement in *Gabelli* that "Congress has expressly required [discovery rule] inquiries in some statutes." *Gabelli*, 133 S. Ct. at 1224. Unremarkably, the *Gabelli* Court merely concluded that it "ha[d] no mandate from Congress" to apply a discovery rule to a government penalty action covered by Section 2462. *See id.* Here, by contrast, the Court's interpretation rests on the plain terms of Section 2462, and *Gabelli*'s holding with respect to the discovery rule and its dictum cited by Defendants are accordingly irrelevant in light of Congress's mandate.

The SEC, meanwhile, expresses concern that, without tolling, "an offender could cause the entire five-year statutory period to run just by setting foot in the United States for a fleeting moment." (SEC Mem. at 28.) This concern appears overstated, as the SEC seemingly could avoid this outcome by filing its complaint within the limitations period, since doing so generally suffices to "commence" an action bringing claims under federal law, even if the defendant is abroad (or beyond the reach of ordinary service of process). *See West v. Conrail*, 481 U.S. 35, 39 (1987) (citing Fed. R. Civ. P. 3, which provides that "[a] civil action is commenced by filing a complaint with the court"); *see also* Charles Alan Wright & Arthur R. Miller *et al.*, 4 *Federal Practice and Procedure* § 1056 (4th ed.) ("If the

federal statute is silent as to when the statute of limitations is tolled, then the absence of a statutory standard – and the desire to maintain uniformity of procedure – would make the test for commencement in Rule 3 applicable."). Of course, the SEC would ultimately have to serve process, but while the Federal Rules typically require service within ninety days of filing, that time limit "does not apply to service in a foreign country under Rule 4(f)," Fed. R. Civ. P. 4(m), and the SEC likely would need only to show that it was endeavoring to serve process under Rule 4(f) to avoid dismissal, *see USHA (India), Ltd. v. Honeywell Int'l, Inc.*, 421 F.3d 129, 133–34 (2d Cir. 2005) (Rule 4(f) exception for service in a foreign country "does not apply" if plaintiff makes no attempt to serve defendant in a foreign country); *Mentor Ins. Co. (U.K.) v. Brannkasse*, 996 F.2d 506, 512 (2d Cir. 1993) (same); *Montalbano v. Easco Hand Tools, Inc.*, 766 F.2d 737, 740 (2d Cir. 1985) (same). Thus, despite the SEC's protestations, the Court seriously doubts that its interpretation of Section 2462 will become a "roadmap for abuse" that rewards defendants who flee the United States or plan fleeting trips here to trigger the statute of limitations. (SEC Reply at 8; *see also* SEC Mem. at 28; SEC Opp'n at 28.)

It also bears noting that neither of the parties' proposed interpretations of Section 2462 would both eliminate an offender's incentive to avoid service *and* completely achieve the oft-stated purpose of limitations periods to "'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'" *Gabelli*, 133 S. Ct. at 1221 (quoting *R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348–49 (1944)). And although such considerations may inform the Court's analysis of the words chosen by Congress, to the extent the

plain language of those words creates an imbalance between the interests of law enforcement and the need for repose, it is Congress's role, not the Court's, to correct that balance. Similarly, while the Court also recognizes that Section 2462 intersects awkwardly with today's methods of serving process internationally, it is likewise Congress's role, not the Court's, to modernize the statute.

For the foregoing reasons, the Court finds that actions covered by Section 2462 are subject to a five-year statute of limitations that applies if the defendant is present in the United States at any time during that five-year period, which begins to run on the date the subject claim accrued and does not toll while the defendant is absent from the United States. The Court also finds that the limitations period does not apply at all if the defendant is not present in the United States at any point during the five-year period. Accordingly, Balogh, whom the parties agree was never in the United States at any point, cannot avail himself of the limitations period. As to the other two defendants, however, Straub's trip to the United States in September 2005 (Def. 56.1 ¶ 1) and Morvai's trips to the United States in June and October 2005 (*id.* ¶ 2) triggered the five-year statute of limitations for any of the SEC's claims that accrued *before* those trips. And because the SEC initiated this action on December 29, 2011 – more than five years after the accrual of any claims that accrued before Straub's and Morvai's trips – those claims are time-barred by Section 2462. By contrast, any claims that accrued *after* Straub's and Morvai's trips would not be subject to Section 2462's limitations period, since neither Straub nor Morvai would have been present in the United States during the five-year periods applicable to those later-accruing claims.

### 3. When the SEC's Claims "First Accrued"

In light of the conclusions above, the Court addresses whether any of the SEC's claims accrued after Straub's and Morvai's trips. Construing Section 2462, the Supreme Court held in *Gabelli* that "a right accrues when it comes into existence"; "[t]hus the 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action.'" 133 S. Ct. at 1220. Applying this rule to the SEC's books and records and false statements to auditors claims, it is clear that portions of those claims are not time-barred because they accrued after Straub's and Morvai's trips to the United States in 2005.[6] Specifically, with respect to its books and records claim, the SEC alleges that Defendants improperly recorded "sham" consulting contracts as late as 2006. (Compl. ¶¶ 29, 32–33, 41; *see also* SEC Opp'n at 30 ("Defendants are charged with books and records violations based on the improper recording in 2006 of sham contracts used to mask the bribe payments.").) And with respect to its false statements to auditors claim, the SEC identifies representations made by Straub in October 2005, November 2005, and January 2006 (SEC 56.1 ¶¶ 27–29) – all after Straub's September 2005 trip to the United States – and a supporting representation made by Morvai in January 2006, well after his October 2005 trip (*id.* ¶¶ 54–56). Thus, some alleged violations of the FCPA's books and records and false statements to auditors provisions occurred after Straub's and Morvai's trips, and so counts three through five of the second amended complaint are not barred by Section 2462's limitations period.

---

[6] As a reminder, none of the SEC's claims are time-barred to the extent they seek injunctive relief or disgorgement, or as they pertain to Balogh.

As for the SEC's bribery claims, the analysis is more complicated. The SEC argues that their bribery claims survive because "[D]efendants promised a series of bribe payments that would continue until June 2006," and "the resulting payments were made via sham contracts as late as May 30, 2006." (SEC Opp'n at 29–30.) While Defendants dispute that the SEC may proceed under this scheme theory (Def. Opp'n at 16–20), neither party addresses whether the date a defendant pays a bribe is actually the date a bribery claim "accrues" under the FCPA. Based on a plain reading of the statute – which states that it is unlawful for a covered person "to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of" a bribe, 15 U.S.C. § 78dd-1 – the triggering act for the running of the limitations period, i.e., the act that would give the SEC "a complete and present cause of action," *Gabelli*, 133 S. Ct. at 1220, would appear to be the "use of the mails," not the payment or offer of payment of the bribe itself. Certainly the statute would not support a claim brought *before* a defendant used the mails.

To decide the instant motions, however, the Court need not resolve the issue, as the SEC has identified both a use of the mails (the filing of Magyar's 3Q 2005 Quarterly Report in November 2005) *and* a payment of a bribe (in May 2006) that postdate Straub's and Morvai's trips to the United States. Thus, one way or another, some alleged violation of the FCPA's anti-bribery provisions occurred after Straub's and Morvai's trips, and so counts one and two of the second amended complaint are not barred by Section 2462's limitations period.

While any violations that accrued after Straub's and Morvai's trips are not time-barred, the Court rejects the SEC's argument that, because it alleges a bribery "scheme" that "began in 2005 and continued well into 2006," the so-called "continuing violation" doctrine tolled Section 2462's limitations period as to all of the alleged violations until the conclusion of the alleged scheme in 2006. (SEC Opp'n at 29.) The continuing violation doctrine is an exception to the general rule of accrual that applies to claims "'composed of a series of separate acts that collectively constitute one unlawful . . . practice'" – usually involving "claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment" – and does not apply to "discrete unlawful acts, even where those discrete acts are part of a 'serial violation[ ].'" *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)). Where the doctrine applies, "the limitations period begins to run when the defendant has 'engaged in enough activity to make out an actionable . . . claim.'" *Id.* (citing *Morgan*, 536 U.S. at 117). Typically, courts apply the doctrine in employment discrimination cases under Title VII where some, but not all, of the conduct amounting to discrimination falls within the limitations period. *See, e.g.*, *Morgan*, 536 U.S. at 118. The Second Circuit has also extended the doctrine to Eighth Amendment claims brought under 42 U.S.C. § 1983 (*see Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009)), and to unlawful takings claims also under Section 1983 (*see Sherman v. Town of Chester*, 752 F.3d 554, 566–67 (2d Cir. 2014)). The common thread among these cases is episodic or continuing conduct that, *in the aggregate*, constitutes a violation, where a single discrete act may not have. The effect of the continuing violation doctrine is to allow recovery based on the entire course of conduct, including those acts that fall outside the limitations period, so long as the plaintiff "allege[s] . . . some

non-time-barred acts contributing to the alleged violation." *Gonzalez*, 802 F.3d at 220 (internal quotation marks omitted).

Although the terms of Section 2462 do not appear to categorically preclude application of the continuing violation doctrine, *see, e.g.*, *Kelly*, 663 F. Supp. 2d at 287–288 (applying Section 2462 to securities fraud violations); *Cornerstone Realty, Inc. v. Dresser Rand Co.*, 993 F. Supp. 107, 115 (D. Conn. 1998) (rejecting the argument that the phrase "first accrued" in Section 2462 forecloses the application of the continuing violation doctrine), the doctrine is a poor fit for the alleged violations here – repeated, discrete uses of the mails and offers and payments of bribes. *Cf. In re Comverse Tech.*, *Inc. Sec. Litig*., 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008) (noting that the "weight of authority in [the Second Circuit] is skeptical of the application of the continuing violations doctrine in securities fraud cases"); *de la Fuente v. DCI Telecommc'ns, Inc.*, 206 F.R.D. 369, 385–86 (S.D.N.Y. 2002) ("It is not at all clear that the continuing fraud doctrine applies in securities fraud cases."). Application of the continuing violation doctrine to Section 2462 is further called into question, at least in the SEC enforcement context, by the Supreme Court's decision in *Gabelli*, which, as discussed above, rejected the application of the discovery rule (which, like the continuing violation doctrine, is an exception to the general rule of accrual) to Section 2462. *See Gabelli*, 133 S. Ct. at 1221–24. The Court thus rejects the SEC's argument that it may pursue FCPA violations that occurred outside of the limitations period simply on the basis that those violations were similar in character to and part of the same alleged "scheme" as violations that occurred within the limitations period.

For the reasons stated above, the Court concludes that claims for civil penalties against Straub and Morvai that accrued before those defendants' trips to the United States are time-barred by Section 2462, since the SEC would have had to bring those claims by, at the latest, October 2010 (five years after Morvai's second trip), and the SEC did not file this action until December 29, 2011 (Doc. No. 1). The SEC's remaining claims, however, are not time-barred. Accordingly, the parties' summary judgment motions on the statute of limitations issue are both granted in part and denied in part.[7]

### D. SEC's Motion for Partial Summary Judgment on Its Books and Records and False Statement Claims

The Court now turns to the SEC's motion for summary judgment on certain portions of its claims under SEC Rules 13b2-1 (books and records) and 12b2-2 (false statements to auditors), and finds that disputed issues of fact exist as to both claims that preclude summary judgment.

#### 1. Falsification of Magyar's Books and Records

The SEC seeks summary judgment on its claim that "Balogh and Morvai falsified Magyar Telekom's books and records by signing a backdated letter authorizing an in-house lawyer to execute two backdated consulting contracts," in violation of SEC Rule 13b2-1.[8] (SEC Mem. at 35.) Rule 13b2-1 provides that "no person shall, directly or indirectly, falsify or cause to be

---

[7] Of course, evidence of conduct and acts that predate October 2005 may still be admissible at trial to prove the existence of the scheme, its background, and the knowledge and intent of the Defendants.

[8] The SEC also brings this claim against Straub, but does not seek summary judgment as to Straub.

falsified, any book, record, or account" subject to the Exchange Act's reporting provisions. 17 C.F.R. § 240.13b2-1. While scienter is not required, *SEC v. McNulty*, 137 F.3d 732, 740–41 (2d Cir. 1998), the SEC must "'demonstrate that [a defendant] knew of facts that contradicted the substance of the reported accounting,'" *SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 394 (S.D.N.Y. 2014) (quoting *SEC v. Espuelas*, 767 F. Supp. 2d 467, 476 (S.D.N.Y. 2011)).

The SEC argues that the undisputed facts reflect that Balogh and Morvai signed a letter to an in-house lawyer, authorizing him to revise contracts between Maktel (Magyar's Macedonian subsidiary) and a Greek intermediary to make Stonebridge (Magyar's holding company for Maktel) the contracting party instead of Maktel. (SEC Mem. at 37.) The SEC contends that these documents were falsified because they concerned purported success-fee based contracts that were executed *after* the success elements had already been achieved. (*Id.*) The authorization letter bears the date May 31, 2005, but was signed a few months later, after August 30, 2005. (*Id.*) According to the SEC, the associated contracts were likewise backdated to June 1, 2005. (*Id.*) The SEC argues that "[t]he drafting history of the . . . contracts and the letter authorizing them leaves no doubt that the dates were carefully chosen to misrepresent when the documents were signed and when the agreements were entered." (*Id.* at 38.) The SEC contends that, although "[t]he defendants may dispute whether the contracts served as a vehicle for the laundering of bribe payments, . . . they cannot pretend that they signed the authorization letter in the reasonable belief that it accurately reflected the underlying transaction." (*Id.*)

The Court finds that disputed issues of fact exist as to the propriety of the authorization letter that turn on the credibility of witness testimony. As noted above, while the SEC cites the drafting history of the letter and testimony to argue that the document was backdated (*id.* at 37–38), Defendants cite testimony stating that the written contracts simply memorialized prior oral agreements (Def. Opp'n at 27). The only undisputed fact is that the date indicated on the letter predated the creation of the letter by approximately three months (*see* SEC 56.1 ¶¶ 91–94), but that does not necessarily prove that, by backdating the letter, Balogh or Morvai created a "false" document in violation of Rule 13b2-1. Rather, that fact could also support a conclusion that, as Defendants contend, the document memorialized a prior oral agreement, and that the document's date accurately reflected the "effective" date of that oral agreement. Ultimately, resolving these conflicting explanations is a task for the jury. Accordingly, the Court denies the SEC's motion for summary judgment on its Rule 13b2-1 claim against Balogh and Morvai.

### 2. False and Misleading Statements to Magyar's Auditor

The SEC also seeks summary judgment on its claim that Straub and Balogh violated SEC Rule 13b2-2 by falsely certifying to PwC that "all financial and accounting records and related data have been made available" and that they were "not aware of any accounts, transactions or material agreements not fairly described and properly recorded" in the company's books and records.[9] (SEC Mem. at 38.) According to the SEC, "[t]hese representations were false

---

[9] The SEC also brings this claim against Morvai, but does not seek summary judgment as to Morvai.

because [Straub and Balogh] had both signed the Protocol of Cooperation and had deliberately excluded the document from Magyar['s] . . . official files, leaving it instead in the hands of their Greek payment intermediary." (*Id.* at 38–39.) Rule 13b2-2 provides that "[n]o director or officer of an issuer shall, directly or indirectly . . . make or cause to be made a materially false or misleading statement to an accountant in connection with" an audit, review, or SEC filing. 17 C.F.R. § 240.13b2-2(a). Like Rule 13b2-1, Rule 13b2-2 does not require scienter. *McNulty*, 137 F.3d at 740–41.

The SEC argues that Straub and Balogh knew that the Protocol of Cooperation was a material transaction or agreement and that it was purposefully excluded from Magyar's books and records, rendering their representations to PwC false and misleading. (SEC Mem. at 41–42.) Defendants argue that there are disputed issues of fact as to the "fundamental nature and impact of" the Protocol, "as well as whether that document was actually material." (Def. Opp'n at 29.) Defendants argue that the Protocol was "merely an informal framework designed to provide a roadmap for the resolution of various disputes that had arisen between the two largest shareholders of Maktel," Magyar and the Macedonian government, and that, "[c]onsistent with this, the objectives set forth in the Protocol could not be achieved without action being undertaken by other entities that were not parties to the Protocol itself," for example, the payment of a dividend to Maktel's shareholders, which would require board approval. (*Id.* at 34, 36–39.)

As with the SEC's motion on its Rule 13b2-1 claim, there are disputed issues of fact preventing summary judgment on its Rule 13b2-2 claim, principally, the purpose and import of the Protocol. For example, the SEC cites testimony from Straub that the

Protocol was "important" and set forth reciprocal obligations between Magyar and the Macedonian government (SEC Mem. at 42), while Defendants cite testimony, also from Straub, that the Protocol was merely a "good faith start to solve a problem," a "wish list," or a "memorandum of understanding" (Def. Opp'n at 34). In light of these inconsistencies, the Court cannot determine as a matter of law that the Protocol of Cooperation was sufficiently formal or material that Defendants were required to disclose it to PwC. Moreover, it is difficult to square the SEC's contention that the Protocol of Cooperation constituted a quid pro quo between Magyar and Macedonian officials (SEC Mem. at 41–42) with the SEC's concession that "there remain disputed issues of fact as to defendants' bribe scheme" (*id.* at 15). Thus, while Defendants do not appear to dispute that the Protocol was not provided to PwC, issues of fact regarding the Protocol's significance and effect require denial of the SEC's summary judgment motion on its Rule 13b2-2 claim.

## IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Defendants' motion for summary judgment is granted to the extent it seeks dismissal on statute of limitations grounds of any claims for civil penalties against Straub that accrued before his trip to the United States in September 2005 and against Morvai that accrued before his trip to the United States in October 2005; Defendants' motion is otherwise denied. IT IS FURTHER ORDERED THAT THE SEC's motion for partial summary judgment is granted to the extent it seeks rulings that the Court may exercise personal jurisdiction over Defendants, that Defendants used an instrumentality of interstate commerce, and that at least some portion of each count of the second amended complaint is not time-

barred; the SEC's motion is otherwise denied. The Clerk of the Court is respectfully directed to terminate the motions pending at docket numbers 229 and 233.

The parties are reminded that trial in this matter is scheduled to commence on Monday, May 8, 2017 at 9:30 a.m. in Courtroom 905 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. The Court will set deadlines for pretrial submissions in a forthcoming order.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated:  September 30, 2016
        New York, New York

                *       *       *

The SEC is represented by Robert I. Dodge, Thomas A. Bednar, John D. Worland, Jr., and Adam J. Eisner of the United States Securities and Exchange Commission, 100 F Street, N.E., Washington, DC 20549.

Elek Straub is represented by Robert B. Buehler and Lisa J. Fried of Hogan Lovells US LLP, 875 Third Avenue, New York, NY 10022, and Carl S. Rauh of Hogan Lovells US LLP, Columbia Square, 555 Thirteenth Street, NW, Washington, DC 20004.

András Balogh is represented by William M. Sullivan, Jr., and Thomas C. Hill of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, DC 20037.

Tamás Morvai is represented by Michael L. Koenig and Victoria P. Lane of Hinckley, Allen & Snyder LLP, 30 South Pearl Street, Suite 901, Albany, NY 12207.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/30/16_